IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re:  MUSHROOM DIRECT PURCHASER<br>          ANTITRUST LITIGATION<br><br>This Document Relates to:<br>          All Actions | )<br>)<br>)<br>)<br>)<br>)<br>)       Master File No. 06-CV-0620 |

# <u>O R D E R</u>

AND NOW, this         day of                    , 2006, upon consideration of Defendants'

Motion to Dismiss All Complaints and the responses thereto, it is hereby **ORDERED** that the

motion is **GRANTED** and these consolidated actions are **DISMISSED**, pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief

can be granted.

**IT IS SO ORDERED.**


_____
THOMAS N. O'NEILL, JR., J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re:  MUSHROOM DIRECT PURCHASER )
ANTITRUST LITIGATION )
)
) Master File No. 06-CV-0620
This Document Relates to: )
All Actions )
)

## MOTION TO DISMISS ALL COMPLAINTS

Defendants move to dismiss all complaints in these consolidated actions for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), as explained in the accompanying memorandum of law.

s/ William A. DeStefano
William A. DeStefano, Esquire
Rudolph Garcia, Esquire
Terr Pawelskii, Esquire
Buchanan Ingersoll & Rooney P.C.
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Telephone: (215) 665-8700

and

H. Laddie Montague, Jr., Esquire
Martin I. Twersky, Esquire
Keith J. Verrier, Esquire
Berger & Montague P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3010

(Counsel for Defendants Eastern
Mushroom Marketing Cooperative, Inc.,
Robert A. Feranto, Jr. t/a Bella Mushroom
Farms, Brownstone Mushroom Farms,
Inc., Brownstone Farms, Inc., Brownstone
Mushroom Farm, To-Jo Fresh
Mushrooms, Inc., Cardile Mushrooms,
Inc., Cardile Bros. Mushrooms Packaging,
Country Fresh Mushroom Co., Forest
Mushroom Inc., Franklin Farms, Inc.,

Gino Gaspari & Sons, Inc., Gaspari
Mushroom Co., Inc., Gaspari Bros. Inc.,
Giorgi Mushroom Company, Giorgio
Foods, Inc., Harvest Fresh Farms, Inc.,
Kaolin Mushroom Farms, Inc., South Mill
Mushroom Sales, Inc., LRP Mushrooms
Inc., LRP-M Mushrooms LLC, Leone
Pizzini and Son, Inc., Modern Mushroom
Farms, Inc., Sher-Rockee Mushroom
Farm, LLC, C & C Carriage Mushroom
Co., Oakshire Mushroom Farm, Inc.,
Phillips Mushroom Farms, Inc., Louis M.
Marson, Jr., Inc., Monterey Mushrooms,
Inc., United Mushroom Farms
Cooperative, Inc., John Pia and Michael
Pia)

s/ Donald M. Barnes
Donald M. Barnes, Esquire
Salvatore A. Romano, Esquire
Porter Wright Morris & Arthur LLP
1919 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006-3434
Telephone: (202) 778-3000

(Counsel for Defendant Eastern
Mushroom Marketing Cooperative, Inc.)

s/ Barbara Sicalides           
Barbara Sicalides, Esquire
Barak Bassman, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Steets
Philadelphia, PA  19103-2799
Telephone:  (215) 981-4783

(Counsel for Defendant Creekside
Mushrooms)

s/ Francis P. Newell           
Francis P. Newell, Esquire
Harkins Cunningham LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103
Telephone: (215) 851-6700

(Counsel for Defendant Kitchen Pride
Mushrooms, Inc.)

Dated: July 31, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re:  MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) |
| This Document Relates to:<br>    All Actions | ) ) ) ) |

Master File No. 06-CV-0620

# MEMORANDUM OF LAW BY DEFENDANTS
## IN SUPPORT OF MOTION TO DISMISS ALL COMPLAINTS

William A. DeStefano, Esquire
Rudolph Garcia, Esquire
Terri Pawelski, Esquire
Buchanan Ingersoll & Rooney P.C.
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Telephone: (215) 665-8700

and

H. Laddie Montague, Jr., Esquire
Martin I. Twersky, Esquire
Keith J. Verrier, Esquire
Berger & Montague P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3010

(Counsel for Defendants Eastern
Mushroom Marketing Cooperative, Inc.,
Robert A. Feranto, Jr. t/a Bella Mushroom
Farms, Brownstone Mushroom Farms,
Inc., Brownstone Farms, Inc., Brownstone
Mushroom Farm, To-Jo Fresh
Mushrooms, Inc., Cardile Mushrooms,
Inc., Cardile Bros. Mushrooms Packaging,
Country Fresh Mushroom Co., Forest
Mushroom Inc., Franklin Farms, Inc.,
Gino Gaspari & Sons, Inc., Gaspari
Mushroom Co., Inc., Gaspari Bros. Inc.,

Giorgi Mushroom Company, Giorgio
Foods, Inc., Harvest Fresh Farms, Inc.,
Kaolin Mushroom Farms, Inc., South Mill
Mushroom Sales, Inc., LRP Mushrooms
Inc., LRP-M Mushrooms LLC, Leone
Pizzini and Son, Inc., Modern Mushroom
Farms, Inc., Sher-Rockee Mushroom
Farm, LLC, C & C Carriage Mushroom
Co., Oakshire Mushroom Farm, Inc.,
Phillips Mushroom Farms, Inc., Louis M.
Marson, Jr., Inc., Monterey Mushrooms,
Inc., United Mushroom Farms
Cooperative, Inc., John Pia and Michael
Pia)

Donald M. Barnes, Esquire
Salvatore A. Romano, Esquire
Porter Wright Morris & Arthur LLP
1919 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006-3434
Telephone: (202) 778-3000

(Counsel for Defendant Eastern
Mushroom Marketing Cooperative, Inc.)

Barbara Sicalides, Esquire
Barak Bassman, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Steets
Philadelphia, PA  19103-2799
Telephone:  (215) 981-4783

(Counsel for Defendant Creekside
Mushrooms)

Francis P. Newell, Esquire
Harkins Cunningham LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103
Telephone: (215) 851-6700

(Counsel for Defendant Kitchen Pride
Mushrooms, Inc.)

Dated: July 31, 2006

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ...................................................................................................1

II.  Background Facts and Procedural History .........................................................3

    A.  The Government's Civil Action ....................................................................3

    B.  The Averments of the DOJ Complaint .......................................................5

    C.  The Money's Bankruptcy Proceeding and Sale of Non-Operating Farms.......................6

    D.  The Averments of the Complaints..............................................................9

III. ARGUMENT......................................................................................................11

    A.  Standard of Review ...................................................................................11

        1.  Strict Scrutiny Is Required. ...........................................................12

        2.  External Documents May Be Considered. ......................................13

        3.  Conclusory Allegations Should Be Disregarded............................14

    B.  Defendants Are Immune from Antitrust Liability Under the Cooperative Exemption.........15

        1.  Statutory Bases of the Exemption .................................................16

        2.  Legislative and Related History .....................................................18

        3.  Judicial Interpretation of the Exemption........................................19

        4.  The Conduct Alleged by Plaintiffs Is Protected Under the Cooperative Exemption.............21

        5.  Plaintiffs' Conclusory Statements Are Insufficient, as a Matter of Law, to Negate the Cooperative Exemption. ..........................24

            a.  Plaintiffs' Conclusory Statement that Certain Unnamed EMMC Members Are Not Farmers Is Insufficient to Avoid the Cooperative Exemption.................25

            b.  Plaintiffs' Conclusory Allegation of Coercion or a Group Boycott Is Insufficient to State a Claim. ..........................27

    C.  Plaintiffs Have No Antitrust Standing.......................................................29

        1.  Plaintiffs Failed to Plead a Causal Connection. .......................30

        2.  Plaintiffs Failed to Plead Antitrust Injury. ..................................31

        3.  Plaintiffs' Claims of Injury are Speculative...........................34

    D.  Plaintiffs' Conspiracy Claims Must Be Dismissed Because They Fail to Plead the Plurality of Actors Necessary to Support Such a Claim..................................35

E.   Plaintiffs' Claims for Monopolization or Attempted Monopolization Should Be Dismissed Because a Relevant Market Has Not Been Properly Defined. ..........................................................................42

  1.   The Purported Product Market Is Insufficient. .......................................43

  2.   The Purported Geographic Markets Are Insufficient..............................45

F.   A Claim Has Not Been Stated for Attempted Monopolization......................................46

  1.   There Was No Specific Intent to Monopolize...........................................47

  2.   There Was No Dangerous Probability of Achieving Monopoly Power..........................................................................................................48

G.   A Claim Has Not Been Stated for Unlawful Acquisition of Assets Under Section 7 of the Clayton Act. ...........................................................................52

  1.   Plaintiffs' Claim Against the Member Defendants Ignores the Express Language of Section 7. ................................................................53

  2.   Plaintiffs' Section 7 Claim Against the EMMC also Is Fatally Flawed. ......................................................................................................56

IV.   CONCLUSION.........................................................................................................57

**TABLE OF AUTHORITIES**

**CASES**

Alexander v. NFO, 687 F.2d 1173 (8th Cir. 1982)............................................................. 22, 23, 24

Allen-Myland v. IBM Corp., 33 F.3d 194 (3d Cir. 1994) ............................................................. 44

Alpern v. Cavarocchi, C.A. No. 98-3105, 1999 WL 257695 (E.D. Pa. April 28,
    1999) ............................................................... 12, 15, 25, 26, 29, 31, 50

April v. National Cranberry Assoc., 168 F. Supp. 919 (D. Mass. 1958).................................... 37

Ashkanazy v. I. Rokeach & Sons, 757 F. Supp. 1527 (N.D. Ill. 1991) ....................................... 49

Associated Gen. Contractors of Cal., Inc. v. California State Counsel of
    Carpenters, 459 U.S. 519 (1983) ............................................................... 12, 30

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) ............................................ 32

Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224 (10th Cir. 2003) ........................... 22, 37, 42, 55

Bergjans Farm Dairy v. Sanitary Milk Producers, 241 F. Supp. 476 (E.D. Mo.
    1965), aff'd, 368 F.2d 679 (8th Cir. 1966) ............................................................... 20, 21

Borough of Lansdale v. Philadelphia Electric Co., 692 F.2d 307 (3d Cir. 1982)........................ 50

Brokerage Concepts v. U.S. Healthcare, Inc., 140 F.3d 494 (3d Cir. 1998) .......................... 42, 44

Brown Shoe Co. v. United States, 370 U.S. 294 (1962)............................................................... 44

Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp.2d 550 (E.D. Pa. 2002)...... 12, 27, 28, 29

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) ......................................... 32

Buck v. The Hampton Township School Dist., 452 F.3d 256, 260 (3d Cir. 2006) ..................... 13

Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449 (9th Cir. 1967) ................................ 41

Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384 (1968) .............................................. 41

City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998)................ 30, 31, 34, 35

Commonwealth of Pa. v. PepsiCo, Inc., 836 F.2d 173 (3d Cir. 1988) 12, 13, 15, 25, 26, 27, 28, 29

Cooper v. Broadspire Services, Inc., No. Civ. A. 04-5289, 2005 WL 1712390
    (E.D. Pa. July 20, 2005)............................................................... 15, 53

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)............................ 36, 37, 38

Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d
    129 (3d Cir. 1998)............................................................... 50

Donahue v. Gavin, No. Civ. A. 98-1602, 1999 WL 165700, at *2 (E.D. Pa. Mar.
    12, 1999) ............................................................... 14

Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105 (3d Cir. 1980) ......................... 35

Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001)........................................................... 43, 45

Ewald Bros., Inc. v. Mid-America Dairymen, Inc., 877 F.2d 1384 (8th Cir. 1989) .............. 22, 23

Fairdale Farms v. Yankee Milk, Inc., 635 F.2d 1037 (2d Cir. 1980) ........................ 22, 24, 40, 47

Friedman v. Delaware County Memorial Hosp., 672 F. Supp. 171 (E.D. Pa. 1987) .................. 36

Garshman v. Universal Resources Holding, Inc., 824 F.2d 223 (3d Cir. 1987) .............. 26, 29, 37

Graham v. Avella Area School Dist., No. 02:05cv1344, 2006 WL 1669881 (W.D.
    Pa. 2006) ............................................................................................. 14

Gregory v. Fort Bridger Rendezvous Ass'n, 448 F.3d 1195 (10th Cir. 2006) ........................... 22

GVF Cannery, Inc. v. California Tomato Growers Ass'n, 511 F. Supp. 711 (N.D.
    Cal. 1981).............................................................................................. 24

Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993)..................................................... 27, 28

Hishon v. King & Spalding, 467 U.S. 69 (1984) ................................................................. 12

Holly Sugar v. Goshen County Coop. Beet Growers Ass'n, 725 F.2d 564 (10th
    Cir. 1986) .............................................................................................. 23

In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198 (3d Cir. 2002)..................... 15

In re The Loewen Group Inc., No. Civ. A. 98-6740, 2003 WL 22436233 (E.D. Pa.
    July 16, 2003) ......................................................................................... 14

In re Washington Crab Ass'n, 66 F.T.C. 45 (1964)........................................................... 18, 23

International Rys. of Cent. Am. v. United Brands Co., 532 F.2d 231 (2d Cir.
    1976) ...................................................................................................... 55

Kinnett Dairies, Inc. v. Dairymen, Inc., 512 F. Supp. 608 (M.D. Ga. 1981), aff'd
    715 F.2d 520 (11th Cir. 1983) ......................................................... 22, 23, 24, 47

Kost v. Kozakiewicx, 1 F.3d 176 (3d Cir. 1993)................................................................. 12

Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) ....................................................... 11

Maryland and Virginia Milk Producers Assoc., Inc. v. United States, 362 U.S.
    458 (1960) ....................................................................... 17, 20, 21, 22, 38

National Broiler Marketing Ass'n v. United States, 436 U.S. 816 (1978) ................................ 18

Nicolette v. Caruso, 315 F. Supp. 2d 710 (W.D. Pa. 2003)................................................... 13

Nova Designs, Inc. v. Scuba Retailers Ass'n, 202 F.3d 1088 (9th Cir. 2000) ........................... 36

Pastore v. Bell Telephone Co., 24 F.3d 508 (3d Cir. 1994) ................................................... 46

Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 998 F.2d
    1192 (3d Cir. 1993)................................................................................. 14

Pontius v. Children's Hosp., 552 F. Supp. 1352 (E.D. Pa. 1982)........................................... 36

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997)............... 43, 46, 48

Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995)............................... 44

Rossi v. Standard Roofing, Inc., 156 F.3d 452 (3d Cir. 1998) ............................................... 35

Russello v. United States, 464 U.S. 16 (1983) .......................................................... 54

Savage v. Bonavitacola, No. Civ. A. 03-0016, 2005 WL 568045 (E.D. Pa. Mar. 9, 2005) .................................................................................................................. 15

Sheet Metal Duct, Inc. v. Lindab, Inc., No. Civ. A. 99-6299, 2000 WL 987865 (E.D. Pa. July 18, 2000) .................................................................................... 13

Stark v. Ear, Nose & Throat Specialists of Northwestern Pa., P.C., No. 05-2345, 2006 WL 1371571 (3d Cir. May 19, 2006) .............................................. 35, 37

Steinberg v. Guardian Life Ins. Co. of Am., 486 F. Supp. 122 (E.D. Pa. 1980) ......... 13

Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., 200 F.3d 307 (5th Cir. 2000) ......................................................................................................... 36

Tim W. Koerner & Assoc., Inc. v. Aspen Labs, Inc., 492 F. Supp. 294 (S.D. Tex. 1980), aff'd, 683 F.2d 416 (5th Cir. 1982) ...................................................... 53

Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998) ................... 51

Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc., 497 F.2d 203 (9th Cir. 1974) ............................................................................................. 20, 24

United States v. Borden, 308 U.S. 188 (1939) ............................................ 20, 38, 39, 42

United States v. Grinnell Corp., 384 U.S. 563 (1966) ................................................. 47

United States v. Marine Bancorporation, Inc., 418 U.S. 602 (1974) ........................... 56

