# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | : : : : : | Master File No. 06-0620 |
| THIS DOCUMENT RELATES TO: | : : | Nos.   06-0638; 06-0657; 06-0677; 06-0861; |
| All Actions. | : : | 06-0932; 06-1464; 06-1854 |

DIRECT PURCHASER CLASS PLAINTIFFS' OMNIBUS
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iv

INTRODUCTION ............................................................................................. 1

THE ALLEGATIONS ....................................................................................... 3

    I.    The Parties ........................................................................................... 3

    II.   The Anti-Competitive Conduct ........................................................... 6

    III.  The Market ........................................................................................... 8

    IV.  The DOJ Investigation ........................................................................ 9

ARGUMENT .................................................................................................. 11

    I.    ALL INFERENCES MUST BE DRAWN IN FAVOR OF PLAINTIFFS ON
          DEFENDANTS' MOTIONS TO DISMISS. .................................................. 11

          **A.**  There is No Heightened Pleading Standard for Capper-Volstead
                Cases. .................................................................................... 12

          **B.**  The Only External Documents that May Properly Be Considered Are
                Those Cited in the Complaint. ................................................. 15

    II.   THE LIMITED IMMUNITY PROVIDED BY THE CAPPER-VOLSTEAD
          ACT DOES NOT SHIELD DEFENDANTS FROM LIABILITY BASED UPON
          THE ALLEGATIONS IN THE COMPLAINT. ............................................. 17

          **A.**  The Allegations that Defendants Acted in Concert With Non-
                Member Entities Are Alone Sufficient to Defeat Defendants' Claims
                of Immunity ........................................................................... 20

          **B.**  Defendants Are Not Entitled to Immunity if the EMMC Has a Single
                Non-Farmer Member. ............................................................ 22

          **C.**  Defendants' Anti-Competitive and Predatory Conduct Is Not Entitled
                to Immunity ........................................................................... 27

**Page**

     **1.** Naked Price-Fixing in the Absence of Joint Cooperative Conduct Is Not Immunized by the Capper-Volstead Act.................................................27

     **2.** Plaintiffs Have Alleged Predatory Practices that Are Not Immunized by the Capper-Volstead Act.................................................33

III.   AS DIRECT PURCHASERS OF AGARICUS MUSHROOMS, PLAINTIFFS HAVE STANDING TO RECOVER OVERCHARGES CAUSED BY DEFENDANTS' ANTI-COMPETITIVE CONDUCT. ...................................37

   **A.** The Facts Alleged Support a Causal Connection. ...................................39

   **B.** The Facts Alleged Demonstrate Antitrust Injury.....................................41

   **C.** Plaintiffs' Claims Are Not At All Speculative. ........................................42

IV.   DEFENDANTS' *COPPERWELD* ARGUMENT SUFFERS FROM THE SAME DEFECTS AS DEFENDANTS' CAPPER-VOLSTEAD ARGUMENT.......................43

V.    PLAINTIFFS PLED MARKET POWER BOTH DIRECTLY AND INDIRECTLY.................................................................................47

   **A.** Defendants Incorrectly Assert that the Only Way to Allege Monopoly Power Is By Defining a Relevant Market and Alleging Market Share. ...................47

   **B.** Plaintiffs' Complaint Adequately Pleads Monopoly Power Directly.......................50

   **C.** Market Definition Is An Inherently Factual Determination and Rarely Serves as a Reason to Dismiss a Complaint. .............................................52

     **1.** The Product Market Is Adequately Alleged and Not Irrational. ............................53

     **2.** The Geographic Market Is Adequately Alleged and Not Irrational. ....................56

VI.   PLAINTIFFS' CLAIMS OF ATTEMPTED MONOPOLIZATION ARE SUPPORTED BY WELL PLED FACTS.........................................................58

   **A.** Defendants' Specific Intent to Monopolize Is Unambiguously Pled, As Are Facts Supporting that Allegation. .................................................58

   **B.** The Facts Pled Unambiguously Support the Allegation That There Was a Dangerous Probability of Success.................................................61

**Page**

VII.  PLAINTIFFS' CLAIMS UNDER SECTION 7 OF THE CLAYTON ACT ARE
WELL PLED......................................................................................................................64

    **A.**  Plaintiffs' Allegations of Injurious Effects of the EMMC
Acquisitions Must be Accepted on a Motion to Dismiss...........................................65

    **B.**  Individual Cooperative Members May Be Liable for Violation of
Section 7......................................................................................................................67

VIII. STATE CORPORATE LAW DOES NOT SHIELD DEFENDANTS FROM
LIABILITY FOR ANY OF THEIR ACTIONS. ............................................................71

IX.  THE PARTICIPATION OF EACH OF THE DEFENDANTS IN THE
ANTICOMPETITIVE SCHEME HAS BEEN ADEQUATELY PLED........................75

CONCLUSION.........................................................................................................................77

**Page**

# TABLE OF AUTHORITIES

## Cases

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), *cert. denied*, 435 U.S. 1081 (2002) ..............................................................38

*A.G. Spalding & Bros., Inc. v. F.T.C.*, 301 F.2d 585 (3d Cir. 1962) ...........................69

*Agritronics Corp. v. National Dairy Herd Ass'n*, 914 F. Supp. 814 (N.D.N.Y. 1996) ........................................................................14, 21, 34, 46

*Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982), *cert. denied,* 461 U.S. 937 (1983) .......................................................... *passim*

*Al-Khazraji v. Saint Francis College*, 784 F.2d 505 (3d Cir. 1986)...........................74

*Allen-Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194 (3d Cir.), *cert. denied*, 513 U.S. 1066 (1994) ..............................................49, 55

*Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004) .............................................79

*American Health Systems, Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*, 1994 WL 314313 (E.D. Pa.)...............................................53

*Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982) ...........................32

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983)...............................................38, 42

*Associated Press v. United States*, 326 U.S. 1 (1945) ......................................47

*Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325 (7th Cir. 1986).............................................................................49

*Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98 (3d Cir. 1992) ..............................................................................................49

*Bell v. Fur Breeders Agricultural Cooperative*, 348 F.3d 1224 (10th Cir. 2003) ..........................................................................45, 71

*Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965), *aff'd*, 368 F.2d 679 (8th Cir. 1966)...........................22, 34

*Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434 (E.D. Pa.) ...................................73

*Black & Yates v. Mahogany Ass'n*, 129 F.2d 227 (3d Cir. 1941), *cert. denied*, 317 U.S. 679 (1942) ...........................................................76

**Page**

*Blue Shield of Virginia v. McCrea*dy, 457 U.S. 465 (1982) ....................................41, 42

*Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979) ................................................. 31-32

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) ...........................................................................................................50

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 29 U.S. 477 (1977) ...........................................41

*California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative*, 413 F. Supp. 984 (N.D. Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978)..........................................................................................................31

*Carpet Group International v. Oriental Rug Importers Association, Inc.*, 227 F.3d 62 (3d Cir. 2000) ..................................................................................41, 42

*Case-Swayne Co., Inc. v. Sunkist Growers, Inc.* ("*Sunkist II*"), 389 U.S. 384 (1967)............................................................................................... *passim*

*Cheatle v. Katz*, 2003 WL 21250583 (E.D. Pa.)...........................................................73

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)..................43

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir. 1996)....................................................................................................48

*Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) ..............................................................................................................13

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)................................ *passim*

*Crimpers Promotions, Inc. v. Home Box Office*, 724 F.2d 290 (2d Cir. 1983) ...............................................................................................................41

*Curvcraft, Inc. v. Chromcraft Inc.*, 193 U.S.P.Q. 371 (E.D. Pa. 1976) ........................53

*Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206 (3d Cir. 1983)....................40

*Deaktor v. Fox Grocery Co.*, 332 F. Supp. 536 (W.D. Pa. 1971)...........................74-75

*Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir. 1978)..................................74, 75

*Dooley v. Crab Boat Owners Marketing Ass'n*, 2004 WL 902361 (N.D. Cal.)................................................................................................... 34, 45-46

*Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451 (1992)..............50-51, 52

**Page**

*Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir.), *cert. denied*, 534 U.S. 1014 (2001)................................................................................................57

*Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384 (8th Cir. 1989)...........................................................................................................35

*Fairdale Farms v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980) .....................................30, 31

*Farmland Dairies v. New York Farm Bureau, Inc.*, 1996 WL 191971 (N.D.N.Y.)......................................................................................................22

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir.), *cert. denied*, 537 U.S. 885 (2002)..................................................................28

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ...............................27-28

*Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922 (E.D. Pa.) ...................................57

*Fuentes v. South Hills Cardiology*, 946 F.2d 196 (3d Cir. 1991)...................................................76

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485 (2d Cir. 2004) ...........................................................................48

*Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838 (N.D. Cal. 2004).......................................71

*Glaberson v. Comcast Corp.*, 2006 WL 2559479 (E.D. Pa.) ........................................................37

*Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir. 2000)....................................................38

*Gulf Coast Shrimpers and Oystermans Ass'n v. United States*, 236 F.2d 658 (5th Cir. 1956)..........................................................................34, 46

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993)..................................................................................41

*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ..................................38, 39, 43

*Hewlett-Packard Co. v. Arch Assocs Corp.*, 908 F. Supp. 265 (E.D. Pa. 1995) .....................................................................................................57-58

*Higbie v. Kopy-Kat, Inc.*, 391 F. Supp. 808 (E.D. Pa. 1975).......................................................74

*Holly Sugar v. Goshen County Coop. Bee Growers Ass'n*, 725 F.2d 564 (10th Cir. 1986)................................................................................35

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003) ................................................................................37

**Page**

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .......................................................................39

*In re Adams Golf, Inc. Securities Litig.*, 381 F.3d 267 (3d Cir. 2004) .................................. 14-15

*In re Bath & Kitchen Fixtures Antitrust Litig.*, 2006 WL 2038605 (E.D. Pa.) ......................................................................................................................................77

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ...................................15

*In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002) .................................38

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003), *cert. denied*, 543 U.S. 939 (2004) .......................................................................................38, 43

*In re Central California Lettuce Producers Cooperative*, 1977 Trade Reg. Rep. (CCH) ¶ 21,337 (FTC 1977) ......................................................................................31

*In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211 (N.D. Ill. 1980) .........................................39

*In re Hydrogen Peroxide Antitrust Litig.*, 401 F. Supp. 2d 451 (E.D. Pa. 2005) ....................................................................................................................... 12-13, 77

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 356 F. Supp. 2d 484 (M.D. Pa. 2005) ........................................................................................................13, 77

*In re Public Offering Antitrust Litig.*, 2004 WL 350696 (S.D.N.Y.) ...........................................39

*In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005) .....................................................................15

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000) ....................................11, 43

*Int'l Rys. of Central America v. United Brands Co.*, 532 F.2d 231 (2d Cir. 1976) ........................................................................................................................................71

*Johnson v. Harrigan-Peach Land Development Co.*, 489 P.2d 923 (Wash. 1971) ........................................................................................................................................76

*Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981), *aff'd*, 715 F.2d 520 (11th Cir. 1983) .......................................................................35

*Knuth v. Erie-Crawford Dairy Cooperative Ass'n*, 395 F.2d 420 (3d Cir. 1968) ........................................................................................................................11, 34, 46

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) .......................................................................................................12

**Page**

*LePage's Inc. v. 3M*, 277 F.3d 365 (3d Cir. 2002), *rev'd on reh'g en banc,*
    324 F.3d 141 (3d Cir. 2003) ................................................................................61

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003).......................................................62

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ......................................61

*Lord v. Living Bridges*, 1999 WL 562713 (E.D. Pa.) ..............................................73

*Los Angeles Memorial Coliseum Commission v. Nat'l Football League,*
    726 F.2d 1381 (9th Cir.), *cert. denied*, 469 U.S. 990 (1984)..............................46-47

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004).........................................12, 16

*Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F.
    Supp. 1019 (S.D. Tex. 1972) ............................................................................34

*Maryland & Virginia Milk Producers Ass'n, Inc.*, 362 U.S. 458 (1960)........................... passim

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988)..........................................40

*McTamney v. Stolt Tankers & Terminals (Holdings) S.A.*, 678 F. Supp.
    118 (E.D. Pa. 1987) ...............................................................................68, 70-71

*Mill Run Associates v. Locke Property Co., Inc.*, 282 F. Supp. 2d 278
    (E.D. Pa. 2003) ..................................................................................................75

*Morris v. Dearborne*, 181 F.3d 657 (5th Cir. 1999)....................................................40

*Moy v. Schreiber Deed Security Co.*, 535 A.2d 1168 (Pa. Super. 1988).....................75

*Multifliex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983),
    *cert. denied*, 465 U.S. 1100 (1984)...............................................................61

*Murray v. Nat'l Football League*, 1996 WL 363911 (E.D. Pa.)...................................47

*National Broiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978)........................... passim

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986) ...........................56

*Nicolette v. Caruso*, 315 F. Supp. 2d 710 (W.D. Pa. 2003)........................................14

*North Tex. Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189 (5th
    Cir. 1965), *cert. denied*, 382 U.S. 977 (1966) .....................................................34

*Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc.*, 382 F.
    Supp. 2d 221 (D. Mass. 2004) ...........................................................................14

**Page**

*Olympic Fish Products, Inc. v. Lloyd*, 611 P.2d 737 (Wash. 1980) ..............................................76

*Otto Milk Co v. United Dairy Farmers Coop. Ass'n*, 388 F.2d 789 (3d Cir. 1967) ..........................................................................................................................34, 44

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248 (3d Cir. 1984), *cert. denied*, 471 U.S. 1016 (1985)..........................................................................57

*Pacific Coast Agriculture Expert Assoc. v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), *cert. denied*, 425 U.S. 959 (1976)...................................... 36, 61-62

*Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994)...................................15, 16

*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464 (1962) .....................................12, 78

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ..........................................................................................................................52, 53

*Re/Max Int'l v. Realty One*, 173 F.3d 995 (6th Cir. 1999)........................................................ 48-49

*Ripplemeyer v. Nat'l Grape Coop. Ass'n, Inc.*, 807 F. Supp. 1439 (W.D. Ark. 1992)..........................................................................................................................22, 26

*Rolite v. Wheelabrator Environmental Systems, Inc.*, 958 F. Supp. 992 (E.D. Pa. 1997) .......................................................................................................... 49-50

*Shane v. Fauver*, 213 F.3d 113 (3d Cir. 2000) ..............................................................................79

*Shay v. Flight C Helicopter Services, Inc.*, 822 A.2d 1 (Pa. Super. 2003) ....................................74

*Sheet Metal Duct, Inc. v. Lindalab, Inc.*, 2000 WL 987865 (E.D. Pa.) ..........................................14

*Shoenberg Farms, Inc. v. Denver Milk Producers, Inc.*, 231 F. Supp. 266 (D. Colo. 1964) ..............................................................................................................45

*Silver v. New York Stock Exchange*, 373 U.S. 341 (1963) ............................................................47

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410 (3d Cir. 1999) .................................................................................16

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .....................................................58, 59

*State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 553 P.2d 423 (Wash. 1976)......................................................................................................... 75-76

**Page**

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999), *cert. denied*, 528 U.S. 1105 (2000)................................37, 41

*Steinberg v. Guardian Life Ins. Co. of America*, 486 F. Supp. 122 (E.D. Pa. 1980) ................................................................................................................14

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.* ("*Sunkist I*"), 370 U.S. 19 (1962) ..................................................................................44

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2004) .............................................................12

*Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987) ...............................................................................................................62

*Tim W. Koerner & Assoc., Inc. v. Aspen Labs, Inc.*, 492 F. Supp. 294 (S.D. Tex. 1980), *aff'd*, 683 F.2d 416 (5th Cir. 1982)...........................................71

*Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594 (1953) .........................................50, 59

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...........................................50, 52, 56

*Tops Mkts., Inc. v. Quality Mkts, Inc.*, 142 F.3d 90 (2d Cir. 1998) ..............................63

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*, 419 U.S. 990 (1974)...........................................30

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478 (3d Cir. 1998)..................................................................................11

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991) ................................50

*U.S. Horticultural Supply, Inc. v. The Scotts Co.*, 2006 WL 1531407 (E.D. Pa.) ...........................................................................................................11, 57

*U.S. v. Beatrice Foods Co.*, 330 F. Supp. 577 (D. Utah 1971).....................................14

*U.S. v. Borden*, 308 U.S. 188 (1939) ...............................................15, 21, 44, 46

*U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956).....................................48

*U.S. v. Hinote*, 823 F. Supp. 1350 (S.D. Miss. 1993) .................................... 15, 25-26, 29

*United Egg Producers v. Bauer Int'l Corp.*, 312 F. Supp. 319 (S.D.N.Y. 1970) ...........................................................................................................45

*United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945) .............................55, 59

**Page**

*United States v. Columbia Pictures, Corp.*, 189 F. Supp. 153 (S.D.N.Y. 1960) .................................................................................................70

*United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) .................................49

*United States v. Employing Plasters' Ass'n*, 347 U.S. 186 (1954) ...............................11

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir.), *cert. denied*, 534 U.S. 952 (2001) ...............................................................................48

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ..................................69

*Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86 (1983) .......................................73-74, 75

*Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173 (3d Cir. 1988) ..........................................76

## Statutes

7 U.S.C. § 291 ............................................................................................... *passim*

15 U.S.C. § 1 ................................................................................................. *passim*

15 U.S.C. § 2 ................................................................................................. *passim*

15 U.S.C. § 18 ...................................................................................... 65-66, 69

15 U.S.C. § 18(a) .................................................................................................67

15 U.S.C. § 18(a)(i)(1) .................................................................................. 67-68

15 U.S.C. § 18(a)(c)(12) ....................................................................................67

15 U.S.C. § 18(d)(2)(B) ......................................................................................67

15 U.S.C. § 521 ..................................................................................................25

15 U.S.C. §§ 3501-3503 .....................................................................................13

Pub. L. No. 81-899, 64 Stat. 1225 (1950)...........................................................69

15 Pa. C.S. § 5552(a) ..........................................................................................72

Wash. Rev. Code Ann. § 23.86.105(1) ...............................................................72

Wash. Rev. Code Ann. § 23.86.360 ............................................................. 73-74

**Page**

**Regulation**

16 C.F.R. § 802.2(g) ............................................................................67


**Legislative History**

59 Cong. Rec. 8024 (1920) ...................................................................20

61 Cong. Rec. 1033 (1921) ...................................................................19

62 Cong. Rec. 2052 (1922) ...................................................................18

62 Cong. Rec. 2057 (1922) ...................................................................19

62 Cong. Rec. 2059 (1922) ...................................................................19

*Hearing Before a Subcommittee of the Committee on the Judiciary of the
   United States Senate on H.R. 2373*, 67th Cong., 1st Sess. (1921).............20

*Hearing Before a Subcommittee of the Committee on the Judiciary of the
   U.S. Senate on S. 4344*, 66th Cong., 2d Sess. (1920) .........................28

H.R. Rep. 24, 67th Cong, 1st Sess. (1921) ...........................................18, 19

H.R. Rep. No. 1118 (reprinted in 1980 U.S. Code Cong. & Admin. News
   at 2373) .........................................................................................13

H.R. Rep. No. 1191, 81st Cong., 1st Sess. (1949) .........................................69

**Other**

ABA Section of Antitrust Law, ANTITRUST LAW & DEVELOPMENTS (5th
   ed. 2002) ..........................................................................................63

II Areeda & Hovenkamp, ANTITRUST LAW (2d ed. 2000) ........................37

R. Bork, THE ANTITRUST PARADOX (1978) ...........................................56

Federal Trade Commission, *Report on Corporate Mergers & Acquisitions*
   (1955) ...............................................................................................69

J. von Kalinowksi, ANTITRUST LAW & TRADE REGULATION (2d ed. 2006)...........69-70

The Direct Purchaser Class Plaintiffs ("Plaintiffs") submit this omnibus opposition to the three separate motions filed by Defendants to dismiss the Consolidated Amended Complaint ("Complaint" or "Comp.").[1]

## INTRODUCTION

Plaintiffs' Complaint alleges in great detail how Defendants have used an agricultural cooperative to implement and support a price-fixing conspiracy. The Capper-Volstead Act, 7 U.S.C. § 291, grants limited immunity to farmers to form cooperatives to act "in collectively processing, preparing for market, handling, and marketing" their products. This is not what Defendants did. Rather, Defendants, many of whom engage in all of these functions on their own, used the Eastern Mushroom Marketing Cooperative ("EMMC") to set the prices at which they individually sold Agaricus mushrooms and to implement an anticompetitive "Supply Control" campaign to maintain the fixed prices by eliminating alternate sources of supply. Defendants contributed more than $6 million to the "Supply Control" campaign to purchase mushroom farms and resell them to non-members who agreed to include deed restrictions that prevented the purchased farms from ever again being used for mushroom production. Defendants include the dominant mushroom producers in the country. They represented 60-90% of the Agaricus mushroom market, and their scheme had the intended effect of increasing the price of Agaricus mushrooms.

