IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | NOS.   06-0638; 06-0657; |
| All Actions | : | 06-0677; 06-0861; |
| | : | 06-0932; 06-1464; |
| | : | 06-1854 |

O'NEILL, J.                                    APRIL 25, 2007

MEMORANDUM

On June 26, 2006, plaintiffs, direct purchasers of mushrooms, filed a consolidated

amended antitrust class action[1] under federal law against defendants, Eastern Mushroom

Marketing Cooperative, Inc. ("EMMC"), thirty-seven members, officers and affiliates of

members, and unidentified members and/or co-conspirators during the class period (collectively,

"member defendants"), alleging that defendants engaged in an illegal scheme and conspiracy to

cause plaintiffs to pay artificially inflated prices for mushrooms from January 2001 to date of

filing.  Specifically, plaintiffs bring this action to recover treble damages, equitable relief, costs

of suit and reasonable attorneys' fees pursuant to the Clayton Act, 15 U.S.C. §§ 15(a) and 26

(2007), for defendants' alleged violations of the anti-competitive conspiracy, monopolization and

attempted monopolization provisions of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the

_____

[1]Plaintiffs filed their consolidated amended antitrust class action complaint pursuant to
my June 5, 2006 Order consolidating seven class actions and one non-class action previously
filed against defendants to promote judicial economy and avoid duplication.

unlawful acquisition provision of the Clayton Act, 15 U.S.C. § 18.  Presently before me are the motion to dismiss filed by defendants collectively, the motion to dismiss filed by M.D. Basciani & Sons, Inc., the motion to dismiss filed by Creekside Mushrooms Ltd., JM Farms, Inc., Kitchen Pride Mushrooms, and Mushroom Alliance, Inc., plaintiffs' response, defendants' replies, and plaintiffs' sur-reply.

BACKGROUND

According to plaintiffs, defendant EMMC is the largest mushroom cooperative in the United States, controlling over sixty percent of all Agaricus mushrooms grown in the United States and approximately ninety percent of all Agaricus mushrooms grown in the eastern United States.[2]  Incorporated in the Commonwealth of Pennsylvania and headquartered in Kennett Square, Pennsylvania, EMMC is made of entities that grow, buy, package and ship mushrooms to retail and food service outlets across the United States.  As a cooperative, EMMC sets and regularly publishes the minimum prices at which its members sell their mushrooms to customers in various geographic regions throughout the United States.  The list of defendants includes mushroom growers, packagers, sellers, distributors, and other related entities that were either members or affiliates of members of EMMC.

Plaintiffs allege that starting in January 2001 defendants undertook a wide-ranging scheme to inflate the average prices for Agaricus mushrooms.  First, defendants allegedly agreed to set prices at which fresh Agaricus mushrooms would be sold in six different geographic

---

[2]Plaintiffs allege that for this action the relevant antitrust product market is fresh Agaricus mushrooms and the relevant antitrust geographic market is the United States or alternatively the eastern United States.

2

regions covering the entire continental United States.[3]  Then, in order to support and maintain artificial price increases, defendants allegedly launched a "supply control" campaign by using membership funds collected during 2001 and 2002 to acquire and subsequently dismantle non-EMMC mushroom growing operations.  Plaintiffs allege that EMMC repeatedly would purchase a mushroom farm or a parcel of farmland and then sell or exchange that farm or parcel at a loss, attaching a permanent or long-term deed restriction to the land prohibiting the conduct of any business related to the growing of mushrooms.  Plaintiffs cite several specific examples of this practice.

In May 2001, EMMC purchased a farm in Dublin, Georgia, outbidding a non-EMMC mushroom grower based in Colorado, and three months later exchanged it for two parcels in Evansville, Pennsylvania.  As a part of that exchange, EMMC placed a permanent deed restriction on the Dublin farm prohibiting the conduct of any business related to the growing of mushrooms.  EMMC then sold separately the two parcels in Evansville, incorporating permanent deed restrictions prohibiting the conduct of any business related to the growing of mushrooms into each sale.  EMMC lost approximately $525,000 as a result of the Dublin farm transactions and $137,000 as a result of the transactions involving the two parcels in Evansville.

In January 2002, EMMC purchased Gallo's Mushroom Farm in Berks County, Pennsylvania, which had an annual mushroom growing capacity of two million pounds.  Less than four months later, EMMC sold Gallo's at a loss of $77,500 with a permanent deed

---

[3]The minimum prices set by EMMC after its formation allegedly were on average higher than prevailing prices prior to EMMC's formation by at least eight percent nationwide.

restriction prohibiting the conduct of any business related to the growing of mushrooms.

In February 2002, EMMC agreed to pay $1 million to the owners of Ohio Valley Mushroom Farms for, among other things, a non-compete agreement, a right of first refusal to lease the mushroom growing operations, a right of first refusal to purchase the properties, and the right to record a deed restriction prohibiting the conduct of any business related to mushroom growing on the property for ten years.  Though it did not lease or purchase the property, EMMC filed the deed restriction on the Ohio Valley Farm, which had operated as a mushroom growing concern with annual capacity of nine million pounds.

In March 2002, EMMC purchased the La Conca D'Oro mushroom farm in Berks County, Pennsylvania, which had an annual mushroom production capacity of approximately five million pounds.  Three months later, EMMC sold La Conca D'Oro and the mushroom-growing equipment on the farm at a loss of $500,000, again attaching a deed restriction prohibiting the conduct of any business related to mushroom growing on the property.

In August 2002, EMMC purchased for $230,000 a ten-year lease option on the Amadio Farm in Berks County, Pennsylvania, which had an annual mushroom production capacity of approximately five million pounds.  Though EMMC never entered into a lease on the property, the property owner agreed to file a deed restriction prohibiting anyone other than EMMC from conducting any business related to the growing of mushrooms on the property for ten years.

