*FILED UNDER SEAL*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | : : : | Master File No. 06-0620 | |
| | : | | |
| | : | Nos. | 06-0638; 06-0657 |
| THIS DOCUMENT RELATES TO: | : | | 06-0677; 06-0861 |
| | : | | 06-0932; 06-1464 |
| | : | | 06-1854; 06-3523 |
| All Actions | : | | 06-4829 |
| | : | | |

### CERTAIN DEFENDANTS' MEMORANDUM IN OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT, M.D. BASCIANI, AND NON-PARTY, BASCIANI FOODS, INC. FOR SPOLIATION

## I.    INTRODUCTION

Direct Purchaser Plaintiffs ("Plaintiffs") have moved for sanctions for alleged spoliation and other discovery violations on the part of Basciani Foods Inc. ("BFI"), which is not a party to this litigation and defendant M.D. Basciani & Sons, Inc. (" M.D. Basciani"). The motion arises from alleged violations of the Court's January 31, 2012 Order ("Order"). The Order required non-party BFI to produce, *inter alia*, transactional sales records (presumably copies of invoices) for fresh agaricus mushrooms during the time period 1999 through 2008. Plaintiffs claim that after the Court entered the Order, BFI's counsel advised plaintiffs' counsel for the first time that BFI had discarded the records for the 1999 through 2002 time period pursuant to BFI's document retention policy.

BFI has separate counsel from Defendant M.D. Basciani and both companies have separate counsel from the below-identified defendants. (hereinafter "Respondents").  Plaintiffs seek to impose sanctions on M.D. Basciani on the theory that because, among other facts, BFI and M.D. Basciani have common ownership, BFI wrote checks to pay M.D. Basciani's EMMC membership dues, and Michael Basciani testified that BFI "had to try to follow" the EMMC minimum pricing policy, M.D. Basciani had the legal obligation and duty to prevent BFI from discarding the transactional sales documents for part of the time period at issue in this litigation.

Respondents take no position on Plaintiffs' arguments or the application of sanctions under Fed. R. Civ. P.  37  to the facts at hand.  However, Respondents, who have had no prior involvement in the discovery disputes between plaintiffs and the Basciani entities, oppose one of plaintiffs' proposed sanctions, namely Plaintiffs request for an Order:

> establishing (a) that the quantities of fresh agaricus mushrooms sold by [BFI] for the period January 1, 2001 through January 1, 2003 are the annual quantities reported by M.D. Basciani to the EMMC for the purposes of calculating its dues; and (b) from on or about February 4, 2001 through January 1, 2003, all fresh agaricus mushrooms sold by [BFI] were sold at or above the minimum prices set by the EMMC.

*See* Plaintiffs Memorandum ('Plfts' Mem.") at p. 20 and Proposed Order at p. 1.

This requested sanction (1) punishes Respondents and the other defendants who had no knowledge of or participation in the alleged discovery violations; (2) is unfairly prejudicial to Respondents  and the other defendants because it would preclude them from asserting defenses otherwise available to them; (3) would unfairly prejudice Respondents and other defendants because in a joint trial it would lead to the false conclusion BFI and other EMMC members followed the EMMC minimum pricing policy; and (4) is inappropriate because the record, which shows aggressive price competition by BFI and other defendants, directly contradicts the

2

proposed "facts" that Plaintiffs ask the Court to conclusively establish. Therefore, the Court should deny this aspect of plaintiffs' requested relief.[1]

## II.   ARGUMENT

A   **Plaintiffs' Request for Conclusive Determinations as to the Amount of Mushrooms Sold by BFI and the Prices at Which BFI Sold These Mushrooms Would Unjustly Prejudice the Respondents**

In connection with this motion for sanctions for alleged discovery abuses, Plaintiffs seek, *inter alia*, the drastic sanction of conclusive determinations in plaintiffs' favor with respect to a number of critical factual issues in this case. Plaintiffs are not entitled to this sanction as it would prejudice Respondents, who have no culpability for the alleged discovery abuses at issue.

As an initial matter, there is a strong presumption against entering sanctions that decide the central issues of a case. *See Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863, 867 (3d Cir. 1984). This is all the more so where the proposed sanction against the alleged violator would prejudice the defense of other innocent parties. *Remington Prods., Inc. v. Am. Phillips Corp.,* 107 F.R.D. 642 (D. Conn. 1985). *Letelier v. Republic of Chile,* 748 F.2d 790, 795 n.2 (2d Cir. 1984) (party not subject to sanctions because of the failure of another party to comply with discovery, absent a showing that the other party controlled the actions of the non-complying party); *Donato v. Fitzgibbons,* 172 F.R.D. 75 (S.D.N.Y. 1997). (separate trials required to avoid prejudice to party not at fault). *See also Schindler Elevator Corp. v. Otis Elevator Co.,* 2011 WL

---

[1]     It also bears mention that other documents and records appear to be available from BFI that would allow Plaintiffs to ascertain the customers who purchased mushrooms during this time period, as well as other information that would enable the calculation of the prices at which the mushrooms were sold to these customers during this time period. *See* Memorandum of January 31, 2012 at pp. 3-4 describing the documents to be produced by BFI. Item number 1 apparently relates to the transactional sales documents, only some of which were apparently discarded. *But see* items 2-6 and 11 relating to the identity of customers, sales reports, revenues, expenses, etc. which are still apparently available for review and copying by Plaintiffs as well as the defendants in this litigation. For this additional reason, it would appear that Plaintiffs' request that certain facts be conclusively established would be inappropriate.

3

4594225 (D.N.J. Mar. 24, 2011), 2011 WL 4954958 (D.N.J. Sept. 30, 2011) (certain facts presumed, but only when no other way to avoid prejudice to moving party, but presumption rebuttable by non-culpable party)

Here, the defendants' pricing policies and procedures with respect to the prices that plaintiffs and putative class members paid for *Agaricus* mushrooms, the total quantities of mushrooms that defendants sold, and the overall market for these mushrooms are central issues in this case. This is so both with respect to the ultimate merits as well as with respect to the certification of this case as a class action.

