**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————x
                              :

| | | |
|---|---|---|
| **IN RE MUSHROOM DIRECT** | : | **Master File No. 06-0620** |
| **PURCHASER ANTITRUST** | : | |
| **LITIGATION** | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | **Nos.**   **06-0638; 06-0657** |
| | : |         **06-0677; 06-0861** |
| **All Actions** | : |         **06-0932; 06-1464** |
| | : |         **06-1854; 06-4829** |

———————————————————x

_____

**OPPOSITION OF CLASS PLAINTIFFS TO THE MOTION OF DEFENDANT**
**M.D. BASCIANI & SONS, INC. FOR SANCTIONS AND TO REMOVE PLAINTIFF**
**WM. ROSENSTEIN & SONS CO. AS A PUTATIVE CLASS REPRESENTATIVE**
_____

Class Plaintiffs submit this Opposition to the Motion of M.D. Basciani & Sons, Inc. for

Sanctions and to Remove Plaintiff Wm. Rosenstein & Sons Co. as a Putative Class

Representative (Doc. No. 404).

**<u>INTRODUCTION</u>**

This motion is one of several filed by Defendant M.D. Basciani & Sons, Inc. ("M.D.

Basciani") and its affiliated distributor Basciani Foods, Inc. ("Basciani Foods") in the wake of

Plaintiffs' Motion for Sanctions for the Spoliation of key documents by M.D. Basciani and

Basciani Foods.[1]  All of these motions are meant to disrupt the orderly conduct of this case in an

_____

[1] In response to Plaintiffs' Spoliation Motion, Basciani Foods filed a Cross-Motion
seeking to hold Plaintiffs in Contempt of the Court's January 31, 2012 Order directing Basciani
Foods to produce the documents that it recently admitted destroying in the Summer of 2009
(Doc. No. 409),  M.D. Basciani served (but has not yet filed) a motion for Rule 11 sanctions
against Plaintiffs claiming that Plaintiffs made false statements to the Court in their spoliation
motion, and M.D. Basciani has further sought to preclude the participation of Class Plaintiff
lawyers Scott W. Fisher and Jonathan M. Gerstein as unauthorized to practice before this Court

effort to obscure the destruction of evidence by M.D. Basciani and Basciani Foods.  Plaintiffs

will respond to all of these motions in due course.  Here, we respond to M.D. Basciani's motion

seeking (1) sanctions arising from the decision of two of the class representatives to withdraw

from this case and (2) to remove Wm. Rosenstein & Sons Co. ("Rosenstein") as a class

representative because its corporate designee supposedly testified that it was "possible" that he

did not suffer damages from the price fixing alleged in this case.

Significantly, none of the more than 30 other defendants in this case has joined in this

motion or any of the others filed by M.D. Basciani or Basciani Foods alleging misconduct by

Plaintiffs and their counsel.  Indeed, Plaintiffs and their counsel have been working

cooperatively with Mr. William DeStefano to schedule depositions of the class representatives.

Mr. DeStefano represents most of the defendants in this case including the EMMC and the

majority of its members (the "EMMC Defendants").

Plaintiffs, of course, regret the decision of two of the class representatives -- Native

Maine Produce and Specialty Foods, LLC ("Native Maine") and Theodore J. Katsiroubas and

Sons, Inc. d/b/a Katsiroubas Brothers Wholesale Fruit and Produce ("Katsiroubas") -- to

withdraw from this case, particularly after Mr. DeStefano and his colleague travelled to Boston

for their deposition.  Plaintiffs' counsel have agreed to discuss the mechanics of the withdrawal

of these class representatives with Mr. DeStefano.  There is no need for this Court to take any

action with respect to these class representatives.  There certainly is no reason to dismiss any

"claims" in this case since all of the claims asserted by Native Maine and Katsiroubas were

---

despite the Case Management Order (Doc. No. 45) specifically deeming any attorney not a
member of this court to be admitted *pro hac vice* and their supervision by local counsel admitted
in the Eastern District of Pennsylvania.  In addition, they have served a deposition notice seeking
the deposition of 9 of the class and opt-out plaintiffs' attorneys.  If M.D. Basciani refuses to
withdraw this wrongful attempt to seek discovery of opposing counsel's strategy and work
product, Plaintiffs will seek a protective order from the Court.

asserted on behalf of a class that will continue to pursue them.  None of M.D. Basciani's lawyers travelled to Boston, and nothing in their motion indicates that counsel for M.D. Basciani spent any significant time preparing to attend these cancelled depositions by telephone.  Indeed, their participation in the deposition of Rosenstein was minor, consisting only of a few brief questions at the end of the deposition.

Finally, M.D. Basciani's attack on the adequacy of Rosenstein to serve as a class representative is entirely baseless.  Mr. Jay Rosenstein appeared for his deposition on March 14, 2012 and answered all questions posed to him.  M.D. Basciani's claims that his testimony indicates that Rosenstein does not have an interest in this case is a premature and meritless attack on the adequacy of Rosenstein as a class representative based on misrepresentations of Mr. Rosenstein's testimony.

## **ARGUMENT**

### I. **THERE IS NO NEED FOR ANY ACTION BY THE COURT WITH RESPECT TO THE WITHDRAWAL OF NATIVE MAINE AND KATSISOUBAS AS CLASS REPRESENTATIVES.**

M.D. Basciani asks the Court to dismiss the "claims" of Native Maine and Katsiroubas and award them attorneys' fees as a sanction for their failure to attend their deposition.  There is no need for the Court to take any action with respect to these class representatives because Plaintiffs' counsel have agreed to work with the parties that noticed the deposition to reach agreement on the withdrawal of Native Maine and Katsiroubas.

Indeed, for the past several months, counsel for Plaintiffs has been working cooperatively with Mr. DeStefano to schedule the depositions of all class representatives.  *See* Declaration of David C. Raphael ("Raphael Dec.") ¶ 2 (attached as Exhibit 1).  M.D. Basciani did not join in the deposition notice served by Mr. DeStefano on behalf of the EMMC defendants, and its counsel neither participated in any of the scheduling discussions nor did they travel to Boston for the

depositions of Native Maine and Katsiroubas.  *Id.* ¶ 2.  Rather, they claim that they intended to participate in the depositions by telephone.  Even if that is what counsel for Basciani intended, they present no evidence that they spent any significant amount of time preparing for the deposition.  Indeed, during the Rosenstein deposition, their participation was minimal, consisting of just a few questions at the end of the deposition.  *See* Deposition of 30(b)(6) witness Jay Rosenstein on behalf of Wm. Rosenstein & Sons, Co. ("Rosenstein Dep."), March 14, 2012, at 127:23-132:4 (attached as Exhibit 2). There is no evidence that they were prepared to engage in any more extensive examination of Native Maine or Katsiroubas.

When counsel learned that representatives of Native Maine and Katsiroubas had decided not to attend their depositions, they informed Mr. DeStefano.  *See* Declaration of Kyle DeValerio ("DeValerio Dec.")  ¶ 16 (attached as Exhibit 3).  They agreed with Mr. DeStefano to discuss the best way for Native Maine and Katsiroubas to withdraw as class representatives.  *Id.* ¶ 17.

Plaintiffs' counsel regret the inconvenience to Mr. DeStefano caused by the decision of Native Maine and Katsiroubas to withdraw from this case after he travelled to Boston.  Plaintiffs' counsel learned that these representatives had decided not to attend their deposition late in the evening before the deposition, and told Mr. DeStefano the next morning.  *Id.* ¶¶ 15-16.  Before hearing from Native Maine and Katsiroubas that evening, Plaintiffs' counsel had every reason to believe that Native Maine and Katsiroubas were ready and willing to fulfill their responsibilities as class representatives.  They were direct purchasers of mushrooms from members of the EMMC.  *Id.* ¶ 5.  They had participated in responding to discovery, and their principal, Nick Katsiroubas, was an active participant in the case.  *Id.* ¶¶ 6-7.  Unfortunately, during the six years that this case has been pending, Nick Katsiroubas became seriously ill. *Id.* ¶¶ 8-9.  In addition, one of the co-owners of Native Maine was bought out.  *Id..* ¶ 10.

Plaintiffs' counsel believed that the companies were still committed to the litigation, but faced with the necessity of sitting for a deposition, it turned out that the current individuals controlling Native Maine and Katsiroubas were no longer willing to serve as class representatives. This decision was entirely unexpected by Plaintiffs' counsel who had travelled from Florida, New York, and Louisiana to participate in the deposition and were just as inconvenienced as Mr. DeStefano. Raphael Dec. ¶ 3. Because Katsiroubas and Native Maine are no longer willing to fulfill the responsibilities of class representatives, Plaintiffs will take steps to withdraw them as class representatives. No further action by the Court is necessary.

## II.  CONTRARY TO THE ASSERTIONS OF M.D. BASCIANI, THE REMAINING PLAINTIFFS ARE COMMITTED TO PROSECUTING THIS CASE.

M.D. Basciani suggests that the withdrawal of Katsiroubas and Native Maine is part of a pattern that reflects the weakness of Plaintiffs' case. There is no basis whatsoever for this claim.

Seven class representatives remain,[2] and their counsel are as committed as ever to this case which is particularly strong. This Court has already rejected Defendants' principal defense -- that they were entitled to claim Capper-Volstead immunity for their price-fixing activities. *See* March 26, 2009 Memorandum and Order (Doc. No. 294). Plaintiffs' counsel fought the jurisdictionally deficient appeal of this decision filed by M.D. Basciani and the other defendants for over two years before it was ultimately dismissed by the Third Circuit. The facts show that the defendants met, agreed on minimum price lists, and increased prices to their customers. Despite the efforts of M.D. Basciani and its associated distributor Basciani Foods to disrupt and delay this case, Plaintiffs and their counsel remain committed to obtaining redress for Defendants' antitrust violations. Raphael Dec. ¶ 4.

---

[2] They are: Wm. Rosenstein & Sons Co., Diversified Foods & Seasonings, Inc., Robert Altman, as trustee for the bankruptcy estate of Stephen Lee McCue d/b/a John Manning Co, M.L. Robert II, L.L.C., M. Robert Enterprises, Inc., Market Fair, Inc., and Associated Grocers, Inc**.**

M.D. Basciani's claims that other class representatives are considering withdrawing from this case rather than sitting for deposition are complete fabrications.  Just four days before M.D. Basciani filed this motion, Plaintiffs proposed a date for the deposition of Diversified Foods & Seasonings, Inc. ("Diversified"), one of the class representatives that M.D. Basciani claims wants to withdraw rather than be deposed.  *Id.* ¶ 5.  Although the proposed date was not acceptable to Mr. DeStefano, the Diversified deposition is now scheduled to take place this week.  *Id.* ¶ 6.  Nor did Plaintiffs ever suggest, as represented by M.D. Basciani, that Robert Altman, the trustee for the bankruptcy estate of Stephen Lee McCue d/b/a/ John Manning Co., is seeking to withdraw.  Rather, Plaintiffs suggested to Mr. DeStefano that a deposition might not be the best way for Defendants to get information about the claims asserted by Mr. Altman since he is a trustee rather than the operator of an ongoing business.  *Id.* ¶ 7.  Mr. Altman is, and has always been, willing to sit for deposition if the defendants so desire.  *Id.*

Since all of Plaintiffs' communications about the availability of witnesses have been with Mr. DeStefano, Plaintiffs asked him about the source of the representations in M.D. Basciani's motion that Diversified and Altman wanted to withdraw from this case rather than be deposed. He responded that the information in M.D. Basciani's motion did not come from him:

> We did not provoke or encourage this motion.  I don't know where Basciani's counsel is getting their facts.  We gave Basciani's counsel the phone-in number for the Katsiroubas and Native Maine depositions and told them that they had been cancelled at the last minute after we talked to David, Kevin , and Kyle on the morning of March 30th.  I think I also told one of Basciani's lawyers that we were trying to schedule 30(b)(6) depositions of the Louisiana plaintiffs and counsel were talking to Diversified and Altman about proceeding with their deposition.  As you know, we do not represent either of the Basciani entities and have no input or control over what their lawyers do.

*Id.* ¶ 8 (quoting April 21, 2012 E-Mail from W. DeStefano).

There is no basis for M.D. Basciani's claim that Plaintiffs are treating this case as a "game." Plaintiffs are serious about this case. While the length of time that this case has been pending has unfortunately caused some class representatives to drop out because of illness or a lack of continued commitment, the remaining plaintiffs are more than sufficient to pursue all of the claims identified in Plaintiffs' complaint.

## III. THERE IS NO BASIS ON WHICH TO "REMOVE" ROSENSTEIN AS A CLASS REPRESENTATIVE.

Finally, M.D. Basciani provides the court with 4 of the 132 pages of Mr. Rosenstein's deposition and claims that even a "cursory review" reveals that he has "little, if no, interest in this case." Basciani Br. at 8.

Preliminarily, this argument is a premature attack on Rosenstein's adequacy to act as a class representative. *See* Fed. R. Civ. P. 23(a)(4). Pursuant to this Court's Order of April 17, 2012 (Doc. No. 403), motions for class certification are not due to be filed until January 18, 2013. Any question that M.D. Basciani has about the adequacy of Rosenstein should wait until the briefing of class certification motions.

More fundamentally, however, M.D. Basciani's attack on Rosenstein is completely unfounded, and a review of 4 of 132 pages of a deposition transcript cannot even charitably be described as "cursory." As the full transcript of the deposition establishes, Rosenstein is an entirely appropriate class representative:

- It purchased directly from members of the EMMC. *See* Rosenstein Dep. at 44:19-47:11.

- It made those purchases from 2000-2008. *Id.* at 44:19-51:20.

- It recognized its duties and responsibilities as a class representative. *Id.* at 127:24-128:23.

- It responded to interrogatories and document requests. *Id.* at 59:14-17.

- It prepared for and attended the deposition noticed by the EMMC defendants.  *Id.* at 98:11-99:25.

- It explained how it learned of the case from its regular outside counsel and became involved in it.  *Id.* at 88:23-91:5.[3]

- It explained its business as a wholesale produce distributor and explained how it made mushroom purchases. *Id.* at 10:11-27:17; 29:8-30:7; 44:19-51:20.

When Mr. Rosenstein was asked whether he believed that Rosenstein was impacted by the EMMC's conduct between 2000 and 2008, he answered:  "If what I understand this class action litigation to be about, then we were most definitely impacted."  *Id.* at 95:10-13. Understandably, given that he is not an economist, he further testified that had not tried to calculate the amount of Rosenstein's damages.  *Id.* at 95:22-96:19.

M.D. Basciani ignores all of this testimony and focuses on a short exchange at the end of the deposition in which, on redirect examination, its counsel asked Mr. Rosenstein whether it was "possible" that it had not suffered any damages, a vague and ambiguous question not even arguably within the brief cross examination of counsel for Rosenstein.[4]   *Id.* at 129:13-15. Mr. Rosenstein recognized the absurdity of this question, and initially responded:  "I don't think I

---

[3] M.D. Basciani criticizes Mr. Rosenstein for saying that he was "solicited" to participate in this case.  *See* Basciani Mot. ¶ 4.  Read in context, it is clear that what Mr. Rosenstein meant when he said that he was "solicited."  Mr. Rosenstein was contacted by Rosenstein's regular outside counsel, Robert Kelley, a respected member of the Scranton, PA bar.  *See* Rosenstein Dep. at 89:25-91:12. Mr. Kelly told Mr. Rosenstein about the potential case against the EMMC, and Mr. Rosenstein decided to get involved because he trusted Mr. Kelley's judgment.  *Id.*  He was not promised anything to participate in this case.  *Id.* at 128:24-129:9.  Mr**.** Rosenstein's adequacy to serve as a class representative should not be called into question by imprecise language taken out of context.  He is a produce distributor, not a lawyer.

[4] Counsel for Rosenstein allowed Mr. Rosenstein to answer the question, but objected to this question on the basis of its form, as calling for a legal conclusion, as seeking economic analysis, as outside the scope of his questions, and as having already been answered throughout the day in much more appropriate ways.  Rosenstein Dep. at 129:16-20, 130:8-13.

want to answer that." *Id.* at 129:23-24.  Refusing to acknowledge the defects in her question,

counsel for M.D. Basciani insisted on an answer:

> Q.      Is it possible that you have not been damaged?
>
> A:      Anything is possible.
>
> Q.      Is it possible that you have not been damaged?
>
> A.      MR. REFSIN: I object to the form of the question. It's inappropriate.
>
> THE WITNESS: I answered the question. Anything is possible.
>
> BY MS. ALBANI:
>
> Q.      That doesn't answer my question.
>
> MR. REFSIN: It does answer the question.
>
> THE WITNESS: It's possible I was damaged. It's possible I wasn't.

Rosenstein Dep. at 131:6-22.

Counsel's representation based on this exchange that Mr. Rosenstein testified that it was

"possible that Rosenstein had suffered no damages at all" (M.D. Basciani Br. at 8) far exceeds

the boundaries of zealous advocacy.  Mr. Rosenstein testified that "[a]nything was possible," not

that he thought that it was likely that he was not damaged.  Indeed, in response to Mr.

DeStefano's more intelligible question, Mr. Rosenstein testified that Rosenstein "was most

definitely impacted" if defendants engaged in the kind of price fixing that he understood was

alleged in this case.

There is no basis anywhere in Mr. Rosenstein's deposition for M.D. Basciani's claim that

"Rosenstein is, at best, a reluctant and disinterested putatative class representative who admitted

that it may have suffered no damages" and "must be removed from its fiduciary role in this

litigation."  Basciani Br. at 8.  Mr. Rosenstein understood his obligations and answered all

questions fully and fairly.  M.D. Basciani's deceptive description of his testimony can only be explained as a desperate attempt to distract the Court's attention from the serious issues raised by Plaintiffs' spoliation motion.

## **CONCLUSION**

For the foregoing reasons, Class Plaintiffs respectfully request that the motion of M.D. Basciani for Sanctions and to remove Plaintiff Wm. Rosenstein & Sons Co. be denied in its entirety.

Dated:  May 7, 2012

<div style="margin-left:40%;">

Respectfully submitted,

/s Barry L. Refsin              
Barry L. Refsin (Pa. ID No. 62526)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
Tel: (215) 568-6200
Fax: (215) 568-0300

Bruce E. Gerstein
GARWIN, GERSTEIN & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620
*Lead Counsel for Direct Purchaser Class*

</div>

Exhibit 1

UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____X | | |
| | : | |
| IN RE MUSHROOM DIRECT | : | Master File No. 06-0620 |
| PURCHASER ANTITRUST LITIGATION | : | |
| | : | No.      06-04829 |
| THIS DOCUMENT RELATED TO | : | |
| | : | |
| All Actions. | : | |
| | : | |
| _____X | | |

**DECLARATION OF DAVID C. RAPHAEL, JR. IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT M.D.BASCIANI & SONS, INC.'S
<u>MOTION FOR SANCTIONS</u>**

I, David C. Raphael, Jr., declare as follows:

1.      I am a partner in the law firm of Smith Segura & Raphael, LLP.  My firm is counsel for Direct Purchaser Plaintiffs in this matter.  I make this declaration on the basis of personal knowledge in support of Direct Purchaser Plaintiffs' Memorandum in Opposition to Defendant M.D. Basciani & Sons, Inc.'s Motion for Sanctions and to Remove Plaintiff William Rosenstein & Sons, Inc. as a Putative Class Representative.

2.      For the past several months, I have been working directly with William A. DeStefano, counsel for the EMMC defendants (the EMMC and most of its members), to schedule the depositions of various plaintiffs pursuant to the EMMC defendants' December 30, 2011 Notice of Oral Videotaped Depositions of Plaintiffs' 30(b)(6) Representatives.  Counsel for Defendant M.D. Basciani & Sons ("M.D. Basciani") did not serve separate deposition notices on plaintiffs nor did they participate in any of the discussions to schedule depositions.

3.        As a result of my discussions with Mr. DeStefano, the deposition of plaintiff Wm. Rosenstein & Sons Co. took place in Philadelphia on March 14, 2012, and the depositions of plaintiffs Native Maine Produce and Specialty Foods, LLC ("Native Maine") and Theodore J. Katsiroubas and Sons, Inc. d/b/a/ Katsiroubas Brothers Wholesale Fruit and Produce ("Katsiroubas") were scheduled for March 29-30, 2012 in Boston.  The two Boston depositions were unexpectedly cancelled on the morning of March 29, 2012 for the reasons set forth in the Declaration of Kyle G. DeValerio filed herewith.  Before they were cancelled, I travelled from Louisiana to Boston for these depositions.  Other counsel for Plaintiffs travelled to Boston from Florida and New York.

4.        In its motion, M.D. Basciani asserts that it learned from Mr. DeStefano that Diversified Foods & Seasonings, Inc. ("Diversified") and Robert Altman ("Altman") were considering withdrawing from this case.  *See* Motion ¶ 19.  This allegation is completely unfounded.  All of the remaining plaintiffs and their counsel are ready, willing, and able to continue to prosecute this case.  Plaintiffs and their counsel have persevered through six years of litigation in this case including a jurisdictionally deficient appeal of this Court's judgment granting them summary judgment on Defendants' principal defense.  Plaintiffs and their counsel have no intention of abandoning this case now.

5.        Just four days before M.D. Basciani filed this motion, I attempted to confirm deposition dates for Diversified and another plaintiff.  *See* April 16, 2012 E-Mail from D. Raphael to B. DeStefano (attached as Exhibit A).

6.        As a result of a number of scheduling conflicts, Mr. DeStefano and I were unsuccessful in scheduling these depositions in April. *See* April 20, 2012 E-mail Exchanges with Mr. DeStefano (Exhibit A).  The two depositions are now scheduled for May 8-9, 2012.

7.       I have also discussed with Mr. DeStefano the deposition of Robert Altman, who is suing as a trustee for the bankruptcy estate of Stephen Lee McCue d/b/a/ John Manning Co.  At no time did I ever suggest to Mr. DeStefano that Mr. Altman would withdraw from this case rather than be deposed.  What I suggested to Mr. DeStefano was that some form of discovery other than a deposition might be more effective with respect to Altman given his status as a trustee rather than the operator of an ongoing business.  Plaintiff Altman is and has always been willing to sit for deposition if the defendants so desire.

8.       On April 21, 2012, I asked Mr. DeStefano where counsel for M.D. Basciani got the idea that Diversified and Altman would rather withdraw from this case than be deposed. With respect to M.D. Basciani's motion, he responded:

> We did not provoke or encourage this motion.  I don't know where Basciani's counsel is getting their facts.  We gave Basciani's counsel the phone-in number for the Katsiroubas and Native Maine depositions and told them that they had been cancelled at the last minute after we talked to David, Kevin , and Kyle on the morning of March 30th.  I think I also told one of Basciani's lawyers that we were trying to schedule 30(b)(6) depositions of the Louisiana plaintiffs and counsel were talking to Diversified and Altman about proceeding with their deposition.  As you know, we do not represent either of the Basciani entities and have no input or control over what their lawyers do.

April 21, 2012 E-Mail from B. DeStefano (Exhibit A).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2012

David C. Raphael, Jr.

## David Raphael

| | |
|---|---|
| **From:** | DeStefano, William A. [WAD@stevenslee.com] |
| **Sent:** | Saturday, April 21, 2012 8:11 AM |
| **To:** | David Raphael |
| **Cc:** | Pawelski, Terri A.; rkutcher@chopin.com; Skylar Rosenbloom (1272); Brent Barriere (1210); Scott Fisher; Jgerstein@garwingerstein.com; Brefsin@hangley.com; Laddie Montague; Marty Twersky |
| **Subject:** | RE: Mushrooms- New Orleans depositions |

David, Scott, Barry and Jon:

Last week, a hearing on pre-trial motions in one of our cases, United States v. Kurlander, got moved to May 9th at the request of the U.S. Attorney and this turned out to be the only day during the first two weeks in May that we were not available to do these depositions.  Since we are coming to your clients' home cities, we did not think it was a big deal to ask if you can move the depositions to the following week.  Anyway, let me try to see if I can move the Kurlander hearing to another day and I will get back to you on Monday.

Alternatively, we can depose either or both of these two plaintiffs and/or any of the other Louisiana plaintiffs (Diversified, Associated, Market Fair, Robert or Altman) during the weeks of May 14th, 21st, June 4th or June 11th in Louisiana.   You will recall that we noticed these depositions in late December and have been working with plaintiffs' counsel ever since that time in order to agree on dates for these 30(b)(6) depositions.  So we would very much appreciate your help in giving us dates when all of the Louisiana plaintiffs can submit to 30(b)(6) depositions during this window of time (the weeks of May 14th through June 11th) preferably in May.  We have tentatively agreed to depose Giant Eagle on 6/1 and hope to agree on a date for Pubix' 30(b)(6) deposition in late May or early June.

I just skimmed Basciani's motion for sanctions.  We did not provoke or encourage this motion.  I don't know where Basciani's counsel is getting their facts. We gave Basciani's counsel the phone-in number for the Katsiroubas and Native Maine depositions and told them that they had been cancelled at the last minute after we talked to David, Kevin and Kyle on the morning of March 30th .  I think I also told one of Basciani's lawyers that we were trying to schedule 30(b)(6) depositions of the Louisiana plaintiffs and counsel were talking to Diversified and Altman about proceeding with their depositions.  As you know, we do not represent either of the Bascaini entities and have no input or control over what their lawyers do.

Anyway David, let's talk on Monday about getting dates for all of the Louisiana plaintiffs.  We have been looking at the discovery produced by these plaintiffs and I will get back to you shortly regarding additional documents as we did with Rosenstein. Katsiroubas and Native Maine.  With respect to Altman, we are still willing to do a preliminary phone conversation with the Trustee as we discussed in Boston so please let us know when Mr. Altman is available for this.

