UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | x | |
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | : : : : | Master File No. 06-0620 |
| THIS DOCUMENT RELATES TO: | : : | |
| ALL ACTIONS | : | |
| | x | |

DIRECT PURCHASER CLASS PLAINTIFFS' SUR-REPLY IN OPPOSITION
TO DEFENDANTS' SUMMARY JUDGMENT AND *DAUBERT* MOTIONS

Direct Purchaser Class Plaintiffs submit this brief Sur-Reply to respond to several of the most egregious misstatements in the Replies filed by the EMMC Defendants and Basciani in support of their summary judgment and *Daubert* motions (D.E. 550, 552, and 553).

INTRODUCTION

The Replies filed by the EMMC Defendants and Basciani on or about March 7, 2014 are rife with misstatements and mischaracterizations of the record that Direct Purchaser Class Plaintiffs have previously addressed. However, we submit this Sur-Reply to address three egregious misstatements that were not previously addressed, namely: (1) the claim of the EMMC Defendants that this Court has not previously addressed their individual entitlement to Capper-Volstead immunity (EMMC SJ Reply at 1) when they have been arguing for such immunity almost from the beginning of this case and this Court has decisively rejected it; (2) the EMMC Defendants' false claim that all of the defendants produced hardcopy sales data and that Professor Elhauge ignored much of what they produced (EMMC *Daubert* Reply at 10 n.7); and

(3) Basciani's inappropriate and unwarranted attack on Professor Elhauge as biased (Basciani *Daubert* Reply at 1-2).  We briefly respond to each of these issues below.

**<u>SUR-REPLY</u>**

**I.    THE EMMC DEFENDANTS' CLAIM TO INDIVIDUAL IMMUNITY UNDER THE CAPPER-VOLSTEAD ACT IS NOT NEW.**

In an attempt to justify their inexplicable delay in waiting 5 years to seek reconsideration of this Court's March 26, 2009 Opinion, the EMMC Defendants' assert that their motion for reconsideration relates to an issue that was not previously addressed by the Court -- whether individual members of the EMMC rather than the cooperative itself are entitled to Capper-Volstead immunity.  EMMC SJ Reply at 1.  This argument was clearly before the Court in 2009, and the Court rejected it.

Indeed, the very reason that the EMMC Defendants asked for phased discovery in this case was to address this issue.  At a hearing on June 27, 2007, Bill DeStefano, counsel for the EMMC Defendants, explained that phased discovery would permit the immunity of the individual defendants to be determined.  As he explained, phased discovery addressing Capper-Volstead immunity first would "have a great deal [of] benefits to it" because summary judgment on the immunity:

> would take this case from an antitrust litigation involving 37 defendants and Section 1 of the Sherman Act, Section 2 of the Sherman Act and Section 7 of the Clayton Act down to a case potentially against only one, the organizational defendant, and only down to a Section 2 claim and perhaps a Section 7 claim as well against that one defendant.

Transcript to June 27, 2007 Hearing Before Hon. Thomas N. O'Neill Jr. (D.E. 136) at 4-5.

At the end of Phase I discovery, when the parties filed cross-motions for summary judgment, the question of individuals' entitlement to Capper-Volstead immunity was the core issue before the Court.  In the memorandum in support of their affirmative motion for summary

judgment filed on or about July 1, 2008, the EMMC Defendants specifically argued that "the individual members of a cooperative cannot, as a matter of law, be held to constitute a conspiracy or combination either among themselves or with their cooperative in violation of the antitrust laws."  EMMC Phase I SJ Mem. (D.E. 245) at 17.  They claimed that limitations on the availability of Capper-Volstead immunity "apply solely to the 'association' or 'cooperative' as an entity" and "do not undermine the clear, basic statutory and legislative history that exempt the individual members of a cooperative from liability as conspirators as a matter of law."  *Id.*  And, in their opposition to Plaintiffs' motion for summary judgment, the EMMC Defendants recognized that Plaintiffs sought summary judgment "establishing that the EMMC *and its members* are not entitled to immunity from conspiracy claims under Sections 1 and 2 of the Sherman Act. "  EMMC SJ Opp. (D.E.272) at 2 (emphasis added).

Accordingly, when the Court granted Plaintiffs' motion for partial summary judgment and held that "defendants are not entitled to the Capper-Volstead exemption," *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 291 (E.D. Pa. 2009), it necessarily rejected the very argument that the EMMC Defendants now claim was not addressed.  *See also id.* at 287 ("It is undisputed that from 2001 through 2005, the EMMC adopted and amended various minimum pricing policies and that these prices applied to the sales of mushrooms of the distributors at issue.  Because price fixing is per se illegal, whether a conspiracy exists to destroy the EMMC's exemption depends on whether the entities that plaintiffs allege engaged in the conspiracy with the EMMC *and its members* can be co-conspirators.") (emphasis added).

The EMMC Defendants recognized that this was what this Court held.  In their appellate brief to the Third Circuit, they wrote:  "In entering judgment against all defendants pursuant to appellees' motion for summary judgment, the district court failed to properly apply the essential

features of the cooperative exemption -- that individual producers of agricultural products who form an agricultural cooperative in good faith are immune from antitrust conspiracy claims and only the cooperative itself is exposed to such claims under limited circumstances, not present here." EMMC 3d Cir. Br. at 27.

Thus, there is nothing new about the EMMC Defendants' argument. The EMMC Defendants made it repeatedly, and it was rejected in the Court's March 2009 Opinion. They have identified no reason for it to now be reconsidered.

## II. MANY OF THE DEFENDANTS DID NOT PRODUCE SALES RECORDS.

In a renewed effort to suggest that Professor Elhauge improperly ignored data that they produced in this case, the EMMC Defendants claim that "[a]ll Defendants made transactional sales data available to counsel for Plaintiffs but in many cases, counsel chose not to copy this data or to cherry pick only limited samples from the available paper data." EMMC *Daubert* Reply at 10 n.7. They further claim that certain individual defendants "made paper transactional sales records available for inspection and copying by Plaintiffs but significantly, Plaintiffs chose either not to inspect or copy these records or to copy only a limited number of selected records from the entire set of documents made available to them." *See id.* The EMMC provides no support for these claims, and they are demonstrably false.

