

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | | |
| THIS DOCUMENT RELATES TO: | : | |
| All Actions | | |
| | | |
| O'NEILL, J. | | August 27, 2015 |

## MEMORANDUM

Presently before me in this antitrust litigation are opt-out plaintiffs Publix and Giant Eagle's[1] motion to exclude the expert testimony of Dr. Rigoberto Lopez offered on behalf of defendant M.D. Basciani (Dkt. No. 641), M.D. Basciani's response (Dkt. No. 654) and plaintiffs' reply (Dkt. No. 657).  For the reasons that follow, I will grant plaintiffs' motion in part and deny it in part.

## BACKGROUND

Plaintiffs allege that the EMMC conspired to set minimum prices and established a supply control program for fresh agaricus mushrooms.  M.D. Basciani is a defendant in this antitrust litigation and has offered the expert opinions of Dr. Lopez in opposition to the expert opinions offered by Professor Einer Elhauge, Dr. Keith Leffler and Dr. Paul Prentice.  See Lopez Rpt.  Here, plaintiffs move to exclude portions of Dr. Lopez's opinions regarding Drs. Leffler and Prentice.[2]  Dr. Lopez is a professor and the head of the Department of Agricultural and Resource Economics at the University of Connecticut.  See id. at ¶¶ 1, 2.  He is also the director

---

[1]    I will refer to opt-out plaintiffs as "plaintiffs" throughout.

[2]    I have already addressed direct purchaser plaintiffs' motion to exclude Dr. Lopez's opinions with respect to Prof. Elhauge, see Dkt. Nos. 712, 713, and defendants' motions to exclude Prof. Elhauge and Dr. Leffler's opinions.  See Dkt. Nos. 693, 694, 703, 704.

ENTERED

AUG 27 2015

CLERK OF COURT

of the Zwick Center for Food and Resource Policy at the University of Connecticut, specializes in the economics of food systems and has a Ph.D. in Food and Resource Economics from the University of Florida. Id.

Plaintiffs submitted an expert report by Dr. Leffler as evidence of anticompetitive impact and damages they allegedly suffered due to defendants' policies. See Leffler Rpt. Dr. Leffler's reports are based on two multi-variable regression analyses, one for each opt-out plaintiff, which attempt to isolate and quantify the impact on mushroom prices caused by and damages resulting from defendants' policies. See id. at ¶¶ 54-60. Dr. Leffler submitted a rebuttal report responding to defendants' experts' criticisms of his opinions, including criticisms by Dr. Lopez. See Leffler Reb. Rpt. Dr. Leffler is a Ph.D. economist and a retired professor of economics with extensive experience testifying in the field of antitrust economics. See Leffler Rpt. at ¶ 1.

Plaintiffs submitted an expert report by Dr. Prentice giving a general background on the mushroom industry and Dr. Prentice submitted a rebuttal report addressing criticisms made by Dr. Lopez. See Prentice Rpt; Prentice Reply. Dr. Prentice is a professor of economics at Yorktown University and holds a Ph.D. in agricultural economics. See Prentice Rpt. at 2.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When faced with expert testimony, the district court acts "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) (internal quotations omitted). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

2

understand the evidence or to determine a fact in issue; **(b)** the
testimony is based on sufficient facts or data; **(c)** the testimony is
the product of reliable principles and methods; and **(d)** the expert
has reliably applied the principles and methods to the facts of the
case.

Fed. R. Evid. 702.  In short, Rule 702 "embodies a trilogy of restrictions on expert testimony:

qualification, reliability and fit."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396,

404 (3d Cir. 2003).

First, expert qualification "refers to the requirement that the witness possess specialized

expertise."  Id.  The Court of Appeals has "interpreted this requirement liberally, holding that a

broad range of knowledge, skills, and training qualify an expert."  Id.  Second, the Court of

Appeals has "made clear" that "the reliability analysis required by Daubert applies to all aspects

of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link

between the facts and the conclusion."  ZF Meritor, 696 F.3d at 291 (internal quotations

omitted).  Third, the requirement of "fit" means that "the expert's testimony must be relevant for

the purposes of the case and must assist the trier of fact."  Schneider, 320 F.3d at 404.  The party

offering the testimony bears the burden of demonstrating compliance with Rule 702.  See

Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd., 362 F. App'x 332, 335 n.2 (3d Cir. 2010).

