IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION | : : : : | Master File NO. 06-0620 |
| THIS DOCUMENT RELATES TO All Actions | : : : | |
| O'NEILL, J. | : | August 11, 2015 |

## MEMORANDUM

Presently before me in this antitrust litigation are putative class plaintiffs'[1] motion to exclude the testimony of Eastern Mushroom Marketing Cooperative (EMMC) defendants' expert Dr. John Johnson (Dkt. No. 583), EMMC defendants' response (Dkt. No. 590) and plaintiffs' reply (Dkt. No. 597). On May 19 and 20, 2015, the Court held a Daubert hearing regarding this and other related Daubert motions. For the reasons that follow, I will deny plaintiffs' motion.

## BACKGROUND

Plaintiffs in this putative antitrust class action are purchasers of fresh agaricus mushrooms. See Dkt. No. 670 at 2. Plaintiffs' motion for certification of a direct purchaser class is pending before me. See Dkt. No. 514. Defendants include the EMMC and other entities that were members of the EMMC or were affiliates of members of the EMMC. See Dkt. No. 670 at 2. Plaintiffs claim that defendants committed antitrust violations when they agreed to set minimum prices of mushrooms and to restrict the supply of mushrooms by purchasing and deed restricting mushroom farms. Id. Plaintiffs submitted an expert report by Professor Einer Elhauge in support of their motion for class certification and as evidence of damages. See Elhauge Rpt. EMMC defendants submitted an expert report by Dr. John Johnson in support of their opposition to class certification. See Johnson Rpt. Prof. Elhauge submitted a reply report responding to Dr.

---

[1] I will refer to putative class plaintiffs as "plaintiffs" throughout.

Johnson's report.  See Elhauge Reply.  EMMC defendants and defendant M.D. Basciani both moved to exclude Prof. Elhauge's opinions.  See Dkt. No. 515; Dkt. No. 521.  On July 29, 2015, I denied defendants' motions to exclude Prof. Elhauge's opinions.  See Dkt. Nos. 693, 694.  Now I will consider plaintiffs' motion to exclude Dr. Johnson's opinions.  See Dkt. No. 585.

## STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  When faced with expert testimony, the district court acts "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation."  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290 (3d Cir. 2012) (internal quotations omitted).  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; **(b)** the testimony is based on sufficient facts or data; **(c)** the testimony is the product of reliable principles and methods; and **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In short, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  First, expert qualification "refers to the requirement that the witness possess specialized expertise."  Id.  The Court of Appeals has "interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert."  Id.  Second, the Court of Appeals has "made clear" that "the reliability analysis required by Daubert applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion."  ZF Meritor, 696 F.3d at 291 (internal quotations

2

omitted). Third, the requirement of "fit" means that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404. Finally, the party offering expert testimony bears the burden of demonstrating compliance with Rule 702. See Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd., 362 F. App'x 332, 335 n.2 (3d Cir. 2010).

Under Daubert and Rule 702, "[p]roponents of expert testimony do not have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." In re DVI, Inc. Sec. Litig., No. 03-5336, 2014 WL 4634301, at *5 (E.D. Pa. Sept. 16, 2014) (emphasis in original), citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994). Thus, Daubert "focuses on principles and methodology, not on the conclusions generated by principles and methodology." Id.

**DISCUSSION**

Plaintiffs argue that Dr. Johnson's opinions are inadmissible under Rule 702 for four reasons: (1) Dr. Johnson misinterprets the concept of statistical significance; (2) Dr. Johnson's sensitivity analysis uses benchmark periods unsupported by the facts; (3) Dr. Johnson compares the wrong prices in conducting his analysis; and (4) Dr. Johnson's opinions do not fit the facts of the case because he does not address a piece of critical evidence. Dkt. No. 585 at 3-4. I will address each of these contentions in turn.