United States v. Maryland & Virginia Milk Producers Ass'n, 167 F. Supp. 45 (D.D.C. 1958) ..................................................................................................... 39

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004) ........................................................................................................... 47

## STATUTES

12 U.S.C. § 1141 ......................................................................................................... 17

12 U.S.C. § 1141(a) ..................................................................................................... 17

15 Pa. C.S. § 1526 ....................................................................................................... 55

15 Pa. C.S. § 5552(a) ................................................................................................... 55

15 Pa. C.S. § 7102 ....................................................................................................... 55

15 U.S.C. § 1 ................................................................................................................ 11

15 U.S.C. § 15(a) ......................................................................................................... 29

15 U.S.C. § 17 ........................................................................................................ 16, 38

15 U.S.C. § 18 .............................................................................................. 11, 42, 52, 56

15 U.S.C. § 18a(d)(2)(B) ............................................................................................. 33

15 U.S.C. §§ 18a(c)(12) ............................................................................................... 57

15 U.S.C. §§ 18a(d)(2)(B) ......................................................................................... 57

15 U.S.C. §§ 521-522 ............................................................................................... 18

7 U.S.C. § 291 ............................................................................................................ 3

## OTHER AUTHORITIES

3A PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 807f (2d ed.
    2002) ....................................................................................................... 49

5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357
    (3d ed. 2004) ........................................................................................... 14

60 Cong. Rec. 312 (1920) ......................................................................................... 18

61 Cong. Rec. 2058 (1922) ....................................................................................... 18

62 Cong. Rec. 2225 (1922) ....................................................................................... 18

62 Cong.Rec. 2058 (1922) ........................................................................................ 24

American Heritage Dictionary of English Language 12 (1973) ................................. 54

Black's Law Dictionary 25 (8th ed. 2004) ................................................................. 54

D. Frederick, Antitrust Status of Farmer Cooperatives:  The Story of the Capper-
    Volstead Act (USDA Cooperative Information Report 59, 2002) ................... 19

David W. Cobia, Cooperatives in Agriculture, 7 (Prentice Hall 1989) ...................... 55

Dunn, et al., Agricultural Cooperatives in the 21st Century, USDA Rural
    Business-Cooperative Service, Cooperative Information Report 60 (2002) ................... 19

J. Iskow & R. Sexton, Bargaining Associations in Grower-Processor Markets for
    Fruits and Vegetables, USDA-ACS Research Report No. 4 (Mar. 1992) ................ 23, 24

Merriam-Webster online dictionary, available at http://www.m-w.com/dictionary/ .................. 54

Peggy Trowbridge, Mushroom Facts, Selection and Storage, at
    http://homecooking.about.com/cs/foodfactsheets/p/mushroom_pro_p.htm ................... 45

R. Posner, Economic Analysis of Law (Little Brown 1986) .................................... 2, 33

S. Rep. No. 236, 67th Cong., 1st Sess. (1921) .......................................................... 24

The New Oxford American Dictionary 14 (2d ed. 2005) ........................................... 54

USDA National Agricultural Statistics Service, 2005 - 2006 Statistical Highlights
    of U.S. Agriculture, at http://www.nass.usda.gov/Publications/Statistical_
    Highlights/2006/stathighnar.htm ............................................................... 33, 48

Webster's New Collegiate Dictionary 10 (1980) ...................................................... 54

## RULES

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 10

**REGULATIONS**

15 C.F.R. § 802.2(g) ................................................................................................................... 57

**MEMORANDUM OF LAW BY DEFENDANTS**
**IN SUPPORT OF MOTION TO DISMISS ALL COMPLAINTS**

Defendants submit this memorandum in support of their Motion to Dismiss All Complaints in these consolidated actions.

## I.   INTRODUCTION

These actions seek to impose liability against the Eastern Mushroom Marketing Cooperative (the "EMMC") and 35 alleged members and officers and affiliates of members of the EMMC (collectively, the "Member Defendants") for a myriad of alleged antitrust violations by attempting to overcome their statutory immunity with little more than conclusory statements and wishful thinking. The actions are based primarily on a one-count civil complaint filed by the United States Department of Justice ("DOJ") against only the EMMC stemming from its purchase of certain non-operating mushroom farms and the filing of deed restrictions preventing those farms from producing mushrooms in the future. The EMMC was able to settle that case with the DOJ, and thereby avoid protracted and expensive litigation, by simply agreeing to remove the deed restrictions because they had no past or present impact on competition.

Nevertheless, Plaintiffs have filed these actions which expand the theories of recovery beyond the DOJ's contentions by asserting unsupportable claims for monopolization and unlawful acquisition and claims against the Member Defendants. Plaintiffs' claims are meritless on their face for a number of reasons.

The nub of each of Plaintiffs' claims is that the EMMC and the Member Defendants collectively or concertedly agreed to fix prices.[1] (Class Compl. ¶¶ 1, 3, 62, 89, 98, 106; Publix

---

[1]   Price-fixing and reduction of output are inextricably intertwined as pointed out by Professor and Judge Posner: "A contract among competing sellers to fix the price of the product they sell (or, what is

Compl. ¶¶ 79, 86.) However, that conduct is specifically protected by the special antitrust exemption afforded to agricultural cooperatives.

The complaints admit that the EMMC is an agricultural cooperative, the members of which grow, produce and sell mushrooms. (Class Compl. ¶ 9; Publix Compl. ¶ 64.) Plaintiffs also admit that there is a statutory antitrust exemption for agricultural cooperatives, including the EMMC. (Class Compl. ¶¶ 91, 99; Publix Compl. ¶ 14.) However, the complaints contain no factual allegations that negate the overarching antitrust immunity enjoyed by the EMMC and rely instead on mere conclusory assertions. Defendants should not be forced to proceed with protracted discovery and litigation, with its associated enormous costs, based on such unsupported allegations.

Plaintiffs' claims are deficient because: (1) the conclusory assertions purporting to establish violations of Section 1 and 2 of the Sherman Act, Section 7 of the Clayton Act and the non-application of the cooperative exemption fail to meet the applicable pleading requirements; (2) Plaintiffs lack standing and have failed to allege the prerequisite antitrust injury—injury of the type the antitrust laws were designed to prevent—because the alleged overcharges and price-fixing injury are exempt, are speculative and cannot constitute antitrust injury; (3) the conspiracy counts fail because the EMMC and the Member Defendants constitute a single entity as a matter of law; (4) the monopoly claims fail to properly allege that Defendants engaged in predatory acts and have market power in properly defined relevant product and geographic markets; and (5) Plaintiffs' unlawful acquisition claim fails to allege that the Member Defendants acquired

---

the same thing, to limit their output) is like any other contract in the sense that the parties would not sign it unless they expected to make them all better off." R. Posner, Economic Analysis of Law at 265 (Little Brown 1986). Thus, the exemption subsumes both sides of the same coin.

anything, and that the acquisitions by the EMMC injured competition in a properly defined relevant market.

## II.     BACKGROUND FACTS AND PROCEDURAL HISTORY

The EMMC, now known as the American Mushroom Cooperative, is a Pennsylvania, non-profit, agricultural cooperative formed in early 2001. From its inception, its membership has been comprised exclusively of mushroom farmers who are entitled to the exemptions from the antitrust laws provided by Section 6 of the Clayton Act, 15 U.S.C. § 17, and Section 1 of the Capper-Volstead Act, 7 U.S.C. § 291.

By the end of 2001, about 20 mushroom farmers had joined the EMMC (including two other cooperatives composed of small "mom and pop" mushroom farmers). Since that time, however, the EMMC's membership and market share have substantially declined. At present, only 12 of the EMMC's initial members remain.

### A.     The Government's Civil Action

As noted above, the genesis of these actions was a civil complaint filed against the EMMC in this district on December, 16, 2004 by the Antitrust Division of United States Department of Justice ("DOJ Complaint"), challenging certain deed restrictions filed on non-operating mushroom farms.[2] At the same time the DOJ also filed a stipulation by the parties to enter a proposed final judgment, and a competitive impact statement.[3] These filings ended an 18-

---

[2]     See App. Tab 1. As explained in Section III.A.2 below, the Court may consider the DOJ Complaint and related filings in ruling on this motion to dismiss, because they are relied upon by Plaintiffs' complaints here and are public records. (Class Compl. at 6; Publix Compl. ¶ 66.) For the convenience of the Court, all such pertinent external documents are included in the accompanying Appendix by Defendants in Support of Motion to Dismiss All Complaints.

[3]     See App. Tabs 2-4.

month civil investigation during which the EMMC's membership activities, its qualification as an antitrust-exempt entity and its marketing practices were all scrutinized by the DOJ.

The proposed final judgment required only that deed restrictions imposed by the EMMC on six parcels of real estate be removed and that the EMMC impose no similar deed restrictions on other properties. It also provided that it shall not constitute any evidence against or admission by any party regarding any issue of fact or law. In the competitive impact statement, the DOJ was careful to avoid any claim that the challenged activity had any past or present impact on competition, and merely pointed out that the removal of the deed restrictions will allow actual or potential mushroom farmers to have access to mushroom producing properties in the future.

The statutory comment period expired in late May 2005 with only one anonymous comment, which the DOJ deemed to be non-meritorious. The DOJ filed a response to the comment[4] on June 27, 2005 and a motion for entry of the proposed final judgment with a supporting memorandum[5] on August 24, 2005. The Final Judgment[6] was entered on September 9, 2005. It provides that, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, the EMMC shall file documents nullifying deed restrictions placed on six properties acquired by the EMMC and for the next ten years, shall refrain from filing deed restrictions on any real property in which the EMMC has any ownership or leasehold interest. However, the EMMC had already removed the deed restrictions on the six properties in February, 2005.

---

[4]     See App. Tab 5.

[5]     See App. Tab 6.

[6]     See App. Tab 7.

**B.      The Averments of the DOJ Complaint**

The DOJ Complaint admitted that the EMMC is organized pursuant to the Capper-Volstead Act, 7 U.S.C. § 291, under which farmers have immunity from the antitrust laws.[7] Nevertheless, the DOJ alleged that the EMMC violated Section 1 of the Sherman Act by imposing deed restrictions in 2001 and 2002 on six parcels of real property that the EMMC had acquired or optioned and in some cases sold shortly after their acquisition.[8] The DOJ's claims were disputed, but were never tested or addressed by the Court, because of the parties' stipulated settlement for inconsequential relief (removal of deed restrictions that were having no effect anyway).

What the DOJ did not allege is also significant. For example, unlike Plaintiffs in these consolidated actions, the DOJ did not make any claims against the Member Defendants. Nor did the DOJ claim that the EMMC monopolized, attempted to monopolize or conspired to monopolize any relevant product or geographic market. Nor did the DOJ allege any violation of Section 7 of the Clayton Act. Moreover, in its complaint filed in late 2004, the DOJ did not allege that the EMMC's so-called "Supply Control Campaign" caused any actual, past or present antitrust injury or had any impact on the prices charged by the EMMC to its customers (who are the plaintiffs in the instant actions). Rather, the DOJ Complaint alleged only that the EMMC's alleged violation "*likely will* have the following [adverse] effects [on competition]. . . ."[9] Significantly, however, the deed restrictions which, under the DOJ's theory, were "likely" to adversely impact competition some time after December of 2004, were removed by the EMMC two months later in February of 2005. Indeed, the competitive impact statement filed by the

---

[7]      See App. Tab 1 (DOJ Compl. ¶¶ 2, 29 and 33).

[8]      See App. Tab 1 (DOJ Compl. ¶¶ 5 and 18-26, 30-31).

[9]      See App. Tab 1 (DOJ Compl. ¶ 34) (emphasis added).

Antitrust Division simultaneously with the DOJ Complaint noted that the EMMC's agreement to void the deed restrictions "will preserve competition," not that it would restore competition.[10]

**C.      The Money's Bankruptcy Proceeding and Sale of Non-Operating Farms.**

Both the DOJ and Plaintiffs failed to allege that any of the farms at issue were actually producing any mushrooms or were even likely to produce mushrooms in the future. In fact, both the DOJ and Plaintiffs here acknowledged that the EMMC acquired the two Evansville farms from "a land developer not connected to the mushroom industry." (See Class Compl. ¶ 67; Publix. Compl. ¶ 51.) In addition, the DOJ admitted that all four farms in Texas, Georgia and Pennsylvania (including Evansville) were not in operation at the time they were acquired by the EMMC.[11] Moreover, public filings in the United States Bankruptcy Court for the District of Delaware[12] confirm that several of those properties would not have been used for mushroom farming whether or not they were acquired by the EMMC.

In 2000, Money's Foods U.S. Inc. and related companies ("Money's") filed for protection from creditors under Chapter 11 of the federal Bankruptcy Code.[13] At that time, Money's was a large grower and marketer of fresh Agaricus mushrooms with several mushroom farms located in Canada and nine farms located in Dublin, GA, Hillsboro, TX, West Chicago, IL,

---

[10]     See App. Tab 2 at 7.

[11]     See App. Tab 5 at 2.

[12]     Although it is not essential for the Court to rely on the bankruptcy documents in order to grant this motion, the Court may consider such public filings without converting the motion to dismiss into a motion for summary judgment. See Section III.A.2 below.

[13]     In Re Money's Financial LLC, Money's (US) Partnership, Money's Foods U.S. Inc., and North American Spawn, Inc., United States Bankruptcy Court for the District of Delaware, Chapter 11 Case Nos. 00-4096 through 00-4099.

Jackson, OH, Evansville, PA (2 farms), Napoleon, OH, Howe, IN, Pescadero, CA and Fentonville, MI.

In a motion filed in the Bankruptcy Court,[14] Money's represented that it had purchased the Dublin, GA farm (which was later sold to the EMMC) from Vlassic Foods Co. several years earlier but was never able to use it for mushroom production. Thus, it is apparent that the Dublin, GA farm had been closed and non-operational for at least three years before it was acquired by the EMMC.

In the same motion, Money's also represented to the Bankruptcy Court that prior to filing its Chapter 11 petition, it had closed five of its farms located in Hillsboro, TX, West Chicago, IL, Jackson, OH and two farms located in Evansville, PA, and, at least since the bankruptcy filing, had engaged in substantial efforts to sell these properties either as a group or individually. However, these efforts by Money's produced no offers from mushroom farmers except a "stalking horse" offer from Rakhra Groups, Inc. to purchase only the Dublin and Hillsboro properties.[15] Thus, Money's sought Bankruptcy Court approval for an auction proceeding in order to obtain offers for its closed mushroom farms and to test whether Rakhra's offer represented the highest available price for two of these farms. Money's also sought court approval for a "break-up fee" in the amount of $50,000 to be paid to Rakhra in the event a better offer was received at the auction from another purchaser.

All five of Money's closed United States farms were made available for sale during the auction conducted by the Bankruptcy Court. However, neither Rakhra nor any other mushroom

---

[14]     See App. Tab 8.

[15]     The acceptance of Rakhra's offer was conditioned upon, inter alia, "the continued accuracy of Rakhra's representations and warranties, including its representation that it has the financial resources to consummate the sale." See App. Tab 8 (Debtors' Motion ¶ 20(i)).

farmer submitted an offer for any of these properties. The EMMC bid $2.85 million for the Dublin and Hillsboro properties and eventually acquired title to those parcels. It then swapped the Dublin property for the two out-of-production Money's farms in Evansville, PA. that had been purchased at the Money's bankruptcy auction by a real estate developer. Money's eventually sold its defunct farms in Jackson, Ohio and West Chicago, IL to other real estate developers.[16]

Three important conclusions may be drawn from the public record in the Money's bankruptcy proceedings. First, there have been a substantial number of mushroom farms available for purchase by mushroom farmers before, during and after the EMMC imposed deed restrictions on the six properties in question. Second, the acquisition and alleged deed restriction of those properties did not diminish the supply of mushrooms in the marketplace because they were no longer producing any mushrooms when they were acquired by the EMMC. Third, with the exception of one entity whose offer to purchase the Dublin, GA and Hillsboro, TX properties may not have been an arms-length transaction, no other mushroom farmer was interested in acquiring any of the nine mushroom farms formerly operated by Money's.[17] These facts reveal

---

[16] See App. Tabs 12-14 (Orders approving sales). The other parcels of real estate bought or leased by the EMMC had similarly been retired from mushroom production or had been offered for sale by their owners with no interest in acquiring these properties having been expressed by mushroom farmers other than members of the EMMC. If this case were to proceed past the motion to dismiss stage, Defendants would also establish that after Money's emerged from bankruptcy, its major secured creditor, Bank of Nova Scotia, engaged in substantial unsuccessful efforts to sell Money's remaining operational farms in Napolian, OH, Howe, IN, Pescadero, CA and Fennville, MI. See App. Tab 15. The EMMC later sold the Hillsboro, TX, property to yet another real estate developer, but with no deed restriction. Thus, this property was not cited in the DOJ complaint as being part of the EMMC's so called "Supply Control Campaign."