---

[1] This Opposition responds to the Memorandum of Law by Defendants in Support of Motion to Dismiss All Complaints ("Joint MTD"); Defendants Creekside Mushroom LTD., JM Farms, Inc., Kitchen Pride Mushroom Farms, Inc., and the Mushroom Alliance, Inc.'s Joint Memorandum of Law in Support of their Motion to Dismiss ("Mushroom Alliance MTD"), and Defendant M.D. Basciani & Sons, Inc.'s Memorandum in Support of its Motion to Dismiss the Consolidated Amended Class Action Complaint ("Basciani MTD"), all of which were filed on July 31, 2006.

Based on Defendants' conduct, Plaintiffs pled three causes of action. Count I of the Complaint alleges a violation of section 1 of the Sherman Act for conspiracy; Count II alleges a violation of section 2 of the Sherman Act for the collective action of Defendants to monopolize or attempt to monopolize the market for Agaricus mushrooms; and Count III alleges a violation of section 7 of the Clayton Act for the anticompetitive acquisition of the non-member mushroom farms.

Defendants' motions assert that Plaintiffs' Complaint suffers from a virtual laundry list of defects, even though the EMMC already entered into a consent decree with the Department of Justice on virtually identical facts. Defendants seek dismissal of the Complaint because they claim:

- the Capper-Volstead Act immunizes all of their actions as members of an agricultural cooperative;

- Plaintiffs lack standing to bring claims that the Defendants' conduct injured them;

- the EMMC and its members cannot conspire as a matter of law;

- Plaintiffs have failed to allege market power to support their monopolization claims;

- Plaintiffs cannot recover pursuant to section 7 of the Clayton Act because the acquisitions by the EMMC did not injure competition and the members of the EMMC did not acquire any assets as required by section 7;

- state corporate law shields members of a cooperative from liability for their conspiratorial acts; and

- the participation of individual members of the EMMC has not been adequately pled.

Defendants' arguments run roughshod over all applicable rules of assessing the sufficiency of a complaint. They introduce a myriad of facts from outside the Complaint,

construe the new facts against Plaintiffs, ignore many of the facts that were pled, tightly compartmentalize the allegations that they acknowledge, and repeatedly draw inferences in their own favor even going so far as to ask the Court to assume that they acted entirely irrationally ("quixotically" in their words).  As we demonstrate below, these motions could not be more deserving of denial.

## THE ALLEGATIONS

Defendants' description of the "Background Facts and Procedural History" goes far beyond anything in Plaintiffs' Complaint.  *See* Joint MTD at 3-10.  They introduce facts from outside of the Complaint and draw inferences against Plaintiffs.  To set the record straight, the following is what Plaintiffs have pled.

### I.   The Parties

The representative class Plaintiffs are ten direct purchasers of Agaricus mushrooms. Comp. ¶¶ 11-17.  They purchased Agaricus mushrooms from one or more of Defendants.  *Id.* They bring this case to recover overcharges for the artificially inflated prices for Agaricus mushrooms that they were forced to pay during the alleged class period (January 1, 2001 through the present).  *Id.* ¶¶ 1, 53.

The Defendants are the EMMC, 27 of its members,[2] 5 non-member distributors or farms

---

[2] The EMMC members are Robert A. Ferranto t/a Bella Mushroom Farms (Comp. ¶ 19), Brownstone Mushroom Farms (*id.* ¶ 20), Cardile Mushrooms, Inc. (*id.* ¶ 22), Country Fresh Mushroom Co. (*id.* ¶ 23), Forest Mushroom Inc. (*id.* ¶ 24), Franklin Farms, Inc. (*id.* ¶ 25), Gino Gaspari & Sons, Inc. and Gaspari Bros, Inc. (*id.* ¶ 26), Giorgi Mushroom Company and Giorgio Foods, Inc. (*id.* ¶ 27), Kaolin Mushroom Farms, Inc. (*id.* ¶ 28), LRP Mushroom, Inc., LRP-M Mushrooms LLC, Leone Pizzini and Son, Inc. (*id.* ¶ 30), Modern Mushroom Farms, Inc. (*id.* ¶ 31), Oakshire Mushroom Farm, Inc. (*id.* ¶ 34), Phillips Mushroom Farms, LP (*id.* ¶ 35), Harvest Fresh Farms, Inc. (*id.* ¶ 36), Louis M. Marson Jr., Inc. (*id.* ¶ 37), Mario Cutone Mushroom Co., Inc. (*id.* ¶ 38), M.D. Basciani & Sons, Inc. (*id.* ¶ 39), Monterey Mushrooms, Inc. (*id.* ¶ 40), Masha & Toto, Inc. t/a M & T Mushrooms (*id.* ¶ 41), W & P Mushroom, Inc. (*id.* ¶ 42),

related to members of the EMMC,[3] three entities that belong to one of the cooperative members of the EMMC,[4] and two individuals who were officers of the EMMC at the time that it implemented the anticompetitive practices at issue in this case.[5]

The EMMC was formed in January 2001, and was the largest mushroom cooperative in the United States. Comp. ¶ 18. It was not formed to sell or market mushrooms on behalf of its members; the Member Defendants themselves individually grow, buy, package, and ship mushrooms to retail and food service outlets across the United States. *Id.*

Plaintiffs allege that one or more of the EMMC's members are not "farmers" as defined by the Capper-Volstead Act and are thus not eligible for Capper-Volstead immunity. Comp. ¶¶ 91, 99. In particular, the Complaint alleges that Defendant Monterey Mushrooms, Inc. is a

---

Mushroom Alliance (*id.* ¶ 43), Kitchen Pride Mushrooms (*id.* ¶ 46), and United Mushroom Farms Cooperarative (*id.* ¶ 48). In the case of related entities such as Gino Gaspari & Sons, Inc. and Gaspari Bros, Inc or Giorgi Mushroom Company and Giorgio Foods, Inc., it is not clear which company was a member of the EMMC or if both were. The membership list of the EMMC was never made public and Defendants have concealed their activities. *Id.* ¶¶ 81-82. To date, Plaintiffs have not been able to serve defendant Masha & Toto, Inc.

[3] The related distributors and farms are To-Jo Mushrooms, Inc., which distributes mushrooms grown by EMMC member Brownstone (Comp. ¶ 21), Cardile Brothers Mushroom Packaging, Inc, a packager, seller and distributor of mushrooms for EMMC member Cardile Mushrooms, Inc. (*id.* ¶ 22), South Mill Mushroom Sales, Inc., a distributor for EMMC member Kaolin Mushroom Farms, Inc. (*id.* ¶¶ 28, 29), Sher-Rockee Mushroom Farm, which is related to EMMC member Modern Mushroom Farms, Inc. (*id.* ¶ 32), and C & C Carriage Mushroom Co., a distributor and shipper for EMMC member Modern Mushroom Farms, Inc. (*id.* ¶ 33).

[4] Creekside Mushrooms, Ltd. (Comp. ¶ 45), Kitchen Pride Mushrooms (*id.* ¶ 46), and JM Farms (*id.* ¶ 47) were all members of EMMC member Mushroom Alliance. Quincy Farms (*id.* ¶ 44) was alleged to be a member of the Mushroom Alliance, but was dismissed when Plaintiffs determined that Quincy was expelled from the Mushroom Alliance before the events at issue in this case. *See* Notice of Voluntary Dismissal of Quincy Farms filed Aug. 14, 2006 (Dkt. No. 65). Kitchen Pride Mushrooms was also a member of the EMMC in its own right (*id.* ¶ 46).

[5] The individuals are John Pia, founder and president of the EMMC, and Chief Executive Officer of Kaolin (Comp. ¶ 49), and Michael Pia, an officer of the EMMC and President of Kaolin (*id.* ¶ 50).

fully integrated grower/shipper and marketer of mushrooms. Comp. ¶ 40. It grows mushrooms on farms located in Florida, Illinois, California, Texas, Tennessee, and Pennsylvania, processes mushrooms at plants in Missouri, California, Pennsylvania, Indiana, and Texas, and sells processed mushrooms that are canned, frozen and glass-jarred. *Id.* Discovery is necessary to determine the precise nature of the operations of the members of the EMMC, including whether they all grow[6] mushrooms and whether they are fully-integrated grower-processors.[7]

The EMMC was a forum where the Member Defendants fixed the minimum prices at which Member Defendants would sell their mushrooms to customers in various geographic regions throughout the United States and conspired to eliminate alternate sources of supply that

---

[6] Consistent with Plaintiffs' allegations, publicly available information suggests that some EMMC members may not grow anything. For instance, the website of defendant Country Fresh Mushroom Co. indicates that Country Fresh may operate as a distributor rather than a farmer. It explains that Country Fresh evolved from two mushroom distributors and currently acquires mushrooms from a "network of grower owners and contract growers." *See* Country Fresh Website (www.countryfreshmushrooms.com/about.html) (attached as Ex. A).

[7] As explained below, vertically integrated producers are not within the class that Congress intended to benefit from the Capper-Volstead Act and are therefore not entitled to Capper-Volstead immunity. *See infra* pp. 22-27. In addition to the facts alleged concerning Monterey, Plaintiffs believe that discovery will show that other defendants are vertically integrated growers/processors/sellers. *See, e.g.,* Phillips Mushroom Website (www.phillipsmushroomfarms.com/pgindex.html) (attached as Ex.B) (touting company as a "vertically integrated producer" of mushroom products and describing plant facilities located on farms); *Kaolin Mushroom Farms Wins NFJP Award*, KennettPaper.com, Nov. 19, 2004 (available at www.KennettPaper.com) (attached as Ex. C) (describing defendant Kaolin as a packager of its own mushrooms as well as those of other growers); Kaolin Credit Application (attached as Ex. D) ( describing Kaolin as growers, packers, shippers, and distributors of mushrooms); Giorgio Foods, Inc. Website (www.giorgiofoods.com) (attached as Ex. E) (describing company as a "fully integrated grower, processor and distributor of the finest fresh, frozen, canned, jarred, and value-added mushroom products."); Oakshire Website (www.oakshire.com) (attached as Ex. F) (describing defendant Oakshire as exclusive marketer and distributor of Dole brand mushrooms which are grown by Oakshire and other certified growers). Plaintiffs do not point to these documents outside the Complaint as grounds on which the Court should deny Defendants' motion to dismiss. We only point to them as an indicator of the kind of evidence that may be developed during discovery to support the allegations in the

might be able to undercut the prices that they set. *Id.* ¶¶ 18, 66-75. The conduct and existence

of the EMMC was concealed until the DOJ filed its civil complaint. *Id.* ¶ 81. The identities of

the EMMC members were not even public. *Id.* ¶ 82.

## II.    The Anti-Competitive Conduct

In January 2001, shortly after the EMMC was formed, the EMMC and its members

agreed to set increased minimum prices at which they would sell fresh mushrooms across the

United States. Comp. ¶ 62. The minimum prices that they agreed to were 8% higher, on

average, than the prices prevailing prior to the EMMC's formation. *Id.*

Defendants' motion attempts to separate the increased prices from the scheme undertaken

to support them. But the Complaint specifically alleges that Defendants launched their campaign

to control the mushroom supply to support and maintain the artificial price increases. Comp. ¶

63. Through membership dues and a "Supply Control Assessment," the Member Defendants

contributed to the EMMC approximately $6 million from 2001-2002. Starting in May 2001, the

EMMC, acting as an agent of its members, bought four mushroom farms and resold them at a

combined total loss of over $1.2 million and placed permanent deed restrictions on the properties

at the time of each resale. *Id.* ¶ 3. One deed restriction read:

> This property shall never be used for the cultivation, growing,
> marketing, sale or distribution of fresh mushrooms, canned and/or
> processed mushrooms or related endeavors.

*Id.* ¶ 3. The Complaint describes each of the four real estate transactions. *See id.* ¶¶ 67-69, 71

(describing transactions involving Dublin, Ga. farm., Evansville, Pa. farm., Gallo's Farm in

Berks County, Pa, and La Conca D'Oro Farm in Berks County, Pa.). In the case of the Dublin,

Ga. farm, the EMMC outbid a non-EMMC mushroom grower based in Colorado that was

---

Complaint.

attempting to enter mushroom farming in the eastern United States in competition with EMMC. *Id.* ¶ 67.

Also as an agent of its members, in February and August 2002, the EMMC purchased lease options, at a cost of over $1.2 million, on two additional mushrooms farms. Comp. ¶ 4. The lease options allowed the EMMC to file deed restrictions on the two properties prohibiting the use of the properties for any business related to growing mushrooms for a period of 10 years. The Complaint describes the lease options for Ohio Valley Mushroom Farms and Amadio Farm in Berks Country, Pennsylvania. Comp. ¶ 70, 72. The EMMC never entered into leases on these farms, but did file the deed restrictions. *Id.*

All told, the EMMC spent approximately $3 million to implement the Supply Control campaign. Comp. ¶ 66. Defendants admitted that the campaign had "[a]nnually taken over 50 million pounds out of production from facilities which could have easily been purchased and remained in production." *Id.* at 74.

The Complaint specifically pleads that the Defendants' purpose in entering into these transactions was "to reduce or eliminate the Agaricus mushroom growing capacity available to potential independent competitors in the United States, thereby improving Defendants' ability to maintain the artificially-inflated price increases to which they had agreed." *Id.* at ¶ 75.

The Complaint also alleges that the EMMC members "supported and reinforced" their scheme to increase the price of Agaricus mushrooms by (a) collectively interfering with any non-EMMC growers that sought to sell at prices that were below the artificially-inflated prices set by the EMMC and (b) using collective and conspiratorial acts to pressure independent growers to join the EMMC and the Defendants' anticompetitive scheme. *Id.* ¶ 76. The Complaint explains the factual basis for these allegations. It alleges that the EMMC members controlled a dominant

share of the Agaricus mushroom supply in the Eastern United States and/or the nation. *Id.* ¶ 77. As a result, they were able to pressure independent growers to join the EMMC or refrain from selling mushrooms at lower prices. In the mushroom industry, growers need to purchase from other growers to meet short term supply needs. *Id.* The portion of the market that they controlled allowed the EMMC members to threaten and/or implement a group boycott of growers who needed to be able to purchase mushrooms to meet short term supply needs. *Id.*

### III.   The Market

The Complaint alleges both a relevant product and geographic market for determining the anticompetitive effect of Defendants' conduct. The relevant product market pled is "fresh Agaricus mushrooms." Comp. ¶ 61. The relevant geographic market pled is "the United States, or alternatively, the eastern United States." *Id.*

In support of these markets, the Complaint alleges that in 2002, the year after the formation of the EMMC, sales of all mushrooms in the United States were over $800 million. The vast majority of all mushrooms sold in the United States are Agaricus mushrooms, the common table variety also known as the "white button" mushroom (agaricus bisporus). Comp. ¶ 60. In 1995, the Agaricus mushroom accounted for 99% of all mushrooms grown in the U.S. *Id.* Agaricus mushrooms are sold to fresh market retailers such as grocery store chains and food distributors, and to canneries. *Id.*

EMMC members controlled over 60 percent of all Agaricus mushrooms grown in the United States and approximately 90 percent of all Agaricus mushrooms grown in the eastern United States. *Id.* ¶ 2.

The Complaint explains that there are significant barriers to entry in opening a new mushroom farm. The construction of a new mushroom farm costs millions of dollars. *Id.* ¶ 65.

In addition, it is generally necessary to get zoning approval for a new mushroom farm.  *Id.*  And, building a new facility takes much longer to generate any revenue than purchasing or leasing an existing growing operation.  *Id.*  By eliminating the existing available productive capacity, Defendants substantially reduced and impeded current competition and substantially forestalled and delayed the entry of new competitors and/or the expansion of existing competitors.  *Id.*

The Complaint further alleges facts demonstrating Defendants' market power.  Defendants were able to increase the price of mushrooms 8%.  *Id.* ¶ 62.  They undertook the Supply Control campaign to eliminate alternate sources of mushroom supply that otherwise could have forced down the inflated prices that they set.  *Id. ¶* 63.  And, their scheme was successful.  Their actions caused an artificial increase in the prices for Agaricus mushrooms that Defendants sold as well as Agaricus mushrooms sold by non-EMMC growers.  *Id.* ¶ 78.  The members of the EMMC were able to affect, fix, raise, maintain and/or stabilize at artificial and non-competitive levels the prices at which Agaricus mushrooms were sold, distributed or obtained in the United States which prices would have been lower in the relevant market in the absence of the unlawful conduct of the EMMC members.  *Id.* ¶¶ 90, 92, 101.

## IV. The DOJ Investigation

The Complaint expressly refers to the investigation and Complaint that the United States Department of Justice filed against the EMMC on December 16, 2004.  Comp. ¶ 79.  The DOJ Complaint arose out of the same facts alleged in the Complaint.  The Complaint explicitly incorporates the DOJ Complaint, the DOJ's Competitive Impact Statement, and the Final Judgment regarding the Justice Department's allegations, to which the EMMC consented.  Comp. at Preamble.  Each of these documents is included in the Appendix to Defendants' Joint Motion to Dismiss.