In addition to the above allegations, plaintiffs allege that defendants engaged in similar practices in other states.  As a result of the supply control campaign, plaintiffs allege that EMMC annually eliminated at least fifty million pounds of mushrooms from production.  Plaintiffs allege

4

that these land purchases and lease option agreements were not intended to promote the growing or marketing of defendants' mushrooms but rather were designed to improve defendants' ability to maintain the artificially-inflated prices which they had set for Agaricus mushrooms.

Plaintiffs further allege that defendants collectively interfered with non-EMMC growers that sought to sell at prices below those set by EMMC and pressured independent growers to join EMMC.  The pressure and coercion tactics alleged include threatening and/or implementing a group boycott in which EMMC members would not sell mushrooms to assist independent growers in satisfying their short-term supply needs and/or selling mushrooms to independent growers at inflated prices.  Plaintiffs allege that defendants affirmatively concealed all of the above activities through various means, including: (1) conducting non-public meetings and communications; (2) avoiding references or discussion in public documents of the acts and identities of EMMC membership; and (3) falsely representing EMMC members' prices as fair and competitive.

On December 16, 2004, the United States Department of Justice filed an antitrust complaint against EMMC after an eighteen-month investigation of EMMC's membership activities, qualifications as a cooperative and marketing practices.  United States v. E. Mushroom Mktg. Coop., Inc., Civil Action No. 04-CV-5829 (E.D. Pa. Dec. 16, 2004).  On September 9, 2005, final judgment was entered, pursuant to which the United States and EMMC agreed to file documents nullifying deed restrictions placed on six parcels sold or transferred by EMMC and to impose no similar deed restrictions on other properties for the next ten years.

Defendants filed a motion to dismiss all complaints on July 31, 2006.  Additionally,

5

separate motions to dismiss have been filed:[4] (1) defendants Creekside Mushroom Ltd., JM Farms, Inc., Kitchen Pride Mushroom Farms, Inc., and the Mushroom Alliance, Inc. filed a joint motion to dismiss all complaints on July 31, 2006; and (2) defendant M.D. Basciani & Sons, Inc. filed a motion to dismiss the consolidated amended class action complaint on July 31, 2006.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6) (2007). In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact and any reasonable inferences that may be drawn therefrom in plaintiffs' complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff[] may be entitled to relief." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (citations omitted).  Nevertheless, in evaluating plaintiff's pleadings I will not credit any "bald assertions."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Nor will I accept as true legal conclusions or unwarranted factual inferences.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  "The complaint will be deemed to have alleged sufficient facts if it adequately puts the defendant on notice of the

---

[4]In addition to the motions to dismiss listed above, motions to dismiss have been filed with respect to related complaints: (1) defendant M.D. Basciani & Sons, Inc. filed a motion to dismiss Publix first amended complaint at law in Civil Action Number 06-CV-0932 (Publix Super Markets, Inc. v. EMMC, Inc., et al.) on September 11, 2006; (2) defendant M.D. Basciani & Sons, Inc. filed a motion to strike and to dismiss the class action complaint in Civil Action Number 06-CV-4829 (Katsiroubas & Sons, Inc. v. EMMC, Inc., et al.) on November 16, 2006; (3) defendants Creekside Mushroom Ltd., JM Farms, Inc., Kitchen Pride Mushroom Farms, Inc. and the Mushroom Alliance, Inc. filed a motion to dismiss the Katsiroubas & Sons complaint on November 17, 2006; and (4) all defendants filed a joint motion to dismiss the Katsiroubas & Sons complaint on November 17, 2006.  I will address these motions to dismiss in separate Orders.

essential elements of the plaintiff['s] cause of action." Nami, 82 F.3d at 65. When considering a Rule 12(b)(6) motion, I do not "inquire whether the plaintiff[] will ultimately prevail, only whether [he is] entitled to offer evidence to support [his] claims." Id. citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Thus, a Rule 12(b)(6) motion may be granted "only if it appears that the plaintiff[] could prove no set of facts that would entitle [him] to relief." Id. citing Conley, 355 U.S. at 45-46. Pursuant to the notice pleading standard of Federal Rule of Civil Procedure 8(a), a plaintiff need not "set out in detail the facts upon which he bases his claim," Conley, 355 U.S. at 47, but need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a). Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley, 355 U.S. at 47.

"It is black-letter law that [a] motion to dismiss for failure to state a claim . . . is to be evaluated only on the pleadings." Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 257 (3d Cir. 2004) citing A.D. Bedell Wholesale Co. v. Philip Morris, Inc., 263 F.3d 239, 266 (3d Cir. 2001). "However, [the Court of Appeals has] recognized that '[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.'" Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004) (holding that documents extraneous to the pleadings are integral where plaintiffs' claim cannot be evaluated without them), quoting U.S. Express Lines, Ltd. v Higgins, 281 F.3d 383, 388 (3d Cir. 2002); see also Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006), quoting 5B Charles A.

Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) ("In evaluating a

motion to dismiss, we may consider documents that are attached to or submitted with the

complaint, and any 'matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, [and] items appearing in the record of the

case.'").