In their motion, plaintiffs contend that BFI and/or M.D. Basciani failed to produce, and actually discarded certain transactional sales data requested by a subpoena directed to the non-party, BFI. Plaintiffs argue the information sought is relevant to establish the pricing policies of BFI.

Defendants agree that this information is relevant to this matter. Indeed, because BFI's price cutting behavior is so helpful to Respondents' case (*see* Section II (B) *infra*), Respondents are equally interested in obtaining the information at issue. However, Plaintiffs do not contend that Respondents have any culpability for the alleged spoliation and discovery abuses that Plaintiffs claim occurred here. Moreover, the information about BFI's sales volume and pricing is available from other sources. [2] Yet, Plaintiffs' proposed relief would prejudice Respondents' defense of this case because it would preclude them from showing that BFI actually sold

---

[2]     For example, Michael Basciani testified about pricing to specific customers. *See e.g*, transcript at 258, 285-86, 301-303. Presently fact discovery relevant to class certification and the merits of plaintiffs' claims remains open. All parties are free to obtain additional facts from BFI and its customers regarding the volume of fresh agaricus mushrooms sold to fresh market customers by BFI and the net prices paid for these mushrooms. Respondents intend to pursue discovery of this information with equal vigor as the Plaintiffs and presumably, the numerous other documents that BFI has been ordered to produce will shed light on these issues (*See* Memorandum of January 31, 2012 at pp. 3-4, items 2-6 and 11).

4

mushrooms at net prices substantially below the EMMC's suggested minimum prices throughout the proposed class period.  Plaintiffs' requested relief is therefore improper.

The *Remington* case is particularly instructive here.  In *Remington*, an antitrust action, the court crafted sanctions to avoid prejudice to two alleged Sherman Act conspirators who provided discovery and  had no part in the discovery violations by their co-defendant.  *See id.*, 107 F.R.D. at  657.

The Court should reach a similar result here.  Regardless of whatever merit attaches to Plaintiffs' request for sanctions against BFI and M.D. Basciani,[3] Plaintiffs are not entitled to preclude Respondents and the other innocent co-defendants from contesting any disputed issues at trial.

> A.  **Plaintiffs Seek Conclusive Factual Determinations that Contradict the Record Evidence and to Which Plaintiffs Would Not Be Entitled Had the Requested Discovery Been Produced.**

Plaintiffs' request for conclusive factual determinations is improper for another critical reason.  The proposed determinations contradict the record, which shows BFI's vigorous price competition against the other defendants in connection with agaricus mushroom sales.

The United States Court of Appeals for the Third Circuit has noted that in order to obtain a sanction precluding a party from contesting facts or issues due to the destruction of evidence, the moving party must come forward with plausible, concrete suggestions as to what the destroyed evidence would have shown.  *Schmidt v. Milwaukee Elec. Tool Corp.,* 13 F. 3d, 76, 81.

---

[3]     It bears mention that the Court entered the Order against BFI only, and not Basciani, and while Plaintiffs purportedly rely upon Rule 37(b)(2)(A)(i) in support of their request for sanctions, the Court may not rely upon that Rule to impose sanctions on a non-party.  *See General Insurance Co. of America v. Eastern Consolidated Utilities, Inc.,* 126 F.3d 215, 220 (3d Cir. 1997).

Courts should not impose sanctions where the movant's claim as to what the destroyed evidence would have shown is speculative. *Id.* at 79-81.

Here, plaintiffs would have the Court determine that BFI adhered to the EMMC's minimum pricing policies. Yet there is substantial evidence that this simply did not happen. To the contrary, during his deposition Mr. Basciani testified that BFI did not abide by the EMMC's minimum pricing policies, because to do so would have jeopardized BFI's business.[4] Indeed, in a brief filed on November 11, 2009 in opposition BFI's motion to quash or modify the subpoena,

---

[4]    The following are samples of the Mr. Basciani's deposition testimony on this issue:

Q.    Were there times when Basciani Foods had to sell mushrooms at prices lower than the EMMC target price or minimum price during the 01 through 05 period?

A.    There was times that I bought mushrooms higher and had to sell them lower, which I wouldn't have lasted too long. So yes there was.

Q.    Was it necessary to keep a customer to sell at lower than the EMMC minimums?

A.    Yes.

Q    How frequently would that occur during a given year between 2001 and 2005?

A.    My customers mean everything to me. A customer is always right. So I'm there to service the customer. It's very hard to get a customer that pays their bills. So it's frequent you know.

Q.    Do you know if other members of the EMMC did likewise with respect to selling below the EMMC minimums when it was necessary to keep a customer?

A.    Yes.

Q.    Did they?

A.    Yes they did.

Basciani Dep. Trans. pp. 287-288 attached hereto as Exhibit "A".

Q:    Did you let the other members of the EMMC know that you were regularly selling at non-EMMC prices?

A:    I let them know that the EMMCGA is something that I was against and that it not right. You cannot take these customers from me. It wasn't fair. It wasn't fair. So, I voiced my opinion, yes, I did several times.

Q:    ... I'm asking you whether or not you came into a meeting and ever said, hey, guys, I just want you to know that I don't agree with the EMMC prices and I'm not selling at EMMC prices and all these customers I have over here I'm not selling at EMMC prices. Did you ever tell them that?

A:    I tried my best to explain to them that, yes, you know, I can't abide by this, I'm sorry. It would damage my company. It would make me go out of business.

Basciani Dep. Trans. pp. 302-03 attached hereto as Exhibit "A".

6

and in a more recent brief filed on November 22, 2011, Plaintiffs acknowledge that Michael Basciani testified that BFI did not follow the EMMC minimum prices.  In note 4 of both briefs Plaintiffs state that:  "Significantly, Michael Basciani suggested at several points of his deposition that Basciani Foods did not always follow EMMC minimum pricing." (citing portions of Michael Basciani's deposition transcript).  Plaintiffs relied on other portions of Mr. Basciani's testimony to support their motion for sanctions. (*See* Plfts' Mem. at p. 4).  But interstingly, they studiously omitted other portions of Mr. Basciani's testimony that substantially undermine the validity of their requested relief.