Regards, Bill

William A. DeStefano
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA 19103
Direct Dial: 215-751-1941
Direct Fax:  610-236-4170


EXHIBIT
A

wad@stevenslee.com

**From:** David Raphael [mailto:draphael@ssrllp.com]
**Sent:** Friday, April 20, 2012 5:39 PM
**To:** DeStefano, William A.
**Cc:** Pawelski, Terri A.; rkutcher@chopin.com; 'Skylar Rosenbloom (1272)'; 'Brent Barriere (1210)'; 'Scott Fisher'; Jgerstein@garwingerstein.com; Brefsin@hangley.com
**Subject:** RE: Mushrooms- New Orleans depositions

Bill:

I bothered the clients to get available dates in the first two weeks in May on your suggestion – only to find out that you are unavailable.  If we can't go forward on May 8 & 9, the next available back-to-back days will be in June.  Before I go back to the folks at Diversified and Associated again, are there any days in the weeks of June 4 and June 11 that you guys are unavailable to take the depositions in New Orleans?

By the way, I assume you've seen the Motion for Sanctions recently filed by Basciani.  Regarding Paragraph 19, who told you that plaintiffs were considering whether Diversified and Altman would rather withdraw than be deposed?

David C. Raphael, Jr.
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, Louisiana 71303
(318) 445-4480
(318) 487-1741 facsimile
draphael@ssrllp.com

~~~~~~~~~~~~~~~~~
IMPORTANT NOTICE: This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me at (318) 455-4480 and permanently delete the original and any copy of any e-mail and any printout thereof.

**From:** DeStefano, William A. [mailto:WAD@stevenslee.com]
**Sent:** Friday, April 20, 2012 4:14 PM
**To:** David Raphael
**Cc:** Pawelski, Terri A.; rkutcher@chopin.com; Skylar Rosenbloom (1272); Brent Barriere (1210); Scott Fisher; Jgerstein@garwingerstein.com; Brefsin@hangley.com
**Subject:** RE: Mushrooms- New Orleans depositions

David, Terri and I have a court appearance in a criminal case in Newark on May 9th. So how about the following week? Regards and have a good weekend. Please let me know as soon as possible.  Regards, Bill

William A. DeStefano
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA 19103

Direct Dial: 215-751-1941
Direct Fax: 610-236-4170
wad@stevenslee.com


**From:** David Raphael [mailto:draphael@ssrllp.com]
**Sent:** Friday, April 20, 2012 4:43 PM
**To:** DeStefano, William A.
**Cc:** Pawelski, Terri A.; rkutcher@chopin.com; 'Skylar Rosenbloom (1272)'; 'Brent Barriere (1210)'; 'Scott Fisher';
Jgerstein@garwingerstein.com; Brefsin@hangley.com
**Subject:** RE: Mushrooms- New Orleans depositions

Bill:

Following up on your request that we provide back-to-back dates in the first half of May for Associated and Diversified,
Diversified is available for deposition on May 8 and Associated can go on May 9 – both in the same locations identified in
my April 16 email below.

Please confirm that this works for you.



David C. Raphael, Jr.
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, Louisiana 71303
(318) 445-4480
(318) 487-1741 facsimile
draphael@ssrllp.com


~~~~~~~~~~~~~~~~
IMPORTANT NOTICE: This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments
thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me at (318) 455-4480 and permanently delete the original and any copy of any
e-mail and any printout thereof.

**From:** DeStefano, William A. [mailto:WAD@stevenslee.com]
**Sent:** Monday, April 16, 2012 12:54 PM
**To:** David Raphael
**Cc:** Pawelski, Terri A.
**Subject:** RE: Mushrooms- New Orleans depositions

Hi David.   Sorry I could not get back to you on Friday.  Anyway, I called your office a few minutes ago and left a message
for you to call me to discuss the Diversified and Associated Grocers depositions.  Regards, Bill

William A. DeStefano
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA 19103
Direct Dial: 215-751-1941
Direct Fax: 610-236-4170
wad@stevenslee.com

**From:** David Raphael [mailto:draphael@ssrllp.com]
**Sent:** Monday, April 16, 2012 1:48 PM
**To:** DeStefano, William A.
**Cc:** Pawelski, Terri A.; 'Scott Fisher'; 'Robert A. Kutcher'; 'Jonathan Gerstein'; 'Brent Barriere (1210)'; 'Barry Refsin'
**Subject:** Mushrooms- New Orleans depositions

Bill:

Confirming the voicemail message I left for you last week, the Diversified deposition will go forward on 4/24 at 9:30 CDT at the offices of Chopin Wagar in Metairie, LA, and Associated will go on 4/26 at 10:30 CDT at Phelps Dunbar in downtown N.O.

Let me know if there are any issues or concerns with these dates/times.  Thanks.

David C. Raphael, Jr.
Smith Segura & Raphael, LLP
3600 Jackson Street, Suite 111
Alexandria, Louisiana 71303
(318) 445-4480
(318) 487-1741 facsimile
draphael@ssrllp.com

~~~~~~~~~~~~~~~

IMPORTANT NOTICE: This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify me at (318) 455-4480 and permanently delete the original and any copy of any e-mail and any printout thereof.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

This email may contain privileged and confidential information and is solely for the use of the sender's intended recipient(s). If you received this email in error, please notify the sender by reply email and delete all copies and attachments. Thank you.

Exhibit 2

Page 1

1         IN THE UNITED STATES DISTRICT COURT

         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    IN RE:  MUSHROOM       : MASTER FILE NO.

     DIRECT PURCHASER       : GD 06-0620

4    ANTITRUST LITIGATION   :

5

6                     *   *   *

7                  MARCH 14, 2012

8                     *   *   *

9

10         Videotaped deposition JAY C.

11   ROSENSTEIN, taken at the law offices of

12   Hangley, Aronchick, Segal, Pudlin & Schiller,

13   One Logan Square, 27th Floor, Philadelphia,

14   Pennsylvania, commencing at 9:55 a.m. before

15   Debbie Leonard, Registered Diplomate

16   Reporter, Certified Realtime Reporter.

17

18

19

20

21

22

23

24

25

Page 2

```
 1    APPEARANCES:
 2
          HANGLEY, ARONCHICK, SEGAL,
 3        PUDLIN & SCHILLER
          BY:  BARRY L. REFSIN, ESQ.
 4        One Logan Square, 27th Floor
          Philadelphia, Pennsylvania 19103
 5        (215) 496-7031
          brefsin@hangley.com
 6        Representing the Direct Purchaser Class
          and the deponent
 7
 8        SMITH SEGURA & RAPHAEL, LLP
          BY:  DAVID C. RAPHAEL, JR., ESQ.
 9        3600 Jackson Street, Suite 111
          Alexandria, Louisiana 71303
10        (318) 445-4480
          draphael@ssrllp.com
11        Representing the Direct Purchaser Class
          and the deponent
12
13        MYERS BRIER & KELLY LLP
          BY:  ROBERT T. KELLY, JR.
14        425 Spruce Street, Suite 200
          Scranton, Pennsylvania 18501
15        (570) 207-3666
          rkelly@mbklaw.com
16        Representing the Direct Purchaser Class
          and the deponent
17
18        STEVENS & LEE
          BY:  WILLIAM A. DESTEFANO, ESQ.
19        BY:  TERRI A. PAWELSKI, ESQ.
          1818 Market Street, 29th Floor
20        Philadelphia, Pennsylvania 19103
          (215) 575-0100
21        wad@stevenslee.com
          tap@stevenslee.com
22        Representing American Mushroom
          Cooperative and several other defendants
23
24    (continued)
25
```

Page 3

1   APPEARANCES (continued):

2

        BERGER & MONTAGUE, P.C.
3       By:  MARTIN I. TWERSKY, ESQ.
        1622 Locust Street
4       Philadelphia, Pennsylvania 19103
        (215) 875-3000
5       twersky@bm.net
        Representing American Mushroom
6       Cooperative and several other
        defendants

7

8       DONNA M. ALBANI, ESQUIRE, PC
        BY:  DONNA M. ALBANI, ESQ.
9       11 Hampton Lane
        Glen Mills, Pennsylvania 19342
10      (610) 459-8858
        dmaesq@comcast.net
11      Representing M.D. Basciani & Sons, Inc.

12

    ALSO PRESENT:
13

14      Jack Crooks, CEO, American Mushroom
        Cooperative

15

16      Ben Keyser, Videographer

17

18

19

20

21

22

23

24

25

Page 4

1                   INDEX TO WITNESSES
2

3   WITNESS:   JAY C. ROSENSTEIN          PAGE
4

            BY MR. DESTEFANO                7
5

            BY MS. ALBANI                 123
6

            BY MR. REFSIN                 124
7

            BY MR. DESTEFANO              125
8

            BY MS. ALBANI                 127
9
10
11
12

13                  INDEX TO EXHIBITS
14                                          PAGE
    EXHIBIT          DESCRIPTION          MARKED
15

16   Rosenstein-1  Notice of Oral           62
                   Videotaped Depositions
17                 of Plaintiffs' 30(b)(6)
                   representatives
18

    Rosenstein-2  Responses and            96
19                Objections of Plaintiff
                  WM. Rosenstein & Sons,
20                Inc. To Defendants'
                  First Set of
21                Interrogatories and
                  Document Requests
22
23
24
25

Page 5

```
 1              JAY C. ROSENSTEIN
 2              THE VIDEOGRAPHER:  My name is      09:55:15
 3      Ben Keyser of Veritext.  The date          09:55:19
 4      today is March 14th, 2012, and the         09:55:20
 5      time is approximately 9:55.                09:55:23
 6              This deposition is located at       09:55:25
 7      18th and Cherry located in                 09:55:27
 8      Philadelphia, Pennsylvania.  The           09:55:29
 9      caption of this case is In Re:             09:55:31
10      Mushroom Direct Purchaser Antitrust        09:55:33
11      Litigation in the United States            09:55:36
12      District Court for the Eastern             09:55:37
13      District of Pennsylvania.                  09:55:38
14              The name of our witness is Jay     09:55:39
15      Charles Rosenstein.                        09:55:41
16              At this time, would the            09:55:42
17      attorneys please identify themselves       09:55:43
18      and the parties they represent, after      09:55:45
19      which our court reporter, Debbie           09:55:47
20      Leonard of Veritext, will swear in the     09:55:48
21      witness, and we can proceed.               09:55:50
22              MR. DESTEFANO:  William            09:55:51
23      DeStefano, representing the American       09:55:52
24      Mushroom Cooperative, formerly known       09:55:56
25      as the Eastern --                          09:55:59
```

```
 1              JAY C. ROSENSTEIN
 2         MR. REFSIN:  Mushroom --        09:56:04
 3         MR. DESTEFANO:  -- EMMC.        09:56:05
 4    Formerly known -- abbreviated as the 09:56:06
 5    EMMC.  Also representing a number of 09:56:08
 6    defendants who are present or former 09:56:12
 7    members of the EMMC.                 09:56:15
 8         With -- with me today are Marty 09:56:21
 9    Twersky of the firm of Berger &      09:56:24
10    Montague and Terri Pawelski of our   09:56:28
11    firm, Stevens & Lee, also representing 09:56:30
12    the same clients.                    09:56:32
13         MS. ALBANI:  I'm Donna M.       09:56:32
14    Albani, representing defendant M.D.  09:56:32
15    Basciani & Sons, Inc.               09:56:41
16         MR. REFSIN:  Barry Refsin,     09:56:41
17    representing the direct purchaser    09:56:44
18    class and the witness, Jay Rosenstein. 09:56:45
19    And with me is David Raphael and Bob 09:56:49
20    Kelly.                               09:56:52
21              *  *  *                    09:57:00
22         JAY C. ROSENSTEIN,             09:57:00
23  having been first duly sworn, testified as 09:57:00
24  follows:                               09:57:00
25              *  *  *                    09:57:00
```

```
 1              JAY C. ROSENSTEIN

 2                 EXAMINATION              09:57:00

 3                  *   *   *               09:57:00

 4    BY MR. DESTEFANO:                     09:57:00

 5         Q.    Mr. Rosenstein, we'll try not   09:57:03

 6    to keep you very long.  We have a number of   09:57:06

 7    questions to ask you regarding your company   09:57:07

 8    and specifically with reference to purchase   09:57:12

 9    and sale of mushrooms by your company.   09:57:16

10              Let me ask you these couple of   09:57:19

11    questions.  Have you ever either given a   09:57:21

12    deposition or testified as a witness in a   09:57:24

13    court proceeding before?              09:57:26

14         A.    I have.                    09:57:27

15         Q.    Okay.  And can you tell us   09:57:27

16    approximately how many times you've been   09:57:30

17    involved in either activity?          09:57:33

18         A.    Twice.                     09:57:36

19         Q.    Twice.  Okay.  So given that   09:57:38

20    you're somewhat familiar with the process --   09:57:43

21    how long ago was your last involvement --   09:57:46

22         A.    A year ago.                09:57:46

23         Q.    -- either being a witness --   09:57:48

24         A.    A year ago.                09:57:49

25         Q.    -- or a deponent?          09:57:50
```

Page 8

```
1                    JAY C. ROSENSTEIN
2          A.     I was deposed a year ago.        09:57:52
3          Q.     Okay.  And in what type of       09:57:54
4    matter were you deposed?                      09:57:56
5          A.     It was a defamation of           09:58:00
6    character.                                    09:58:02
7          Q.     Okay.  And was your status in    09:58:02
8    that proceeding a party or a witness?         09:58:07
9          A.     I was for the plaintiff.         09:58:12
10         Q.     Were you a witness for the       09:58:15
11   plaintiff, or were you the plaintiff or one   09:58:16
12   of the plaintiffs?                            09:58:21
13         A.     I would have been a witness for  09:58:24
14   the plaintiff.                                09:58:25
15         Q.     Okay.  All right.  Let me just   09:58:25
16   give you a couple of brief instructions, sir. 09:58:29
17   And they're probably not anything you haven't 09:58:31
18   heard already, but a couple of things.        09:58:36
19              You must answer my questions       09:58:38
20   audibly with a "yes" or a "no" or a verbal    09:58:39
21   answer.  Sometimes witnesses like to -- to    09:58:43
22   nod their heads or say "uh-huh," and in this  09:58:46
23   type of proceeding that's not acceptable      09:58:49
24   because the court reporter has difficulty     09:58:51
25   transcribing that.                            09:58:55
```

```
                                            Page 9
 1              JAY C. ROSENSTEIN

 2              Secondly, if you don't          09:58:56

 3   understand or if my question is too complex  09:59:00

 4   or too -- not understandable, please don't   09:59:01

 5   attempt to answer it, but -- but stop me and  09:59:05

 6   ask me to rephrase the question.  And if you  09:59:08

 7   do answer, I will assume that you understand  09:59:12

 8   and have a responsive answer to my question.  09:59:15

 9   Okay?                                         09:59:17

10              Please be advised that any time  09:59:18

11   you need to take a break for bathroom         09:59:23

12   purposes or the like, don't be bashful and --  09:59:25

13   and just say, "We -- we need a break."        09:59:27

14              Also, you will be sworn in by     09:59:29

15   the court reporter shortly.                   09:59:36

16              MR. DESTEFANO:  If he hasn't      09:59:40

17       already.                                 09:59:41

18              THE REPORTER:  He's already       09:59:41

19       been sworn.                              09:59:43

20              MR. DESTEFANO:  Already been      09:59:44

21       sworn.                                   09:59:45

22   BY MR. DESTEFANO:                            09:59:44

23       Q.    And that means you have to         09:59:45

24   answer each and every one of my questions    09:59:46

25   truthfully to the best of your -- in good    09:59:48
```

```
 1              JAY C. ROSENSTEIN
 2   faith and to the best of your knowledge and    09:59:51
 3   belief.  Okay.                                 09:59:53
 4              Understand all of those             09:59:55
 5   instructions?                                  09:59:55
 6        A.    Yes, I do.                          09:59:56
 7        Q.    Okay.  State your business          09:59:56
 8   address for the record, please.               10:00:02
 9        A.    950 North Keyser, K-E-Y-S-E-R,     10:00:05
10   Avenue, Scranton, Pennsylvania 18504.         10:00:08
11        Q.    And the name of the person by      10:00:12
12   whom you are employed?                         10:00:15
13        A.    William Rosenstein & Sons          10:00:17
14   Company.                                       10:00:20
15        Q.    Okay.  What is your position        10:00:20
16   with -- currently today --                     10:00:22
17        A.    Vice president --                   10:00:24
18        Q.    -- your position --                 10:00:25
19        A.    -- and owner.                       10:00:27
20        Q.    One other instruction, if I --     10:00:28
21   if I might.  Witnesses sometimes try to be    10:00:29
22   too helpful, and they -- they try to          10:00:32
23   anticipate the rest of the question and jump  10:00:34
24   in with an answer, sort of like Jeopardy, you 10:00:36
25   know, when you press the buzzer.  Please try  10:00:38
```

```
                                            Page 11

  1                 JAY C. ROSENSTEIN

  2     to refrain from doing that.  Listen to my      10:00:42

  3     entire question, and don't give a verbal       10:00:44

  4     answer to my question until it's complete.     10:00:46

  5          A.     Yeah.                               10:00:49

  6          Q.     That way, we won't talk over        10:00:50

  7     each other, and, again, the court reporter     10:00:53

  8     will be able to transcribe everything          10:00:54

  9     accurately.  Okay?                             10:00:56

 10          A.     Yes.                                10:00:58

 11          Q.     Okay.  All right.  My question      10:00:58

 12     was -- I'll ask it again.                      10:01:01

 13                 Your position today with           10:01:02

 14     William Rosenstein company?                    10:01:04

 15          A.     Vice president.                     10:01:08

 16          Q.     Okay.  Does the vice               10:01:09

 17     presidential title have any adjectives, vice   10:01:15

 18     president of sales, marketing, or is it just   10:01:18

 19     vice president?                                10:01:20

 20          A.     Just vice president.                10:01:22

 21          Q.     Okay.  How long have you held      10:01:23

 22     that position with the Rosenstein company?     10:01:25

 23          A.     42 years.                          10:01:29

 24          Q.     Okay.  Who is the president        10:01:31

 25     today?                                         10:01:44
```

```
                                            Page 12
 1                    JAY C. ROSENSTEIN
 2          A.      Philip Rosenstein.        10:01:44
 3          Q.      And how long has he been the  10:01:49
 4    president?                              10:01:50
 5          A.      For about the past 15 years.  10:01:51
 6          Q.      Is he your older brother?  10:01:54
 7          A.      Older brother.           10:01:56
 8          Q.      Is there a CEO or a chairman  10:01:57
 9    of -- of the board, other than you or Philip?  10:02:04
10          A.      No.                      10:02:10
11          Q.      Okay.  All right.  Are there  10:02:10
12    any other vice presidential-level employees  10:02:11
13    of the Rosenstein company?             10:02:15
14          A.      No.                      10:02:17
15          Q.      Okay.  Do you focus your effort  10:02:19
16    today with Rosenstein on any particular  10:02:27
17    aspect of its business versus Philip's --  10:02:33
18    Philip's job duties, for example?      10:02:39
19          A.      I do the majority of the buying  10:02:41
20    of the western fruit and vegetables, with a  10:02:46
21    little bit of the eastern fruit and    10:02:51
22    vegetables.                            10:02:53
23                  MR. DESTEFANO:  Okay.  Can we  10:02:57
24          go off the record, please?       10:02:58
25                  THE VIDEOGRAPHER:  The time is  10:03:00
```

Page 13

1              JAY C. ROSENSTEIN

2         10:02.  We're going off the video      10:03:01

3         record.                                10:03:04

4                   *  *  *                       10:03:05

5              (Recess from 10:02 a.m. to        10:09:40

6         10:09 a.m.)                            10:09:40

7                   *  *  *                       10:09:40

8              THE VIDEOGRAPHER:  The time is    10:09:45

9         10:09.  We are back on the video       10:09:45

10        record.                                10:09:48

11   BY MR. DESTEFANO:                           10:09:49

12         Q.    Mr. Rosenstein, can you         10:09:51

13   describe what you mean by "the western fruit 10:09:53

14   and vegetables" versus "the eastern fruit and 10:09:55

15   vegetables"?                                10:09:58

16         A.    Western fruit and vegetables    10:10:00

17   are everything, for the most part, west of  10:10:02

18   the Mississippi.                            10:10:07

19         Q.    Okay.                           10:10:08

20         A.    The big agricultural states     10:10:08

21   being California and Arizona.               10:10:10

22         Q.    Okay.  So would it be accurate  10:10:12

23   to say, today you focus on -- mostly on     10:10:13

24   purchasing the western -- the fruits and    10:10:18

25   vegetables grown west of the Mississippi?   10:10:21

Page 14

JAY C. ROSENSTEIN

1

2       A.     The majority.  That would be a    10:10:25

3   correct statement.                           10:10:27

4       Q.     Okay.  And with respect to the    10:10:27

5   vegetables grown east of the Mississippi,    10:10:31

6   today you have some involvement --           10:10:35

7       A.     I do.                             10:10:38

8       Q.     -- would that be accurate?        10:10:38

9   Okay.                                        10:10:39

10              What of the vegetables grown     10:10:41

11   east of the Mississippi do you focus on     10:10:44

12   buying today?                               10:10:46

13       A.     Well, it all depends on the      10:10:47

14   season.                                     10:10:51

15       Q.     Okay.                            10:10:52

16       A.     Okay.  This week, I bought some  10:10:52

17   celery out of Florida.  Okay.  Bought some  10:10:55

18   tomatoes out of Florida.  There's leafy     10:11:00

19   vegetables.  There are peppers, a variety of 10:11:04

20   different colored peppers.                  10:11:07

21       Q.     Let me stop you and shorten the  10:11:08

22   question a little bit.  Are you focusing on 10:11:12

23   purchasing mushrooms today?                 10:11:14

24       A.     No.                              10:11:15

25       Q.     Okay.  At any time during your   10:11:15

                    JAY C. ROSENSTEIN

1
2    tenure, so to speak, with the company, did      10:11:27
3    you have a responsibility to purchase           10:11:30
4    mushrooms, whether they be east -- grown east   10:11:33
5    or west of the Mississippi?                     10:11:35
6          A.    That wasn't one of my main          10:11:37
7    jobs, no.                                        10:11:41
8          Q.    Ever?                                10:11:41
9          A.    Ever.                                10:11:42
10         Q.    Okay.  Whose -- whose job was        10:11:42
11   it, if you know, sir?  Was it Philip's?         10:11:49
12         A.    No.  That goes to one of our        10:11:51
13   salesmen that work for us.                      10:11:53
14         Q.    Was it Ronald Pusateri?             10:11:55
15         A.    At one point, yes.                  10:12:05
16         Q.    Okay.  Who is it today?             10:12:06
17         A.    The gentleman's name would be       10:12:08
18   Michael Anderson.                               10:12:10
19         Q.    And for how long has                10:12:11
20   Mr. Anderson been responsible for purchasing    10:12:21
21   mushrooms with your company, the Rosenstein     10:12:24
22   company?                                         10:12:26
23         A.    Approximately five or six           10:12:26
24   years.                                           10:12:28
25         Q.    Okay.  Would it be accurate to      10:12:32

```
                                              Page 16

  1                   JAY C. ROSENSTEIN

  2    say that Ronald Pusateri had that job before    10:12:33

  3    Mr. Anderson?                                    10:12:37

  4          A.     That would be accurate.            10:12:37

  5          Q.     Okay.  And for how long back        10:12:39

  6    from five or six years ago was Mr. Pusateri     10:12:43

  7    responsible for purchasing mushrooms?           10:12:47

  8          A.     Approximately ten years.           10:12:49

  9          Q.     Okay.  Is Mr. Pusateri still        10:12:57

 10    employed by the company?                        10:13:01

 11          A.     No.                                 10:13:02

 12          Q.     Okay.  When did he leave the        10:13:02

 13    employ of the company?                          10:13:06

 14          A.     Two years ago.                     10:13:07

 15          Q.     And can you just briefly            10:13:08

 16    describe the reason he left?                     10:13:10

 17          A.     The reason he gave me is that      10:13:13

 18    he was offered a job as a broker with another  10:13:16

 19    produce company.                                10:13:22

 20          Q.     Who was that other produce         10:13:23

 21    company?                                        10:13:24

 22          A.     Don't know the name.               10:13:24

 23          Q.     How old a fellow is                 10:13:26

 24    Mr. Pusateri?  You don't have to have his      10:13:32

 25    exact age, but if you can give me a             10:13:35
```

Page 17

1           JAY C. ROSENSTEIN

2   reasonable estimate, that would be fine.        10:13:37

3       A.     42.                                  10:13:41

4       Q.     How long did he work for            10:13:44

5   Rosenstein?                                      10:13:46

6       A.     Approximately 12 years.              10:13:47

7       Q.     Besides being involved in            10:13:51

8   purchasing of produce mostly west of the        10:14:21

9   Mississippi, what are your other duties and     10:14:25

10  responsibilities today with the company?        10:14:27

11      A.     It's fair to say that I oversee     10:14:31

12  pretty near every operation.                     10:14:38

13      Q.     Are there any operations that        10:14:42

14  you do not oversee?  I know you used the word   10:14:45

15  "pretty near," but let's see if we could        10:14:49

16  exclude one or two.                              10:14:52

17      A.     I -- I attempt to make myself        10:14:58

18  aware of everything that's going on, since I    10:15:01

19  am an owner of the business, but we do have     10:15:03

20  an -- a controller, and we have an office       10:15:09

21  manager who have their sets of                   10:15:11

22  responsibilities.  I might peek over their      10:15:13

23  shoulder, but as far as buying the pens and     10:15:17

24  the paper clips and glasses, no, I don't do     10:15:19

25  any of that.                                     10:15:21

```
 1                    JAY C. ROSENSTEIN
 2          Q.    And the controller is         10:15:22
 3     responsible for all the financial reporting  10:15:23
 4     or --                                    10:15:26
 5          A.    Correct.                       10:15:26
 6          Q.    -- accounting or whatever?     10:15:27
 7          A.    That is correct.               10:15:28
 8          Q.    Do you have an outside auditor  10:15:30
 9     or accounting firm --                    10:15:32
10          A.    Yes, we do.                    10:15:33
11          Q.    -- that you also use?  Who is   10:15:34
12     that?                                    10:15:37
13          A.    Rossi & Company, R-O-S-S-I.    10:15:37
14          Q.    I know how to spell it.  How   10:15:39
15     long has Rossi & Company been doing your  10:15:47
16     financial accounting?                    10:15:49
17          A.    About five years.              10:15:50
18          Q.    Who was it before Rossi?       10:15:51
19          THE WITNESS:  Bob, can you help      10:16:08
20          me?  Starts with a K.                10:16:09
21     BY MR. DESTEFANO:                         10:16:10
22          Q.    That's okay.  If you can't     10:16:10
23     remember, maybe it will come back to you.  10:16:12
24          A.    It was only for a relative --  10:16:13
25     our -- the accountant we had -- we had for  10:16:15
```