As Professor Elhauge explained in his opening report, he incorporated all of the usable data produced by Defendants to construct his model. Elhauge Rpt. ¶¶ 85-87. Professor Elhauge considered all of the transactional records that Defendants produced (*id.* at ¶¶ 85-87, 112-115), considered what the missing data was likely to show[1] (*id.*), and extrapolated from existing data to

---

[1] As Professor Elhauge explained, the paper invoices produced by the EMMC Defendants were not usable because it was not feasible to code them and because there was no way to know whether the invoices produced "offer[ed] complete systematic data" for these defendants.

fill in the gaps in Defendants' productions.  *See* Elhauge Rpt. ¶¶ 87, 94 (explaining inference for defendants without usable sales data); *id.* ¶¶ 112-16 (describing process of estimating sales for defendants without usable data).[2]

Many of the Defendants who now accuse Professor Elhauge of failing to consider their data never produced that data to Plaintiffs despite Plaintiffs repeated efforts to obtain it.  *See* Gerstein Decl. (filed with this Sur-Reply).  The EMMC Defendants should not be permitted to exploit their own failure to produce data by asserting data deficiencies that in many cases were beyond Plaintiffs' control and in other cases were due to defendants' omissions (such as defendants' failure to produce relevant information despite repeated requests and the spoliation of data by one of the largest distributors[3]).  In any event, Professor Elhauge considered whether the missing data would affect his opinions.  He concluded that an effect was unlikely given the nature of the conspiracy and market conditions.  *See* Elhauge Rpt. ¶ 87.

---

Elhauge Reply ¶ 226.  In any event, according to the EMMC Defendants' own expert, even the subset of Professor Elhauge's database that mainly drove the results contained transactions representing 71% of all purchases by class members.  Class Cert. App. Ex. 54, Johnson Rpt. ¶ 110.

[2] While the EMMC Defendants now try to use the missing data as grounds to strike Professor Elhauge's report, the EMMC Defendants and Mr. DeStefano previously acknowledged that extrapolation would be necessary.  When Plaintiffs sought sanctions against Basciani for spoliation of records, Mr. DeStefano argued to Magistrate Judge Rice that Plaintiffs should not be entitled to a presumption about what the missing data would show because the experts could simply extrapolate the missing data based on the available data.  As Mr. DeStefano said at that time, the economic experts "can certainly go back and extrapolate information."  *See* July 23, 2012 Hearing Transcript Before the Hon. Timothy R. Rice (D.E. 453) at 58.

[3] Basciani Foods, Inc., the distributor affiliate of Defendant M.D. Basciani & Sons, Inc., was found to have spoliated evidence of its sales during the course of this case. See D.E. 452, at 3-6.

### III.    BASCIANI'S ATTACK ON THE IMPARTIALITY OF PROFESSOR ELHAUGE IS ENTIRELY UNWARRANTED, BUT AT MOST RAISES ISSUES FOR CROSS-EXAMINATION.

The centerpiece of Basciani's Reply in support of its motion to preclude Professor Elhauge from testifying is a claim that he is a "practicing attorney" who gave a speech in 2008 that Basciani characterizes as the "blatant promotion of litigation. Basciani *Daubert* Reply at 1. Basciani accuses Plaintiffs of failing to address this "elephant in the room" because "there is really nothing to be said." *Id.*

In fact, in their Opposition, Plaintiffs explained that Professor Elhauge is not biased and that claims of bias are appropriate for cross examination not exclusion. *See* Class *Daubert* Opp. at 51. Nevertheless, Basciani persists in spinning a misleading story about what Professor Elhauge said in 2008 to the American Antitrust Institute. That speech had nothing to do with the mushroom industry, the EMMC, market definition, the determination of common impact for purposes of class certification, or any other issue in this case. Elhauge Decl. ¶ 2 (filed with this Sur-Reply). It concerned "merger enforcement and the implications of statistical evidence showing that public merger enforcement had declined during the George W Bush Administration." *Id.* (citing Elhauge Decl. App. A).

Professor Elhauge was not "pitching his services" to the group as an expert economist nor urging other lawyers to bring potential lawsuits that he had conceived. Basciani *Daubert* Reply at 1. The speech was mainly about how the decline in public merger enforcement created an empirical opportunity for academic and agency studies to determine which kinds of mergers raised prices. Elhauge Decl. ¶ 3. Professor Elhauge illustrated that opportunity using his preliminary results from an econometric analysis of data collected by state insurance regulators showing that health insurance mergers had produced concentration levels that led to a statistically significant increase in prices. *Id.* The reference to "whetting their appetite" referred

to the preliminary nature of the study. *Id.* And, because the speech was to a group of trial lawyers at a conference on private enforcement, Professor Elhauge pointed out that the decline in merger enforcement and the apparent effect on prices created an "opportunity for private enforcement." *Id.* ¶ 4.

Contrary to Basciani's claim that Professor Elhauge was pitching himself to be hired as a plaintiff's expert against health insurer mergers, since that speech in 2008, Professor Elhauge has not been engaged in any lawsuits to support challenges to mergers in the healthcare or any other industry either as an economist or a lawyer. Elhauge Decl. ¶ 5. However, he has served as an economic expert for numerous health insurer **defendants** in antitrust matters, and has twice worked as a consultant for parties **defending** mergers in other industries. *Id.* ¶ 5.

This speech is so far removed from any issue in this case that it is difficult to see how Basciani could use it at trial to show anything. The misleading description of the speech is just one more in a long string of arguments that Basciani has dreamed up to detract from the real issues in this case.[4]

---

[4] For other examples of this kind of argument by Basciani, see Pl. Opp. to Basciani SJ Mot. (D.E. 539) at 2-3 n.5.

## **CONCLUSION**

For the foregoing reasons, and those set forth in their Opposition briefs, Direct Purchaser

Class Plaintiffs respectfully request that the Court deny the motions for summary judgment and

*Daubert* motions filed by the EMMC Defendants and Basciani.

Dated:  March 20, 2014                    Respectfully submitted,

                                          /s Barry L. Refsin
                                          Barry L. Refsin (Pa. ID No. 62526)
                                          HANGLEY ARONCHICK SEGAL PUDLIN &
                                          SCHILLER
                                          One Logan Square, 27th Floor
                                          Philadelphia, PA  19103-6933
                                          Tel:  (215) 568-6200
                                          Fax:  (215) 568-0300
                                          *Liaison Counsel for Direct Purchaser Class*

                                          Bruce E. Gerstein
                                          Scott W. Fisher
                                          Jonathan Gerstein
                                          GARWIN, GERSTEIN & FISHER, L.L.P.
                                          1501 Broadway, Suite 1416
                                          New York, NY  10036
                                          Tel:  (212) 398-0055
                                          Fax:  (212) 764-6620
                                          *Lead Counsel for Direct Purchaser Class*

                                          Brent B. Barriere
                                          David Patrón
                                          PHELPS DUNBAR, L.L.P.
                                          Canal Place
                                          365 Canal Street, Suite 2000
                                          New Orleans, LA  70130
                                          Tel:  (504) 584-9210
                                          Fax:  (504) 568-9130