Under Daubert and Rule 702, "[p]roponents of expert testimony do not have to prove

their case twice—they do not have to demonstrate to the judge by a preponderance of the

evidence that the assessments of their experts are correct, they only have to demonstrate by a

preponderance of evidence that their opinions are reliable."  In re DVI, Inc. Sec. Litig., No. 03-

5336, 2014 WL 4634301, at *5 (E.D. Pa. Sept. 16, 2014) (emphasis in original), citing In re

Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).  Thus, Daubert "focuses on

principles and methodology, not on the conclusions generated by principles and methodology."

In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000).  But

where the "analytical gap between the data and the opinion proffered is too great and is

connected only by the ipse dixit of the expert, not by any evidence" expert testimony is properly

excluded.  Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009)

(affirming exclusion of expert testimony as unreliable).  "'[N]othing in either Daubert or the

Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the ipse dixit of the expert.'"  In re Human Tissue Prods. Liab. Litig., 582

F. Supp. 2d 644, 656 (D.N.J. 2008), citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997);

see also Player v. Motiva Enters., LLC, 240 F. App'x 513, 520 (3d Cir. 2007) (stating the

"District Court certainly had the discretion to exclude opinion evidence that is connected to

existing data only by the ipse dixit of the expert." (internal citations omitted)).

## DISCUSSION

Plaintiffs contend that Dr. Lopez's opinions regarding Dr. Leffler and Dr. Prentice's

reports should be excluded under Federal Rules of Evidence 702 and 403.  Dr. Lopez's

qualification to testify in this case is not at issue.  Plaintiffs also do not move to exclude Dr.

Lopez's opinions with regard to Dr. Leffler's choice of cost and demand variables.  See Dkt. No.

642 at 16 n.4.  I will address plaintiffs' arguments in turn.

### I.   Dr. Lopez's Opinions Regarding Dr. Leffler's Damages Models

Plaintiffs contend that Dr. Lopez's opinions regarding Dr. Leffler's damages models

should be excluded under Rule 702.  See Dkt. No. 642 at 8-16.  Plaintiffs contend Dr. Lopez's

opinions are not based upon any reliable empirical analysis and do not fit the facts because they

are not tied to the factual record.  Id.  Specifically, plaintiffs argue that Dr. Lopez improperly

opines that (1) Giant Eagle and Publix exercised "buyer power" to lower prices below

4

competitive levels, (2) Publix's prices increased due to its own increased quality requirements

and (3) Dr. Leffler had no basis for including conduct periods after ███████ in his models.

### A.      Buyer Power

Dr. Leffler used a competitive benchmark period from ███████████ in

his Giant Eagle regression to reflect his conclusion that Giant Eagle obtained competitive prices

in that time period as a result of an internet auction it ran to set its contract prices.  I have already

found Dr. Leffler's use of a competitive benchmark for this time period is reliable.  See Dkt.

Nos. 703, 704.  Dr. Lopez opines in the background section of his report that "it is also possible

for buyers to exercise market power . . . to lower prices below the competitive level . . .

mushroom producers sell to many large buyers such as ████ and █████ among others,

whose purchases are large enough to have the ability to exercise a degree of buying power . . .

beyond a simply negotiated price . . . ."[3]  Lopez Rpt. at ¶ 23.  Dr. Lopez then opines that the

prices paid by Giant Eagle during ██████ through █████ "do not reflect success

other than possibly in paying prices lower than the competitive norm . . . they could well reflect

buying power on the part of Giant Eagle."  Id. at ¶¶ 88-89.  Generally, an opinion that a party

"may have bid at a 'negative margin' without exploring the relationship between variable costs,

fixed costs, and profits" in order to establish that a price was set at an anticompetitive level is

insufficient.  Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 532 (5th Cir. 1999); see

also In re Se. Milk Antitrust Litig., 801 F. Supp. 2d 705, 728 (E.D. Tenn. 2011) (finding that

simply because a buyer is a "major player, perhaps a leader, in the market . . . does not establish,