**I.    Statistical Significance**

Plaintiffs contend that Dr. Johnson's expert report is unreliable because it is based on a flawed understanding of basic statistical and econometric principles. Specifically, plaintiffs

3

argue that Dr. Johnson improperly characterizes his findings when he concludes that his testing shows a "substantial number of proposed class members that were not impacted by the alleged conduct." Dkt. No. 585 at 8, citing Johnson Rpt. at ¶ 119. Plaintiffs contend that the scientifically proper formulation of Dr. Johnson's conclusion is that "statistical evidence was not sufficient to reject the null hypothesis," which is simply the hypothesis meant to be tested, "of no impact." Id. Plaintiffs state that "the mistake of accepting a 'null hypothesis' as true when there is insufficient evidence to reject the hypothesis is a recognized statistical error." See id., citing Wooldridge, Introductory Econometrics 799 (3d. ed. 2006). However, defendants point out that elsewhere in the same paragraph of his report, Dr. Johnson uses the textbook definition of statistical significance in formulating his conclusions. Dkt. No. 590 at 6 n.3. For example, Dr. Johnson states that Prof. Elhauge "neglects to account for the fact that some of those 'positive' overcharges are not statistically different from zero, i.e., statistical testing does not reject the null hypothesis that the overcharge is zero." Johnson Rpt. at ¶ 119. I find that Dr. Johnson's statement regarding the definition of statistical significance in his report does not render his opinions on the statistical significance of Prof. Elhauge's results unreliable, especially when considered in context with the apparently more accurate formulation of his conclusions elsewhere in his report. Thus, to the extent they contend Dr. Johnson applies a flawed understanding of the concept of statistical significance in his report I will deny plaintiffs' motion.

**II.    Benchmark Periods**

Dr. Johnson conducts a "sensitivity analysis" intended to test the effect of Prof. Elhauge's decision to use two agnostic periods before and after the "conduct" period in his regression model.[2] See Johnson Rpt. at ¶¶ 133-34. Dr. Johnson's sensitivity model includes sales data that

---

[2] Prof. Elhauge's regression model defines conduct and conduct free periods, meaning the periods before, during and after the alleged EMMC minimum pricing conspiracy

4

Prof. Elhauge's report excludes through the use of agnostic periods.  Id.  Dr. Johnson designates that data as unaffected by anticompetitive conduct, which results in a reduction in quantitative impact attributable to the EMMC's pricing policies compared to Prof. Elhauge's model.  Id. Plaintiffs argue that Dr. Johnson's sensitivity test is unreliable because it unreasonably assumes a lack of anticompetitive conduct during the periods Prof. Elhauge characterizes as agnostic in his regression model.  Dkt. No. 585 at 11.  Defendants first respond that Dr. Johnson simply is testing the effect on Prof. Elhauge's model of not using agnostic periods and that such a sensitivity test is necessary to examine the robustness of a regression model.  Dkt. No. 590 at 8. Second, defendants argue that Dr. Johnson's sensitivity test also helps capture variables omitted from Prof. Elhauge's analysis during the agnostic periods such as mushroom farm closings.  Id. at 12.

Generally, "criticisms . . . of potential benchmark years go to the weight of [an expert's] opinions and not their admissibility."  In re Urethane Antitrust Litig., No. 04-1616, 2012 WL 6681783, at *6 (D. Kan. Dec. 21, 2012), aff'd, 768 F.3d 1245 (10th Cir. 2014).  Dr. Johnson's sensitivity testing considers the effect of not using agnostic periods for time periods during which Prof. Elhauge opines that the evidence of anticompetitive impact is "murky."  Elhauge Rpt. at ¶¶ 90-91.  I have found elsewhere that Dr. Johnson's sensitivity testing is not a sufficient basis upon which to exclude Prof. Elhauge's models.  See Dkt. No. 693 at 15-24.  At the same time, Dr. Johnson may present his opinion regarding the effect of making alternative assumptions about those "murky" periods even if Prof. Elhauge's use of agnostic periods might be the better methodology.  While Dr. Johnson's alternative assumptions may not be better than

---

was effective. Elhauge Rpt. at ¶ 64.  Prof. Elhauge remained "agnostic" about whether there was anticompetitive conduct from _____ until _____ 2001 and the period after _____ 2005 to reflect his consideration of evidence of anticompetitive conduct during those periods but that the level of actual anticompetitive conduct is "murky."  Id. at ¶¶ 90-91.