[17] Plaintiffs allege that EMMC bought Hillsboro Farm in Texas "to reduce and forestall the threat of a potential competitor (Stuart Thomas) from producing mushrooms in Texas." (Class Complaint at ¶ 74.) However, the bankruptcy records clearly show that the Dublin Farm (Ga.) and the Hillsboro Farm (Texas) were auctioned upon notice to all interested parties, and Plaintiffs do not allege that Stuart Thomas bid for either farm at the auction. See App. Tabs 9, 12 (Orders approving auction and sale). In any event, no deed

that the deed restrictions on the six former mushroom farms in question had absolutely no impact on the supply of Agricus mushrooms before, during or after they were acquired and deed restricted by the EMMC.

### D.     The Averments of the Complaints.

Beginning in February of this year, seven class action complaints were filed in this district by various alleged direct purchasers of mushrooms. A complaint was also filed in this district by Publix Supermarkets, Inc. ("Publix") a large supermarket chain with stores in the southern and mid-western states. On June 5, 2006, the Court issued an Order, *inter alia*, consolidating all complaints filed in this district, designating lead counsel for Plaintiffs and requiring class counsel to file a consolidated, amended complaint by June 30, 2006. The Consolidated Amended Class Action Complaint ("Class Complaint") was filed on June 26, 2006, and Publix filed a very similar amended complaint ("Publix Complaint") on June 30, 2006.[18]

In contrast to the government's complaint, Plaintiffs' complaints name as defendants not only the EMMC but also the Member Defendants. (Class Complaint ¶¶ 18-52; Publix Compl. ¶¶3-36.) Moreover, Plaintiffs' complaints are far more ambitious than the DOJ Complaint in that they allege that the deed restrictions imposed by the EMMC in 2001 and 2002 violated not only Section 1 of the Sherman Act (Count I), but also Section 2 of the Sherman Act (Count II), by somehow enabling the EMMC to monopolize or attempt to monopolize a purported relevant market for fresh Agricus mushrooms. Also unlike the DOJ Complaint, Plaintiffs' complaints focus on the EMMC's activity in attempting to raise prices for Agricus mushrooms—an activity

---

restriction was placed on the Texas farm. Thus, it was not included in the DOJ Complaint and is irrelevant to Plaintiffs' claims.

[18]     A complaint was also filed in the Western District of Pennsylvania by Topco LLC and Giant Eagle Supermarkets, Inc. ("Giant Eagle Complaint"). Defendants have filed a motion to transfer that action to this district, which is currently pending before Chief Judge Ambrose.

which is clearly exempt from the antitrust laws by virtue of Section 6 of the Clayton Act and Section 1 of the Capper-Volstead Act. The Class Complaint even goes so far as to contend that the EMMC's purchase of farms violated Section 7 of the Clayton Act (Count III), which prohibits mergers or acquisitions that may substantially lessen competition or tend to create a monopoly.

Plaintiffs allege that the deed restrictions somehow enabled the EMMC to charge higher prices for fresh Agaricus mushrooms even though there is no indication that the restrictions had any actual effect on the production of mushrooms by competitors. (Class Compl. ¶¶ 63, 75, 90, 97, 104; Publix Compl. 47, 59, 68, 69, 79, 87.)

In an attempt to circumvent Defendants' immunity, the private Plaintiffs have made certain conclusory allegations which are nowhere to be found in the DOJ Complaint. First, in apparent recognition of the unsoundness of their contention that the EMMC is not exempt from the antitrust laws, the Class Plaintiffs make the naked and non-specific allegation that "[O]ne or some of the EMMC members are not 'farmers' within the meaning of the Capper Volstead Act." (Class Compl. ¶¶ 91, 99.) Moreover, out of nowhere, Plaintiffs allege that Defendants interfered with hypothetical non-EMMC growers that may have sought to sell at prices that were below the prices set by the EMMC, and pressured independent growers to join the EMMC. (Class Compl. ¶¶ 5, 76, 77, 78, 88.e, 96.e; Publix Compl. ¶¶ 61, 77.e, 85.e) As will be shown below, these conclusory allegations are insufficient to negate an agricultural cooperative's immunity from the antitrust laws.

For the reasons which follow, we respectfully request that the Class Complaint and the Publix Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### III.   ARGUMENT

The Class Complaint attempts to assert claims for conspiracy to restrain trade under Section 1 of the Sherman Act (Count I), monopolization or attempted monopolization under Section 2 of the Sherman Act (Count II) and unlawful acquisition under Section 7 of the Clayton Act (Count IV). See 15 U.S.C. §§ 1-2, 18. The Publix Complaint attempts to assert claims for conspiracy to restrain trade under Section 1 of the Sherman Act (Count I) and conspiracy to monopolize under Section 2 of the Sherman Act (Count II). See 15 U.S.C. §§ 1-2. As will be explained below, all of those purported claims are insufficient as a matter of law.

Defendants are an agricultural cooperative, its members and certain officers and affiliates of its members.[19] As such, Defendants are allowed to engage in concerted conduct that would otherwise be violative of the antitrust laws. Nevertheless, Plaintiffs contend that Defendants exceeded the scope of their immunity by removing certain land from the reach of hypothetical purchasers who might be or become competitors. Plaintiffs seek recovery for an alleged price increase that they admit *preceded* that purportedly unlawful conduct. (Class Compl. ¶ 62; Publix Compl. ¶ 46.)

For the reasons explained below, Plaintiffs have failed to allege any claim upon which relief can be granted.

### A.   Standard of Review

When ruling on a motion to dismiss, the court "must accept as true all of the factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiffs." Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) (citation omitted). A

---

[19]   There are no allegations whatsoever as to how the members' affiliates were supposedly involved in the allegedly unlawful conduct.

court may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id.; Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citation omitted).

However, "courts have not hesitated to dismiss antitrust claims at the pleadings stage in proper cases." Alpern v. Cavarocchi, No. CIV. A. 98-3105, 1999 WL 257695, at *4 (E.D. Pa. Apr. 28, 1999) (O'Neill, J.) (citing Associated Gen. Contractors of Cal., Inc. v. California State Counsel of Carpenters, 459 U.S. 519 (1983)); see also Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp.2d 550, 567 (E.D. Pa. 2002) (Baylson, J.) (citing Alpern and Associated Gen. Contractors). It is incumbent upon the plaintiff "to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." Alpern, 1999 WL 257695, at *3 (quoting Kost v. Kozakiewicx, 1 F.3d 176, 183 (3d Cir. 1993) (internal quotations omitted)). It is not the court's duty and, in fact, it is improper "'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.'" Commonwealth of Pa. v. PepsiCo, Inc., 836 F.2d 173, 180 (3d Cir. 1988) (quoting Associated Gen. Contractors, 459 U.S. at 526 n.11 (alteration in original)).

### 1.      Strict Scrutiny Is Required.

While the general standard of review on a motion to dismiss is well known, Plaintiffs' complaints require special scrutiny, because Defendants have been granted an immunity from the antitrust laws by Congress through enactment of Section 6 of the Clayton Act and the Capper-Volstead Act. 15 U.S.C. § 17 (Clayton Act, Section 6); 7 U.S.C. § 291 (Capper-Volstead Act). When such a Congressionally-mandated immunity is at stake, the third circuit has made clear that the allegations in the complaint should be closely scrutinized because a plaintiff's "bald

assertions" and recitations of "legal conclusions" with no factual support cannot provide the basis for avoiding such an immunity. See PepsiCo, 836 F.2d at 181-83 (statutory immunity under the Soft Drink Act could not be avoided by conclusory allegations that the defendants actions were *per se* violations of the antitrust laws). A plaintiff cannot successfully avoid dismissal based upon a statutory immunity at the pleadings stage simply by alleging, with no factual predicate, that defendants engaged in misconduct that would remove them from the statutory immunity or by "tack[ing] on an *ipse dixit* legal conclusion that conduct 'is not exempt' under the Act."[20] Id. at 183. Attempts by Plaintiffs here to baldly assert misconduct with no factual basis or rely upon empty legal conclusions for the purpose of avoiding immunity under Section 6 of the Clayton Act and the Capper-Volstead Act should not be countenanced.

### 2.    External Documents May Be Considered.

Moreover, "[i]n evaluating a motion to dismiss, [the court] may consider documents that are attached to or submitted with the complaint, . . . and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Township School Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice &

---

[20]    Other cases also illustrate that, in antitrust immunity cases, a plaintiff must plead sufficient facts negating the application of an exemption. Nicolette v. Caruso, 315 F. Supp. 2d 710, 720 (W.D. Pa. 2003) (where township official qualified as "local government" under the Local Government Antitrust Act, defendants' motion to dismiss granted as to plaintiff's Clayton Act claim); Steinberg v. Guardian Life Ins. Co. of Am., 486 F. Supp. 122, 123 (E.D. Pa. 1980) (where defendant was exempt from federal antitrust laws by the McCarran-Ferguson Act, it was necessary for the court to determine "(a) whether the actions alleged come within the meaning of the 'business of insurance', and (b) whether such business is regulated by the State of Pennsylvania within the meaning of the Act"); cf. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998) (upholding defendants' motion to dismiss where anticompetitive behavior occurred in a highly regulated industry); Sheet Metal Duct, Inc. v. Lindab, Inc., No. Civ. A. 99-6299, 2000 WL 987865, *5-7 (E.D. Pa. July 18, 2000) (defendants' motion to dismiss granted where its conduct was exempted by the United States Patent laws and plaintiff failed to allege facts sufficient to strip defendants of their immunity).

Procedure § 1357 (3d ed. 2004)) (internal citations omitted); see also Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196-97 (3d Cir. 1993) (defining what is considered a "public record"); Graham v. Avella Area School Dist., No. 02:05cv1344, 2006 WL 1669881, at *2 (W.D. Pa. 2006) (McVerry, J.) ("a court may look beyond the complaint to matters of public record, including court files and records"); In re The Loewen Group Inc., No. Civ. A. 98-6740, 2003 WL 22436233, at *5 (E.D. Pa. July 16, 2003) (O'Neill, J.); Donahue v. Gavin, No. Civ. A. 98-1602, 1999 WL 165700, at *2 (E.D. Pa. Mar. 12, 1999) (O'Neill, J.).

Thus, the Court may consider documents not attached to a complaint without converting the motion to dismiss into a motion for summary judgment when the documents are "integral to or explicitly relied upon in the complaint." See In re The Loewen Group Inc., 2003 WL 22436233, at *5; see also Pension Benefit Guaranty, 998 F.2d at 1196 (may consider documents upon which the complaint is based). In this case, Plaintiffs state that the allegations are based, in part, on Plaintiffs' counsel's review of the DOJ Complaint. (Class Compl. at 6; Publix Compl. ¶ 66.) Therefore, this Court may reference pleadings from the DOJ action.

Similarly, the Court may consider documents filed in the Money's bankruptcy, which directly involved some of the mushroom farms purchased by the EMMC, because those filings are matters of public record.[21]

### 3.    Conclusory Allegations Should Be Disregarded.

It is axiomatic that while well-pleaded factual allegations in the complaint are taken as true, a court testing the sufficiency of the plaintiff's complaint will not accept as true any "bald

---

[21]    The Money's bankruptcy was located in the United States Bankruptcy Court for the District of Delaware, Case Nos. 00-4096 through 00-4099, jointly administered Case No. 00-4096.

assertions" or "legal conclusions" that are unsupported by the requisite factual information. See Savage v. Bonavitacola, No. Civ. A. 03-0016, 2005 WL 568045, at *3 (E.D. Pa. Mar. 9, 2005) (O'Neill, J.); see also Alpern, 1999 WL 257695, at *3. "[L]egal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness." In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002). In addition, the court will not credit a plaintiff with any inferences unwarranted by the factual allegations actually contained in the complaint. See Savage, 2005 WL 568045, at *3; see also Cooper v. Broadspire Services, Inc., No. Civ. A. 04-5289, 2005 WL 1712390, at *2 (E.D. Pa. July 20, 2005) (O'Neill, J.) (same). As discussed previously, the third circuit has emphasized the importance of strictly adhering to these long-standing rules when a statutory immunity is at issue. See PepsiCo, Inc., 836 F.2d at 181-83 (conclusory statements insufficient to state a claim to avoid immunity under the Soft Drink Act).

There is little doubt that allowing litigation to proceed based upon unsupported "legal conclusions" and "bald assertions" "is simply not fair to the defendants, and [] an onerous imposition on the judicial process." Id. at 182. To allow such litigation to proceed when a statutory immunity is at issue would thwart Congress' intent to protect certain industries, as potential plaintiffs could simply recite the requisite buzzwords and conclusory statements to move past the pleading stage into costly litigation.

It is within this framework and with this background that the Court should consider this motion to dismiss.

**B.     Defendants Are Immune from Antitrust Liability Under the Cooperative Exemption**

The EMMC is an agricultural cooperative whose members are mushroom farmers. Some of the Member Defendants also process and package mushrooms in addition to farming. As a

duly organized agricultural cooperative, the EMMC enjoys a special exempt status under the antitrust laws resulting from two basic statutory provisions rooted in a broad-based and sound public policy supporting the right of farmers or agricultural producers to act collectively in dealing with the powerful buyers of their production.

### 1.      Statutory Bases of the Exemption

Section 6 of the Clayton Act, which was enacted in 1914 and is the original legislative foundation of the cooperative antitrust exemption, provides as follows:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural or horticultural organizations instituted for the purposes of mutual help . . . or forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; *nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.*

15 U.S.C. § 17 (emphasis added).[22] In 1922, Section 1 of the Capper-Volstead Act, 7 U.S.C. § 291, was enacted to clarify and expand the exemption, to include cooperatives with capital stock and present examples of the type of conduct protected by the Act:

> *Persons engaged in the production of agricultural products as farmers*, planters, ranchmen, dairymen, nut, or fruit growers *may act together in associations, corporate of otherwise, with or without capital stock, in collectively processing, preparing for market, handling and marketing in interstate and foreign commerce, such products of persons so engaged.* Such associations may have marketing agencies in common, and such associations and their members may make the necessary contracts and agreements to effect such purposes. . . .

7 U.S.C. § 291 (emphasis added). These sections allow members of cooperatives to act collectively in preparing for market, marketing, and selling their products on the same bases as a

---

[22]     The Class Complaint does not even mention Section 6 of the Clayton Act.

corporate entity to offset the significant leverage exercised by the large buyers of their products.[23]

In the Agricultural Marketing Act of 1929 (codified as part of the Farm Credit Acts, 12 U.S.C. § 1141), Congress confirmed the important public policy of promoting economic equality for farmers by controlling their supply:

> (3) by encouraging the organization of producers into effective associations or corporations under their own control for greater unity of effort in marketing . . . (4) *by aiding in preventing and controlling surpluses* . . . through orderly production and distribution, . . . *and prevent such surpluses from causing undue and excessive fluctuations or depressions in prices for a commodity*.

12 U.S.C. § 1141(a) (emphasis added). Thus, Congress understood and specifically recognized that the ability to control production and fix prices were inextricably intertwined.

The Supreme Court has also specifically recognized the equitable principles embodied in the cooperative exemption:

> We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage—and responsibility— available to businessmen acting through corporations as entities. . . . This indicates a purpose to make it possible for farmer-producers to organize together, *set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws*.