The DOJ Complaint – like Plaintiffs' Complaint – alleged that "fresh agaricus mushrooms is a relevant market within the meaning of § 1 of the Sherman Act," DOJ Complaint ¶ 30 (attached as Ex. 1 to Joint MTD), the "eastern United States is a relevant geographic market," *id.*; and the "Supply Control Campaign is not a joint activity protected by the Capper Volstead Act." *Id.* ¶ 33. It also alleged that the EMMC divided the country into six geographic regions, *id.* ¶ 16, and that "[f]resh market mushroom prices historically have been lowest in the east." *Id.* ¶ 15. The EMMC entered into a consent decree that acknowledged without admitting liability that the DOJ "Complaint states a claim upon which relief may be granted against [it] under § 1 of the Sherman Act." Proposed Final Judgment at 2 (attached as Ex. 4 to Joint MTD). Final Judgment was entered on September 9, 2005. Comp. at Preamble. The DOJ recognized the potential for private lawsuits arising out of Defendants' conduct. Competitive Impact Statement at 6 (attached as Ex. 2 to Joint MTD). The DOJ told this Court that the proposed Final Judgment would "neither impair nor assist the bringing of such actions." *Id.*

An anonymous letter received by the Energy & Agriculture Section of DOJ in connection with the proposed Final Judgment further supports the allegations in Plaintiffs' Complaint. *See* Letter dated January 5, 2005 to Roger W. Fones (attached to Response of the United States to Public comments on the Proposed Final Judgment) (Ex. 5 to Joint MTD). The author alleges that the EMMC had "forced many members to be in the EMMC or they would not do business with them." *Id.* at 1. The author further explained that a great deal of pressure was put on mushroom farmers that were not members of the EMMC – "[f]rom not selling to overcharging and even trying to limit the picking containers they could pick in." *Id.* In connection with the EMMC's purchase of the mushroom farms, the author described how the EMMC threatened anyone that competed for the facilities. *Id.*

## ARGUMENT

**I.     ALL INFERENCES MUST BE DRAWN IN FAVOR OF PLAINTIFFS ON DEFENDANTS' MOTIONS TO DISMISS.**

The standard of review on a motion to dismiss an antitrust case is well-settled.  Such a motion should be granted "only if 'after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations in the complaint.'" *In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 398 (3d Cir. 2000) (citing *Trump Hotels and Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998)).  Plaintiffs are required to plead only "a short and plain statement of the claim showing that [they] are entitled to relief." Fed. R. Civ. P. 8(a).  All doubts should be resolved in favor of the position that will uphold the pleading.  *Knuth v. Erie-Crawford Dairy Cooperative Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968); *U.S. Horticultural Supply, Inc. v. The Scotts Co.*, 2006 WL 1531407, at *2 & n.1 (E.D. Pa.) ("When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court accepts all facts and allegations listed in the complaint as true and construes them in the light most favorable to the plaintiff.").

Even "conclusory" facts must be considered on a motion to dismiss.  As recognized in *Knuth*, a Capper-Volstead case like the present one,  "'whether (the) charges be called 'allegations of fact' or 'mere conclusions of the pleader' * * * they must be taken into account in deciding' whether a claim for relief is stated." *Id.* (quoting *United States v. Employing Plasters' Ass'n*, 347 U.S. 186, 189 (1954)).  Complaints that plead every element of the claim should rarely be dismissed:

> Where a bona fide complaint is filed that charges every element
> necessary to recover, summary dismissal of a civil case for failure
> to set out evidential facts can seldom be justified.  If a party needs

> more facts, it has a right to call for them under Rule 12(e) of the
> Federal Rules of Civil Procedure.  Any time a claim is frivolous an
> expensive full dress trial can be avoided by invoking the summary
> judgment procedures under Rule 56.

*Id.* (quoting *Employing Plasters'*, 347 U.S. at 189).  *See also Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962) (cautioning that "summary judgment procedures should be used sparingly in complex antitrust litigation" given that "the proof is largely in the hands of the alleged conspirators . . . .").

Defendants try to pervert this liberal standard of pleading.  First, they claim that Plaintiffs' complaint must be subjected to "strict scrutiny" because it involves an immunity.  Second, they introduce a myriad of facts outside the Complaint, from isolated portions of the bankruptcy proceedings of Money's Mushrooms to statistics concerning the amount of farm land in the United States.  Neither strategy is proper on a motion to dismiss.

### A.  There is No Heightened Pleading Standard for Capper-Volstead Cases.

The argument that allegations not subject to Fed. R. Civ. P. 9(b) must satisfy a heightened level of pleading has been rejected twice by the Supreme Court.  In *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), the Court held that the circumstances specified in Fed. R. Civ. P. 9(b) (fraud and mistake) were the only circumstances required to be pled with specificity.  The Court reaffirmed that holding in *Swierkiewicz v. Sorema*, 534 U.S. 506, 513 (2004), where it reiterated that "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."  *See also Lum v. Bank of America*, 361 F.3d 217, 228 (3d Cir. 2004) (antitrust claims not sounding in fraud are not subject to heightened pleading requirements), *cert. denied*, 543 U.S. 918 (2004); *In re Hydrogen Peroxide Antitrust Litigation*, 401 F. Supp. 2d 451, 454-55 (E.D. Pa. 2005) (the text of

the Federal Rules, jurisprudence, and policy dictate the application of Rule 8 and not Rule 9 in

the antitrust context); *In re Pressure Sensitive Labelstock Antitrust Litigation*, 356 F. Supp. 2d

484, 490-91 (M.D. Pa. 2005) ("no heightened pleading requirements apply in antitrust cases").

Notwithstanding their previous acknowledgement that the DOJ's Complaint stated a

claim,[8] Defendants now assert that Plaintiffs' Complaint based on the same conduct must be

subjected to "strict scrutiny" because a "Congressionally-mandated immunity is at stake." Joint

MTD at 12. In support, they cite *Commonwealth of Pennsylvania v. Pepsico, Inc.*, 836 F.2d 173

(3d Cir. 1988), a pre-*Leatherman* case. Even if such a holding could survive *Leatherman* and

*Swierkiewicz*, the case stands for no such far-reaching proposition.

Nowhere does *Pepsico* state that it is applying "strict scrutiny." Rather, in that case, the

Court of Appeals dealt with the sufficiency of a complaint subject to the Soft Drink Interbrand

Competition Act of 1980, 15 U.S.C. §§ 3501-3503, which was "enacted to remove certain soft

drink industry practices from the reach of the antitrust laws." *Pepsico*, 836 F.2d at 175. In

affirming the District Court's dismissal, the Court recognized both that the Soft Drink Act was

"*sui generis*" and that the Act placed the burden of proving that it did not apply "squarely on the

Plaintiff." *Id.* at 177.[9] Thus, at most, *Pepsico* stands for the rather unremarkable proposition

---

[8] *See* Stipulation ¶ 2 (attached as Ex. 3 to Joint MTD); Proposed Final Judgment at 2 (attached as Ex. 4 to Joint MTD).

[9] The Court relied on the language of the statute, 15 U.S.C. § 3501, and the House Report recommending passage of the Bill that clearly explained: "If a Plaintiff cannot establish that there is an absence of substantial and effective competition within the territory, then the existence and enforcement of such arrangements would not violate the antitrust laws." *Pepsico*, 836 F.2d at 177 (quoting H. Rep. No. 1118, *reprinted in* 1980 U.S. Code Cong. & Admin. News at 2373, 2389).

that a complaint that does not plead all of the elements of the Plaintiff's claim should be dismissed.[10]

Nothing similar exists with respect to the Capper-Volstead Act. The Act "was not intended to create an absolute shield from antitrust liability for agricultural cooperatives." *Agritronics Corp. v. National Dairy Herd Ass'n*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996). Unlike the Soft Drink Act, which puts the burden of proof on Plaintiff, the Capper-Volstead Act is an affirmative defense. *See Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc.*, 382 F. Supp. 2d 221, 223 (D. Mass. 2004); *U.S. v. Beatrice Foods Co.*, 330 F. Supp. 577, 580 (D. Utah 1971). Consequently, it is Defendants' burden to prove entitlement to the "limited immunity" that Congress granted. *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184 (8th Cir. 1982), *cert. denied* 461 U.S. 937 (1983) (as an affirmative defense, defendant must show "sufficient evidence" of entitlement to Capper-Volstead immunity).

---

[10] Defendants cite a number of additional cases that they claim impose additional pleading requirements in cases involving antitrust immunities. *See* Joint MTD at 13 n.20. None suggest that there is a heightened pleading requirement in such cases nor impose obligations on Plaintiffs to plead around an affirmative defense. All of them stand for the unremarkable proposition that a complaint may be dismissed where it establishes a defense on its face. *See Nicolette v. Caruso*, 315 F. Supp. 2d 710, 720 (W.D. Pa. 2003) (dismissing *pro se* Plaintiff's Sherman Act conspiracy where allegations against Township and its officers established that the acts at issue were undertaken in their official capacity and were therefore by definition immune under Local Government Antitrust Act); *Steinberg v. Guardian Life Ins. Co. of America*, 486 F. Supp. 122, 123-24 (E.D. Pa. 1980) (dismissing complaint where it was "apparent" from its face that Plaintiff's allegations concerned "the business of insurance" and nothing to the contrary was alleged); *Sheet Metal Duct, Inc. v. Lindalab, Inc.*, 2000 WL 987865 (E.D. Pa.) (dismissing Plaintiff's antitrust claim against patent holder for exclusion from market because, *inter alia*, Plaintiff alleged defendant held a valid and enforceable patent and made "no allegations that the . . . patent is invalid or that it was procured by fraud"). These cases are irrelevant here because Plaintiffs have not pled any facts that Defendants are entitled to Capper-Volstead immunity. *See infra* pp. 17-37 (demonstrating that Capper-Volstead immunity cannot be determined on this motion to dismiss).

A 12(b)(6) motion is not the proper vehicle for Defendants to seek judgment on the basis of an affirmative defense.  See *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (3d Cir. 2004) ("an affirmative defense may not be used to dismiss a Plaintiff's complaint under Rule 12(b)(6)"); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (holding that courts "will not rely on an affirmative defense . . . to trigger dismissal of a complaint under Rule 12(b)(6)").

The applicability of the immunity granted by the Capper-Volstead Act is a particularly fact-intensive inquiry.  *See infra* pp. 17-37.  Such issues are particularly ill-suited for resolution on a motion to dismiss, and courts routinely deny or reverse the grant of motions to dismiss on the basis of Capper-Volstead immunity.  *See, e.g.*, *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967) ("*Sunkist II*") (reversing and remanding  appeals court's decision to dismiss a charge under § 1 of the Sherman Act); *Maryland & Virginia Milk Producers Ass'n, Inc.*, 362 U.S. 458 (1960) (reversing dismissal of Sherman Act § 2 claim on Capper-Volstead grounds); *U.S. v. Borden*, 308 U.S. 188 (1939) (reversing dismissal of § 1 claim under the Sherman Act); *Alexander*, 687 F.2d at 1182  (reversing lower court dismissal of claims under §§ 1 & 2 of the Sherman Act); *U.S. v. Hinote*, 823 F. Supp. 1350 (S.D. Miss. 1993) (denying motion to dismiss criminal indictment against president of catfish cooperative pursuant to § 1 of Sherman Act).

### B.  The Only External Documents that May Properly Be Considered Are Those Cited in the Complaint.

Documents cited in a complaint such as the DOJ Complaint, the DOJ's Competitive Impact Statement, and the Final Judgment regarding the Justice Department's allegations are appropriately considered on a motion to dismiss.  *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guaranty Corp. v. White Consol.*

*Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994). Defendants, however, go far beyond the allegations in Plaintiffs' Complaint and introduce a wide variety of "facts," including details of a bankruptcy involving a mushroom producer named Money's, statistics about the availability of farmland in the United States, and claims about the shipment of mushrooms from foreign countries. Joint MTD at 6-8, 31-33, 46. None of these "facts" is included in the Complaint and none is appropriately considered on a motion to dismiss.

Defendants assert that these facts are appropriately considered because they are matters "of public record." Joint MTD at 14. Defendants distort the "public record" exception beyond all recognition. That exception permits the existence of simple facts – criminal case dispositions such as convictions or mistrials or decisions by government agencies – to be considered on a motion to dismiss even if they are not pled in a complaint. *See Pension Benefit*, 998 F.2d at 1197. It does not allow a defendant to pull facts out of a record in another case or present isolated snippets of government reports and argue that they support dismissal of the complaint. As our Court of Appeals has explained, "[w]hile a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss *only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion*." *Lum*, 361 F.3d at 222 n.3 (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd*., 181 F.3d 410, 427 (3d Cir. 1999)) (emphasis added).

A motion to dismiss is not the appropriate place to marshal facts about the competitive effects of the conduct challenged by Plaintiffs.

## II.  THE LIMITED IMMUNITY PROVIDED BY THE CAPPER-VOLSTEAD ACT DOES NOT SHIELD DEFENDANTS FROM LIABILITY BASED UPON THE ALLEGATIONS IN THE COMPLAINT.

Defendants argue that "EMMC's conduct of purchasing land capable of producing mushrooms and imposing restrictions on its use falls squarely within the protection of the Capper-Volstead exemption."  Joint MTD at 21.  In fact, the Complaint pleads facts that indicate that Defendants are not entitled to the Capper-Volstead exemption.  The Act's limited immunity does not extend to cooperatives that:  (1) conspire with non-member entities, (2) include non-farmer members, and (3) are formed merely to engage in naked price-fixing and/or engage in predatory acts.  On Defendants' motion to dismiss, where all inferences must be made in favor of Plaintiffs, the Complaint must be read to support each of these exceptions to the limited immunity of the Capper-Volstead Act.

The Capper-Volstead Act provides limited immunity to agricultural cooperatives.  It was enacted in 1922 to clarify the antitrust exemption granted to such cooperatives by section 6 of the Clayton Act.  *Sunkist II*, 389 U.S. at 391.  The Act gives protection to a broader class of agricultural co-operatives than does section 6.  *Maryland & Virginia Milk Producers*, 362 U.S. at 466.

The Act provides:

> Persons engaged in the production of agricultural product as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations . . . in collectively processing, preparing for market, handling and marketing in the interstate and foreign commerce, such products of persons so engaged . . . . Provided, however . . . that the association shall not deal in the products of nonmembers to an amount greater in value than such as handled by it for members.

7 U.S.C. § 291.

The legislative history of the Act makes it clear that it was intended to permit very specific participants in the agricultural industry to act in very specific ways.  At the time, "farmers were seen as being caught in the hands of processors and distributors who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever profits might be available from agricultural production." *National Broiler Marketing Ass'n v. United States,* 436 U.S. 816, 825 (1978).  Congress hoped to bolster the market strength of farmers by allowing them to join together in cooperatives to improve their ability to weather adverse economic periods and deal with processors and distributors.  *Id*. at 826.

The Supreme Court has recognized that "Congress did not intend to extend the benefits of the Act to the processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk."  *National Broiler*, 436 U.S. at 826.  In reaching this conclusion, the court relied on legislative history such as the exchange between Senators Kellogg and Cummins:

> Mr. CUMMINS . . . Take the flouring mills of Minneapolis:  They are engaged in a broad sense, in the production of an agricultural product.  The packers are engaged in a broad sense, in the production of an agricultural product.  The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?
>
> Mr. KELLOG:  Certainly not . . . .

62 Cong. Rec. 2052 (1922).

The Act does not grant a general immunity to farmers for all activities taken behind the shield of a cooperative.  Rather, its "object" was "to authorize the producers of agricultural products to form associations for the purpose of collectively preparing for market and marketing their products."  H.R. Report No. 24, 67th Cong., 1st Sess. 1 (1921).  *See also Maryland &*

*Virginia Milk Producers*, 362 U.S. at 466 (explaining that Act's "general philosophy" was that "individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage – and responsibility – available to businessmen acting through corporations as entities").

The intent of the Capper-Volstead Act was to remedy the imbalance of bargaining power by removing all doubt that farmers could pool their resources into a single democratically-functioning corporate entity which would be better able to meet the large buyers in the open market and bargain over price for agricultural products. *See* H.R. Report No. 24, 67th Cong., 1st Sess. 3 (1921) ("To maintain his self-respect and the dignity of his occupation the farmer must be given an opportunity to deal in selling his products on an equal footing with those who purchase it."); 61 Cong. Rec. 1033 (1921) ("The bill seeks to place [farmers] in the same position as the line elevator, so they may be able to compete successfully with them.") (remarks of Cong. Volstead) ; 62 Cong. Rec. 2057 (1922) (The bill "was designed simply to give to the growers or the farmers the same opportunity for successful organization and distribution of their products that the great corporations of America have enjoyed for many years") (remarks of Senator Capper).

The efficiencies generated by cooperatives were central considerations during the congressional debates. As Senator Capper made the point in introducing the bill:

> There is a nation-wide demand for greater efficiency all along the line. Cooperation will apply that efficiency to the marketing of farm produce because it will prevent loss to the average farmer through more equitable marketing. It will cut costs of production and risk and reduce the spread between the consumer and the producer. Thus it will give farm products to the consumer cheaper and at the same time yield larger returns to the man who produces by eliminating much of the excessive cost of distribution under the present system in which speculation plays so dominant a part. Furthermore, participation by farmers in the marketing of farm

19

> products through cooperative associations, giving them the right to
> bargain collectively with buyers, will result in stabilizing the
> market, preventing waste, and as I have said, bring about more
> efficient distribution.

62 Cong. Rec. 2059 (1922) (remarks of Sen. Capper).[11]

Defendants' entitlement to this limited immunity granted by Congress cannot be

determined as a matter of law on the face of the Complaint.

### A. The Allegations that Defendants Acted in Concert With Non-Member Entities Are Alone Sufficient to Defeat Defendants' Claims of Immunity.

Defendants acknowledge that the Capper-Volstead Act does not insulate anticompetitive

conduct if taken by cooperatives in concert with non-exempt, non-farmer entities.  Joint MTD at

20.  However, they ignore all of the non-exempt entities identified in the Complaint.

The Complaint alleges that the EMMC and its members sought out and purchased

mushroom farms from non-exempt, non-member entities (Comp. ¶ 67-75) and sold those

properties to developers and other third parties with restrictions preventing future mushroom

production on that land (*id.*).  In addition, the Complaint alleges that non-member distributors

conspired with members to increase prices and restrict supply.  To-Jo Mushrooms, Inc., a

---

[11] This belief in the ability of cooperatives to enhance efficiency and social welfare runs
throughout the Act's legislative history.  *See, e.g.,* 59 Cong. Rec. 8024 (1920) (remarks of Rep.
Andrews) ("Intelligent cooperation among the farmers of the country under the terms of this bill
will increase the production of food products to such an extent as to secure reasonable prices in
the markets."); *id*. at 8025 (remarks of Rep. Hersman) ("[C]ooperative farm associations tend to
increase production"); *id.* at 9153 (extended remarks of Rep. Summers) (Cooperatives will "do
away with extravagant waste of time and energy, to the benefit of the producer and consumer.");
*Hearings Before a Subcommittee of the Committee on the Judiciary of the United States Senate
on H.R. 2373*, 67th Cong., 1st Sess. 155 (1921) (testimony of Mr. Benjamin C. Marsh of the
Farmers' National Council and the American Cooperative Ass'n) (testifying that the bill is "a
very much needed step for efficiency and economy of distribution" and that in the long run it
will "reduce prices, with advantage to both producer and consumer."); *id*. at 179 (testimony of
Charles W. Holman, Secretary, National Milk Producers Federation) (explaining that

distributor of mushrooms grown by EMMC member Brownstone (Comp. ¶ 21), Cardile Brothers

Mushroom Packaging, Inc, a packager, seller and distributor of mushrooms for EMMC member

Cardile Mushrooms, Inc. (*id.* ¶ 22), South Mill Mushroom Sales, Inc., a distributor for EMMC

member Kaolin Mushroom Farms, Inc. (*id.* ¶¶ 28, 29)*,* Sher-Rockee Mushroom Farm, which is

related to EMMC member Modern Mushroom Farms, Inc. (*id.* ¶ 32), and C & C Carriage

Mushroom Co., a distributor and shipper for EMMC member Modern Mushroom Farms, Inc. (*id.*

¶ 33), are all alleged to have participated in the scheme.[12]

In one of its earliest cases regarding the Capper-Volstead Act, the Supreme Court held

that the "right of . . . agricultural producers thus to unite [under Capper-Volstead] in preparing

for market and in marketing the products, and to make the contracts which are necessary for that

collaboration, cannot be deemed to authorize any combination or conspiracy with other persons

in restraint of trade that these producers may see fit to devise." *Borden*, 308 U.S. at 204. In

*Borden,* the Court held that Defendants' activities in conspiring with trade groups and

distributors to control the supply and maintain artificial prices for milk were not immunized

under the Capper-Volstead Act. *Id*. at 205.