DISCUSSION

Plaintiffs allege that defendants violated Sections 1 and 2 of the Sherman Act as well as

Section 7 of the Clayton Act.  Defendants' motions to dismiss rest on several grounds.  In their

motion to dismiss all complaints, defendants argue that plaintiffs' claims are deficient because:

(1) plaintiffs, by setting forth mere conclusory allegations in their complaint to establish

defendants' statutory violations, fail to meet the pleading requirements; (2) plaintiffs lack

adequate standing because defendants' alleged overcharges and price-fixing activities are exempt,

are speculative and cannot constitute antitrust injury; (3) defendants constitute a single entity and

therefore as a matter of law defendants' alleged conduct cannot give rise to a conspiracy; (4)

plaintiffs' monopoly claims fail to allege properly that defendants engaged in predatory acts and

have market power in properly defined relevant product and geographic markets; and (5)

plaintiffs' unlawful acquisition claim fails to allege that the member defendants acquired anything

and defendant EMMC's acquisition injured competition in a properly defined relevant market.

I.      Antitrust Exemption for Agricultural Cooperatives Pursuant to the Capper-Volstead Act

Initially I must address defendants' argument that EMMC is a duly-organized agricultural

cooperative and as such enjoys exemption from antitrust laws pursuant to Section 6 of the Clayton

8

Act and Section 1 of the Capper-Volstead Act.[5]

The Supreme Court has determined that the Capper-Volstead Act provides agricultural cooperatives a limited exemption from antitrust laws.  See Nat'l Broiler Mktg. Ass'n v. United States, 436 U.S. 816, 822 (1977); Md. & Va. Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 466-67 (1960).  The Act states, in relevant part:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged.  Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: Provided, however, That such associations are operated for the mutual benefit of the members thereof .
> . . .

7 U.S.C. § 291.  In Maryland & Virginia Milk Producers, the Supreme Court recognized that the Act and its legislative history "indicate[] a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws."  362 U.S. at 466.

---

[5]The Capper-Volstead Act clarified and expanded the antitrust exemption for cooperatives found in Section 6 of the Clayton Act, which states, in relevant part:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural or horticultural organizations instituted for the purposes of mutual help . . . or forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.

15. U.S.C. § 17.

However, "if the cooperative includes among its members those not so privileged under the statute to act collectively, it is not entitled to the protection of the Act." Nat'l Broiler, 436 U.S. at 822. "Thus, in order for [defendants] to enjoy the limited exception of the Capper-Volstead Act, and, as a consequence, to avoid liability under the antitrust laws for its collective activity, all its members must be qualified to act collectively. It is not enough that a typical member qualify, or even that most of [the cooperative defendant's] members qualify." Id. at 822-23. In Case-Swayne Co. v. Sunkist Growers, Inc. (Sunkist II), for example, the Supreme Court "concluded that a cooperative of orange growers, which included some members who operated packing houses but grew no fruit, was not entitled to the protection of the Act." Nat'l Broiler, 436 U.S. at 827 n.17, citing Sunkist II, 389 U.S. 384, 393-96 (1967).

Courts have held that where an agricultural cooperative acts in concert or enters into an agreement with persons or entities not engaged in agricultural production, the Capper-Volstead exemption does not apply. See Nat'l Broiler, 436 U.S. at 827-28 (concluding that "Congress did not intend to extend the benefits of the Act to the processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore part of the risk); United States v. Borden Co., 308 U.S. 188, 204-05 (1939) ("The right of these agricultural producers thus to unite in preparing for market and in marketing their products, and to make the contracts which are necessary for that collaboration, cannot be deemed to authorize any combination or conspiracy with other persons in restraint of trade that these producers may see fit to devise."); Holly Sugar Corp. v. Goshen County Coop. Beet Growers Ass'n, 725 F.2d 564, 569 (10th Cir. 1984) ("For example, an agricultural marketing association cannot enter into

agreements with persons not engaged in agricultural production, particularly for the purpose of acquiring monopoly power."); Alexander v. Nat'l Farmers Org., 687 F.2d 1173, 1182 (8th Cir. 1982) ("Co-ops cannot, for example, conspire or combine with nonexempt entities to fix prices or control supply, even though such activities are lawful when engaged in by co-ops alone."). Accordingly, if non-producers participate as members in an agricultural cooperative, that cooperative is not entitled to avail itself of the Capper-Volstead exemption. Sunkist II, 389 U.S. at 395-96 (holding that a cooperative that contained non-producer members was not entitled to assert Capper-Volstead as a defense to the suit based on § 1 of the Sherman Act).

Further, the Act and its legislative history do "not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve a monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way." Md. & Va. Milk Producers, 362 U.S. at 466-67.  "[T]he Act did not leave co-operatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative." Id. at 467 (recognizing that the Act does "not authorize cooperatives to engage in predatory practices in violation of the Sherman Act"). Indeed, "even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act." Id. at 472; see also Alexander, 687 F.2d at 1183.  In Maryland & Virginia Milk Producers, therefore, the Supreme Court found it was error for the District Court to dismiss antitrust claims where "the allegations of the complaint and the statement of particulars . . . charge[d] anticompetitive practices which [were] so far outside the 'legitimate objects' of a cooperative that, if proved, they would constitute clear violations of . . . the Sherman Act." Md.

11

& Va. Milk Producers, 362 U.S. at 468.

In its consolidated amended class action complaint, plaintiffs allege that (1) certain defendants were members of defendant EMMC but were not engaged in agricultural production;[6] (2) defendants entered into multiple agreements with persons or entities not engaged in agricultural production;[7] and (3) defendants engaged in the types of anticompetitive and predatory practices that fall outside the legitimate objects of an agricultural cooperative.[8]  Any of these allegations, if proved, would place defendants outside the protection of the Capper-Volstead exemption.  Because the applicability of the Capper-Volstead exemption depends on the nature of the role each individual defendant played in the cooperative and the nature of the actions of the cooperative and its members, the question of whether defendants qualify for the Capper-Volstead exemption remains open at this pre-discovery stage of the litigation.