Moreover, testimony from other defendants' representatives about the prevalence of widespread price cutting was to similar effect.[5]   Thus, the record belies Plaintiffs' contention that the allegedly discarded documents would have shown that BFI sold its mushrooms at or above the EMMC minimum prices. For this reason as well, Plaintiffs' effort to gain a conclusive factual determination on these issues should be denied.

---

[5]      *See:* Ciarrocchi Dep. Trans. pp. 166-67 (minimum pricing abandoned because it was not working); Meya Dep. Trans. pp. 213-14. (minimum pricing did not work); Phillips Dep. Trans. pp. 205 (minimum pricing abandoned because "too many people cheating."); Marson Dep. Trans. pp. 93-96 (disputes regarding EMMC members not abiding by the EMMC minimum pricing policy were common). Excerpts from deposition transcripts collectively attached as Exhibit "B" *See also* Phase I testimony Defendants Responses to Plaintiffs' Statement of Undisputed Facts In Support of Plaintiffs' Motion for Summary (Document No. 274) at pp. 8-12.

## III.   **CONCLUSION**

For the foregoing reasons, Respondents respectfully request that the Court deny Plaintiffs' Motion for Sanctions for Spoliation insofar as it seeks an Order that any facts are conclusively determined for the purposes of this case.

Respectfully submitted,

/s/ William A. DeStefano
William A. DeStefano
Terri A. Pawelski
Francis X. Taney
Matthew C. Brunelli
STEVENS & LEE
1818 Market Street, 29th Floor
Philadelphia, PA 19103

/s/ H. Laddie Montague
H. Laddie Montague, Jr.
Martin I. Twersky
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pa 19103-6365

Counsel for Defendants EMMC, Robert A. Feranto, Jr., t/a Bella Mushroom Farms; Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom Farm; To-Jo Fresh Mushrooms, Inc.; Cardile Mushrooms, Inc.; Cardile Bros. Mushrooms packaging; Country Fresh Mushroom Co.; Forest Mushroom Inc.; Gino Gaspari & Sons, Inc.; Gaspari Mushroom Co., Inc.; Gaspari Bros., Inc.;  Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; LRP Mushrooms, Inc.; LRP-M Mushrooms LLC; Leone Pizzini and Son, Inc.; Modern Mushroom Farms, Inc.; Sher-rockee Mushroom Farm, LlC; C&C Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis M. Marson, Jr., Inc.; Monterey Mushrooms, Inc.; United Mushroom Farms Cooperative, Inc.; John Pia; Michael Pia

8

# EXHIBIT "A"

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3    _____

                                   )MASTER FILE NO.
4    In Re:   MUSHROOM DIRECT       )06-0620
                                   )
5    PURCHASER ANTITRUST            )
                                   )06-0638; 06-0657;
6    LITIGATION                     )06-0677; 06-0861;
     _____)06-0932; 06-1464;
7                                    )06-1854
     THIS DOCUMENT RELATES TO       )
8                                    )
     ALL ACTIONS                    )
9    _____)

10

11                   HIGHLY CONFIDENTIAL

12

13              Videotaped deposition of

14   MICHAEL BASCIANI, SR., taken pursuant to

15   notice, at the Law Offices of Reger, Rizzo,

16   Kavulich & Darnall, LLP., Cira Centre, 13th

17   Floor, 2929 Arch Street, Philadelphia,

18   Pennsylvania  19104, on Thursday, January

19   17th, 2008, beginning at approximately 10:30

20   a.m., before David Walsh, Registered

21   Professional Reporter and Notary Public, and

22   Richard Kanzinger, Jr., Videotape Operator,

23   there being present:

24

25                    - - -

BASCIANI / HIGHLY CONFIDENTIAL

286
1  make them at the EMMC minimum FOB price or the
2  willing buyer, willing seller price?
3  A.  I answered that before.
4  Q.  Okay.
5  A.  That it might have been certain, not all
6  of the mushrooms.  So, yes, if I did sell one
7  mushroom at one time at the EMMC prices, then
8  that would be yes.
9  Q.  How frequently did you sell mushrooms to
10  these companies during the period '01 through
11  '05?
12      MR. LIVINGSTON:  Object to
13  form.
14  BY MR. DeSTEFANO:
15  Q.  Go ahead, you can answer.
16  A.  They were my customers all the time.
17  They were good people.
18  Q.  All right.  Was it more frequent that
19  you sold to them at the willing seller,
20  willing buyer price or the FOB minimum EMMC
21  price?
22  A.  Willing seller, willing buyer.
23  Q.  Did you ever get sanctioned or penalized
24  or fined or reprimanded for making those sales
25  at the willing seller, willing buyer price to

287
1  either Gourmet, Elite, Creekside, Quincy or
2  Money's?
3  A.  No.
4  Q.  Did you ever hear of any other EMMC
5  member getting sanctioned, fined, reprimanded
6  or disciplined in anyway for making a sideways
7  sale to a non-member at the willing seller,
8  willing buyer price?
9      MR. LANDAU:  Objection.
10  BY MR. DeSTEFANO:
11  Q.  You can answer.
12  A.  If they did, there wouldn't be anybody
13  sitting at the table because everybody was
14  doing it, so no.
15  Q.  Would you also sell mushrooms to Mario
16  Cutone after he resigned from the EMMC?
17  A.  Yes, I did.
18  Q.  And were those at the willing seller,
19  willing buyer price mostly or mostly the FOB
20  minimum EMMC pricing?
21  A.  If I sold one mushroom at the FOB, I
22  would say, mostly willing buyer, you know what
23  I mean?  You know, a mixture of both.
24  Q.  Were there times when Basciani Foods had
25  to sell mushrooms at prices lower than the