```
 1              JAY C. ROSENSTEIN
 2   quite some time had retired, and he -- he      10:16:18
 3   sold it to this company.  And we didn't        10:16:20
 4   particularly care for him, so we left him      10:16:22
 5   after a year.                                  10:16:25
 6        Q.    No problem.                         10:16:26
 7              Now, you mentioned --               10:16:29
 8        A.    Kohanski, K-O-H-A-N-S-K-I,          10:16:30
 9   Kohanski and Jones.                            10:16:34
10        Q.    Is it true that you have to be      10:16:37
11   either Italian, Polish, or Irish to live in   10:16:39
12   the Scranton area?                             10:16:41
13        A.    They let a few Jews in.            10:16:42
14        Q.    You mentioned that you were an      10:16:55
15   owner of the business.  And can you tell me    10:16:56
16   how long you have held an ownership interest   10:17:00
17   in the business?                               10:17:02
18        A.    Approximately 30 years.            10:17:04
19        Q.    Who today are the other owners?     10:17:16
20        A.    Philip Rosenstein and Lyn          10:17:18
21   Rosenstein.                                    10:17:23
22        Q.    Is Lyn your sister?                10:17:24
23        A.    Lyn is my sister.                  10:17:25
24        Q.    Okay.  Was the company prior to     10:17:26
25   you, Philip, and Lyn acquiring an ownership    10:17:34
```

```
 1              JAY C. ROSENSTEIN
 2   interest owned -- owned solely by your        10:17:38
 3   father?                                       10:17:41
 4        A.    No.                                10:17:41
 5        Q.    Okay.  Who was it owned by?        10:17:41
 6        A.    My father and my uncle.            10:17:43
 7        Q.    Okay.  What's your uncle's         10:17:44
 8   name?                                         10:17:46
 9        A.    Sidney.                            10:17:46
10        Q.    And your father's name is          10:17:47
11   William?                                      10:17:49
12        A.    Eugene.                            10:17:49
13        Q.    Eugene.  Your grandfather's        10:17:50
14   name is William?                              10:17:52
15        A.    (Moving head up and down.)         10:17:53
16             THE REPORTER:  What's your          10:17:54
17        answer?                                  10:17:55
18             THE WITNESS:  Yes.                  10:17:56
19   BY MR. DESTEFANO:                             10:17:56
20        Q.    You're already breaking a          10:17:56
21   couple rules, but that's okay.  Everybody     10:17:58
22   does.                                         10:17:59
23             Are you, Philip, and Lyn the        10:18:11
24   sole owners --                                10:18:13
25        A.    Correct.                           10:18:14
```

```
                                          Page 21

 1              JAY C. ROSENSTEIN

 2     Q.     -- of the company?          10:18:14

 3            And have you all been the sole   10:18:15

 4  owners of the company for the last 30 years?   10:18:17

 5     A.     No.                         10:18:19

 6     Q.     Okay.  When did Philip acquire   10:18:19

 7  an ownership interest?               10:18:25

 8     A.     Philip acquired an ownership   10:18:26

 9  when I did.                          10:18:28

10     Q.     30 years ago, approximately?   10:18:28

11     A.     Yes.                       10:18:30

12     Q.     How about Lyn?             10:18:30

13     A.     Lyn acquired it approximately   10:18:32

14  15 years ago.                        10:18:36

15     Q.     Okay.  Are you all equal?   10:18:39

16     A.     No.                        10:18:41

17     Q.     Okay.  Can you give the rough   10:18:41

18  percentage, just as background?      10:18:43

19     A.     Excuse me?                 10:18:44

20     Q.     Can you give the rough      10:18:45

21  percentage of each person's ownership --   10:18:47

22     A.     You mean --                10:18:47

23     Q.     -- just as background?  Okay.   10:18:48

24     A.     My sister Lyn owns 3 percent.   10:18:49

25     Q.     Okay.                      10:18:51
```

```
 1              JAY C. ROSENSTEIN

 2        A.    My brother and I own the rest   10:18:52

 3    equally, 46 and a half percent.  47 percent.  10:18:54

 4    Yeah.  47 and a half.                    10:19:05

 5        Q.    I think it's 47 and a half,    10:19:14

 6    but --                                   10:19:16

 7        A.    Yeah.                          10:19:16

 8        Q.    Excuse me for just one second.  10:19:19

 9              Would it be -- I'm just trying  10:19:30

10    to shorten this up.  Would it be accurate to  10:19:47

11    describe your company's business as a    10:19:50

12    wholesale distributor of fresh fruits and  10:19:53

13    vegetables?                              10:19:58

14        A.    Yes.                           10:19:59

15        Q.    Does Rosenstein do anything    10:20:00

16    else today besides --                    10:20:03

17        A.    Yes.                           10:20:04

18        Q.    -- distribute --               10:20:04

19              What else?                     10:20:07

20        A.    We broker fresh fruits and     10:20:07

21    vegetables.                              10:20:11

22        Q.    Which fresh fruits and         10:20:12

23    vegetables do you broker?                10:20:18

24        A.    A to Z.                        10:20:19

25        Q.    Okay.  I was looking on the Web  10:20:20
```

```
 1                JAY C. ROSENSTEIN

 2   site, and there appears to be something      10:20:30

 3   called Atlantic Fresh Trading, LLC.  Let me   10:20:32

 4   ask you that.  Is -- is that a -- a           10:20:35

 5   subsidiary of William Rosenstein?            10:20:37

 6        A.    No.                               10:20:40

 7        Q.    Okay.  Separately incorporated    10:20:40

 8   entity?                                      10:20:42

 9        A.    Yes.                              10:20:43

10        Q.    Okay.  When was Atlantic Fresh    10:20:43

11   Trading incorporated?                        10:20:46

12        A.    Approximately 10 or 11 years      10:20:47

13   ago.                                         10:20:49

14        Q.    Okay.  And who are the owners     10:20:49

15   of Atlantic Fresh Trading?                   10:20:51

16        A.    The owners are Philip and Jay     10:20:52

17   and my two sons, Jamy and Jeffrey.           10:20:55

18        Q.    Okay.  Is Atlantic Fresh          10:20:59

19   Trading, LLC in any different sort of        10:21:15

20   business than William Rosenstein & Sons?     10:21:16

21        A.    They are exclusively in the       10:21:18

22   business of brokering fresh fruits and       10:21:20

23   vegetables.                                  10:21:24

24        Q.    Is that -- I see they're --       10:21:25

25   they appear to be headquartered in -- in     10:21:32
```

Page 24

```
 1              JAY C. ROSENSTEIN
 2   Arizona.                                10:21:34
 3        A.     We have an office in Arizona.   10:21:35
 4        Q.     Okay.  Is the headquarters here  10:21:37
 5   in the Clarks Summit area of Pennsylvania?  10:21:40
 6        A.     Scranton.                    10:21:43
 7        Q.     Okay.  Scranton.  Okay.       10:21:44
 8               Can you describe for me        10:21:54
 9   briefly, sir, the difference between being a  10:21:55
10   distributor of fresh fruits and vegetables  10:21:57
11   and being a broker of fresh fruits and    10:22:02
12   vegetables in a nutshell?                 10:22:05
13        A.     A distributor takes actual    10:22:07
14   physical possession of the product into their  10:22:09
15   warehouse and then, in turn, distributes   10:22:13
16   it -- that merchandise to their customers.  10:22:18
17               A broker may or may not take   10:22:23
18   title to the product, depending upon each  10:22:26
19   particular sale.  They may choose to let the  10:22:28
20   shipper do the billing and just bill the   10:22:34
21   customer brokerage, or they may take title,  10:22:36
22   but they do not actually take physical     10:22:42
23   possession of the product.                10:22:44
24               So the broker might sell to    10:22:45
25   customer J that has a produce distribution  10:22:51
```

Page 25

|    |                                                      |          |
|----|------------------------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                                     |          |
| 2  | business in Boston.  They might ship to              | 10:22:54 |
| 3  | customer B who has a produce distribution            | 10:22:56 |
| 4  | center in New Jersey.  That's the difference.        | 10:22:59 |
| 5  | Q.    Okay.  And a broker would then                 | 10:23:03 |
| 6  | get a commission on that sale from the               | 10:23:05 |
| 7  | producer?                                            | 10:23:08 |
| 8  | A.    It can be done several                         | 10:23:10 |
| 9  | different ways.  They can get their -- they          | 10:23:12 |
| 10 | can get their brokerage fees by either the           | 10:23:15 |
| 11 | shipper, depending upon if they are a buying         | 10:23:18 |
| 12 | broker or a selling broker.  If they're a            | 10:23:20 |
| 13 | selling broker, they'll get it from the --           | 10:23:23 |
| 14 | from the shipper.  If they're a buying               | 10:23:25 |
| 15 | broker, they will charge their fees to the           | 10:23:27 |
| 16 | customer.                                            | 10:23:29 |
| 17 | Q.    Okay.  Is Rosenstein and --                    | 10:23:30 |
| 18 | and/or Atlantic Fresh Trading a buying broker        | 10:23:33 |
| 19 | only or a selling broker only, or is there a         | 10:23:38 |
| 20 | mixture?                                             | 10:23:41 |
| 21 | A.    Mixture.                                        | 10:23:41 |
| 22 | Q.    Okay.  Can -- for Rosenstein,                  | 10:23:42 |
| 23 | can you give me an approximate percentage of         | 10:23:47 |
| 24 | the buyers you represent versus the sellers?         | 10:23:50 |
| 25 | A.    I don't understand the                         | 10:23:52 |

```
                                            Page 26

 1              JAY C. ROSENSTEIN

 2   question.                              10:23:52

 3        Q.    Okay.  Rosenstein is also in  10:23:53

 4   the brokerage business --             10:23:55

 5        A.    Correct.                    10:23:56

 6        Q.    -- as well as Atlantic Fresh  10:23:56

 7   Trading?                              10:23:59

 8        A.    Correct.                    10:23:59

 9        Q.    Okay.  I think you said, in  10:23:59

10   response to my last question, that Rosenstein  10:24:04

11   represents a mixture of buyers and sellers as  10:24:07

12   a broker.                            10:24:12

13        A.    (Moving head up and down.)  10:24:14

14        Q.    Okay.  My question is, can you  10:24:15

15   give me a percentage of the buyers versus the  10:24:17

16   sellers that Rosenstein represents?  Is it  10:24:22

17   90/10 in favor of buyers or some other  10:24:26

18   percentage?                          10:24:28

19        A.    I -- I don't think I could  10:24:33

20   legitimately answer that --          10:24:36

21        Q.    Okay.                       10:24:36

22        A.    -- answer that question.    10:24:38

23        Q.    All right, all right.  Now,  10:24:38

24   Atlantic Fresh Trading, do you have any  10:24:43

25   duties and responsibilities with respect to  10:24:44
```

Page 27

|    |                                        |          |
|----|----------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                       |          |
| 2  | Atlantic Fresh Trading?                 | 10:24:46 |
| 3  | A.    I oversee their operation,        | 10:24:48 |
| 4  | and -- and, of course, we do business with | 10:24:55 |
| 5  | them.                                   | 10:24:57 |
| 6  | Q.    I'm assuming by doing business,   | 10:25:02 |
| 7  | you mean you buy from --                | 10:25:03 |
| 8  | A.    I buy and sell.                   | 10:25:05 |
| 9  | Q.    And sell to?                      | 10:25:07 |
| 10 | A.    On occasion.                      | 10:25:09 |
| 11 | Q.    Okay.  Mostly buy?                | 10:25:09 |
| 12 | A.    Mostly buy.                       | 10:25:12 |
| 13 | Q.    Okay.  Are fresh mushrooms one    | 10:25:14 |
| 14 | of the produce items that Atlantic City -- | 10:25:21 |
| 15 | Atlantic Trading, LLC --                | 10:25:26 |
| 16 | A.    No.                               | 10:25:28 |
| 17 | Q.    No mushrooms?                     | 10:25:28 |
| 18 | A.    No mushrooms.                     | 10:25:29 |
| 19 | Q.    Okay.  How about Rosenstein?      | 10:25:30 |
| 20 | A.    Yes.                              | 10:25:32 |
| 21 | Q.    Does Rosenstein today act as a    | 10:25:32 |
| 22 | broker as well as a distributor --      | 10:25:34 |
| 23 | A.    No.                               | 10:25:36 |
| 24 | Q.    -- of fresh mushrooms?            | 10:25:36 |
| 25 | A.    Strictly as a distributor.        | 10:25:38 |

```
                                        Page 28

 1              JAY C. ROSENSTEIN
 2        Q.    Okay.  Has Rosenstein at any    10:25:40
 3   time in the past, to the best of your      10:25:43
 4   knowledge, acted as a broker of fresh      10:25:45
 5   mushrooms?                                 10:25:47
 6        A.    No.                             10:25:48
 7        Q.    Did Rosenstein ever attempt to  10:25:48
 8   become a broker of fresh mushrooms, to the 10:26:03
 9   best of your knowledge?                    10:26:05
10        A.    No.                             10:26:06
11        Q.    Is there any particular reason  10:26:07
12   why not?                                   10:26:14
13        A.    No.                             10:26:17
14        Q.    How long has Rosenstein been    10:26:20
15   distributing fresh mushrooms, to the best of 10:26:38
16   your knowledge?                            10:26:40
17        A.    94 years.                       10:26:43
18        Q.    Many of my questions are going  10:26:45
19   to pertain to the time period, roughly, 2001 10:27:03
20   through 2008.  Let me ask you a couple of  10:27:07
21   questions going back specifically to that  10:27:13
22   time period.                               10:27:16
23              Was your title still the same   10:27:17
24   during that title [sic] period as it is    10:27:20
25   today?                                     10:27:23
```

1              JAY C. ROSENSTEIN

2        A.    Yes.                        10:27:23

3        Q.    Were your job duties and    10:27:23

4    responsibilities the same during the 2000   10:27:25

5    through 2008 --                        10:27:29

6        A.    Yes.                        10:27:30

7        Q.    -- time period?            10:27:30

8              From 2000 up to the present,   10:27:46

9    did Rosenstein purchase any fresh mushrooms   10:27:48

10   through a broker?                      10:27:53

11       A.    Not to my knowledge.        10:27:55

12       Q.    Okay.  Would it be accurate to   10:27:58

13   say that all of its fresh mushrooms that it   10:28:02

14   purchased during that time period were   10:28:04

15   directly from a producer?              10:28:06

16       A.    No.                         10:28:09

17       Q.    Okay.  Was there someone else   10:28:10

18   who Rosenstein purchased mushrooms from --   10:28:13

19       A.    Well --                     10:28:17

20       Q.    -- other than a producer?   10:28:18

21       A.    There -- there -- there have   10:28:20

22   been occasions that we may run short and our   10:28:20

23   delivery wasn't due that particular day, so   10:28:23

24   we do business in the Hunts Point Market and   10:28:25

25   in the Philadelphia Terminal Market.  And   10:28:28

```
 1                    JAY C. ROSENSTEIN

 2     we -- we are normally in both of those cities  10:28:33

 3     three, four, five times a week.                10:28:35

 4              So if I was short, it would not        10:28:38

 5     be unusual to have our buyer in New York --     10:28:42

 6     say, "Pick me up ten cases.  I'm short for an   10:28:46

 7     order.  My truck won't be in until tomorrow."   10:28:50

 8         Q.    Okay.  So you sell into the           10:28:52

 9     Hunts Point and the Philadelphia Terminal       10:28:55

10     Markets?                                        10:28:57

11         A.    We sell into them, yes.               10:28:58

12         Q.    And since you have people there       10:28:59

13     selling, it's not unusual, if you're running    10:29:02

14     short from your producer or your supplier, to   10:29:06

15     buy some mushrooms directly from the terminal   10:29:09

16     market?                                         10:29:12

17         A.    Correct.                              10:29:13

18         Q.    Do you have a relationship,           10:29:13

19     either contractual or sort of verbal, with      10:29:23

20     any single entity that participates in either   10:29:26

21     of those two markets under which you would      10:29:29

22     buy mushrooms?                                  10:29:32

23              MR. REFSIN:  Object to the             10:29:34

24         form.                                       10:29:35

25              MR. DESTEFANO:  Okay.                  10:29:35
```

```
 1              JAY C. ROSENSTEIN

 2              MR. REFSIN:  You can answer.    10:29:37

 3   BY MR. DESTEFANO:                          10:29:38

 4       Q.    If you understand it.           10:29:38

 5       A.    Repeat the question, please.    10:29:39

 6              MR. REFSIN:  That was my        10:29:40

 7       problem with it, because I didn't     10:29:41

 8       understand it.                        10:29:42

 9              MR. DESTEFANO:  Okay.           10:29:45

10   BY MR. DESTEFANO:                          10:29:46

11       Q.    When you do buy in either Hunts 10:29:46

12   Point or Philadelphia, is there a particular 10:29:49

13   supplier in that market that you buy the  10:29:52

14   mushrooms from?                           10:29:55

15       A.    No.                             10:29:55

16       Q.    Okay.  And -- well, let me ask  10:29:56

17   you this.  The geographic area in which   10:30:13

18   Rosenstein does business, would it be,    10:30:17

19   roughly, 200 miles from Scranton?         10:30:21

20       A.    Our distribution is             10:30:25

21   approximately 200 miles from Scranton.    10:30:30

22       Q.    Okay.  Is there a smaller       10:30:33

23   geographic area in which Rosenstein produces, 10:30:39

24   let's say, 90 percent of its -- or        10:30:43

25   distributes, let's say, 90 percent --     10:30:45
```

Page 32

```
 1              JAY C. ROSENSTEIN

 2        A.    No.                          10:30:48

 3        Q.    -- of its produce?          10:30:48

 4              So you cover customers       10:30:50

 5   throughout that -- pretty evenly throughout  10:30:52

 6   that 200-mile area?                     10:30:55

 7        A.    Yes.                         10:30:57

 8        Q.    All right.  How long has the 10:30:59

 9   company been servicing customers or     10:31:05

10   distributing to customers within that   10:31:10

11   200-mile area?                          10:31:12

12        A.    At least 40 years.           10:31:16

13        Q.    Okay.  And how many different 10:31:26

14   items of fruits and vegetables do you   10:31:35

15   distribute to customers in your geographic 10:31:37

16   area?  And when I say, "you," I'm talking 10:31:39

17   about Rosenstein, the company.          10:31:43

18        A.    Everything.                  10:31:45

19        Q.    Can you give me an approximate 10:31:47

20   number of fruits and vegetables?        10:31:49

21        A.    No.                          10:31:51

22        Q.    Okay.  Can you tell me whether 10:31:51

23   it's more fruits than vegetables?       10:31:57

24        A.    More vegetables.             10:32:00

25        Q.    Okay.  And can you give me a  10:32:02
```

```
                                          Page 33

 1              JAY C. ROSENSTEIN

 2    rough breakdown percentage-wise between      10:32:09

 3    fruits and vegetables?                       10:32:11

 4         A.    75 percent.                        10:32:14

 5         Q.    Veggies?                           10:32:19

 6         A.    Vegetables.                        10:32:20

 7         Q.    Okay.  Now, do you distribute     10:32:28

 8    vegetables -- well, let me ask you this.     10:32:39

 9    What types of customers do you distribute    10:32:44

10    vegetables to?  "You," again, being          10:32:48

11    Rosenstein & Company, excluding Atlantic     10:32:51

12    Fresh Trading.                               10:32:56

13         A.    Well, really, all types.  We      10:32:56

14    have retail trade.  That would encompass     10:33:03

15    supermarkets.  We have wholesale trade that  10:33:06

16    encompasses smaller jobbers that would       10:33:10

17    deliver, you know, some schools or           10:33:12

18    restaurants.  There are some restaurants that 10:33:16

19    we deliver on a direct basis.  There are     10:33:18

20    institutions that we bid, whether they're    10:33:25

21    hospitals, prisons.  And anybody who uses    10:33:28

22    fresh fruits and vegetables is a potential   10:33:38

23    customer.                                     10:33:41

24         Q.    Today, can you tell me who your   10:33:43

25    largest retail customer is?                  10:33:50
```

```
                                        Page 34

  1              JAY C. ROSENSTEIN

  2         A.     Largest retail customer?  Today  10:33:55

  3    would be an outfit by the name of Adams,     10:33:59

  4    A-D-A-M-S.                                    10:34:03

  5         Q.     Is Adams a supermarket chain or   10:34:05

  6    small supermarket chain?                      10:34:10

  7         A.     They have three supermarkets.     10:34:12

  8         Q.     Three.  Where are those markets   10:34:15

  9    located?                                      10:34:19

 10         A.     Kingston, New York;               10:34:20

 11    Poughkeepsie, New York; and I forget the name 10:34:25

 12    of the new location.                          10:34:31

 13         Q.     Do they have a distribution       10:34:32

 14    center --                                     10:34:33

 15         A.     No.                               10:34:33

 16         Q.     -- or are you delivering direct   10:34:33

 17    to the markets?                               10:34:35

 18         A.     Direct to their stores.           10:34:36

 19         Q.     Okay.  So it's Kingston,          10:34:37

 20    Poughkeepsie, and some other location in      10:34:39

 21    New York?                                     10:34:41

 22         A.     In that vicinity.                 10:34:41

 23         Q.     Okay.  All right.                 10:34:42

 24         A.     Kingston, Newburgh                10:34:48

 25    Poughkeepsie.  Newburgh.                      10:34:52
```

```
 1              JAY C. ROSENSTEIN
 2        Q.     Okay.  And just -- can you give   10:34:53
 3   me a reasonably accurate ballpark of the      10:34:59
 4   volume of sales that Rosenstein does with     10:35:01
 5   Adams in vegetables?                          10:35:03
 6        A.     No.                               10:35:07
 7        Q.     Okay.  Who would be your second   10:35:07
 8   largest retail customer today?               10:35:15
 9              Do you know what?  If you could    10:35:17
10   give me the top five, to the best of your     10:35:18
11   ability, that would be helpful.  Again, just  10:35:20
12   retail for now.                               10:35:29
13              MR. REFSIN:  And, Bill, we've      10:35:31
14         objected to downstream discovery.  I    10:35:33
15         mean, I'll let you get some background  10:35:35
16         information.                            10:35:37
17              MR. DESTEFANO:  I know.            10:35:37
18              MR. REFSIN:  But not --            10:35:38
19              MR. DESTEFANO:  I don't have       10:35:39
20         many more questions beyond this to      10:35:41
21         downstream discovery, and, you know,    10:35:44
22         we can work those out.  It can always   10:35:45
23         be redacted or whatever from the        10:35:47
24         deposition.                             10:35:49
25              MR. REFSIN:  Okay.  Well, to       10:35:49
```

Page 36

```
 1                    JAY C. ROSENSTEIN
 2          the extent, he -- he can do this -- I    10:35:49
 3          mean, I'm letting -- I'm letting you     10:35:52
 4          do it as background information --       10:35:53
 5                  MR. DESTEFANO:  Sure.            10:35:53
 6                  MR. REFSIN:  -- from a class     10:35:56
 7          representative, but -- but that's all.   10:35:57
 8                  MR. DESTEFANO:  Sure.            10:35:57
 9     BY MR. DESTEFANO:                            10:35:59
10          Q.    Can you give me the top five      10:35:59
11     retail customers?                            10:36:01
12          A.    Schiff's Supermarket.             10:36:08
13          Q.    Would that be number two?         10:36:10
14          A.    That's S-C-H-I-F-F.  It would     10:36:11
15     be in the top three.                         10:36:13
16          Q.    Okay.  How many retail outlets    10:36:14
17     does Schiff have?                            10:36:21
18          A.    One.                              10:36:23
19          Q.    Okay.  Where is it located?       10:36:23
20          A.    Scranton.                         10:36:24
21          Q.    Okay.  How about Quinn's?         10:36:28
22          A.    No.                               10:36:31
23          Q.    Oh, okay.  I'm sorry.  I          10:36:31
24     just -- I know Quinn's.  Don't ask me how I  10:36:34
25     know Quinn's.                                10:36:36
```

                                          Page 37

1              JAY C. ROSENSTEIN

2              Who would be number two or      10:36:38

3    four?                                     10:36:42

4        A.    Jac's.                          10:36:53

5        Q.    Jac's?                          10:36:53

6        A.    In Williamsport.               10:36:55

7        Q.    One -- one retail location?     10:36:58

8        A.    (Moving head up and down.)      10:37:02

9              THE REPORTER:  What's your      10:37:02

10        answer?                             10:37:03

11             THE WITNESS:  Jac's, J-A-C      10:37:04

12        apostrophe S.                       10:37:08

13   BY MR. DESTEFANO:                        10:37:08

14        Q.    No.  Actually, what you did,  10:37:08

15   sir, was -- I said, when that -- would that  10:37:09

16   be only one retail outlet -- you shook your  10:37:10

17   head instead of giving a verbal answer.  So,  10:37:14

18   I mean, not to be overly critical or     10:37:17

19   anything, but she's -- if I don't do it,  10:37:19

20   she's going to do it.                    10:37:21

21        A.    One retail location.          10:37:29

22        Q.    Okay.  Rounding out the top   10:37:30

23   five, can you give me another one?       10:37:32

24        A.    I can't recall.               10:37:33

25        Q.    Okay, okay.  Now, back during  10:37:34

Page 38

|    |                                                          |          |
|----|----------------------------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                                        |          |
| 2  | the period in question that we're -- we're              | 10:37:42 |
| 3  | focusing on, which would be, roughly, 2000              | 10:37:44 |
| 4  | through 2008, would your answers be the same            | 10:37:46 |
| 5  | with respect to your top five retail                    | 10:37:52 |
| 6  | customers, or would -- would -- did somebody            | 10:37:55 |
| 7  | fall out of there or sneak into there?                  | 10:37:56 |
| 8  | A.    It might be the same.                             | 10:37:59 |
| 9  | Q.    Okay.  Is it your best belief                     | 10:38:02 |
| 10 | that they were probably the same?                       | 10:38:04 |
| 11 | A.    Yes.                                              | 10:38:05 |
| 12 | Q.    Okay.  All right.  Now, there                     | 10:38:07 |
| 13 | is another wholesale produce distributor in             | 10:38:19 |
| 14 | the Scranton area, correct?  And its name               | 10:38:22 |
| 15 | used to be DiMare, and it now changed to                | 10:38:24 |
| 16 | something else.  Can you tell me what the               | 10:38:28 |
| 17 | something else name is?                                 | 10:38:29 |
| 18 | A.    The current name now is DiMare.                   | 10:38:32 |
| 19 | Q.    Oh, okay.  What was it before                     | 10:38:34 |
| 20 | DiMare?  It starts with an N, and I can't               | 10:38:36 |
| 21 | remember it.                                            | 10:38:40 |
| 22 | A.    Notarianni.                                       | 10:38:40 |
| 23 | Q.    Notarianni.  Okay.  Is DiMare                     | 10:38:42 |
| 24 | still in business today?                                | 10:38:47 |
| 25 | A.    Yes.                                              | 10:38:48 |