                                          Robert A. Kutcher
                                          CHOPIN, WAGAR, RICHARD & KUTCHER
                                          3850 N. Causeway Blvd., Suite 900
                                          Metairie, LA  70002
                                          Tel:  (504) 830-3838
                                          Fax:  (504) 836-9540

Adam M. Moskowitz
KOZYAK TROPIN & THROCKMORTON,
P.A.
2525 Ponce de Leon Boulevard
9th Floor
Coral Gables, FL 33134
305-728-2977

Andrew Kelly
ODOM & DES ROCHES, L.L.P.
650 Poydras Street, Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

David P. Smith
Susan C. Segura
SMITH SEGURA & RAPHAEL, LLP
3600 Jackson Street, Suite 111
Alexandria, LA 71303
Tel: (318) 445-4480
Fax: (318) 487-1741

*Counsel for Direct Purchaser Class*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | x | |
| **IN RE MUSHROOM DIRECT** | : | **Master File No. 06-0620** |
| **PURCHASER ANTITRUST** | : | |
| **LITIGATION** | : | |
| | : | |
| **THIS DOCUMENT RELATES TO:** | : | |
| | : | |
| **ALL ACTIONS** | : | |
| | x | |

---

## DECLARATION OF JONATHAN M. GERSTEIN

---

I, Jonathan M. Gerstein, an associate at the law firm Garwin, Gerstein & Fisher L.L.P. lead counsel for the putative Direct Purchaser Class in this case, submit this Declaration in connection with Plaintiffs' Sur-Reply in Opposition to Defendants' Summary Judgment and *Daubert* Motions:

1.     The EMMC Defendants' Reply in support of their motion to exclude Professor Einer Elhauge's expert opinions contains a footnote stating that "[a]ll Defendants made transactional sales data available to counsel for Plaintiffs but in many cases, counsel chose not to copy this data or to cherry pick only limited samples from the available paper data." EMMC *Daubert* Reply at 10 n.7. They also indicate that certain individual defendants "made paper transactional sales records available for inspection and copying by Plaintiffs but significantly, Plaintiffs chose either not to inspect or to copy these records or to copy only a limited number of

1

selected records from the entire set of documents made available to them." *See id.* at 10 n.7. This is not true.

2.      Attached hereto is a series of letters I wrote to EMMC Defendants' counsel, Mr. Bill DeStefano, demonstrating Plaintiffs' extensive efforts to obtain a complete record of Defendants' sales, including records from smaller Defendants who purportedly did not have electronic sales data. *See* Exhibit A.

3.      Despite the numerous and detailed requests outlined in the letters, the EMMC Defendants only produced discs containing scanned paper invoices on behalf of two defendants, Cardile Bros. Packaging, Inc. and Greenwood Mushrooms. For a third defendant, Country Fresh Mushroom Co., counsel for the EMMC Defendants invited Plaintiffs to inspect and copy paper invoices. I traveled from New York to Avondale, Pennsylvania, where approximately 50 bankers boxes of transactional invoice documents were stored on a truck bed. I inspected the documents on the back of the truck bed, and instructed a representative from a copying service to copy samples of the paper invoices.

4. For the three EMMC Defendants who produced paper invoices, plaintiffs converted samples of the hardcopy documents into computer readable form and provided the computer readable data to Professor Elhauge for his consideration.

5. Over the course of 3 years, I repeatedly asked counsel for the EMMC Defendants to produce transactional sales data for each and every defendant. On February 17, 2012, I even inventoried all of the transactional sales data that had been produced to that date, and I asked the EMMC Defendants' counsel to produce any missing records that existed. Despite repeated promises to do so, counsel for the EMMC defendants did not make hardcopy sales records available for any defendant other than the three described above.

2

I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of March, 2014.

Jonathan M. Gerstein

**EXHIBIT A**

# GARWIN GERSTEIN & FISHER LLP

COUNSELORS AT LAW
1501 BROADWAY
NEW YORK, NY 10036
(212) 398-0055
TELECOPIER NO. (212) 764-6620
E-mail: lawoffices@garwingerstein.com

BRUCE E. GERSTEIN
SCOTT W. FISHER
JOSEPH OPPER

**OF COUNSEL**
NOAH H. SILVERMAN

SIDNEY L. GARWIN
(1908-1980)

ELENA K. CHAN
EPHRAIM R. GERSTEIN
JONATHAN M. GERSTEIN
KIMBERLY M. HENNINGS
DAN LITVIN
ANNA L. TYDNIOUK

October 19, 2011

**Via Email**
William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Two Liberty Place, 50 S. 16th Street
Suite 3200
Philadelphia, PA 19102-2555

Re:    **In Re Mushroom Direct Purchaser Antitrust Litigation
        Civ. No. 06-0620**

Dear Bill:

In light of the Court's October 18, 2011 order implementing the new Phase II discovery schedule and, prior to the imposition of the stay by the Third Circuit, our substantive and ongoing communications, both written and verbal, regarding document discovery, Class Plaintiffs would like to resolve all of the outstanding discovery requests for all Defendants as promptly as possible.

To that end, attached please find for your review a copy of our May 6, 2010 letter detailing the various outstanding discovery issues. In that letter, I asked you to either produce responsive documents for all the requests addressed by the letter or, in the event that no such documents exist, make a representation on behalf of each of your clients to that effect. Please consider this letter and the attached May 6, 2010 letter as a renewal of that request.

We would like to schedule a telephone conference either later today or tomorrow to discuss the substance of the requests and when we might expect a complete response.

Please advise as to your availability.

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 2

Best regards,

Jonathan Gerstein

cc:  Scott W. Fisher, Esq.
Barry L. Refsin, Esq.
H. Laddie Montague, Esq.

# GARWIN GERSTEIN & FISHER LLP

### Counselors at Law
### 1501 Broadway, Suite 1416
### New York, NY 10036
### (212) 398-0055
### Telecopier No. (212) 764-6620
### E-Mail: lawoffices@garwingerstein.com

May 6, 2010

**Via Email**
William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Two Liberty Place, 50 S. 16th Street
Suite 3200
Philadelphia, PA 19102-2555

> Re:   **In Re Mushroom Direct Purchaser Antitrust Litigation
> Civ. No. 06-0620**

Dear Bill:

I write to follow up on our prior correspondence regarding Defendants'
outstanding document productions. On March 19, 2010 I sent a letter to you in which I
requested the following:

> "Please complete your clients' production of documents in the agreed upon
> categories of our Phase I and Phase II discovery requests including without
> limitation documents in the above categories.[1]  We request that you complete this

---

[1] The "above categories" referenced by this sentence were listed in the letter as follows:

- Communications including, without limitation, emails and/or correspondence
  from EMMC member Defendants or affiliates to customers informing customers
  of price increases.
- Communications including, without limitation, emails and/or correspondence
  between Defendants and the EMMC, to the extent that any such documents exist
  beyond those that were produced to the Department of Justice pursuant to their
  investigation.
- Communications including without limitation emails and/or correspondence
  between and amongst Defendants.
- Transactional Data for Defendants other than those identified in my March 19,
  2010 as having provided data.