---

[3]      Also known as monopsony power, which "is to the buy side of the market what a
monopoly is to the sell side and is sometimes colloquially called a buyer's monopoly."
Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320 (2007) (internal
citation omitted).

however, that [it] has the ability to set prices at an anti-competitive level."). Additionally, Dr. Leffler reasonably opines in his rebuttal report that Giant Eagle's buyer power is irrelevant as an explanation for the lowering of prices during this time period because any buyer power wielded by Giant Eagle would be constant across the entire relevant time frame of benchmark and conduct periods. See Leffler Reb. Rpt. at ¶ 7.

Dr. Lopez does not provide any basis in the factual record or empirical analysis to support his opinion that Giant Eagle's buyer power, as opposed to the auction conducted by Giant Eagle, is the reason it achieved lower prices during the ███████████████ time frame. Plaintiffs correctly argue that for the purposes of Rule 702, Dr. Lopez would have to provide substantially more support to reliably reach the conclusion that Giant Eagle exercised market power in such a way that it could lower prices below competitive prices. The only support offered for this conclusion is Dr. Lopez's opinion – but such "ipse dixit fails to meet the reliability standard in Daubert." In re Human Tissue, 582 F. Supp. 2d at 680. Thus, I will grant plaintiffs' motion and exclude Dr. Lopez's opinion that Giant Eagle achieved lower prices during Dr. Leffler's competitive benchmark period due to its buyer power.

**B.     Publix's Price Adjustment**

Plaintiffs agree that Publix terminated its purchase/supply agreement with defendant ████████ because of concerns regarding the quality of ████████ mushrooms. See Dkt. No. 642 at 14. Dr. Lopez opines, however, that the increased prices set by the contracts Publix awarded to defendants ██████ and ██████ in ████ following the termination of the ████████ agreement were "the direct result of Publix placing explicitly greater emphasis on non-price terms of trade, i.e. quality and service." Lopez Rpt. at ¶ 95. Plaintiffs contend that I should exclude this opinion because it is offered with no support other than Dr. Lopez's ipse dixit. Dr.

Lopez performs no analysis of prices that Publix paid before and after the termination of the

███ contract or to support his contention that the increased price was driven by Publix

changing, rather than simply finding new suppliers to meet, its requirements regarding quality

and service.  I am mindful that "[a] party confronted with an adverse expert witness who has

sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion

can highlight those weaknesses through effective cross-examination."  Stecyk v. Bell Helicopter

Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002).  There is record evidence supporting the

proposition that Publix terminated its agreement with ███ due to quality concerns.  See

Dkt. No. 642 at 14-15 (citing exhibits).  In his report, however, Dr. Lopez provides no relevant

analysis or citation to the record regarding the prices paid by Publix and their relation to Publix's

quality requirements for ███ and ███ other than his ipse dixit.  Thus, I will grant

plaintiffs' motion and exclude Dr. Lopez's opinion regarding the prices Publix paid under its

contracts awarded to ███ and ███ in ███.

**C.     Dr. Leffler's Conduct Periods After ███**

In his Publix model, Dr. Leffler defines the conduct period to include both the time when

the EMMC minimum pricing policy existed from ███ through ███ and the

three years and four months following the suspension of that policy until ███.

Leffler Rpt. at ¶ 59.  In his Giant Eagle model, Dr. Leffler includes a second conduct period from

███ until ███ to reflect that prices were set during that period based on a

contract entered into in ███ rather than the competitive auction.  Id. at ¶ 57.  I have already

found that Dr. Leffler's inclusion of these conduct periods in his model is reliable.  See Dkt. No.