5

Prof. Elhauge's method or may not ultimately show Prof. Elhauge's method is flawed, they are not so unreasonable as to warrant exclusion.  Ultimately, the experts consider through their reports and rebuttals the alternative effects of using agnostic periods, conduct periods and conduct free periods for these disputed "murky" periods of anticompetitive conduct.  These various permutations of Prof. Elhauge's modeling are not unreasonable and together provide a valuable background upon which to determine the weight that should be accorded to Prof. Elhauge's model on class certification.  These varying assumptions as they relate to damages are also appropriate material for cross-examination at trial even though they do not support exclusion of Dr. Johnson's analysis on reliability grounds.

### III.     Price Comparison

Plaintiffs contend that Dr. Johnson uses the wrong price comparison to analyze antitrust impact to the putative class when he compares actual prices versus EMMC list prices rather than actual versus hypothetical but-for prices absent defendants' conduct. Dkt. No. 585 at 16-18. Defendants contend that Dr. Johnson is simply responding to Prof. Elhauge's own report citing high levels of compliance with EMMC list prices as evidence of common impact. Dkt. No. 590 at 20-22.  In his report, Prof. Elhauge considers that the EMMC estimated _____ percent compliance with its minimum pricing policies and that this level of compliance "would indicate a strong impact on virtually all class members, although it is not necessary for common impact on class members because they would all be harmed if the agreement increased prices above but-for levels even if those prices were somewhat below the fixed minimum prices." Elhauge Rpt. at ¶ 33.  In response, Dr. Johnson provides "empirical evidence that a substantial portion of Defendants' sales were below the stated EMMC minimums is inconsistent with the proposition that the alleged conduct had a common impact across all proposed class members." Johnson

Rpt. at ¶ 60.  Yet, both parties apparently agree that "one has to look at the actual versus the but-for price and the econometric results to make the determination of common impact."  Dkt. No. 590 at 21 n.14; see also Dkt. No. 585 at 16-17.  I am satisfied that Dr. Johnson is simply providing an empirical analysis of Prof. Elhauge's statement regarding the level of EMMC compliance with its minimum pricing policy.  At the same time, I am concerned because both parties appear to accept that actual price-comparison evidence is improper to show common impact and only but-for pricing evidence is relevant, see Dkt. No. 590 at 21, Dkt. No. 585 at 17-18, yet both plaintiffs and defendants arguably offer actual price-comparison evidence in their experts' reports to support or oppose a finding of common impact.  Thus, I will not exclude Dr. Johnson's price-comparison analysis but note that I find it pertinent only to refuting Prof. Elhauge's statement that there was widespread compliance with EMMC minimum prices.

## IV.    Fit

Plaintiffs argue that Dr. Johnson "ignores" evidence that is critical to whether the EMMC's conduct caused common impact and therefore argue that his opinions do not "fit" the facts as required under Rule 702.  Dkt. No. 585 at 18.  In particular, plaintiffs claim that Dr. Johnson ignores the EMMC "Accomplishments" document in which the EMMC stated that it had raised "average industry per pound prices from falling ___ to stable ___."  Id., citing Ex. 5.  I am satisfied that Dr. Johnson does not ignore this evidence, but rather states that "the data seems to suggest that facts like this are not true."  Dkt. No. 590 at 27, citing Ex. 1.  Dr. Johnson's statistical analysis may contradict the EMMC "Accomplishments" document, but that does not mean that Dr. Johnson ignores the document.  Plaintiffs' argument that when preparing his report Dr. Johnson should have inquired further into EMMC internal documents and given them more credence goes to the weight of Dr. Johnson's opinions but does not present sufficient

7

justification for the exclusion of them.  Thus, I find that Dr. Johnson's opinions fit the facts of the case under Rule 702.

## CONCLUSION

For the reasons discussed more fully above, I will deny plaintiffs' motion to exclude the expert opinions of Dr. Johnson.

An appropriate Order follows.