Maryland and Virginia Milk Producers Assoc., Inc. v. United States, 362 U.S. 458, 466 (1960) (emphasis added). Subsequent to its decision in Maryland and Virginia, the Supreme Court emphasized that an essential purpose of the exemption was to alleviate farmers' "particularly harsh economic position," by equipping them to bargain effectively with large buyers, who

---

[23]      Throughout, we will refer to the antitrust exemption contained in both statutes as the Capper-Volstead or cooperative exemption.

otherwise could prevent them from obtaining fair prices for their products. <u>National Broiler Marketing Ass'n v. United States</u>, 436 U.S. 816, 824-827 (1978).

### 2.      Legislative and Related History

The legislative history reinforces the unequivocal statutory language by emphasizing the full extent to which cooperative members can pool their resources to obtain monopoly power—the power to fix prices and control output. That legislative intent is manifest. Senator King, an opponent of the Capper-Volstead Act, noted that:  "it provides . . . that they shall not only be permitted to combine for the purpose of marketing their products, but for the purpose of holding them for an indefinite period in order to secure higher prices, even though such action might constitute a monopoly or restrain trade or be destructive of competition." 60 Cong. Rec. 312 (1920). Senator Capper emphasized that:  "No association can efficiently operate that does not control and handle a substantial part of a given commodity in the locality where it operates." 61 Cong. Rec. 2058 (1922). Senator Lenroot noted the necessity of farmers to "have some control and agreement as to production and as to prices" and Congress was justified in passing the Act "which will enable farmers . . . to put themselves somewhat nearer an equality of bargaining power and control of output in production that all other industries have today." 62 Cong. Rec. 2225 (1922).

In 1934, Congress enacted the Fishermans Collective Marketing Act, which provides the same basic antitrust exemption for persons engaged in the fishery industry in collectively catching, producing, preparing for market, processing, handling and marketing such products. 15 U.S.C. §§ 521-522. That Act has been interpreted to permit fishermen to control production by collectively refusing to fish or to withhold products from the market. <u>In re Washington Crab Ass'n</u>, 66 F.T.C. 45, 126-27 (1964). This Act and its interpretation have significance to the

Capper-Volstead Act exemption because the two Acts are virtually identical and have the same basic purposes in protecting the producers in their respective industries. D. Frederick, <u>Antitrust Status of Farmer Cooperatives:  The Story of the Capper-Volstead Act</u> at 142-143 (USDA Cooperative Information Report 59, 2002).

The disparity in size and bargaining power between Plaintiffs and Defendants in this case could not be more stark and exemplifies the very rationale for the exemption. The concentration of big buyers in food retailing has increased exponentially. Thus, the much smaller mushroom growers, as well as other agricultural producers, continue selling into markets "increasingly dominated by fewer, large buyers" that exercise "oligopsony power." Dunn, <u>et al.</u>, <u>Agricultural Cooperatives in the 21st Century</u>, USDA Rural Business-Cooperative Service, Cooperative Information Report 60 at 4, 6 (2002). A few examples suffice:  Publix has more than 136,000 employees with 2005 retail sales of $20.6 billion; Meijer has 75,000 employees with 2005 sales of $12.5 billion; and Topco, in which Meijer and Giant Eagle are members, has about 56 retail, wholesale, and food service members whose sales are second only to Wal-Mart. J. Bruss, PL Buyer, <u>Topco Tackles A Changing Environment</u> at 1 (Nov. 2003), at www.PrivatelabelBuyer. com. In contrast, as the Class Complaint alleges, retail sales of all mushrooms in the United States were only approximately $800 million in 2002. (Class Compl. ¶ 60.)

### 3.    Judicial Interpretation of the Exemption

The cases interpreting the bounds of the cooperative exemption make it clear that the conduct described in Plaintiffs' complaints is exempt. Plaintiffs' efforts to circumvent the exemption through conclusory assertions cannot change the essence of their claim of harm: price fixing. (Class Compl. ¶¶ 3, 62, 89, 98, and 106.) Permissible and exempt collective or concerted conduct by farmers includes:  (1) organizing into a single entity or cooperative and

setting or fixing the prices for their products; (2) obtaining a complete monopoly—100% control of the products produced; (3) marketing, preparing for market and using common marketing agencies for their products; (4) marketing the production of non-members of the cooperative as long as that production does not exceed the production of the members; and (5) entering into contracts necessary to achieve these listed legitimate goals or objects, particularly setting or fixing prices and controlling production of their commodities. Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc., 497 F.2d 203, 216 n.11 (9th Cir. 1974). Section 1 the Capper-Volstead Act specifically authorizes cooperatives to market and gain control over non-member production as well as member production, provided the volume of non-member production does not exceed 50% of the total. 7 U.S.C. § 291. Therefore, the EMMC's acquisition of non-members' unused production capacity at non-operational farms clearly falls within the protection of the cooperative exemption. Because the exemption insulates controling the actual production, it necessarily also insulates controling the capacity for such production.

The cases interpreting the exemption exclude from its protection two basic courses of conduct. First, the exemption does not insulate anticompetitive conduct if taken by cooperatives in concert with non-exempt, non-farmer entities. United States v. Borden, 308 U.S. 188, 204-05 (1939); see Maryland and Virginia, 362 U.S. at 468-471. Second, predatory conduct directed at a specific, identifiable group of non-member competitors is not insulated from liability under Section 2. See Maryland and Virginia Milk Producers Assoc., Inc. v. United States, 362 U.S. 458 (1960) (cooperative's acquisition of a dairy processor in order to cut off processing by independent dairy farmers constituted an unlawful predatory act); Bergjans Farm Dairy v. Sanitary Milk Producers, 241 F. Supp. 476 (E.D. Mo. 1965), aff'd, 368 F.2d 679 (8th Cir. 1966) (cooperative's acquisition of a fluid milk plant and related conduct to cut off independent

producers' access to processing constituted unlawful predatory acts). Neither of those exceptions applies here.

### 4. The Conduct Alleged by Plaintiffs Is Protected Under the Cooperative Exemption.

The EMMC's conduct of purchasing land capable of producing mushrooms and imposing restrictions on its use falls squarely within the protection of the Capper-Volstead Act exemption. The conduct challenged in the complaints is not predatory since there is no allegation that Defendants caused or even sought to cause the systematic elimination of existing competing mushroom growers, or coerced or harassed customers or buyers to boycott existing, competing mushroom growers. The allegations here are entirely different in nature than those in <u>Maryland and Virginia Milk Producers Assoc., Inc. v. United States</u>, 362 U.S. 458 (1960) and <u>Bergjans Farm Dairy v. Sanitary Milk Producers</u>, 241 F. Supp. 476 (E.D. Mo. 1965), <u>aff'd</u>, 368 F.2d 679 (8th Cir. 1966). Thus, the complaints fail to allege the predatory conduct requisite to an actionable antitrust claim.

The nub of Plaintiffs' alleged claim of injury is price-fixing, which is clearly permissible under the exemption. The Supreme Court has determined that the Capper-Volstead exemption permits "farmer-producers to *organize* together, *set* association *policy*, *fix prices* at which their cooperative will sell their produce, and otherwise *carry on like a business* corporation without thereby violating the antitrust laws." <u>Maryland & Virginia</u>, 362 U.S. at 466 (emphasis added). All that is alleged by Plaintiffs is conduct that falls within the scope of that already deemed permissible by the Supreme Court:  the complaints allege that Defendants organized together, collectively agreed upon a policy to fix prices for mushrooms by controlling supply, and otherwise acted as a business corporation. (Class Compl. ¶ 3; Publix Compl. ¶ 46.) The alleged "supply control" policy was to have been carried out by acquiring farm land in order to limit

capacity for future mushroom production and thereby permit the EMMC to maintain minimum prices. Id. The basic flaw in the complaints is that, under the Capper-Volstead exemption, none of the foregoing is illegal.

Cooperatives are exempt from liability for price-fixing as well as other joint marketing efforts that seek to achieve the lawful aims of the cooperative, *i.e.*, collective marketing of farm products so as to improve economic conditions for individual farmers. Alexander v. NFO, 687 F.2d 1173, 1182 (8th Cir. 1982) (citing Maryland and Virginia). Thus, individual members of a cooperative, including board members of a cooperative, cannot constitute the plurality of actors prerequisite to establishing a conspiracy under Section 1 of the Sherman Act. Indeed, Section 6 of the Clayton Act by its very terms specifically provides that members of a cooperative should not be treated as "illegal combinations or conspiracies in restraint of trade under the antitrust laws." Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224, 1233-34 (10th Cir. 2003); see also Gregory v. Fort Bridger Rendezvous Ass'n, 448 F.3d 1195, 1200-1202 (10th Cir. 2006). Cooperatives may, singly or in combination with other exempt cooperatives, obtain monopoly power in a given market so long as it is achieved through voluntary confederation and without resort to predatory or anti-competitive practices. Alexander, 687 F.2d at 1182 (citing Fairdale Farms v. Yankee Milk, Inc., 635 F.2d 1037 (2d Cir. 1980)).

Significantly, the Act has also been held to exempt cooperative supply control arrangements which have the effect of keeping product from entering a market in order to maintain a premium price. See Kinnett Dairies, Inc. v. Dairymen, Inc., 512 F. Supp. 608 (M.D. Ga. 1981), aff'd 715 F.2d 520 (11th Cir. 1983); Ewald Bros., Inc. v. Mid-America Dairymen, Inc., 877 F.2d 1384 (8th Cir. 1989). In Kinnett Dairies, for example, a dairy processor challenged the payment by a federation of agricultural cooperatives for an "option" to purchase

non-member milk in order to prevent surplus milk from entering a market and causing a decrease in prices. Rejecting the plaintiff's contention, the Kinnett Dairies court held:

> In marketing the milk of its members, [the cooperative] may lawfully fix the price or prices at which the milk will be sold and, in seeking to obtain the best price for the milk, may exercise such market leverage as is afforded by managing in the market the combined production of its members. Thus, through [the cooperative] its members can present a common, agreed upon price to milk buyers like plaintiff Kinnett even though similar conduct by private businessmen who are not farmers would be "price fixing" in violation of the antitrust law.

512 F. Supp. at 632; accord Alexander, 687 F.2d at 1207.

Thus, the courts recognize that since a cooperative may legally fix its prices directly, it inescapably follows that it may attempt to or may accomplish that result by management of the supply that it provides to the market. See Kinnett Dairies, 512 F. Supp. at 632; Ewald Bros., 877 F.2d at 1388 (finding no predatory conduct and affirming right of cooperative to participate in standby pool which had effect of controlling supply); Alexander, 687 F.2d at 1188 (holding that cooperative's milk withholding action was part of concerted demand for higher prices, not intended to eliminate competing cooperatives, and thus within the scope of the Capper-Volstead exemption).

A cooperative confronted with excess capacity has the right under the Act to pursue the same business alternatives as any corporate entity and reduce production in response to market conditions. Holly Sugar v. Goshen County Coop. Beet Growers Ass'n, 725 F.2d 564, 569-70, 572 (10th Cir. 1986); J. Iskow & R. Sexton, Bargaining Associations in Grower-Processor Markets for Fruits and Vegetables, USDA-ACS Research Report No. 4 (Mar. 1992). The Fisherman's Collective Marketing Act, the virtually identical sister act to the Capper-Volstead Act, has been interpreted to permit fisherman to control production by refusing to fish or to withhold production from the market. In re Washington Crab, 66 F.T.C. at 126-27. In highly

concentrated buyer markets, such as the mushroom market, cooperatives, like their corporate counterparts, are able to encourage the limitation of production, and reduce or withhold production from the marketplace in order to fix prices and offset the significant imbalance created by the buying power concentrated in the hands of their customers. Bargaining Associations in Grower-Processor Markets at 10-11. As Senator Capper said, in successfully opposing Senator Walsh's proposed amendment to the Capper-Volstead Act that would have prohibited the creation of cooperative monopolies, see S. Rep. No. 236, 67th Cong., 1st Sess. (1921), "no association can efficiently operate that does not control and handle a substantial part of a given commodity in the locality where it operates." 62 Cong. Rec. 2058 (1922); see Fairdale Farms, Inc. v. Yankee Milk, Inc., 635 F.2d 1037, 1043 (2d Cir. 1980).

With respect to the EMMC's exemption from the antitrust laws, the allegations in Plaintiffs' complaints are notable for what they do not include:  there are no factual allegations of the type of predatory conduct or tactics which courts have found to violate the antitrust laws when engaged in by cooperatives. There are, for example, merely conclusory allegations without content of coerced membership or boycotts, and no allegations of picketing, bad faith harassment or discriminatory pricing. See Alexander, 687 F.2d at 1182, 1193-1208; see generally Fairdale Farms, 635 F.2d at 1044; Treasure Valley Potato Bargaining Ass'n v. OreIda Foods, Inc., 497 F.2d 203, 216 (9th Cir.); Kinnett Dairies, 512 F. Supp. at 642-43; GVF Cannery, Inc. v. California Tomato Growers Ass'n, 511 F. Supp. 711, 715-16 (N.D. Cal. 1981).

### 5.    Plaintiffs' Conclusory Statements Are Insufficient, as a Matter of Law, to Negate the Cooperative Exemption.

While the majority of this memorandum addresses the insufficiency of the Plaintiffs' allegations as it relates to the specific claims brought by Plaintiffs, there are several conclusory statements and unsupported assertions by Plaintiffs that should be addressed at the outset.

Plaintiffs set forth conclusory assertions that some EMMC members are not "farmers," that the EMMC threatened a "group boycott" and that the EMMC put "pressure" on or "forced" independent entities to do things like join the EMMC or charge lower prices. (Class Compl. ¶¶ 6, 77, 78, 88.e, 91, 96.e, 99; Publix Compl. ¶¶ 61, 62, 77.e, 80, 85.e, 88.) With absolutely no factual allegations to support these contentions,[24] Defendants are without sufficient notice to investigate and challenge these assertions. This fails to comply with the well established requirement that a complaint must give "fair notice of what the plaintiff's claim is and the grounds upon which it rests" as well as the rule that plaintiff "must allege some facts to support his conclusory allegation[s]." See Conley v. Gibson, 355 U.S. 41, 47 (1957); see also Alpern, 1999 WL 257695, at *7. As discussed at length in Section III.B.5 above, the third circuit has applied those rules more rigidly where, as here, the allegations are made for the sole purpose of avoiding a Congressionally-mandated immunity. PepsiCo, Inc., 836 F.2d at 183.

### a.   Plaintiffs' Conclusory Statement that Certain Unnamed EMMC Members Are Not Farmers Is Insufficient to Avoid the Cooperative Exemption.

Class Plaintiffs' allegations that "[o]ne or some of the EMMC members are not 'farmers' within the meaning of the Capper-Volstead Act" are a transparent attempt to concoct a "waiver" of the Act's immunity with the very type of allegation, nothing more than an "*ipse dixit* legal conclusion," that was rejected by the third circuit in PepsiCo.[25] (Class Compl. ¶¶ 91, 99.) See PepsiCo, Inc., 836 F.2d at 183. Plaintiffs do not even attempt to identify which member or members of the EMMC purportedly are not "farmers," nor do Plaintiffs attempt to explain why any of the EMMC members would fail to qualify as "farmers" as that term is used in the Capper-

---

[24]    None of these allegations were made by the government in the DOJ Complaint.

[25]    The Publix Complaint does not allege that any of the EMMC members are not "farmers" as that term is defined under the Capper-Volstead Act.

Volstead Act. See Garshman v. Universal Resources Holding, Inc., 824 F.2d 223, 230 (3d Cir. 1987) (finding allegations that entities had "engaged in concerted action with other entities, which agreements are in restraint of trade and are unreasonable, to achieve the anti-competitive and unlawful actions and effects" to be insufficient to state an antitrust conspiracy because the allegedly anticompetitive agreements were unspecified and the alleged "co-conspirators" were unidentified); see also PepsiCo, Inc., 836 F.2d at 181 (plaintiff's allegations "consistently refer to conduct by 'defendants and their co-conspirators'—not otherwise identified").[26] This allegation is wholly conclusory and insufficient. See Alpern, 1999 WL 257695, at *3.