Lower courts have consistently followed suit. *See Alexander,* 687 F.2d at 1182 ("[C]o-

ops cannot . . . conspire or combine with nonexempt entities to fix prices or control supply even

though such activities are lawful when engaged in by co-ops alone."); *Agritronics*, 914 F. Supp.

at 825-26 ("Farmers and their organizations . . . lose protection from antitrust attack when they

---

cooperatives eliminate "needless waste").

[12] Discovery is necessary to determine the precise relationship of these entities to the
EMMC members. To the extent that discovery shows them to be separate, the EMMC has
impermissibly conspired with non-members. To the extent that they may be considered to be the
alter-egos of EMMC members, the EMMC members become integrated producers who do not

combine with nonproducer outsiders to unreasonably restrain trade under Section 1 of the Sherman Act."); *Farmland Dairies v. New York Farm Bureau, Inc.*, 1996 WL 191971, at *5 (N.D.N.Y.) ("[E]ntities covered by the Capper-Volstead Act are not allowed to combine or conspire with non-exempt entities in restraint of trade."); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476, 483 (E.D. Mo. 1965), *aff'd*, 368 F.2d 679 (8th Cir. 1966) (rejecting a claim that actions of defendants in conspiring with stores to fix prices on milk by means of a rebate scheme enjoyed Capper-Volstead immunity).

Plaintiffs' allegations that the EMMC entered into contracts with non-exempt entities that unreasonably restrained trade *are alone sufficient* to deny Defendants' motions to dismiss.

## B. Defendants Are Not Entitled to Immunity if the EMMC Has a Single Non-Farmer Member.

The Capper-Volstead Act immunizes the activities of a cooperative whose membership is composed solely of "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers." 7 U.S.C. § 291. If the cooperative has just a *single* non-qualifying member, it will not be entitled to the immunity of the Capper-Volstead Act. *National Broiler*, 436 U.S. at 822-23; *Sunkist II*, 389 U.S. at 393. *See also Ripplemeyer v. Nat'l Grape Coop. Ass'n, Inc.*, 807 F. Supp. 1439, 1458-59 (W.D. Ark. 1992) (holding that membership by Welch, which processed but did not grow grapes, meant that the cooperative could not claim exemption under the Capper-Volstead Act).

As the Supreme Court noted in *National Broiler*, "[a] common-sense reading of this language clearly leads us to conclude that not all persons engaged in the production of agricultural products are entitled to join together and obtain and enjoy the Act's benefits." 436

---

qualify as farmers under the Capper-Volstead Act. *See supra* pp. 22-27.

U.S. at 823.  The Act's language – limiting its immunity to "farmers, planters, ranchmen, dairymen, nut or fruit growers" – and its legislative history clearly indicate that Congress meant to protect only actual agricultural producers.  *Sunkist II*, 389 U.S. at 392-92.  "Congress did not intend to allow an organization with . . . nonproducer interests to avail itself of the Capper-Volstead exemption." *Id.* at 395-96.

Plaintiffs allege that "[o]ne or some of the EMMC members are not 'farmers' within the meaning of the Capper-Volstead Act."  Comp. ¶¶ 91, 99.  Defendants assert that there is no support for this allegation and that it is a "transparent attempt to concoct a 'waiver' of the Act's immunity."  Joint MTD at 25-26.  But it is Defendants' burden to prove their entitlement to Capper-Volstead immunity, and not Plaintiffs' burden to disprove it.  *See supra* pp. 14-15.  This statement is more than sufficient to put Defendants on notice that Plaintiffs will be challenging the entitlement of the EMMC's membership to claim immunity.  In this respect, although not necessary for this Court to deny Defendants' motion, Plaintiffs point out that publicly available statements by at least one member of the EMMC indicate that it may be a distributor rather than a farmer.  *See* Country Fresh Website (www.countryfreshmushrooms.com /about.html) (attached as Ex. A) (explaining that defendant Country Fresh evolved from two mushroom distributors and that it currently acquires mushrooms from a "network of grower owners and contract growers").

But Plaintiffs' allegations go further.  Allegations ignored by Defendants support the conclusion that some members of the EMMC are integrated grower/processors rather than farmers.  Thus, the Complaint alleges that members of the EMMC who farm also "buy, package, and ship mushrooms to retail and food service outlets."  Comp. ¶ 18.[13]  The activities of

---

[13] Defendants' memorandum in support of the motion to dismiss also admits that some of the EMMC members "process and package mushrooms" as well as grow them.  Joint MTD at

Monterey Mushrooms, the "largest grower shipper and marketer of fresh mushrooms in the United States" are described in detail.  Comp. ¶ 40.  Plaintiffs plead that Monterey not only grows mushrooms on farms in Florida, Illinois, California, Texas, Tennessee, and Pennsylvania, but that it is a processor of mushrooms in plants that it operates in Missouri, California, Pennsylvania, Indiana, and Texas.  *Id.*[14]

Integrated producers like Monterey are not "farmers" under the Capper-Volstead Act. Justice Brennan's concurrence in *National Broiler* sets out the relevant test and its rationale.  In that case, some members of a cooperative operated chicken farms, but were also integrated downstream through substantial processing operations. *National Broiler*, 436 U.S. at 821-22. The majority opinion did not reach the issue of whether such vertically integrated producers were entitled to the immunity that Congress intended for farmers.  Instead, it held that the cooperative was not entitled to immunity because some of the members of the cooperative had no growing operations at all.  *Id.* at 828-29.

Justice Brennan, however, reached the question "of whether a fully integrated producer of agricultural products performing its own processing or manufacturing and which hence does not associate for purposes of common handling, processing, and marketing is nevertheless 'engaged in the production of agricultural products as [a] farme[r]' for purposes of § 1's exemption for such cooperatives if also engaged in traditional farming activity."  *Id.* at 834.  He concluded that the presence of such an integrated producer in a cooperative destroys the exemption.  Justice Brennan reasoned that Congress intended the Capper-Volstead Act to allow

---

15.

[14] Plaintiffs believe that discovery would show that other EMMC members are also fully integrated grower-processors of mushrooms.  *See supra* n. 7.

the farmers to join together to balance out the power of the processors.  It did not intend to allow

the protections of the Act to extend to "processors and packers to whom the farmers sold their

goods, even when the relationship was such that the processor and packer bore a part of the

risk."  *Id.* at 832 (quoting majority opinion, *id.* at 826-27).

According to Justice Brennan, integrated producers who "seek protection of the

exemption not to permit collectivized processing but simply as a shield for price fixing" are  not

entitled to the immunity extended to farmers.  *Id.* at 834.  As he explained, "[i]t is hard to believe

that in enacting a provision to authorize horizontal combinations for purposes of collective

processing, handling, and marketing so as to eliminate middlemen, Congress authorized firms

which integrated further downstream beyond the level at which cooperatives could be utilized

for these purposes to combine horizontally as a cartel with license to carve up the national

agricultural market."  *Id.* at 835.

To define the scope of the exemption consistent with the purpose of the Act, Justice

Brennan announced a test that considers "the nature of the association's activities, the degree of

integration of its members, and the functions historically performed by farmers in the industry."

*Id*. These are particularly factual issues that Justice Brennan could not assess on the basis of the

record before the Court.  *Id.*

Lower federal courts considering the application of the Capper-Volstead Act to

integrated farmers have used the test set out by Justice Brennan.  For instance, in *U.S. v. Hinote*,

823 F. Supp. 1350 (S.D. Miss. 1993), the District Court refused to dismiss the criminal

indictment of the president and CEO of a catfish processor who argued that any conspiratorial

price fixing by him and the alleged co-conspirators was exempt from antitrust liability under the

Capper-Volstead Act and/or the Fisherman's Collective Marketing Act, 15 U.S.C. § 521.[15]  *Id.* at 1352.  The Court reasoned that Justice Brennan's interpretation of the Capper-Volstead Act was "not only persuasive," but "the only construction of the statute which is plausible in view of the Act's legislative history."  *Id.* at 1358.  After a hearing, the Court held that the integrated catfish farmer/processor did not satisfy Justice Brennan's test.  Of particular significance to the Court was defendant's failure to "claim that [the] independent processors associated for the purposes of 'collective handling and processing – the very activities for which the exemption was created.'"  *Id.* at 1358 (quoting *National Broiler*, 436 U.S. at 835).

Similarly, in *Alexander*, 687 F.2d at 1186, the court recognized that "vertical integration in agricultural industries cannot extend to a point where non-farmer middlemen can claim the Capper-Volstead shield."  Vertical integration may be tolerated to an extent, but it is not tolerated where a processor or distributor is really a middleman with a producing portion to its business. *Id.  See also Ripplemeyer*, 807 F. Supp. at 1457 ("[t]he [Supreme] Court has made clear that when agricultural industries vertically integrate, including non-farmer middlemen such as processors, the economic role of these middlemen exceeds the conduct Congress intended to permit through the Capper-Volstead exemption").

Plaintiffs' allegations are more than sufficient to raise the issue of whether all of the members of the EMMC are "farmers" within the meaning of the Capper-Volstead Act.  Defendants' entitlement to immunity requires consideration of "the nature of the association's activities, the degree of integration of its members, and the functions historically performed by

---

[15] The Fisherman's Collective Marketing Act is patterned after the Capper-Volstead Act except that it is applicable to fishermen and aquatic products.  15 U.S.C § 521.

farmers in the industry."  These issues can be assessed only after discovery.  It would be inappropriate to assess them on a motion to dismiss.

### C.  Defendants' Anti-Competitive and Predatory Conduct Is Not Entitled to Immunity.

Finally, even if the membership of the EMMC qualified for the exemption and the EMMC did not conspire with non-members, the Capper-Volstead Act does not put all activities of a cooperative beyond the reach of the antitrust laws.  The EMMC already conceded this much when it acknowledged that the predatory conduct alleged in the DOJ Complaint "states a claim upon which relief may be granted against [it] under § 1 of the Sherman Act."  Final Judgment at 2 (attached as Ex. 4 to Joint MTD).

Nevertheless, Defendants argue that the "nub of Plaintiffs' alleged claim of injury is price-fixing, which is clearly permissible under the exemption."  Joint MTD at 21.  Defendants' argument is wrong because it misconstrues the law and improperly limits Plaintiffs' allegations.

### 1.  Naked Price-Fixing in the Absence of Joint Cooperative Conduct Is Not Immunized by the Capper-Volstead Act.

All that the Capper-Volstead Act protects is joint activity in "collectively processing, preparing for market, handling and marketing."  7 U.S.C. § 291.  Defendants argue for much more.  They claim that the Capper-Volstead exemption immunizes their secret price-fixing activities even though the EMMC did not perform any cooperative activities.

As explained above, the purpose of the Act was to permit farmers to organize cooperatives to obtain the advantages of a business corporation.  *See supra* pp. 18-19.  But shareholders of a business corporation cannot do what the members of the EMMC did here.  Agreements "wholly internal" to a corporation are "presumably immune" from attack under section 1 of the Sherman Act, but price fixing agreements that extend beyond the corporation to

shareholders acting on their own accounts are not. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1149 (9th Cir. 2003) (holding that shareholders of a corporation engaged in *per se* illegal price-fixing when they used the corporation's price to sell their individual services). *See also Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 57 (1st Cir.) ("That a stockholder may be insulated by *Copperweld* when making ordinary governance decisions does not mean automatic protection when the stockholder is also an entrepreneur separately contracting with the company."), *cert. denied*, 537 U.S. 885 (2002).

Nothing in the language of the Capper-Volstead Act nor its legislative history suggests that Congress intended to authorize farmers to fix their individual prices without engaging in any cooperative conduct. In discussing the Senate version of the bill that became the Capper-Volstead Act, Senator Walsh observed that the language authorizing farmers to act together "in collectively processing, preparing for market, handling, and marketing" "does *not* reach to *agreement between individuals for the purpose of fixing prices*, nor does it apparently reach to agreements between independent associations for the purpose of fixing prices." *Hearing Before a Subcommittee of the Committee on the Judiciary of the United States Senate on S. 4344*, 66th Cong., 2d Sess. 43 (1920) (remarks of Sen. Walsh) (emphasis added). *See also id.* at 7 (remarks of Sen. Walsh) (observing that dairymen "very likely . . . do not want . . . any law that will permit . . . dairymen around the city of Washington to combine together and fix any price on milk that they see fit, or boost it up to 20 cents a quart).

Congress' intent to permit joint conduct with the potential to enhance competition is recognized in *Maryland & Virginia Milk Producers*, 362 U.S. at 466. There, the Supreme Court explained that the philosophy of the Capper-Volstead Act and section 6 of the Clayton Act "was simply that individual farmers should be given, through agricultural cooperatives *acting as*

28

*entities*, the same unified competitive advantage – and responsibility – available to businessmen acting through corporations *as entities*." 362 U.S. at 467 (emphasis added). Consequently, the Capper-Volstead exemption permits "farmer-processors to organize together, set association policy, *fix prices at which **their cooperative will sell their produce***, and otherwise carry on like a business corporation without thereby violating the antitrust laws." *Id.* at 466 (emphasis added). Significantly, the Court did not suggest that it was the intent of the Capper-Volstead Act to immunize the conduct of farmers as individuals nor to allow farmers to fix the prices at which they individually sell their products.

As Justice Brennan recognized, the Capper-Volstead Act was not intended "simply as a shield for price fixing." *National Broiler*, 436 U.S. at 834 (Brennan, J., concurring). Rather, the Act was "populist legislation to authorize farmers' cooperatives for collective handling, processing, and marketing purposes." *Id.* The Act should not be interpreted to permit "the behemoths of agribusiness to form an exempt association to engage in price fixing, and territorial and market division, so long as these concerns are engaged in the production of agriculture." *Id.* at 834-35. *See also Hinote*, 823 F. Supp. at 1358 (refusing to extend immunity of Capper-Volstead Act where defendant made no claim that "independent processors associated for the purposes of 'collective handling and processing – the very activities for which the exemption was created'").

The failure of Defendants to use the cooperative in any way intended by Congress is clearly pled. The Complaint alleges that the EMMC "sets the minimum prices at which its members sell their mushrooms to customers in various geographic regions." Comp. ¶ 18. The EMMC could not possibly help its members to equalize bargaining power with middlemen processors because, as pled in the Complaint, nothing about its operation was public. The

EMMC was not Defendants' public face nor did it bargain collectively with middlemen; its operation and membership were completely secret until the DOJ filed its complaint.  *Id.*  ¶¶ 81, 82.  Such a clandestine cartel should not be immunized by a statute intended to enhance competition by permitting farmers to organize to bargain collectively.

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*, 419 U.S. 999 (1974), and *Fairdale Farms v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980), both cited by Defendants, directly address the right of an agricultural cooperative to set prices.  *Treasure Valley* is squarely in line with the proposition that the Capper-Volstead Act immunizes conduct undertaken by cooperatives as entities, but not naked price fixing.  In that case, two associations were formed "to bargain collectively for their respective members as to prices, terms and conditions of preseason potato contracts."  *Treasure Valley*, 497 F.2d at 215. The court concluded that such joint bargaining was immunized by the Capper-Volstead Act as a marketing function even though the cooperative did not take title to and sell any potatoes.  *Id.* Unlike the EMMC, which did not publicly identify its members, the *Treasure Valley* associations "acted and bargained for the sale of potatoes by its members."  *Id.*  As a result, they served to equalize bargaining power and to eliminate the costs of many individualized negotiations.

*Fairdale Farms*, on the other hand, loses sight of the intent of the Capper-Volstead Act. Faced with an appeal of a summary judgment motion, the court concluded that the Capper-Volstead Act would immunize the price fixing activities of a cooperative association "organized for the sole purpose of fixing prices."  *Fairdale Farms*, 635 F.2d at 1040.  The entirety of the court's reasoning was as follows:

> The establishment of price is an integral part of marketing. . . .It
> would be strange indeed if participation in this portion of the

> marketing process, standing alone, would subject a cooperative to
> antitrust liability, when the exercise of the full range of activities
> covered by Capper-Volstead would not.

*Id.*[16]

*Fairdale Farms*' reasoning ignores the rationale behind the Capper-Volstead Act. Congress' willingness to tolerate incidental price fixing as a quid pro quo for the competition-enhancing effects of joint integration says nothing at all about Congress' willingness to immunize naked price fixing.

The distinction between the two is a central tenet of antitrust law. The competition-enhancing effects of integration often separate *per se* illegal price fixing from joint ventures judged under the rule of reason. As the Supreme Court explained in *Copperweld*:

> Certain agreements, such as horizontal price fixing and market
> allocation, are thought so inherently anticompetitive that each is
> illegal per se without inquiry into the harm it has actually caused.
> Other combinations, such as mergers, joint ventures, and various
> vertical agreements, hold the promise of increasing a firm's
> efficiency and enabling it to compete more effectively.
> Accordingly, such combinations are judged under a rule of reason,
> an inquiry into market power and market structure designed to
> assess the combination's actual effect.

*Copperweld*, 467 U.S. at 768.

Similarly, in *Broadcast Music, Inc. v. CBS*, 441 U.S. 1 (1979), the Court reversed the Second Circuit's determination that blanket licenses for all musical compositions controlled by two music clearinghouses were a *per se* illegal price fixing agreement. The Court explained that the blanket license was "not a naked restraint of trade with no purpose except stifling

---

[16] The Fairdale court cited *California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative*, 413 F. Supp. 984, 992 (N.D. Cal. 1976), *aff'd*, 580 F.2d 369 (9th Cir. 1978), and In re Central California Lettuce Producers Cooperative, 1977 Trade Reg. Rep. (CCH) ¶ 21,337 (FTC 1977). Like Fairdale, both cases fail to distinguish between naked-price fixing

competition, but rather accompanie[d] the integration of sales, monitoring, and enforcement against unauthorized copyright use," thereby offering substantial efficiencies "potentially beneficial to both sellers and buyers."  *Id*. at 20-21.

In contrast, in *Arizona v. Maricopa County Medical* Society, 457 U.S. 332 (1982), the Court struck down an agreement among competing medical doctors creating a maximum fee schedule as a *per se* illegal price fixing agreement.  In doing so, it emphasized the absence of any integrative efficiencies:

> The foundations [in this case] are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market.  The agreement under attack is an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers. It is true that some are surgeons, some anesthesiologists, and some psychiatrists, but the doctors do not sell a package of three kinds of services.  If a clinic [had] offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price-fixing agreement among the doctors would be perfectly proper.  But the fee arrangements disclosed by the record in this case are among independent competing entrepreneurs. They fit squarely into the horizontal price-fixing mold

*Id*. at 356-57.

In assuming that the immunity that Congress granted to cooperatives to incidentally set prices in connection with joint marketing activities includes the right to engage in naked price fixing, the *Fairdale* Court ignored the well-established difference between the two.  This failure is a critical mistake given that the legislative history indicates that integrative efficiencies were a principal rationale for the Capper-Volstead Act.

---

and price-fixing that occurs as an incident to efficiency-enhancing cooperative conduct.

### 2. Plaintiffs Have Alleged Predatory Practices that Are Not Immunized by the Capper-Volstead Act.

Even if Defendants could fix their prices without engaging in joint processing, handling, or marketing, the Complaint specifically alleges that Defendants have engaged in the kind of predatory practices that do not receive protection under the Capper-Volstead Act. Defendants engaged in an anticompetitive Supply Control campaign to acquire and dismantle non-member mushroom operations to support the prices that they set (Comp. ¶ 66), engaged in a group boycott of non-members who needed to be able to purchase from Defendants to meet short term supply needs (*id.* ¶ 77), and otherwise coerced non-EMMC members to join the EMMC (*id.*).