II.      The Antitrust Claims

Plaintiffs bring this action to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees pursuant to the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for defendants'

---

[6]Identifying thirty-seven members, officers or affiliates of members of defendant EMMC, plaintiffs allege that "[o]ne or some of the EMMC members are not 'farmers' within the meaning of the Capper-Volstead Act."  Consolidated Amended Complaint at ¶¶ 91 and 99.

[7]Specifically, plaintiffs' amended complaint alleges that deed restrictions were placed on six parcels sold or transferred by EMMC and that the purpose of these deed restrictions was to prevent, forestall and restrict competition from independent mushroom producers.

[8]Plaintiffs' amended complaint alleges the anticompetitive and predatory practices of placing deed restrictions on properties sold or transferred by EMMC, pressuring non-EMMC members to join the cooperative, threatening or implementing collective boycotts, penalizing and retaliating against independent growers seeking to sell mushrooms as prices below the prices set by EMMC, and selling mushrooms to independent growers at inflated prices.

alleged violations of the anti-competitive conspiracy, monopolization and attempted

monopolization provisions of the Sherman Act, 15 U.S.C. §§ 1 and 2.  Plaintiffs allege that the

"supply control" campaign adopted and implemented by defendants constitutes a conspiracy in

restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Section 1 of the

Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or

conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is

declared to be illegal."  15 U.S.C. § 1.  Plaintiffs further allege that defendants possessed or

attempted to acquire monopoly power in the market for Agaricus mushrooms in the United States

and/or the market for Agaricus mushrooms in the eastern United States in violation of Section 2

of the Sherman Act, 15 U.S.C. § 2.  Section 2 of the Sherman Act provides: "Every person who

shall monopolize, or attempt to monopolize, or combine or conspire with any other person or

persons, to monopolize any part of the trade or commerce among the several States, or with

foreign nations, shall be deemed guilty of a felony."  15 U.S.C. § 2.  The alleged relevant market

with regard to both claims is the market for fresh Agaricus mushrooms and in the United States or

alternatively in the eastern United States.

The Court of Appeals has discouraged dismissals of antitrust claims at the pleading stage.

See Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995); see also Hosp. Bldg. Co. v.

Trustees of Rex Hosp., 425 U.S. 738, 746 (1976) (holding that in antitrust cases, where "proof is

largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample

opportunity for discovery should be granted very sparingly").  However there is no per se rule that

antitrust claims are not subject to summary disposition, and courts have not hesitated to dismiss

13

antitrust claims at the pleading stage when proper.  See, e.g., Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 528 n.17 (1983) ("Certainly in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

A.     Antitrust Injury

Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides a cause of action for treble damages and costs of suit to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," has been construed over the years to encompass a number of standing requirements for private antitrust plaintiffs.  Among these requirements is "antitrust injury," which in turn encompasses a number of requirements that limit which potential plaintiffs may maintain private antitrust claims and the injuries for which plaintiffs may recover.  See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) ("[A] plaintiff must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"), quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).

Essential to "antitrust injury" is a showing that defendants' challenged conduct has harmed competition.  See Brunswick Corp., 429 U.S. at 488 ("The antitrust laws . . . were enacted for 'the protection of *competition*, not *competitors*.'"), quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).  Business practices – however unseemly, hurtful, or even otherwise unlawful – do not constitute antitrust violations unless they harm, or at least endanger, competition.  See, e.g., Tunis Bros. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1992).  Thus, an antitrust plaintiff must

14

allege that the "'challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996), quoting Tunis Bros., 952 F.2d at 728.  The antitrust injury requirement "ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." Atl. Richfield Co., 495 U.S. at 344.

Defendants contend that plaintiffs fail to state a claim under either Section 1 or Section 2 of the Sherman Act because plaintiffs do not sufficiently allege antitrust injury, plead an injury that has not occurred, and at most seek damages that are speculative.  In other words, defendants argue that plaintiffs have alleged no facts from which anti-competitive effects may be inferred.  I disagree.  First, defendants premise their arguments upon the conclusion that defendants could lawfully fix prices under Section 6 of the Clayton Act and Section 1 of the Capper-Volstead Act. However, as stated above, the applicability of those exemptions to defendants' behavior remains an open question at this stage of the litigation.  In the context of this Rule 12(b)(6) motion to dismiss, I cannot rely upon defendants' contention of lawfulness as a basis for finding a failure to plead antitrust injury.

Defendants also argue that because EMMC raised its prices before entering into any of the challenged land transactions, there is no causal link between those transactions and the alleged harm.  Defendants further assert that plaintiffs make no factual allegations linking these land transactions with defendants' ability to maintain its price increases.  Yet within the context of a Rule 12(b)(6) motion to dismiss, the question is not whether antitrust injury indeed occurred but whether plaintiffs allege facts from which antitrust injury can be inferred.  Though defendants

15

contend that a causal relationship did not exist between the defendants' conduct and plaintiffs' alleged harm, I find that plaintiffs' allegation that defendants acquired several allegedly productive parcels and attached deed restrictions to those parcels in an effort to maintain an inflated price for Agaricus mushrooms certainly is a set of facts sufficient to infer antitrust injury and permit discovery with respect to this issue.

B.      Relevant Product Market

        Defendants also contend that plaintiffs' antitrust claims should be dismissed because their complaint fails to identify a relevant product market and relevant geographic market.  In determining whether plaintiffs present a viable claim under the Sherman Act, "a court must inquire 'into the relevant product and geographic market.'"  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997), quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 446, 459 (1993).  A product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes," and a geographic market is defined as the "area in which a potential buyer may rationally look for the goods or services he or she seeks." Tunis Bros. v. Ford Motor Co., 952 F.2d 715, 722, 726 (3d Cir. 1991).