288
1  EMMC target price or minimum price during the
2  '01 through '05 period?
3  A.  There was times that I bought mushrooms
4  higher and had to sell them lower, which I
5  wouldn't have lasted too long.  So, yes, there
6  was.
7  Q.  Was it necessary to keep a customer to
8  sell at lower than the EMMC minimums?
9  A.  Yes.
10  Q.  How frequently would that occur during a
11  given year between 2001 and 2005?
12  A.  My customers mean everything to me.  A
13  customer is always right.  So, I'm there to
14  service the customer.  It's very hard to get a
15  good customer that pays their bills.  So, it's
16  frequent, you know.
17  Q.  Do you know if other members of the EMMC
18  did likewise with respect to selling below the
19  EMMC minimums when it was necessary to keep a
20  customer?
21  A.  Yes.
22  Q.  Did they?
23  A.  Yes, they did.
24  Q.  And in your view, how frequent was that?
25      MR. LIVINGSTON:  Object to

289
1  the form.
2  BY MR. DeSTEFANO:
3  Q.  What was your understanding of the
4  frequency of that?
5      MR. LIVINGSTON:  Same
6  objection.
7      MS. ALBANI:  You can answer.
8  BY MR. DeSTEFANO:
9  Q.  You can answer.
10  A.  Say it again, sir.
11  Q.  How frequently do you understand other
12  members of the EMMC had to sell below the EMMC
13  minimum price in order to keep a customer?
14  A.  In order to keep a customer or stay in
15  business?
16  Q.  Or stay in business.
17  A.  I mean, you know, you had to stay in
18  business.  You know, what are you going to do,
19  thumb in the field.  So, it was frequently.
20  Q.  At some point was the minimum
21  pricing -- was minimum pricing abandoned by
22  the EMMC?
23  A.  Yes, it was.
24  Q.  Do you recall when that was?
25  A.  Right at the end where I got out.  Right

73  (Pages 286 to 289)

BASCIANI / HIGHLY CONFIDENTIAL

302

1      Do you recall that?
2  A.   Yes.
3  Q.   Okay. And earlier you testified that
4  you were committed to the organization, the
5  EMMC, correct?
6  A.   Correct.
7  Q.   But yet you were more often than not
8  selling at non-EMMC prices; is that correct?
9  A.   Well, a very small portion of the
10 product. I mean what are you supposed to do,
11 go out of business, throw in the field?
12 Q.   I'm not asking you what -- I'm just
13 asking you if that's true or not. Is that a
14 true statement or not?
15 A.   Yes.
16 Q.   Okay.
17      VIDEO OPERATOR: I need to
18 change tapes. This completes videotape
19 number three, the time is 6:17.
20      We are now off the record.
21      (Whereupon, the testimony was
22 taken down by the court reporter only.)
23 BY MR. LIVINGSTON:
24 Q.   Did you let the other members of the
25 EMMC know that you were regularly selling at

303

1  non-EMMC prices?
2  A.   I let them know that the EMMCGA is
3  something that I was against and that is not
4  right. You cannot take these customers from
5  me. It wasn't fair. It wasn't fair. So, I
6  voiced my opinion, yes, I did several times.
7  Q.   You said not take my customers away.
8  I'm not sure I understand you. I'm asking you
9  whether or not you came into a meeting and
10 ever said, hey, guys, I just want you to know
11 that I don't agree with the EMMC prices and
12 I'm not selling at EMMC prices and all these
13 customers I have over here I'm not selling at
14 EMMC prices.
15      Did you ever tell them that?
16 A.   I tried my best to explain to them that,
17 yes, you know, I can't abide by this, I'm
18 sorry. It would damage my company. It would
19 make me go out of business.
20 Q.   I know you voiced your objection to the
21 policy, but you understood that the policy
22 was, despite your objection, adopted by the
23 EMMC, correct?
24 A.   Correct.
25 Q.   Okay. Now, it's a policy of the EMMC

304

1  and everyone at least was supposed to abide by
2  it, correct?
3  A.   Correct.
4  Q.   Okay. And you've now testified that
5  more often than not at least with respect to
6  some customers, you didn't abide by those
7  prices, correct?
8  A.   To the other farms. Not to, you know,
9  direct customers to the sideway sales.
10 Q.   Right, okay. Did you ever notify the
11 EMMC itself or any members of the EMMC to say,
12 hey, I just want you know, I'm cheating on the
13 side with the sideway sales. I'm not abiding
14 by the EMMC pricing.
15      Did you ever tell anybody that?
16      MS. ALBANI: Objection to the
17 word "cheating" and it's been now asked and
18 answer three times.
19      MR. LIVINGSTON: It hasn't
20 been answered and there's nothing wrong with
21 the word "cheating". I think the witness
22 knows what that means.
23      MS. ALBANI: Objection.
24 BY MR. LIVINGSTON:
25 Q.   Do you have any problems with the word

305

1  "cheating", do you know what that means? Not
2  following EMMC prices even though you had
3  agreed -- or even though the organization had
4  adopted them?
5      MS. ALBANI: Object to the
6  word "cheating".
7      MR. LIVINGSTON: All right.
8  Your counsel -- hopefully, are you done with
9  your objection now?
10      Anything more you want to
11 add?
12      MS. ALBANI: If you ask
13 another objectionable question.
14      MR. LIVINGSTON: Is there any
15 other word in that question that you have a
16 problem with?
17      MS. ALBANI: Why don't we
18 just move on.
19      THE WITNESS: It wasn't
20 cheating, it was a lesser grade product. It
21 was a food service grade, you know what I'm
22 saying?
23 BY MR. LIVINGSTON:
24 Q.   Well, are you saying that there wasn't
25 an EMMC price that applied to those

# EXHIBIT "B"

Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    IN RE:  MUSHROOM        : MASTER FILE NO.