```
                                       Page 39

 1               JAY C. ROSENSTEIN

 2       Q.      Would that be your largest    10:38:48

 3   competitor?                               10:38:50

 4       A.      No.                           10:38:51

 5       Q.      Okay.  Who would be your      10:38:51

 6   largest competitor?                       10:38:52

 7               MR. REFSIN:  Object to the    10:38:54

 8       form.                                 10:38:56

 9   BY MR. DESTEFANO:                         10:39:06

10       Q.      You can answer, sir.          10:39:07

11       A.      Excuse me?                    10:39:08

12       Q.      You can answer.  Let me       10:39:09

13   embellish the question a little bit.  Who 10:39:18

14   would be your largest competitor, if not  10:39:20

15   DiMare, as a wholesale vegetable distributor? 10:39:24

16               MR. REFSIN:  I'm going to     10:39:30

17       object to the form.                   10:39:31

18               THE WITNESS:  Probably Four   10:39:40

19       Seasons.                              10:39:41

20   BY MR. DESTEFANO:                         10:39:44

21       Q.      Where is Four Seasons located? 10:39:45

22       A.      Denver, Pennsylvania.         10:39:47

23       Q.      DiMare is located in Scranton? 10:39:48

24       A.      Correct.                      10:39:51

25       Q.      The -- of the -- of the       10:39:51
```

Page 40

```
 1                   JAY C. ROSENSTEIN
 2    institutional customers, can you, again, give   10:40:04
 3    me your best belief as to the top five of       10:40:09
 4    those, first as we sit here today?              10:40:12
 5            A.    The federal prisons.              10:40:20
 6            Q.    Just the prison in Canaan, or     10:40:34
 7    more than one federal prison?                   10:40:41
 8            A.    No.  We bid on about 20 federal   10:40:42
 9    prisons.                                        10:40:46
10            Q.    20 federal prisons?              10:40:46
11            A.    Okay.  If we are fortunate        10:40:48
12    enough to get the lucky bid, the lowest bid,    10:40:49
13    then we service them.                           10:40:52
14            Q.    Would the 20 federal prisons      10:40:53
15    all be within that 200-mile --                  10:40:57
16            A.    Yes.                              10:41:00
17            Q.    -- radius?                        10:41:00
18                  And you deliver with your own     10:41:01
19    trucks to --                                    10:41:03
20            A.    Correct.                          10:41:04
21            Q.    -- the federal prisons --         10:41:04
22            A.    Yes.                              10:41:05
23            Q.    -- if you're lucky enough to      10:41:05
24    get the bid?                                    10:41:07
25            A.    Yes.                              10:41:08
```

                                        Page 41

1                     JAY C. ROSENSTEIN

2          Q.     Okay.  Moving down the food        10:41:09

3    chain a little bit, not to create a bad pun,    10:41:15

4    from the federal prisons, can you give us one   10:41:19

5    or more of your other largest institutional     10:41:21

6    customers?                                       10:41:23

7          A.     Red Barn.                           10:41:24

8          Q.     What is Red Barn?                   10:41:27

9          A.     Red -- Red Barn is in the area      10:41:28

10   near Poughkeepsie.                               10:41:35

11         Q.     What is it?                          10:41:38

12         A.     It's a wholesaler.                  10:41:39

13         Q.     Okay.  Can you give us another      10:41:40

14   one, another large customer for institutional   10:41:45

15   business?                                        10:41:49

16         A.     Danny's.                            10:41:50

17         Q.     What is Danny's?                    10:42:04

18         A.     It's a wholesaler.                  10:42:07

19         Q.     Where is Danny's?                   10:42:08

20         A.     Hazleton.                           10:42:11

21         Q.     And you consider them              10:42:12

22   institutional customers, or are we now moved     10:42:22

23   into the wholesale jobber category with Red      10:42:25

24   Barn and Danny's?                                10:42:28

25         A.     I -- I consider them to be one      10:42:30

```
                                         Page 42

 1              JAY C. ROSENSTEIN

 2    and the same.                          10:42:31

 3         Q.    Oh, okay.  I mean, you gave me  10:42:35

 4    three categories, retail, wholesaler jobbers,  10:42:38

 5    and institutions.  And I was just focusing on  10:42:41

 6    institutions, but then you gave me Red Barn  10:42:45

 7    and Danny's, who appear to be wholesalers or  10:42:51

 8    jobbers.                                10:42:54

 9         A.    Okay.                        10:42:55

10         Q.    And so you're now lumping the  10:42:55

11    wholesalers and jobbers with the         10:42:59

12    institutions?                           10:43:00

13         A.    We -- we consider that to be  10:43:01

14    wholesale business versus retail business.  10:43:03

15         Q.    Okay.  In other words, would  10:43:05

16    you consider the Red Barn and Danny the same  10:43:07

17    classification of customers as the federal  10:43:10

18    prisons?                                10:43:16

19         A.    Yes.                         10:43:16

20         Q.    Okay.  Back in the 2000 to 2008  10:43:17

21    time period, would the customers you gave me  10:43:30

22    as your largest customers in the         10:43:33

23    institutional/wholesale jobber category be  10:43:35

24    the federal prisons, Red Barn, and Danny's,  10:43:39

25    or would someone else have been in there  10:43:43
```

Page 43

1              JAY C. ROSENSTEIN

2    during that time period?                  10:43:45

3         A.    We had a customer by the name  10:43:47

4    of Walter's, W-A-L-T-E-R apostrophe S.     10:43:50

5         Q.    And what was Walter's, and      10:43:59

6    where was it located?                      10:44:00

7         A.    Blairs --                       10:44:00

8         Q.    Not to ask you two questions at 10:44:03

9    once, but --                               10:44:06

10        A.    He was a large wholesaler, and  10:44:06

11   he was located in Blairstown, New Jersey.  10:44:08

12        Q.    And at some point in time,      10:44:21

13   Walter's ceased becoming -- ceased being a 10:44:23

14   customer?                                  10:44:26

15        A.    Correct.                        10:44:26

16        Q.    Can you pinpoint the year that  10:44:26

17   that happened?                             10:44:29

18        A.    Two years ago.                  10:44:29

19        Q.    Okay.  Would any -- any other   10:44:33

20   customer have been in the top five for the 10:44:41

21   wholesale retail -- I'm sorry -- wholesale 10:44:43

22   institutional category besides Walter's    10:44:47

23   that's not there today?                    10:44:49

24        A.    Perhaps Lewis Brothers.         10:44:51

25        Q.    What is Lewis Brothers, and     10:45:00

Page 44

|    |                                          |          |
|----|------------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                        |          |
| 2  | where is it located?                     | 10:45:03 |
| 3  | A.    Mount Pocono.                       | 10:45:05 |
| 4  | Q.    And --                              | 10:45:07 |
| 5  | A.    They're wholesale --                | 10:45:08 |
| 6  | Q.    Is it wholesale?                    | 10:45:09 |
| 7  | A.    -- vegetable purveyors.             | 10:45:11 |
| 8  | Q.    Okay.  During the 2000 to 2008      | 10:45:12 |
| 9  | time period, sir, can you give me a      | 10:45:25 |
| 10 | reasonably accurate, but perhaps not pinpoint | 10:45:30 |
| 11 | percentage, of -- that the distribution of | 10:45:35 |
| 12 | fresh mushrooms bears to your total      | 10:45:41 |
| 13 | distribution of vegetables?  Fruits and  | 10:45:45 |
| 14 | vegetables.  I'm sorry.                   | 10:45:49 |
| 15 | A.    Somewhere between 1 and             | 10:46:11 |
| 16 | 2 percent.                                | 10:46:13 |
| 17 | Q.    Is that still true today?           | 10:46:14 |
| 18 | A.    Yes.                                | 10:46:21 |
| 19 | Q.    Okay.  Do you know from whom        | 10:46:22 |
| 20 | you are buying fresh mushrooms today?    | 10:46:38 |
| 21 | A.    I'm not sure.                       | 10:46:45 |
| 22 | Q.    Okay.  If I suggested that it       | 10:46:48 |
| 23 | was Monterey Mushrooms, would that ring a | 10:46:52 |
| 24 | bell?                                     | 10:46:54 |
| 25 | A.    Can you speak a little louder?      | 10:46:54 |

```
 1                    JAY C. ROSENSTEIN

 2          Q.     If I suggested that was        10:46:56

 3    Monterey Mushrooms, would that ring a bell?  10:46:57

 4          A.     That sounds correct.           10:47:00

 5          Q.     Okay.  Can you tell me how long 10:47:01

 6    you've been buying mushrooms -- fresh       10:47:02

 7    mushrooms from Monterey Mushrooms?          10:47:04

 8          A.     No.                            10:47:06

 9          Q.     Okay.  Can you tell me who your 10:47:07

10    mushroom supplier was before Monterey?      10:47:10

11          A.     I believe it was a company by  10:47:15

12    the name of To-Jo.                          10:47:16

13          Q.     Okay.  Can you tell me how long 10:47:18

14    your relationship -- buying relationship with 10:47:22

15    To-Jo -- or the span of time that you bought  10:47:23

16    mushrooms from To-Jo?                       10:47:26

17          A.     No.                            10:47:28

18          Q.     Okay.  Going back a little     10:47:29

19    further, can you tell me who your mushroom   10:47:31

20    supplier was before To-Jo?                  10:47:34

21          A.     Country Fresh.                 10:47:36

22          Q.     And can you tell me            10:47:39

23    approximately or exactly how long you bought 10:47:41

24    mushrooms from Country Fresh?               10:47:44

25          A.     No.                            10:47:46
```

Page 46

                    JAY C. ROSENSTEIN

1

2        Q.    Let me ask you, sir, was there    10:47:50

3    another company you bought mushrooms from    10:47:52

4    called Giorgi Foods?                         10:47:55

5        A.    Yes.                               10:47:57

6        Q.    And can you tell me when that      10:47:57

7    relationship was?                            10:47:58

8        A.    Not sure.                          10:48:00

9        Q.    Not sure.  Okay.                   10:48:01

10            Who in the company would be         10:48:05

11   able to answer these questions?  Would it be 10:48:06

12   Mr. Anderson or Mr. --                       10:48:09

13       A.    I think I would be capable of      10:48:15

14   answering if I --                            10:48:17

15       Q.    But you have to look them up?      10:48:17

16       A.    Correct.                           10:48:20

17       Q.    Okay.  Do you -- can you lay       10:48:20

18   your hands on documents that would disclose  10:48:24

19   those answers conveniently?                  10:48:28

20            MR. REFSIN:  You have them,         10:48:31

21       Bill.                                    10:48:32

22            MR. DESTEFANO:  Okay.  All          10:48:33

23       right.                                   10:48:34

24            THE WITNESS:  No.                   10:48:38

25   BY MR. DESTEFANO:                            10:48:39

```
 1                    JAY C. ROSENSTEIN

 2         Q.    No.  All right.              10:48:39

 3               During the time that Country 10:48:47

 4    Fresh, Giorgi, To-Jo, and now Monterey  10:48:49

 5    supplied mushrooms, did you buy mushrooms 10:48:55

 6    from anyone else, putting aside the times you 10:48:58

 7    purchased small quantities of mushrooms from 10:49:03

 8    one of the terminal markets to fill a -- a 10:49:06

 9    shortage gap in your -- in your stock of  10:49:12

10    mushrooms?                               10:49:15

11         A.    Not to my knowledge.          10:49:15

12         Q.    Okay.  Can you tell me why you 10:49:16

13    switched from To-Jo to Monterey?         10:49:21

14         A.    No.                           10:49:25

15         Q.    Is there someone else in the  10:49:35

16    company that would be able to answer that 10:49:36

17    question, perhaps Mr. Anderson or Mr. -- the 10:49:38

18    fellow who left two years ago whose name I'm 10:49:44

19    forgetting?                              10:49:46

20         A.    I would be most capable, if I 10:49:49

21    did a little investigation.              10:49:52

22         Q.    Okay.  Would you be willing to 10:49:55

23    do that investigation sometime in the next 10:50:06

24    couple of weeks or so?                   10:50:09

25         A.    If I don't have to, no.       10:50:10
```

```
 1              JAY C. ROSENSTEIN
 2        Q.     If you don't have to?  Okay.    10:50:12
 3   All right.                                  10:50:16
 4              Let me ask you this, sir.        10:50:17
 5   Apparently, from the documents, Rosenstein  10:50:20
 6   switched from -- to To-Jo from Giorgi Foods 10:50:23
 7   or Giorgi Mushrooms.  Can you tell me why the 10:50:29
 8   company switched from Giorgi to To-Jo?      10:50:33
 9        A.     You asked me that before, and I 10:50:38
10   said no.                                    10:50:40
11        Q.     No.  What I asked you was -- is 10:50:40
12   why the company switched from To-Jo to      10:50:43
13   Monterey, and you did say no.  Now I'm moving 10:50:46
14   the clock back a little bit and asking you  10:50:50
15   why the company switched from Giorgi to     10:50:52
16   To-Jo.                                      10:50:55
17        A.     Well, to the best of my         10:50:56
18   knowledge, there are two reasons for        10:50:59
19   switching.  One is price, and one is quality. 10:51:03
20   Sometimes both.  So without even bothering  10:51:10
21   looking it up, it's one of those two or both. 10:51:16
22        Q.     How about the fact that Giorgi  10:51:19
23   became a supplier to DiMare, and Rosenstein 10:51:24
24   didn't want to have the same supplier as    10:51:28
25   DiMare?  Would that be another --           10:51:31
```

JAY C. ROSENSTEIN

A. No. 10:51:34

Q. -- possible reason for switching? 10:51:34 10:51:35

A. No. 10:51:36

Q. But, again, without looking it up, you're pretty much just telling me general reasons for switching but not the specific reason you switched from Giorgi to To-Jo? 10:51:36 10:51:43 10:51:47 10:51:49 10:51:53

A. Correct. 10:51:55

MR. REFSIN: Object to the form. 10:51:55 10:51:56

BY MR. DESTEFANO: 10:51:56

Q. Okay, all right. Let me just take it back a little further. Can you tell me the reason the company switched from Country Fresh to Giorgi? 10:51:57 10:51:58 10:52:00 10:52:02

A. No. 10:52:05

Q. Okay. Would that be something that you could ascertain if you looked it up, if you were required to look it up? 10:52:05 10:52:11 10:52:14

A. Probably not. 10:52:16

Q. Probably not? Because it's too far back in time? 10:52:16 10:52:18

```
 1              JAY C. ROSENSTEIN
 2        A.    I would think so.           10:52:19
 3        Q.    Okay.  Who made those switching 10:52:20
 4   decisions within the company?          10:52:23
 5              And do you know what?  It may 10:52:26
 6   be different people at different times, so 10:52:28
 7   let's talk about the -- the switch from To-Jo 10:52:29
 8   to Monterey.                           10:52:33
 9              Now, you've already said you 10:52:36
10   don't know what the reason was unless you 10:52:37
11   look it up.  And you've already said, I 10:52:38
12   believe, that you don't know exactly when 10:52:40
13   that switch took place.                10:52:42
14              But if I was to represent to 10:52:44
15   you that that switch took place sometime in 10:52:48
16   early 2006, who would be the person or 10:52:52
17   persons within the company that made that 10:52:54
18   decision?                              10:52:56
19              MR. REFSIN:  I'm going to    10:52:57
20         object to that question.  I think it 10:52:58
21         mischaracterizes some of his prior 10:52:59
22         testimony.                       10:53:01
23              MR. DESTEFANO:  Okay.        10:53:02
24   BY MR. DESTEFANO:                      10:53:02
25        Q.    Who would be the person in 2006 10:53:02
```

Page 51

1                    JAY C. ROSENSTEIN

2    or persons in 2006 in the company who would    10:53:05

3    have made that decision?                       10:53:09

4         A.    Would have either been my           10:53:10

5    brother Philip or myself.                      10:53:13

6         Q.    Okay.  Going back -- and I'll       10:53:15

7    make another representation to you that the    10:53:22

8    switch from Giorgi to To-Jo took place in      10:53:24

9    early 2001.  Who would be the person or        10:53:31

10   persons within the company to have made that   10:53:34

11   decision?                                      10:53:37

12        A.    Either my brother Philip or         10:53:37

13   myself.                                        10:53:39

14        Q.    Okay.  And going back a little       10:53:39

15   bit further, the switch from Country Fresh to  10:53:40

16   Giorgi, I'll make a representation to you      10:53:43

17   that that took place in early 1999.  And,      10:53:46

18   again, same question.  Who would have made --  10:53:50

19   in the company made those decisions?           10:53:53

20        A.    Either my brother or myself.        10:53:55

21        Q.    Okay.  And to the extent you        10:53:57

22   either made or participated in that decision,  10:54:00

23   as we sit here today, you don't remember the   10:54:03

24   reasons why the switch was -- was made?        10:54:04

25              MR. REFSIN:  Object to the          10:54:07

Page 52

                    JAY C. ROSENSTEIN

1

2       form.                                    10:54:08

3   BY MR. DESTEFANO:                            10:54:09

4       Q.    You can answer, sir.               10:54:09

5       A.    I believe I said it's one of       10:54:11

6   two reasons --                               10:54:14

7       Q.    Right.                             10:54:15

8       A.    -- or both.                        10:54:15

9       Q.    No, I understand that.  But you    10:54:16

10  don't remember the specific --               10:54:18

11      A.    And that's -- that's the way it    10:54:19

12  is with -- every time you make a switch.     10:54:20

13      Q.    And you said either price or       10:54:32

14  quality.  Is that the --                     10:54:34

15      A.    Once in a while, service.          10:54:36

16      Q.    Service?  Price, quality, and      10:54:37

17  now service?  Okay.  Would those be the three 10:54:40

18  reasons why --                               10:54:44

19      A.    Correct.                           10:54:45

20      Q.    -- you normally, usually make a    10:54:45

21  switch?                                      10:54:48

22      A.    That's correct.                    10:54:49

23      Q.    Does Rosenstein, the company,      10:54:55

24  specialize in high-quality produce?          10:55:00

25      A.    We carry a line of high-quality    10:55:03

Page 53

1            JAY C. ROSENSTEIN

2    produce.                              10:55:05

3         Q.    Okay.  Your Web site says,   10:55:06

4    wholesale and foodservice customers --  10:55:10

5    providing "Retail," wholesaler -- "Wholesale  10:55:12

6    and Foodservice customers with the finest in  10:55:15

7    fresh fruits and vegetables."           10:55:20

8              And from that statement, I'm   10:55:21

9    getting the impression -- and you can correct  10:55:23

10   me if I'm wrong -- is that Rosenstein focuses  10:55:25

11   on the high end of the fruit and vegetable  10:55:29

12   market.                                10:55:33

13             MR. REFSIN:  Object to the   10:55:33

14        form.                            10:55:34

15   BY MR. DESTEFANO:                      10:55:38

16        Q.    Do you have -- and from your  10:55:39

17   answer I'm sort of assuming that, well, maybe  10:55:40

18   you have a low end and a high end.  Do you --  10:55:41

19   do you do both?                        10:55:44

20             MR. REFSIN:  Object to the   10:55:45

21        form.                            10:55:45

22   BY MR. DESTEFANO:                      10:55:46

23        Q.    You can answer, sir.        10:55:46

24        A.    We do both.                 10:55:47

25        Q.    Okay.  With respect to      10:55:49

                                              Page 54

1              JAY C. ROSENSTEIN

2     mushrooms, do you focus on -- on one or the      10:55:51

3     other sort of market segments, low end, high     10:55:57

4     end, or do you focus on --                       10:56:00

5          A.     We do both.                          10:56:02

6          Q.     Both?                                10:56:03

7                 Is it true that Rosenstein has       10:56:05

8     over 800 items of fruits and vegetables          10:56:13

9     available at any given time for distribution     10:56:18

10    to customers?                                    10:56:20

11         A.     I don't know.                        10:56:21

12         Q.     Don't know.                          10:56:26

13                Would you have reason to doubt       10:56:28

14    that it's that many items that --                10:56:29

15         A.     No.                                  10:56:31

16         Q.     -- Rosenstein carries?               10:56:31

17                There is -- I'll make a              10:56:34

18    representation to you, and show it to you if     10:56:51

19    you want, that there's a Web site -- sales       10:56:53

20    range for Rosenstein today of between 10 and     10:56:56

21    $24 million.                                     10:57:01

22                Can you give me -- and it            10:57:03

23    doesn't have to be a precise annual sales        10:57:05

24    number, but something between that range for     10:57:08

25    today's, you know, general revenues or total     10:57:14

Page 55

```
 1              JAY C. ROSENSTEIN
 2   revenues of Rosenstein?                  10:57:18
 3              MR. REFSIN:  Object to the    10:57:18
 4        form.                               10:57:20
 5              MR. DESTEFANO:  Okay.         10:57:20
 6              MR. REFSIN:  You want to know 10:57:21
 7        Rosenstein's annual revenue?       10:57:22
 8              MR. DESTEFANO:  Yeah, that's a 10:57:24
 9        much simpler question.             10:57:25
10   BY MR. DESTEFANO:                        10:57:26
11        Q.    What's Rosenstein's annual    10:57:26
12   revenues today?                          10:57:28
13        A.    Just the distribution center? 10:57:29
14        Q.    Yes.  We can exclude Atlantic 10:57:33
15   Fresh Trading.                           10:57:38
16        A.    Over $30 million.            10:57:38
17        Q.    Okay.  Let me go back to the  10:57:39
18   two thousand and -- 2000 through 2008 time 10:57:48
19   period.  And tell me if -- if revenues    10:57:51
20   increased during that period, but can you 10:57:56
21   give me a number for that time period?    10:57:58
22        A.    2002 and 2008, we probably were 10:58:01
23   doing between 20 and 22, 24 maybe.        10:58:04
24        Q.    Okay.  So it's increased from  10:58:09
25   2008 to today from, let's say, roughly, 24 up 10:58:16
```

```
                                        Page 56

 1              JAY C. ROSENSTEIN

 2   to --                               10:58:20

 3        A.     Correct.               10:58:21

 4        Q.     -- something over 30,000?  10:58:22

 5        A.     Correct.               10:58:23

 6        Q.     Okay.  Excuse me for one  10:58:25

 7   second.                             10:58:36

 8               Can we take five minutes?  10:58:37

 9               MR. REFSIN:  Sure.     10:58:44

10               THE VIDEOGRAPHER:  The time is  10:58:45

11         10:58.  We're going off the video  10:58:45

12         record.                       10:58:48

13                    *  *  *            10:58:48

14               (Recess from 10:58 a.m. to  11:05:47

15         11:05 a.m.)                   11:05:47

16                    *  *  *            11:05:47

17               THE VIDEOGRAPHER:  The time is  11:05:50

18         11:05.  This is tape number 2.  11:05:50

19   BY MR. DESTEFANO:                   11:05:53

20        Q.     Before the break,       11:05:54

21   Mr. Rosenstein, I was asking you some  11:05:57

22   questions about high-end and low-end produce,  11:05:58

23   and you answered that the company did both.  11:06:02

24   And then I asked you the same question  11:06:04

25   specifically with reference to mushrooms, and  11:06:06
```

```
 1                  JAY C. ROSENSTEIN
 2     I think you answered that the company did      11:06:08
 3     both or distributed both.                      11:06:10
 4              Can you just define for me your       11:06:12
 5     belief as to the difference between a high-    11:06:15
 6     end and a low-end mushroom?                    11:06:17
 7          A.    Well, we would consider a           11:06:24
 8     high-end mushroom something that is pricier.   11:06:27
 9     It's a selected mushroom.  When a mushroom     11:06:30
10     grows, it can grow to many different sizes,    11:06:37
11     and there are many different purposes for      11:06:44
12     each particular size.                          11:06:49
13              So a person who wants what we         11:06:53
14     refer to as a silver-dollar mushroom -- it's   11:06:55
15     approximately the size of a silver dollar --   11:06:58
16          Q.    Okay.                               11:07:01
17          A.    -- that would be what I would       11:07:02
18     consider a higher-end mushroom because they,   11:07:03
19     A, charge more.  Certainly, the growing time   11:07:09
20     is more.  And what they do with a mushroom     11:07:13
21     like that is, normally, a very specific        11:07:16
22     purpose, where they would stuff it and serve   11:07:18
23     it perhaps as an appetizer.                    11:07:22
24              Where a -- something on the           11:07:26
25     opposite end of the spectrum might be what we  11:07:29
```