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 2

production as soon as is possible and, in any event, no later than April 9, [2010].
In addition, we request a representation from each Defendant that each has seen
our requests and made a good faith search to identify, locate, and produce all
responsive documents in its possession, custody or control.  Should any of your
clients have no documents that fall within our agreed upon Phase I and Phase II
requests, including, but without limitation, the above categories, please provide a
representation from that Defendant asserting that it has no documents responsive
to Plaintiffs' requests.  If any such documents were in existence but were
subsequently destroyed, please identify when such documents were destroyed."

Then, on April 19, 2010 I sent a letter replying to your April 15th response and
very modest additional production, thanking you for producing documents on behalf
defendants Oakshire and Phillips but also requesting the following:

"[P]lease tell us whether the documents produced on these discs comprise the
entirety of Oakshire's and Phillips' production of documents responsive to
Plaintiffs' Phase I and Phase II requests for the remainder of the case. Should
either defendant have no additional documents that fall within our agreed to Phase
I and Phase II requests, please provide a representation from that defendant
asserting that it has no additional documents responsive to Plaintiffs' requests."

"In addition, please make a representation on behalf of each defendant that each
has seen our Phase I and Phase II requests and made a good faith effort to search
for, identify, locate and produce all documents in their possession, custody or
control responsive to these requests. If any such responsive documents were in
existence for a particular defendant but were subsequently destroyed, please
identify that defendant and when such documents were destroyed."

"With respect to your ongoing efforts working with your clients to identify and
produce documents responsive to Plaintiffs' Phase I and Phase II requests, please
undertake to complete those reviews and productions as quickly as is practicable
and in any event no later than April 30, 2010 as these requests have been
outstanding for some time."

The April 30th deadline has lapsed and Defendants have failed to provide any
additional responsive documents or certifications that were requested by my March 19th
and April 19th letters. Moreover, our Phase II document requests have been outstanding
for nearly a year (since June 15, 2009) and a significant number of your clients still have
yet to produce any documents at all. Please promptly complete your clients' document
discovery by producing the remaining outstanding documents or, in the event that no
responsive documents exist, representations for each such client that they possess no
additional documents that are responsive to Plaintiffs' Phase I and Phase II requests.

We would like to arrange a telephone conference Monday or Tuesday of next
week (May 10th and 11th, respectively) to bring this discovery issue to a satisfactory

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 3

conclusion. Should we be unable to reach agreement, we expect to bring this matter to
Judge O'Neill for prompt resolution.

     Please inform us as to your availability for a conference call.

                            Best regards,

                            Jonathan Gerstein

cc:  Scott W. Fisher, Esq.
Barry L. Refsin, Esq.
H. Laddie Montague, Esq.
Moses Sliverman Esq.

# GARWIN GERSTEIN & FISHER LLP

COUNSELORS AT LAW
1501 BROADWAY
NEW YORK, NY 10036
(212) 398-0055
TELECOPIER NO. (212) 764-6620
E-mail: lawoffices@garwingerstein.com

BRUCE E. GERSTEIN
SCOTT W. FISHER
JOSEPH OPPER

**OF COUNSEL**
NOAH H. SILVERMAN

SIDNEY L. GARWIN
(1908-1980)

ELENA K. CHAN
EPHRAIM R. GERSTEIN
JONATHAN M. GERSTEIN
KIMBERLY M. HENNINGS
DAN LITVIN
ANNA L. TYDNIOUK

October 20, 2011

**Via Email**
William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Two Liberty Place, 50 S. 16th Street
Suite 3200
Philadelphia, PA 19102-2555

Re:    **In Re Mushroom Direct Purchaser Antitrust Litigation
Civ. No. 06-0620**

Dear Bill:

　　　In response to your request during our conference call this morning, attached please find copies of the two letters referenced in my May 6, 2010 letter: a March 23, 2010 letter (that I erroneously refer to as a March 19, 2010 letter in my May 6th letter) and an April 19, 2010 letter.

　　　During the call, you told us that you would:  (1) provide an updated transactional database early next week; and (2) check with your clients to make sure that they had produced all documents responsive to our discovery requests.  We also agreed to exchange lists of deponents so that we can begin scheduling depositions.  Our goal is to begin depositions within a month and to have all documents produced well before then to avoid the possibility of having to recall deponents.

　　　Thank you.

Best regards,

Jonathan Gerstein

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 2


cc: Scott W. Fisher, Esq.
Barry L. Refsin, Esq.
H. Laddie Montague, Esq.
Moira Cain-Mannix, Esq.
David P. Germaine, Esq.

# GARWIN GERSTEIN & FISHER LLP

**Counselors at Law**
**1501 Broadway, Suite 1416**
**New York, NY 10036**
**(212) 398-0055**
**Telecopier No. (212) 764-6620**
**E-Mail: lawoffices@garwingerstein.com**

March 23, 2010

<u>Via Email</u>
William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Two Liberty Place, 50 S. 16th Street
Suite 3200
Philadelphia, PA 19102-2555

      Re: In Re Mushroom Direct Purchaser Antitrust Litigation,
         Civ. Act. No. 06-0620

Dear Bill:

  As the Court has approved our stipulated schedule and Phase II discovery has recommenced, we would like to close the loop on your clients' outstanding document productions.

  To recap the current status of your clients' document productions, we have received transactional data for Giorgi, South Mill, Modern, Monterey, Bella/Buona, Country Fresh, and Gaspari. In addition, Giorgi, Modern, and Monterey produced a handful of additional documents relating to their sales of mushrooms products.

  Plaintiffs still await productions from the following Defendants, including transactional sales data:

- Cardile Mushroom
- Phillips Mushroom Farms
- Brownstone Mushroom Farms/To-Jo
- Forrest Mushroom, Inc.
- Harvest Fresh Farms
- Leone Pizzini & Son, Inc.
- LRP-M/Manfredini Enterprises
- Louis M. Marson Jr. Inc.
- M&T Mushroom Inc./Robert Masha Sales. Inc.