703, 704.  Dr. Lopez opines in his report that "Dr. Leffler does not offer a solid economic

justification for extending the conspiracy period beyond ███" when the EMMC

minimum pricing policy officially ended.  Lopez Rpt. at ¶ 93.  Dr. Lopez states that this conduct

period "does not withstand empirical scrutiny," id. at ¶ 87, but he fails to provide any empirical

analysis of whether there were conspiratorial effects or lingering price effects due to the

EMMC's policies during this period.  Dr. Lopez performs no analysis to support his claim that

"Dr. Leffler does not offer any solid economic justification" for including a conduct periods after

██████████ in his models.  Indeed, Dr. Leffler offers justifications in his report for these

conduct periods, see Leffler Rpt. at ¶¶ 29-32, Leffler Reb. Rpt. at ¶ 16-17, and I have found that

those conduct periods are reliable.  See Dkt. Nos. 703, 704.  Without any analysis, Dr. Lopez's

opinion regarding this issue is simply ipse dixit and is inadmissible under Rule 702.  Thus, I will

grant plaintiffs' motion and exclude Dr. Lopez's opinions regarding Dr. Leffler's inclusion of

conduct periods after ████████ .

**D.    Imports**

Dr. Lopez asserts in his report that plaintiffs Publix and Giant Eagle "have options to buy

outside the EMMC and mushrooms from other countries, particularly neighboring ones."  Lopez

Rpt. at ¶ 96.  Plaintiffs contend that Dr. Lopez did nothing to evaluate whether such options

actually exist for plaintiffs and that therefore this opinion should be excluded.  See Dkt. No. 642

at 11 n.1.  Although Dr. Lopez does discuss imports in the mushroom market generally in the

background of his report, see Lopez Rpt. at ¶ 26, I agree that Dr. Lopez does not provide any

basis for his statement in paragraph 96 that plaintiffs specifically have these purchasing options.

Thus, I will exclude this statement because it is based on nothing but his ipse dixit and is not

grounded in the factual record of the case.

## II.      Dr. Lopez's Opinions Regarding Prentice's Report

First, Dr. Prentice states in his report that U.S. mushroom production trended downward

in the ███████████. See Prentice Rpt. at 2-3. Dr. Lopez opines that Dr. Prentice's

statement is not applicable to the geographic market defined by Prof. Elhauge and that Dr. Lopez

has shown production in Pennsylvania and the non-Western United States went up during that

time period. Lopez Rpt. at ¶ 98. Plaintiffs contend that the increase or decrease of mushroom

production in absolute terms is irrelevant and thus Dr. Lopez's criticism of Dr. Prentice's report

should be excluded. I have already precluded Dr. Lopez from opining on the absolute increase

or decrease in mushroom production as it relates to mushroom prices and production in the but-

for world and as it relates to Prof. Elhauge's opinions. See Dkt. No. 712, 713; see also In re

Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 222 (M.D. Pa. 2012) (stating that

"[w]hen calculating damages, the usual measure in an over-charge case is the difference between

the illegal price that was actually charged and the price that would have been charged 'but for'

the violation" (internal citations omitted)). However, Dr. Lopez offers the same testimony in

paragraph 98 of his report to rebut the limited factual statement by Dr. Prentice regarding

absolute production of mushrooms. I will not exclude Dr. Lopez's testimony regarding absolute

levels of mushroom production to that limited extent. However, I have already accepted

plaintiffs' argument that any further extrapolation of Dr. Lopez's statement regarding absolute

levels of production to the but-for world is inadmissible.

Second, Prof. Lopez opines that an increase in demand rather than defendants' supply

control program involving buying and deed restricting mushroom farms is responsible for price

increases. See Lopez Rpt. at ¶ 99. He conducts no analysis to support this conclusion other than

to state the general proposition that according to basic economic principles since there was "both

an increase in price and an increase in supply . . . an upward shift in demand must have occurred during this period." Id. Although I agree with M.D. Basciani that Dr. Lopez clearly does not intend to state that increased demand was the only factor responsible for increasing prices, see Dkt. No. 654 at 30, I am troubled by the conclusory language of Dr. Lopez's opinion as an explanation for increasing prices in the absence any analysis to support its ultimate relevance to the question of mushroom prices in the but-for world absent defendants' policies. Again, the relevant inquiry here is the levels of production and prices but-for the existence of defendants' minimum pricing and supply control policies. Opinions grounded in absolute trends in pricing and supply offered to rebut but-for supply and pricing testimony have the potential to confuse the jury about the relevant inquiry and at worst are unreliable. See Prentice Reply at 4 (noting that Dr. Lopez is correct that increased demand "can lead to an increase in price" but also opining that the "observation is irrelevant" because "[w]hat matters when determining the economic effects of the EMMC–led actions is whether those actions resulted in less production than there otherwise would have been, and therefore whether prices were higher than they otherwise would have been."); Lopez Rpt. at ¶ 100 (opining that "[w]ithout controlling for increasing input prices or other market conditions one cannot just assume that" leaps in prices are due to conspiracy behavior"). Thus, I will grant plaintiffs' motion and exclude Dr. Lopez's opinion regarding increased demand as an explanation for increased mushroom prices.