This naked contention is also contradicted by Plaintiffs' own factual allegation that "[t]he Defendants are an agricultural cooperative and its members, who are *engaged in the production and sale of fresh market mushrooms* in interstate commerce." (Class Compl. ¶ 9 (emphasis added).) This allegation encompasses the very definition of "farmer" in the Capper-Volstead Act. Further confounding this bald assertion is Plaintiffs' reliance upon the pleadings in the DOJ action. The DOJ did not allege that any of the EMMC members are not "farmers" and to the contrary, conceded that the EMMC was, in all respects, a valid cooperative. (DOJ Compl. ¶¶ 9 ("[t]he [EMMC] is an agricultural cooperative whose members are engaged in the production and sale of fresh market mushrooms in interstate commerce"), 11 ("[t]he members of the EMMC

---

[26]     In the PepsiCo case, Plaintiff, the Commonwealth of Pennsylvania, brought an antitrust action against two Pepsi-Cola bottlers challenging certain practices that the Defendants asserted were immune from antitrust liability under the Soft Drink Act. PepsiCo, 836 F.2d at 174-76. Exempted from the Soft Drink Act's protections were "price-fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints, or boycotts would otherwise be unlawful." Id. at 178. Plaintiffs therefore alleged Defendants' conduct, all intended to make sure that resales were not made outside of the bottlers' exclusive territory, amounted to, among other things, horizontal restraints of trade, group boycotts and agreements which, directly or indirectly, fixed or stabilized prices. Id., at 181. In both the original and amended complaints, Pennsylvania requested that the alleged agreements be "decreed *per se* unreasonable restraints of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1," and that an injunction be issued against refusals to deal with resellers and against imposing any system "to enforce geographic bottling territories against resellers." PepsiCo at 181.

grow, sell, and ship mushrooms to retail and food service outlets across the United States"); DOJ Competitive Impact Statement at 1 ("[t]he EMMC is made up of entities that grow, buy, package, and ship mushrooms to retail and food service outlets across the United States").) The government's understanding of the EMMC's status and makeup comports with the EMMC's understanding—all of its members are "farmers" as that term is understood in both the real world and under the Capper-Volstead Act.

Based upon the foregoing, Plaintiffs' attempt to circumvent the immunity offered by the Capper-Volstead Act based upon their non-specific, unsupported, conclusory allegation that "one or some" of the EMMC members are not "farmers" must be rejected.

### b. Plaintiffs' Conclusory Allegation of Coercion or a Group Boycott Is Insufficient to State a Claim.

Attempting to illustrate what conduct would "force" independent entities to allegedly bow to the pressure of the EMMC, Plaintiffs also dress up their allegations "in the pejorative appellation 'group boycott.'" PepsiCo, Inc., 836 F.3d at 183. (Class Compl. ¶ 77; Publix Compl. ¶ 61.) As a preliminary matter, to have a true "group boycott" claim, the plaintiff must allege multiple actors conspiring and it must involve "joint efforts at persuading suppliers or customers to refuse to deal with a certain competitor." Brunson Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp.2d 550, 561-62 (E.D. Pa. 2002) (Baylson, J.).[27] Therefore, as the EMMC and the Member Defendants are incapable of conspiring among themselves as discussed at length in Section III.D below, the "group boycott" claim must fail.

---

[27]     A group boycott does not exist when an entity or entities refuse to engage in a transaction unless certain terms are met that are integral to the transaction. See Hartford Fire Ins. Co. v. California, 509 U.S. 764, 803-06 (1993) (discussing history of the group boycott). It could potentially be a group boycott when multiple entities refuse to deal with a specific entity in a transaction until certain conditions, *unrelated* to the transaction, are satisfied. Id.

Ultimately, however, putting aside the Plaintiffs' failure to satisfy the concerted action requirement that is fatal to its efforts to allege a group boycott, the allegations amount to nothing more than "name-calling or label-pasting" with no factual allegations to back them up. See PepsiCo, Inc., 836 F.3d at 183. In Brunson Communications (a non-immunity case), the plaintiff (a small independent television station) alleged that the defendant had "combin[ed] and conspir[ed] with plaintiff's competitors to exclude plaintiff from the [viewership] survey," "practiced a group boycott, and participated with plaintiff's competitors in a program to exclude plaintiff from the Philadelphia television advertising sales market." See Brunson Commc'ns, Inc., 239 F. Supp.2d at 559. In PepsiCo, because the immunity provided by the Soft Drink Act did not exempt the defendant from, among other things, group boycott claims, the plaintiff alleged a group boycott premised upon the defendant bottlers' retaliatory and exclusionary conduct aimed at resellers who sold outside of the defendants' exclusive territory. See PepsiCo, Inc., 836 F.2d at 183. Both courts rejected the alleged "group boycott" because simply using the conclusory phrase "group boycott" unsupported by any factual allegations is insufficient. Additionally, as in PepsiCo, more substantial allegations are essential because the exclusionary conduct alleged to constitute a group boycott is precisely the collective conduct allowed by the exemption. See Brunson Commc'ns, Inc., 239 F. Supp.2d at 561-62; see also PepsiCo, Inc., 836 F.2d at 183. Similarly, in this case, there are no allegations of what entity, if any, was unable to purchase mushrooms from the EMMC and it is unclear if the Plaintiffs are really only alleging that certain non-EMMC mushroom farmers were charged a higher price for mushrooms than farmers that were EMMC members. (Class Compl. ¶¶ 77; Publix Compl. ¶¶ 61.) See Hartford Fire Ins. Co. v. California, 509 U.S. 764, 803-06 (1993) (disagreement over essential terms of the agreement does not make refusal to deal a "boycott"). Without this basic information, it is

impossible to assess Plaintiffs' legal conclusion that there was a "group boycott" and such a conclusory allegation "devoid of details" should be disregarded, see Brunson Commc'ns, Inc., 239 F. Supp.2d at 561, especially as the basis to circumvent the immunity provided by the cooperative exemption.

Plaintiffs reiterate, throughout the complaints, the hollow theme of "coercion" and "pressure" used to force independent entities to join the EMMC or charge higher prices than they otherwise would charge. (Class Compl. ¶¶ 6, 77, 78, 88.e, 91, 96.e, 99; Publix Compl. ¶¶ 61, 62, 77.e, 80, 85.e, 88.) The terms "coercion," "pressure" and "force" amount to nothing more than bald assertions when not accompanied by any factual allegations which provide sufficient notice to allow evaluation or investigation of their legitimacy. Plaintiffs do not even attempt to identify which member or members of the EMMC were "forced" to join against their will or were forced to charge higher prices because of the EMMC's alleged coercive conduct. See Garshman v. Universal Res. Holding, Inc., 824 F.2d 223, 230 (3d Cir. 1987); see also PepsiCo, Inc., 836 F.2d at 181. This allegation is wholly conclusory and insufficient. See Alpern, 1999 WL 257695, at *3, *7 (citing Morse, 132 F.3d at 906, and rejecting unsupported conspiracy claims).

The type of speculative allegations at issue here are insufficient to overcome the immunity provided by Section 6 of the Clayton Act and the Capper-Volstead Act.

### C.     Plaintiffs Have No Antitrust Standing.

The Court should also dismiss Plaintiffs' complaints in their entirety because they demonstrate, on their face, that Plaintiffs lack standing and therefore cannot maintain a cause of action under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

To maintain a private cause of action under Section 4 of the Clayton Act, a plaintiff must allege facts from which antitrust standing can be inferred. Associated Gen. Contractors of Cal.,

Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-38 (1983); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998)" \. Courts examine the following factors when determining whether a plaintiff has standing to pursue antitrust damages:

(1)     the causal connection between the antitrust violation and the harm to the plaintiff and the intent of the defendant to cause the harm, with neither factor alone conferring standing;

(2)     whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; [and]

(3)     the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims.

West Penn Power, 147 F.3d at 264.

### 1.     Plaintiffs Failed to Plead a Causal Connection.

Plaintiffs' complaints are based entirely on their contention that the EMMC and its members engaged in anticompetitive conduct with the purpose and result of artificially raising or maintaining the price of fresh Agaricus mushrooms. However, Plaintiffs' complaints do not contain sufficient allegations linking the EMMC's alleged anticompetitive conduct (imposing deed restrictions) to an increase in the price of Agaricus mushrooms, as it must to state a claim. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998).

Moreover, Plaintiffs implicitly admit that the EMMC's deed restrictions did not bring about the increase in the EMMC's mushroom prices. (Class Compl. ¶ 62; Publix Compl. ¶ 46.) The EMMC, in consultation with its members, lawfully raised its prices under the Capper-Volstead Act *before* it entered into any of the deed restrictions that Plaintiffs now challenge. (Class Compl. ¶ 62; Publix Compl. ¶ 46.) See 7 U.S.C. § 291 (authorizing agricultural cooperatives to undertake common marketing activities in exception to the antitrust laws). Thus, neither the price increase that is the heart of Plaintiffs' Complaint nor Plaintiffs' purported

payment of those higher prices could have been caused by the deed restrictions that Plaintiffs challenge.

The challenged deed restrictions also had no causal role in maintaining the price increase. Plaintiffs allege that the EMMC eliminated seven mushroom farms in 2001 and 2002. As explained in Section II.C above, however, Plaintiffs do not allege that any of the acquired farms were producing any mushrooms.[28] Moreover, public records show that there were many other mushroom farms available for purchase before, during and after the deed restrictions in question, and no other mushroom farmer purchased any of the other farms formerly operated by Money's.

Accordingly, none of the challenged actions taken by the EMMC prevented competitor farmers from expanding their operations or prevented potential competitors from entering the market. Any argument to the contrary would be highly speculative and, as will be discussed below, insufficient to serve as grounds for antitrust standing.

### 2.      Plaintiffs Failed to Plead Antitrust Injury.

Plaintiffs' alleged injury, payment of allegedly artificially high Agaricus mushroom prices, is not the result of predatory or anticompetitive conduct on the part of the EMMC or its members.

To assert an antitrust claim, Plaintiffs must establish that they have suffered an antitrust injury. City of Pittsburgh v. West Penn Power, Co., 147 F.3d 256, 265 (3d Cir. 1998); Alpern v. Cavarocchi, C.A. No. 98-3105, 1999 WL 257695, at *5 (E.D. Pa. April 28, 1999) (O'Neill, J.). The antitrust laws are designed to protect competition, and therefore to plead antitrust injury, Plaintiffs must allege facts from which it could be inferred that the EMMC's conduct has harmed

---

[28]     Indeed, Plaintiffs do not even allege that the farms ever produced Agaricus mushrooms, as opposed to other types not included in the purported product market.

competition. <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977). Plaintiffs can only state a valid claim if their alleged damages "stem[] from a competition reducing aspect or effect" of the EMMC's conduct. <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 344 (1990).

Plaintiffs allege harm from price-fixing. But Defendants could lawfully fix prices under Section 6 of the Clayton Act and Section 1 of the Capper-Volstead Act. Thus, Plaintiffs attempt to rely instead on the deed restrictions as the cause of antitrust injury—an overcharge on the price of mushrooms.

However, it is clear that Plaintiffs suffered no harm as a result of the EMMC's deed restrictions, which in any event were competition-neutral. Higher mushroom prices in this matter were the result of the EMMC's lawful decision under the Capper-Volstead Act to raise prices. Plaintiffs acknowledge that the EMMC raised the prices *before* any of the challenged deed restrictions were imposed. (Class Compl. ¶¶ 62-63.) Plaintiffs have alleged no facts that, if taken as true, could establish that the deed restrictions actually affected either supply or prices.

Moreover, the placement of deed restrictions on a handful of farms spread among Georgia, Pennsylvania, and Ohio did not reduce or restrict competition in the proposed fresh Agaricus mushroom market, which by Plaintiffs' own admission is national in scope. (Class Compl. ¶¶ 9, 53-54; Publix Compl. ¶¶ 3, 46.) As discussed above, between 2001 and the present, Money's placed nine mushroom farms on the market.[29] The EMMC is the only mushroom grower to acquire any of those farms, and it is speculative at best to assume that the farms

---

[29]     <u>See</u> App. Tabs 9-11.

purchased by real estate developers would have produced any mushrooms whether or not the EMMC first acquired them.[30]

Plaintiffs have alleged no facts supporting an inference that the EMMC's deed restrictions kept competitors out of the market or kept them from expanding their production. Nowhere in their complaints do Plaintiffs allege that the EMMC's competitors were unable to find farm land for expansion if they wanted it,[31] that the EMMC ever tried to enforce deed restrictions on the land it had acquired, that any member or non-member expressed interest to the EMMC in purchasing or leasing any farm from the EMMC,[32] or that the existence of the deed restrictions was known within the mushroom industry and discouraged would-be-grower purchasers.

The purchase of agricultural producing land is particularly unsuited for antitrust scrutiny irrespective of whether or not it is taken out of production. First, land in and of itself is not susceptible to monopoly control. See R. Posner, Economic Analysis of Law at 261 (Little Brown 1986). Second, this principle is reinforced by the fact that agricultural land acquisition has been exempted under the Hart-Scott-Rodino pre-merger notification provisions precisely because it is unlikely such acquisitions could ever violate the antitrust laws. 15 U.S.C. § 18a(d)(2)(B). Congress specifically recognized that certain acquisitions should be exempt because the burden

---

[30]   See App. Tabs 12-14.

[31]   According to the Department of Agriculture, there are approximately *2 million farms* and *933 million acres* of farmland in the United States. See App. Tab 16 (USDA National Agricultural Statistics Service, 2005 - 2006 Statistical Highlights of U.S. Agriculture, p. 11, at http://www.nass.usda.gov/ Publications/Statistical_Highlights/2006/stathighnar.htm). The Court may take judicial notice of those facts in ruling on this motion to dismiss. See Section III.A above. Plaintiffs admit that mushrooms are grown in one-story cinderblock buildings. (Class Compl. ¶ 64; Public Compl. ¶ 48.) Thus, unlike other crops, very little land is required for mushroom production.

[32]   Plaintiffs allege that a competitor (Stuart Thomas) wanted to purchase Money's Hillsboro, Texas farm. (Class Compl. ¶ 74; Publix Compl ¶ 58.) However, that is a farm on which *no* deed restriction was placed. Accordingly, it was not included in the DOJ Complaint and it is irrelevant to Plaintiffs' claims.

of notification should not be required where the acquisitions have no antitrust relevance. Thus, regulations dealing with exempt transactions under the Act, provide that: "agricultural property and assets incidental to the ownership of such property, shall be exempt from the requirements of the Act." 16 C.F.R. § 802.2(g).

In short, Plaintiffs' complaints fail to allege facts that would support an inference of antitrust injury. Accordingly, they should be dismissed.

### 3.      Plaintiffs' Claims of Injury are Speculative.

When read in a light most favorable to Plaintiffs, the complaints seek damages because the EMMC exercised its lawful right to raise prices and then allegedly supported its price increases by placing deed restrictions on a total of six mushroom farms in the entire United States. The existence of any antitrust injury under circumstances such as these is inherently speculative. City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 269 (3d Cir. 1998). Antitrust injury would be dependent upon proof that some non-member mushroom grower or growers were ready, willing and able to purchase one or more of the farms that the EMMC acquired and then use the purchased land for mushroom cultivation, instead of other potentially more valuable uses, producing a certain percentage of mushrooms and selling those mushrooms for less than the EMMC's mushrooms. Presumably, while all other market conditions remained static, the EMMC would be forced to lower its prices to stay competitive.

Plaintiffs, in essence, are pleading an injury that has not occurred (as indicated by the fact that there were several other mushroom farms on the market with no interest expressed by existing or potential mushroom producers during the class period) and that will probably never occur (as indicated by the resignations from the EMMC and the elimination of the deed restrictions under the terms of the final judgment in the DOJ action). A claim based on such

speculation does not sufficiently allege an antitrust injury. Id. Thus, Plaintiffs' complaints should be dismissed in their entirety.

> **D.    Plaintiffs' Conspiracy Claims Must Be Dismissed Because They Fail to Plead the Plurality of Actors Necessary to Support Such a Claim.**

Count I of the Class Complaint and both Counts of the Publix Complaint should also be dismissed because a conspiracy cannot exist among members of a single enterprise.