Such predatory conduct is not immunized by the Capper-Volstead Act. In *Maryland & Virginia Milk Producers*, the Supreme Court specifically held that the Capper-Volstead Act does not give farmers the right to "engage in predatory trade practices at will." 362 U.S. at 466. In reaching this conclusion, the Court observed that the legislative history of the Act "does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own business in their own legitimate way." *Id.* at 466-67. As a result, an acquisition entered into "as a weapon to restrain and suppress competitors and competition" was not entitled to Capper-Volstead immunity. *Id.* at 472. *See also Alexander*, 687 F.2d at 1183 ("A cooperative may not use its position, no matter how lawfully acquired, 'to stifle or smother competition.' Where such unlawful intent is clear, overt acts in furtherance of this purpose are not immunized simply because they might also have other justifications or because they are merely 'anticompetitive' rather than 'predatory.'").

The lower federal courts have found a broad range of anticompetitive or predatory conduct to be outside the scope of the Capper-Volstead Act. *See, e.g.*, *Knuth*, 395 F.2d at 424-

25 (discriminatory pricing); *North Tex. Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189,

195 (5th Cir. 1965) (boycotts and coercion), *cert. denied*, 382 U.S. 977 (1966); *Otto Milk Co v.*

*United Dairy Farmers Coop. Ass'n*, 388 F.2d 789, 797 (3d Cir. 1967) (picketing and

harassment); *Gulf Coast Shrimpers and Oystermans Ass'n v. United States*, 236 F.2d 658 (5th

Cir. 1956) (coerced membership), *cert. denied*, 352 U.S. 927 (1956); *Dooley v. Crab Boat*

*Owners Assoc.*, 2004 WL (N.D. Cal.) (price fixing and harassment); *Agritronics*, 914 F. Supp. at

825 (coerced membership, barring access to essential facilities, and price fixing); *Marketing*

*Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1023-24 (S.D. Tex.

1972) (restrictive membership and marketing agreements); *Bergjans*, 241 F. Supp. 476 (payment

of secret rebates).

  The anti-competitive Supply Control Campaign and alleged coercion of non-EMMC

members fall squarely within these precedents.  Indeed, the DOJ cited the exclusion for

predatory practices in its Complaint against the EMMC and the EMMC acknowledged that the

alleged practices stated a cause of action (although it did not concede liability).  *See* DOJ

Complaint at ¶ 29 (Ex. 1 of Joint MTD); Competitive Impact Statement at 3 (Ex. 2 of Joint

MTD); Final Judgment at 2 (Ex. 4 of Joint MTD).

  EMMC purchased and sold mushroom farms at a loss to secure deed restrictions

preventing the properties from ever again being used as mushroom farms.  The only explanation

of that conduct is that Defendants believed that the deed restrictions would limit the supply of

mushrooms and thereby prop up the fixed prices.  As Defendants point out at the very beginning

of their joint brief, "[p]rice-fixing and reduction of output are inextricably intertwined" and a

"contract among competing sellers to fix the price of the product they sell (or, what is the same

thing, to limit their output) is like any other contract in the sense that the parties would not sign it

unless they expect to make them all better off."  Joint MTD at 1 n.1 (quoting R. Posner, ECONOMIC ANALYSIS OF LAW 265 (1986)).  The only fair inference is that Defendants invested millions of dollars to limit the available farms available for growing mushrooms.  No other explanation makes economic sense.

Defendants argue that their conduct is not predatory because cooperative members may legally manage supply.  In support, they point to two lines of authority.  First, they cite cases dealing with the Capper-Volstead Act's specific authorization in 7 U.S.C. § 291 permitting cooperatives to buy the products of nonmembers so long as the value of the products of nonmembers do not exceed the value of the products of members.  *See*, *e.g.*, *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (M.D. Ga. 1981), *aff'd*, 715 F.2d 520 (11th Cir. 1983); *Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384 (8th Cir. 1989).  Second, they cite cases standing for the proposition that a cooperative is permitted to manage the output of their members just as a corporation is entitled to manage its own supply.  *See, e.g., Holly Sugar v. Goshen County Coop. Bee Growers Ass'n*, 725 F.2d 564, 569-70 (10th Cir. 1986).  Neither line of cases permits a cooperative to buy up potential competitors and impose restrictions so that they can never again produce competing products.

The case law is unambiguous that such attempts to restrict competition from outside the cooperative is predatory.  *Maryland & Virginia Milk Producers* could not be any clearer.  There, the United States challenged the acquisition by  an agricultural cooperative of the largest milk dealer in the area.  *Maryland & Virginia Milk Producers*, 362 U.S. at 469.  Defendants' interpretation of the Capper-Volstead Act would immunize this acquisition as a permitted restriction of supply.  However, the Supreme Court expressly held that the purchase was *not* protected by the Capper-Volstead Act:

> The contract of purchase here, viewed in the context of all the
> evidence and findings, was not one made merely to advance the
> Association's own permissible processing and marketing business;
> it was entered into by both parties, according to the court's
> findings as we understand them, because of its usefulness as a
> weapon to restrain and suppress competitors and competition in the
> Washington metropolitan area. We hold that the privilege the
> Capper-Volstead Act grants producers to conduct their affairs
> collectively does not include a privilege to combine with
> competitors so as to use a monopoly position as a lever further to
> suppress competition by and among independent producers and
> processors.

*Id.* at 472. *See also Alexander,* 687 F.2d 1206 (holding that acquisition of dairies not intended to
achieve production economies, but to foreclose competition, was not protected by Capper-
Volstead immunity); *Pacific Coast Agriculture Expert Assoc. v Sunkist Growers, Inc.*, 526 F.2d
1196, 1203 (9th Cir. 1975), *cert. denied*, 425 U.S. 959 (1976) (concluding that Capper-Volstead
Act did not immunize Sunkist's acquisition of shipping space for exported oranges to prevent
space from being available to rivals for the shipment of their goods). The Supply Control
Campaign was predatory in the same sense. It was not pursued to increase the efficiency of the
cooperative, but rather to eliminate competition with members of the EMMC.

Defendants' claims about the conclusory nature of Plaintiffs' allegations of pressure on
non-EMMC members are no better founded. As previously demonstrated, Plaintiffs were not
required to plead anything at all about Defendants' affirmative defense. *See supra* pp. 14-15.
Nevertheless, Plaintiffs do not simply allege that there was pressure or a group boycott as
Defendants suggest. Rather, they specifically pled that it is necessary in the mushroom-growing
industry for growers to sell fresh mushrooms to each other to fill daily needs. Comp. ¶ 77. As a
result, EMMC members were able to use their collective strength to force independent growers
to join the EMMC cooperative or to refrain from selling mushrooms at lower prices that would
undermine the scheme. *Id.* The Amended Complaint alleges that the EMMC members "applied

such pressure and coercion through various means, including but not limited to threatening

and/or implementing a group boycott in which they would not sell mushrooms to other growers

who needed them to meet short term supply needs and/or selling mushrooms to such independent

growers at inflated levels." *Id.* These allegations are further supported by the comment received

by the DOJ in connection with the proposed final judgment. *See* Letter dated January 5, 2005 to

Roger W. Fones (attached to Response of the United States to Public Comments on the Proposed

Final Judgment) (Ex. 5 to Joint MTD). That letter describes the pressure that the EMMC put on

non-members. *Id.*

These allegations of predatory conduct are not conclusory. They provide a "short and

plain statement of the claim" sufficient for Defendants to admit or deny the allegations. Nothing

about them merits dismissal.

### III.   AS DIRECT PURCHASERS OF AGARICUS MUSHROOMS, PLAINTIFFS HAVE STANDING TO RECOVER OVERCHARGES CAUSED BY DEFENDANTS' ANTI-COMPETITIVE CONDUCT.

In evaluating antitrust standing, the fact of the antitrust violation must be assumed. *See*

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 (3d

Cir. 1999), *cert. denied*, 528 U.S. 1105 (2000); *Glaberson v. Comcast Corp.*, 2006 WL 2559479

at *4 (E.D. Pa.); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 272 (D.

Conn. 2003); II Areeda & Hovenkamp, ANTITRUST LAW ¶ 335(f) (2d ed. 2000).

Here, Plaintiffs are direct purchasers of Agaricus mushrooms that they allege were

purchased at artificially inflated prices as a result of Defendants' anticompetitive practices. Such

direct purchasers have repeatedly been held to have antitrust standing to sue for overcharge

damages. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968), *reh'g*

*denied*, 393 U.S. 901 (1968) (holding that direct purchaser is to recover full amount of

overcharge even if he passes it on to his customers); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 247 (3d Cir. 2001), *cert. denied*, 435 U.S. 1081 (2002) ("[d]irect buyers are the only parties with standing to assert damage claims under the antitrust laws for overcharges based on an output cartel."); *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896, 910-11 (6th Cir. 2003), *cert. denied*, 543 U.S. 939 (2004) (direct purchasers have antitrust standing to pursue overcharge because "[p]reventing that kind of injury was undoubtedly a raison d'etre of the Sherman Act when it was enacted in 1890"); *Goldwasser v. Ameritech Corp*., 222 F.3d 390, 398 (7th Cir. 2000) (finding direct purchaser to have standing because "[a]s people forced to pay an alleged monopolistic overcharge, they have described the kind of injury the antitrust laws are designed to redress"); *In re Buspirone Patent & Antitrust Litig*., 210 F.R.D. 43, 59 (S.D.N.Y. 2002) ("[e]xcept in certain limited circumstances, a direct purchaser is 'injured' within the meaning of Clayton § 4 by the full amount of the overcharge paid by it.").

Nevertheless, Defendants assert that the Complaint shows on its face that the direct purchaser Plaintiffs here lack standing because (a) there is no causal connection between Defendants' alleged wrongdoing and Plaintiffs' harm; (b) the alleged injury is not an antitrust injury; and (c) Plaintiffs' damage claim is too speculative. Each step of Defendants' analysis is fundamentally flawed.[17]

---

[17] Defendants' analysis is also flawed because it ignores two of the five factors for standing announced by the Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 537-545 (1983). Those two factors – the existence of more direct victims of the alleged antitrust violations and the potential for duplicative recovery or complex apportionment of damages – cut strongly in favor of standing for direct purchasers like Plaintiffs. *See In re Public Offering Antitrust Litig.*, 2004 WL 350696 at *25 (S.D.N.Y.) ("According to antitrust jurisprudence . . . it is the direct purchaser . . . who [is] in the best position to remedy any wrong[s] that may have occurred."). There is no potential for duplicative recovery or complex apportionment of damages in claims by direct purchasers. *See In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211, 218 (N.D. Ill. 1980) (noting that

#### A. The Facts Alleged Support a Causal Connection.

Defendants argue that the Complaint does not allege a causal connection between Defendants' conduct and Plaintiffs' injury. Joint MTD at 30-31. Defendants' construction of the Complaint is impermissibly narrow. In fact, Plaintiffs allege that to support the "artificial price increases," Defendants "eliminated competing mushroom supply, which could otherwise force down the artificially increased prices." Comp. ¶ 63. They further allege that "Defendants' purpose in entering into the purchase and lease transaction was to reduce or eliminate the Agaricus mushroom growing capacity available to potential independent competitors in the United States, thereby improving Defendants' ability to maintain the artificially-inflated price increases to which they had agreed." *Id.* ¶ 24. As a result of "collective boycotts and other collective efforts to penalize non-EMMC members that threatened to undermine Defendants' anticompetitive scheme, the Defendants caused the artificial inflation of prices for not only the fresh Agaricus mushrooms that Defendants sold, but also for the fresh Agaricus mushrooms sold by non-EMMC growers." *Id.* ¶ 78.

Defendants ignore all of these allegations linking Defendants' agreement to raise prices to the Supply Control campaign and ask the Court to draw inferences against the Plaintiffs. Thus, they contend that the Court should find as a matter of law that the prices that they set and the Supply Control campaign were two separate, unrelated actions by the EMMC and its members, even though they argue elsewhere that price fixing and supply control are two sides of the same coin. *See* Joint MTD at 1 n.1.

---

duplicative recovery is not a possibility when Plaintiffs are direct purchasers). The no-pass on rules of *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), eliminate the risk of duplicative recoveries by barring anyone other than the direct purchasers from recovering overcharges caused by antitrust

Defendants assert that the challenged deed restrictions had no causal role in maintaining the price increase. Joint MTD at 31. But causation is a classic fact issue. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 751 (1977), *reh'g denied*, 434 U.S. 881 (1977) ("If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury."); *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999) ("the question of causation is intensely factual"); *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) ("The matter of causation is an issue of fact which must be decided by the jury."). *See also Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 212 (3d Cir. 1983) (affirming jury's finding of antitrust causation). Defendants are not entitled to a dismissal of Plaintiffs' complaint merely because Defendants say that the deed restrictions could not have caused any injury.

Such an assumption is particularly inappropriate given that Defendants obviously believed that the expenditure of $3 million for the deed restrictions was going to benefit them in some way. Now, they ask the Court to assume as a matter of law that their conduct was completely irrational because it could not possibly have had the effect that they so obviously intended. Such inferences in favor of Defendants are not appropriate on a motion to dismiss.[18]

---

violations committed by the direct purchasers' suppliers.

[18] Defendants also assert that language in the DOJ complaint establishes that no damages were caused by Defendants' conduct. *See* Joint MTD at 5. Such an adverse inference is contrary to both the standards applicable to a motion to dismiss and the DOJ's recognition that the Final Judgment should not be read to "impair nor assist the bringing" of any private actions. Competitive Impact Statement at 6 (attached as Ex. 2 to Joint MTD).

### B.  The Facts Alleged Demonstrate Antitrust Injury.

Antitrust injury is "injury of the type the antitrust laws were designed to prevent" and "that flows from that which makes the defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 29 U.S. 477, 490 (1977).

Defendants assert that no such injury was pled because they were entitled to fix prices pursuant to the Capper-Volstead Act and because facts outside of the Complaint concerning the Money's bankruptcy and the availability of farm land show that there was no injury to competition.  Joint MTD at 31-32. As we have already demonstrated, neither of these issues can be determined on a motion to dismiss.  *See supra* pp. 17-37 (demonstrating that the question of Defendants' immunity is an inherently factual question);  *supra* pp. 15-17 (establishing that Defendants' reference to facts outside of the complaint is inappropriate on a motion to dismiss).

Antitrust injury will be found where the resulting injury is the "precisely intended consequence" of the Defendants' anticompetitive conduct and was "inextricably intertwined" with that conduct. *Carpet Group International v. Oriental Rug Importers Association, Inc.,* 227 F.3d 62, 78 (3d Cir. 2000) (citing *Crimpers Promotions Inc. v. Home Box Office*, 724 F.2d 290, 294 (2d Cir. 1983) and *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 (3d Cir. 1999)).  *See also Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982); *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993) (holding that Plaintiff's injury may flow from Defendant's wrongdoing if "there exists a 'significant causal connection' such that the harm to the Plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy").

In *Carpet Group*, the Plaintiff, a corporation that purchased rugs directly from foreign manufacturers, claimed that the Defendants, an association of importer/wholesalers, conspired to

sabotage its efforts to facilitate direct sales between rug manufacturers and retailers by, among other things, threatening not to purchase from participating manufacturers or threatening not to sell to participating retailers. The court held that defendants' conduct caused antitrust injury to the purchaser because the injury was the "precisely intended consequence" of the Defendants' conduct and was "inextricably intertwined" with that conduct. *Id*. at 78.

Here, the allegations are that Defendants conspired to restrict supply and set artificially inflated prices – prices that were charged to Plaintiffs. It is hard to imagine a more "precisely intended consequence" of a conspiracy to fix prices than an overcharge to a direct purchaser. *See Associated Gen. Contractors*, 459 U.S. at 538; *McCready*, 437 U.S. at 482-83 ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 [of the Clayton Act] potentially offers redress. . . .").

### C. Plaintiffs' Claims Are Not At All Speculative.

Finally, Defendants contend that Plaintiffs' claim for damages is "inherently speculative." Joint MTD at 34. They claim that Plaintiffs are "pleading an injury that has not occurred" and "that will probably never occur." *Id.* While that may be the claim that Defendants wish Plaintiffs had pled, it is not at all what was pled. Plaintiffs pled an overcharge that has actually occurred because of Defendants' impermissible price fixing and illegal supply control program. *See* Comp. ¶¶ 1, 63, 78. Based on those facts, Defendants are not entitled to Capper-Volstead immunity, and Plaintiffs are entitled to recover the amount by which the prices that they paid for mushrooms exceeded the price that they would have paid but-for Defendants illegal conduct. *Hanover Shoe*, 392 U.S. at 491 (recognizing "the general principle that the victim of an overcharge is damaged within the meaning of § 4 to the extent of that overcharge"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 311-12 (E.D. Mich. 2001) (observing that

damages in price-fixing cases are based on the overcharge itself, i.e., "the differences between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement."). There is nothing at all speculative about that claim.[19]

## IV.   DEFENDANTS' *COPPERWELD* ARGUMENT SUFFERS FROM THE SAME DEFECTS AS DEFENDANTS' CAPPER-VOLSTEAD ARGUMENT.

Defendants argue that Plaintiffs' allegations of a conspiracy must be dismissed because a conspiracy cannot exist among members of a single enterprise. *See* Joint MTD at 35-42 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)); Mushroom Alliance MTD at 11; Basciani MTD at 15-17.

Defendants once again ignore key allegations of the Complaint. Plaintiffs' conspiracy allegations do not simply assert that members of the EMMC conspired with each other. Rather, the Complaint alleges that the EMMC and its members conspired with non-members including distributors who were not EMMC members and property owners who were not EMMC members. Comp. ¶¶ 3-5, 21, 29, 32-33, 66-75, 87, 88. Defendants recognize that such

---

[19] Throughout their standing argument, Defendants sprinkle citations to *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 269 (3d Cir. 1998). However, as our Court of Appeals recognized in overturning a district court opinion dismissing a complaint for lack of standing and antitrust injury, that case was a result of a "regulatory quirk" and must be limited to its facts:

> We arrived at this conclusion [in West Penn], however, because an intervening regulatory system precluded the companies from competing, i.e. the merger was not the cause of the injury. No significant antitrust injury inquiry was required to reach this conclusion and none was undertaken. We can reasonably posit, however, that *if not for this regulatory quirk*, the City would have been entitled to section 16 relief because the proposed merger would have eradicated competition."

*In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 401 (3d Cir. 2001) (emphasis added).

allegations of conspiracy with non-members survived dismissal in *Maryland & Virginia Milk Producers*, 362 U.S. at 472, but fail to recognize that the very same kind of allegations exist here. These allegations alone are sufficient to defeat Defendants' motion to dismiss Plaintiffs' conspiracy allegations. *See Borden*, 308 U.S. at 204-05; *Otto Milk Co. v. United Dairy Coop.*, 388 F.2d 789, 796-97 (3d Cir. 1967).

In addition, Plaintiffs have pled facts that demonstrate that the Capper-Volstead Act does not apply at all to Defendants' conduct. They have alleged that the EMMC contains members that are not "farmers," that the EMMC and its members entered into anticompetitive and/or restrictive agreements with non-member entities, and that the EMMC and its members have engaged in naked price fixing and predatory anticompetitive conduct. *See supra* pp. 17-37.