        "To survive a Rule 12(b)(6) motion to dismiss, plaintiffs' alleged market must be plausible." Glaberson v. Comcast Corp., 2006 WL 2559479, at *12 (E.D. Pa. Aug. 31, 2006), quoting Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (internal quotation marks omitted).  The Court of Appeals has noted that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." Queen City Pizza, 124 F.3d at 436; see also Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311

(3d Cir. 1984) ("The definition of the relevant geographic market . . . is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration.").  However, there is no per se prohibition against dismissal of antitrust claims for failure to plead a relevant market.  Queen City Pizza, 124 F.3d at 436.

The outer boundaries of the relevant product market are to be "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Id., quoting Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962); Tunis Bros., 952 F.2d at 722.  In other words, the alleged product market must include all commodities that are reasonably interchangeable by consumers for the same purposes.  Eichorn v. AT&T Corp., 248 F.3d 131, 147 (3d Cir. 2001), citing Queen City Pizza, 124 F.3d at 436 ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").  As for the relevant geographic market, it may be local, regional, national or international in origin.  See Brown Shoe Co., 370 U.S. at 337.  However, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographical market."  Tunis Bros., 952 F.2d at 727.

I find that plaintiffs have defined sufficiently a relevant product market and a relevant geographic market in their complaint to survive defendants' motions to dismiss on these grounds.

The relevant product market alleged in plaintiffs' amended complaint is the market for fresh Agaricus mushrooms.  Plaintiffs allege that in 1995 ninety-nine percent of all mushrooms grown in the United States were of the Agaricus variety.  Defendants argue that Agaricus mushrooms could not be a relevant product market if an increase in their price would shift some demand to other types of mushrooms, but as plaintiffs argue in their response brief that other mushroom varieties comprise only one percent of all mushrooms sold in the United States in 1995 implies a lack of interchangeable alternatives for consumers.

Though defendants further assert that "it is common knowledge that many different varieties of mushrooms are available in the United States," this broad assertion is not a proper basis for dismissing plaintiffs' complaint, as it asks me to assume both its truth and the falsity of plaintiffs' allegations.  Additionally, the proposed class of plaintiffs is comprised not of end users of mushrooms but rather of market retailers.  Therefore, defendants' rhetorical question concerning what end consumers may substitute when creating their meals is not a basis for dismissing plaintiffs' complaint.

I also will not dismiss plaintiffs' complaint for its use of statistics from 1995.  At this stage of the litigation, I must accept plaintiffs' allegations as true, and I find it reasonable to infer that the current sales statistics for Agaricus mushrooms are consistent with those in 1995.  If further factual inquiry reveals a current statistical reality in conflict with plaintiffs' allegations, defendants may raise that point in a subsequent motion for summary judgment.

Defendants also argue that plaintiffs fail to acknowledge the potential interchangeability of fresh Agaricus mushrooms with mushroom products such as processed mushrooms, canned

mushrooms, frozen mushrooms and glass-jarred mushrooms.  Plaintiffs' amended complaint

alleges that fresh Agaricus mushrooms are sold to fresh market retailers such as grocery store

chains as well as food distributors and canneries, some of which create the above-listed

mushroom products.  These derivative products do nothing to increase or decrease the supply of

fresh Agaricus mushrooms, and only further discovery will reveal whether the commercial

realities faced by consumers require their inclusion in the relevant product market.

Plaintiffs also adequately define the relevant geographic market as six different geographic

regions, covering the entire United States, where consumers would look to purchase Agaricus

mushrooms.  Defendants argue that the relevant geographic market cannot be limited to the

United States because that market definition does not account for foreign producers.  However,

because the relevant geographic market is a question of fact to be determined in the context of

each case in acknowledgment of the commercial realities of the industry, I cannot accept at this

point defendants' argument as a proper basis for a motion to dismiss.

C.      Plaintiffs' Claims Pursuant to Section 1 of the Sherman Act

Plaintiffs allege that the "supply control" campaign adopted and implemented by

defendants constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.  To establish a violation of Section 1 of the Sherman Act, plaintiffs must

allege and eventually prove: (1) concerted action by defendants (2) that produced anti-competitive

effects within the relevant product and geographic markets (3) and that involved illegal conduct or

purpose (4) proximately caused injury to plaintiffs.  See Gordon v. Lewistown Hosp., 423 F.3d

184, 207 (3d Cir. 2005); Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 639 (3d Cir. 1996).

1.      Concerted Action by Defendants

The essence of a Section 1 claim is the existence of an agreement.  Gordon, 423 F.3d at

207, citing Mathews, 87 F.3d at 639. "Concerted action is established where two or more distinct

entities have agreed to take action against the plaintiff.  Accordingly, it requires proof of a causal

relationship between pressure from one conspirator and an anticompetitive decision of another

conspirator."  Id. (citations omitted).  "[M]ere unilateral or independent activity, whatever its

motivation, cannot give rise to an antitrust violation."  Arnold Pontiac-GMC, Inc. v. Gen. Motors

Corp., 786 F.2d 564, 572 (3d Cir. 1986).  "The officers of a single firm are not separate economic

actors pursuing separate economic interests, so agreements among them do not suddenly bring

together economic power that was previously pursuing different goals."  Copperweld Corp. v.

Independence Tube Corp., 467 U.S. 752, 769 (1984) ("[I]t is perfectly plain that an internal

'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that

§ 1 was designed to police.").  The Supreme Court has determined that agricultural cooperatives,

like corporations, do not have the plurality of actors necessary for a Section 1 conspiracy.  See

Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co. (Sunkist I), 370 U.S. 19, 27-29

(1962) (holding that 12,000 growers organized into three legal entities constituted in practical

effect and in the contemplation of the statutory exemption one organization or association

incapable of conspiracy under antitrust laws).