     DIRECT PURCHASER        : GD 06-0620

4    ANTITRUST LITIGATION    :

5

6                     *   *   *

7                 JANUARY 20, 2012

8                     *   *   *

9

10         Videotaped deposition of CHARLES J.

11    CIARROCCHI, JR., taken at the law offices of

12    Hangley, Aronchick, Segal, Pudlin & Schiller,

13    One Logan Square, 27th Floor, Philadelphia,

14    Pennsylvania, commencing at 9:37 a.m. before

15    Debbie Leonard, Registered Diplomate

16    Reporter, Certified Realtime Reporter.

17

18

19

20

21

22

23

24

25

Page 166

1     CHARLES J. CIARROCCHI, JR.
2  1:55 p.m.)
3         * * *
4     THE VIDEOGRAPHER:  The time is
5  1:55.  We are back on the video
6  record.
7     MR. FISHER:  Mr. Ciarrocchi, I
8  have no further questions.
9     MR. DESTEFANO:  I just have a
10  couple of questions real quick, if
11  that's okay.
12     THE WITNESS:  Yes.
13     MR. DESTEFANO:  All right.
14         * * *
15         EXAMINATION
16         * * *
17  BY MR. DESTEFANO:
18     Q.   There was a lot of discussion
19  about the EMMC's minimum pricing policy, but
20  let me ask you this.  Was that policy
21  eventually abandoned?
22     A.   Yes.
23     Q.   When?
24     A.   I can't remember exactly when,
25  but it was abandoned.

Page 167

1     CHARLES J. CIARROCCHI, JR.
2     Q.   Why was it abandoned?
3     A.   Because it was not working, and
4  it was unenforceable.
5     Q.   The request for documents that
6  Mr. Fisher asked you about --
7     A.   Yes.
8     Q.   -- did you personally look for
9  documents that were requested by the
10  plaintiffs in this case?
11     A.   I personally did not look for
12  them --
13     Q.   Okay.
14     A.   -- but I did give them --
15     Q.   Okay.  Second question.  Do you
16  know if other people in your company, Modern
17  Mushroom, and C&C Carriage, which is a
18  subsidiary, made a search for those
19  documents?
20     A.   Yes.
21     Q.   Okay.  Who -- who was it?  And
22  it may have been more than one, but who was
23  it that -- that you recall making the search?
24     A.   Ben Lazar and Jack Reitnauer.
25     MR. DESTEFANO:  Okay.  Scott,

Page 168

1     CHARLES J. CIARROCCHI, JR.
2  can you just give me two minutes --
3     MR. FISHER:  Sure.
4     MR. DESTEFANO:  -- to confer
5  with Terri --
6     MR. FISHER:  Sure.
7     MR. DESTEFANO:  -- who's the
8  brains of this outfit.
9     THE VIDEOGRAPHER:  The time is
10  1:57.  We're going off the video
11  record.
12         * * *
13     (Recess from 1:57 p.m. to
14  2:03 p.m.)
15         * * *
16     THE VIDEOGRAPHER:  The time
17  2:03.  We are back on the video
18  record.
19     MR. DESTEFANO:  We have no
20  further questions of this witness at
21  this time, but we would like to read
22  and sign the deposition -- or have the
23  opportunity to read and sign the
24  deposition.
25     MR. FISHER:  That's fine.

Page 169

1     CHARLES J. CIARROCCHI, JR.
2     MR. DESTEFANO:  Okay.  Thank
3  you.  No, we don't need it for the
4  other deposition.  Thank you.
5     THE VIDEOGRAPHER:  The time is
6  2:03, and this concludes the
7  deposition.
8         * * *
9     (Witness excused.)
10         * * *
11     (Off the record at 2:03 p.m.)
12         * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

43 (Pages 166 - 169)

Page 1

1            IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    IN RE:  MUSHROOM        : MASTER FILE NO.

     DIRECT PURCHASER        : GD 06-0620

4    ANTITRUST LITIGATION    :

5

6                       *   *   *

7                   MARCH 8, 2012

8                       *   *   *

9

10          Videotaped deposition of WILHELM MEYA,

11    taken at the law offices of Hangley,

12    Aronchick, Segal, Pudlin & Schiller, One

13    Logan Square, 27th Floor, Philadelphia,

14    Pennsylvania, commencing at 9:43 a.m. before

15    Debbie Leonard, Registered Diplomate

16    Reporter, Certified Realtime Reporter.

17

18

19

20

21

22

23

24

25

Page 210

WILHELM MEYA

1
2 October of 2000 -- and sometime prior to that
3 shut down some of its United States farms, to
4 the best of your knowledge, did Moneys
5 continue to grow mushrooms in Canada at that
6 time?
7     A.   Yes.
8     Q.   Okay.  Do you know for
9 approximately how long Moneys continued --
10 well, is Moneys' Canadian growing operation
11 still in business today, to the best of your
12 knowledge?
13     A.   I couldn't answer that.
14     Q.   Okay.
15     A.   I only know the president, they
16 fired.
17     Q.   Okay.  Do you know for how long
18 Moneys continued its Canadian growing
19 operation after 2000?
20     A.   No, I don't know.
21     MR. LANDAU:  You're meaning
22 Canada, Bill?
23     MR. DESTEFANO:  In Canada.  I'm
24 sorry.
25     MR. LANDAU:  Okay.

Page 211

WILHELM MEYA

1
2     MR. DESTEFANO:  In Canada.
3 BY MR. DESTEFANO:
4     Q.   Did Moneys, after its
5 bankruptcy in late 2000, continue to grow
6 mushrooms at midwestern farms, farms located
7 in the Midwest?
8     A.   I don't think so.
9     Q.   Okay.  Do you recall another
10 Canadian grower by the name of Highline?
11     A.   Yes.
12     Q.   Was Highline a large producer
13 of mushrooms?
14     A.   The second larger in Canada.
15     Q.   When the people at Stop & Shop
16 told you that if you raised your price, they
17 would just go to a Canadian supplier, do you
18 know which Canadian supplier they were
19 talking about?
20     A.   They were talking about it, but
21 they would shop around.
22     THE VIDEOGRAPHER:  Counselor,
23 two minutes left.
24     MR. DESTEFANO:  Do you want to
25 change it now?  Go ahead.