```
 1                    JAY C. ROSENSTEIN
 2    refer to as a foodservice mushroom.  They      11:07:32
 3    just go in, and they harvest whatever is in    11:07:34
 4    the harvest.  It's the cheapest way to         11:07:37
 5    package, the cheapest -- and who would you     11:07:40
 6    give it to?  You might give it to a            11:07:42
 7    restaurant that's making mushroom soup.        11:07:44
 8    Okay.  They wouldn't want to pay the price     11:07:47
 9    for a silver-dollar mushroom when all they     11:07:49
10    need is mushrooms for the soup.                11:07:51
11         Q.    Okay.  Would the institutional      11:07:53
12    customers in your business normally be buying  11:07:56
13    the lower-end mushrooms --                     11:07:59
14         A.    Yes.                                11:08:00
15         Q.    -- whereas the retail customers     11:08:01
16    would normal -- well, would buy all types,     11:08:03
17    low, high?                                     11:08:08
18         A.    That's a correct statement.         11:08:09
19         Q.    Okay.  And what about these         11:08:10
20    wholesale customers?                           11:08:12
21         A.    All kinds.                          11:08:12
22         Q.    All types?                          11:08:13
23         A.    (Moving head up and down.)          11:08:15
24         Q.    Okay.  What about the Bureau of     11:08:16
25    Prisons, the mushrooms you sold to the Bureau  11:08:26
```

```
                                        Page 59

 1                   JAY C. ROSENSTEIN

 2   of Prisons?                            11:08:30

 3        A.     Not many mushrooms they use,    11:08:30

 4   but it's normally on the lower end.    11:08:32

 5        Q.     Okay.  Because they're chopping 11:08:34

 6   them up and putting them in --         11:08:35

 7        A.     Correct.                    11:08:37

 8        Q.     -- soup or salads or whatever  11:08:37

 9   have you?                              11:08:38

10        A.     (Moving head up and down.)  11:08:38

11        Q.     Let me ask you this, sir.  Can  11:08:52

12   you recall how many --                 11:08:59

13               Well, let me ask you this.  11:09:02

14   Documents that your company produced earlier  11:09:04

15   indicate that Rosenstein bought about 38  11:09:07

16   different types of mushrooms during the 2000  11:09:12

17   to 2008 time period.                   11:09:18

18               Let me ask you this.  Why --  11:09:22

19   why 38 different types?                11:09:26

20               MR. REFSIN:  Objection to form.  11:09:28

21   BY MR. DESTEFANO:                      11:09:30

22        Q.     Do you know why Rosenstein  11:09:30

23   bought 38 different types of mushrooms?  11:09:31

24               MR. REFSIN:  What do you mean,  11:09:33

25        "different types"?  Package sizes?  11:09:34
```

Page 60

1          JAY C. ROSENSTEIN

2              MR. DESTEFANO:  If he          11:09:37

3          doesn't -- if he doesn't understand    11:09:38

4          the question, he'll stop me, as per    11:09:39

5          instructed, and -- and whatever.    11:09:41

6              THE WITNESS:  One answer.    11:09:43

7     BY MR. DESTEFANO:                     11:09:44

8          Q.    Yeah.                      11:09:44

9          A.    A customer ordered them.   11:09:44

10         Q.    Okay.  So it would be safe to    11:09:46

11    say or accurate to say that your customers    11:09:49

12    that you serviced and that you sold to wanted  11:09:52

13    38 different types or -- or sizes or --    11:09:56

14         A.    That would be accurate.    11:09:59

15         Q.    -- specifications of mushrooms?  11:10:01

16         A.    (Moving head up and down.)    11:10:07

17             THE REPORTER:  Just remember to   11:10:19

18         wait until he's totally done.  We're    11:10:22

19         getting the answer in the middle of    11:10:24

20         the question.                    11:10:26

21    BY MR. DESTEFANO:                     11:10:28

22         Q.    Was the -- of these 38       11:10:28

23    different types or specifications of    11:10:32

24    mushrooms, was the silver-dollar mushroom    11:10:33

25    your biggest seller?                  11:10:37

```
                                        Page 61
 1              JAY C. ROSENSTEIN
 2         A.     I don't know.              11:10:39
 3         Q.     Okay.  Would there be a way to  11:10:40
 4    find that out, that you could find that out?  11:10:44
 5         A.     Probably.                  11:10:52
 6         Q.     Okay.  Let me ask you this,  11:10:52
 7    sir.  Do you have knowledge, as we sit here  11:11:07
 8    today, regarding what Rosenstein paid for  11:11:12
 9    these various types of mushrooms during the  11:11:15
10    2000 to 2008 time period?              11:11:18
11         A.     I brought my invoices with me.  11:11:21
12    I could look it up.                    11:11:23
13         Q.     Okay.  All right.  Would you be  11:11:24
14    able to look up the relative quantity of  11:11:29
15    silver-dollar mushrooms versus the other  11:11:33
16    types?                                 11:11:37
17         A.     If I had the time, sure.    11:11:38
18         Q.     Well, with -- with quick   11:11:39
19    reference to your book.                11:11:41
20         A.     No.                        11:11:44
21         Q.     Okay.  I'm going to ask the  11:11:44
22    court reporter to mark a document --   11:12:17
23                What will we call it?  Let's  11:12:20
24    say Rosenstein-1.                      11:12:23
25                -- and also give you a copy.  11:12:24
```

Page 62

```
 1              JAY C. ROSENSTEIN

 2                  *   *   *              11:12:56

 3              (Exhibit Rosenstein-1 marked for 11:12:56

 4          identification.)                 11:12:56

 5                  *   *   *              11:12:57

 6              MR. REFSIN:  And, Bill,     11:12:57

 7          Rosenstein-1 is a copy of the 30(b)(6) 11:12:57

 8          deposition notice that was issued by  11:13:00

 9          the EMMC defendants.  We're producing 11:13:01

10          Mr. Rosenstein in response to this   11:13:05

11          notice, but it's subject to the      11:13:06

12          objections --                        11:13:08

13              MR. DESTEFANO:  Correct.        11:13:09

14              MR. REFSIN:  -- that we served   11:13:09

15          earlier this week.                   11:13:10

16              MR. DESTEFANO:  I understand     11:13:11

17          that.  I saw -- I saw the objections 11:13:11

18          yesterday or the day before.         11:13:13

19              MR. REFSIN:  And one of them     11:13:14

20          was the downstream discovery         11:13:15

21          objection.                           11:13:17

22              MR. DESTEFANO:  Right.          11:13:17

23              MR. REFSIN:  I've been giving    11:13:18

24          you a little bit of latitude on that. 11:13:19

25              MR. DESTEFANO:  Sure.           11:13:20
```

                                                    Page 63

1                    JAY C. ROSENSTEIN

2                    MR. REFSIN:  But I hope we move   11:13:21

3          into some more relevant topics soon.   11:13:22

4                    MR. DESTEFANO:  Okay.          11:13:24

5     BY MR. DESTEFANO:                            11:13:25

6          Q.    Take a moment to look through     11:13:25

7     that document, if you would, Mr. Rosenstein,  11:13:26

8     and after you've -- after you've paged       11:13:28

9     through it, I'm going to ask you a couple     11:13:33

10    questions about it.                          11:13:34

11         A.    (Reviewing.)                      11:13:50

12         Q.    And I would, just to save a       11:13:59

13    little bit of time, focus your attention on  11:14:01

14    pages 3, 4, and 5, which are a list of topics  11:14:05

15    ranging from A through GG.  Just take a      11:14:12

16    moment to scan through those, if you would.  11:14:20

17         A.    (Reviewing.)                      11:14:23

18         Q.    Okay.  Let me ask you this,       11:15:11

19    sir.  Have you seen the document that we've  11:15:13

20    marked Rosenstein-1 or a copy of same before  11:15:15

21    coming in here today?                        11:15:19

22         A.    I believe so.                     11:15:22

23         Q.    And can you give us an            11:15:22

24    approximation of when you first looked at    11:15:23

25    that document?                               11:15:25

```
 1              JAY C. ROSENSTEIN

 2        A.     Last week.                    11:15:28

 3        Q.     Okay.  Did your brother Philip  11:15:28

 4   also review that document, to the best of    11:15:39

 5   your knowledge?                              11:15:41

 6        A.     No.                            11:15:41

 7        Q.     Okay.  Without telling me what  11:15:42

 8   was discussed, did you discuss that document  11:15:46

 9   with your counsel?                           11:15:49

10        A.     I did.                         11:15:52

11        Q.     Okay.  Your counsel being      11:15:52

12   present here today, the gentleman from Myers,  11:15:56

13   Brier & Kelly?  Is that the person you        11:15:59

14   discussed --                                 11:16:01

15        A.     No.                            11:16:02

16        Q.     -- the document with?          11:16:02

17               Okay.  Who was it?             11:16:03

18        A.     Attorney Barry.                11:16:04

19        Q.     Mr. Refsin?                    11:16:05

20        A.     Correct.                       11:16:06

21        Q.     Attorney Barry.  Okay.         11:16:07

22               And can you give me an          11:16:13

23   approximation of when and how long you        11:16:15

24   discussed this document with Mr. Refsin?      11:16:18

25   Again, I do not want to know the substance of  11:16:22
```

                                                    Page 65

1                    JAY C. ROSENSTEIN

2    what you discussed with him.              11:16:24

3         A.    The date was yesterday         11:16:27

4    afternoon for approximately, this document,  11:16:31

5    perhaps maybe 45 minutes.                 11:16:35

6         Q.    And I'm sorry, sir.  When did  11:16:39

7    you first look at it?  Was it approximately a  11:16:40

8    week ago, did you say?                    11:16:42

9         A.    Correct.                       11:16:43

10        Q.    And to the best of your        11:16:47

11   knowledge, your brother Philip did not look  11:16:49

12   at this document?                         11:16:52

13        A.    Excuse me?                     11:16:52

14        Q.    To the best of your knowledge,  11:16:53

15   your brother Philip did not --            11:16:55

16        A.    Correct.                       11:16:57

17        Q.    -- look at this document?      11:16:57

18              Did you show this document to  11:17:00

19   anybody else at Rosenstein, leaving aside  11:17:01

20   your brother Philip?                      11:17:06

21        A.    No.                            11:17:07

22        Q.    Are you prepared here today to  11:17:21

23   answer questions pertaining to all of these  11:17:27

24   topics?                                   11:17:29

25              MR. REFSIN:  Subject to our    11:17:31

Page 66

```
 1              JAY C. ROSENSTEIN

 2       objections.                          11:17:32

 3              THE WITNESS:  If I have to.    11:17:41

 4   BY MR. DESTEFANO:                         11:18:38

 5       Q.      When purchasing mushrooms     11:18:39

 6   during the time period 2000 through 2008, can 11:18:41

 7   you tell us how the company made their    11:18:46

 8   purchase decisions?                       11:18:52

 9       A.      By telephone.                 11:18:54

10       Q.      Did the company solicit quotes 11:18:55

11   or bids from more than one mushroom producer 11:19:10

12   when it made its purchase decisions?      11:19:17

13       A.      At times.                     11:19:20

14       Q.      Okay.  Please explain the     11:19:24

15   times.                                    11:19:26

16       A.      Every time we made a change,  11:19:27

17   okay, if we found -- the reason we would make 11:19:33

18   a change, A, because of the quality.  And B, 11:19:35

19   maybe we could get the same or better quality 11:19:41

20   for a cheaper price.  Okay.  So those would 11:19:44

21   be the times that we would have only       11:19:48

22   solicited other prices.                    11:19:49

23              Or, I might add, have been      11:19:52

24   solicited.  I mean, there were people that 11:19:54

25   would come in and knock on the door,       11:19:57
```

                                         Page 67

 1                  JAY C. ROSENSTEIN

 2    introduce yourself, and they'd, you know,     11:19:59

 3    drop off samples and so on and so forth.      11:20:01

 4          Q.    Okay.  Would you be the person    11:20:04

 5    who made these telephone calls?              11:20:11

 6          A.    No.                              11:20:13

 7          Q.    Who in the company would have     11:20:14

 8    made these telephone calls?                  11:20:15

 9          A.    Either Mr. -- Mr. Pusateri or     11:20:16

10    Mr. Anderson.                                11:20:22

11          Q.    Okay.  Were you generally         11:20:23

12    present when --                              11:20:24

13          A.    No.                              11:20:24

14          Q.    -- these telephone calls were     11:20:24

15    made?                                        11:20:25

16          A.    No.                              11:20:26

17          Q.    Can you name any specific         11:20:27

18    customers, aside from the four -- I'm        11:20:57

19    sorry -- suppliers, aside from the four -- we 11:21:00

20    talked about Country Fresh, Giorgi, To-Jo,   11:21:03

21    and Monterey -- that were contacted by you   11:21:05

22    for purposes of -- of making a change or who 11:21:10

23    contacted you soliciting --                  11:21:14

24          A.    No.                              11:21:16

25          Q.    -- your business?                11:21:16

Page 68

|   |   |   |
|---|---|---|
| 1 | JAY C. ROSENSTEIN | |
| 2 | Who would be able to do that in | 11:21:21 |
| 3 | the company?  Would it be Mr. Anderson or | 11:21:22 |
| 4 | Mr. Pusateri? | 11:21:29 |
| 5 | A.    Perhaps. | 11:21:32 |
| 6 | Q.    Would another possibility be | 11:21:34 |
| 7 | Philip? | 11:21:37 |
| 8 | A.    Perhaps. | 11:21:38 |
| 9 | Q.    Do you -- let me ask you; you | 11:21:39 |
| 10 | can only tell us what you remember or don't | 11:22:01 |
| 11 | remember -- being solicited by or contacting | 11:22:03 |
| 12 | any of the following companies with respect | 11:22:10 |
| 13 | to the purchase of mushrooms.  Okay?  And | 11:22:11 |
| 14 | I'll go through them one by one.  Will you do | 11:22:14 |
| 15 | your best to -- | 11:22:19 |
| 16 | A.    Sure. | 11:22:20 |
| 17 | Q.    -- remember if you can?  Okay. | 11:22:21 |
| 18 | South Mill mushroom company? | 11:22:25 |
| 19 | A.    No. | 11:22:26 |
| 20 | Q.    Modern? | 11:22:29 |
| 21 | A.    Pardon me? | 11:22:30 |
| 22 | Q.    Modern -- | 11:22:30 |
| 23 | A.    Yes. | 11:22:31 |
| 24 | Q.    -- Mushroom company? | 11:22:31 |
| 25 | Okay.  Can you remember when? | 11:22:34 |

```
 1            JAY C. ROSENSTEIN
 2      A.   No.                      11:22:36
 3      Q.   Can you remember the substance  11:22:36
 4   of that contact?                 11:22:37
 5      A.   We were a customer of theirs at  11:22:38
 6   one time.                        11:22:40
 7      Q.   Oh, okay.  Going how far back?  11:22:40
 8      A.   Don't know.              11:22:42
 9      Q.   Again, let me -- let me narrow  11:22:42
10   my question to the time period between 2000  11:22:44
11   and 2008.  Maybe that will be helpful.  11:22:46
12           Do you believe that you had  11:22:49
13   contact from Modern or by Modern or with  11:22:51
14   Modern during that 2000 to 2008 time period?  11:22:55
15      A.   Don't know.              11:22:58
16      Q.   Okay.  How about Oakshire  11:22:59
17   Mushrooms?                       11:23:04
18      A.   No.                     11:23:04
19      Q.   How about Phillips Mushrooms?  11:23:05
20      A.   Yes.                    11:23:07
21      Q.   Okay.  Can you remember  11:23:07
22   approximately when?              11:23:10
23      A.   No.                     11:23:10
24      Q.   Can you remember when the  11:23:11
25   contact was made, either by Phillips or by --  11:23:13
```

Page 70

```
 1              JAY C. ROSENSTEIN
 2       A.    No.                        11:23:17
 3       Q.    -- you to Phillips?        11:23:17
 4             Do you have a reasonable belief  11:23:20
 5    that it was made any time between 2000 and  11:23:22
 6    2008?                               11:23:24
 7       A.    Don't know.                11:23:25
 8       Q.    Gaspari Mushrooms?         11:23:25
 9       A.    No.                        11:23:29
10       Q.    Cardile Mushrooms?         11:23:30
11       A.    No.                        11:23:32
12       Q.    Basciani Mushrooms?        11:23:32
13       A.    No.                        11:23:35
14       Q.    Cutone Mushrooms?          11:23:35
15       A.    No.                        11:23:36
16       Q.    Is Mario Cutone a competitor of  11:23:37
17    yours?                              11:23:44
18       A.    Who?                       11:23:45
19       Q.    Mario Cutone --            11:23:46
20       A.    Not familiar with them.    11:23:47
21       Q.    -- or Cutone Brothers?     11:23:49
22       A.    Not familiar with them.    11:23:50
23       Q.    If you're not familiar with  11:23:52
24    them -- they do business primarily in the  11:23:54
25    Boston, Massachusetts, area.  Is that out of  11:23:56
```

|  |  |  |  |
|---|---|---|---|
| 1 |  | JAY C. ROSENSTEIN |  |
| 2 | your -- |  | 11:23:57 |
| 3 | A. | Marketing area. | 11:23:58 |
| 4 | Q. | -- marketing area? | 11:24:00 |
| 5 |  | Okay.  Robert Masha? | 11:24:01 |
| 6 | A. | No. | 11:24:04 |
| 7 | Q. | Bella Foods? | 11:24:04 |
| 8 | A. | No. | 11:24:07 |
| 9 | Q. | Buona Foods? | 11:24:07 |
| 10 | A. | Excuse me? | 11:24:11 |
| 11 | Q. | Buona Foods. | 11:24:11 |
| 12 | A. | Spell it. | 11:24:13 |
| 13 | Q. | Buona -- | 11:24:14 |
| 14 | A. | No. | 11:24:15 |
| 15 | Q. | -- B-U-O-N-A -- | 11:24:15 |
| 16 | A. | No. | 11:24:17 |
| 17 | Q. | -- Mushrooms.  I'm sorry. | 11:24:17 |
| 18 |  | How about Pizzini -- | 11:24:20 |
| 19 | A. | No. | 11:24:22 |
| 20 | Q. | -- or Pizzini Brothers? | 11:24:22 |
| 21 | A. | (Moving head side to side.) | 11:24:24 |
| 22 | Q. | How about Manfredini? | 11:24:25 |
| 23 | A. | Manfredi? | 11:24:28 |
| 24 | Q. | Well, I suppose you could say | 11:24:29 |
| 25 | it -- I say, "Manfredini," but let's -- let's | | 11:24:30 |

```
                                            Page 72
 1              JAY C. ROSENSTEIN
 2   do either.                             11:24:34
 3        A.    We -- we -- we did business 11:24:35
 4   with a Manfredi.                       11:24:35
 5        Q.    Okay.  Do you remember if you 11:24:36
 6   did business with a Manfredi during that 11:24:39
 7   2000 --                                11:24:41
 8        A.    No.                         11:24:41
 9        Q.    -- to 2008 time period?     11:24:42
10        A.    No.                         11:24:44
11        Q.    Okay.  How about Moneys     11:24:45
12   Mushrooms?                             11:24:49
13        A.    No.                         11:24:49
14        Q.    How about Highline Mushrooms? 11:24:49
15        A.    No.                         11:24:51
16        Q.    And, again, my question is -- 11:24:51
17   is, do you remember any contact either from 11:24:57
18   them to you or from you to them with respect 11:24:58
19   to the purchase of mushrooms?          11:25:00
20              Okay.  You're nodding.  Say 11:25:02
21   "yes."                                 11:25:04
22        A.    Yes.                        11:25:04
23        Q.    Okay.  How about Elite or Elite 11:25:04
24   Mushrooms?                             11:25:09
25        A.    No.                         11:25:10
```

```
                                            Page 73

 1                 JAY C. ROSENSTEIN

 2      Q.     How about Creekside Mushrooms?   11:25:12

 3      A.     No.                              11:25:13

 4      Q.     Blue Mountain Mushrooms?         11:25:14

 5      A.     No.                              11:25:16

 6      Q.     Gourmet Delight Mushrooms?       11:25:16

 7      A.     No.                              11:25:19

 8      Q.     DiCarlo?                         11:25:19

 9      A.     No.                              11:25:22

10      Q.     Yeatman?                         11:25:23

11      A.     No.                              11:25:24

12      Q.     Franklin?                        11:25:24

13      A.     No.                              11:25:25

14      Q.     Did you ever engage in          11:25:26

15   competitive bidding for the purchase of   11:26:03

16   mushrooms?  Again, "you" means Rosenstein &   11:26:06

17   Company.                                   11:26:09

18             MR. REFSIN:  Object to the       11:26:09

19        form.                                 11:26:11

20             THE WITNESS:  I don't            11:26:14

21        understand the basis of the question.   11:26:14

22   BY MR. DESTEFANO:                          11:26:15

23      Q.     Okay.  Competitive bidding I'll   11:26:15

24   define as getting either sealed or unsealed   11:26:19

25   bids from a number of suppliers and then   11:26:23
```

```
                                        Page 74

 1                JAY C. ROSENSTEIN

 2   picking one.                            11:26:29

 3                MR. REFSIN:  I still object to  11:26:34

 4        the form.                          11:26:35

 5   BY MR. DESTEFANO:                       11:26:36

 6        Q.    You can answer.             11:26:36

 7                MR. REFSIN:  I still don't  11:26:37

 8        understand the question.          11:26:38

 9   BY MR. DESTEFANO:                       11:26:39

10        Q.    You can answer, sir.        11:26:39

11        A.    The only times that we would  11:26:41

12   have ever had any price sheets would be when  11:26:43

13   we were considering making a change.    11:26:50

14        Q.    Okay.  But at those times, when  11:26:53

15   you were considering making a change, did you  11:26:55

16   engage in competitive bidding for the   11:26:57

17   purchase of mushrooms?                  11:26:59

18                MR. REFSIN:  Object to the term  11:27:01

19        "competitive bidding."            11:27:02

20   BY MR. DESTEFANO:                       11:27:07

21        Q.    You can answer, sir.        11:27:07

22                You're shaking your head.   11:27:13

23   Could you --                            11:27:14

24        A.    I don't understand the term  11:27:15

25   "competitive bidding."                  11:27:17
```

```
                         JAY C. ROSENSTEIN
 1

 2        Q.     Okay.  I'm defining competitive  11:27:17

 3   bidding as obtaining firm prices from a        11:27:19

 4   number of different suppliers and then         11:27:22

 5   internally in your company picking one to get  11:27:27

 6   the -- to get -- to get your business.         11:27:29

 7               MR. REFSIN:  I object to the       11:27:31

 8          form, Bill.                             11:27:32

 9               THE WITNESS:  No.                  11:27:33

10               MR. REFSIN:  He described how      11:27:33

11          he did it.                              11:27:34

12   BY MR. DESTEFANO:                              11:27:34

13        Q.     Can you -- no?  Okay.  Your        11:27:35

14   answer is no?                                  11:27:39

15        A.     No.                                11:27:40

16        Q.     Okay, okay.  I'm going to ask      11:27:40

17   you this question.  I think I know the         11:27:45

18   answer.  But did your company ever             11:27:47

19   participate in any type of Internet bidding    11:27:48

20   procedures --                                  11:27:52

21        A.     No.                                11:27:52

22        Q.     -- or auctions -- you have to      11:27:52

23   wait until I finish -- or auctions for the     11:27:54

24   purchase of fresh mushrooms?                   11:27:57

25        A.     No.                                11:27:59
```

```
 1              JAY C. ROSENSTEIN
 2        Q.    Okay.  When you decided to      11:27:59
 3   purchase from a mushroom supplier -- and I  11:28:09
 4   understand that during the time in question 11:28:13
 5   it looks like you purchased from four       11:28:15
 6   different ones successively -- did you -- did 11:28:17
 7   your company engage -- did your purchase    11:28:23
 8   involve a written contract between you and  11:28:30
 9   your supplier --                           11:28:33
10        A.    No.                             11:28:35
11        Q.    -- your company and the         11:28:35
12   supplier?                                   11:28:37
13              Was it a verbal agreement?      11:28:37
14   Would you characterize it as a verbal      11:28:39
15   agreement?                                  11:28:41
16        A.    Yes.                            11:28:41
17        Q.    Either in writing -- and you    11:28:41
18   had no written contracts, but verbally, was 11:28:54
19   the supplier locked in to a price for the  11:28:56
20   duration of its business with you?         11:29:00
21              MR. REFSIN:  Object to the      11:29:02
22        form.                                 11:29:04
23              THE WITNESS:  We were locked    11:29:06
24        into a price until they announced when 11:29:08
25        they were changing the prices.        11:29:11
```

```
 1              JAY C. ROSENSTEIN

 2    BY MR. DESTEFANO:                         11:29:13

 3         Q.    Did prices change frequently?  11:29:19

 4         A.    No.                            11:29:22

 5         Q.    When there was an announcement 11:29:27

 6    that the price was changing from a particular 11:29:38

 7    supplier -- and I'm specifically focusing on 11:29:40

 8    Giorgi, To-Jo, and Monterey; I guess it would 11:29:44

 9    be those three -- did you always accept the  11:29:49

10    price change?                            11:29:56

11         A.    No.                            11:29:58

12         Q.    Okay.  Who in the company would 11:30:00

13    have negotiated those price changes?      11:30:12

14              MR. REFSIN:  Object to the      11:30:14

15         form.                               11:30:15

16    BY MR. DESTEFANO:                         11:30:17

17         Q.    You can -- or discuss those    11:30:17

18    price changes with the suppliers.         11:30:18

19         A.    Philip Rosenstein.             11:30:23

20         Q.    Philip, not you?               11:30:24

21         A.    Correct.                       11:30:26

22         Q.    How about Anderson or Pusateri? 11:30:27

23         A.    No.                            11:30:33

24         Q.    All right.  So would it be     11:30:35

25    accurate to say that Philip would discuss 11:30:45
```

Page 78

                          JAY C. ROSENSTEIN

1
2    price changes with a mushroom supplier and    11:30:47
3    either accept, reject, or compromise with     11:30:49
4    respect to a price change?                    11:30:52
5         A.    Yes.                               11:30:53
6         Q.    Okay.  Can you recall, sir, or    11:30:54
7    are you prepared to answer whether or not any  11:31:20
8    of those suppliers that we're talking          11:31:23
9    about -- and I guess there's three; I think I  11:31:25
10   said four, and I probably misspoke; Giorgi,    11:31:28
11   To-Jo, and Monterey -- gave Rosenstein any     11:31:31
12   rebates, volume discounts, promotional         11:31:35
13   allowances, or money back with respect to its  11:31:41
14   purchases of mushrooms?                        11:31:45
15        A.    Throughout a normal business       11:31:49
16   relationship with any of our vendors, whether  11:31:51
17   it be apples, oranges, or mushrooms, there     11:31:54
18   are times that we request a special price      11:31:58
19   because some of our customers would -- would   11:32:02
20   like to put them on sale.  And then we         11:32:04
21   attempt to negotiate a price on a certain      11:32:08
22   specific item.                                 11:32:13
23        Q.    But -- and I understand and        11:32:21
24   appreciate your answer, but can you recall     11:32:23
25   any of those special situations where you      11:32:25