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 2

Plaintiffs have not received any documents from Defendants that fall within the following categories:

- Communications including, without limitation, emails and/or correspondence from EMMC member Defendants or affiliates to customers informing customers of price increases.
- Communications including, without limitation, emails and/or correspondence between Defendants and the EMMC, to the extent that there any such documents exist beyond those that were produced to the Department of Justice pursuant to their investigation
- Communications including without limitation emails and/or correspondence between and amongst Defendants.
- Transactional Data for Defendants other than those identified above as having provided data.

Please complete your clients' production of documents in the agreed upon categories of our Phase I and Phase II discovery requests including without limitation documents in the above categories.  We request that you complete this production as soon as is possible and, in any event, no later than April 9, 2010. In addition, we request a representation from each Defendant that each has seen our requests and made a good faith search to identify, locate, and produce all responsive documents in its possession, custody or control.  Should any of your clients have no documents that fall within our agreed upon Phase I and Phase II requests, including, but without limitation, the above categories, please provide a representation from that Defendant asserting that it has no documents responsive to Plaintiffs' requests.  If any such documents were in existence but were subsequently destroyed, please identify when such documents were destroyed.

Thank you for your attention to this issue. If you have any questions, please do not hesitate to call.

Best regards,

Jonathan Gerstein

cc:  Scott W. Fisher, Esq.
Barry L. Refsin, Esq.
H. Laddie Montague, Esq.
Moses Sliverman Esq.

# GARWIN GERSTEIN & FISHER LLP

**Counselors at Law**
**1501 Broadway, Suite 1416**
**New York, NY 10036**
**(212) 398-0055**
**Telecopier No. (212) 764-6620**
**E-Mail: lawoffices@garwingerstein.com**

April 19, 2010

**Via Email**
William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Two Liberty Place, 50 S. 16th Street
Suite 3200
Philadelphia, PA 19102-2555

Re:     In Re Mushroom Direct Purchaser Antitrust Litigation
Civ. No. 06-0620

Dear Bill:

Thank you for your letter of April 15, 2010 responding to my March 19, 2010 letter and updating us on the status of your clients' forthcoming document productions.

Also, thank you for the transactional data and documents produced on behalf of Oakshire and Phillips that were enclosed with the hard copy of your April 15th letter. As I requested in my March 19, 2010 letter, with respect to these defendants, please tell us whether the documents produced on these discs comprise the entirety of Oakshire's and Phillips' production of documents responsive to Plaintiffs' Phase I and Phase II requests for the remainder of the case. Should either defendant have no additional documents that fall within our agreed to Phase I and Phase II requests, please provide a representation from that defendant asserting that it has no additional documents responsive to Plaintiffs' requests.

In addition, please make a representation on behalf of each defendant that each has seen our Phase I and Phase II requests and made a good faith effort to search for, identify, locate and produce all documents in their possession, custody or control responsive to these requests. If any such responsive documents were in existence for a particular defendant but were subsequently destroyed, please identify that defendant and when such documents were destroyed.

With respect to your ongoing efforts working with your clients to identify and produce documents responsive to Plaintiffs' Phase I and Phase II requests, please undertake to complete those reviews and productions as quickly as is practicable and in

William A. DeStefano
Buchanan, Ingersoll & Rooney, PC
Page 2

any event no later than April 30, 2010 as these requests have been outstanding for some
time.

      Thank you for your attention to the above. If you have any questions, please do
not hesitate to call.

                          Best regards,

                          Jonathan Gerstein

cc:  Scott W. Fisher, Esq.
Barry L. Refsin, Esq.
H. Laddie Montague, Esq.
Moses Sliverman Esq.

# GARWIN GERSTEIN & FISHER LLP

COUNSELORS AT LAW
1501 BROADWAY
NEW YORK, NY 10036
(212) 398-0055
TELECOPIER NO. (212) 764-6620
E-mail: lawoffices@garwingerstein.com

BRUCE E. GERSTEIN
SCOTT W. FISHER
JOSEPH OPPER

OF COUNSEL
NOAH H. SILVERMAN

SIDNEY L. GARWIN
(1908-1980)

ELENA K. CHAN
EPHRAIM R. GERSTEIN
JONATHAN M. GERSTEIN
KIMBERLY M. HENNINGS
DAN LITVIN
ANNA L. TYDNIOUK

February 17, 2012

**Via Email**
William A. DeStefano
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA 19103

Re:    **In Re Mushroom Direct Purchaser Antitrust Litigation
Civ. No. 06-0620**

Dear Bill:

I am writing to you about the completeness of the document productions of your clients in this case. I have raised this issue with you on several occasions and requested several times that you confirm that the document productions of your clients are complete.[1]

To date, I have not received any such confirmation, and based on our review of the documents, it appears as though the productions are deficient in several significant respects including the following:

1. Contracts with mushroom purchasers during the class period. We asked for the production of contracts that pertain to the sale, purchase, or marketing of mushrooms (excluding invoices and bills of lading). *See* Phase II Doc. Request No. 4. Although some deponents have suggested that written contracts between EMMC members and their customers for the sale of mushrooms existed, we have not found a single such contract in any of the document productions. If you intend to rely on the existence of such contracts for any purpose, please produce all of them. In the absence of such a production, we will object to any reference to the alleged existence of such contracts.

---

[1] For example, I have inquired in correspondence about outstanding productions from your clients on March 23, 2010, April 19, 2010 and May 6, 2010. In addition, I sent correspondence following up on those inquiries on October 20, 2011.

2.  <u>Minimum price lists issued by the EMMC</u>.   All EMMC price lists should have been produced in response to Phase I Doc. Request No. 37 and/or Phase II Doc. Request No. 3.  We have been able to identify minimum prices lists with the following revision dates: 3/13/01, 4/19/01, 6/6/01, 3/1/02, 9/25/02, 10/11/02, 11/29/02, 1/26/03. At the very least, we are missing the EMMC's first price list from February, 2001.  We also request that you check to make sure that all other price lists have been produced.

3.  <u>Pricing Announcements</u>.  We repeatedly requested that your clients produce any correspondence that they sent to their customers announcing increases in the prices of mushrooms. *See*, *e.g.*, Phase II Doc. Request No. 3.   We are particularly interested in seeing those communications on and around February 4, 2001 and October 20, 2002. Your clients have produced no such announcements.  During his deposition, Mr. Ciarrocchi testified that Modern/C&C Carriage sent letters to its customers advising them of price increases, but further testified that no one had ever asked him to conduct a search for those letters in connection with this case. *See* Ciarrocchi Tr. 48:20-49:5.