Third, plaintiffs point out that the same issue of absolute values being used to make inferences about the but-for world exists in paragraph 100 of Dr. Lopez's report, where he opines that "prices for mushrooms in California went up dramatically . . . even though EMMC pricing policies did not apply to that geographic area." Lopez Rpt. at ¶ 100; Dkt. No. 642 at 19-20. Dr. Lopez does not explain how absolute prices for mushrooms in California are relevant to the but-

for prices plaintiffs would have paid absent defendants' pricing and supply policies.[4]  Dr. Lopez

even states in the same paragraph that without "controlling for increasing input prices or other

market conditions one cannot just assume" whether price movement is due to anticompetitive

conduct or not.  Lopez Rpt. at ¶ 100.  Despite that statement, Dr. Lopez goes on to opine that that

his "analysis reveals that even though Pennsylvania prices went up . . . so did prices in California

and even more so . . . prices received by Pennsylvania producers are still significantly below

those received by similar producers in California."  Id. at ¶ 101.  The context of these statements

is clear – they are meant to cast doubt on the effectiveness of the EMMC's supply control and

minimum pricing policies even though Dr. Lopez does not conduct any but-for analysis of

supply or prices.  The "analytical gap" between California prices and prices plaintiffs would

have paid in the but-for world absent defendants' conduct is simply "too great."  Meadows, 306

F. App'x at 790.  Thus, I will grant plaintiffs' motion and exclude Dr. Lopez's California price

comparison analysis.

     Finally, despite plaintiffs' contentions and without determining the merits of Dr. Lopez's

criticisms of Dr. Prentice's report, I will not exclude Prof. Lopez's opinion that "one cannot just

assume that" great leaps in prices are suggestive of conspiracy behavior because that statement is

consistent with the requirements of reliable testimony regarding mushroom prices in the but-for

world.  See Dkt. No. 642 at 18-19.

## III.    Rule 403

     Plaintiffs also move to exclude Dr. Lopez's testimony under Rule 403.  Rule 403

provides that "[t]he court may exclude relevant evidence if its probative value is substantially

---

[4]     Dr. Lopez does not conduct an empirical out-of-sample test of Dr. Leffler's model using California prices such as the test Dr. David conducts in his report.  See David Rpt. at ¶ 70-72.

outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Since I have already excluded the unreliable portions of Dr. Lopez's testimony, I will deny plaintiffs' motion under Rule 403.  Prof. Lopez's remaining admissible testimony will not prejudice plaintiffs.

## CONCLUSION

For the reasons above, I will grant plaintiffs' motion and exclude Dr. Lopez's opinion that Giant Eagle achieved lower prices during Dr. Leffler's competitive benchmark period due to its buyer power, Dr. Lopez's opinion regarding the prices Publix paid under its contracts awarded to ▉▉ and ▉▉ in ▉▉, Dr. Lopez's opinion regarding Dr. Leffler's inclusion of conduct periods after ▉▉▉, Dr. Lopez's statement that plaintiffs specifically had options to buy outside the EMMC and from other countries, Dr. Lopez's opinion regarding increased demand as an explanation for increased mushroom prices and Dr. Lopez's California price comparison analysis.  I will deny plaintiffs' motion insofar as it seeks to exclude Dr. Lopez's opinion directly responding to Dr. Prentice's statement regarding absolute quantities of mushroom production and Dr. Lopez's opinion that one cannot assume price changes are suggestive of conspiracy behavior absent but-for analysis.  I also will deny plaintiffs' motion under Rule 403.

An appropriate Order follows.