Plaintiffs' allegations are insufficient as a matter of law because they fail to allege the plurality of actors necessary to state a claim for violations of the conspiracy provisions of Sections 1 and 2 of the Sherman Act. In their Complaint, Plaintiffs purport to assert a cause of action for conspiracy in violation of Section 1, which prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce."[33] See 15 U.S.C. § 1. (Class Compl. ¶¶ 85-93; Publix Compl. ¶¶ 75-82.) In addition, Publix purports to assert a claim for conspiracy to monopolize in violation of Section 2, which is applicable to "[e]very person who shall . . . combine or conspire *with any other person or persons*, to monopolize any part of" interstate commerce. 15 U.S.C. § 2 (emphasis added). (Publix Compl. ¶¶ 83-90.) However, Plaintiffs have failed to allege an agreement or concerted action by two or more distinct entities, a prerequisite of both Sections 1 and 2 of the Sherman Act. See Stark v. Ear, Nose & Throat Specialists of Northwestern Pa., P.C., No. 05-2345, 2006 WL 1371571, at *3 (3d Cir. May 19, 2006) (stating that "[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a Section 1 violation") (not precedential); see also Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998) (same); Friedman v. Delaware County Memorial Hosp., 672 F. Supp. 171, 196 (E.D.

---

[33]    Although Section 1 of the Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade or commerce," those three terms have been held to be interchangeable as representing one concept regarding common action. See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980).

Pa. 1987) (stating as an element of a Section 2 conspiracy claim that a plaintiff must plead "an agreement or understanding between two or more economic entities"); <u>Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.</u>, 637 F.2d 105, 110 (3d Cir. 1980) (same); <u>Pontius v. Children's Hosp.</u>, 552 F. Supp. 1352, 1377 (E.D. Pa. 1982) (same).[34]

The only conspiracy alleged in the complaints is between the EMMC and its members. (Class Compl. ¶¶ 1 ("due to the illegal scheme and conspiracy by the EMMC and its members"), 3 ("[t]he EMMC and its members implemented their scheme"), 7 ("[t]he agreement among the EMMC members . . . was an illegal restraint of trade"), 86 ("constitutes a conspiracy between and among EMMC members in unreasonable restraint of trade"); Publix Compl. ¶¶ 60 ("the EMMC members supported and reinforced their scheme"), 68 ("[t]he overall effect of Defendants' unlawful agreement"), 76 (the Defendants combined and conspired to restrain competition"), 77 ("[t]o form and effectuate this conspiracy, EMMC and its members"), 78 ("Defendants have used their illegal conspiracy"), 84 ("the Defendants combined and conspired to monopolize"), 86 ("Defendants have used their illegal conspiracy").) Plaintiffs allegations fail as a matter of law because the EMMC, its members and officers are a single entity and are thus incapable of conspiring with each other for purposes of the conspiracy provisions of the Sherman Act.

In <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752 (1984), the Supreme Court stated it clearly: "[t]he conduct of a single firm is governed by § 2 alone and is unlawful

---

[34]     A plaintiff who cannot establish a conspiracy under Section 1 also cannot succeed on a Section 2 conspiracy claim. <u>See</u> <u>Nova Designs, Inc. v. Scuba Retailers Ass'n</u>, 202 F.3d 1088, 1092 (9th Cir. 2000); <u>see also</u> <u>Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.</u>, 200 F.3d 307, 316 (5th Cir. 2000). As stated above, under both Section 1 and Section 2, a conspiracy claim requires agreement by two or more distinct economic entities. Thus, failure to properly plead concerted action is fatal to both causes of action. As a result, the textual discussion in this section applies to both the Section 1 and Section 2 conspiracy claims.

only when it threatens actual monopolization." Id. at 767. The Court continued:  "[t]he point remains, however, that purely unilateral conduct is illegal only under § 2 and not under § 1. Monopolization without conspiracy is unlawful under § 2, but restraint of trade without a conspiracy or combination is not unlawful under § 1." Id. at 767 n.13; see also April v. National Cranberry Ass'n, 168 F. Supp. 919, 922 n.3 (D. Mass. 1958) ("It seems simpler to proceed under [S]ection 2 than to delineate some theory whereby the members of a cooperative become an 'unlawful' combination at the moment they overstep permissible bounds.").

Despite this established principle, Plaintiffs seek to impose Section 1 and Section 2 liability for an alleged intra-enterprise conspiracy based on the concerted action taken by farmers. (Class Compl. ¶¶ 1, 3, 7, 86; Publix Compl. ¶¶ 60, 68, 76, 77, 78, 84, 86.) However, as previously pointed out, the cooperative exemption precludes the existence of a conspiracy because Defendants must be considered a single entity that is incapable of conspiring with itself. See Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 27 (1962) ("Sunkist I") (finding one entity without looking at alleged misconduct). The same rule holds true for the officers of the EMMC.[35] See Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224,

---

[35]    Even without the cooperative immunity, the allegations against the individual officers of the EMMC are deficient. See Garshman v. Universal Res. Holding, Inc., 824 F.2d 223, 230 (3d Cir. 1987) (unspecified conspiracy allegations do not meet the minimum pleading standards). Plaintiffs include as Defendants two individuals, John Pia and Michael Pia (collectively, the "Individual Defendants"), who are alleged to be officers of the EMMC or one of its members. (Class Compl. ¶¶ 49, 50; Publix Compl. ¶¶ 34, 35.) It is well-settled that "'officers or employees of the same firm do not provide the plurality of actors imperative for a Section 1 conspiracy'" and that to get around that rule the plaintiff "must allege that [the officers or employees] [were] acting outside [the company's] interests." Stark, 2006 WL 1371571, at *3. Other than naming these two individuals as Defendants and identifying the positions that they held, the Class Complaint contains no allegations as to these Individual Defendants. The Publix Complaint contains an allegation as to only Michael Pia that he "was an officer of the EMMC and as such was directly responsible for its anticompetitive practices." (Publix Compl. ¶ 35.) This complete lack of allegations regarding any wrongdoing is clearly insufficient on its face to state any claim against Michael Pia. The allegation by Publix as to Michael Pia is equally insufficient to state a conspiracy claim for the reasons discussed herein. Thus, the Individual Defendants should be dismissed from these consolidated actions.

1233-35 (10th Cir. 2003) (finding cooperative and its board members a single entity incapable of conspiring with itself); <u>see also</u> <u>Copperweld</u>, 467 U.S. at 769. Because all of the alleged participants in the conspiracy are either the EMMC itself or the Member Defendants, Plaintiffs' conspiracy claims fail as a matter of law.

As discussed more fully in Section III.B above, Section 6 of the Clayton Act ("Section 6") and the Capper-Volstead Act provide farmers with a statutory right to act in a concerted fashion through cooperatives that is equivalent to the same type of protection from the antitrust laws enjoyed by businessmen acting through corporations. <u>See</u> 7 U.S.C. § 291; 15 U.S.C. § 17; <u>see also</u> <u>United States v. Maryland and Virginia Milk Producers Ass'n</u>, 362 U.S. 458, 466 (1960) (discussing purpose of the Agricultural Immunity Acts). Plaintiffs in this case seek to circumvent the plain language of the statute and clear Congressional intent by arguing that the minute the farmer's conduct steps over an undefined boundary, it ceases to be one entity and is required to engage in costly litigation. (Class Compl. ¶¶ 91, 99; Publix Compl. ¶¶ 80, 88.) <u>But see</u> <u>Maryland and Virginia</u>, 362 U.S. at 465 (discussing purpose of Section 6 to immunize agricultural cooperatives for claims premised on concerted action).[36] That is contrary to the controlling law.

The immunity from antitrust liability arising from concerted action provided to agricultural entities has been consistently reaffirmed by the Supreme Court since the passage of Section 6 and the Capper-Volstead Act. <u>See</u> <u>Borden</u>, 308 U.S. at 204-05 (1939) (discussing statutes permitting concerted action).

In <u>Maryland & Virginia</u>, the Supreme Court once again reaffirmed the status of a cooperative, its members and its officers as one economic entity with the right to engage in

---

[36]     The conspiracy claims in <u>Maryland & Virginia Milk Producers Ass'n</u> were not dismissed because the cooperative in that case conspired with entities outside of the cooperative. <u>See</u> <u>Maryland & Virginia Milk Producers Ass'n</u>, 362 U.S. at 472.

concerted activity without incurring antitrust liability. Maryland & Virginia involved a cooperative that was charged with, among other things, violations of Sections 1 and 3 of the Sherman Act for allegedly combining and conspiring with "certain persons who [were] not engaged in agricultural pursuits as defined in [Section 6 of the Clayton Act and the Capper-Volstead Act]." See United States v. Maryland & Virginia Milk Producers Ass'n, 167 F. Supp. 45, 53 (D.D.C. 1958) (containing background of case); see also Maryland & Virginia Milk Producers Ass'n, 362 U.S. at 460-61. The lower court allowed the claims under Section 1 and 3 to proceed only because the alleged conspiracy and combination with entities outside of the cooperative fell "clearly within the exception of the Borden case and, therefore, a cause of action [was] stated in respect to those activities." Maryland & Virginia Milk Producers Ass'n, 167 F. Supp. at 53. In affirming that determination, the Supreme Court stated that "the *privilege the Capper-Volstead Act grants producers to conduct their affairs collectively* does not include a privilege to combine with competitors so as to use monopoly position as a lever further to suppress competition by and among independent producers and processors." Maryland & Virginia, 362 U.S. at 472 (emphasis added). Once again, the Supreme Court reaffirmed the principle that an agricultural cooperative, under the Capper-Volstead Act, has a "privilege . . . to conduct their affairs collectively," subject to the proviso that they do not act collectively with outsiders, thereby creating the requisite plurality of actors necessary to state a conspiracy claim under the Sherman Act.

Following its opinions in Borden and Maryland & Virginia, the Supreme Court in Sunkist I left no doubt that the only way an agricultural cooperative, its members and its officers could be liable for antitrust conspiracy based upon concerted action would be if they conspired with an entity outside of the cooperative, thereby providing the requisite plurality of actors

necessary to state such a claim. In <u>Sunkist I</u>, the court was faced with three cooperatives—Sunkist, Exchange Orange, and Exchange Lemon—collectively comprised of approximately 12,000 citrus growers who were accused of conspiring, among themselves and with other non-cooperative entities,[37] to restrain trade and monopolize in violation of Sections 1 and 2 of the Sherman Act. <u>Sunkist I</u>, 370 U.S. at 20-21. The court noted that because of an ambiguity in the jury instructions, the general jury verdict against the defendants could have rested on a finding of a conspiracy among *solely* the three cooperatives. <u>Id.</u> at 29. Therefore, without discussion as to the *nature of the violation found or any other factor*, the Supreme Court limited its inquiry to one question, strikingly similar to the question before this Court—whether the three cooperatives formed by the 12,000 citrus growers "*can be considered independent parties for the purposes of the conspiracy provisions of §§ 1 and 2 of the Sherman Act.*" <u>Id.</u> at 27 (emphasis added).

Important to the analysis here, the Supreme Court, at the outset of its analysis in <u>Sunkist I</u>, once again reiterated that it is the permission to engage in concerted activity that is the hallmark and purpose of Section 6 and the Capper-Volstead Act. <u>See</u> <u>Sunkist I</u>, 370 U.S. at 28; <u>see also</u> <u>Fairdale Farms, Inc. v. Yankee Milk, Inc.</u>, 635 F.2d 1037, 1042-43 (2d Cir. 1980) (reviewing the legislative and political history of the agricultural immunity acts). In reviewing the language and legislative history of the Capper-Volstead Act, the court in <u>Sunkist I</u> noted that "[t]he language of the Capper-Volstead Act is specific in permitting concerted efforts by farmers." <u>Sunkist I</u>, 370 U.S. at 28. Therefore, according to the court, the only remaining question was whether the tripartite structure of the cooperatives weakened the existing immunity. <u>Id.</u> at 28-29.

---

[37]     Although the plaintiff in <u>Sunkist I</u> alleged a conspiracy between the three cooperatives and outsiders, only Sunkist Growers, Inc. and The Exchange Orange Products Company were named defendants.

Taking a realistic view of the entities in question, the court found that three separate cooperatives did not constitute the plurality of actors necessary to state a claim for an antitrust conspiracy because the 12,000 citrus growers were "in practical effect and in the contemplation of the statutes *one 'organization' or 'association'* even though they ha[d] formally organized themselves into three separate legal entities." Id. at 29. Because "[t]here [could] be *no doubt* that under [Section 6 and the Capper-Volstead Act] the 12,000 California-Arizona citrus growers ultimately could *join together into one organization . . . without the business decisions of their officers being held combinations or conspiracies*," the Supreme Court held that the three cooperatives were entitled to immunity under Section 6 and the Capper-Volstead Act. See id. at 28-29. Without any discussion of whether the jury's findings were correct regarding the alleged restraint of trade, the Supreme Court unequivocally stated that there was no doubt that a single cooperative could not be held to be a combination or conspiracy unless it conspired with an outsider.[38] Id. The clear lesson of this ruling is that if the alleged conspiracy is only within the

---

[38]     Further support for the notion that the nature of the wrongdoing has no impact on whether an agricultural cooperative loses its immunity is found in the Supreme Court's decision in Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384 (1968) ("Sunkist II"). In Sunkist II, the appellants were challenging the trial court's grant of a directed verdict in favor of the defendant on the plaintiff's monopolization and attempted monopolization claims under Section 2 of the Sherman Act as well as the trial court's finding that Sunkist was a properly formed and organized Capper-Volstead cooperative and therefore, immune from liability under Section 1. Case-Swayne Co. v. Sunkist Growers, Inc., 369 F.2d 449, 450-51 (9th Cir. 1967) (circuit court opinion preceding Sunkist II). The Ninth Circuit reversed the lower court's ruling on the plaintiff's section 2 claims and sent that case back to the trial court but upheld the trial court's determination that Sunkist was a validly organized Capper-Volstead cooperative and therefore, was immune from liability under Section 1. Id. at 459-60. The appeal before the Supreme Court dealt only with the issue of whether Sunkist was a validly organized Capper-Volstead cooperative and therefore immune under the Capper-Volstead Act. Sunkist II, 389 U.S. at 386. Despite the fact that the Ninth Circuit had already determined that it was inappropriate to direct a verdict on the issue of whether Sunkist had engaged in monopolistic practices or attempted to monopolize in violation of Section 2, the Supreme Court proceeded with its analysis with no mention of the nature of the purported wrongdoing. Ultimately, the Supreme Court reversed the lower court on that issue finding that it did not believe Congress intended "to allow an organization with such nonproducer interests to avail itself of the Capper-Volstead exemption." Id. at 395-96.

cooperative framework, there can be no Section 1 violation regardless of whether the conduct unreasonably restrained trade.

Subsequent to <u>Sunkist I</u>, the principle that an agricultural cooperative can not be held liable for conspiring with only itself has not changed—as most recently reiterated by the tenth circuit in 2003. <u>See</u> <u>Bell</u>, 348 F.3d at 1233. In <u>Bell</u>, the plaintiffs, cooperative members, alleged that the cooperative and its former directors and members of the board of directors conspired in violation of Section 1 of the Sherman Act. <u>Id.</u> at 1227. In affirming the district court's grant of summary judgment that disposed of the plaintiffs conspiracy claims, the court stated clearly that "[t]he Supreme Court and other federal courts have determined that agricultural cooperatives, like corporations, do not have the plurality of actors necessary for a *Section 1* conspiracy." <u>Id.</u> (emphasis in original). This is exactly the principle, reaffirmed in case law from <u>Borden</u> through <u>Bell</u>, that is dispositive of Plaintiffs' conspiracy claims in this case.

Based upon the foregoing, the EMMC and the Member Defendants are incapable of conspiring with themselves and Defendants respectfully urge that Plaintiffs' conspiracy claims under Section 1 and Section 2 of the Sherman Act should be dismissed.