These facts distinguish the cases that Defendants cite in support of the inability of an agricultural cooperative to conspire. Defendants' cases depend upon the applicability of the Capper-Volstead immunity to the cooperative and its activities. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 28 (1962), *reh'g denied*, 370 U.S. 965 (1962) ("*Sunkist I*") (holding on review of judgment after trial that three separate cooperatives could not conspire because "[t]here can be no doubt that under these statutes the 12,000 California-Arizona citrus growers ultimately involved could join together into one organization for the collective processing and marketing of their fruit and fruit products");[20] *Bell v. Fur Breeders Agricultural Cooperative*, 348 F.3d 1224, 1235 (10th Cir. 2003) (holding on review of motion for summary judgment that "the prohibitions in Section 1 of the Sherman Act are

---

[20] In a subsequent proceeding, the Court determined that Sunkist was not entitled to Capper-Volstead immunity and that a section 1 claim could therefore proceed because some of Sunkist's members were non-producer packing houses. *See Sunkist II*, 389 U.S. at 395.

inapplicable here because the cooperative's activities fall squarely within the antitrust

exemptions in the Clayton and Capper-Volstead Acts"); *United Egg Producers v. Bauer Int'l

Corp.*, 312 F. Supp. 319, 320 (S.D.N.Y. 1970) (granting partial summary judgment where there

was no allegation that non-producers were members of the cooperative or that the cooperative

had conspired with non-producers); *Shoenberg Farms, Inc. v. Denver Milk Producers, Inc.*, 231

F. Supp. 266, 268 (D. Colo. 1964) (partially granting motion to dismiss section 1 claims where

complaint alleged no conspiracy other than intra-cooperative conspiracy, but granting leave to

amend).

When a cooperative is not entitled to Capper-Volstead immunity, it cannot claim to be a

single economic entity.  Thus, in *Dooley v. Crab Boat Owners Marketing Ass'n*, 2004 WL

902361 (N.D. Cal.), a case under the Fisherman's Collective Marketing Act, the court

specifically rejected Defendants' argument that a cooperative organized under the Act cannot be

found to have conspired:

> Defendants claim that they are not liable under section 1 of the
> Sherman Act because the activity of the association should be
> considered the activity of a single firm under the Fisherman's
> Collective Marketing Act. . . . While that Act does give individual
> fishermen joining in a cooperative or association the same rights as
> other business entities, it does not provide them with immunity for
> antitrust violations. . . . Nor does it allow them to join collectively
> so as to use a monopoly position to suppress competition.

*Id*. at *13 n.19.  *See also Gulf Coast Shrimpers*, 236 F.2d at 665 (affirming jury verdict finding

association to have engaged in a conspiracy or combination in restraint of trade in violation of

Section 1 of the Sherman Act because "[i]n its price fixing, the Association exceeded any

possible privilege or exemption granted by the Fisherman's Collective Marketing Act when it

undertook not simply to [fix] the prices demanded by its members, but to exclude from the market all persons not buying and selling according to the fixed prices.").[21]

In the absence of Capper-Volstead immunity, Defendants are competitors with divergent economic interests like member teams belonging to the National Football League, members of the Associated Press, or members of the New York Stock Exchange. Although each of these organizations jointly produce economically useful benefits, the members of each have been found to be sufficiently independent and competitive to be capable of conspiring. *See Los Angeles Memorial Coliseum Commission v. Nat'l Football League*, 726 F.2d 1381, 1389-90 (9th Cir.), *cert. denied*, 469 U.S. 990 (1984) (NFL); *Murray v. Nat'l Football League*, 1996 WL 363911, at *22 (E.D. Pa.) (NFL); *Silver v. New York Stock Exchange*, 373 U.S. 341, 347-48 (1963), *reh'g denied*, 375 U.S. 870 (1962) (NYSE); *Associated Press v. United States*, 326 U.S. 1, 19 (1945), *reh'g denied*, 326 U.S. 802 (1945) (AP).

---

[21] Defendants claim that the "nature of the wrongdoing has no impact on whether an agricultural cooperative loses its immunity" from Sherman section 1 liability. Joint MTD at 41 n.38. Defendants suggest that support for this proposition may be found in *Sunkist II*, 389 U.S. 384. As explained above, the issue in that case was whether a cooperative with non-producer members could claim Capper-Volstead immunity. Nowhere does the opinion say that a cooperative and its members that act in an anticompetitive manner may nevertheless claim immunity from Sherman section 1. Such a proposition is contrary to both *Dooley* and *Gulf Coast Shrimpers.* Numerous other Supreme Court and lower federal court cases reject Defendants' claim that the nature of the conduct at issue is irrelevant to whether Capper-Volstead immunity applies to claims brought pursuant to Sherman section 1. *See, e.g., Borden*, 308 U.S. at 204-05 (holding that Capper-Volstead Act not intended to immunize conspiracies with non-members from section 1 liability); *Knuth*, 395 F.2d at 423 (holding that cooperative may be liable for a combination or conspiracy in violation of Sherman section 1 despite Capper-Volstead Act where the activity at issue is predatory); *Alexander*, 687 F.2d at 1191 (concluding Capper-Volstead Act does not immunize predatory conduct from liability under section 1 or 2 of Sherman Act); *Agritronics*, 914 F. Supp. at 826 (holding that Sherman section 1 claim survived summary judgment because, *inter alia*, there was a genuine issue of material fact over whether defendants engaged in predatory practices). *See also Maryland & Virginia Milk Producers*, 362 U.S. at 463-64 (concluding that the same kind of predatory practices will abrogate Capper-Volstead immunity for both sections 1 and 2 of the Sherman Act).

The argument for finding the EMMC to be a single economic enterprise is much weaker than the NFL, NYSE, or the AP.  Each of those organizations collectively creates a product different from that which its individual members could create on their own.  The EMMC does not.  The EMMC does not jointly process nor market mushrooms as originally contemplated by the Capper-Volstead Act.  Rather, it is a cooperative whose primary functions were to set prices and eliminate potential alternate supplies that would undermine the fixed prices.  Each of the individual members continued to grow, buy, package, and ship their own mushrooms.  Comp. ¶ 18.  In these circumstances, the EMMC and its members should not be regarded as a single entity under § 1 which is incapable of conspiring.[22]

## V.    PLAINTIFFS PLED MARKET POWER BOTH DIRECTLY AND INDIRECTLY.

### A.    Defendants Incorrectly Assert that the Only Way to Allege Monopoly Power Is By Defining a Relevant Market and Alleging Market Share.

Defendants argue that the "viability of Plaintiffs' purported claims under Section 2 of the Sherman Act must be assessed within the confines of a relevant market."  Joint MTD at 42.  Defendants are wrong.  The case law clearly establishes that market power may be pled and proven either directly by demonstrating actual adverse effects on the market or indirectly by defining a relevant market and a high market share.

---

[22] As a result, the motion to dismiss should also be denied as to the individual defendants, John and Michael Pia, who claim that they should be dismissed because they are incapable of conspiring as officers of the EMMC and one of its members.  Joint MTD at 37 n.35.  But, as explained in the text, the capacity of the EMMC, its members, and others to conspire depends upon the EMMC's entitlement to Capper-Volstead immunity which cannot be determined on this motion to dismiss.  *See also infra* p. 73 (explaining that corporate officers may be held personally liable for participating in antitrust violations).

Monopoly power is the "power to control prices or exclude competition."  *U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  There are two distinct ways to plead and prove market power:  (1) directly by presenting evidence of defendant's ability to control price or exclude competition; and (2) indirectly by showing a defendant's large share of the relevant market.  *See, e.g., Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market"); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996),  ("Market power [in a monopolization case] can be shown through two types of proof."), *cert. denied*, 519 U.S. 927 (1996).  *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir.), *cert denied*, 534 U.S. 952 (2001) ("Where evidence indicates that a firm has in fact profitability [raised prices substantially above the competitive level], the existence of monopoly power is clear."); *Re/Max Int'l v. Realty One,* 173 F.3d 995, 1018 (6th Cir. 1999) ("[a]n antitrust Plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually set prices or excluded competition.").

As the Court of Appeals made the point:

> Market share, of course, is only one type of evidence that may prove the defendant has sufficient market power to impose per se antitrust liability.  "Market share is just a way of estimating market power, which is the ultimate consideration.  When there are better ways to estimate market power, the court should use them."

*Allen-Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194, 209 (3d Cir.), *cert. denied*, 513 U.S. 1066 (1994) (quoting *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)).  S*ee also United States v. Dentsply Int'l, Inc.,* 399 F.3d 181,

187-91 (3d Cir. 2005) (considering direct evidence of exclusion in concluding that defendants exercised monopoly power through ability to exclude competitors from the relevant market); *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 112 (3d Cir. 1992) ("[A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive.").

In *Rolite v. Wheelabrator Environmental Systems, Inc.*, 958 F. Supp. 992 (E.D. Pa. 1997), Judge Brody considered a motion to dismiss an antitrust complaint for failure to plead market power through allegations of market share. Relying on *Allen-Myland* and *Barr*, she held that the Plaintiff was "correct that it need not plead market share in its complaint in order to have adequately pled that Defendants possess monopoly power." *Id.* at 1000. Rather, she found sufficient direct evidence of market power to have been pled in light of plaintiffs' allegations that defendants were able to "fix and maintain prices in each of the relevant markets," that "there have been substantial barriers to entry into each of the relevant markets," and that the "barriers include, among other things, the necessary large investment of capital and know-how, stringent regulatory controls, the relatively limited supply of [raw materials] by reason of [long-term contracts]." *Id.* at 1000, 1001-02.

Defendants complain that Plaintiffs' allegations do not sufficiently allege facts supporting the boundaries of the market through an analysis of cross-elasticity. Joint MTD at 43-44. Significantly, however, facts that show directly that a defendant has monopoly power to raise price or restrict output also tends to show that the market should be defined narrowly and that the products in it do not exhibit a high level of cross-elasticity with other products outside of the defined market. Cross-elasticity exists when "the rise in the price of a good within [the] relevant market would tend to create a greater demand for other like goods in that market."

49

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3d Cir. 1998) (quoting

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)).  *See also Todd v. Exxon*

*Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001) ("Cross-elasticity of demand exists if consumers

would respond to a slight increase in the price of one product by switching to another product.").

        If the purchaser has insufficient ability or incentive to switch to product "B" in response

to a price increase in product "A," then products "A" and "B" are not in the same relevant

antitrust market.  *Id.*; *see also Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 612 n.31 (1953)

("The [market definition] circle must be drawn narrowly to exclude any other product to which,

within reasonable variations in price, only a limited number of buyers will turn.").  Thus,

evidence that shows directly that defendant has priced its product above the competitive level

supports a narrow market definition because there is a low level of cross-elasticity with other

products, *i.e.,* potential substitutes are not in fact constraining defendant's price to the

competitive level and therefore should not be included in the relevant market.  *See*, *e.g.*, *Eastman*

*Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 469 n.15 (1992) ("Whether considered in the

conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same.").

> ### B.  Plaintiffs' Complaint Adequately Pleads Monopoly Power Directly.

        Contrary to Defendants' arguments, the facts pled by Plaintiffs in their Complaint

strongly support the allegation that Defendants have market power.  Defendants' argument to the

contrary ignores the multitude of facts constituting direct evidence that Defendants possessed

such power.

        The Complaint alleges that:

- After the formation of the EMMC, its members set increased minimum prices at which they would sell fresh mushrooms in six different

geographic regions which covered the entire continental United States. Comp. ¶ 62.

- The price increases imposed by the members of the EMMC were an average of 8% higher nationwide than the prices prevailing prior to the formation of the EMMC. *Id.*

- To maintain the prices that they set, the members of the EMMC set about eliminating alternate sources of mushroom supply that otherwise could have forced down the inflated prices that they set. *Id*. at ¶ 63.

- By eliminating existing available productive capacity, the members of the EMMC substantially reduced and impeded the existence of current competition and substantially forestalled and delayed the entry of new competitors and/or the expansion of existing competitors. *Id*. at ¶ 65.

- Defendants contributed $6 million and spent $3 million to purchase four mushroom farms and acquire lease options on two additional farms in the eastern United States for the purpose of shutting them down and reducing the mushroom production capacity available for nonmembers to grow mushrooms in competition with the Defendants. *Id*. at ¶¶ 66-75.

- The Defendants admitted that the Supply Control Campaign has "[a]nnually taken over 50 million pounds out of production from facilities which could have easily been purchased and remained in production." *Id*. at ¶ 74.

- The Defendants' actions caused an artificial increase in the prices for the Agaricus mushrooms that Defendants sold as well as the Agaricus mushrooms sold by non-EMMC growers. *Id*. at ¶ 78.

- The members of the EMMC were able to affect, fix, raise, maintain and/or stabilize at artificial and non-competitive levels the prices at which Agaricus mushrooms were sold, distributed or obtained in the United States which prices would have been lower in the relevant market in the absence of the unlawful conduct of the EMMC members. *Id*. at ¶¶ 90, 92, 101.

These are not conclusory nor insubstantial allegations of market power. Defendants raised and were able to maintain the prices of Agaricus mushrooms. Their scheme eliminated 50 million pounds of mushroom production. Thus, Defendants were actually able to increase price *and* restrict supply. These are the hallmarks of monopoly power and are sufficient standing alone to preclude the dismissal of Plaintiffs' Complaint.

### C.  Market Definition Is An Inherently Factual Determination and Rarely Serves as a Reason to Dismiss a Complaint.

Even if it were necessary to define a market, and allege a high market share, the Complaint provides far more than the "short and plain statement" required by Federal Rule of Civil Procedure 8.

Market definition in an antitrust case is a particularly fact-intensive inquiry that requires an examination of the commercial realities faced by consumers.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *reh'g denied*, 129 F.3d 430 (3d Cir. 1997), *cert. denied*, 523 U.S. 1059 (1998); *Todd*, 275 F.3d at 199.  *See also Eastman Kodak,* 504 U.S. at 482 ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities" faced by consumers.").  As a result, courts should hesitate to dismiss complaints for failure to adequately plead market definition.  *Todd*, 275 F.3d at 199-200.

Nevertheless, in certain narrow circumstances, a court might grant a motion to dismiss for failure to adequately plead a relevant market.  For instance, courts have dismissed antitrust complaints where the complaint is devoid of any allegations at all about the relevant market, *see, e.g., Curvcraft, Inc. v. Chromcraft Inc.*, 193 U.S.P.Q. 371, 373-74 (E.D. Pa. 1976), or where the complaint alleges a narrow market definition that is economically implausible on its face, *Queen City Pizza*, 124 F.3d at 436-37.  In *American Health Systems, Inc. v. Visiting Nurse Ass'n of Greater Philadelphia*, 1994-1 Trade Cas. (CCH) ¶ 70,633, 1994 WL 314313, at *12 (E.D. Pa. 1994) (O'Neill, J), this Court refused to dismiss an antitrust complaint and distinguished cases like those cited by Defendants on these very grounds – *i.e.,* all but one involved circumstances where Plaintiffs had failed to plead *any* market definition with the one exception being a case where Plaintiff's market definition was irrational.

*Queen City Pizza* is a prime example of the kind of case that gets dismissed for an inadequate market definition.  There, a group of franchisees brought a section 2 monopolization claim against Domino's Pizza alleging that it had monopolized the market for pizza ingredients and supplies used by Domino's franchisees.  *Id*. at 435.  Because the franchise agreement required the franchisees to purchase all ingredients and supplies from Domino's, the franchisees claimed that Domino's was a monopolist with 100% of the market.  *Id.*  The district court dismissed the complaint and the Court of Appeals affirmed because on the face of the complaint it was apparent that the "dough, tomato sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies."  *Id*. at 438.  Indeed, the court recognized that it was the very availability of interchangeable ingredients of comparable quality from other suppliers at a lower cost than charged by Domino's that motivated the lawsuit.  *Id.*

Plaintiffs' Complaint does not suffer from this kind of legal defect.  The product and geographic markets are expressly alleged, supported by facts, and are not economically irrational on their face.

### 1.  The Product Market Is Adequately Alleged and Not Irrational.

The Complaint expressly alleges that the relevant product market is Agaricus mushrooms.  Comp. ¶ 60.  It supports the allegation with further background facts about that market.  In 2002, the year after the formation of the EMMC, sales of all mushrooms in the United Sates were over $800 million with the vast majority being Agaricus or "white button" mushroom (agaricus bisporous).  Further, in 1995, Agaricus mushrooms accounted for 99% of all mushrooms grown in the U.S.  *Id.*

The Complaint also describes significant barriers to entry into the mushroom growing business.  Building a new mushroom growing and production facility costs millions of dollars and requires zoning approval.  It also takes much longer to generate revenue from building a new facility than from purchasing or leasing an existing operation.  *Id.* at ¶ 65.

Defendants argue that the Complaint must be dismissed because there are no allegations about the potential for substitution of other types of mushrooms.  Joint MTD at 44.  They claim that Plaintiffs' allegations fail to rule out the substitutability of "specialty mushrooms," "processed mushrooms," "canned mushrooms," "frozen Mushrooms," and "glass jarred mushrooms."  *Id.*  Defendants are flat wrong.  Plaintiffs pled that 99% of all mushroom production consisted of Agaricus mushrooms.  The natural inference is that consumers who wish to purchase mushrooms do not have alternatives.  An increase in the price of Agaricus mushrooms could not be offset by an increase in the sale of other mushrooms because the supply of alternate mushrooms was relatively insignificant.[23]  Nor can processed, canned, frozen, or glass jarred mushrooms dilute Defendants' market share.  Processed, canned, frozen, and glass jarred mushrooms are derived from and could not exist without fresh mushrooms.  The courts have held that attempts to dilute market share with such derivative products are legally deficient.  *Allen-Myland*, 33 F.2d at 202-03 (incorrect to add used mainframe computers to market because those computers were already in the market when new); *see also United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (concluding that because all secondary aluminum

---

[23] If the remaining 1% of mushroom production in the U.S. were added to the relevant product market, the allegations in the Complaint would still support the conclusion that Defendants have significant market power.

ingot was derived from virgin ingot, it was improper to use the secondary ingot to reduce defendant Alcoa's market share).

Plaintiffs' allegations go even further. The direct evidence pled by Plaintiffs demonstrates that Defendants were able to raise and maintain prices 8% over the level that existed before the formation of the EMMC and that they were able to restrict the supply of Agaricus mushrooms. Comp. ¶¶ 62, 74, 75. Contrary to Defendants' claims that there are no allegations supporting the lack of cross-elasticity, these allegations of direct market power support the lack of any significant cross-elasticity between Agaricus mushrooms and any other product. If significant cross-elasticity existed between Agaricus mushrooms and other products, Defendants would not have been able to maintain the 8% price increase. Consumers would have turned to other products, and Defendants would have been forced to lower their prices. Instead, as the Complaint alleges, Defendants' price increase supported the prices of non-EMMC members. *Id.* ¶ 78. These facts support the strong inference that there were no close substitutes for Agaricus mushrooms.

Defendants' conduct further supports Plaintiffs' proposed product market. Defendants undertook the Supply Control Program for the purpose of *supporting* and *maintaining* the price that they set for Agaricus mushrooms. *Id.* ¶ 63. If they did not believe that Agaricus mushrooms were a relevant market, their actions would be completely irrational. Defendants spent $3 million to take Agaricus mushroom growing capacity in the United States out of production. *Id.* ¶ 66. If other farm land was a reasonable substitute for operational mushroom farms, the deed restrictions would not benefit Defendants in the least because potential competitors could simply purchase other property. Similarly, if other products were easily substitutable, Defendants' expenditures of millions of dollars to limit the supply of mushrooms would serve no purpose. As

one Court perceptively noted, "no one would incur the costs of [exclusion] to keep a single competitor from the market if there were enough other rivals so that after successful predation the market would remain competitive." *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 428 (D.C. Cir. 1986). Rather than assuming that the market participants are wrong in believing that exclusion would have an effect on the market, the court should "suppose that the conspirators know the market best and . . . take their beliefs as sufficient." *Id. See also Todd*, 275 F.3d at 205 (stating that participants in a market must be assumed to understand the market and act rationally); R. Bork, THE ANTITRUST PARADOX 269 (1978) ("Very few firms that lack power to affect market prices will be sufficiently foolish to enter into conspiracies to fix prices. Thus, the fact of agreement defines the market."). Thus, Defendants' own actions as alleged in the Complaint further support Plaintiffs' proposed market definition.