Defendants argue that plaintiffs fail to allege concerted action as they bring their claims

against a single entity: an agricultural cooperative and its members.  Specifically, defendants

assert that "the only way an agricultural cooperative, its members and its officers could be liable

20

for antitrust conspiracy based upon concerted action would be if they conspired with an entity outside of the cooperative."  As I noted above, plaintiffs allege not only that certain members of EMMC were not engaged in agricultural production, but also that defendants entered into multiple agreements with other persons or entities not engaged in agricultural production.[9]  I find that plaintiffs should be given the opportunity to present evidence to support these allegations.  At this pre-discovery stage of the litigation, I do not consider whether plaintiffs ultimately will satisfy the concerted action requirement but merely conclude that plaintiffs have pled sufficiently concerted action to defeat defendants' motions to dismiss on this ground.

As stated above, plaintiffs adequately define the relevant product market and the relevant geographic market and state facts from which antitrust injury may be inferred.  Plaintiffs further allege that defendants' conduct was illegal and proximately caused injuries to plaintiffs' businesses and properties.  Because I find that plaintiffs have pled sufficiently all elements of a Section 1 claim, I will deny defendants' motion to dismiss this claim.

---

[9]Defendants cite Garshman v. Universal Resources Holding, Inc. for the proposition that an "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act."  824 F.2d 223, 230 (3d Cir. 1987).  This is not such a case, as plaintiffs in their pleadings have specified land contracts and deed restrictions with non-cooperative entities as bases for their antitrust claims.

Similarly, defendants' contention that the two individual defendants, officers of defendant EMMC, should be dismissed fails.  Defendants cite Stark v. Ear Nose & Throat Specialists of Northwestern Pennsylvania for the proposition that it is well-settled that "officers or employees of the same firm do not provide the plurality of actors imperative for a Section 1 conspiracy." 185 Fed. Appx. 120, 124 (3d Cir. 2006), quoting Weiss v. York Hosp., 745 F.2d 786, 813 (3d Cir. 1984).  However, in this case plaintiffs do not rely on the individual defendants as a basis for pleading a plurality of actors; rather, plaintiffs sufficiently plead concerted action between a plurality of cooperative and non-cooperative entities and then include the individual defendants as co-conspirators.

IV.     Plaintiffs' Claims Pursuant to Section 2 of the Sherman Act

Plaintiffs allege that defendants possessed or attempted to acquire monopoly power in the market for Agaricus mushrooms in the United States and/or the market for Agaricus mushrooms in the eastern United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  "In order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must . . . prove the required elements against each individual defendant."  Carpet Group Int'l v. Oriental Rug Imps. Assoc., 256 F. Supp. 2d 249, 284 (D.N.J. 2003).  In order words, unlike Section 1, the monopolization and attempted monopolization offenses of Section 2 contain no concerted action element.  See id. at 285 ("[O]nly section 2's conspiracy to monopolize claim targets concerted action.  In effect, Plaintiffs are seeking to charge Defendants with conspiring to attempt to monopolize.  The Sherman Act states no such offense.").

A.     Plaintiffs' Monopolization Claim

To state a claim for monopolization under Section 2, plaintiffs "must allege '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'" Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc., 159 F.3d 129, 141 (3d Cir. 1998), quoting Schuylkill Energy Res. v. Pa. Power & Light Co., 113 F.3d 405, 412-13 (3d Cir. 1997).

Plaintiffs have pleaded sufficiently the elements of a Section 2 monopolization claim against defendant EMMC.  Defendants do not dispute that monopoly power may be established by direct evidence as well as by indirect evidence such as high market share and high barriers to

22

entry.  Plaintiffs have pled sufficiently monopoly power for defendant EMMC by alleging that defendant EMMC controlled sixty to ninety percent of the Agaricus mushroom market and annually removed over fifty million pounds of Agaricus mushrooms from production.  Plaintiffs further allege that defendant EMMC was able to raise and maintain artificially high prices for Agaricus mushrooms.  Plaintiffs further cite as indirect evidence of monopoly power the high economic barriers to entry into the business of growing Agaricus mushrooms.[10]  Plaintiffs' allegations regarding the supply control campaign are sufficient to indicate willful acquisition or maintenance of monopoly power as distinguished from legitimate growth or development.

However, because there is no claim for concerted monopolization under Section 2, the member defendants must be dismissed from plaintiffs' Section 2 monopolization claim.  Plaintiffs' amended complaint contains no allegations regarding the monopoly power of the individual member defendants.  Instead, the allegations regarding monopoly power only apply to defendant EMMC.

B.      Plaintiffs' Attempted Monopolization Claim

To state a claim for attempted monopolization under Section 2, plaintiffs "must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  Crossroads Cogeneration Corp., 159 F.3d at 141, quoting Schuylkill, 113 F.3d at 413.

---

[10]"[B]uilding a new mushroom growing and production facility costs millions of dollars and generally requires zoning approval.  Building a new facility takes much longer to generate any revenue than purchasing or leasing an existing growing operation."  Consolidated Amended Complaint at ¶ 65.

"[T]he level of market power required to support a finding of attempted monopolization is, in general, less than the level of market power required to support a finding of actual monopolization." Tasty Baking Co. v. Ralston Purina, Inc., 653 F. Supp. 1250, 1268 (E.D. Pa. 1987). "[A]lthough the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive." Barr Labs, Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992). "Other factors to be considered include the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." Id.