Page 212

WILHELM MEYA

1
2     THE VIDEOGRAPHER:  The time is
3 3:05.  We're going off the video
4 record.  This concludes videotape
5 number 3.
6         * * *
7     (Recess from 3:05 p.m. to
8 3:07 p.m.)
9         * * *
10     THE VIDEOGRAPHER:  The time is
11 3:07.  We're back on the video record.
12 This begins tape 4 of the videotaped
13 deposition of Wilhelm Meya.
14 BY MR. DESTEFANO:
15     Q.   Mr. Meya, so -- so I'm clear,
16 Franklin exited the mushroom business except
17 for a very small amount of high-end specialty
18 organic mushrooms, shiitakes, maitakes, in
19 2006?
20     A.   We close down the main farm
21 2006, yes.
22     Q.   Okay.  Do you remember what
23 month it was --
24     A.   June.
25     Q.   -- in 2006?  June?

Page 213

WILHELM MEYA

1
2     Did the main farming operation
3 of Franklin that you closed down in June of
4 '06 make money in '06?
5     A.   No.
6     Q.   Was there a loss?
7     A.   Yes.
8     Q.   How about '05?
9     A.   There was also a loss.
10     Q.   How about '04?
11     A.   There was also a loss.
12     Q.   Was -- were mushrooms -- fresh
13 mushrooms a highly competitive business
14 between 2000 and the time you closed down in
15 2006?
16     A.   Very competitive.
17     Q.   And I believe you answered one
18 or more of Mr. Landau's questions by
19 commenting or saying that the -- EMMC's
20 minimum pricing policy just simply didn't
21 work.  Would that be correct?
22     A.   That's correct.
23     Q.   Can you tell us why?
24     A.   As I stated before, we had to
25 hold our customer base, if you want to stay

54 (Pages 210 - 213)

Page 214

WILHELM MEYA
1
2  in business, the best way you could.  And
3  there were EMMC members, too, plus outside of
4  EMMC member, were trying to get market share.
5  So it was a continuous struggle always,
6  holding onto customer and going back and
7  forth.  You lose them until you lowered your
8  price.  Then you got them back.  And it was
9  just -- for example, look at Franklin Farms.
10  Lost about 3 to 4 million in customers.
11        Q.   When -- were all of your big
12  customers individually negotiated prices?
13        A.   Yes.
14            MR. LANDAU:  Object to the
15        form.
16  BY MR. DESTEFANO:
17        Q.   And let me ask you this.  Was
18  the starting point in your pricing somewhere
19  in the vicinity of the EMMC minimums?
20        A.   Yes.  I think in certain
21  instances higher than the EMMC.
22        Q.   Okay.  And was it more common
23  to wind up below or above with respect to
24  your big customers?
25            MR. LANDAU:  Object to the

Page 215

WILHELM MEYA
1
2        form.
3            THE WITNESS:  I would think if
4        you calculate in the volume discount,
5        it was below minimum pricing.
6  BY MR. DESTEFANO:
7        Q.   And how about the promotional
8  allowances?
9        A.   They might be equal or covered,
10  you know.  It was same pricing.
11        Q.   Did Creekside go out of
12  business, to the best of your recollection?
13        A.   To my understanding, yes.
14        Q.   Was that before or after
15  Franklin shut down its main growing
16  operation?
17        A.   After Franklin shut down.
18        Q.   How about Quincy in Florida?
19        A.   Similar.  Little later.
20            MR. DESTEFANO:  That's all I
21        have, Kevin.
22            MR. LANDAU:  Okay.  We have
23        nothing further.  Thank you.
24            THE WITNESS:  Thank you.
25            THE VIDEOGRAPHER:  The time is

Page 216

WILHELM MEYA
1
2  3:13, and that concludes the
3  videotaped deposition of Wilhelm Meya.
4            * * *
5        (Witness excused.)
6            * * *
7        (Off the record at 3:13 p.m.)
8            * * *
9
10
11  _____
12            WILHELM MEYA
13  Subscribed and sworn to before me
14  this _____ day of _____, 2012.
15
16  _____
17            Notary Public
18
19
20
21
22
23
24
25

Page 217

WILHELM MEYA
1
2        C E R T I F I C A T E
3
4     I do hereby certify that I am a Notary
     Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
     notice, at the time and place indicated; that
6  said deponent was by me duly sworn to tell
     the truth, the whole truth, and nothing but
7  the truth; that the testimony of said
     deponent was correctly recorded in machine
8  shorthand by me and thereafter transcribed
     under my supervision with computer-aided
9  transcription; that the deposition is a true
     and correct record of the testimony given by
10  the witness; and that I am neither of counsel
     nor kin to any party in said action, nor
11  interested in the outcome thereof.
12     WITNESS my hand and official seal this
     12th day of March, 2012.
13
14
15
16
     _____
     Debbie Leonard, RDR, CRR
17  Notary Public
18
19
20
21
22
23
24
25

55 (Pages 214 - 217)

Page 1

1          IN THE UNITED STATES DISTRICT COURT

       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3   IN RE:  MUSHROOM        : MASTER FILE NO.