```
 1                JAY C. ROSENSTEIN
 2    would negotiate a special price for a period   11:32:30
 3    of time with any of the mushroom suppliers?    11:32:32
 4         A.    Yes.                                11:32:34
 5         Q.    Okay.  Which ones?                  11:32:35
 6         A.    All of them.                        11:32:37
 7         Q.    Can you speak to the frequency      11:32:38
 8    during a typical year that those special      11:32:50
 9    prices would apply to?                        11:32:54
10         A.    Two or three times a year.          11:32:56
11         Q.    And what magic to those two or     11:33:01
12    three times a year?  Would they be holiday    11:33:05
13    seasons, or would they be --                  11:33:07
14         A.    No.                                 11:33:07
15         Q.    -- or just two or three times a    11:33:09
16    year?                                         11:33:10
17         A.    Well, sometimes we would get a     11:33:10
18    request from a customer of ours that they     11:33:15
19    would like to put them on sale.  So then we   11:33:17
20    would initiate a phone call and see if we --  11:33:20
21    if our supplier would be accommodating.       11:33:23
22               Other times, we decided that we    11:33:26
23    would like to initiate and put a store-wide   11:33:28
24    sale on.  And then we would --                11:33:33
25         Q.    When you say, "store-wide          11:33:35
```

```
 1                    JAY C. ROSENSTEIN
 2   sale," are you talking about your -- your --   11:33:37
 3        A.     All of our customers.             11:33:39
 4        Q.     Okay.  Okay.  I'm sorry.  I --     11:33:40
 5   I interrupted your answer.  Did I interrupt    11:33:47
 6   your answer?  No?                              11:33:48
 7        A.     I gave it.                         11:33:51
 8        Q.     You gave it?  Okay.                11:33:52
 9               All right.  And -- and those       11:33:54
10   instances would be, on average, two or three   11:33:56
11   times a year with respect to your mushroom     11:34:01
12   suppliers?                                     11:34:02
13        A.     Correct.                           11:34:03
14        Q.     Okay.  Who would do the            11:34:04
15   negotiation with -- in your company, with the  11:34:06
16   suppliers --                                   11:34:09
17        A.     Philip.                            11:34:11
18        Q.     -- for these -- for these          11:34:12
19   rebates or promotional allowances?             11:34:16
20        A.     My brother Philip.                 11:34:18
21        Q.     Okay.  Would you participate in    11:34:19
22   those negotiations, or was that something      11:34:29
23   that Philip did exclusively?                   11:34:32
24        A.     Philip did them.                   11:34:34
25        Q.     Did you always, to the best of     11:34:46
```

```
 1              JAY C. ROSENSTEIN

 2    your recollection and belief, buy mushrooms    11:34:50

 3    FOB your location?                             11:34:53

 4         A.    Yes.                                11:34:57

 5         Q.    Okay.  So you were paying a         11:34:57

 6    delivered price --                             11:34:59

 7         A.    Correct.                            11:35:00

 8         Q.    -- for mushrooms?                   11:35:00

 9               Is that how most of your            11:35:02

10    produce is purchased?                          11:35:03

11         A.    Excuse me?                          11:35:04

12         Q.    Is that how most of your            11:35:05

13    produce is purchased?                          11:35:06

14         A.    No.                                 11:35:07

15         Q.    Oh, okay.  Some of it you go        11:35:08

16    pick up at the supplier's --                   11:35:12

17         A.    Correct.                            11:35:15

18         Q.    -- facility?  Okay.                 11:35:15

19               Can you tell me or estimate for     11:35:19

20    me during the 2000 through 2008 time period    11:35:20

21    the percentage of all of your produce that     11:35:24

22    was FOB your location or picked up by you?     11:35:31

23    And, again, "you" means Rosenstein company.    11:35:36

24         A.    Are you referring to purchases,     11:35:42

25    or are you referring to sales?                 11:35:44
```

Page 82

| | | | |
|---|---|---|---|
| 1 | | JAY C. ROSENSTEIN | |
| 2 | Q. | Purchases. | 11:35:47 |
| 3 | A. | Purchases?  99 percent of all | 11:35:48 |
| 4 | of our produce we pick up. | | 11:35:56 |
| 5 | Q. | Okay.  At the farm or at | 11:35:58 |
| 6 | some -- | | 11:36:08 |
| 7 | A. | Throughout the country. | 11:36:08 |
| 8 | Q. | Okay.  Do you know why it's | 11:36:09 |
| 9 | different with mushrooms? | | 11:36:16 |
| 10 | A. | Yes. | 11:36:17 |
| 11 | Q. | Please tell me. | 11:36:19 |
| 12 | A. | Mushrooms happens to be a | 11:36:22 |
| 13 | locally sourced item 12 months of the year. | | 11:36:24 |
| 14 | Mushrooms is not in a high-volume capacity | | 11:36:30 |
| 15 | such as other vegetables.  And, therefore -- | | 11:36:34 |
| 16 | another reason, mushrooms is a highly | | 11:36:42 |
| 17 | perishable product, so you need frequent | | 11:36:48 |
| 18 | deliveries. | | 11:36:51 |
| 19 | And when you have a supplier | | 11:36:53 |
| 20 | that's a couple of hours away, when you get a | | 11:36:58 |
| 21 | distributor such as ourselves, the size that | | 11:37:05 |
| 22 | we are, they normally put us -- when I say | | 11:37:09 |
| 23 | "us," distributors of like sizes, and they'll | | 11:37:15 |
| 24 | make what they -- we refer to as a milk run. | | 11:37:19 |
| 25 | They'll put five or six or eight stops on a | | 11:37:23 |

|    |                                                    |          |
|----|----------------------------------------------------|----------|
| 1  |              JAY C. ROSENSTEIN                      |          |
| 2  | truck and drop from here to here to here.          | 11:37:26 |
| 3  |              Whereas, a different item that         | 11:37:31 |
| 4  | we use a much higher volume, we would source        | 11:37:34 |
| 5  | from California, from Florida, one stop, one        | 11:37:41 |
| 6  | pickup, one drop here, et cetera, et cetera.        | 11:37:43 |
| 7  |      Q.    To make your pickups, do you            | 11:37:45 |
| 8  | use common carrier, or do you have your own        | 11:37:47 |
| 9  | fleet of trucks?                                   | 11:37:50 |
| 10 |      A.    Both.                                   | 11:37:51 |
| 11 |      Q.    Both?  What percentage is               | 11:37:51 |
| 12 | common carrier versus your own forces?             | 11:37:53 |
| 13 |      A.    80 percent.                             | 11:37:56 |
| 14 |      Q.    Common carrier?                         | 11:37:57 |
| 15 |      A.    (Moving head up and down.)              | 11:38:01 |
| 16 |              THE REPORTER:  "Yes"?  Is that        | 11:38:01 |
| 17 | a "yes"?                                           | 11:38:03 |
| 18 |              THE WITNESS:  Yes.                     | 11:38:03 |
| 19 | BY MR. DESTEFANO:                                  | 11:38:04 |
| 20 |      Q.    It's like George Burns and             | 11:38:04 |
| 21 | Gracie Allen.  Do you remember that, "Say         | 11:38:07 |
| 22 | yes, Gracie"?  Sorry about that.                  | 11:38:09 |
| 23 |      A.    Unfortunately, I remember.             | 11:38:12 |
| 24 |      Q.    I do, too.                             | 11:38:13 |
| 25 |      A.    You better be older than me.          | 11:38:16 |

Page 84

|      |      |                                       |          |
|------|------|---------------------------------------|----------|
|      |      | JAY C. ROSENSTEIN                     |          |
| 1    |      |                                       |          |
| 2    | Q.   | But I look younger.                   | 11:38:20 |
| 3    |      | All right.  Okay.                     | 11:38:25 |
| 4    | A.   | No.  On the way up, Mr. Kelly         | 11:38:25 |
| 5    | told me I would enjoy hanging out with you | 11:38:27 |

1            JAY C. ROSENSTEIN

2      Q.    But I look younger.            11:38:20

3            All right.  Okay.             11:38:25

4      A.    No.  On the way up, Mr. Kelly  11:38:25

5  told me I would enjoy hanging out with you  11:38:27

6  because you would make me look good.  That's  11:38:29

7  what he told me.                       11:38:31

8      Q.    Well, we don't trust         11:38:36

9  Mr. Kelly's judgment.                  11:38:37

10           You mentioned perishability  11:38:46

11  with respect to mushrooms.  Was -- was that  11:38:49

12  your most highly perishable produce that you  11:38:51

13  sold at Rosenstein?                    11:38:54

14     A.    One of them.                 11:38:55

15     Q.    Okay.  What were the others?  11:38:56

16     A.    Strawberries.                11:38:57

17     Q.    Strawberries.  Anything else  11:38:58

18  you can remember that's in the same    11:39:00

19  perishability category as mushrooms?   11:39:02

20     A.    Raspberries, blackberries,   11:39:04

21  blueberries.                           11:39:08

22     Q.    Berries and mushrooms?       11:39:09

23     A.    Essentially.                 11:39:11

24     Q.    Do you have refrigerated     11:39:12

25  warehouse facilities?                  11:39:16

```
 1              JAY C. ROSENSTEIN
 2       A.     Yes.                        11:39:16
 3       Q.     And the mushrooms go in the 11:39:17
 4   fridge?                                11:39:19
 5       A.     Correct.                    11:39:19
 6       Q.     Okay.  Along with the berries? 11:39:20
 7       A.     Correct.                    11:39:22
 8       Q.     Okay.  Can you tell me the -- 11:39:31
 9   the -- the life of the mushroom between the 11:39:37
10   time you receive it and the time you have to 11:39:40
11   sell it?                               11:39:43
12       A.     Approximately three days.   11:39:48
13       Q.     Have you gotten stuck with  11:39:55
14   mushrooms that you couldn't sell for three 11:39:57
15   days, to the best of your recollection -- 11:39:59
16       A.     Yes.                        11:40:02
17       Q.     -- during this 2000 to 2008 11:40:02
18   time period?                           11:40:05
19       A.     Yes.                        11:40:05
20       Q.     What do you do with them?    11:40:05
21       A.     Sell them at a discount.     11:40:07
22       Q.     To any particular buyer or  11:40:08
23   customer?                              11:40:12
24       A.     Whoever will buy them.       11:40:12
25       Q.     Let me ask you this, sir.    11:40:40
```

Page 86

```
 1                    JAY C. ROSENSTEIN
 2    From, again, roughly 2000 to the present day,  11:40:53
 3    has the amount of mushrooms that you've been   11:40:59
 4    purchasing at Rosenstein remained relatively   11:41:02
 5    constant?                                       11:41:05
 6         A.    I'd say relatively constant.         11:41:10
 7         Q.    Okay.  Let me phrase it a            11:41:13
 8    slightly different way and see if there's the   11:41:18
 9    same or different answer.                       11:41:20
10               Have you seen in the                 11:41:21
11    marketplace an increasing demand for            11:41:22
12    mushrooms or relatively flat demand for         11:41:25
13    mushrooms between 2000 and -- and today?        11:41:27
14         A.    There has been an increase in        11:41:32
15    some of the specialty mushrooms.                11:41:34
16         Q.    Okay.  Can you define what you       11:41:36
17    mean by "specialty mushrooms"?                  11:41:38
18         A.    Oh, I would say, like, a             11:41:40
19    portobello mushroom I would consider a          11:41:45
20    specialty mushroom.                             11:41:48
21         Q.    Do you sell shiitake mushrooms?      11:41:49
22         A.    We do.                               11:41:51
23         Q.    And how about oyster mushrooms?      11:41:52
24         A.    We do.                               11:41:55
25         Q.    Okay.  Would you -- would you        11:41:55
```

Page 87

1             JAY C. ROSENSTEIN

2    lump that -- are those considered specialty      11:42:01

3    mushrooms as well that have increased in         11:42:04

4    demand?                                          11:42:07

5         A.    I would consider them, yes.           11:42:07

6         Q.    Okay.  So it would be --              11:42:08

7    portobello, shiitake, and oyster mushrooms       11:42:09

8    would be considered specialties by you?          11:42:16

9         A.    I would consider them                 11:42:18

10   specialties, yes.                                11:42:21

11        Q.    Okay, okay.  Any others?  Any         11:42:22

12   other types that you can think of that you       11:42:23

13   would consider -- that you would put into        11:42:26

14   that specialty category?                         11:42:28

15        A.    If somebody showed me a list of       11:42:31

16   all the varieties, because I don't remember      11:42:36

17   all of them off the top of my head, I'm sure     11:42:38

18   I could point some out.                          11:42:40

19        Q.    Okay.  Nor do I, so we'll             11:42:42

20   dispense with the list.                          11:42:45

21              But to -- as we sit here today,       11:42:46

22   you're -- you're remembering portobellos,        11:42:50

23   shiitakes, and oysters as specialties?           11:42:52

24        A.    Correct.                              11:42:58

25        Q.    Okay.  Would you consider the         11:42:58

Page 88

```
 1              JAY C. ROSENSTEIN
 2    brown mushrooms, no matter what their size,   11:42:59
 3    also a specialty?                             11:43:01
 4         A.     In our area, yes.                 11:43:06
 5         Q.     Okay.  Do you remember, sir,      11:43:17
 6    engaging in any conversation internally at    11:43:33
 7    Rosenstein regarding a co-op or trade         11:43:37
 8    organization known as the Eastern Mushroom    11:43:42
 9    Marketing Cooperative, otherwise abbreviated  11:43:47
10    sometimes EMMC?                               11:43:50
11              MR. REFSIN:  Excluding             11:43:51
12         discussions with counsel?               11:43:52
13    BY MR. DESTEFANO:                             11:43:52
14         Q.     Excluding discussions with        11:43:53
15    counsel.                                      11:43:54
16         A.     No.                               11:43:54
17         Q.     Excluding discussions with        11:43:55
18    counsel, do you recall that there even was an 11:44:00
19    EMMC or Eastern Mushroom Marketing            11:44:06
20    Cooperative during the time period between    11:44:09
21    2000 and 2001 -- 2008?  I apologize.          11:44:12
22         A.     No.                               11:44:16
23         Q.     As you probably know, a           11:44:17
24    Complaint was filed by William Rosenstein     11:44:48
25    against the EMMC and a whole bunch of its     11:44:53
```

1              JAY C. ROSENSTEIN

2     present and former members back in 2006.  Do     11:44:56

3     you recall that event?                            11:45:00

4          A.    Yes.                                    11:45:01

5          Q.    Okay.  Before the Complaint was        11:45:02

6     filed, did you read it?                            11:45:05

7          A.    I don't remember.                       11:45:12

8          Q.    Okay.  Was there somebody in           11:45:15

9     the company that was more involved than you       11:45:19

10    in making the decision to file that Complaint     11:45:23

11    or prepare that Complaint?                         11:45:27

12         A.    No.                                     11:45:30

13         Q.    It would be you --                      11:45:30

14         A.    It would be me.                         11:45:33

15         Q.    -- would be the only person?           11:45:33

16         A.    Correct.                                11:45:34

17         Q.    Would Philip also be involved          11:45:35

18    in that decision -- have been involved in         11:45:37

19    that decision?                                     11:45:40

20         A.    We may have had some discussion        11:45:40

21    on it, but --                                      11:45:42

22         Q.    But you pulled the trigger, so         11:45:43

23    to speak?                                          11:45:45

24         A.    I pulled the trigger.                   11:45:45

25         Q.    Yeah.  Can you tell us why you         11:45:47

```
 1                 JAY C. ROSENSTEIN
 2    filed the Complaint?                        11:45:49
 3         A.    I was solicited by an            11:45:51
 4    outstanding member of the Pennsylvania Bar  11:45:54
 5    Association by the name of Mr. Robert Kelly. 11:46:00
 6         Q.    He is an outstanding member of   11:46:03
 7    the --                                      11:46:05
 8         A.    Yes, he is.                       11:46:05
 9         Q.    -- Pennsylvania Bar.             11:46:05
10               When you say, "solicited," what 11:46:20
11    do you mean, "solicited"?  Can you be a     11:46:21
12    little bit more descriptive of that?        11:46:24
13               MR. REFSIN:  Yeah, and I'm       11:46:25
14          going to object to the form of the -- 11:46:26
15          the term "solicited."  But he can     11:46:27
16          answer about what -- how -- how he    11:46:33
17          became aware of the case.             11:46:34
18    BY MR. DESTEFANO:                            11:46:35
19         Q.    How did -- how did you become    11:46:35
20    aware of the --                             11:46:36
21               MR. REFSIN:  Without the         11:46:36
22          substance of any --                   11:46:37
23               MR. DESTEFANO:  Yeah.            11:46:37
24               MR. REFSIN:  -- discussions      11:46:38
25          with any attorneys.                   11:46:38
```

```
 1              JAY C. ROSENSTEIN
 2              THE WITNESS:  I received a        11:46:41
 3         phone call from Attorney Kelly asking  11:46:42
 4         me if I would participate in a class   11:46:48
 5         action lawsuit regarding mushrooms.    11:46:55
 6    BY MR. DESTEFANO:                           11:47:02
 7         Q.    Was Mr. Kelly or his firm        11:47:02
 8    Rosenstein's -- I'll use the word general   11:47:06
 9    outside counsel --                          11:47:11
10         A.    One of them.                     11:47:11
11         Q.    -- at the time?  One of them?    11:47:12
12         A.    (Moving head up and down.)       11:47:14
13         Q.    From the time you filed the      11:47:30
14    Complaint forward, which I understand is    11:47:31
15    getting quite -- quite elderly, 2006 to     11:47:34
16    today, have you saved all of the documents  11:47:40
17    and papers and records and books that you   11:47:46
18    used to draft up the Complaint or to support 11:47:51
19    your -- your claim?  And "you" meaning      11:47:54
20    Rosenstein.                                 11:47:57
21              MR. REFSIN:  And I object to      11:47:58
22         the form.  This assumes that certain   11:47:59
23         documents in his possession were used  11:48:02
24         to draft the Complaint.                11:48:04
25    BY MR. DESTEFANO:                           11:48:05
```

Page 92

1                    JAY C. ROSENSTEIN

2          Q.     Well, to the extent you used      11:48:05

3    documents, records, books, or -- or the like.  11:48:06

4          A.     I don't know.                      11:48:08

5          Q.     Okay.  Who -- who in the           11:48:09

6    company would know that?                        11:48:12

7          A.     Maybe my controller.               11:48:14

8          Q.     Was your controller the same       11:48:20

9    person in 2006 that it is today?                11:48:24

10         A.     Yes.                                11:48:27

11         Q.     And I'm sorry.  Did you give me    11:48:28

12   his name before?                                11:48:30

13         A.     I did not.                          11:48:31

14         Q.     Would you please?                   11:48:31

15         A.     Donald Cwikla, C-W-I-K-L-A.         11:48:32

16         Q.     C-W --                              11:48:40

17         A.     I-K-L-A.                            11:48:42

18         Q.     Again, to the best of your         11:48:58

19   knowledge, between 2000 and 2008, did the       11:48:59

20   company consider purchasing mushrooms from --   11:49:02

21   that were grown in Canada?                       11:49:05

22         A.     Not to my knowledge.                11:49:08

23         Q.     Who -- who would have that          11:49:09

24   knowledge?  Would it be Messrs. Anderson         11:49:12

25   or --                                            11:49:16

| | | | |
|---|---|---|---|
| 1 | | JAY C. ROSENSTEIN | |
| 2 | A. | No. | 11:49:16 |
| 3 | Q. | -- the Italian fellow whose | 11:49:16 |
| 4 | name -- | | 11:49:19 |
| 5 | A. | Yours truly. | 11:49:19 |
| 6 | Q. | Would it be yours truly? | 11:49:21 |
| 7 | A. | (Moving head up and down.) | 11:49:22 |
| 8 | Q. | Okay.  You don't -- you don't | 11:49:23 |
| 9 | recall -- | | 11:49:24 |
| 10 | A. | I know I've never been | 11:49:24 |
| 11 | solicited by anyone from Canada. | | 11:49:25 |
| 12 | Q. | Did you ever reach out to | 11:49:27 |
| 13 | anybody -- | | 11:49:28 |
| 14 | A. | No. | 11:49:29 |
| 15 | Q. | -- who grew mushrooms in | 11:49:29 |
| 16 | Canada? | | 11:49:30 |
| 17 | A. | No. | 11:49:31 |
| 18 | Q. | Do you know whether it was the | 11:50:55 |
| 19 | company's practice when you made -- when you | | 11:50:56 |
| 20 | switched to a new supplier to save the price | | 11:50:59 |
| 21 | quotations submitted by that new supplier for | | 11:51:06 |
| 22 | a period of time afterwards? | | 11:51:10 |
| 23 | A. | Not that I recall. | 11:51:13 |
| 24 | Q. | Okay.  Do you know whether it | 11:51:16 |
| 25 | was the company's practice to save other -- | | 11:51:19 |

Page 94

|    |                                                      |          |
|----|------------------------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                                    |          |
| 2  | quotations, to the extent they were made, by        | 11:51:24 |
| 3  | other suppliers at or around the time you           | 11:51:27 |
| 4  | made the switch from one supplier to another?       | 11:51:31 |
| 5  | A.    Are you referring only to                     | 11:51:35 |
| 6  | mushroom suppliers?                                  | 11:51:38 |
| 7  | Q.    Only to mushrooms.                            | 11:51:39 |
| 8  | A.    No.                                           | 11:51:40 |
| 9  | Q.    Okay.  You don't recall -- are               | 11:51:40 |
| 10 | you saying, no, you don't recall, or no, you        | 11:51:42 |
| 11 | believe that other quotations were thrown           | 11:51:46 |
| 12 | away or discarded?                                   | 11:51:48 |
| 13 | A.    I believe other quotations, if               | 11:51:50 |
| 14 | we got any, would have been discarded or            | 11:51:52 |
| 15 | thrown away.                                          | 11:51:55 |
| 16 | Q.    Do you believe, sir, that                     | 11:51:57 |
| 17 | Rosenstein was impacted by anything that the        | 11:52:33 |
| 18 | EMMC or its members did during the time             | 11:52:39 |
| 19 | period from 2000 to 2008?                            | 11:52:42 |
| 20 | MR. REFSIN:  I object to the                        | 11:52:45 |
| 21 | form of that question.  It calls for a              | 11:52:45 |
| 22 | legal conclusion and economic                        | 11:52:47 |
| 23 | analysis.                                             | 11:52:49 |
| 24 | BY MR. DESTEFANO:                                     | 11:52:50 |
| 25 | Q.    Okay.  You can answer.                        | 11:52:50 |

Page 95

|    |                                                        |          |
|----|--------------------------------------------------------|----------|
| 1  | JAY C. ROSENSTEIN                                       |          |
| 2  | MR. REFSIN:  It's --                                   | 11:52:52 |
| 3  | BY MR. DESTEFANO:                                       | 11:52:53 |
| 4  | Q.    You can answer.                                   | 11:52:53 |
| 5  | A.    Repeat the question, please.                     | 11:52:53 |
| 6  | Q.    Do you believe that Rosenstein                   | 11:52:55 |
| 7  | was impacted by anything that the EMMC or its          | 11:52:56 |
| 8  | members did between 2000 and 2008?                     | 11:53:00 |
| 9  | MR. REFSIN:  Same objection.                           | 11:53:02 |
| 10 | THE WITNESS:  If what I                                 | 11:53:03 |
| 11 | understand this class action                            | 11:53:07 |
| 12 | litigation to be about, then we were                    | 11:53:09 |
| 13 | most definitely impacted.                                | 11:53:11 |
| 14 | BY MR. DESTEFANO:                                       | 11:53:16 |
| 15 | Q.    Okay.  And what do you                            | 11:53:16 |
| 16 | understand this class action litigation to be          | 11:53:17 |
| 17 | about?                                                   | 11:53:19 |
| 18 | A.    Well, I understand it's about                    | 11:53:19 |
| 19 | price fixing.                                            | 11:53:20 |
| 20 | Q.    Anything else?                                    | 11:53:23 |
| 21 | A.    Not to my knowledge.                              | 11:53:25 |
| 22 | Q.    Have you taken any steps to                      | 11:53:27 |
| 23 | calculate the magnitude of this impact,                | 11:53:34 |
| 24 | otherwise known as how Rosenstein, if at all,          | 11:53:37 |
| 25 | was damaged, as a result of anything the EMMC          | 11:53:40 |

Page 96

1              JAY C. ROSENSTEIN

2    did from the time period 2000 through 2008?    11:53:44

3              MR. REFSIN:  And I object to      11:53:48

4         the form to the extent it calls for a   11:53:49

5         legal conclusion and economic          11:53:51

6         analysis.                               11:53:53

7              MR. DESTEFANO:  Sure.             11:53:53

8    BY MR. DESTEFANO:                            11:53:54

9         Q.    But you can answer.              11:53:54

10        A.    We took the time out and         11:53:55

11   gathered all of our invoices.  Unless I know  11:53:57

12   how much we were overcharged -- or I should   11:54:01

13   say alleged overcharged; is that correct?    11:54:04

14        Q.    That would be correct.           11:54:07

15        A.    Then I wouldn't have any          11:54:09

16   knowledge unless I had that to work off of.   11:54:10

17        Q.    Okay.  Do you know how much, if  11:54:14

18   at all, you were overcharged?               11:54:21

19        A.    No.                               11:54:23

20        Q.    I'm going to mark another         11:54:24

21   document as Rosenstein-2.                    11:54:48

22                   *  *  *                     11:55:15

23              (Exhibit Rosenstein-2 marked for 11:55:15

24        identification.)                        11:55:15

25                   *  *  *                     11:55:22

Page 97

1                    JAY C. ROSENSTEIN

2                MR. REFSIN:  Bill, there's      11:55:22

3            writing on this exhibit.  Is that what  11:55:23

4            you meant?                          11:55:24

5                MR. DESTEFANO:  I -- I didn't   11:55:25

6            take the time to white it out, but --  11:55:27

7                MR. REFSIN:  Did you tell us --  11:55:29

8            did you tell us anything good about  11:55:30

9            the case in your notes?             11:55:31

10               MR. DESTEFANO:  No.  All there   11:55:34

11           is is scribbles, circles, and Xs.    11:55:35

12           Actually, all there is is circles and  11:55:38

13           Xs.                                 11:55:40

14               MR. REFSIN:  Okay.              11:55:41

15   BY MR. DESTEFANO:                           11:55:44

16       Q.    Take a moment to -- let's --     11:55:44

17   let's take a five-minute break.  And either   11:55:45

18   during or after you come back from the       11:55:47

19   five-minute break, take a moment to read that  11:55:49

20   document and familiarize yourself with it.   11:55:51

21               THE VIDEOGRAPHER:  The time is   11:55:53

22           11:55.  We're going off the video    11:55:54

23           record.                             11:55:56

24                    *  *  *                    11:55:57

25               (Recess from 11:55 a.m. to      12:06:37

Page 98

1              JAY C. ROSENSTEIN

2         12:06 p.m.)                           12:06:37

3                   *  *  *                     12:06:37

4              THE VIDEOGRAPHER:  The time is   12:06:40

5         12:06.  This is tape number 3.        12:06:41

6    BY MR. DESTEFANO:                          12:06:43

7         Q.    Did you have a chance to page   12:06:43

8    through the document that we've identified as  12:06:45

9    Rosenstein-2?                              12:06:49

10        A.    Yes.                            12:06:50

11        Q.    Yeah.  Before we get into that,  12:06:50

12   let me ask you this, sir.  I think you     12:06:53

13   mentioned that you looked at Rosenstein-1   12:06:55

14   about a week ago and then met with the     12:06:59

15   honorable Mr. Refsin for about 45 minutes   12:07:03

16   either yesterday or a few days ago.        12:07:06

17              MR. REFSIN:  I don't think       12:07:09

18        that's quite accurate.               12:07:10

19              MR. DESTEFANO:  Okay.            12:07:11

20   BY MR. DESTEFANO:                          12:07:12

21        Q.    How long did you meet with      12:07:12

22   Mr. --                                     12:07:13

23        A.    I was with him from around      12:07:14

24   12:30 until about 4 o'clock.               12:07:16

25        Q.    Oh, okay.                       12:07:17

1              JAY C. ROSENSTEIN

2        A.    On this particular          12:07:18

3    (indicating) --                       12:07:23

4        Q.    Okay, okay.  But besides your   12:07:23

5    review of this document, "this document"   12:07:24

6    being Rosenstein-1, and your meeting with   12:07:26

7    Mr. Refsin, did you do anything else to   12:07:29

8    prepare yourself for this deposition?   12:07:32

9        A.    We went over a brief period of   12:07:36

10   questions and --                       12:07:43

11       Q.    Who's the "we"?             12:07:45

12       A.    I'm sorry.  It would have been   12:07:46

13   the honorable Barry and the honorable Kris   12:07:48

14   from Bob Kelly's office.               12:07:55

15       Q.    Okay.  This was during that   12:07:59

16   meeting from 12:30 --                   12:08:00

17       A.    Correct.                    12:08:03

18       Q.    -- 12:45 until four o'clock?   12:08:03

19       A.    Correct.                    12:08:05

20       Q.    Okay.  Besides that, did you do   12:08:05

21   anything else to prepare for this deposition?   12:08:10

22       A.    I had received a loose-leaf   12:08:12

23   binder last week, and I perused through that   12:08:16

24   to familiarize myself with some of this   12:08:20

25   litigation.                            12:08:23

1              JAY C. ROSENSTEIN

2        Q.      Okay.  And who did you get the    12:08:23

3   loose-leaf binder from?                        12:08:25

4        A.      Attorney Barry.                    12:08:26

5        Q.      Okay.  Did your preparation for   12:08:28

6   this deposition include any discussions with   12:08:35

7   either Mr. Anderson or -- who's the other      12:08:39

8   fellow?  Pass --                               12:08:42

9        A.      Pusateri.                          12:08:44

10        Q.      Pusateri.  Did you speak with     12:08:45

11   either of those two?                           12:08:47

12        A.      No.                               12:08:48

13        Q.      Okay.  Did you speak with         12:08:48

14   Philip?                                        12:08:50

15        A.      Briefly.                           12:08:51

16        Q.      How briefly?                       12:08:52

17        A.      Phil sat in with -- in our        12:08:54

18   discussion yesterday for approximately 45     12:09:02

19   minutes.                                       12:09:03

20        Q.      Okay.  And how about your         12:09:04

21   controller or anyone else in the company?     12:09:06

22        A.      He sat in for about five          12:09:08

23   minutes.                                       12:09:10

24        Q.      Was there anyone else within      12:09:11

25   the Rosenstein organization that you met with 12:09:13

1                JAY C. ROSENSTEIN

2    or spoke to to prepare yourself for this      12:09:15

3    deposition besides Philip, when he sat in the 12:09:18

4    meeting --                                    12:09:21

5         A.    My nephew sat in for a little      12:09:22

6    while.                                        12:09:24

7         Q.    And your nephew also sat in the    12:09:24

8    meeting for a little while?  Okay.            12:09:26

9         A.    Yes.                               12:09:28

10         Q.    All right.  Did they contribute   12:09:28

11    anything to the meeting, Philip or your       12:09:30

12    nephew --                                     12:09:32

13         A.    My nephew was strictly --         12:09:33

14         Q.    -- or your controller?            12:09:34

15         A.    -- an observer.                   12:09:36

16         Q.    Okay.                             12:09:38

17         A.    And my controller had answered    12:09:38

18    a question that we weren't able to.           12:09:40

19         Q.    Okay.  And how about Philip?      12:09:41

20         A.    Philip contributed what he        12:09:42

21    remembered.                                   12:09:44

22         Q.    Okay.  Going back to a couple     12:09:47

23    of questions ago, we were talking about these 12:09:53

24    rebates and promotional allowances that you   12:09:56

25    thought were, roughly, three times a year     12:09:59