4.  <u>Meet but not beat applications made to the EMMC</u>.  As you know, EMMC policies required members who wished to meet the pricing of non-members to submit meet but not beat applications to the Pricing Committee. *See* CREEK-RFP-0001067.  All such applications should have been produced in response to Phase I Doc. Request Nos. 42 and 43, but we have not found a single such application in the document productions.

5.  <u>Reports of pricing violations to the EMMC</u>.  Although there are a number of general references in EMMC meeting minutes to members violating the pricing policies of the EMMC (see, e.g. April 13, 2001 General Meeting Minutes, EMMC-DOJ-00222-25; June 5, 2001 General Meeting Minutes, EMMC-DOJ-00201-03), we have not seen documents specifically identifying the violators.  All such documents should have been produced in response to Phase I Doc. Request Nos. 42 and 43.

6.  <u>Minutes from all EMMC general and committee meetings</u>. Our document requests asked for all minutes produced of meetings of EMMC members. *See* Phase I Doc. Request Nos. 19, 20. While we have received a number of general EMMC meeting minutes and executive committee minutes, we do not have the following:

- EMMC General Meeting Minutes for January 2002 and April 2002 and after February 2003

- Executive Committee Minutes for any months other than January 2003 through March 2003

- EMMCGA General Minutes for any month other than February 2003 through April 2003

- Marketing Committee Minutes other than for October 2002

- Pricing Committee Minutes

- Minutes for any other EMMC committee.

    7.  <u>Financial statements</u>.  In Phase I, we requested all financial statements, whether audited or unaudited, showing assets, revenues, liabilities, and profits (Phase I Doc. Request No. 10), and Judge O'Neill entered an order specifically requiring such documents to be produced (*See* Dkt. No. 206).  While we have received some financial documents from your clients, the productions do not appear to be complete.  We do not have any financial statements at all for Forest Mushroom, Inc., Cardile Mushrooms Inc./Cardile Bros. Mushrooms Packaging, Louis M. Marson, Inc./Greenwood, Leone Pizzini & Son and Masha & Toto/M&T Mushrooms and the productions for your other clients appear incomplete.  Attachment 1 to this letter catalogues the deficiencies of your clients who have produced such information.

    8.  <u>Mushroom sales records</u>.   We requested transactional sales data in electronic form, if available, identifying each sale of mushrooms by each of your clients.  *See* Phase I Doc. Request No. 12.  Again, Judge O'Neill specifically ordered this data to be produced during Phase I.  See Dkt. No. 206.  While you have produced some sales data and recently supplemented some of the electronic productions, we still do not have any sales data from Masha & Toto/M&T, Leone Pizzini & Son and Forest Mushroom, Inc. and the data that we have are still incomplete.  Attachment 2 to this letter catalogues the sales data produced, the deficiencies, and questions that we have.  Please let us know what additional data is available and respond to our questions.

    Please instruct each of your clients to conduct a thorough search for documents responsive to each of the categories listed above and produce documents to Plaintiffs no later than February 27, 2012.  In this respect, we are concerned that a number of the recent deponents did not appear to have ever seen the document requests or to have been instructed to search for documents responsive to the various requests. Make sure that each of your clients has been instructed to search for all documents responsive to Plaintiffs' requests.   Once you have verified that your clients have searched for all of the documents responsive to Plaintiffs' Document requests, including the items identified in this letter, we once again ask you to confirm that all responsive documents have been searched for and produced.

    Thank you for your attention to this matter.  If you have any questions, please do not hesitate to call.

Best regards,

Jonathan Gerstein

cc:  Scott W. Fisher, Esq.
     Barry L. Refsin, Esq.
     H. Laddie Montague, Esq.
     Mayur P. Saxena, Esq.
     Moira Cain-Mannix, Esq.
     David P. Germaine, Esq.

Attachment 1

Financial Statements

| Defendant | Produced | Missing |
|---|---|---|
| Bella Farms | Balance Sheets and Income Statements for 2000-2005. Tax returns for Buona Foods. | Financial statements for the years 1999, 2006-2008. |
| Brownstone | Balance sheets and Income Statements for 2000-2005. | Financial statements for Brownstone for the years 1999, 2006-2008; Financial statements for To-Jo for the years 1999-2008 |
| Country Fresh | Audited financial statements for the years 2000-2005. | Financial Statements for the years 1999, 2006-2008 |
| Gino Gaspari & Sons/Gaspari Brothers | Audited financial statements for 2000-2005. | Financial Statements for the years 1999, 2006-2008 |
| Giorgi/Giorgio | Balance sheets and income statements for Giorgio Fresh and Giorgi Mushroom for 2000-2005 | Financial Statements for the years 1999, 2006-2008 |
| Mountain Fresh/Harvest Fresh | Profit and loss statements and Summary Balance Sheets for the years 2000-2005. | Financial Statements for the years 1999, 2006-2008 |
| LRPM/Manfredini | Income Statements for 2003-2005 for Manfredini Enterprises; Balance Sheets for 2004 and 2005. | Financial statements for LRP-M; Balance Sheets and Income Statements of Manfredini for the years 1999-2002, 2006-2008. Balance Sheet for 2003. |
| Modern | Audited financial statements for Modern, Sher-Rockee, and C&C Carriage for 2000-2005 | Financial Statements for the years 1999, 2006-2008 for each of the companies. |
| Oakshire | Financial statements for 2000-2005. | Financial Statements for the years 1999, 2006-2008 |
| Phillips | Income Statements and Balance sheets for | Financial Statements for the years 1999 |

| Defendant | Produced | Missing |
|---|---|---|
| | the years 2000-2007. | and 2008. |
| United Mushroom Farms | Tax returns and audited financial statements for the years 2003-2005. | Financial statements for the years 1999-2002, 2006-2008. |