E.    **Plaintiffs' Claims for Monopolization or Attempted Monopolization Should Be Dismissed Because a Relevant Market Has Not Been Properly Defined.**

The viability of Plaintiffs' purported claims under Section 2 of the Sherman Act must be assessed within the confines of a relevant market.[39] <u>See</u> <u>Brokerage Concepts v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 513 (3d Cir. 1998). Such a market includes product and geographic components, and it is the plaintiff's burden to properly define both. <u>Id.</u> That burden is not met by

---

[39]    As discussed in Section III.G below, this also applies to Plaintiffs' purported claims under Section 7 of the Clayton Act. 15 U.S.C. § 18.

simply alleging a particular product and geographic scope. Sufficient facts must be stated to establish that the market makes economic sense from an antitrust point of view. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997). To meet that standard, the product market must include all commodities that are reasonably interchangeable by consumers for the same purposes, and the geographic market must include all locations where a potential buyer may rationally look for those commodities. Eichorn v. AT&T Corp., 248 F.3d 131, 147 (3d Cir. 2001).

These requirements are so essential that an antitrust complaint may be dismissed at the pleading stage if the relevant market is not properly defined:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza, 124 F.3d at 436.

In this case, Class Plaintiffs contend that the relevant product market includes only "fresh Agaricus mushrooms."[40] (Class Compl. ¶ 61.) They also contend that the relevant geographic market includes only "the United States, or alternatively, the eastern United States." (Id.) However, they have not supported those contentions with the requisite economic facts.

### 1.    The Purported Product Market Is Insufficient.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and

---

[40]    The Publix Complaint fails to specifically allege any market definition. Even that alone warrants dismissal of Publix's monopolization claim.

substitutes for it." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962). This principle

has been further explained as follows:

> The outer boundaries of a product market are determined by evaluating which
> products would be reasonably interchangeable by consumers for the same
> purpose. "Interchangeability implies that one product is roughly equivalent to
> another for the use to which it is put; while there might be some degree of
> preference for the one over the other, either would work effectively." One
> measure of interchangeability is "cross elasticity of demand between the product
> itself and substitutes for it."
>
> When there is cross-elasticity of demand between products in a market, "the rise
> in the price of a good within [the] relevant market would tend to create a greater
> demand for other like goods in that market."

<u>Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.</u>, 140 F.3d 494, 513-14 (3d Cir. 1998) (internal

citations omitted); <u>see also</u> <u>Rebel Oil Co., Inc. v. Atlantic Richfield Co.</u>, 51 F.3d 1421, 1434 (9th

Cir. 1995) ("if the sales of other producers substantially constrain price-increasing ability of the

monopolist or alleged cartel, these other producers must be included in the market."); <u>Allen-</u>

<u>Myland v. IBM Corp.</u>, 33 F.3d 194, 208 (3d Cir. 1994) (the relevant product market must be

broad enough to include all of the products that exert a restraining force on the price of the

products at issue).

     Thus, fresh Agaricus mushrooms could not be a relevant product market here if raising

their price would shift some of the demand for them to other types of mushrooms.

     Plaintiffs' complaints say nothing at all about the potential for substitution of other types

of mushrooms. Indeed, Plaintiffs refer at different times to the "mushroom market," "Agaricus

mushrooms," "specialty mushrooms," "fresh mushrooms," "processed mushrooms," "canned

mushrooms," "frozen mushrooms" and "glass-jarred mushrooms." (Class Compl. ¶¶ 2, 35, 40,

60, 77.) Yet Plaintiffs fail to rule out substitutability of any of those with the fresh Agaricus

mushrooms to which their purported product market is limited. Moreover, it is common

knowledge that many different varieties of mushrooms are available in the United States.[41] Will an increase in the price of Agaricus mushrooms cause some consumers to choose Shiitake mushrooms, Oyster mushrooms or any other type of mushrooms for their meals instead? If so, those types of mushrooms are part of the same market. The same analysis is required for the other thousands of varieties. Plaintiffs have failed to allege any reason why such substitution is improbable.

### 2.    The Purported Geographic Markets Are Insufficient.

Similarly, the United States could not be a relevant geographic market if a price increase would shift some of the demand to imports from Mexico and Canada. For the same reason, the eastern United States could not be a relevant geographic market if raising the price there would shift some of the demand to other regions, because a geographic market must include all locations where a potential buyer may rationally look for the commodity. Eichorn v. AT&T Corp., 248 F.3d 131, 147 (3d Cir 2001). In other words, the relevant market in this case must include all fresh Agaricus mushrooms (and reasonable substitutes) that could be supplied from other locations.

It is common knowledge that some mushrooms are imported from other countries.[42] If the price of domestic mushrooms rises, will demand for imported mushrooms increase? If so, the relevant market cannot be limited to the United States. In addition, the Class Complaint admits

---

[41]    For example, About.com states that there are more than 3,000 varieties of mushrooms in North America alone, with varying colors, textures and flavors. See App. Tab 17 (Peggy Trowbridge, Mushroom Facts, Selection and Storage, at http://homecooking.about.com/cs/foodfactsheets/p/mushroom _pro_p.htm).

[42]    Plaintiffs acknowledge that mushrooms are shipped long distances (Class Compl. ¶¶ 9, 18, 40, 62) and do not allege any barriers to foreign imports.

that mushrooms are shipped from the eastern United States to other regions.[43] (Class Compl. ¶¶ 9, 18, 60.) Would a price increase induce some of those remote purchasers to buy mushrooms in their own regions instead? If so, the market cannot be limited to the eastern United States. Plaintiffs' complaint fails to address these issues.[44]

Because they have alleged no absence of product or geographic substitutability, Plaintiffs have failed to define a proper relevant market. Accordingly, their complaint should be dismissed. See Queen City Pizza, 124 F.3d at 436.

### F.    A Claim Has Not Been Stated for Attempted Monopolization.

The attempted monopolization claim in Count II of the Class Complaint[45] should also be dismissed for failure to allege the requisite elements of such a claim. Attempted monopolization requires proof that a defendant "(1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 422 (3d Cir. 1997); accord Pastore v. Bell Tel. Co., 24 F.3d 508, 512 (3d Cir. 1994). Here, the alleged predatory acts were permitted by the cooperative exemption, as explained above, and the other two elements are lacking as a matter of law, as explained below.

---

[43]    If this case were to proceed past the current motion to dismiss, it would quickly become clear that the eastern United States is not an economically valid market, because fresh mushrooms are often shipped to different regions in refrigerated trucks. Indeed, that may be why the government chose not to bring a monopolization claim. Moreover, the EMMC has lost members and no longer has anywhere near the market share that it had in 2001-02.

[44]    Yet another fatal defect is the absence of clear boundaries for the purported geographic markets. Does the "eastern United States" include everything from Florida to Maine? Are Puerto Rico and the Virgin Islands also included? How far west do Plaintiffs mean to go? (New Jersey? Pennsylvania? Ohio? Indiana?) It also is unclear whether they mean to include Alaska and Hawaii or just the continental United States. These distinctions must be made, because they may have a significant impact on the market share attributed to Defendants.

[45]    This discussion only applies to the Class Complaint, because Publix has not asserted a claim for attempted monopolization.

### 1.     There Was No Specific Intent to Monopolize.

The Class Complaint does not assert a specific intent to monopolize and the facts alleged rule out any such intent.[46]

Class Plaintiffs allege that Defendants had a 90% share of the purported market in the eastern United States from January 1, 2001 through the present. (Class Compl. ¶ 2.) That period began several months *before* the start of the alleged "Supply Control" campaign. (Class Compl. ¶ 3.) A 90% market share is ordinarily presumed to be a monopoly.[47] See United States v. Grinnell Corp., 384 U.S. 563, 571 (1966) ("The existence of [monopoly] power ordinarily may be inferred from the predominant share of the market."). Defendants could not have had specific intent to monopolize if they already had a monopoly before embarking on the "Supply Control" campaign. Thus, there is no basis for an attempted monopolization claim with respect to the purported market in the eastern United States.

With respect to the purported United States market, Plaintiffs allege that Defendants had a 60% share from January 1, 2001 through the present. (Class Compl. ¶ 2.) Plaintiffs further contend that the 60% share was a monopoly. (Class Compl. ¶ 95.) In the alternative, they assert that Defendants attempted to monopolize the purported market. (Id.) However, they do not

---

[46]     Even if there were such intent, it would be permitted by the cooperative exemption. See Kinnett Dairies, Inc. v. Dairymen, Inc., 512 F. Supp. 608, 631 (M.D. Ga. 1981), aff'd 715 F.2d 520 (11th Cir. 1983); Fairdale Farms v. Yankee Milk, Inc., 635 F.2d 1037 (2d Cir. 1980).

[47]     Such a monopoly is not necessarily unlawful. As the Supreme Court has explained:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices-at least for a short period-is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis in original).

contend that Defendants tried to increase their 60% share. Instead, they allege that Defendants tried to reduce opportunities for new entry into the market by restricting less than a thousandth of a percent of the country's available farm land.[48] That does not portray a specific intent to monopolize. At most it suggests a quixotic effort to preserve the *status quo* in a competitive market.

Accordingly, Count II fails to allege, or even imply, a specific intent to monopolize.

### 2.     There Was No Dangerous Probability of Achieving Monopoly Power.

The Class Complaint contends that Defendants had a "dangerous possibility" of achieving monopoly power, but the facts alleged belie that assertion.[49]

Plaintiffs acknowledge that the deed restrictions they complain about were removed in 2005, before these actions were commenced. (Class Compl. ¶ 79; see also DOJ Mot. of 12/16/04 at 2.) Once the restrictions were removed, they obviously posed no threat of any kind. Thus, they clearly created no dangerous probability of monopolization between the time of their removal and the filing of these actions.

It is also clear that the deed restrictions created no such dangerous probability during the period before they were removed. Plaintiffs allege that Defendants' market shares were 60 percent in the United States and 90 percent in the eastern United States since January 1, 2001.

---

[48]     According to the Department of Agriculture, there are approximately *2 million farms* and *933 million acres* of farmland in the United States. See App. Tab 16 (USDA National Agricultural Statistics Service, 2005 - 2006 Statistical Highlights of U.S. Agriculture, at http://www.nass.usda.gov/Publications/ Statistical_Highlights/2006/stathighnar.htm). The Court may take judicial notice of those facts in ruling on this motion to dismiss. See Section III.A above.

[49]     Even the failure to allege a dangerous *probability* (which is the statutory requirement), as opposed to a dangerous "possibility" of success is sufficient grounds to dismiss the attempted monopolization claim. See Queen City Pizza. It may be possible that pigs will fly one day, but that does not mean it is probable.

(Class Compl. ¶ 2.) Thus, Plaintiffs have not alleged that the deed restrictions had any appreciable effect on Defendants' share of either purported geographic market. Plaintiffs also have not alleged that the deed restrictions actually locked any would-be competitors out of the market.[50] Without such allegations, there is no basis for the bald assertion that the restrictions created a dangerous "possibility" (let alone probability) of monopolization. As explained by the leading antitrust treatise:

> Conduct occurring for significant time shows no dangerous probability of success because it has already achieved all that it is going to achieve to strengthen the defendant's position. Thus, when challenged exclusionary conduct has ended three years earlier without increasing the defendant's market share or forcing the exit of any competitor, a court is likely to see no dangerous probability of success.

3A PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 807f (2d ed. 2002) (citing Ashkanazy v. I. Rokeach & Sons, 757 F. Supp. 1527 (N.D. Ill. 1991)). In Ashkanazy, the defendant's market share had not increased and no competitors had been eliminated for nearly three years after an alleged predatory pricing scheme had been completed. Id. at 1543. The court reasoned that "subsequent market performance, while not conclusive, is useful in evaluating the defendant's capacity to monopolize at the time of the supposed attempts." Id. (internal quotation omitted). Such subsequent performance is equally useful here. Plaintiffs allege no increase in Defendants' market shares and no elimination of any competitors. That belies any dangerous probability of successful monopolization.[51]

Moreover, "[a]lleging market share alone is not sufficient to state a claim . . . . Monopolization or threatened monopolization requires something more, which may include the

---

[50]   Farms sold to real estate developers would not ordinarily be used for mushroom farming in any event. Thus, it cannot be assumed that the deed restrictions would have had any impact on the market.

[51]   While in some circumstances, a dangerous probability of monopolization may be presumed from a high market share, that is not the case here. If it were, a dangerous probability would already have existed without the deed restrictions.

strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." <u>Alpern v. Cavarocchi</u>, No. Civ. A. 98-3105, 1999 WL 257695, at *4 (E.D. Pa. Apr. 28, 1999) (O'Neill, J.) (quoting <u>Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.</u>, 159 F.3d 129, 141 (3d Cir. 1998)) (internal quotations omitted). Indeed, even a market share of 100% is insufficient if barriers to entry are low. <u>See</u> <u>Borough of Lansdale v. Philadelphia Elec. Co.</u>, 692 F.2d 307 (3d Cir. 1982).

>Plaintiffs' only allegations regarding barriers to entry are as follows:

>Depending on the size and location, building a new mushroom growing and production facility costs millions of dollars and generally requires zoning approval. Building a new facility takes much longer to generate any revenue than purchasing or leasing an existing growing operation. By eliminating the existing available productive capacity, the Defendants substantially reduced and impeded the existence of current competition and substantially forestalled and delayed the entry of new competitors and/or the expansion of existing competitors.

(Class Compl. ¶ 65.) The assertion that the EMMC eliminated "the existing available productive capacity" is conclusory, may be disregarded and is based on the speculative premise that there was no other land available that could be used for mushroom farming. <u>See</u> Section III.B.5 above. It is also patently false. As noted in Section II.B above, numerous mushroom farms were available from Money's at bankruptcy-sale prices at the same time the challenged deed restrictions were in place. There is no allegation that a single competitor was prevented from entering the market because the deed restrictions made such entry too expensive. Nor could there be, because anyone could have purchased one or more of the Money's farms. EMMC's purchases from Money's were not "back-room" covert transactions. They were the product of a public auction with substantial notice to all interested parties, under the auspices of the

Bankruptcy Court.[52] Thus, the conduct complained of here did not stop anyone from competing, had no impact on the proposed market and did nothing to increase Defendants' market power.

Plaintiffs' market share allegations are also insufficient in and of themselves. Plaintiffs assert that Defendants "controlled over 60% of all Agaricus mushrooms grown in the United States . . . ." (Class Compl. ¶2.) However, the quantity grown is immaterial. What counts is Defendants' share of the quantity *sold* in the purported market. Plaintiffs alleged nothing at all about that.[53]

Since Plaintiffs' theory is that Defendants restricted the supply of Agaricus mushrooms, they would need to establish that the total *capacity* was constrained by imposing deed restrictions on a handful of farms that no longer grew mushrooms anyway. Even where a deed restriction is alleged to have locked a particular competitor out of the market (which is *not* alleged here), that must be shown to have had a detrimental effect on competition as a whole. See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998). If non-EMMC farmers could easily increase their capacity to fill any additional demand with their existing facilities (and there is no allegation that they could not) or by purchasing other available land, the deed restrictions could not have had any impact on the market price. The restrictions also could not have had any impact if there were other existing farms available for sale during this same period, as we know there were from the Moneys' bankruptcy records. Indeed, even controlling capacity would not have harmed competition unless demand were such that all

---

[52]    See App. Tabs 9-14.

[53]    It is also unclear what Plaintiffs mean by "controlled." Do they contend that Defendants had 60% of the existing growing capacity of operating mushroom farms? Do they mean the potential growing capacity of operating mushroom farms? Do they mean the potential growing capacity of all farms that could be used to grow mushrooms? Without clarifying their meaning, Defendants' are without fair notice of what Plaintiffs' are trying to allege regarding monopoly power.

available capacity could have been sold at a price high enough to return a reasonable profit. Plaintiffs do not even attempt to deal with any of these issues in their complaints. Plaintiffs do not allege that the restrictions affected the quantity grown, the quantity sold or the total production capacity.

Accordingly, Count II of the Class Complaint fails to sufficiently allege a dangerous probability of achieving monopoly power.