## 2. The Geographic Market Is Adequately Alleged and Not Irrational.

Plaintiffs allege that the relevant geographic market for Agaricus mushrooms is the United States, or alternatively, the eastern United States. Comp. ¶ 62. The Complaint also alleges that Defendants were able to set minimum prices in six geographic regions that covered the entire United States. *Id.* ¶ 62.

The relevant geographic market is the "area in which a potential buyer may rationally look for the goods or services he or she seeks." *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984), *cert. denied,* 471 U.S. 1016 (1985); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir.), *cert. denied*, 534 U.S. 1014 (2001). Extremely narrow geographic markets that are irrational on their face may be subject to dismissal.

However, Plaintiffs have not pled a narrow nor implausible market. They have not tried to limit the market to a single producer's site, a small town, nor even a single state. They have

alleged that the geographic market is the entire United States, or alternatively the eastern part of the United States where most of the anti-competitive land transactions occurred, Comp. ¶ 66, and the DOJ alleged prices historically have been the lowest, DOJ Complaint ¶ 15 (attached as Ex. 1 to Joint MTD).  Defendants have not cited a single case dismissing a complaint alleging the entire United States as a geographic market.  Indeed, such a broad geographic market should be accepted as adequate without the need to plead anything else.  *See*, *e.g., U.S. Horticultural Supply, Inc. v. The Scotts Co.*, 2004 WL 1529185, at *6 (E.D. Pa.) (holding that the complaint's identification of the United States as the relevant geographic market was sufficient to defeat a motion to dismiss); *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 & n.10 (E.D. Pa.) (recognizing the United States as an appropriate geographic market); *Hewlett-Packard Co. v. Arch Assocs Corp.*, 908 F. Supp. 265, 270 (E.D. Pa. 1995) (rejecting defendant's argument that no geographic market had been pled where the United States was named as the relevant geographic market).

Defendants suggest that there is a need to plead more to rule out the possibility that the geographic market should be even broader because "[i]t is common knowledge that some mushrooms are imported from other countries."  Joint MTD at 45.  Defendants do not point to anything in the Complaint to indicate:  (1) that mushrooms from outside the United States are reasonably substitutable in terms of price and quality for those grown and sold in the United States; or (2) that they could be imported in any appreciable amounts to offset increases in price by a monopolist.  In fact, as discussed in connection with the relevant product definition, the facts that Plaintiffs pled suggest precisely the opposite – *i.e.,* that there are no sources outside the United States sufficient to constrain Defendants' increases in price.  If there were, Defendants would not have been able to increase and maintain prices by 8%.  Comp. ¶ 62.  And, if imported

mushrooms were a significant constraint, Defendants would not have spent $3 million of their

own money to restrict domestic mushroom production.  Such conduct would not make any

economic sense if significant quantities of imported mushrooms could be substituted for

domestically produced mushrooms.

## VI.    PLAINTIFFS' CLAIMS OF ATTEMPTED MONOPOLIZATION ARE SUPPORTED BY WELL PLED FACTS.

The offense of attempted monopolization requires proof:  "(1) that the defendant has

engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3)

a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*,

506 U.S. 447, 456 (1993).  Defendants challenge all three elements.  They claim that there was

no predatory conduct because the Capper-Volstead Act permitted their conduct and that the

second and third elements are lacking as a matter of law.  Joint MTD at 46.  We have already

demonstrated that Defendants' entitlement to Capper-Volstead immunity cannot be determined

on this motion to dismiss.  *See supra* pp. 17-37.  We address Defendants' other two arguments

below.

### A.  Defendants' Specific Intent to Monopolize Is Unambiguously Pled, As Are Facts Supporting that Allegation.

The intent required for an attempt to monopolize is the "specific intent to destroy

competition or build monopoly."  *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594,

626 (1953).  This intent is distinguished from the mere "intent to do the act" which is sufficient

for monopolization, *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431-32 (2d Cir. 1945),

or the desire simply to increase market share to win customers from a competitor, which is not

sufficient in any case.  *Spectrum Sports*, 506 U.S. at 459.

Defendants assert that the Complaint "does not assert a specific intent to monopolize and the facts alleged rule out any such intent."  Joint MTD at 47.  Once again, Defendants' argument ignores the specific facts alleged in the Complaint.  The Complaint alleges that Defendants eliminated competing mushroom supply "[i]n order to support and maintain . . . artificial price increases" (Comp. ¶ 63), that Defendants "launched a campaign to control the mushroom supply by acquiring and subsequently dismantling non-EMMC mushroom growing operations" (*id*.), and that the EMMC spent "approximately $3 million to purchase four mushroom farms and to acquire lease options on two additional mushroom farms in the eastern United States *for the purpose of shutting them down and reducing the mushroom production capacity available for nonmembers to grow mushrooms in competition with Defendants*" (*id*. at ¶ 66 (emphasis added); *see also id.* at ¶ 75).

Paragraph 96 of the Amended Consolidated Complaint elaborates further on Defendants' specific intent to monopolize:

> During the relevant period, Defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, by willfully and unlawfully acquiring, maintaining, and/or attempting to acquire or maintain monopoly power by, inter alia:
>
> a. conducting the Supply Control campaign;
>
> b. buying multiple properties and reselling them at a loss with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;
>
> c. entering into agreements with nonmembers to place deed restrictions on properties for which the cooperative purchased lease options;
>
> d. filing deed restrictions on the lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms for ten years; and
>
> e.  supporting and reinforcing the scheme by (i) collectively interfering with, penalizing and retaliating against any non-EMMC

> growers that sought to sell at prices that were below the
> artificially-inflated prices set by the EMMC; and (ii) using
> collective and conspiratorial acts to pressure independent growers
> to join the EMMC and the Defendants' anticompetitive scheme.

And, paragraph 97 alleges:

> Defendants have used their illegal monopoly power to suppress
> competition and harm Plaintiffs and other members of the Class by
> enacting an overarching, illegal scheme to affect, fix, raise,
> maintain and/or stabilize at artificial and non-competitive levels,
> the prices of Agaricus mushrooms that were sold, distributed or
> obtained in the United States.  Alternatively, if it is determined that
> defendants have not yet secured monopoly power, their conduct
> constitutes attempted monopolization which has harmed Plaintiffs
> and poses a dangerous possibility of success.

Defendants' specific intent to monopolize could not have been pled more clearly.

Defendants undertook a scheme with the specific purpose of eliminating non-EMMC production

to maintain or increase their monopoly power.  That is the very definition of an intent to

monopolize.

Defendants assert that they could not have had a specific intent to monopolize because

the Complaint alleges that they already had a monopoly before embarking on the Supply Control

Campaign.  Joint MTD at 48-49.  Paragraph 97 set out above clearly states that Plaintiffs'

monopolization and attempted monopolization claims are set forth in the alternative as permitted

by Federal Rule of Civil Procedure 8(a).  Rather than drawing all inferences to favor Plaintiffs,

Defendants construe the two alternate arguments against Plaintiffs.  Plaintiffs are not required to

elect between these two claims under section 2.

Moreover, the argument that a monopolist cannot be found liable for an attempt to

monopolize is wrong as a matter of law.  A monopolist may violate the "attempt to monopolize"

clause of § 2 when it uses its monopoly to destroy "threatened competition."  *Lorain Journal Co.*

*v. United States*, 342 U.S. 143, 154 (1951).  Similarly, a monopolist that uses illegal means to

60

protect a lawful monopoly against a rising competitive challenge may also be found to have attempted monopolization even if it is ultimately unsuccessful at maintaining its monopoly. *Multifliex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 990-95 (5th Cir. 1983), *reh'g denied*, 716 F.2d 901 (5th Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984).[24] *See also Pacific Coast*, 526 F.2d at 1203-05 (affirming jury verdict finding defendants liable for both monopolization and attempted monopolization).

Finally, Defendants try to dismiss the very specific intent pled in Plaintiffs' Complaint as "a quixotic effort to preserve the *status quo*."  Joint MTD at 48.  Defendants are the largest mushroom producers in the country and control a majority of the mushroom production under any reasonable market definition.  For Defendants to now claim that Plaintiffs' Complaint should be dismissed because their intent to dominate the market was "quixotic" is ludicrous. They clearly believed that they would benefit from the reduction of mushroom producing capacity.  It would be entirely improper on a motion to dismiss to assume that Defendants did not understand the markets in which they operated or to dismiss Plaintiffs' Complaint because Defendants now claim that their actions could not possibly have succeeded.

> ### B.  The Facts Pled Unambiguously Support the Allegation That There Was a Dangerous Probability of Success.

Defendants argue that the Complaint does not adequately allege a dangerous probably of achieving monopoly power.  They are wrong.

---

[24] In her dissent from the panel decision in *LePage's Inc. v. 3M*, 277 F.3d 365, 406 (3d Cir. 2002), Judge Sloviter specifically relied on these cases in concluding that the "law is clear that a defendant possessing monopoly power can be found liable under § 2 for attempted monopolization where that defendant either has failed in its attempt to maintain its monopoly or has not yet succeeded in its attempt to maintain its monopoly."  On rehearing *en banc*, Judge Sloviter's majority opinion did not reach this issue.  *See LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003).

The dangerous-probability-of-success prong of an attempted monopolization claim considers whether Defendants have a dangerous probability of acquiring monopoly power. The factors considered are the same as those considered in determining whether a defendant has sufficient market power to be guilty of monopolization. *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1267-68 (E.D. Pa. 1987). The only difference is that the level of market power required to support a finding of attempted monopolization is generally less than the level required to support a finding of actual monopolization. *Id.* at 1270. For instance, in *Tops Mkts., Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 100-01 (2d Cir. 1998), the Court of Appeals concluded that there was insufficient market power to support a monopolization claim because barriers to entry were low, but that there was nevertheless sufficient market power to support an attempt claim.

Thus, a proper analysis of the dangerous probability of success prong should closely follow the analysis set forth above with respect to market power. The allegations that Defendants had the ability to increase and maintain prices 8% and to restrict the output of mushrooms show a high degree of market power sufficient to support Plaintiffs' claim that there was a dangerous probability of success. In addition, courts often find a dangerous probability of success where the defendant starts with a market share of more than 50%. *See* ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS 304 & n.436 (5th ed. 2002) (citing cases). Here, Plaintiffs have pled that Defendants' share of the market for Agaricus mushrooms is at least 60% and possibly as high as 90% and that there are barriers to entry. Comp. ¶¶ 65, 77. These allegations are more than sufficient to support the allegation that Defendants had a dangerous probability of achieving monopoly power.

Defendants make a variety of misguided arguments as to why a dangerous probability of success has not been pled.

First, they claim that there was no probability of success because the deed restrictions were removed as a result of the Consent Agreement with the Department of Justice. Joint MTD at 48. This argument misses the point entirely. The issue is whether there was a probability of success *before* the Department of Justice stepped in to stop Defendants' anticompetitive practices. The fact that the deed restrictions were removed does not mean that there was not a dangerous probability of success before the DOJ intervened.

Second, Defendants assert that Plaintiffs have not pled any facts showing that the deed restrictions had a dangerous probability of success before they were removed. Joint MTD at 48-49. Defendants ignore all of the facts discussed above showing that Defendants had market power and that they expected that the deed restrictions for which they paid $3 million would benefit them by supporting the prices that they set.

Third, Defendants assert that Plaintiffs' allegations concerning barriers to entry are conclusory, may be "disregarded," and are "patently false." Joint MTD at 50. No more inappropriate arguments on a motion to dismiss could be advanced by a defendant. Defendants may ultimately be able to argue to a jury that the deed restrictions could not have affected competition because alternate farm land was available to be converted into mushroom farms, but such arguments are entirely inappropriate on a motion to dismiss. The Complaint alleges that Defendants took these actions because they believed that the reduction of supply would allow them to keep their prices high. There is no basis for reaching any other conclusion on a motion to dismiss. And, contrary to Defendants' assertion that there are no allegations that any competitor was prevented from entering the market (Joint MTD at 50), there are clear allegations

63

that Defendants purchased farm land to prevent its purchase by potential non-EMMC competitors.  *See, e.g.,* Comp. ¶ 67 (EMMC outbid non-EMMC grower in Colorado for Dublin, Georgia mushroom farm); *see also id.* ¶ 65 (Defendants' elimination of productive capacity "substantially reduced and impeded the existence of current competition and substantially forestalled and delayed the entry of new competitors and/or the expansion of existing competitors").  The only fair inference is that all of the deed restrictions were intended to block such potential competition.  If the mushroom farms were not otherwise going to be used to grow mushrooms, why would a group of the largest mushroom producers in the country spend $3 million to secure deed restrictions?

Finally, Defendants attack Plaintiffs for identifying the quantity of mushrooms grown as opposed to the quantity sold.  Joint MTD at 51.  This case is about commercial mushroom production.  The only fair inference is that virtually all of the mushrooms grown are in fact sold. Indeed, the Complaint alleges that the Agaricus mushrooms grown are sold to "fresh market retailers such as grocery store chains and food distributors, and also to canneries."  Comp. ¶ 60. In light of the likelihood that the quantity of mushrooms grown closely corresponds to the quantity sold, the market shares provided in the Complaint more than satisfy Plaintiffs' obligation to provide a "short and plain" statement of their claims.  Additional detail can be obtained through discovery.  Indeed, as the principal participants in the industry, Defendants are likely in possession of much of the data needed to refine the market figures alleged in the Complaint.

## VII.  PLAINTIFFS' CLAIMS UNDER SECTION 7 OF THE CLAYTON ACT ARE WELL PLED.

Section 7 of the Clayton Act makes it unlawful for a person to acquire the assets of another person where the effect of the acquisition may be anticompetitive:

> *[N]o person* subject to the jurisdiction of the Federal Trade Commission *shall acquire* the whole or any part of *the assets of* one or more *persons engaged in commerce* or in any activity affecting commerce, *where in any line of commerce* or in any activity affecting commerce *in any section of the country, the effect of such acquisition*, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, *may be substantially to lessen competition, or tend to create a monopoly*.

15 U.S.C. § 18 (emphasis added).  Plaintiffs allege that Defendants' acquisition of mushroom farms substantially lessened competition in the market for Agaricus mushrooms.  Comp. ¶¶ 103, 106.  Defendants assert that the Section 7 claim against the EMMC must be dismissed because "the 'acquisitions' had absolutely no injurious effect on competition" (Joint MTD at 56) and the claims against the cooperative members must be dismissed because the members did not acquire anything (Joint MTD at 54).  The first argument improperly raises factual issues on a motion to dismiss and the second is based on an incorrect statement of the law.

### A.  Plaintiffs' Allegations of Injurious Effects of the EMMC Acquisitions Must be Accepted on a Motion to Dismiss.

Defendants argue that the acquisitions identified in the Complaint "had absolutely no injurious effect on competition" because "the properties at issue were all failing as mushroom farms."  Joint MTD at 56-57.  This argument ignores Plaintiffs' factual allegations and improperly makes inferences in *Defendants'* favor.

The Amended Consolidated Complaint alleges that the Defendants undertook the acquisitions to eliminate "competing mushroom supply, which could otherwise force down . . . artificially increased prices."  Comp. ¶ 63.  It further alleges that Defendants spent $3 million to acquire four mushroom farms and acquire lease options on two additional farms "for the purpose of shutting them down and reducing the mushroom production capacity available for nonmembers to grow mushrooms in competition with Defendants."  *Id.* ¶ 66; *see also id.* ¶¶ 67-

69, 71.  Defendants themselves admitted that the effect of the acquisitions was to take "over 50 million pounds out of production from facilities which could have easily been purchased and remained in production."  *Id.* at ¶ 74.  And, the Complaint further alleges that Defendants' very purpose in undertaking this Supply Control Campaign was "to reduce or eliminate the Agaricus mushroom growing capacity available to potential independent competitors in the United States, thereby improving Defendants' ability to maintain the artificially-inflated prices to which they had agreed."  *Id.* ¶ 75.

All of these allegations, which must be accepted on a motion to dismiss, support Plaintiffs' conclusions that the acquisitions had the effect of "substantially lessening competition in a relevant market."  *Id..* ¶ 103.[25]

The liability of a cooperative for such anticompetitive actions is clear.  In *Maryland & Virginia Milk Producers,* 362 U.S. at 469, the Supreme Court concluded that a cooperative's acquisition of the assets of its members' principal competitor "tended to create a monopoly or substantially lessen competition, and was therefore a violation of § 7."

Defendants' reference to regulations exempting particular acquisitions of agricultural property from the notification requirements of the Hart-Scott-Rodino Act ("HSR") is completely irrelevant to any issue in this case.  Joint MTD at 57 (citing 15 U.S.C. § 18(a) and 16 C.F.R. § 802.2(g)[26]).  The regulations that Defendants cite were promulgated pursuant to section 7A(c) of HSR which authorizes the FTC, with the concurrence of the Assistant Attorney General, to promulgate rules exempting particular transactions "which are not likely to violate the antitrust

---

[25] We rebut defendants' claim that Plaintiffs inadequately pled a relevant market *supra* pp. 47-58.

[26] Defendants erroneously cited this regulation as 15 C.F.R. §802.2(g).

laws" from the pre-acquisition notification and waiting periods of the Act.  15 U.S.C. §§ 18(a)(c)(12) and 18(d)(2)(B) (emphasis added).  Exemption from the HSR notice and waiting periods is not an immunity from the antitrust laws.  An HSR exempt transaction may still be found to violate the antitrust laws.  *See* 15 U.S.C. § 18(a)(i)(1) ("Any action taken by the Federal Trade Commission or the Assistant Attorney General or any failure of the Federal Trade Commission or the Assistant Attorney General to take any action under this section shall not bar any proceeding or any action with respect to such acquisition at any time under any section of this Act or any other provision of law.").

Here, Plaintiffs have pled that barriers to entry make it particularly difficult to open a new mushroom farm.  Comp. ¶ 65.  And, as we have said before, Defendants obviously believed that the deed restrictions for which they paid more than $3 million would have some effect.  These allegations raise issues about the competitive impact of the EMMC's acquisitions that are not appropriately addressed on a motion to dismiss.  *Cf. McTamney v. Stolt Tankers & Terminals (Holdings) S.A.*, 678 F. Supp. 118, 120 (E.D. Pa. 1987) (denying motion for judgment on the pleadings of a private action for damages pursuant to section 7 despite defendants' claim that plaintiffs had alleged only an "unconsummated acquisition" on grounds that that plaintiffs should have opportunity to obtain evidence through discovery to show sufficient control of competitors during the attempted acquisition).

### B.  Individual Cooperative Members May Be Liable for Violation of Section 7.

Defendants assert that members of a cooperative may not be found liable for a violation of section 7 of the Clayton Act when their cooperative engages in an acquisition with the potential to substantially lessen competition or create a monopoly.  Joint MTD at 53-54.  Defendants admit that they do not have any cases that stand for this proposition.  *Id.* at 52.

Instead, they rely on dictionary definitions of the word "acquire" and argue that the members of the cooperative have not acquired any assets for which they may be found liable under section 7. *Id.* at 54 & n. 56.