I find that plaintiffs have stated a claim for attempted monopolization under Section 2 against defendant EMMC. First, plaintiffs have alleged sufficiently specific intent to monopolize. The basis of plaintiffs' complaint is that defendant EMMC engaged in a campaign "to control the mushroom supply" and maintain artificially heightened prices. Defendants wrongly assert that they could not have had specific intent to monopolize in the eastern United States if they already possessed a monopoly in that market. Defendants cite no cases for the general proposition that a monopolist cannot also be liable for attempted monopolization. Contrary to defendants' assertion, in Lorain Journal Co. v. United States the Supreme Court held that "a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." 342 U.S. 143, 154 (1951). Because plaintiffs allege that defendants tried to reduce opportunities for new entry into the

market,[11] I find that defendants may be liable for attempted monopolization even if defendants possessed a monopoly in the eastern United States.

Second, plaintiffs have alleged that defendant EMMC had a sufficiently dangerous probability of achieving monopoly power. In support of their attempted monopolization claim, plaintiffs allege that defendant EMMC's market share for Agaricus mushrooms was somewhere between sixty to ninety percent. Furthermore, plaintiffs do not rely exclusively on market share as a basis for their claim. As stated above, plaintiffs make allegations regarding the barriers to entry into the mushroom market, the predatory nature of defendant EMMC's anticompetitive conduct, and the limited alternatives for consumers. Again, at this stage of the litigation, I do not decide whether plaintiffs ultimately will be able to prevail in their claim but merely find that they are entitled to offer evidence to support these allegations.

Defendants contend that plaintiffs fail to allege sufficiently dangerous probability of achieving monopoly power, but their arguments fail at this stage because they ask me to look beyond the pleadings and weigh evidence. For example, defendants argue that plaintiffs' amended complaint contains no allegations regarding subsequent market performance, which "belies any dangerous probability of successful monopolization." However, as the case cited by

_____

[11]Defendants urge me to take judicial notice of the total amount of acreage of farmland in the United States, arguing that restriction of less than one thousandth of one percent of farmland in the United States does not evince specific intent to monopolize. Defendants state that, at most, their actions suggest "a quixotic effort to preserve the status quo in a competitive market." However, these arguments ask me to assume the falsity of the allegations in plaintiffs' amended complaint. Plaintiffs allege defendants' supply control campaign cost approximately three million dollars and annually took over fifty million pounds of Agaricus mushrooms out of production. These alleged facts indicate a specific intent to monopolize.

defendants states, subsequent market performance is "not conclusive" and "is useful in evaluating the defendant's capacity to monopolize." Ashkanazy v. I. Rokeach & Sons, 757 F. Supp. 1527, 1543 (N.D. Ill. 1991). Therefore, while the nature of subsequent market performance may prove relevant to a determination of attempted monopolization, the absence of allegations concerning subsequent market performance is not sufficient as a basis for a motion to dismiss.

Likewise, defendants maintain that "it is also clear that the deed restrictions created no such dangerous probability," as plaintiffs failed to allege that the restrictions had any appreciable effect on defendant EMMC's share of the market or locked would-be competitors out of the market. Yet the alleged deed restrictions, by their very nature, locked would-be competitors out of the market by prohibiting on these parcels the conduct of any business related to the growing of mushrooms. In support of their argument, defendants state, "Farms sold to real estate developers would not ordinarily be used for mushroom farming in any event. Thus, it cannot be assumed that the deed restrictions would have had any impact on the market." I will not credit defendants' bald assertions in order to dismiss plaintiffs' amended complaint for failure to state a claim.

Defendants further urge me to consider that there were numerous mushroom farms available at bankruptcy-sale prices at the same time the challenged deed restrictions were in place, and consequently that plaintiffs' claims are "based on the speculative premise that there was no other land available" for mushroom farming. Even if I was able to consider such facts in the context of the present motion,[12] I do not find them a convincing basis for dismissing plaintiffs'

_____

[12]Defendants argue that I may take judicial notice of unrelated public filings in the United States Bankruptcy Court for the District of Delaware that show a number of mushroom farms were available for purchase while the challenged deed restrictions were in place. However, as plaintiffs note, the Court of Appeals has stated that "[w]hile a prior judicial opinion constitutes a

complaint against defendant EMMC.  Defendants ask me to look beyond the pleadings and

conclude that because there may have been other land available for mushroom farming

defendants' conduct "did not stop anyone from competing, had no impact on the proposed market

and did nothing to increase Defendants' market power."  Again, I will not credit defendants' bald

assertions in order to dismiss plaintiffs' amended complaint for failure to state a claim.

However, like the Section 2 monopolization claim, the Section 2 attempted

monopolization claim fails against the member defendants.  Plaintiffs would have to rely on a

concerted action theory to state a claim against the individual member defendants, but Section 2

does not provide for a conspiracy to attempt to monopolize claim.  Because plaintiffs have failed

to allege that any of the individual member defendants had a dangerous probability of achieving

monopoly power, I will dismiss plaintiffs' Section 2 claims against the member defendants.