    DIRECT PURCHASER        : GD 06-0620

4   ANTITRUST LITIGATION    :

5

6                    *   *   *

7               FEBRUARY 23, 2012

8                    *   *   *

9

10          Videotaped deposition of STEVEN

11  PHILLIPS, taken at the law offices of

12  Hangley, Aronchick, Segal, Pudlin & Schiller,

13  One Logan Square, 27th Floor, Philadelphia,

14  Pennsylvania, commencing at 9:54 a.m. before

15  Debbie Leonard, Registered Diplomate

16  Reporter, Certified Realtime Reporter.

17

18

19

20

21

22

23

24

25

STEVEN PHILLIPS

1        STEVEN PHILLIPS
2  own members couldn't expand.
3      So what happened was, as those
4  mushroom plants went out of business,
5  eventually supply and demand -- there were
6  too many mushrooms. Those mushroom farms
7  that we bought, those people went out of
8  business because of oversupply. Things
9  balanced out.
10     But as soon as things balanced
11  out, you had the local growers in
12  Pennsylvania who grow in beds -- you
13  typically have 24 beds in a mushroom house.
14  They all decided to go seven beds high in the
15  existing mushroom houses.
16     So within a year and a half,
17  there was probably another 10 percent more
18  mushrooms grown just in Kennett Square,
19  without building any additional mushroom
20  houses.
21     So without that part being --
22  you know, which nobody would agree to,
23  because everyone wanted to take advantage of
24  a shortage of mushrooms, and so that's
25  probably why it didn't work out in the long

1        STEVEN PHILLIPS
2  run.
3     Q.   Okay. Let me ask you this.
4  From its inception in very early 2001, did
5  the EMMC gain members or lose members over
6  the ensuing five to eight years?
7     A.   Lost members.
8     Q.   Okay. Was there once a member
9  by the name of Cutone?
10     MS. CAIN-MANNIX: Objection.
11  Form.
12     Go ahead.
13     THE WITNESS: Yes.
14  BY MR. DESTEFANO:
15     Q.   Did he resign fairly shortly
16  after he joined?
17     A.   Yes.
18     Q.   Another member by the name of
19  Basciani. Did Basciani resign?
20     A.   He was the biggest, yeah.
21     MS. CAIN-MANNIX: I'm objecting
22  to this line as leading. Go ahead.
23     MR. DESTEFANO: I don't think
24  it's leading.
25  BY MR. DESTEFANO:

1        STEVEN PHILLIPS
2     Q.   Did other members besides
3  Cutone and Basciani resign shortly after
4  2001?
5     A.   Yes.
6     Q.   So between 2001 and 2005, was
7  there a net gain in membership or a net loss
8  in membership of the EMMC?
9     A.   As far as I recall, net loss.
10     Q.   Was the EMMC's minimum pricing
11  policy successful over the long term in
12  stabilizing or increasing prices for fresh
13  mushrooms in the marketplace?
14     A.   There was -- there was a
15  short-term -- there was a short-term gain.
16  But, like I said, people expanded pretty --
17  pretty rapidly after that. And so net, no.
18     Well, I mean, short-term. Then
19  price went down. And I think -- if you look
20  at the big picture, I think our -- as an
21  industry, our biggest price increase we've
22  had in the last ten years came in 2006 or
23  2007, after there was no -- because things
24  got bad enough, people went out of business
25  again, and then the price goes up. I mean,

1        STEVEN PHILLIPS
2  that's typically what happens.
3     Q.   Was the minimum pricing policy
4  abandoned or eliminated in 2005?
5     A.   What's the difference?
6     Q.   Well, I was using them as
7  synonyms. Was it abandoned in 2005?
8     A.   As far as I recall.
9     Q.   And why was it abandoned?
10     A.   Too many people cheating. And
11  competition. Like I said, enough people --
12  enough people got out that -- they got out
13  because they knew they could probably do
14  better out than in.
15     Q.   When you say there was a
16  short-term increase, are you talking about
17  average prices or are you talking about
18  prices in every case to every customer?
19     A.   No, obviously not in every
20  case, because lots of times you couldn't
21  raise prices. But, you know, there was a --
22  I mean, there was an increase in pricing in
23  general.
24     Q.   Do you recall any serious
25  effort by the EMMC to enforce its minimum

Page 1

1            IN THE UNITED STATES DISTRICT COURT

         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    IN RE:  MUSHROOM        : MASTER FILE NO.

     DIRECT PURCHASER        : GD 06-0620

4    ANTITRUST LITIGATION    :

5

6                     *   *   *

7                  JANUARY 19, 2012

8                     *   *   *

9

10          Videotaped deposition of MATTHEW

11    MARSON, taken at the law offices of Hangley,

12    Aronchick, Segal, Pudlin & Schiller, One

13    Logan Square, 27th Floor, Philadelphia,

14    Pennsylvania, commencing at 10:02 a.m. before

15    Debbie Leonard, Registered Diplomate

16    Reporter, Certified Realtime Reporter.

17

18

19

20

21

22

23

24

25

Page 90

MATTHEW MARSON

1
2     Q.    Okay.  Let's take a look at
3  EMMC-DOJ-00324 on this document.  That's
4  page 16 of the actual document.
5          Okay.  Again, I'll direct you
6  to subheading B.  And it says, "EMMC's
7  Strengths."  Do you see that?
8     A.    Yes.
9     Q.    And it says, "Primary
10 Strengths."  And the first bullet is, "The
11 ability to stabilize-maximize prices."
12    A.    Yes.
13    Q.    And next to that, in
14 parentheses, there's the number 30?
15    A.    Yeah.
16    Q.    Okay.  And then if you want to
17 just turn the page to 00325, just the next
18 page over --
19    A.    I don't know what that 30
20 means, though.
21    Q.    Okay.  Do you think the 30
22 could be the number of people who attended
23 the meeting that agreed with that premise?
24    A.    I don't recall.
25    Q.    Okay.

Page 91

MATTHEW MARSON

1
2     A.    I do not know what these
3  numbers mean.
4     Q.    Okay.  I'll direct you to
5  subheading C on 00325.  And it says, "EMMC's
6  Weaknesses."  And do you see the subheading
7  "Other Weaknesses"?
8     A.    Yes.
9     Q.    And way down at the bottom, it
10 says, "We lack discipline"?
11    A.    Yes.
12    Q.    And the number in parentheses
13 is 2?
14    A.    (No audible response.)
15    Q.    Okay.
16        THE REPORTER:  I didn't get an
17 answer.
18        THE WITNESS:  Yes.
19        MR. GERSTEIN:  Okay.  I'm going
20 to mark in EMMC-DOJ-00222 through 225.
21 This is a general meeting minutes,
22 Eastern Mushroom Marketing
23 Cooperative, April 13, 2001.  And it's
24 been previously marked Modern-16A.
25        MR. DESTEFANO:  16A?