```
 1              JAY C. ROSENSTEIN
 2   from the mushroom producers that you asked   12:10:02
 3   for and sometimes received, sometimes didn't 12:10:04
 4   receive.                                     12:10:08
 5              MR. REFSIN:  Yeah, I'm going to   12:10:10
 6        object to the form.                     12:10:11
 7              MR. DESTEFANO:  Okay.             12:10:12
 8   BY MR. DESTEFANO:                            12:10:13
 9        Q.    Well, just to -- forget what I   12:10:13
10   just said, except to refresh your            12:10:14
11   recollection.                                12:10:18
12              Were those discounts or           12:10:18
13   promotions reflected on the invoices, or were 12:10:21
14   they done off the invoices?                  12:10:24
15        A.    Don't know.                       12:10:26
16        Q.    Don't know one way or the         12:10:27
17   other?  Who would know that?  Would that be  12:10:29
18   your controller or Philip?                   12:10:31
19        A.    Perhaps.                          12:10:36
20        Q.    Perhaps one of those two?         12:10:37
21        A.    (Moving head up and down.)        12:10:41
22        Q.    But you don't --                  12:10:43
23              THE REPORTER:  What's
24        your answer?
25              THE WITNESS:  Excuse me?
```

```
                                      Page 103

1              JAY C. ROSENSTEIN

2              THE REPORTER:  Perhaps one of

3        those two?                      12:10:44

4              THE WITNESS:  Perhaps one of   12:10:44

5        those two.                      12:10:45

6   BY MR. DESTEFANO:                    12:10:59

7        Q.    To the extent the mushroom   12:11:00

8   supplier refused to participate in the   12:11:01

9   promotion, did Rosenstein go ahead and do it   12:11:04

10  anyway?                              12:11:07

11       A.    I don't know.            12:11:17

12       Q.    Again, would Philip be the one   12:11:17

13  to talk to about that or your controller?   12:11:20

14       A.    The controller would not have   12:11:22

15  any knowledge.                       12:11:24

16       Q.    Okay.                     12:11:25

17       A.    Phil may have knowledge.   12:11:26

18       Q.    Okay.  All right.  Have you   12:11:29

19  seen the document that we've marked as   12:11:34

20  Rosenstein-2 before today?           12:11:37

21       A.    I believe I perused it   12:11:41

22  yesterday with Attorney Barry.       12:11:43

23       Q.    Okay.  Before yesterday, did   12:11:45

24  you see it?  Was yesterday the first time you   12:11:50

25  saw it?                              12:11:53
```

```
  1              JAY C. ROSENSTEIN

  2        A.    I may have it in my --        12:11:53

  3        Q.    Notebook?                     12:11:54

  4        A.    -- in my notebook, but I don't  12:11:55

  5    recall.                                 12:11:57

  6        Q.    Okay.  But you -- you've had   12:11:57

  7    the notebook for maybe only a week?     12:11:59

  8        A.    Correct.                      12:12:00

  9        Q.    Okay.  Was someone other than  12:12:01

 10    you at Rosenstein responsible for gathering  12:12:09

 11    the information that is conveyed in the  12:12:13

 12    document that we've marked Rosenstein-2?  12:12:18

 13        A.    Yes.                          12:12:21

 14        Q.    And who was that?             12:12:21

 15        A.    Don't know.                   12:12:22

 16        Q.    Okay.  Do you have a reasonable  12:12:24

 17    belief as to who -- who it probably was?  12:12:28

 18        A.    I believe -- I believe it was  12:12:31

 19    our former office manager, who retired a  12:12:32

 20    couple years ago.                       12:12:35

 21        Q.    All right.  And his name is?   12:12:36

 22        A.    His name is Ann.              12:12:41

 23        Q.    Her name is Ann?              12:12:44

 24        A.    Ann.                          12:12:45

 25        Q.    Does Ann have a last name?    12:12:47
```

```
 1              JAY C. ROSENSTEIN
 2        A.     Ann has a last name.        12:12:49
 3        Q.     And what is it?  Okay.      12:12:51
 4        A.     You'd think I can remember.  12:13:01
 5   Starts with an M.  Meisko, M-E-I-S-K-O,  12:13:04
 6   Meisko.                                 12:13:10
 7        Q.     How long did Ann work for   12:13:10
 8   Rosenstein before she retired?          12:13:12
 9        A.     Approximately 30 years.     12:13:14
10        Q.     Oh, okay.  Do you know whether 12:13:26
11   or not she passed away, or is she still 12:13:27
12   alive?                                  12:13:29
13        A.     We treat our employees so good, 12:13:30
14   they were able to retire, and she's living 12:13:33
15   very comfortably.                       12:13:35
16        Q.     Okay.  If you refer to the last 12:13:36
17   page of -- I'm sorry.  It's really not the -- 12:13:50
18   it's something called a "Verification," and 12:13:56
19   it's close to the end, but not quite.  And 12:14:01
20   it's not numbered, so I can't -- it would be 12:14:04
21   following page 28.                      12:14:08
22              MR. REFSIN:  Eighth page from 12:14:10
23        the back.                          12:14:11
24              THE WITNESS:  I've got it.    12:14:13
25   BY MR. DESTEFANO:                       12:14:15
```

Page 106

1            JAY C. ROSENSTEIN

2        Q.     All right.  I -- I note that    12:14:16

3    there appears to be Philip's signature there  12:14:23

4    on the "Verification."  Do you recognize    12:14:26

5    Philip's signature?                          12:14:29

6        A.     That's Philip's signature.       12:14:30

7        Q.     And is that Philip's signature?  12:14:32

8        A.     Yes.                             12:14:34

9        Q.     Okay.  To the best of your       12:14:35

10   relief -- belief, Ann participated in        12:14:38

11   gathering up the information, and Philip      12:14:41

12   actually signed the "Verification."  Do you  12:14:44

13   know whether Philip reviewed the information  12:14:48

14   before he signed the "Verification"?         12:14:50

15       A.     I don't know.                    12:14:52

16       Q.     Okay.  Did you have any role in  12:14:54

17   either gathering the information or reviewing 12:14:57

18   the information to enable the company to      12:14:59

19   answer this --                               12:15:04

20       A.     No.                              12:15:05

21       Q.     -- document?                     12:15:05

22              I'm just going to go through it  12:15:07

23   and ask you maybe a couple of questions here, 12:15:43

24   Mr. Rosenstein.                              12:15:46

25              Do you believe, sir, that you    12:15:48

```
                                             Page 107

 1                JAY C. ROSENSTEIN
 2    never had a written contract with any      12:16:23
 3    mushroom supplier or a purchase order of some  12:16:24
 4    sort, any type of writing?  Well, let me    12:16:29
 5    narrow the question a little bit.           12:16:37
 6               During the time period 2000      12:16:38
 7    through 2008, is it your best belief that   12:16:39
 8    you -- that Rosenstein never had a written  12:16:43
 9    contract or a purchase order contract with --  12:16:45
10        A.    We never had a written --         12:16:48
11        Q.    Okay.                             12:16:50
12        A.    -- contract.                      12:16:50
13        Q.    These rebates or promotional      12:17:08
14    allowances, do you recall how those funds   12:17:10
15    came from the mushroom suppliers who        12:17:14
16    participate -- who agreed to participate to 12:17:17
17    Rosenstein?  Was it by check, cash, or some 12:17:19
18    other form of payment?                      12:17:21
19               MR. REFSIN:  I object to the     12:17:23
20        form.                                   12:17:24
21               THE WITNESS:  I don't know.      12:17:25
22    BY MR. DESTEFANO:                           12:17:26
23        Q.    Okay.  Do you know if             12:18:37
24    Rosenstein ever did any forecasting of demand  12:18:38
25    for, A, mushrooms; B, any of its other      12:18:41
```

1                 JAY C. ROSENSTEIN

2    produce?                                    12:18:47

3         A.     We forecast every week.         12:18:48

4         Q.     What you think you might be      12:18:52

5    able to sell for the upcoming week?  How --  12:18:54

6    how do you go about doing these forecasts?   12:18:58

7         A.     Well, it's really -- we look at  12:19:01

8    sales from prior weeks.                      12:19:04

9         Q.     Uh-huh.                          12:19:07

10        A.     And we look at the price.        12:19:08

11        Q.     Uh-huh.                          12:19:10

12        A.     We look at the price of a        12:19:10

13   particular item.  If we sold it for $10 this 12:19:12

14   week and we moved a thousand cases and the   12:19:15

15   price is going to $20, we know we're not     12:19:16

16   going to sell as many.  If we were selling   12:19:19

17   for $20 last week and they're $10 this week, 12:19:22

18   we think we're going to sell some more.  So  12:19:25

19   we take our best educated guess and -- and   12:19:28

20   order on that basis.                         12:19:31

21        Q.     Based upon price fluctuations?   12:19:31

22        A.     Correct.                         12:19:34

23        Q.     At any time during the period    12:19:45

24   2000 to 2008, do you have a recollection of  12:19:49

25   mushrooms being in short supply?             12:19:53

```
                                            Page 109

1              JAY C. ROSENSTEIN

2              MR. REFSIN:  Object to the      12:19:58

3         form.                                12:19:59

4    BY MR. DESTEFANO:                         12:20:02

5         Q.    "Short supply" meaning         12:20:02

6    Rosenstein being unable to get whatever   12:20:03

7    mushrooms it wants.                       12:20:06

8         A.    Well, to my -- best of my      12:20:09

9    recollection, the high peak periods are a 12:20:13

10   holiday time.  And there have been several 12:20:17

11   times over the years where we would get cut 12:20:22

12   short because they said to us that they ran 12:20:24

13   out.  In reality, I think they probably gave 12:20:29

14   them to their larger customers and shorted 12:20:34

15   their smaller customers.                  12:20:36

16        Q.    All right.  That's -- that's   12:20:39

17   a -- perhaps an educated guess on your part, 12:20:41

18   but nothing more?                         12:20:44

19        A.    Correct.                       12:20:44

20        Q.    Are there any particular       12:20:45

21   holidays -- when you're talking about the 12:20:53

22   holiday season, are you talking about     12:20:55

23   Thanksgiving, Christmas, 4th of July,     12:20:57

24   Independence Day, Martin Luther King's Day? 12:21:00

25        A.    Well, any holiday.             12:21:06
```

Page 110

1              JAY C. ROSENSTEIN

2        Q.     Any holiday?                    12:21:07

3        A.     Any public holiday is a         12:21:08

4    high-produce experience.                   12:21:11

5        Q.     Oh, really?                      12:21:13

6        A.     You want to talk about Easter,  12:21:14

7    everybody puts on a big spread.             12:21:17

8    Thanksgiving, a big spread.  July 4th, they 12:21:19

9    have picnics.  Labor Day, they have picnics. 12:21:22

10   Christmas, they have all kinds of meals.  Any 12:21:25

11   holiday is a reason to have it be a festive  12:21:27

12   holiday.  You may not believe this, but even 12:21:32

13   in some of the Jewish holidays.             12:21:35

14       Q.     Oh, yeah, sure.  Passover?       12:21:37

15       A.     No bread on Passover.  Matzah    12:21:42

16   only.  Matzah and mushrooms.                12:21:49

17       Q.     They sell mushrooms -- they      12:21:50

18   sell matzah in Scranton?                    12:21:55

19       A.     Sure.  Sure.                     12:21:55

20       Q.     Okay.  But is -- am I right      12:21:56

21   to -- to believe that -- that -- that       12:21:59

22   Thanksgiving/Christmastime is a particularly 12:22:03

23   strong time for mushrooms?                  12:22:05

24       A.     That's correct.                  12:22:07

25       Q.     I understand any holiday, there  12:22:08

```
                                    Page 111
 1              JAY C. ROSENSTEIN
 2   might be a blip.  But would that be correct   12:22:09
 3   that Thanksgiving/Christmas is a             12:22:13
 4   particular --                               12:22:15
 5        A.    If I were to take an educated    12:22:15
 6   guess, I would say that's correct.          12:22:17
 7        Q.    Okay.  Let me ask you this.      12:22:38
 8   Between 2000 and 2008, what was the average 12:22:39
 9   number of employees -- people who worked    12:22:43
10   for -- for Rosenstein?                      12:22:46
11        A.    Somewhere between 45 and 50.     12:22:55
12        Q.    Okay.  That remain pretty        12:22:57
13   constant through the years, or has it       12:22:59
14   increased over time?                        12:23:01
15        A.    We've had our periods of ups     12:23:04
16   and downs, but --                           12:23:14
17        Q.    Okay.  Are you including the --  12:23:15
18   I'm forgetting the name -- or excluding --  12:23:21
19   what's the name of your Arizona --          12:23:30
20        A.    Atlantic?                        12:23:31
21        Q.    Atlantic.                        12:23:33
22        A.    Excluding.                       12:23:34
23        Q.    Okay.  The people in Rosenstein  12:23:35
24   responsible for purchasing, is it broken down 12:24:07
25   by type of produce?                         12:24:11
```

```
                                                  Page 112

 1                    JAY C. ROSENSTEIN

 2                    Well, first of all, let me ask    12:24:13

 3     you, how many people do you have today           12:24:16

 4     responsible for purchasing?                      12:24:18

 5          A.    For purchasing?                        12:24:18

 6          Q.    Yes.                                   12:24:20

 7          A.    Approximately six.                     12:24:25

 8          Q.    Same number during the 2000 to        12:24:32

 9     2008 time period?                                 12:24:37

10          A.    Approximately.                         12:24:38

11          Q.    Okay.  And how do you assign          12:24:39

12     responsibility to those six people?             12:24:44

13          A.    In order of brains.                    12:24:46

14          Q.    The smarter people get the            12:24:53

15     higher volume?                                    12:24:57

16          A.    Very good.                             12:24:58

17          Q.    Okay.                                  12:24:59

18          A.    Can't pull the wool over your         12:25:00

19     eyes.                                             12:25:02

20          Q.    Where does mushrooms fit in           12:25:03

21     that -- in that hierarchy?                        12:25:05

22          A.    Mushrooms are way down the            12:25:07

23     bottom.                                           12:25:09

24          Q.    Okay.                                  12:25:09

25          A.    It's very difficult to make a         12:25:11
```

```
 1              JAY C. ROSENSTEIN
 2    mistake when you're getting a delivery three   12:25:12
 3    or four times a week.                          12:25:14
 4         Q.    Back at the time you were           12:25:19
 5    considering filing the Complaint that you --   12:25:21
 6    that was filed by Rosenstein and able          12:25:26
 7    counsel, did you talk with other -- other      12:25:29
 8    people outside the company about the --        12:25:34
 9    the -- the matters raised in the Complaint?    12:25:41
10         A.    No.                                 12:25:45
11              MR. REFSIN:  Excluding counsel?      12:25:47
12    BY MR. DESTEFANO:                              12:25:48
13         Q.    Excluding counsel, yes.             12:25:48
14         A.    No.                                 12:25:50
15         Q.    No other buyers or purchasers       12:25:50
16    of mushrooms did you consult with or talk to?  12:25:52
17         A.    No.                                 12:25:55
18         Q.    Did anyone estimate for you the     12:25:55
19    amount of damages or injury, in terms of       12:26:04
20    dollars or any other terms, that you thought   12:26:09
21    might be possible if the alleged overcharges   12:26:14
22    were, for a fact, overcharged?                 12:26:17
23         A.    For whom, sir?                      12:26:21
24         Q.    For you.                            12:26:22
25         A.    For Rosenstein?                     12:26:23
```

Page 114

|   |   |   |
|---|---|---|
| 1 | JAY C. ROSENSTEIN | |
| 2 | Q.    For Rosenstein, yes. | 12:26:24 |
| 3 | A.    No. | 12:26:25 |
| 4 | Q.    Okay.  Did you do any | 12:26:25 |
| 5 | back-of-the-envelope or other type of | 12:26:29 |
| 6 | calculations to estimate what you thought | 12:26:32 |
| 7 | this case would be worth to -- to Rosenstein | 12:26:36 |
| 8 | if it filed? | 12:26:39 |
| 9 | A.    I did nothing. | 12:26:40 |
| 10 | Q.    Okay.  Did anybody else in the | 12:26:41 |
| 11 | company do any type of calculations or rough | 12:26:43 |
| 12 | or precise math -- | 12:26:46 |
| 13 | A.    Well -- | 12:26:49 |
| 14 | Q.    -- to try to estimate the -- | 12:26:49 |
| 15 | the magnitude of what Rosenstein might | 12:26:51 |
| 16 | recover from this litigation? | 12:26:55 |
| 17 | A.    If my memory is correct, you | 12:26:57 |
| 18 | asked me a couple minutes ago, and I believe | 12:26:59 |
| 19 | I answered that if I knew how much per pound | 12:27:03 |
| 20 | the damage was -- | 12:27:08 |
| 21 | Q.    Right. | 12:27:09 |
| 22 | A.    -- then I could of.  But I had | 12:27:09 |
| 23 | no knowledge of how much the price -- the | 12:27:11 |
| 24 | alleged price fixing was. | 12:27:13 |
| 25 | Q.    Okay.  Do you have any such | 12:27:15 |

```
 1              JAY C. ROSENSTEIN
 2   knowledge or belief today?              12:27:19
 3        A.    I think -- I think our damages  12:27:21
 4   are something -- about $25 million.  Oh, I'm  12:27:26
 5   sorry.  I have no knowledge.           12:27:29
 6        Q.    Okay.  Of the -- stop me if I'm  12:27:31
 7   wrong, but I think you said somewhere between  12:28:04
 8   40 and 45 employees that you have today.  12:28:08
 9        A.    45 and 50.                   12:28:10
10        Q.    45 and 50.  How many of them  12:28:12
11   are -- are management-level employees versus  12:28:13
12   delivery people or clerical people or     12:28:22
13   non-management-type people?            12:28:25
14        A.    Approximately ten in         12:28:29
15   management.                            12:28:34
16        Q.    Is it accurate to say that   12:28:34
17   Philip is the -- is the boss --        12:28:51
18        A.    Excuse me, sir?             12:28:53
19        Q.    Is it accurate to say        12:28:53
20   Philips -- Philip is the boss of the company  12:28:56
21   or the top manager, with you sort of also in  12:28:57
22   that position or slightly --           12:29:02
23        A.    That's not accurate.         12:29:04
24        Q.    That's not accurate?         12:29:05
25        A.    No.                          12:29:06
```