**Attachment 2**

**Transactional Sales Data**

| Defendant | Produced | Missing | Questions |
|---|---|---|---|
| Mountain Fresh/Harvest Fresh | Electronic transactional detail for the years 2003-2005. Rundown of sales by year by customer for the years 2003-2007. | Transactional or summary data for 1999-2002 and 2006-2008. | |
| Buona/Bella | Revised electronic transactional data for 2006-2008. Earlier Phase II transactional data contained sales data for 2000-2006 with significant gaps. Examples: Only 2001 sales were in December. No 2002. 2003 only in November. 2004 only in November. 2004 only August. 2005 only November. Data reflected only customer, sale and price. | Complete transactional data or summary data for the years1999-2005 | |
| South Mill | Revised electronic transactional data beginning on March 19, 2001 through December 31, 2008. Earlier Phase II South Mill production also contained Kaolin sales data for the years 2001- 2008, beginning in March, 2001. | Transactional or summary data for 1999-March 19, 2001 | |
| Oakshire | Revised electronic transactional data for 1999-2008. Earlier | | |

| Defendant | Produced | Missing | Questions |
|---|---|---|---|
| | Phase II production also contained sales from 1999-2008. | | |
| Cardile | Revised electronic transactional data for 2006-2008 broken out by quarter (Q4 of '08 is broken out by month). All other sales information was produced via sales slips, invoices etc. for individual transactions. | Any electronic transactional data for 1999-2005. Any summary sales data for 1999-2005. | |
| Phillips | Revised transactional data for 2003-2008. Phase II data produced earlier also contained sales for the years 2003-2008. | Transactional data for 1999-2003. | |
| Country Fresh | Revised transactional data for September 2003 through December '08. Earlier Phase II production also contained sales for the years 2003-2008. | *Previously requested production of hardcopy invoices and sales slips for sales during the applicable period occurring before September 2003.* | |
| Monterey | Revised transactional data for 1999-2008 broken out by facility. Previous Phase II production contained sales for the years 1999-2008 but not separated by facility. | | |
| Giorgi | Revised transactional data for 2000-2008 for Giorgio Fresh. Previous Phase II production included the same. | | |

| Defendant | Produced | Missing | Questions |
|---|---|---|---|
| Modern | Revised transactional data for 2000-2008. Previous Phase II production included the same. | | Data provided does not have column headings. What are the column headings/field names? |
| Greenwood/Louis Marson | Hardcopy sales slips, invoices etc. for individual transactions for the years 2000-2006. | Evidence of sales for 2007-08. | |
| Gaspari | Transactional sales data for 2000-2007 with the exception of first half of 2001. Data set reflects that 1999 data was destroyed in a flood. | Transactional data for missing first half of 2001 and 2008. | Item and Memo fields appear as though they may be transposed in the 2000-2001 files. Please check. |
| Brownstone/To-Jo | Transactional data for purchasers by To-Jo from Mushroom Growers for the years 2000-2005; Individual Invoices for sales by To-Jo for the years 1999 (beginning in October) through 2007. | Purchases from growers by To-Jo for the years 1999, 2006-2008; Invoices for sales by To-Jo for 2008. Electronic transactional data for sales by To-Jo for the years 1999-2008. | To-Jo's invoices appear computerized. Can they be produced in a format that can be manipulated? |
| LRP-M | Transactional sales data for May, 2001 through 2007. | Transactional sales data for the years 1999-2000; January through April, 2001; 2008. | |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | x | |
| IN RE MUSHROOM DIRECT | : | **Master File No. 06-0620** |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | x | |
| _____ | | |

_____

**DECLARATION OF PROF. EINER ELHAUGE**

_____

I, Professor Einer Elhauge, submit this Declaration in connection with Plaintiffs' Sur-Reply in Opposition to Defendants' Summary Judgment and *Daubert* Motions:

1.      The Reply of M.D. Basciani & Sons. Inc. in support of its motion to exclude my expert testimony stresses a certain speech I gave six years ago to the American Antitrust Institute.  Basciani claims that the speech shows that I am biased in this case, was pitching my expert services to plaintiffs' lawyers, and was acting as a lawyer.

2.      The topic of this 2008 speech has **nothing** to do with the issues or industry at issue in this case.  The topic of the speech was about merger enforcement and the implications of statistical evidence showing that public merger enforcement had declined during the George W Bush Administration, as is made clear by the attached slides from this talk.  *See* Appendix A. The speech did not at all discuss cartels, the mushroom industry, market definition, how to

determine common impact, or any of the other topics at issue in this case. Nor did the speech anywhere discuss the law or develop new legal theories for lawsuits.

3.      Instead, the 2008 speech stressed that the decline in public merger enforcement created an empirical opportunity for academic and agency studies to determine which sorts of mergers raised prices, and I mainly discussed how the government could obtain data and how to address the selection bias issues raised by econometric studies of past mergers. *See* Appendix A Slides 2-7. To illustrate the potential for future data analysis, I presented preliminary results of econometric analysis based on data collected by state insurance regulators that showed that health insurer mergers that produced certain concentration levels had raised prices in a way that was statistically significant. *See* Appendix A Slides 8-10. The line about "whetting their appetite" referred to the fact that I was presenting preliminary results only to whet the appetite of my audience for such studies, and that such preliminary results should not be interpreted as the final word because not all health insurer mergers had been coded yet. *See* Appendix A Slide 8 ("***Preliminary*** results (not all mergers coded yet) – so just to whet appetite, not final word.") (emphasis in original). Finally, I discussed various econometric techniques for measuring damages in merger cases. *See* Appendix A Slides 12-13

4.      In my speeches, I generally try to point out the relevance of my analysis to my audience in order to keep the audience interested. Because this speech was given at a conference on private enforcement and many in the audience were trial attorneys, in one of my 13 slides, I noted that the decline in public merger enforcement created an opportunity for private enforcement if data analysis showed that these mergers did raise prices, but that this opportunity would end if public enforcement rose under the Obama administration. *See* Appendix A Slides 11. I teased my audience humorously with some of the language Basciani cites because I find

2

that humor often helps audiences get through dry technical analysis, especially during a lunchtime speech, and the audience laughed accordingly.

5.    Basciani's claim that this language instead shows I was pitching my services as an economic expert against health insurer mergers is entirely untrue.   Indeed, since that 2008 speech, I have ***never*** been an expert or lawyer working for plaintiffs bringing an antitrust challenge to any merger in the healthcare or any other industry.   In contrast, since then I have served as an economics expert for many health insurer ***defendants*** in antitrust matters, and have twice consulted for parties ***defending*** mergers in other industries.   Unfortunately, because these defense matters are confidential, I cannot identify the parties.


I hereby declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 19th day of March, 2014.


*Einer Elhauge*
_____

Prof. Einer Elhauge

APPENDIX A

# The Future of Antitrust Enforcement:
# Public and Private

Einer Elhauge

Petrie Professor of Law

Harvard Law School

# Overview

- **Merger enforcement dropped off** during recent Bush administration, especially at DOJ, which creates:
- **Empirical opportunity** for public agencies and academics seeking to improve public enforcement by studying price effects of past mergers.
- **Litigation opportunity** for private enforcement actions seeking damages from consummated mergers.