### G. A Claim Has Not Been Stated for Unlawful Acquisition of Assets Under Section 7 of the Clayton Act.

Count III of the Class Complaint[54] should also be dismissed because it fails to state a claim under Section 7 of the Clayton Act ("Section 7"). Section 7 makes it unlawful for a person to acquire the assets of another person where the acquisition may have anticompetitive effects.

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.

Plaintiffs do not, and can not, allege that anything was acquired by the Member Defendants. Plaintiffs allege only that the EMMC itself acquired the assets of various farms. Plaintiffs' attempt to extend liability under Section 7 to non-acquiring defendants is unprecedented. Defendants' research has yielded not even one case where a member, affiliate or officer of a cooperative or a shareholder of a corporation has been found liable under Section 7 for the *cooperative's or the corporation's* acquisitions. Indeed, an examination of the hundreds

---

[54]    The Publix Complaint does not include this claim.

of Section 7 cases and administrative proceedings brought by the government reveals no cases where the mere fact of membership or stockownership in the acquiring firm served as the basis for an enforcement action. This is undoubtedly because Section 7, on its face and in its application, cannot support such a novel approach.

The Section 7 claim against the EMMC itself should also be dismissed, because Plaintiffs have failed to properly define a relevant market and have failed to adequately allege market impact, and because the conduct alleged is protected by the cooperative exemption.

       1.       **Plaintiffs' Claim Against the Member Defendants Ignores the Express Language of Section 7.**

When interpreting any statute, a court must first determine whether the statute's express language is clear and unambiguous. United States v. Cooper, 396 F.3d 308, 310 (3d Cir. 2005). "Where the statute is clear . . . the text of the statute is the end of the matter." Id.

Section 7 clearly states that it applies only to the acquiring corporation: "no person . . . shall *acquire* the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce . . . the effect of such acquisition may be substantially to lessen competition." See 15 U.S.C. § 18 (emphasis added); see also Tim W. Koerner & Assoc., Inc. v. Aspen Labs, Inc., 492 F. Supp. 294, 300 (S.D. Tex. 1980), aff'd, 683 F.2d 416 (5th Cir. 1982) ("By its express terms section 7 of the Clayton Act is directed only against the acquiring corporation").[55]

---

[55]     To the extent courts permit claims to proceed against the acquired company, such claims are based on the fact that the acquired firm participation is necessary for the court to provide the requested remedy in the event of a finding of a violation of Section 7. For example, if a plaintiff argued and the court concluded that rescission was the appropriate remedy for a Section 7 violation, the acquiring firm would have to be subject to the court's order.

The word, "acquire" must ultimately include some sort of meaningful control over the underlying assets or stock.[56] By expressly limiting its scope to the person who "acquires" the assets, Section 7 by its own terms allows a plaintiff to assert a claim only against the actual acquiring person.[57]

The EMMC is the only entity that Plaintiffs allege to have acquired any farm assets. (Class Compl. ¶¶ 67 ("the EMMC purchased a farm in Dublin, Georgia . . ."), 69 ("the EMMC purchased Gallo's Mushroom Farm . . ."), 71 ("the EMMC purchased the La Conca D'Oro mushroom farm . . ."), 72 ("the EMMC purchased a ten-year lease option on the Amadio Farm . . .").) Despite naming thirty-five defendants other than the EMMC, Plaintiffs do not allege that any of them actually acquired an asset. This failure, pursuant to the express terms of Section 7, proves fatal to Plaintiffs' Section 7 claim against the Member Defendants. Plaintiffs cannot bootstrap mere association with the EMMC into a Section 7 claim against the Member

---

[56]    For example, various dictionaries make clear that the one can not acquire an item without attaining control over or possession of it. See Black's Law Dictionary 25 (8th ed. 2004) ("to gain possession or control of; to get or obtain"); Merriam-Webster online dictionary, available at http://www. m-w.com/dictionary/acquire ("To get or gain by one's own efforts or actions. 2. To get as one's own."); Webster's New Collegiate Dictionary 10 (1980) ("To get as one's own: a: to come into possession or control of often by unspecified means . . . ."); The New Oxford American Dictionary 14 (2d ed. 2005) ("buy or obtain (an object or asset) for oneself . . . ."); American Heritage Dictionary of English Language 12 (1973) ("to gain possession of. To get by one's own efforts.").

[57]    Section 7's emphasis on the party actually acquiring the assets is further supported by Congress' intentional inclusion of the term "indirect" in the stock acquisition clause and the omission of the word "indirect" from the asset acquiring clause in Section 7. See Russello v. United States, 464 U.S. 16, 23 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (citations omitted). In the clause applicable to stock acquisitions, Section 7 states that "[n]o person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital." See 15 U.S.C. § 18. In 1950, Congress amended Section 7 to include asset acquisitions, specifically including language identical to the stock acquisition clause but yet purposely omitting the "indirect" language. Id. This purposeful omission further evinces that Congress intended Section 7 to apply to the actually acquiring corporation in connection with asset acquisitions.

Defendants. (Compare Class Compl. ¶¶ 19-51 (alleging membership in EMMC) with ¶ 103 ("Defendants unlawfully acquired the assets . . ." through the EMMC).)[58]

The closest analogy is to shareholders in a corporation. Courts considering a similar theory based on mere stockownership flatly rejected Plaintiffs' position. See International Rys. of Cent. Am. v. United Brands Co., 532 F.2d 231, 247 (2d Cir. 1976) (noting that mere stock ownership is not enough to warrant Section 7 liability). "[N]early all cooperatives are corporations" which is, as plaintiffs alleged, the case with the EMMC. Moreover, cooperatives are generally subject to both the general corporate laws applicable to C-corporations and also the specific state statutes that apply to cooperatives. See David W. Cobia, Cooperatives in Agriculture, 7 (Prentice Hall 1989). Indeed, Capper-Volstead cooperatives were meant to be treated as corporations. See Bell v. Fur Breeders Agric. Coop., 348 F.3d 1224, 1232-33 (10th Cir. 2003).

Mere membership in an agricultural cooperative, like mere stock ownership in a corporation, should not and does not give rise to Section 7 liability. Importantly, Pennsylvania law applies the same limitation on liability to members as it does to stockholders. 15 Pa. C.S. § 7102 of the Pennsylvania cooperative laws incorporates the statutory provisions governing for-profit and not-for-profit corporations. Specifically, under 15 Pa. C.S. § 5552(a), "[a] member of a nonprofit corporation shall not be liable, solely by reason of being a member, under an order of a court or in any other manner for a debt, obligation or liability of the corporation of any kind or for the acts of any member or representative of the corporation." 15 Pa. C.S. § 1526 provides identical protection to stockholders in for-profit companies:   "shareholder of a business

---

[58]   Although the Complaint in conclusory fashion suggests all the defendants acquired the farm assets, such conclusory averments are insufficient and the only defendant expressly alleged to have acquired any assets is the EMMC.

corporation shall not be liable, solely by reason of being a shareholder, under an order of a court or in any other manner for a debt, obligation or liability of the corporation of any kind or for the acts of any shareholder or representative of the corporation." Otherwise, the potential exposure would surely chill even the hardiest of investors and that could not have been what Congress intended when enacting Section 7.

Permitting Plaintiffs to maintain a Section 7 action against the Member Defendants based solely on an allegation of membership would fly in the face of state and federal law and impermissibly extend Section 7 beyond its intended reach.

### 2. Plaintiffs' Section 7 Claim Against the EMMC also Is Fatally Flawed.

Plaintiffs' Section 7 claim against the EMMC is also doomed for a variety of reasons. Chief among them is that the "acquisitions" had absolutely no injurious effect on competition. As noted above, Section 7 only applies to an acquisition if "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Such an effect could only be found in the context of a properly defined relevant market, and as explained in Section III.E above, Plaintiffs' market definition is inadequate as a matter of law. See United States v. Marine Bancorporation, Inc., 418 U.S. 602, 618 (1974) ("Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act.").

Moreover, as explained in Section III.F.2 above, Plaintiffs do not allege that the EMMC's acquisitions of non-operating mushroom farms increased its market share or prevented competitors from entering the alleged market. The properties at issue were all failing as

mushroom farms and thus the EMMC's acquisition of them had no impact on the market.[59] With no impact on mushroom competition, Plaintiffs' Section 7 claim against the EMMC fails.

This conclusion is further supported by the fact that the legislature and administrative agencies most knowledgeable about competition issues related to Section 7 have determined that acquisitions of agricultural land are unlikely to harm competition. Specifically The Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act") and the regulations promulgated thereunder exempt "acquisitions[s] of agricultural property, assets incidental to the ownership of such property and associated agricultural assets. Agricultural property is real property and assets that primarily generate revenues from the production of crops, fruits, vegetables, livestock, poultry, milk and eggs." 15 C.F.R. § 802.2(g). Section 7A(c) of the HSR Act sets forth certain specific exemptions and empowers the FTC, with the concurrence of the Assistant Attorney General, to promulgate rules exempting other types of transactions "which are *not likely to violate the antitrust laws*." 15 U.S.C. §§ 18a(c)(12) and 18(d)(2)(B) (emphasis added). The FTC's express exemption of agricultural property from the HSR Act further evinces that acquisitions of agricultural property, like the failing mushroom farms at issue in this lawsuit, are not likely to violate the antitrust laws. The fatal problems associated with Plaintiffs' Section 7 claim against the EMMC supports this conclusion and it should therefore be dismissed.

## IV.  CONCLUSION

For the reasons explained above, this Court should dismiss all claims asserted in these consolidated actions for failure to state a claim upon which relief can be granted.

---

[59]     Further, the EMMC's lawful raising of prices prior to the first alleged acquisition means the EMMC's acquisitions had absolutely nothing to do with the price increase alleged by the Plaintiffs.

Respectfully submitted,

s/ William A. DeStefano
William A. DeStefano, Esquire
Rudolph Garcia, Esquire
Pawelski Terri, Esquire
Buchanan Ingersoll & Rooney P.C.
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Telephone (215) 665-8700

and

H. Laddie Montague, Jr., Esquire
Martin I. Twersky, Esquire
Keith J. Verrier, Esquire
Berger & Montague P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone (215) 875-3010

(Counsel for Defendants Eastern
Mushroom Marketing Cooperative, Inc.,
Robert A. Feranto, Jr. t/a Bella Mushroom
Farms, Brownstone Mushroom Farms,
Inc., Brownstone Farms, Inc., Brownstone
Mushroom Farm, To-Jo Fresh
Mushrooms, Inc., Cardile Mushrooms,
Inc., Cardile Bros. Mushrooms Packaging,
Country Fresh Mushroom Co., Forest
Mushroom Inc., Franklin Farms, Inc.,
Gino Gaspari & Sons, Inc., Gaspari
Mushroom Co., Inc., Gaspari Bros. Inc.,
Giorgi Mushroom Company, Giorgio
Foods, Inc., Harvest Fresh Farms, Inc.,
Kaolin Mushroom Farms, Inc., South Mill
Mushroom Sales, Inc., LRP Mushrooms
Inc., LRP-M Mushrooms LLC, Leone
Pizzini and Son, Inc., Modern Mushroom
Farms, Inc., Sher-Rockee Mushroom
Farm, LLC, C & C Carriage Mushroom
Co., Oakshire Mushroom Farm, Inc.,

Phillips Mushroom Farms, Inc., Louis M.
Marson, Jr., Inc., Monterey Mushrooms,
Inc., United Mushroom Farms
Cooperative, Inc., John Pia and Michael
Pia)

s/ Donald M. Barnes
Donald M. Barnes, Esquire
Salvatore A. Romano, Esquire
Porter Wright Morris & Arthur LLP
1919 Pennsylvania Ave NW, Suite 500
Washington, DC 20006-3434
Telephone (202) 778-3000

(Counsel for Defendant Eastern
Mushroom Marketing Cooperative, Inc.)

s/ Barbara Sicalides
Barbara Sicalides, Esquire
Barak Bassman, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Steets
Philadelphia, PA  19103-2799
Telephone:  (215) 981-4783

(Counsel for Defendant Creekside
Mushrooms)

s/ Francis P. Newell
Francis P. Newell, Esquire
Harkins Cunningham LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103
Telephone (215) 851-6700

(Counsel for Defendant Kitchen Pride
Mushrooms, Inc.)

Dated: July 31, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re:  MUSHROOM DIRECT PURCHASER )
       ANTITRUST LITIGATION )
                                  )
                                  )    Master File No. 06-CV-0620
This Document Relates to: )
       All Actions )
                                  )

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing documents have been filed electronically today, are available for viewing and downloading from the ECF system, and were served upon Lead Counsel for Plaintiffs and all unrepresented Defendants by overnight courier for next-business-day delivery, and upon other counsel for defendants by notice of electronic filing, addressed as follows:

Bruce E. Gerstein, Esquire
Noah Silverman, Esquire
Kevin Landau, Esquire
Garwin, Gerstein and Fisher LLP
1501 Broadway, Suite 1416
New York, NY 10036
(Lead Counsel for Plaintiffs)

James J. Rohn, Esquire
Patricia M. Hamill, Esquire
Conrad O'Brien Gellman & Rohn, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102
jrohn@cogr.com
(Counsel for Defendant M.D. Basciani
& Sons, Inc.)

Donna M. Albani, Esquire
Donna M. Albani, Esquire, PC
11 Hampton Lane
Glen Mills, PA 19342
dmaesq@comcast.net
(Counsel for Defendant M.D. Basciani
& Sons, Inc.)

Abraham C. Reich, Esquire
Fox Rothschild O'Brien & Frankel LLP
2000 Market St., 10th Fl.
Philadelphia, PA 19103
areich@frof.com
(Co-Counsel for Defendants C & C
Carriage Mushroom Co., Modern
Mushroom Farms, Inc. and Sher-Rockee
Mushroom Farm)

Michael E. Lowenstein, Esquire
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886
mlowenstein@reedsmith.com
(Counsel for Defendant Quincy Farms)

Elizabeth S. Fenton, Esquire
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
efenton@reedsmith.com
(Counsel for Defendant Quincy Farms)

Masha & Toto, Inc. t/a
M & T Mushrooms
519 Hillendale Rd
Avondale,PA 19311
(Unrepresented Defendant)

Mario Cutone Mushroom Co., Inc.
Rts 1 &41
Avondale, PA 19311
(Unrepresented Defendant)

W & P Mushroom Inc.
4300 Barnsley Chrome Rd
Oxford, PA 19363
(Unrepresented Defendant)

Mushroom Alliance, Inc.
c/o CT Corporation System
520 Pike St.
Seattle, WA 98101
(Unrepresented Defendant)

JM Farms, Inc.
7001 S. 580 Road
Miami, OK 74354
(Unrepresented Defendant)

s/ Rudolph Garcia, Esquire
Rudolph Garcia, Esquire
Buchanan Ingersoll & Rooney PC
1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985
Telephone: (215) 665-3843
Rudolph.Garcia@BIpc.com
Counsel for Defendants Eastern Mushroom
Marketing Cooperative, Inc., Robert A.
Feranto, Jr. t/a Bella Mushroom Farms,
Brownstone Mushroom Farms, Inc.,
Brownstone Farms, Inc., Brownstone
Mushroom Farm, To-Jo Fresh Mushrooms,
Inc., Cardile Mushrooms, Inc., Cardile Bros.
Mushrooms Packaging, Country Fresh
Mushroom Co., Forest Mushroom Inc.,
Franklin Farms, Inc., Gino Gaspari & Sons,
Inc., Gaspari Mushroom Co., Inc., Gaspari
Bros. Inc., Giorgi Mushroom Company,
Giorgio Foods, Inc., Harvest Fresh Farms,
Inc., Kaolin Mushroom Farms, Inc., South
Mill Mushroom Sales, Inc., LRP
Mushrooms Inc., LRP-M Mushrooms LLC,
Leone Pizzini and Son, Inc., Modern
Mushroom Farms, Inc., Sher-Rockee
Mushroom Farm, LLC, C & C Carriage
Mushroom Co., Oakshire Mushroom Farm,
Inc., Phillips Mushroom Farms, Inc., Louis
M. Marson, Jr., Inc., Monterey Mushrooms,
Inc., United Mushroom Farms Cooperative,
Inc., John Pia and Michael Pia

Dated: July 31, 2006