Defendants' narrow construction of the term "acquire" in section 7 is contrary to the purpose of Congress in amending the statute, the interpretation given to it by the FTC, and the expansive interpretation given by the cases.

In 1950, Congress amended section 7 of the Clayton Act to expand its coverage. *See* Pub. L. No. 81-899, 64 Stat. 1225 (1950) (codified as amended at 15 U.S.C. § 18). Prior to the amendment, section 7 applied solely to acquisitions of stock, and Congress' purpose was to plug a loophole by bringing "the entire range of corporate amalgamations, from pure stock acquisitions to pure asset acquisitions, within the scope of § 7." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 342 (1963). As the Court of Appeals has recognized, the amendment was intended to reach a broad range of conduct "when the effect of an acquisition may be a significant reduction in the vigor of competition" which may arise "in various ways; such as elimination in whole or in material part of the competitive activity of an enterprise which has been a substantial factor in competition, increase in the relative size of the enterprise making the acquisition to such a point that its advantage over its competitors threatens to be decisive, undue reduction in the number of competing enterprises, or establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete." *A.G. Spalding & Bros., Inc. v. F.T.C.*, 301 F.2d 585, 627 (3d Cir. 1962) (quoting H.R. Rep. No. 1191, 81st Cong., 1st Sess., p.2 (1949)).

Consistent with this Congressional intent, the FTC has concluded, contrary to Defendants' argument, that all asset acquisitions, direct or indirect, that substantially lessen

competition violate section 7.  *See* Federal Trade Commission, *Report on Corporate Mergers & Acquisitions* 150 (1955) (recognizing that "[i]ndirect, as well as direct, acquisitions of stock and assets are covered" by section 7).  *See also* J. von Kalinowski, ANTITRUST LAWS & TRADE REGULATION § 29.02[2][d] (2d ed. 2006) ("The statute does not expressly state whether indirect acquisition of *assets* are similarly prohibited.  It would seem, however, that indirect, as well as direct, asset acquisitions are covered by Section 7.").

Finally, the courts have broadly construed the term "acquire."  In *United States v. Columbia Pictures, Corp.*, 189 F. Supp. 153 (S.D.N.Y. 1960), the court examined the proper construction of section 7:

> [T]he words "acquire" and "assets" are not terms of art or technical legal language.  In the context of this statute, they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring person may accomplish the acquisition by means of purchase, assignment, lease, license, or otherwise.  The test is pragmatic.  The final answer is not in the dictionary.

> The statute imposes no specific method of acquisition.  It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse "effect."

> The broad sweep to be given to the term "acquire" is also suggested by the circumstance that the following words are unrestricted, i.e., "the whole or any part of the assets."  Nothing could be more unqualified than the words "any part."  Those words likewise must be given a liberal interpretation.

> * * *

> Congress was painting with a broad brush when it prohibited the acquisition of the whole or any part of the assets of another corporation, where the effect of such acquisition may be substantially to lessen competition.  The language was deliberately couched in general and flexible terms.  Its vague contours are characteristic of the antitrust statutes.  It is a judicial responsibility

to contribute to the fashioning of a coherent body of substantive
law out of the Congressional policy and language.

*Columbia Pictures,* 189 F. Supp. at 181-82. *See also McTamney,* 678 F. Supp. at 120-21

(denying motion for judgment on the pleadings where acquisition was not even consummated

because Plaintiffs should have opportunity to use discovery to show sufficient control of

competitors during the attempted acquisition); *Gerlinger v. Amazon.Com, Inc.,* 311 F. Supp. 2d

838, 853 (N.D. Cal. 2004) ("In keeping with the broad mandate of antitrust laws, … courts have

generally adopted a flexible approach in determining the scope of this language").  This flexible

construction of the terms of asset and acquisition is inconsistent with the narrow construction

urged by Defendants.

    The allegations of the Complaint satisfy the flexible standard adopted by the courts.  The

Complaint specifically alleges that the individual EMMC members formed the EMMC and used

it to set prices and to control the mushroom supply to support those prices.  Comp. ¶ 63.  The

EMMC did not collectively process, handle, or market mushrooms for its members who

continued to grow, buy, package, and ship their own mushrooms to retail and food service

outlets.  *Id.* ¶ 18.  And, the Complaint alleges that in acquiring and subsequently shutting down

non-EMMC mushroom growing operations, the EMMC was "acting as an agent of its members."

*Id.* ¶ 66.

    These allegations distinguish this case from cases like *Tim W. Koerner & Assoc., Inc. v.

Aspen Labs, Inc.,* 492 F. Supp. 294, 299 (S.D. Tex. 1980), *aff'd,* 683 F.2d 416 (5th Cir. 1982)**,**

cited by Defendants for the proposition that "by its express terms Section 7 of the Clayton Act is

directed only against the acquiring corporation," and *Int'l Rys. of Central America v. United

Brands Co.,* 532 F.2d 231 (2d Cir. 1976), cited for the proposition that mere stock ownership is

not enough to warrant section 7 liability.  *See also Bell v. Fur Breeders Agricultural*

*Cooperative,* 348 F.3d 1224 (10th Cir. 2003) (cited by Defendants for proposition that

cooperative should be treated as a corporation).  Plaintiffs are not seeking to hold Defendants

responsible "merely" for their membership in the cooperative.  Plaintiffs are seeking to impose

liability on Defendants for improperly using the cooperative to acquire mushroom farms to

support the prices that they collusively set.

### VIII. STATE CORPORATE LAW DOES NOT SHIELD DEFENDANTS FROM LIABILITY FOR ANY OF THEIR ACTIONS.

Basciani and the Mushroom Alliance Defendants (the Mushroom Alliance with its

members Creekside, JM Farms, and Kitchen Pride) assert that state corporate law shields them

from liability for the antitrust violations pled in the Complaint because they assert that any

liability is derivative of the EMMC and the Mushroom Alliance.  Basciani MTD at 12-13,

Mushroom Alliance MTD at 8-10.  *See also* Joint MTD at 55-56 (pointing to state corporation

law in support of Clayton section 7 argument).  This argument misconstrues the Complaint and

the applicable law.

Basciani and the Mushroom Alliance Defendants point to Pennsylvania statutory law

codifying the principle of limited liability for non-profit corporations:

> A member of a nonprofit corporation shall not be liable, *solely by reason* of being a member, under an order of a court or in other manner *for a debt, obligation or liability of the corporation* of any kind or *for the acts of any member or representative of the corporation.*

15 Pa. C.S. § 5552(a) (emphasis added).  The Mushroom Alliance Defendants also point to a

similar Washington statute since the Mushroom Alliance is a Washington corporation:

> Except for debts lawfully contracted between a member and the association, no member shall be liable *for the debts of the association* to an amount exceeding the sum remaining unpaid on his or her membership fee or subscription to capital stock.

Wash. Rev. Code Ann. § 23.86.105(1).

The reliance of Basciani and the Mushroom Alliance Defendants on these statutes is misplaced.  Plaintiffs are not seeking to hold any defendant liable "solely by reason" of the defendant's membership in a cooperative for a "debt, obligation, or liability of the corporation" or an "act" of a member or representative.  Rather, the Complaint clearly alleges that Plaintiffs are seeking to impose liability on Defendants for their own actions in conspiring to raise the price and restrict the supply of Agaricus mushrooms.  *See* Comp. ¶¶ 3 ("EMMC and its members" implemented "Supply Control" campaign), 6-7 & 76-77 ("EMMC members supported and reinforced their scheme"), 62 ("EMMC and its members" agreed to and set a collective minimum price), 66-75 ("EMMC members" contributed $6M in membership dues and Supply Control Assessment fees and EMMC acted as agent of its members in using money to acquire deed restrictions).

State corporate law does not shield Defendants from liability for such actions.  Both Pennsylvania and Washington recognize that where individual corporate actors, including shareholders, participate in wrongful conduct, they may be held personally liable.[27]  Much of the applicable case law has been developed in the context of claims against directors and officers of for-profit corporations, but the same principles have been applied to members of a non-profit corporation and shareholders of for-profit corporations.  *See, e.g., Lord v. Living Bridges*, 1999 WL 562713, at *3 (E.D. Pa.) (relying on the participation theory to deny summary judgment to defendant members of a nonprofit corporation); *Cheatle v. Katz*, 2003 WL 21250583, at * 6-7

---

[27] Members of a cooperative are legally analogous to shareholders of a for-profit corporation.  *See* Wash. Rev. Code Ann. § 23.86.360.

(E.D. Pa.) (applying the participation theory to determine shareholder liability); *Bethea v. Bristol Lodge Corp.*, 2002 WL 31859434, at * 15-16 (E.D. Pa.).

*Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 621-22, 470 A.2d 86, 90 (1983), is the leading Pennsylvania case describing the participation theory:

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

The essential issue is whether the named defendant has been alleged or proven to be an active participant in the commission of a wrongful act such that it would be appropriate to hold him individually liable. *See Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986) (holding that "[a]n individual, including a director, officer, or agent of a corporation, may be liable for injuries suffered by third parties because of his torts, regardless of whether he acted on his own account or on behalf of the corporation. 'An officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefore.'"); *Shay v. Flight C Helicopter Services, Inc.,* 822 A.2d 1, 17 (Pa. Super. 2003).

In the context of allegations of unfair competition, the Court of Appeals has specifically held that a "corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978). *See also Higbie v. Kopy-Kat, Inc.,* 391 F. Supp. 808, 810 (E.D. Pa. 1975) (holding that "[i]t is well-established that a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts, or where he has acquiesced or ratified the actions of other

officers or agents of the corporation which were in violation of the anti-trust law."); *Deaktor v. Fox Grocery Co.,* 332 F. Supp. 536, 541-42 (W.D. Pa. 1971) (holding that corporate officer was liable for his own antitrust violations); *Moy v. Schreiber Deed Security Co.,* 535 A.2d 1168, 1171 (Pa. Super. 1988) (overruling the lower court's demurrer to complaint seeking to hold corporate officer personally liable for unfair and deceptive trade practices).

The Mushroom Alliance Defendants argue that the Complaint is defective because it fails to allege facts that would justify piercing the corporate veil. Mushroom Alliance MTD at 10. But Pennsylvania courts have clearly distinguished the corporate veil piercing theory from the participation theory:

> There is a distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity.

*Wicks*, 470 A.2d at 89-90. *See also Donsco*, 587 F.2d at 606; *Mill Run Associates v. Locke Property Co., Inc.*, 282 F. Supp. 2d 278, 288 (E.D. Pa. 2003).[28]

Washington law is no different. The Supreme Court of Washington has held that "[i]f a corporate officer participates in the wrongful conduct, or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties. Corporate officers

---

[28] Because Plaintiffs seek to hold each defendants liable for its own participation in this conspiracy to fix prices and limit supply, there is no issue of "twice-removed vicarious" liability as suggested by the Mushroom Alliance Defendants. *See* Mushroom Alliance MTD at 3.

cannot use the corporate form to shield themselves from individual liability." *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 553 P.2d 423, 439 (Wash. 1976) (internal citations omitted). *See also Olympic Fish Products, Inc. v. Lloyd*, 611 P.2d 737, 738-39 (Wash. 1980); *Johnson v. Harrigan-Peach Land Development Co.*, 489 P.2d 923, 927-28 (Wash. 1971).

## IX.    THE PARTICIPATION OF EACH OF THE DEFENDANTS IN THE ANTICOMPETITIVE SCHEME HAS BEEN ADEQUATELY PLED.

Finally, the Mushroom Alliance Defendants argue that the Complaint has failed to sufficiently allege or adequately notify the Mushroom Alliance of its alleged participation in the unlawful conduct.  Mushroom Alliance MTD at 5-7.  The Mushroom Alliance Defendants argue that "[t]he law requires that Plaintiffs allege some facts supporting their theory because 'a defendant deserves fair notice of the general factual background for the Plaintiff's claims.'" *Id.* at 6.  They further claim that "[p]laintiffs plead not one single factual allegation as to how Creekside, JM Farms, Kitchen Pride, or the Mushroom Alliance each allegedly 'participated' in any purported anticompetitive activity" and claim that they "have absolutely no idea of 'what they allegedly did wrong.'" *Id.* at 6.  These assertions misstate Plaintiffs' pleading requirements and are factually untrue.

To survive a motion to dismiss a conspiracy claim, a Plaintiff need not plead the specific acts of each conspirator in support of the conspiracy. As the Court of Appeals has held, Plaintiffs need only "plead the facts constituting the conspiracy, its object and accomplishment." *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 202 (3d Cir. 1991); *Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988); *Black & Yates v. Mahogany Ass'n*, 129 F.2d 227, 231 (3d Cir. 1941), *cert. denied*, 317 U.S. 672 (1942).  Therefore "allegations identifying the conspiracy's participants, purpose and motive are sufficient to survive a motion to dismiss." *Fuentes*, 946 F.2d at 202.

The district courts in this circuit have not required anything more.  *See, e.g., In re Hydrogen Peroxide Antitrust Litigation*, 401 F. Supp. 2d 451, 459-60 (E.D. Pa. 2005) (denying defendants' motion to dismiss where Plaintiffs had identified each defendant as a participant and alleged that the conspiracy's purpose was to artificially raise the price of hydrogen peroxide for the purpose of profiting the members of the conspiracy); *In re Pressure Sensitive Labelstock Antitrust Litigation*, 356 F. Supp. 2d 484, 491-92 (W.D. Pa. 2005) (denying defendants' motion to dismiss where defendants were identified as participants in the conspiracy and the purpose of the conspiracy was to fix prices and restrain competition in the self-adhesive labelstock business to assure market share and profitability).

*In re Bath & Kitchen Fixtures Antitrust Litigation*, 2006 WL 2038605 (E.D. Pa.), relied on by the Mushroom Alliance Defendants, does not say anything different.  In that case, the court recognized that Plaintiffs "must plead the facts constituting the conspiracy, its object and accomplishment."  *Id.* at *3.  Nowhere did the court articulate a more stringent pleading standard as to each individual defendant.  The court held that the complaint was insufficient because "the consolidated and amended complaint alleges only in the most general terms that the defendants agreed to fix prices, that they communicated about this agreement and that they carried out the agreement."  *Id.* at *8.

Here, the Complaint alleges with specificity the object and accomplishments of the EMMC conspiracy as a whole, as well as individual actions by these Defendants in furtherance of the conspiracy. It alleges that the EMMC and its members raised prices an average of at least 8% (Comp. ¶ 3), that they implemented a Supply Control Campaign (Comp. ¶ 63), that they collected $6 million and spent $3 million to implement the Supply Control Campaign, that they purchased four farms and entered into lease agreements on two others to implement deed

restrictions (*id.* ¶ 66), that they pressured non-members to join the EMMC or sell at the prices set by the EMMC (i*d.* ¶ 76-79), and that the members sold mushrooms at inflated prices (*id.* ¶ 78).[29]

It would be particularly inappropriate to grant the Mushroom Alliance's motion to dismiss for failure to plead each of the conspirators' acts with more particularity where the EMMC and its members concealed their activities from the public and did not even make their membership public. Comp. ¶ 82. Such a requirement would wholly ignore the nature and particular evils associated with conspiratorial conduct where the proof is largely in the hands of the alleged conspirators. C*f. Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962) (cautioning that "summary judgment procedures should be used sparingly in complex antitrust litigation" given that "the proof is largely in the hands of the alleged conspirators . . . .").

Plaintiffs have provided a short and plain statement of Plaintiffs' claims as required under Fed. R. Civ. P. 8(a), and the Mushroom Alliance Defendants have enough information to admit or deny the allegations of the Complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, the Direct Purchaser Class Plaintiffs respectfully request that the Defendants' motions be denied and Plaintiffs' claims be permitted to proceed to discovery. In the alternative, should the Court grant any part of Defendants' motions to dismiss, Plaintiffs ask for permission to amend the Complaint pursuant to Fed. R. Civ. P. 15(a). Such leave must

---

[29] The Mushroom Alliance Defendants and Basciani claim that there are no allegations that they individually possessed monopoly power or individually had a dangerous probability of obtaining a monopoly. Mushroom Alliance MTD at 12; Basciani MTD at 14. But that is not Plaintiffs' claim. The Complaint alleges that Defendants joined together in the EMMC to acquire, maintain, and/or attempt to acquire or maintain monopoly power. Comp. ¶ 101. Nothing more is required to plead a claim for monopolization, conspiracy to monopolize and/or

be granted unless it is clear that no amendment could cure the deficiency.  *See, e.g., Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  Such circumstances are unlikely here.  Defendants have already entered into a consent agreement with the Department of Justice based on the same general allegations raised in the Complaint and the conduct at issue is far outside that intended to be immunized by the Capper-Volstead Act.  Consequently, if the Court perceives any technical pleading deficiencies, Plaintiffs request the opportunity to amend.

Dated:  September 15, 2006            Respectfully submitted,


        /s Barry L. Refsin
        Barry L. Refsin (Pa. ID No. 62526)
        HANGLEY ARONCHICK SEGAL & PUDLIN
        One Logan Square, 27th Floor
        Philadelphia, PA 19103-6933
        Tel:  (215) 568-6200
        Fax:  (215) 568-0300

        Steve D. Shadowen (Pa. ID No. 41953)
        HANGLEY ARONCHICK SEGAL & PUDLIN
        20 North Third Street
        Suite 700
        Harrisburg, PA  17101-1701
        Tel:  (717) 364-1030
        Fax:  (717) 364-1020

        Bruce E. Gerstein
        Noah H. Silverman
        Kevin Landau
        GARWIN, GERSTEIN & FISHER, L.L.P.
        1501 Broadway, Suite 1416
        New York, NY  10036
        Tel:  (212) 398-0055
        Fax:  (212) 764-6620
        *Lead Counsel for Direct Purchaser Class*

---

attempted monopolization against all Defendants.

David P. Smith
W. Ross Foote
PERCY, SMITH & FOOTE, L.L.P.
720 Murray Street
P. O. Box 1632
Alexandria, LA  71309
Tel:  (318) 445-4480
Fax:  (318) 487-1741

Brent B. Barriere
David Patrón
Susie Morgan
PHELPS DUNBAR, L.L.P.
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA  70130
Tel:  (504) 584-9210
Fax:  (504) 568-9130

Robert T. Kelly, Jr.
MYERS, BRIER & KELLY, LLP
425 Spruce Street - Suite 200
P.O. Box 551
Scranton, PA 18501-0551
Tel:  (570) 342-6100
Fax:  (570) 342-6147

Adam Moskowitz (FBN 984280)
Tucker Ronzetti (FBN 965723)
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon, 9th Floor
Coral Gables, Florida 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508

John Gregory Odom
Stuart E. Des Roches
ODOM & DES ROCHES, L.L.P.
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel:  (504) 522-0077
Fax:  (504) 522-0078

Robert A. Kutcher
CHOPIN, WAGAR, RICHARD & KUTCHER
3850 N. Causeway Blvd., Suite 900
Metairie, LA  70002
Tel:  (504) 830-3838
Fax:  (504) 836-9540

Alfred G. Yates
LAW OFFICE OF ALFRED G. YATES JR PC
519 Allegheny
Building 429 Forbes Avenue
Pittsburgh, PA 15219
Tel:  (412) 391-5164
Fax:  (412) 471-1033

Linda P. Nussbaum
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022-7519
Tel:  (212) 838-7797
Fax:  (212-838-7745

Michael D. Hausfeld
Brian A. Ratner
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4669

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
SPECTOR ROSEMAN & KODROFF
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:  (215) 496-0300
Fax:  (215) 496-6611

*Attorneys for Direct Purchaser Class Plaintiffs*