V.      Plaintiffs' Claims Pursuant to Section 7 of the Clayton Act

Plaintiffs allege that defendants unlawfully acquired the assets of their direct competitors,

thereby substantially lessening the competition in the market for Agaricus mushrooms in the

United States and/or the market for Agaricus mushrooms in the eastern United States in violation

of Section 7 of the Clayton Act, 15 U.S.C. § 18.  Section 7 makes it unlawful for a person to

acquire the assets of another person where the acquisition may have anticompetitive effects:

No person engaged in commerce or in any activity affecting commerce shall

_____

public record of which a court may take judicial notice, it may do so on a motion to dismiss only
to establish the existence of the opinion, not for the truth of the facts asserted."  Lum v. Bank of
Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004), citing S. Cross Overseas Agencies, Inc. v. Wah
Kwong Shipping Group, Ltd., 181 F.3d 410, 427 n.7 (3d Cir.1999) ("[A] court that examines a
transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for
summary judgment.").

acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of they country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.  In United States v. Columbia Pictures Corp., the Court stated that "[t]he statute imposes no specific method of acquisition.  It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse 'effect.'"  189 F. Supp. 153, 182 (S.D.N.Y. 1960) (asserting that "[t]he test is pragmatic.  The final answer is not in the dictionary.").

I find that plaintiffs have pleaded sufficiently a claim under Section 7.  Defendants argue that the Section 7 claim against defendant EMMC should be dismissed because EMMC's acquisitions had no injurious effect and that the Section 7 claim against the cooperative member defendants should be dismissed because the members did not acquire anything.

The first of these arguments asks me to make inferences on behalf of defendants to conclude that defendants' alleged activities had no impact on mushroom competition.  Contrary to defendants' argument and pursuant to the allegations covered above, I find that plaintiffs have set forth sufficient facts in their amended complaint regarding injurious effect.  Defendants assert that the properties at issue in this case "were all failing as mushroom farms and thus the EMMC's acquisition of them had no impact on the market."  I will not credit such bald assertions as basis for a motion to dismiss.  Defendants further contend that "the EMMC's lawful raising of prices

prior to the first alleged acquisition means the EMMC's acquisitions had absolutely nothing to do with the price increase alleged by the Plaintiffs." As stated above, the lawfulness of defendants' activities remains an open question at this stage of the litigation, as does the role any acquisitions played in maintaining heightened prices. Finally, defendants argue that "legislative and administrative agencies most knowledgeable about competition issues related to Section 7 have determined that acquisitions of agricultural land are unlikely to harm competition." That agencies have found a general unlikelihood of harm does not mean that plaintiffs' present claim is fatally flawed, and certainly does not provide a sufficient reason to dismiss the present claim.

I further conclude that it would be premature to dismiss the Section 7 claim against the member defendants. Defendants argue that as a matter of law a member, affiliate or officer of a cooperative cannot be held liable under Section 7 for the cooperative's acquisitions because "[m]ere membership in an agricultural cooperative, like mere stock ownership in a corporation, should not and does not give rise to Section 7 liability." Defendants do not cite any cases for this proposition but instead analogize the present facts to cases involving shareholder liability for corporate activities. Defendants note that "[d]espite naming thirty-five defendants other than EMMC, Plaintiffs do not allege any of them actually acquired an asset," and they deem this omission to be fatal to plaintiffs' Section 7 claim against the member defendants.

Despite defendants' contentions, plaintiffs' amended complaint alleges that the member defendants engaged in something more than mere membership in defendant EMMC[13] and that

---

[13]Also for this reason, defendants assert that state corporate law insulates the member defendants from liability fails at this stage. Defendants Basciani & Sons, Mushroom Alliance, Creekside Mushroom, JM Farms, Kitchen Pride, and Mushroom Farms argue separately that nothing in plaintiffs' amended complaint justifies piercing the corporate veil. Under

defendant EMMC, in acquiring the parcels of land at issue, acted "as an agent of its members."

Plaintiffs are entitled to offer evidence to support these allegations and to determine whether the

member defendants transferred or received any legal rights and privileges as a result of any land

transactions at issue in this case.  I will not rely on the dictionary definition of the term "acquire,"

as defendants urge, to dismiss plaintiffs' claim at this stage of the litigation.  Instead, I will allow

discovery on the precise nature of the acquisitions in this case and the corresponding roles of the

member defendants.

     An appropriate Order follows.

---

Pennsylvania law, "[a] member of a nonprofit corporation shall not be liable, solely by reason of
being a member, under an order of a court or in any other manner for a debt, obligation or
liability of the corporation of any kind or for the acts of any member or representative of the
corporation."  Pa. Cons. Stat. § 5552(a) (2007).  Contrary to defendants' contention that "the
gravamen of the Complaint is the purchase or lease or deed restriction of land to allegedly
support a lawful price increase by the EMMC," plaintiffs' complaint alleges a conspiratorial
activities engaged in by and between defendant EMMC and the member defendants.  Because
plaintiffs seek to impose liability on the member defendants not solely by reason of their
membership, state corporate law is not a basis for dismissing plaintiffs' amended complaint.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE MUSHROOM DIRECT          :          Master File NO. 06-0620
PURCHASER ANTITRUST            :
LITIGATION                     :
                               :
THIS DOCUMENT RELATES TO:      :          NOS.  06-0638; 06-0657;
All Actions                    :                06-0677; 06-0861;
                               :                06-0932; 06-1464;
                               :                06-1854

ORDER

AND NOW, on this 25th day of April 2007, upon consideration of the motion to dismiss
all complaints filed by defendants collectively, the motion to dismiss consolidated class action
complaint filed by M.D. Basciani & Sons, Inc., and the joint motion to dismiss all complaints
filed by Creekside Mushrooms Ltd., JM Farms, Inc., Kitchen Pride Mushrooms, and Mushroom
Alliance, Inc., plaintiffs' response, defendants' replies, and plaintiffs' sur-reply, it is hereby
ORDERED that Count II of plaintiffs' consolidated amended complaint is DISMISSED as to all
defendants other than defendant Eastern Mushroom Marketing Cooperative, Inc.  In all other
respects, defendants' motions are DENIED.

Counsel should agree upon a discovery schedule and submit a proposed Order within
fifteen (15) business days from date.

s/Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.