Page 92

MATTHEW MARSON

1
2        MR. GERSTEIN:  16A.
3  BY MR. GERSTEIN:
4     Q.    Mr. Marson, have you ever seen
5  this document before?
6     A.    No.
7     Q.    Okay.  Do you have -- or do you
8  see among the present that the first one is
9  Louis Marson?
10    A.    Yes.
11    Q.    Do you think that's referring
12 to your father?
13    A.    Yes.
14    Q.    Okay.  Do you know who prepared
15 the minutes for the EMMC?
16    A.    No, I do not.
17    Q.    I believe you testified earlier
18 that you knew that meeting minutes were
19 prepared.
20    A.    Yes.
21    Q.    Okay.  Did you know at the
22 time, in 2001, that meeting minutes were
23 being prepared contemporaneous with the
24 meeting?
25    A.    I -- I don't recall that.  I

Page 93

MATTHEW MARSON

1
2  mean, I think they were being prepared, but I
3  don't know by who --
4     Q.    Okay.
5     A.    -- or when or what meetings.
6  But --
7     Q.    Okay.  Okay.  I'll direct your
8  attention to 00224, which is the third page
9  of these meeting minutes.  And at the top, it
10 says, "New Business."
11    A.    Okay.
12    Q.    And it says, "Penalties for
13 Non-Compliance."  Then it says,
14 "Non-compliant issues are to be sent to the
15 Board along with documentation of violation."
16        "The non-compliant party will
17 be notified of the violation.  The accuser
18 and the alleged offender will have 5 days to
19 resolve the issue."
20        "If the issue is not resolved
21 within 5 days a grievance will be filed with
22 the Board."
23        "Within 10 days of the
24 grievance being filed, both parties will meet
25 with the Executive Committee for mediation."

24 (Pages 90 - 93)

Page 94

MATTHEW MARSON

1          MATTHEW MARSON
2          "If resolution is not reached
3 after mediation the Board will render a
4 decision."
5          Do you recall in April of 2001
6 there being a dispute resolution system like
7 this in place for EMMC members?
8     A.    I can't recall that one.
9     Q.    Okay.  Did Greenwood ever have
10 a dispute with another EMMC member about
11 pricing?
12    A.    Depends what time period.
13    Q.    Well -- okay.  In -- in 2001,
14 let's say.
15    A.    I can't recall.  That was ten
16 years ago.
17    Q.    Okay.  Let me direct you
18 further down the page --
19    A.    Okay.
20    Q.    -- where it says, "Pricing/
21 Member Issues."
22          And it says, "Cardile/Buona --
23 It was decided that there is no violation on
24 the part of Buona until proof is presented."
25    A.    Okay.

Page 95

1          MATTHEW MARSON
2     Q.    And then way at the bottom, it
3 says, "Georgio Contracts -- It is agreed that
4 Georgio is not in violation with the
5 contracts signed before the cut-off date."
6          Do you recall ever having
7 attended meetings where these kinds of issues
8 were aired --
9     A.    Yes.
10    Q.    -- among the members?
11          Okay.  Now, when an issue like
12 this came up, how did the members resolve
13 dispute?
14    A.    With pricing?
15    Q.    Well, say an EMMC member like
16 Cardile, you know, has a complaint about
17 another EMMC member and their pricing and
18 they raise it with the EMMC in a general
19 meeting, as it happened here.
20    A.    Okay.
21    Q.    How would -- what would the
22 membership do?
23    A.    That would depend, because
24 there's so many -- there were so many
25 non-members and so many pounds that were

Page 96

1          MATTHEW MARSON
2 unaccounted for that when -- even though
3 members shared an account, they would always
4 have outside pressure coming in at cheaper
5 numbers, which made these disputes happen.
6     Q.    Okay.  And you would -- in the
7 case that there was a dispute, would the
8 member raise it amongst the membership?
9     A.    Raise what?
10    Q.    Raise the -- bring the dispute
11 to light amongst the membership.  If there
12 was a disagreement between two members, would
13 they -- in the general meeting, did they just
14 explain the dispute to the membership?
15    A.    Not all the time, no.
16    Q.    Okay.
17    A.    This is a very fast-paced
18 industry.  Sometimes you don't have time to
19 wait for the meeting to make your decision
20 with all the outside pounds coming in and
21 forcing the price down.
22    Q.    Okay.  But in certain
23 instances, they did, right?
24    A.    Yes.
25          MR. GERSTEIN:  Okay.  Let's

Page 97

1          MATTHEW MARSON
2 mark in June 5, 2001 --
3          Okay.  These are June 5, 2001,
4          general meeting minutes.  The Bates
5          stamp is EMMC-DOJ-201 through 203, and
6          this has been previously marked as
7          Oakshire-19.
8 BY MR. GERSTEIN:
9     Q.    Mr. Marson, have you ever seen
10 this document before?
11    A.    Documents like this one.  I
12 don't know about this exact one.
13    Q.    Okay.  So you understand that
14 these are EMMC meeting minutes?
15    A.    Yeah.
16    Q.    Okay.  On the "In attendance"
17 list, do you see your name there amongst the
18 distribution?
19    A.    Yes, I do.
20    Q.    Okay.  I direct you to
21 EMMC-DOJ-00203.  If you look down at number
22 13, it says, "Market Issues."
23    A.    Okay.
24    Q.    And then there's four of them.
25          "Southmill/Cardile -- issue

25 (Pages 94 - 97)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Opposition to Motion for Sanctions was served on counsel for all parties to these consolidated civil actions by filing same pursuant to the ecf. filing system of the United States District Court for the Eastern District of Pennsylvania.

Dated:   April 25, 2012

/s/ William A. DeStefano

9