```
 1              JAY C. ROSENSTEIN

 2       Q.    No.  How -- how so?  How is it    12:29:06

 3  not accurate?                               12:29:09

 4       A.    Phil and I share the --          12:29:10

 5       Q.    Okay.                            12:29:13

 6       A.    -- managerial responsibilities   12:29:14

 7  equally.                                    12:29:16

 8       Q.    Okay.  Behind you and Phil, who  12:29:16

 9  would be the next most senior or responsible 12:29:19

10  manager?                                    12:29:22

11       A.    Depends on what responsibility,  12:29:22

12  whether it's warehouse management or        12:29:25

13  financial management.                       12:29:28

14       Q.    Okay.                            12:29:28

15       A.    The financial would be the       12:29:29

16  controller.                                 12:29:30

17       Q.    Okay.                            12:29:31

18       A.    And the warehouse management     12:29:31

19  would be our foreman.                       12:29:33

20       Q.    Okay.  Who is your foreman?      12:29:34

21       A.    Gentleman by the name of John    12:29:35

22  Ehrat.                                      12:29:37

23       Q.    Okay.  And behind those two      12:29:38

24  managers, what would be the next in the     12:29:39

25  hierarchy?                                  12:29:44
```

Page 117

1                    JAY C. ROSENSTEIN

2          A.     Underneath the controller, we     12:29:45

3    have an office manager.                        12:29:47

4          Q.     Okay.  And that would be Ann      12:29:48

5    and whoever replaced Ann?                      12:29:50

6          A.     Correct.                          12:29:51

7          Q.     Okay.  And anybody else           12:29:51

8    underneath the --                              12:29:57

9          A.     Well, there's several clerical    12:29:58

10   people.  You know, we have accounts payable    12:29:59

11   clerk, accounts receivable clerk.              12:30:01

12         Q.     Sure.  Okay.  How about           12:30:02

13   salesmen?  How many salesmen do you have?      12:30:05

14         A.     Salesmen?  We have six or         12:30:07

15   seven.                                         12:30:18

16         Q.     Okay.  And, then, I think you     12:30:18

17   said earlier six purchasers, or are the        12:30:20

18   salesmen and the purchasers the same people?   12:30:23

19         A.     I can't pay them for just         12:30:26

20   purchasing --                                  12:30:28

21         Q.     Okay.                             12:30:29

22         A.     -- a little bit of stuff.         12:30:29

23         Q.     All right.                        12:30:29

24         A.     So they have to sell.             12:30:30

25         Q.     So your sales force, so to        12:30:34

Page 118

|     |                                                      |          |
|-----|------------------------------------------------------|----------|
|     | JAY C. ROSENSTEIN                                    |          |
| 1   |                                                      |          |
| 2   | speak, also purchases, and it's the same six         | 12:30:35 |
| 3   | or seven people?                                     | 12:30:37 |
| 4   | A.    Correct.                                       | 12:30:37 |
| 5   | MR. DESTEFANO:  Okay.  I'm very                       | 12:31:32 |
| 6   | close to being done, you'll be happy                 | 12:31:33 |
| 7   | to know.                                             | 12:31:35 |
| 8   | MR. REFSIN:  Okay.                                    |          |
| 9   | MR. DESTEFANO:  Can we take a                         |          |
| 10  | five or ten-minute break --                          |          |
| 11  | MR. REFSIN:  Sure.                                    |          |
| 12  | MR. DESTEFANO: -- just so I can                       |          |
| 13  | consult with the rest of the crew and                |          |
| 14  | see if I've --                                       |          |
| 15  | MR. REFSIN:  Sure.                                    |          |
| 16  | MR. DESTEFANO:  -- missed                            |          |
| 17  | anything.  I'm sure I have.                           | 12:31:35 |
| 18  | THE VIDEOGRAPHER:  The time is                        | 12:31:35 |
| 19  | 12:31.  We're going off the video                    | 12:31:45 |
| 20  | record.                                              | 12:31:47 |
| 21  | *  *  *                                              | 12:31:53 |
| 22  | (Recess from 12:31 p.m. to                           | 12:46:59 |
| 23  | 12:46 p.m.)                                           | 12:46:59 |
| 24  | *  *  *                                              | 12:46:59 |
| 25  | THE VIDEOGRAPHER:  The time is                        | 12:47:00 |

Page 119

1              JAY C. ROSENSTEIN

2        12:46.  We are back on the video        12:47:01

3        record.                                 12:47:03

4    BY MR. DESTEFANO:                            12:47:04

5        Q.    Do you recall when you said you   12:47:05

6    sort of did these weekly forecasts and -- and 12:47:07

7    they were based on price fluctuations?       12:47:10

8        A.    Correct.                           12:47:13

9        Q.    Did you -- did your company       12:47:13

10   create a report or some type of sales report 12:47:15

11   or compilation to allow you to -- to do      12:47:19

12   these -- to have accurate information when   12:47:23

13   you did your forecasting?                    12:47:25

14       A.    Well, we have our sales           12:47:28

15   velocity report.                             12:47:34

16       Q.    You have a sales velocity         12:47:35

17   report?                                      12:47:37

18       A.    Daily, weekly, monthly, yearly,   12:47:37

19   you know.                                    12:47:37

20       Q.    Okay.  How far back have you      12:47:41

21   kept that information?                       12:47:44

22       A.    We're required by the United      12:47:45

23   States Department of Agriculture to keep     12:47:47

24   records for two years.                       12:47:49

25       Q.    Okay.                             12:47:50

```
                                              Page 120
 1              JAY C. ROSENSTEIN
 2       A.      After that, we ditch them.    12:47:50
 3       Q.      Okay.                         12:47:50
 4       A.      Much safer.                   12:47:52
 5       Q.      Okay.  Since you filed the    12:47:53
 6   litigation, did anybody ever instruct you or 12:47:54
 7   the company that you -- you ought to hold  12:47:56
 8   documents while the litigation is pending? 12:48:02
 9       A.      I can't recall.               12:48:03
10       Q.      Okay.  Do you know whether    12:48:05
11   you've held on to certain relevant documents 12:48:07
12   or any of the documents that -- that would be 12:48:09
13   relevant to this litigation?             12:48:13
14       A.      Well, I was --                12:48:14
15              MR. REFSIN:  Object to the     12:48:14
16       form.                                 12:48:15
17   BY MR. DESTEFANO:                          12:48:16
18       Q.      Go ahead.  You can answer.    12:48:16
19       A.      I was given a copy last week, 12:48:17
20   and those were given to me by Attorney Barry. 12:48:19
21   And they were the copies set up in a nice 12:48:23
22   loose-leaf binder, and I know those are the 12:48:27
23   documents.                                12:48:29
24       Q.      Did they go back to 2000,     12:48:30
25   2001 --                                   12:48:33
```

Page 121

```
 1              JAY C. ROSENSTEIN

 2      A.    Yes.                        12:48:33

 3      Q.    Okay.                       12:48:34

 4      A.    Yes.                        12:48:34

 5      Q.    We were looking at some of the  12:48:40

 6   invoices out in the other room, and there  12:48:43

 7   appeared to be sometimes cross-outs in the  12:48:50

 8   price and new prices written in and then the  12:48:55

 9   initials PHL.  It looked like -- it looked  12:48:57

10   like Phil.                            12:49:02

11              Do you know whether Phil  12:49:04

12   reviewed invoices and sometimes negotiated  12:49:05

13   raised or lower prices with the suppliers for  12:49:08

14   mushrooms during the 2000 and two thousand --  12:49:11

15   to 2008 time period?                  12:49:15

16              MR. REFSIN:  Object to the  12:49:16

17        form.                           12:49:21

18   BY MR. DESTEFANO:                     12:49:21

19      Q.    You can answer.             12:49:21

20      A.    I believe -- I believe almost  12:49:22

21   every invoice that I looked at there was  12:49:25

22   signed -- well, when he says "Phil" on it,  12:49:28

23   that was his okay to pay the bill.    12:49:31

24      Q.    Okay.  All right.           12:49:33

25      A.    Okay?  And if there was a    12:49:34
```

Page 122

1              JAY C. ROSENSTEIN

2    change, which I saw several changes       12:49:36

3    yesterday, from maybe a 7.50 price to a $7  12:49:38

4    price --                                  12:49:45

5         Q.    Right.                         12:49:45

6         A.    -- that might have been the    12:49:46

7    quoted price, and the shipper might have   12:49:48

8    said, "Well, just take it off the bill."  And  12:49:50

9    that was that.                            12:49:52

10        Q.    Okay.  The 7.50 would be the   12:49:55

11   quoted price, but if -- if, for some reason,  12:50:00

12   the shipper wanted to reduce --           12:50:02

13        A.    There were very, very few      12:50:03

14   instances on all of the invoices that I went  12:50:04

15   through that there were any price changes.  12:50:06

16             And the few that I saw, okay,   12:50:08

17   the reason the price was changed, I'm      12:50:16

18   assuming, was, if it was 7.50 and we paid it  12:50:17

19   at 7, all right, that we were given        12:50:20

20   permission to or perhaps -- I don't want to  12:50:23

21   speculate, but without looking at an exact  12:50:27

22   invoice, it may have been changed because we  12:50:30

23   were shorted a box, something, you know,    12:50:35

24   insignificant like that.                  12:50:39

25             MR. DESTEFANO:  Okay.  All      12:50:45

Page 123

1          JAY C. ROSENSTEIN

2      right.  That's it.                    12:50:45

3              *  *  *                        12:50:49

4              EXAMINATION

5              *  *  *

6    BY MS. ALBANI:

7          Q.    I have a couple questions.

8          A.    Okay.

9          Q.    Sir, I represent M.D.        12:50:50

10   Basciani & Sons, Inc.                    12:50:53

11         A.    Pleasure to meet you.        12:50:53

12         Q.    Nice to meet you.            12:50:54

13               During the period 2000 to 2008,  12:50:58

14   did your company purchase any mushrooms from  12:50:59

15   M.D. Basciani & Sons, Inc.?              12:51:02

16         A.    Never.                       12:51:04

17         Q.    Sir, are you aware of a       12:51:06

18   publication known as The Packer?         12:51:07

19         A.    I am.                        12:51:12

20         Q.    Does your company subscribe to  12:51:13

21   that publication?                        12:51:15

22         A.    We have over the years.  I   12:51:15

23   don't know if we currently are subscribed to  12:51:16

24   it.                                      12:51:19

25         Q.    Do you know if you did in the  12:51:20

```
                                              Page 124

 1               JAY C. ROSENSTEIN

 2    period 2000 to 2008?                     12:51:21

 3          A.    I can't recall.              12:51:23

 4          Q.    How about The Produce News?  12:51:25

 5    Same question?                           12:51:26

 6          A.    Yes.                         12:51:26

 7          Q.    So you subscribed to that?   12:51:26

 8          A.    We get that every week.      12:51:30

 9          Q.    Did you get that during the  12:51:32

10    period 2000 --                           12:51:33

11          A.    Yes.                         12:51:33

12          Q.    -- to 2008?  Your answer is  12:51:34

13    yes?                                     12:51:36

14          A.    Yes.                         12:51:36

15                MS. ALBANI:  Thank you.      12:51:37

16                THE WITNESS:  You're welcome. 12:51:38

17                    *  *  *                  12:51:39

18                  EXAMINATION                12:51:39

19                    *  *  *                  12:51:39

20    BY MR. REFSIN:                           12:51:39

21          Q.     I have one or two.          12:51:40

22                Mr. Rosenstein, if you wanted 12:51:41

23    to figure out the actual price at which  12:51:42

24    William Rosenstein & Sons purchased mushrooms 12:51:48

25    during the period 2000 to 2008, what     12:51:50
```

Page 125

                    JAY C. ROSENSTEIN

 1

 2   documents would you look at?              12:51:53

 3         A.    I would look at the invoices.  12:51:55

 4         Q.    Anything else?                 12:51:56

 5         A.    No.                            12:51:58

 6         Q.    And would that include the     12:51:58

 7   price at which Rosenstein purchased when it  12:52:00

 8   had any of the promotional prices that you   12:52:03

 9   discussed earlier --                        12:52:05

10         A.    Absolutely.                    12:52:06

11         Q.    -- in your deposition?         12:52:07

12         A.    Absolutely.                    12:52:08

13              MR. REFSIN:  That's all that I  12:52:10

14         have.                                12:52:11

15                  *   *   *                   12:52:12

16              EXAMINATION                     12:52:12

17                  *   *   *                   12:52:12

18   BY MR. DESTEFANO:                          12:52:12

19         Q.    Let me just follow up with a   12:52:13

20   question or two.                           12:52:14

21              How do you determine the sale   12:52:15

22   price of your produce -- let me phrase it   12:52:22

23   this way.  Let -- let's assume you buy a    12:52:32

24   quantity of mushrooms for a dollar or any   12:52:34

25   produce for a dollar.  How does the company  12:52:37

Page 126

```
1              JAY C. ROSENSTEIN
2    determine what to sell it for?        12:52:42
3         A.    There are variables involved.  12:52:46
4         Q.    Which are?                  12:52:48
5         A.    Well, if you are in the fresh  12:52:49
6    produce business, you should at least be  12:52:53
7    semi-aware of what your competition is  12:52:57
8    getting for it.  So you would like to remain  12:53:01
9    as competitive as possible.           12:53:03
10        Q.    Okay.                       12:53:06
11        A.    Number two, there are certain  12:53:06
12   trigger prices.  And by a trigger price -- a  12:53:15
13   trigger price can generate additional volume.  12:53:19
14   All right?  You and I both know that the  12:53:23
15   supermarkets overcharge whoever it is.  They  12:53:27
16   don't care.  They don't discriminate.  Okay?  12:53:29
17             But, you know, if -- if -- if  12:53:32
18   the average wholesaler marks up their produce  12:53:36
19   15 or 20 percent, just grabbing a number out  12:53:39
20   of the air, a retailer isn't happy unless  12:53:42
21   they're getting 40 percent.            12:53:47
22             So theoretically, if something  12:53:48
23   cost 60 cents a pound, they'll sell it for 99  12:53:51
24   cents a pound.  If it cost 75 cents a pound  12:53:57
25   and they'll jump it to a dollar and a  12:54:01
```

Page 127

```
 1                JAY C. ROSENSTEIN
 2   quarter, that will slow it down.  Anything    12:54:03
 3   over that dollar price will slow it down.     12:54:04
 4        Q.     Uh-huh.                           12:54:08
 5        A.     Now, over the years, as the       12:54:08
 6   price has escalated, there's been some        12:54:10
 7   marketing.  Okay?  And instead of getting,    12:54:13
 8   like, a dollar 49 cents or 59, they might go  12:54:19
 9   two for 2.99 or something like that.  You     12:54:24
10   know, buy one, get one free.  And it's --     12:54:27
11   it's all included in the price anyway.        12:54:29
12             MR. DESTEFANO:  Okay.  Thank        12:54:33
13        you.                                     12:54:33
14             THE WITNESS:  And the secret to     12:54:34
15        making money in the produce business,   12:54:36
16        buy low, sell high.                      12:54:37
17             MS. ALBANI:  I have a couple        12:54:42
18        follow-ups, Bill.                        12:54:43
19             MR. DESTEFANO:  Yeah.               12:54:44
20                  *   *   *                      12:54:45
21               EXAMINATION                       12:54:45
22                  *   *   *                      12:54:45
23   BY MS. ALBANI:                                12:54:45
24        Q.     Sir, are you aware of your        12:54:46
25   duties and responsibilities as a class       12:54:47
```

Page 128

```
1                 JAY C. ROSENSTEIN
2    representative?                          12:54:48
3               MR. REFSIN:  Objection.  That's  12:54:48
4         outside the scope of my questioning.  12:54:50
5               MS. ALBANI:  I'm going to ask   12:54:53
6         it anyway.                           12:54:54
7               MR. REFSIN:  I also object to   12:54:55
8         the form of the question.            12:54:56
9    BY MS. ALBANI:                            12:54:57
10        Q.    Are you aware of your duties    12:54:57
11   and responsibilities as a class rep?  You can  12:54:59
12   answer.                                   12:55:01
13              MR. REFSIN:  You can answer if  12:55:02
14        you understand that question.        12:55:03
15              MR. DESTEFANO:  You can answer. 12:55:05
16              THE WITNESS:  I was made aware  12:55:11
17        of my responsibilities, I believe.   12:55:12
18   BY MS. ALBANI:                            12:55:14
19        Q.    And what are those, sir?       12:55:14
20        A.    What are those?  To make myself 12:55:15
21   available for deposition purposes, trial if  12:55:19
22   necessary, and to tell the whole truth and  12:55:23
23   nothing but the truth.                    12:55:26
24        Q.    Were you promised any incentive 12:55:28
25   to -- any additional remuneration or monetary  12:55:30
```

```
                                        Page 129
 1              JAY C. ROSENSTEIN
 2   incentive to be a class representative?      12:55:33
 3              MR. REFSIN:  I'm going to         12:55:35
 4         object as outside the scope of my      12:55:35
 5         questioning.                           12:55:39
 6   BY MS. ALBANI:                               12:55:39
 7         Q.    You can still answer.            12:55:40
 8         A.    It was made quite clear to me    12:55:40
 9   that I was not going to get anything.        12:55:42
10         Q.    Why did you decide to sue?       12:55:44
11         A.    My friend, the honorable Robert 12:55:45
12   Kelly asked me.                              12:55:48
13         Q.    So sitting here today, is it     12:55:50
14   possible that you have not suffered any      12:55:51
15   damages?                                     12:55:53
16              MR. REFSIN:  I object to the      12:55:53
17         form.  It calls for a legal            12:55:54
18         conclusion.  It calls for economic     12:55:56
19         analysis.  And it's outside the scope  12:55:58
20         of my questions.                       12:56:00
21   BY MS. ALBANI:                               12:56:00
22         Q.    You can answer, sir.             12:56:01
23         A.    I don't think I want to answer   12:56:02
24   that.                                        12:56:03
25         Q.    But you do need to, or we'll     12:56:03
```

```
                                      Page 130

 1              JAY C. ROSENSTEIN
 2   have to get the judge involved.         12:56:06
 3        A.    Pardon me?                    12:56:07
 4        Q.    You do need to answer the     12:56:07
 5   question.                               12:56:09
 6              Is it possible that you have  12:56:11
 7   not been damaged, sir?                  12:56:13
 8              MR. REFSIN:  Object to the    12:56:14
 9         form.  It's an inappropriate question 12:56:15
10         for this witness and it's also been  12:56:16
11         asked and answered in much more    12:56:18
12         appropriate ways during the course of 12:56:20
13         the day.                          12:56:21
14   BY MS. ALBANI:                          12:56:21
15        Q.    I remind you that you're under 12:56:21
16   oath.  Is it possible that you have not been 12:56:23
17   damaged, sir?                           12:56:25
18              MR. REFSIN:  I object.        12:56:26
19              MR. DESTEFANO:  Generally, you 12:56:29
20         can answer.                        12:56:30
21              MR. REFSIN:  Tell her what your 12:56:32
22         understanding is about the case.   12:56:33
23              MS. ALBANI:  That's not what I 12:56:35
24         asked.  I want an answer to the    12:56:36
25         question or we'll get the judge    12:56:38
```

Page 131

```
 1            JAY C. ROSENSTEIN
 2       involved.                        12:56:39
 3    BY MS. ALBANI:                      12:56:40
 4       Q.    Sir, you are under oath.   12:56:40
 5       A.    I will answer your question. 12:56:41
 6       Q.    Is it possible that you have 12:56:42
 7    not been damaged?                   12:56:42
 8       A.    Anything is possible.      12:56:43
 9       Q.    Is it possible that you have 12:56:45
10    not been damaged?                   12:56:46
11            MR. REFSIN:  I object to the 12:56:47
12       form of the question.  It's      12:56:49
13       inappropriate.                   12:56:50
14            THE WITNESS:  I answered the 12:56:51
15       question.  Anything is possible. 12:56:52
16    BY MS. ALBANI:                      12:56:52
17       Q.    That doesn't answer my     12:56:52
18    question.                           12:56:53
19            MR. REFSIN:  It does answer the 12:56:54
20       question.                        12:56:54
21            THE WITNESS:  It's possible I 12:56:55
22       was damaged.  It's possible I wasn't. 12:56:56
23            MS. ALBANI:  Thank you, sir. 12:56:58
24            THE WITNESS:  You're welcome. 12:56:59
25            MR. REFSIN:  We're done.    12:57:00
```

Page 132

1              JAY C. ROSENSTEIN

2              THE VIDEOGRAPHER:   The time is    12:57:01

3         12:56, and this concludes the         12:57:02

4         deposition.                           12:57:04

5                    *   *   *

6              (Witness excused.)

7                    *   *   *

8              (Off the record at 12:57 p.m.)

9                    *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 133

JAY C. ROSENSTEIN
C E R T I F I C A T E

1
2
3
4      I do hereby certify that I am a Notary
Public in good standing, that the aforesaid
5   testimony was taken before me, pursuant to
notice, at the time and place indicated; that
6   said deponent was by me duly sworn to tell
the truth, the whole truth, and nothing but
7   the truth; that the testimony of said
deponent was correctly recorded in machine
8   shorthand by me and thereafter transcribed
under my supervision with computer-aided
9   transcription; that the deposition is a true
and correct record of the testimony given by
10  the witness; and that I am neither of counsel
nor kin to any party in said action, nor
11  interested in the outcome thereof.
12      WITNESS my hand and official seal this
18th day of March, 2012.
13
14
15
16  _____
Debbie Leonard, RDR, CRR
17  Notary Public
18
19
20
21
22
23
24
25

Exhibit 3

UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————X

IN RE MUSHROOM DIRECT                          :          Master File No. 06-0620
PURCHASER ANTITRUST LITIGATION      :
                                                                    :          No.      06-04829
THIS DOCUMENT RELATED TO                  :
                                                                    :
All Actions.                                                  :
                                                                    :
———————————————————X

**DECLARATION OF KYLE G. DeVALERIO IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANT M.D. BASCIANI & SONS, INC.'S
<u>MOTION FOR SANCTIONS</u>**

I, Kyle G. DeValerio, declare as follows:

1.        I am an attorney with the law firm Berman DeValerio.  Berman DeValerio is

counsel for Direct Purchaser Plaintiffs Native Maine Produce and Specialty Foods, LLC

("Native Maine") and Theodore J. Katsiroubas and Sons, Inc., d/b/a Katsiroubas Brothers

Wholesale Fruit and Produce ("Katsiroubas Bros.").  I make this declaration based on my

personal knowledge and offer it in support of Direct Purchaser Plaintiffs' Memorandum in

Opposition to Defendant M.D. Basciani & Sons, Inc.'s Motion for Sanctions and to Remove

Plaintiff William Rosenstein & Sons Inc. as a Putative Class Representative.

2.        On August 14, 2006, Berman DeValerio was retained by Nick Katsiroubas to

represent Native Maine and Katsiroubas Bros.

3.        Berman DeValerio filed a complaint on behalf of Plaintiffs Native Maine and

Katsiroubas Bros. on October 27, 2006.

4.      Nick Katsiroubas is part owner of Native Maine and is the owner/operator of Katsiroubas Bros.

5.      Native Maine and Katsiroubas Bros. purchased mushrooms directly from Defendants Country Fresh Mushroom Co. ("Country Fresh"); Mario Cutone Mushroom Co., Inc.; and Franklin Farms, Inc. ("Franklin Farms") during the class period, and consequently were qualified to represent the putative class of direct purchasers.  At all times during my firm's representation of Native Maine and Katsiroubas Bros., we believed that they were good class representatives by virtue of their direct purchases of mushrooms from these Defendants.  This belief was based on our pre-complaint investigation as well as discovery that has been received during the course of this case.

6.      Native Maine and Katsiroubas Bros. participated in discovery in this case.  For example, on July 23, 2009, both Native Maine and Katsiroubas Bros. responded timely to Defendants' First Set of Interrogatories.  Shortly thereafter, both Plaintiffs also produced documents in response to Defendants' First Set of Requests for Production of Documents.

7.      Until discovery was stayed by the Third Circuit Court of Appeals on May 18, 2010, Nick Katsiroubas was an active participant in this case on behalf of Native Maine and Katsiroubas Bros.

8.      In June 2010, I learned that Nick Katsiroubas was taking a leave from operating Katsiroubas Bros. for health reasons.  Thereafter, I made it a practice to send him written updates on developments in the case and also copied  his son, Ted Katsiroubas, on those communications.  I understood that Ted Katsiroubas would take over the everyday operations of Katsiroubas Bros. given the ill health of his father.  Nick Katsiroubas still planned to remain an active participant in this case.

2

9.      In August 2011, shortly after informing Nick and Ted Katsiroubas of the Third Circuit's decision dismissing Defendants' appeal of this Court's order granting summary judgment to Plaintiffs on Defendants' Capper-Volstead defense, I learned that Nick Katsiroubas' health had deteriorated to the point that he could no longer personally participate in this case. Nevertheless, I understood at that point that Native Maine and Katsiroubas Bros. intended to continue to serve as Plaintiffs in this action.

10.     During the stay imposed by the Third Circuit, one of the co-owners of Native Maine, JJ Morkarzel, was bought out of the company.  I understood that, as of February 2012, Mr. Morkarzel would no longer participate in the case for Native Maine.  Instead, co-owner, Joe Pizzo became Native Maine's contact person on matters related to the litigation.

11.     Both Native Maine, through Joe Pizzo, and Katsiroubas Bros., through Ted Katsiroubas, were notified that they would need to produce representatives for the Rule 30(b)(6) depositions noticed by the Defendants represented by Mr. DeStefano.

12.     Both Joe Pizzo and Ted Katsiroubas were responsive to Defendants requests for available dates for their companies' depositions.

13.     Native Maine's deposition was scheduled for March 29, 2012 and Katsiroubas Bros. deposition was scheduled for March 30, 2012 in Boston, Massachusetts.

14.     Prior to the scheduled deposition, I received an e-mail from counsel for Defendants, Mr. DeStefano, that only he and his colleague, Ms. Pawelski, would be attending the deposition.  While I was asked for, and provided a dial in number for Mr. DeStefano, plaintiffs were never informed that either Mr. Schindler, counsel for M.D. Basciani & Sons, Inc., nor any other counsel would in fact be attending or participating in the deposition by telephone.

3

15.     Late in the evening on March 28, 2012, I received e-mails from both Joe Pizzo and Ted Katsiroubas in which I learned for the first time that they would not be attending their scheduled depositions the following morning.  I attempted to contact both Joe Pizzo and Ted Katsiroubas regarding their decisions not to attend their depositions.

16.     The next morning at 9:30 AM, when Mr. DeStefano and Ms. Pawelski arrived to take Native Maine's deposition, I informed them that Native Maine's deposition would not go forward.  I explained that I was trying to get clarification on whether a representative for Katsiroubas Bros. would appear for deposition the following day.

17.     Mr. DeStefano, Ms. Pawelski, and I discussed the likelihood that Native Maine and perhaps Katsiroubas Bros. would need to withdraw as class representatives in this case.  Mr. DeStefano said that we would further discuss the best way to do so in the near future.

18.     Less than an hour after their departure from my office on March 29, 2012, I telephoned Mr. DeStefano and Ms. Pawleski and informed them that the Katsiroubas Bros. deposition scheduled for the following day would not be going forward as scheduled.

19.     Later in the day, I learned from a customer of Katsiroubas Bros. that Nick Katsiroubas' health had recently worsened further, to the point where he is totally incapacitated.

20.     I have subsequently been informed that Native Maine and Katsiroubas Bros. no longer wish to participate in this action because of Nick Katsiroubas' rapidly deteriorating health.

21.     Prior to March 28, 2012, I had not received any indications that either Katsiroubas or Native Maine were unwilling to serve as class representatives.

4

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2012

Kyle G. DeValerio