# The Enforcement Drop Off

- Far fewer merger enforcement actions than under Clinton.
- Just reflects fewer merger filings?
  - No, odds Bush DOJ would challenge large mergers 58% below Clinton levels.  (FTC only 11-19% lower).  AAI; Baker & Shapiro.
- Just difference between Democrats and Republicans?
  - No, Bush Jr. DOJ odds also 50% below Bush Sr. DOJ levels.
- Just reflects fact that something changed about character of mergers during this period?  No:
  - Enforcement drop off less at more bipartisan FTC.
  - Bush Jr. DOJ also 42% less likely to challenge mergers that it thought merited serious investigation (FTC 14% less likely).  Harkrider.
  - Regression that adjusts for antitrust risk finds Bush Jr DOJ 24% less likely to challenge mergers with 98.9% confidence.  (Bush FTC 12% less likely with 82.9% confidence). Harkrider
  - Antitrust lawyers believe merger standards got laxer.  B&S survey.
  - Laxer standards should have induced *more* worrisome mergers, which makes drop off in odds more striking.
- But was the enforcement drop off bad for consumers?

# The Empirical Opportunity

- When agencies applied incipiency standard, that left less room for empirical analysis of which merger concentration levels and other factors tended to increase prices.
  - Many studies were done, and usually found mergers increased prices, but virtually all lacked enough samples at various concentration levels to statistically test possible HHI thresholds, etc.
  - Important because need to know not just whether mergers generally increase prices, but *which future* mergers to block.
- Recent period of laxer antitrust enforcement should allow more thorough empirical analysis of such issues
  - by providing a bigger sample of mergers with relatively high concentration levels.
- AAI, AMC, ABA all favor retrospective merger studies.
- But need data, by market and firm, on mergers, prices, costs, output, etc.  Where going to get that?

# Government Data Collection

- FTC has authority to require businesses to provide periodic reports on their business, conduct, and practices in whatever form the FTC wants, so could demand regular electronic data on sales and costs.  FTC Act §46(a)-(b).
  - Except certain financial institutions & common carriers.
- FTC cannot make confidential financial information public, but could keep firm-specific data confidential by aggregating data in reports on optimal enforcement policy.  FTC Act §46(f).
  - Can also pass data on to enforcement agencies.

# The Selection Bias Concern

- Dennis Carlton has pointed out that studying price effects of allowed mergers has a selection bias problem.
- If agency is deciding optimally
  - it allows all mergers expected to lower prices and blocks all others.
  - Thus, the set of correctly-allowed mergers should result in an expected *decrease* in price.
- If agency is too lax
  - It incorrectly allows some mergers expected to increase price
  - But combined with the expected decrease from the correctly-allowed mergers, the net effect may still be a *decrease* in prices.
- If we find that post-merger prices do increase, "then we know the government policy is too lax." Carlton. But this is a very conservative test because "retrospective studies of price change can show negative price increases even if the government policy is too lax."  *Id.*

3

# Addressing Selection Bias

- Carlton suggests can address it by combining market data with data on what the agencies predicted would happen.
  - Agencies should fill out data sheet at end of each merger investigation detailing its predictions on price, cost, etc.
  - Good idea, but doesn't help assess the past, and if merger enforcement goes back up will lose opportunity to examine effects of laxer enforcement.
- Alternatives
  - Can estimate excess laxity by the largest price increase allowed, if one adjusts for neutral error rates.
  - Can limit analysis to cases that agencies considered close calls.
  - Can just take into account that retrospective studies will tend to be conservatively biased toward price decreases.

# Health Insurer Merger Study

- Elhauge & Reinker – Using NAIC data to look at multiple health insurer mergers in 2000s.
- State by state data on each insurer's prices, costs, share, etc.
- *Preliminary* results (not all mergers coded yet) – so just to whet appetite, not final word.
- Summary stats: States with horizontal insurer mergers had a greater increase in prices, costs, profit margin, markup and concentration than non-merger states.
- Regressions controlling for post-merger HHI and HHI change, change in statewide costs, year, and state show that health insurer mergers caused price increases.

# Preliminary Summary Results
## % Change from Year Before Merger to After

|  | ΔHHI | ΔPrice | ΔCost | ΔProfit Margin | ΔMark up |
|---|---|---|---|---|---|
| **Merger States** | 25% | 25% | 20% | 29% | 41% |
| **Other States** | 6% | 19% | 18% | 7% | 6% |

- Preliminary finding that costs increased faster in merger states suggests health insurer mergers did not generally increase efficiency.

# Preliminary Regression Results on Insurer Merger Price Effects

| Post-Merger HHI | ΔHHI < 50 | ΔHHI > 50 |
|---|---|---|
| **1000-1799** | +3% | +1% |
| **1800-2999** | +12%* | +2% |
| **3000 or more** | No data | +12%* |

* Statistical confidence > 98%.  Other results not (yet) significant.

- Results conservative given Carlton effect (no price decrease)

- If HHI >3000 = "close call," data indicates significant laxness.

- 1800-2999 results suggest maverick effects may dominate this range.

## Private Enforcement Opportunity

- Traditionally, few private suits seeking damages from price increases caused by mergers.
- But that is probably because agencies historically applied an incipiency standard, so less likely to have consummated mergers that significantly increased prices.
- Laxer enforcement by Bush Jr. DOJ creates opportunities in next few years for buyer suits and class actions seeking damages for price increases caused by anticompetitive mergers.
- Window of opportunity for such private enforcement may close soon if Obama DOJ restores prior public enforcement levels.

## Proving Merger Damages

- Too difficult to prove?  Should be easier than most antitrust cases because:
  - Have discrete well-defined moment of change.
  - The change applies to all buyers in relevant market.
- Regressions to Calculate Price Increase
  - Use multi-market data where some markets unaffected by the merger.
    - can be hard to get data if other markets involve nonmerging parties (absent government reports on other markets), and
    - may not help if lack multiple geographic markets for comparison.
  - Use single market data to do before and after regression – distant or nonbrand firms might provide good control group in differentiated market cases.

# Fancier Methods

- Use single market data to fill model variables
- Unilateral effects:  $(P-C)/P = S/(\varepsilon_d + \varepsilon_{rs}(1-S))$
  - Can use market *or* product space to define right-side variables.
- Differentiated Market: $\Delta price = R(P-C-EC)D/(1-D)$
  - R = rate of cost pass through (0.5 with linear demand).
  - E = efficiency % cost reduction.
  - D = diversion ratio - fraction of one firm's sales gain that comes from other firm's sales loss
- Oligopoly Effects:  $(P-C)/P = HHI(1+K)/\varepsilon_d$
  - K = conduct parameter, which can empirically vary from -1 (perfect competition) to 0 (Cournot) to (1-HHI)/HHI (perfect coordination).
- More Complex Merger Simulations.

7