IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |

O'NEILL, J.                                                                November 22, 2016

## MEMORANDUM

In this long-running antitrust litigation, plaintiffs[1] claim defendants acted in violation of

Sections 1 and 2 of the of the Sherman Act and Section 7 of the Clayton Act by conspiring "to

set artificially-inflated prices" for fresh agaricus mushrooms, see Dkt. No. 185 at ¶ 93, and

through the implementation of a supply control scheme related to the production of mushrooms.

Id. at ¶ 94.  A putative class of plaintiffs – who classify themselves as direct purchasers of fresh

agaricus mushrooms – now seek certification of a class of:

> [a]ll persons and entities in the non-Western United States[2] who
> purchased fresh agaricus mushrooms directly from an [Eastern
> Mushroom Marketing Cooperative (EMMC)] member or one of its
> co-conspirators or its owned or controlled affiliates, agents, or
> subsidiaries at any time between February 4, 2001 and August 8,
> 2005 (the "Class Period").  The Class excludes the EMMC, its
> members and their parents, subsidiaries and affiliates.

---

[1]       Publix Supermarkets, Inc. and Giant Eagle, Inc. are opt-out plaintiffs.  Further
references to "plaintiffs" in this opinion do not encompass the opt-out plaintiffs.

[2]       The non-Western United States refers to the following states which plaintiffs
claim were subject to the EMMC's pricing policies:  Maine, New Hampshire, Vermont,
Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey, Delaware,
Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Tennessee, Alabama,
Mississippi, Arkansas, Louisiana, Wisconsin, Minnesota, Iowa, Kansas, Nebraska, Colorado,
Oklahoma, Texas, Ohio, Missouri, Michigan, Indiana, Kentucky, West Virginia and Illinois, and
the District of Columbia.  Dkt. No. 517 at 4 n.5.

Dkt. No. 517 at 4.[3]  These plaintiffs seek certification of the putative class under Federal Rule of

Civil Procedure 23(b)(3) and assert that all of the requirements of Rule 23 have been satisfied.

     Defendants, who include the Eastern Mushroom Marketing Cooperative and other

entities who were members of the EMMC or were affiliates of members of the EMMC,[4]

---

[3]     Now before me with respect to the question of class certification are the
following:  (1) plaintiffs' motion for class certification and memorandum of law in support
thereof, Dkt. Nos. 514 and 517; (2) certain defendants' memorandum in opposition ("certain
defendants" are identified in footnote 4, infra.), Dkt. No. 537; (3) defendant M.D. Basciani and
Sons Inc.'s Opposition, Dkt. No. 538; (4) defendant Franklin Farms' joinder in the oppositions of
certain defendants and M.D. Basciani, Dkt. No. 541;(5) defendant JM Farms' joinder in M.D.
Basciani's opposition, Dkt. No. 542; (6) defendant Mario Cutone's joinder in the oppositions of
certain defendants and M.D. Basciani, Dkt. Nos. 545 and 546; (7) plaintiffs' reply; Dkt. No. 549;
(8) a letter from plaintiffs regarding In re Nexium, Dkt. No. 621; (9) a letter from certain
defendants regarding In re Blood Reagents Antitrust Litig., Dkt. No. 655; (10) plaintiffs' notice
of supplemental authority, Dkt. No. 738; (11) defendant M.D. Basciani's response to plaintiffs'
notice of supplemental authority, Dkt. No. 750; (12) certain defendants' supplemental
memorandum of law in opposition to class certification in light of the Court's rule of reason
decision, Dkt. Nos. 754 and 755; (13) plaintiffs' response to certain defendants' supplemental
opposition to class certification, Dkt. No. 758; (14) the transcript from the June 18, 2016 oral
argument on the motion for class certification, certain defendants' motion to dismiss, or in the
alternative for summary judgment against plaintiffs Diversified Foods and Seasonings, Inc. and
Associated Grocers, Inc. and defendant M.D. Basciani's motion for summary judgment, Dkt. No.
768; (15) certain defendants' joinder in M.D. Basciani's response to the direct purchaser class
plaintiffs' notice of supplemental authority, Dkt. No. 770; (16) plaintiffs' notice of supplemental
authority regarding Kleen Prods. v. Int'l Paper Co., No. 15-2385, Dkt. No. 772; (17) certain
defendants' notice of supplemental authority for Harnish v. Widener Univ., Dkt. No. 773;
(18) plaintiffs' response to certain defendants' notice of supplemental authority, Dkt. No. 774;
(19) certain defendants' letter re: Wallach v. Eaton Corp., No. 15-3320, Dkt. No. 775; (20) a
notice of supplemental authority regarding the September 6 and September 8, 2016 decisions in
In re Processed Egg Prods. Antitrust Litig. filed on behalf of the following defendants: EMMC,
Robert A. Feranto, Jr. t/a Bella Mushroom Farms, Inc.; To-Jo Fresh Mushrooms, Inc.; Country
Fresh Mushroom Co.; Gaspari Mushroom Co., Inc.; Kaolin Mushroom Farms, Inc.; Sher-Rockee
Mushroom Farm, LLC; C&C Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips
Mushroom Farms, Inc., Louis M. Marson, Jr., Inc.' Monterey Mushrooms, Inc.; and John Pia,
Dkt. No. 776; and (21) plaintiffs' response to Dkt. No. 776.  Dkt. No. 777.

[4]     Among the defendants opposing class certification are "certain defendants":  the
Eastern Mushroom Marketing Cooperative (EMMC), Robert A. Feranto, Jr., t/a Bella Mushroom
Farms; Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom
Farm; To-Jo Fresh Mushrooms, Inc.; Cardile Mushrooms, Inc.; Cardile Bros. Mushrooms
Packaging; Country Fresh Mushroom Co.; Forest Mushroom Inc.; Gino Gaspari & Sons, Inc.;
Gaspari Mushroom Co., Inc.; Gaspari Bros., Inc.; Kaolin Mushroom Farms, Inc.; South Mill

vigorously oppose certification and argue plaintiffs have failed to demonstrate the requirements

of numerosity, commonality, typicality, adequacy, ascertainability and predominance.  For the

reasons that follow, I find plaintiffs have satisfied all of the relevant Rule 23 requirements, and

thus, that class certification is appropriate.  Accordingly, I will grant plaintiffs' motion for class

certification.

Also before me is a related motion by certain defendants to dismiss, or in the alternative

for summary judgment, with respect to the claims brought by plaintiffs Diversified Foods and

Seasonings, Inc. (Civ. A. No. 06-0657) and Associated Grocers, Inc. (Civ. A. No. 06-1854).[5]

Dkt. No. 441.  I will grant the motion in part and deny the motion in part.[6]

## BACKGROUND

### I.    The Product

"Fresh Agaricus mushrooms include white mushrooms, crimini mushrooms, and

portabella mushrooms."  Dkt. No. 537, Ex. 2 (Johnson Rpt.) at ¶ 29; see also Dkt. No. 517, Ex. 2

---

Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; LRP Mushrooms, Inc. LRP-M
Mushrooms LLC; Modern Mushroom Farms, Inc.; Sher-rockee Mushroom Farm, LLC; C&C
Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis
M. Marson Jr., Inc.; Monterey Mushrooms, Inc.; United Mushroom Farms Cooperative, Inc.;
John Pia; and Michael Pia.  Dkt. No. 537.  M.D. Basciani has filed a separate opposition to
plaintiffs' motion for class certification.  Dkt. No. 538.

[5]    Also before me with respect to the motion to dismiss are plaintiffs' opposition,
Dkt. No. 457, and certain defendants' reply.  Dkt. No. 462.

As filed, this motion also sought to dismiss the actions filed by Meijer, Inc. and Meijer
Distribution, Inc. (Civ. A. No. 06-0677); Theodore J. Katsiroubas and Sons, Inc. and Native
Maine Produce and Specialty Foods, LLC (Civ. A. No. 06-0429); and Robert Altman, Trustee
for the Bankruptcy Estate of Stephen Lee McCue d/b/a John Manning Co. (Civ. A. No. 06-
0657).  See Dkt. No. 441.  These actions were dismissed by Order of the Court on September 12,
2012, it having been reported to the Court that "Certain Defendants . . . ha[d] reached an
agreement with [those plaintiffs] which will resolve the matters raised as to them in [the] Motion
filed by Certain Defendants, and it appearing that the above-identified plaintiffs ha[d] agreed to
withdraw as putative class representatives . . . ."  Dkt. No. 468.

[6]    Also pending is a motion for summary judgment by defendant M.D. Basciani &
Sons, Inc., Dkt. No. 518, which will be decided separately.

(Elhauge Rpt.) at ¶ 21 (describing "both types of agaricus mushroom" as "white (young) and brown (aged, also sometimes called 'Portobello' or 'crimini')").  Certain defendants argue that there is a distinction between agaricus mushrooms sold "to fresh market customers such as retailers and food service customers" and agaricus mushrooms sold "to food processors who purchase agaricus mushrooms in bulk quantities for canning or for use as ingredients in other food products such as soup."  Dkt. No. 537 at 15.  They explain that processor market customers "paid drastically lower prices and . . . were not subject to the EMMC's minimum pricing policy." Id.  Defendants also argue that "mushrooms sold to fresh market customers . . . are highly differentiated by numerous factors such as type, packaging, size, grade, slicing, washing, and farming method."  Id.  Plaintiffs' proposed class definition does not divide fresh agaricus mushrooms into different categories or recognize distinctions between the fresh market and food processor market.

## II.    The Players

On class certification, "[t]he relevant market can be envisioned as a three-layer cake, with [agaricus mushroom growers] at the top, [distribution entities] in the middle, and [purchasers of fresh agaricus mushrooms] at the base."  Wallach v. Eaton Corp., 837 F.3d 356, 361 (3d Cir. 2016).  At the base layer of the market are the plaintiffs.  Six putative class representatives remain in this litigation:  (1) William Rosenstein and Sons Company – a produce wholesaler located in Scranton, Pennsylvania, see Dkt. No. 185 at ¶ 12; (2) Associated Grocers, Inc. – a buying group for independent grocery stores located in Louisiana, Texas and Mississippi, see id. at ¶ 18; (3) Diversified Food & Seasonings, Inc. – a manufacturer of processed foods, see id. at ¶ 13; and (4-6) three related companies:  M. Robert Enterprises, Inc., M.L. Robert, II, LLC and Market Fair, Inc. – who operate grocery stores in Louisiana and buy mushrooms to sell.  See id.

at ¶ 16.

Defendants make up the top and middle layers of the market and include the EMMC and its members.[7]   At least one member of the EMMC falls in the middle layer of the "cake," but not in the top layer:  defendant M. Cutone Mushroom Co., Inc., which was a mushroom distributor, but not a mushroom grower.  See In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274, 285 (E.D. Pa. 2009) (finding that "M. Cutone is a mushroom distributor and a middleman" and a "non-grower member" of the EMMC).  Certain other EMMC member defendants belong to only the top layer of the market – mushroom growers without integrated distribution operations.  And other defendant members of the EMMC – with integrated mushroom growing and distribution operations – fall in both the top and middle layers of the

---

[7]       In opposing class certification, certain defendants again assert that "before adopting its minimum pricing policy or its supply control program, the EMMC and its members relied in good faith on the advice of counsel that the EMMC was properly formed in accordance with the requirements of the Capper-Volstead Act," which "exempts agricultural cooperatives and their members from price fixing claims under § 1 of the Sherman Act."  Dkt. No. 537 at 7-8.  In support of their position, they note the United States Department of Justice Antitrust Division filed a Competitive Impact Statement following its 2003 investigation of the EMMC which concluded, inter alia, that EMMC was an agricultural cooperative organized pursuant to Capper-Volstead.  See United States v. E. Mushroom Mktg. Coop., Inc., No. 04-5829, 2005 WL 3412413 (E.D. Pa. Sept. 9, 2005).

I decline to deny plaintiffs' motion for class certification on the basis of certain defendants' Capper-Volstead argument.  The DOJ's finding does not bind this Court and I have previously considered and rejected defendants' contention that the EMMC and its members are exempt from antitrust liability under Capper-Volstead.  See In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274 (E.D. Pa. 2009); see also In re Mushroom, 54 F. Supp. 3d 382, 384 (E.D. Pa. 2014).  In relevant part, I found the EMMC did not qualify as an exempt cooperative under Capper Volstead because one member, M. Cutone Mushroom Co., Inc., was not technically a grower of agricultural produce.  In re Mushroom, 621 F. Supp. 2d at 286.

Also, in 2011 defendants asked the Court of Appeals for the Third Circuit to review this Court's initial Capper-Volstead determination, but the Court of Appeals held that "a district court order denying a defendant [the Capper-Volstead Act's] protections is not effectively unreviewable after final judgment, and, therefore, is not a collateral order subject to interlocutory review."  In re Mushroom, 655 F.3d 158, 167 (3d Cir. 2011).  The Court of Appeals also denied defendants' requests for permission to appeal from this Court's 2014 decision seeking reconsideration of my Capper-Volstead finding.  Dkt. No. 614.

"cake," including defendant Mushroom Alliance, whose integrated grower/distributor members are defendants, but were not themselves members of the EMMC.  See Dkt. No. 768 at 20:18-21:10 ("[T]here are two types of members in the EMMC . . . .  [There] are companies that both grow mushrooms and distribute mushrooms. . . . [T]here are also some members of the EMMC that are just growers. . . ."); id. at 23:15-18 ("[T]hen we have a number of cooperatives that belonged to the EMMC.  So we have two cooperators [sic], the Mushroom Alliance and United Mushroom Farm Cooperative. . . . .  And also, . . . four members of the Mushroom Alliance are also individually named defendants . . . .").  Also named as defendants in this litigation are a number of mushroom distributors which were *not* members of the EMMC, but which distributed mushrooms grown by EMMC members – they belong to the middle layer of the "cake."  Id. at 24:7-8 ("4 of the distributors are actually named as defendants.  And we named To-Jo, Cardile Brothers Mushroom Packaging, C&C Carriage, and Mario Cutone as defendants.  And members of the class purchased from those four.").

As background for this decision, it is important to mention certain non-defendants who have a connection to the facts relevant to this litigation.  Also in the middle layer of the cake are a number of non-defendant distributors who distributed mushrooms grown by members of the EMMC.  See, e.g., Dkt. No. 768 at 81:4-5 ("I think there are eight distributors who are not named as defendants."); cf. id. at 24:15-19  (counsel for plaintiffs arguing that "we learned about these others over time through discovery, and we learned in discovery that we really shouldn't have to name them as defendants because they were very tightly controlled by the growers . . . .").  And finally, at the top layer of the "cake," but not named as a defendant is M&V Enterprises, the mushroom grower who sold mushrooms to distributor defendant M. Cutone.  See id. at 80:13-6 ("And then the one grower who is not named as a defendant is the

grower that was supposed to be the member of the EMMC for Cutone, who was – who appeared by mistake.").

## II.    The Claimed Conspiracies

### A.    Price Fixing Claims

Plaintiffs contend that from on or around February 4, 2001 and through at least August 8, 2005, the EMMC and its members circulated written price lists and pricing policies for "sales of mushrooms made by distributors to the retail, wholesale, and foodservice markets."[8]  Dkt. No. 517 at 5; see Dkt. No. 517, Ex. 20 (document identified as the EMMC January 9, 2001 Meeting Minutes explaining, inter alia, that "[m]inimum price for individual products were discussed and agreed to by region" and that "[t]he minimum pricing agreed by the cooperative is effective February 4, 2001"); Dkt. No. 517, Ex. 27 ("EMMC Current Policies," revised April 24, 2002, explaining, inter alia, that "[t]he pricing listed of each product is the minimum price for that product delivered to a customer in a region"); see also Dkt. No. 517, Ex. 23 (***** Dep.) at 39:18-22 ("[I]n order to fund our marketing and promotional effort, we thought if we have minimum pricing, then the growers would feel comfortable raising their prices so we could generate enough income to support our promotional activities . . . .").  Under the EMMC membership agreement, members agreed "not to sell or otherwise dispose of mushrooms except as provided under the terms of [the membership] Agreement and the Articles of Incorporation and Bylaws of the Cooperative."  Dkt. No. 517, Ex. 4 (Executed Membership Agreement for Bella Farms) at 4, ¶ 6.  EMMC members also agreed "to handle and market all crops of mushrooms under [the member's] control during the term of th[e] Agreement, pursuant to the terms and conditions of th[e] Agreement and the Articles of Incorporation and Bylaws of the

_____

[8]      In other words, the EMMC circulated prices and pricing policies for mushroom sales from the middle layer of the cake – distributors – to the cake's bottom layer – purchasers.

Cooperative." Id. at 4, ¶ 3.

Through its policies, the EMMC endeavored to set floor pricing for mushrooms at the point of distribution (i.e., the prices charged by the middle layer of the market), and not the price for mushrooms emerging from growing operations (i.e., the top layer of the market). See Dkt. No. 517 at Ex. 14 (***** Dep.) at 145:9-147:4. ("Q. . . . You're a grower and a packager and the EMMC set floor pricing for the packaging aspect. Correct? A. Correct. . . . Q. And was any floor pricing set by EMMC that came out of growing operations? A. No. Sir."); see also Dkt. No. 517 at Ex. 12 (***** Dep.) at 75:18-24 ("Q. . . . one of the policies that the EMMC adopted was to try to set prices for – the downstream price that shippers got when they sold their product to wholesalers and retailers, correct? A. Yes, sir."); Dkt. No. 517 at Ex. 17 (***** Dep.) at 171:6-172:3 (explaining that the EMMC's minimum pricing policy did not apply to the sales from the grower entity (Brownstone) to the distributor entity (To-Jo), but rather applied to the sales made by the distributor (To-Jo)). Plaintiffs contend that "[t]he pricing policies required distributors that were *controlled* by EMMC members to sell at the EMMC minimum prices." Dkt. No. 517 at 6 (emphasis added). They assert that "[t]he EMMC created elaborate mechanisms to monitor prices charged by members and their *affiliated* distributors and to punish members who failed to comply with minimum prices." Id. at 8 (emphasis added).

Defendants challenge the success of the EMMC's price fixing policies, arguing that there is evidence during the relevant time period regarding EMMC members' lack of adherence to the EMMC price lists. Dkt. No. 537 at 6. They explain that "the minimum pricing policy allowed the member companies to depart from the minimum prices when necessary to meet a lower price offered by a competitor" and argue that "there is no dispute that the EMMC members faced substantial price competition from mushroom producers who refused to join the EMMC as well

as . . . numerous member companies that resigned beginning shortly after the minimum pricing policy was adopted and throughout the relevant time period."  Id. at 6-7.

### B.    Supply Control:  Deed Restrictions[9]

Plaintiffs also contend that to support the EMMC's minimum pricing policies, defendants implemented a supply control scheme – purchasing and leasing mushroom farms in order to place on the properties deed restrictions prohibiting the conduct of business related to the production of mushrooms.  Dkt. No. 185 at ¶ 94; see also id. at ¶¶ 69, 73-81; Dkt. No. 517, Ex. 36 (April 17, 2001 EMMC management committee minutes identifying plans to address the issue of "How can we control SUPPLY??").  Specifically, plaintiffs claim that

> [t]hrough membership dues and a "Supply Control Assessment," EMMC collected approximately $6 million from its members during 2001-2002.  EMMC, acting as an agent of its members, then spent approximately $3 million to purchase four mushroom farms and to acquire lease options on two additional mushroom farms in the eastern United States for the purpose of shutting them down and reducing the mushroom production capacity available for nonmember non-conspirators to grow mushrooms in competition with the Defendants.

Id. at ¶ 72.

Defendants argue that there is evidence that it was "highly unlikely that the properties would ever be re-employed as mushroom production facilities" and "that all of the closed mushroom production and distribution facilities were purchased for other uses."  Dkt. No. 537 at

---

[9]     In 2005, the EMMC and the DOJ entered into a consent judgment prohibiting the EMMC from placing deed restrictions on parcels sold for a ten year period and requiring the EMMC to nullify the deed restrictions on six parcels it had sold.  U.S. v. E. Mushroom Mktg. Coop., No. 04-5829, 2005 WL 3412413 (E.D. Pa. Sept. 9, 2005); see also Dkt. No. 517 at Ex. 34 (Proposed Final Judgment and Competitive Impact Statement; United States v. Eastern Mushroom Marketing Cooperative, Inc., 70 Fed. Reg. 7120 (Feb. 10, 2005) ("To restore competition, the proposed Final Judgment . . . will require the cooperative to remove the deed restrictions already filed and will enjoin and restrain the cooperative from creating, filing, or enforcing any mushroom deed restrictions with respect to any real property in which the cooperative has an ownership or leasehold interest of any kind.").

14. They contend there is evidence that the "supply control program was of no consequence to supply conditions in the relevant geographic market(s) between 2001 and the present time. Id.

## III.    Expert Testimony

### A.    Plaintiffs' Expert

In moving for class certification, plaintiffs rely on the expert testimony of Professor Einer Elhauge. In his report, Professor Elhauge uses economic analysis, including regression analysis and an analysis of pre-conduct and post-conduct pricing to reach a conclusion that (1) the EMMC's minimum pricing policy likely impacted all or nearly all class members, Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶¶ 7-13; (2) there were class-wide aggregate damages from the EMMC's policies in an estimated total amount of ***** million, id. at ¶ 14; (3) the EMMC's supply control agreement had common anticompetitive impact on the putative class, id. at ¶ 15; and (4) damages resulting from just the supply control agreement total an estimated ***** million.[10] Id.

Relying on his regression analysis as "direct evidence of the EMMC's ability to raise prices in the non-Western United States" and considering "that fresh mushrooms are highly perishable and that transport over the Rocky Mountains is impractical," Professor Elhauge opines that the non-Western United States is a relevant geographic market for the mushrooms that are the subject of this litigation. See Dkt. No. 693 at 44, citing Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶¶ 55-57.

### B.    Certain Defendants' Expert

In opposing class certification, certain defendants cite the testimony of their expert, Dr.

---

[10]    I denied defendants' motions to exclude Professor Elhauge's expert opinions on July 29, 2015. See Dkt. Nos. 693, 694, 718, 719.

John Johnson.[11]  In his report, Dr. Johnson concludes:  (1) that "economic impact cannot be demonstrated on a class-wide basis for all (or substantially all) direct purchasers of fresh Agaricus mushrooms"; and (2) "that a formulaic approach to damages that relies on common evidence to all (or substantially all) class members cannot be constructed."  Dkt. No. 537, Ex. 2 (Johnson Rpt.) at ¶ 1.

Dr. Johnson questions Professor Elhauge's failure "to test for smaller, local markets compared to an all 'non-Western states' geographic market."  Id. at ¶ 101.  He concludes that "[t]here are many factors that require consideration in any determination of a relevant geographic market for mushrooms, none of which Professor Elhauge analyzed or discussed."  Id.  These factors include:  imports from Canada "and the fact that states near the Canadian border could substitute away from domestic mushrooms," the presence "of non-EMMC growers in the Midwest and East that might be sufficient to defeat a price increase from the EMMC in some locations" and customer-specific transportation costs and viable shipping ranges."  Id. (emphasis in original).

C.     **M.D. Basciani's Expert[12]**

M.D. Basciani relies on the testimony of its expert, Dr. Rigoberto Lopez, in seeking to defeat class certification.  It is Dr. Lopez's opinion that Professor "Elhauge has failed to show that all members of the putative direct buyers class have sustained antitrust injuries as a result of the EMMC pricing policies and deed restrictions."  Dkt. No. 538, Ex. A. (Lopez Rpt.) at ¶ 10.  He concludes that "a common framework applied to all buyers" cannot account for "the concept

---

[11]     I denied plaintiffs' motion to exclude Dr. Johnson's expert opinion on August 11, 2015.  See Dkt. Nos. 709, 710, 744, 748.
[12]     I ordered that Dr. Lopez's report should be excluded as unreliable only to the extent he improperly uses actual output data to rebut Professor Elhauge's but-for price and output analysis and that it should be excluded to the extent that he opines on the legal conclusion of whether the class should be certified.  See Dkt. Nos. 733 & 734.

that buyers place certain restrictions on the purchase of mushrooms that increase the price." <u>Id.</u> at ¶ 68.  Dr. Lopez opines that "buyer-specific terms of trade . . . need to be included in any empirical analysis to adjust the invoice price to the actual cost of the good purchased" and that "there are quality and service requirements that are demanded by the buyer that all factor into the pricing by the seller." <u>Id.</u>

Dr. Lopez opines that when using a price correlation to define the relevant geographic market, "the market is the entire United States, not just east of the Rockies," "a properly defined market share would also need to include imports" and that Professor Elhauge's regression analysis cannot provide evidence of his defined geographic market. <u>Id.</u> at ¶¶ 32, 34, 35.

Dr. Lopez also concludes that the "estimated damages from EMMC deed restrictions are zero" because the EMMC's "deed restrictions were ineffective in controlling supply . . . ." <u>Id.</u> at ¶ 85.

<b>CLASS CERTIFICATION STANDARD</b>

Rule 23 of the Federal Rules of Civil Procedure sets the standard for class certification. A party seeking class certification must affirmatively demonstrate compliance with the Rule. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011).  Courts must conduct a "rigorous analysis" to ensure that the standards of Rule 23 are met.  <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 318 (3d Cir. 2008), as amended (Jan. 16, 2009).  "To be certified, a class must not only meet the standards set forth in Rule 23(a), but also must meet at least one of the standards under Rule 23(b)."  <u>In re Processed Egg Products Antitrust Litig.</u>, 312 F.R.D. 124, 142 (E.D. Pa. 2015).  Before the court can certify a class, Rule 23's standards must be met by a preponderance of the evidence.  <u>Hydrogen Peroxide</u>, 552 F.3d at 321.

In relevant part, Rule 23 provides:

(a) . . . One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

(b) . . . A class action may be maintained if Rule 23(a) is satisfied and if:

> . . .
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23.

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" and "effectively limit[s] the class claims to those fairly

encompassed by the named plaintiff's claims." Wal-Mart, 564 U.S. at 349, citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982). "Rule 23(a)'s demands are typically referred to as 'numerosity, commonality, typicality, adequacy, and ascertainability,' and every potential class must meet these standards." Processed Egg, 312 F.R.D. at 132. "Rule 23(b)(3)'s requirements have been dubbed 'predominance' and "superiority.'" Id. at 142. Under Rule 23(b), the Court must consider whether the "proposed classes are sufficiently cohesive to warrant adjudication by representation, . . . and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011) (quotation and citation omitted).

In making a determination on class certification, the Court necessarily will consider issues that, to some extent, overlap issues to be decided at the final merits determination. See Hydrogen Peroxide, 552 F.3d at 316. ("An overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met."). The Court of Appeals has held that

> at the certification stage, the district court cannot be bashful. It must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits – including disputes touching on elements of the cause of action. . . . Without this searching inquiry, a district court cannot determine if class certification is appropriate.

Reyes v. Netdeposit, LLC, 802 F.3d 469, 484 (3d Cir. 2015) (quotation and citation omitted).

## DISCUSSION

In considering whether plaintiffs have met their burden under Rule 23, I am mindful that "[t]here are no hard and fast rules . . . regarding the suitability of a particular type of antitrust case for class action treatment. Rather, the unique facts of each case will generally be the determining factor governing certification." Robinson v. Tex. Auto. Dealers Ass'n, 387 F.3d

416, 420-21 (5th Cir. 2004) (quotation and citations omitted).

## I.     Numerosity

I find that plaintiffs have met their burden with respect to the first element of analysis

under Rule 23(a):  whether the class contains a number of members that is too large to practically

join them all in a single case.  Fed. R. Civ. P. 23(a)(1).  "This calls for an inherently fact-based

analysis that requires a district court judge to 'take into account the context of the particular

case,' thereby providing district courts considerable discretion in making numerosity

determinations."  In re: Modafinil Antitrust Litig., No. 15-3475, 2016 WL 4757793, at *7 (3d

Cir. Sept. 13, 2016).  M.D. Basciani argues that plaintiffs have not met their burden "to

affirmatively demonstrate that the numerosity requirement of Rule 23 has been met . . . ."  Dkt.

No. 538 at 29 (emphasis omitted).  I disagree.

To demonstrate numerosity, plaintiffs have "relied on Defendants' own sales data . . . " to

demonstrate the number of customers who they claim purchased fresh agaricus mushrooms

directly from an EMMC member or one of its co-conspirators or its owned or controlled

affiliates, agents, or subsidiaries during the relevant time period.  Dkt. No. 549 at 11.

"[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds

40" the numerosity requirement has been satisfied.  Stewart v. Abraham, 275 F.3d 220, 226–27

(3d Cir. 2001).  On the record before me, I can reasonably infer that there were more than 40

purchasers of agaricus mushrooms.  See Dkt. No. 517, Ex. 6 at 106:8-110:18 (Johnson Dep.)

("there are . . . 1,754 customers who appear to meet the class definition as currently proposed");

see also Dkt. No. 537, Ex. 2 (Johnson Rpt.) at App'x H.1 ("Total Proposed Class Members in

Professor Elhauge's Data:  1,754"); cf. Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at 42, ¶ 86 ("Twenty-

seven firms participated in the conspiracy, but only seven provided useable sales data from both

the pre-conduct and conduct periods . . . .").[13]

## II.   Commonality

Likewise, I find that plaintiffs have met their burden to show that there are "questions of law or fact common to the class[.]"  Fed. R. Civ. P. 23(a)(2).  "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant[s'] conduct was common as to all of the class members."  Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation and citations omitted).  "Commonality does not require perfect identity of questions of law or fact among all class members."  Reyes, 802 F.3d at 486.  The Court of Appeals has explained that it has "acknowledged commonality to be present even when not all plaintiffs suffered an actual injury, . . . when plaintiffs did not bring identical claims, . . . and, most dramatically, when some plaintiffs' claims may not have been legally viable . . . ."  Rodriguez, 726 F.3d at 382 (citations omitted).  "[F]or purposes of Rule 23(a)(2) even a single common question will do . . . ."  Wal-Mart, 564 U.S. at 359 (quotation, citation and internal alterations omitted).  The commonality bar "is not a high one."  Rodriguez, 726 F.3d at 382.

M.D. Basciani argues that the element of commonality is not met because "[p]laintiffs offer no evidence . . . that class members have suffered the same injury," citing "[t]he myriad dissimilarities within the proposed class . . . ."  Dkt. No. 538 at 30.  Plaintiffs respond that "factual differences among the claims of the putative class members do not defeat certification."  Dkt. No. 549 at 12, quoting In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 310 (3d Cir. 1998) (internal quotation marks omitted).  They contend there are

---

[13]      M.D. Basciani gives me no reason to find that the number of customers used by either Professor Elhauge or Dr. Johnson in preparing their expert reports is so inaccurate as to render the putative class insufficiently numerous for purposes of certification.  See Dkt. No. 538 at 29.

three clear common issues:  (1) whether all defendants conspired to fix prices and limit the supply of agaricus mushrooms; (2) whether all or nearly all of the class members suffered overcharges arising from defendants' price fixing and supply restrictions – antitrust impact; and (3) aggregate damages suffered by the class as a result of defendants' conduct.  Dkt. 517 at 23. They argue commonality exists even if "the class members may have claims of different sizes, some bigger, some smaller . . . " and "[d]ifferences in size of claims are issues that can be addressed in a damages phase . . . ."  Dkt. No. 768 at 12:1-9.  I agree with plaintiffs.  The commonality requirement is satisfied.

## III.    Ascertainability

With respect to ascertainability, the "inquiry is two-fold, requiring a plaintiff to show that:  (1) the class is defined with reference to objective criteria; and (2) there is a 'reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015), quoting Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013).

> First . . . ascertainability and a clear class definition allow potential
> class members to identify themselves for purposes of opting out of
> a class.  Second, it ensures that a defendant's rights are protected
> by the class action mechanism.  Third, it ensures that the parties
> can identify class members in a manner consistent with the
> efficiencies of a class action.

Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013).  "Ascertainability mandates a rigorous approach . . . ."  Id.  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate."  Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 593 (3d Cir. 2012).  That being said, "[b]ecause the proposed class need only be ascertainable by some objective criteria, not actually ascertained, challenges to individual claims based on class membership may be resolved at the claims phase

of the litigation."  In re OSB Antitrust Litig., No. 06-826, 2007 WL 2253418, at *9 (E.D. Pa.

Aug. 3, 2007).

A.     The **Illinois Brick** Direct Purchaser Rule

Relevant here, defendants contend my consideration of whether plaintiffs have met the

ascertainability requirement is impacted by application of the direct purchaser rule set forth in

Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  See, e.g., Dkt. No. 537 at 21-23, Dkt. No. 538

at 27-28; see also Dkt. No. 441 at 24-28.  Pursuant to Illinois Brick, there is a "general rule that

only direct purchasers from antitrust violators may recover damages in antitrust suits."  Howard

Hess Dental Labs., Inc. v. Dentsply Int'l, Inc. (Hess I), 424 F.3d 363, 369 (3d Cir. 2005); see

McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 847-48 (3d Cir. 1996) ("the [Illinois Brick]

Court . . . enunciat[ed] a bright-line rule that only the purchaser immediately downstream from

the alleged monopolist may bring an antitrust action").  Put another way, "[o]nly one purchaser

of any specific good whose price has allegedly been fixed" or otherwise impacted by conduct in

violation of the antitrust laws "may state a claim for damages under the Clayton Antitrust Act."

Burkhalter Travel Agency v. MacFarms Int'l, Inc., 141 F.R.D. 144 (N.D. Cal. 1991).  "Although

in most cases that single person is the direct purchaser, in some cases that person will be a

secondary purchaser who has absorbed all of the damages of the" antitrust violation.  Id.

In the Third Circuit, indirect or secondary purchasers may sue under the antitrust laws if

they can establish one of three possible exceptions to the Illinois Brick direct purchaser rule:  (1)

a "cost-plus" exception, (2) a "co-conspirator" exception, and (3) an "owned or controlled"

exception.  See In re: Domestic Drywall Antitrust Litig., No. 13-2437, 2016 WL 3769680, at *4

(E.D. Pa. July 13, 2016), citing Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 968 n.22

(3d Cir. 1983) and Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc. (Hess II), 602 F.3d

237, 258-59 (3d Cir. 2010).  Illinois Brick thus requires the Court to consider whether the

members of the putative class made their mushroom purchases *directly* from those claimed to

have violated the antitrust laws with their conduct – here the EMMC and its members – or, if

purchases were made *indirectly* – whether the purchases qualify for one of the exceptions to

Illinois Brick.[14]  The answer to this question is not immediately apparent because of the

relationships between the members of the EMMC – mushroom growers (along with distributor

M. Cutone) who plaintiffs claim agreed to fix the *distribution* price for agaricus mushrooms –

and the mushroom distributors who allegedly charged the artificially inflated distribution prices

to the members of the putative class.

In opposing class certification, certain defendants contend that without a series of mini-

trials it is not possible to ascertain whether members of the putative class can recover either

because they are direct purchasers under Illinois Brick or because they made purchases that fell

within one of its exceptions.  See Dkt. No. 536 at 21-22.  Plaintiffs respond that there is no

Illinois Brick issue in this litigation – and therefore no ascertainability problem –  because "any

class member purchasing from an affiliated distributor would be the first to purchase mushrooms

at prices fixed by Defendants" and thus they are not precluded from proceeding as a class under

Illinois Brick because "no class member's claims involve proof of passed on[15] overcharges."

Dkt. No. 549 at 8-9.

---

[14]     To continue with the "cake" analogy, pursuant to Illinois Brick, parties on the
bottom layer of the cake can only recover for antitrust violations committed by parties in the
middle layer of the cake, unless it can be established that one of the exceptions to Illinois Brick
applies with respect to the relationships between the parties in the cake's top layer and its middle
layer.

[15]     "[P]assing on refers to the process whereby a member of the distributive chain
who has been overcharged (or even undercharged) adjusts its prices to reflect that overcharge (or
undercharge)."  In re Mid-Atl. Toyota Antitrust Litig., 516 F. Supp. 1287, 1290 n.8 (D. Md.
1981).

Notwithstanding plaintiffs' argument that this case does not involve a pass-on, "[t]his Court does not consider it fruitful to undertake an overly semantic analysis . . . ; what is useful instead is to review the allegations in light of the policy objectives underlying <u>Illinois Brick</u>."  <u>In re Mid-Atl. Toyota Antitrust Litig.</u>, 516 F. Supp. 1287, 1295 (D. Md. 1981).  In articulating the rationale for the bright-line 'direct purchaser' rule, the Supreme Court explained:

> permitting the use of pass-on theories under [Clayton Act] § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge – from direct purchasers to middlemen to ultimate consumers.  However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

<u>Ill. Brick</u>, 431 U.S. at 37.  The Supreme Court's decision was driven by three policy considerations.

> (1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and (3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

<u>Hess I</u>, 424 F.3d at 369-70 (3d Cir. 2005), <u>citing</u> <u>Ill. Brick</u>, 431 U.S. at 730-35 & nn.11-12, 737 & n.18, 740-43 & nn.23, 27, 745; <u>see also</u> <u>Wallach v. Eaton Corp.</u>, 837 F.3d 356, 365 (3d Cir. 2016) ("<u>Illinois Brick</u>'s direct purchaser rule seeks to counteract 'the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants, and the weakening of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers'"), <u>quoting</u> <u>Gulfstream III Assocs. v. Gulfstream Aerospace Corp.</u>, 995 F.2d

425, 439 (3d Cir. 1993) (Greenberg, J., concurring and speaking for the majority).  The narrow

exceptions to Illinois Brick may apply to permit claims by secondary purchasers when their

claims do not implicate these policy concerns.

The cost-plus exception applies where a pre-existing, fixed-quantity, cost-plus contract

insulates a direct purchaser "from any decrease in its sales as a result of attempting to pass on the

overcharge, because its customer is committed to buying a fixed quantity regardless of price."

Ill. Brick, 431 U.S. at 736; see also Warren Gen. Hosp. v. Amgen Inc., No. 09-4935, 2010 WL

2326254, at *6 (D.N.J. June 7, 2010) ("[B]ecause the indirect purchaser's commitment to buy a

fixed quantity of the product insulates the direct purchaser from market responses to the

overcharge, the effect of the overcharge on the indirect purchaser is not complicated by the need

to recreate whether and how much of the overcharge is borne by the indirect purchaser . . . .").

"Courts have almost never applied this exception, however."  In re OSB, 2007 WL 2253418, at

* 9 (citing cases).

Under the co-conspirator exception, "[a]n indirect purchaser may sue if it can establish

that the actual direct purchaser, the middleman, has entered into a price-fixing conspiracy with

the manufacturer, [or in this case, the grower,] thus rendering the direct purchaser a 'co-

conspirator.'"  Animal Sci. Prod., Inc. v. China Minmetals Corp., 34 F. Supp. 3d 465, 505

(D.N.J. 2014); see also In re Apple iPhone Antitrust Litig., No. 11-06714, 2013 WL 4425720, at

*10 (N.D. Cal. Aug. 15, 2013) (explaining the co-conspirator "exception allows an indirect

purchaser to sue when the direct purchaser conspires horizontally or vertically to fix the price

paid by plaintiffs"); cf. Wallach, 837 F.3d at 362 n.3 ("[T]he limited co-conspirator exception to

the direct purchaser rule . . . allows an entity to sue its supplier and its supplier's supplier if (1) it

sues both at once, and (2) the immediate supplier (i.e., the middleman) was so wrapped up in the

conspiracy that it would be barred from seeking antitrust relief against the top-level supplier in a suit of its own.") (emphasis in original).  Such an exception is warranted because "[i]f such a co-conspiracy in fact existed, market forces were super[s]eded when the retail price was established; by definition, the retail price was not arrived at through the interaction of supply and demand," as the Court explained where there was an alleged dealer/distributor co-conspiracy in In re Mid-Atlantic Toyota Antitrust Litigation. 516 F. Supp. 1287, 1294-95 (D. Md. 1981) (finding Illinois Brick did not bar certain plaintiffs' claims where they "alleged a voluntary price fixing conspiracy between, inter alia, the regional Toyota distributor . . . and the various Toyota dealers" and "[e]ach of these alleged conspirators ha[d] been named as a party defendant").  Importantly, the Court of Appeals "has expressly refused to adopt a co-conspirator exception to Illinois Brick absent the joinder as defendants of the alleged co-conspirators immediately upstream . . . ."  Hess I, 424 F.3d at 371; cf. Mid-Atlantic Toyota, 516 F. Supp. at 1296 (finding the Illinois Brick doctrine barred the claims of a plaintiff who had "not in his lawsuit named the individual Toyota dealers as . . . defendants," meaning "[t]he risk of multiple liability facing the distributor defendants would thus appear to be a significant one").  Accordingly, "[t]he co-conspirator exception applies to suits brought by indirect purchasers when there are allegations of conspiracy, the co-conspirators are joined as co-defendants, and the middleman's involvement is truly complete, i.e., the middleman is 'at least substantially equal[ly] responsib[le]for the violation' as the seller."  Royal Mile Co. v. UPMC, No. 10-1609, 2013 WL 5436925, at *39 (W.D. Pa. Sept. 27, 2013).

Finally, the owned or controlled exception permits suits brought by indirect purchasers when "the direct purchaser to whom they pay the passed-on overcharge is owned or controlled

by a conspirator.  This rule . . . cabins [antitrust] standing[16] to only those situations where the overcharge is paid to an entity owned or controlled by a conspirator."  In re Lithium Ion Batteries Antitrust Litig., No. 13-MD-2420 YGR, 2014 WL 309192, at *9 (N.D. Cal. Jan. 21, 2014); see also Hess I, 424 F.3d at 371 ("The 'control exception' to Illinois Brick 'might' permit an indirect purchaser to sue an initial seller when the initial seller 'own[s] or control[s]' the direct purchaser."), quoting Ill. Brick, 431 U.S. at 736 n.16.  Courts " require 'relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale.'"  Hess I, 424 F.3d at 372, quoting Jewish Hosp. Ass'n of Louisville v. Stewart Mech. Enter., Inc., 628 F.2d 971 (6th Cir. 1980).  In other words, "this exception is available only if the plaintiff shows that the defendant has such control over the subsidiary that the defendant can be said to have 'set prices along the chain of distribution.'"  In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 101 (E.D.N.Y. 2012), quoting Kloth v. Microsoft Corp., 444 F.3d 312, 321 (4th Cir. 2006).  "Modes of control that might qualify for the control exception include 'interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements.'"  Hess I, 424 F.3d at 372, quoting In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 605 (7th Cir. 1997) (alteration in original); see Labrador, Inc. v. Iams Co., No. 94-4463, 1995 WL 714454, at *3 (C.D. Cal. Sept. 18, 1995) ("Joint ownership or financial interdependence between a manufacturer and a distributor could evidence the control

---

[16]        "The antitrust standing inquiry seeks to determine whether the plaintiff is a proper party to bring a private antitrust action."  Animal Sci., 34 F. Supp. 3d at 499 (internal quotation omitted).  "That Article III standing and antitrust standing both employ the term 'standing' tends to confuse matters.  The two concepts are distinct, with the former implicating a court's subject matter jurisdiction and the latter affecting only the plaintiff's ability to succeed on the merits."  Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., No, 15-3289, 2016 WL 4651381, at *5 (3d Cir. Sept. 7, 2016).

factor."); cf. Royal Printing Co. v. Kimberly Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980) ("There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator.").

Responding to defendants' Illinois Brick argument, plaintiffs assert that "there is no threat of duplicative recovery nor any need to engage in complex theories of apportionment." Dkt. No. 549 at 9.  Plaintiffs explain that "the Illinois Brick issue is really a red herring" because the distributors are "involved in the conspiracy, they don't have a right to sue the growers."  Dkt. No. 768 at 148:9-16.  They argue that "[t]he affiliated distributors would not have any claims against the EMMC members with which they dealt because the EMMC members fixed distribution prices, not the prices at which agaricus mushrooms were sold to the distributors." Dkt. No. 549 at 9. With respect to those distributors who have not been named as defendants, plaintiffs argue that "we learned in discovery that we really shouldn't have to name them as defendants because they were very tightly controlled by the growers, and this was a conspiracy that was established for the benefit of these distributors."  Dkt. No. 768 at 24:17-21.

However, on the record now before the Court, plaintiffs have not persuaded me that the policy concerns underlying Illinois Brick are negated simply by virtue of the EMMC's alleged scheme to fix the *distribution* price of mushrooms (and not the price for mushroom sales to distributors).  Although I am sensitive to the concern that an antitrust violator should not be able to evade liability "by the simple expedient of inserting a subsidiary between the violator and the first uncontrolled purchaser," In re Sugar Indus. Antitrust Litig., 579 F.2d 13, 19 (3d Cir. 1979), I do not accept plaintiffs' argument that there is no pass-on merely because "any class member purchasing from an affiliated distributor would be the first to purchase mushrooms at prices fixed by Defendants."  Dkt. No. 549 at 9.  "When determining whether a plaintiff and a defendant are

involved in a direct purchaser/seller relationship, courts look to the 'economic substance of the transaction,' rather than the physical attributes of the transaction or the geographical movement of goods and services."  Animal Sci., 34 F. Supp. 3d at 500, quoting Hess I, 424 F.3d at 373.

It is not clear whether the EMMC's grower members each had their own integrated or otherwise owned or controlled distribution operations or that all of the relevant distributors have been named as defendants.  As counsel for certain defendants explained at oral argument,

> the distributors did not sign [the EMMC membership] agreement. That was signed by the growers with the one exception [of] Mr. Cutone . . .  But . . . other than that, no distributor signed the membership agreement.  And every distributor has a different relationship, they[ a]re corporate, family, or what other than the other.  It[ i]s not a uniform issue that every distributor and grower has the exact same relationship.

Dkt. No. 768 at 162:16-25.  Certain defendants thus argue class certification would be inappropriate because "each [relationship between a distributor and a grower] is a separate issue which is going to affect liability in this case for a particular set of plaintiffs who purchased from that particular distributor."  Id. at 163:3-6.  Also, to the extent that members of the putative class must rely on an exception to Illinois Brick in order to recover, certain defendants contend that the proposed class definition is problematic because "[p]laintiffs have never identified any alleged co-conspirators" and "[e]ven if they had attempted to identify the alleged co-conspirators, they are required in this Circuit to be named as defendants in order to invoke the co-conspirator exception to the Illinois Brick doctrine."  Dkt. No. 537 at 21, citing Hess I, 424 F.3d at 369.  Certain defendants contend that

> A substantial number of putative class members bought mushrooms from entities that may have been affiliated with EMMC members but are not named as defendants in this case. This would include . . . ***** (a downstream affiliate of [M.D.] Bascian[i] & Son[s], Inc.)[,] Buona Foods (a downstream affiliate of Bella Mushrooms); Manfredini Enterprises (a downstream

affiliate of LRP mushrooms); and the Southmill distributors in
Houston, Dallas, New Orleans and Atlanta.

Dkt. No. 537 at 21-22.  Some defendants thus argue plaintiffs have not met their burden to show

"that . . . . it was not the independent mushroom distributors (rather than the putative class

members) who were the true victims [of any antitrust violations], since they were the first, direct

purchasers from the EMMC member growers."  Dkt. No. 776 at 5.

Defendants' arguments do not, however, require me to deny class certification.  In the

context of plaintiffs' motion, I find that the questions raised by Illinois Brick – namely, whether

the direct purchaser rule or any of its exceptions apply to permit claims against particular

defendants under the Clayton Act – are not questions which defeat ascertainability.  Instead, they

are questions which can be answered by reference to the definition of the putative class.  By

definition, the putative class includes only direct purchasers of mushrooms who purchased

"directly from an EMMC member or one of its co-conspirators or its owned or controlled

affiliates, agents or subsidiaries . . . ."  Dkt. No. 517 at 5.  Plaintiffs argue it follows that "the

class does not include any indirect purchasers who did not deal with a defendant or one of its

controlled co-conspirator distributors."  Dkt. No. 549 at 7.

Indeed, evidence which is common to the class can be used to answer the question of

whether class members made their mushroom purchases directly from those claimed to have

violated the antitrust laws with their conduct or, if purchases were made indirectly – whether the

purchases qualify for one of the exceptions to Illinois Brick.  Ascertainability "does not mean

that a plaintiff must be able to identify all class members at class certification—instead, a

plaintiff need only show that 'class members can be identified.'"  Byrd v. Aaron's Inc., 784 F.3d

154, 163 (3d Cir. 2015), quoting Carrera, 727 F.3d at 308 n. 2 (emphasis added in Byrd).  Here,

class members can be identified – ascertained – by looking to the relationships between

mushroom growers and their distributors (i.e., between the entities in the first and second layer of the market).  Under Illinois Brick, proper members of the class are those who made their purchases through distribution chains which are fully integrated or which meet either the co-conspirator exception or the owns or controls exception.  I find that it will be administratively feasible to ascertain class members using objective criteria.

But it is important to note that for plaintiffs to ultimately prevail on the merits, it will remain their burden to show the direct purchaser rule does not bar their claims against any of the defendants.  The Court cannot simply take plaintiffs' "word for the fact that they bought mushrooms from one of the EMMC members or their 'affiliates, agents or subsidiaries' during the time that one of the alleged defendant companies was a member of the EMMC . . . ."  Dkt. No. 537.  To recover, plaintiffs must prove that the defendants from whom they made purchases were integrated grower/distributors or, if they were not, plaintiffs must answer the question of whether or not distributors who sold mushrooms subject to the conduct of the alleged conspiracy to fix prices and control supply were named as defendants – thus allowing indirect purchaser liability under the co-conspirator exception.[17]  And where a distributor sold mushrooms which

---

[17]     In their opposition to certain defendants' motion seeking dismissal and/or summary judgment with respect to certain class representatives, plaintiffs argue that because their "case does not involve a pass-on, it is subject to the general rule that horizontal conspirators are jointly and severally liable for damages caused by their conduct, and plaintiff need not sue all members of the conspiracy to recover all damages caused by its conduct."  Dkt. No. 457 at 13. First, I am not prepared to adopt plaintiffs' view that there is no pass-on absent further consideration of the relationships between the mushroom growers and their distributors involved in this litigation.

Further, although plaintiffs cite a number of cases in support of their argument (without any parenthetical explanation), Dkt. No. 457 at 13, review of the cited cases shows that, while they indeed stand for the proposition that all co-conspirators need not always be named as defendants, none of the cases address the specific question of whether co-conspirators must be named as defendants in the context of a case involving application of the Illinois Brick direct purchaser rule.  See Am. Motor Inns, Inc. v. Holiday Homes, Inc., 521 F.2d 1230, 1244 n.42 (3d Cir. 1975) (explaining in a footnote that "[i]n an antitrust action, of course, the plaintiff

were subject to the alleged conspiracy but was not named as a defendant, plaintiffs must show

the defendant who supplied the mushrooms to such distributors can be subjected to liability

under the owns or controls exception to Illinois Brick.[18]  See Dkt. No. 754 at 34 (arguing that

there is an Illinois Brick defense unique to the eight growers with distributors that were not

named defendants and to the putative class members that purchased from those distributors").

---

ordinarily need not join all the alleged co-conspirators as defendants, as long as the plaintiff does not seek to enforce the judgment against those not made defendants"); In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 284 (4th Cir. 2007) (finding that purchasers of yarn could be required to arbitrate their price-fixing claims against manufacturer defendants even though arbitration would not allow the joinder of all defendants in a single proceeding because, "while many antitrust plaintiffs are able to proceed against all co-conspirators in a single action, the fact remains that co-conspirators are not necessary parties; a plaintiff can prove the existence of a conspiracy in an action against just one of the members of the conspiracy" and "the defendants would be jointly and severally liable"); William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc., 668 F.2d 1014, 1052-53 (9th Cir. 1981) (holding without consideration of the direct purchaser rule that the plaintiff "was not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy"); In re Wellbutrin XL Antitrust Litig., No. 08-2431, 2012 WL 1657734, at *34 (E.D. Pa. May 11, 2012) (explaining that "[a]ntitrust co-conspirators are jointly and severally liable for all damages caused by the conspiracy to which they were a party" without any discussion of the direct purchaser rule).

 Accordingly, I decline to conclude that plaintiffs need not name a distributor as a defendant in order to permit their claims to proceed when the distributor from whom they purchased mushrooms was neither integrated with nor owned or controlled by the EMMC member who supplied the mushrooms which it sold.

[18] Plaintiffs do not set forth evidence illustrating the relationships between the growers and distributors which allowed the growers to control mushroom prices at the distribution level in their motion for class certification.  Questions about these relationships remain.  For example, for at least one such distributor, Buona, who distributed mushrooms for EMMC member defendant Bella, there is testimony that when Bella sold mushrooms to Buona, the price was determined as a "[w]illing buyer, willing seller" price. Dkt. No. 252, Ex. 22 (***** 30(b)(6) Dep.) at 22:4-5.  Asked if this meant "just a market price," Bella's designee answered, "[p]ossibly."  Id. at 22:6-8.  There is also testimony of record that "the two companies are completely separate companies."  See id. at 17:17-18:8.  ("Q.  Would it be fair to say that – that the two companies – are completely separate companies?  A.  Yes.  Q.  And that they have separate tax returns?  A.  Yes, sir.  Q.  And they have separate bank accounts?  Yes, sir.  And they have separate employees, different employees?  A.  Yes, sir.  Q.  And they have their own separate financial statements?  A.  Yes, sir.").  However, there is also testimony that the partners in Bella overlapped with the owners of Buona.  See id. at 9:13-10:21.

## IV.    Adequacy and Typicality

Next I consider whether the remaining elements of Rule 23(a) are satisfied:  adequacy and typicality.  "[T]he analyses of the [typicality and adequacy] elements tend to merge, as they both focus on the extent to which the class representatives have potential conflicts with the class members."  In re Processed Egg Prods. Antitrust Litig., 312 F.R.D. 124, 133 (E.D. Pa. 2015). Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This "inquiry concerns both (1) the experience and performance of class counsel; and (2) the interests and incentives of the representative plaintiffs."  Processed Egg, 312 F.R.D. at 133, quoting Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (internal quotation omitted).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality inquiry ensures "that the class representatives are sufficiently similar to the rest of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – so that certifying those individuals to represent the class will be fair to the rest of the proposed class."  In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009).

In order to determine whether the typicality and adequacy requirements have been met, I am obliged to consider defendants' motion seeking either to dismiss or summary judgment in their favor[19] with respect to the claims of two putative class representatives – Diversified Foods

---

[19]    Dismissal is warranted for "failure to state a claim upon which relief can be granted" pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Summary judgment will be granted under Rule 56 "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment

& Seasonings, Inc. and Associated Grocers, Inc.  See Dkt. No. 441; see also Dkt. No. 537 at 23-24.  Certain defendants also challenge the typicality of the claims of Wm. F. Rosenstein & Sons, Co., Inc. and of M. Robert, Enterprises, Inc., M.L. Robert, LLC and Market Fair, Inc.  Dkt. No. 537 at 25.  Additionally, I must consider M.D. Basciani's arguments that plaintiffs, who "represent purchasers who service different types of end-users and who interact differently with the mushroom market, with diverse product needs, buying methods, buying power, product specifications, and terms of trade" have not met the adequacy or typicality requirements.  Dkt. No. 538 at 30-32.  I consider defendants' challenges in turn.

### A.     Diversified

In their motion to dismiss or for summary judgment, certain defendants argue that Diversified[20] is "an indirect purchaser, rather than a direct purchaser of fresh agaricus mushrooms, having purchased all of its fresh agaricus mushrooms from one or more distributors of Defendant Southmill Mushroom Sales, Inc. . . . ."  Dkt. No. 441 at 10; see also id. at 24-25.  Specifically, certain defendants contend that "Diversified purchased all of its fresh agaricus mushrooms from . . . South Mill of New Orleans."  Id. at 25.  At oral argument, plaintiffs explained that

> Diversified Foods and Seasonings is buying mushrooms that were grown by Kaolin.  Kaolin was the grower and Kaolin is the member of the EMMC that signed the EMMC membership agreement.  It then transferred those mushrooms to a distributor, South Mill Mushroom Distributor of New Orleans, which sold the

---

bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[20]     Diversified uses mushrooms in "[j]ust one sauce.  In a sauce. . . . It's a duck sauce" that is typically sold "[t]o a restaurant. . . . Copeland's Restaurant New Orleans."  Dkt. No. 755, Ex. 7 (Dziadon 30(b)(6) Dep.) at 22:19-23:10.

mushrooms to Diversified.

Dkt. No. 768 at 25:2-8; see also Dkt. No. 185, ¶ 32 (alleging that defendant Kaolin Mushroom Farms, Inc., a grower, "sold mushrooms . . . under the South Mill Label"); Dkt. No. 250, Ex. A. at 2 (explaining that grower Kaolin supplied mushrooms to South Mill Mushroom Sales, who supplied mushrooms to Dallas South Mill Mushroom Distribution, L.P., Houston South Mill Distribution, L.P., South Mill New Orleans, LLC, and Atlanta South Mill Distribution LLC).

Defendants argue that "i[t] cannot be disputed that Diversified is an indirect purchaser that lacks [antitrust] standing to bring this action under the Illinois Brick [d]octrine." Dkt. No. 441 at 25. They explain that "pursuant to the Court's Opinion of March 26, 2009, South Mill of New Orleans was not controlled by Defendant South Mill Mushroom Sales, Inc., nor did it have a unity of interest with the Defendant Southmill." Id. at 25. Certain defendants also argue that because Illinois Brick bars Diversified's claims, Diversified is not an adequate or typical class representative for purposes of class certification. See Dkt. No. 537 at 23-24.

In their response to the motion to dismiss or for summary judgment, plaintiffs argue that "[b]ecause Diversified was the first purchaser to purchase at a price fixed by the EMMC, its claims do not involve any proof of passed-on damages of the kind barred by Illinois Brick." Dkt. No. 457 at 12. In plaintiffs' reply in support of their motion for class certification they argue that "[t]he affiliated distributors would not have any claims against the EMMC members with which they dealt because the EMMC members fixed distribution prices, not the prices at which agaricus mushrooms were sold to the distributors." Dkt. No. 549 at 9; see also id. at 8 ("the fact that some class members purchase from distributors affiliated with EMMC class members does not create an Illinois Brick indirect purchaser issue"). However, as is further set forth above, I am not persuaded that Illinois Brick does not apply to bar Diversified's claims simply because the

-31-

EMMC fixed mushroom distribution prices instead of the prices for mushrooms sold by growers to distributors.  Rather, what matters under <u>Illinois Brick</u> is the nature of the distributors' "affiliations" with the growers; I must consider the connections between Kaolin and South Mill of New Orleans, which, on the record before me, are not fully integrated entities.

Plaintiffs have argued that "[t]he South Mill Mushroom Distributor was part of the conspiracy, it was controlled by Kaolin.  It participated in that conspiracy."  Dkt. No. 768 at 25:18-20.  But because South Mill of New Orleans is not named as a defendant, plaintiffs cannot rely on the co-conspirator exception to permit claims arising from the purchases which Diversified made from it.  The question then becomes whether the controls or owns exception applies to permit Diversified's claims.

At oral argument on class certification plaintiffs also argued that "[t]he defendants previously said, in reality, the grower who is a member of the EMMC and its commonly owned and operated, packaging and distribution entities function as a single economic unit with the EMMC member.  In other words, the grower controls the distributor and they operate as one." <u>Id.</u> at 28:13-19.  But, without more, any such prior representation by defendants is not proof of Kaolin's control.  As evidence of control, plaintiffs also point to the EMMC membership agreement in which members such as Kaolin agreed as follows:  "Producer expressly represents and warrants that it is now engaged in the production of mushrooms, <u>that it is in a position to control the mushrooms subject to this Agreement</u> and that it will be able to perform according to this Agreement."  Dkt. No. 517, Ex. 4 at 7, ¶ 14 (emphasis added); <u>see</u> Dkt. No. 768 at 26:1-22 (citing the EMMC agreement as evidence "that members of the EMMC like Kaolin control the distributors").  Plaintiffs also rely on the testimony of *****, who was a partial owner of the New Orleans distribution entity.  <u>See id.</u> at 149:23-8; Dkt. No. 252, Ex. 41 (***** Dep.) at 8:17-

9:13.  When asked whether he was "ever informed that [the distribution entity] had to sell based on prices set by the EMMC," he responded that he "was informed that [he] had to sell based on the prices that were told – were given to [him]."  Dkt. No. 252, Ex. 41 (***** Dep.) at 48:1-4. Specifically, he testified that *****, who was at that time a 50% owner of the South Mill distribution entities, communicated the prices at which the distribution entity should sell.  Id. at 48:8-13.  From this testimony, plaintiff argues that "the prices that the South Mill Distributor had to sell were the prices set by the EMMC and . . . as a part of Kaolin's involvement in the EMMC, the prices at which South Mill had to sell to Diversified were set."  Dkt. No. 768 at 150:9-14.

Defendants respond that "South Mill of New Orleans was not controlled by Defendant South Mill Mushrooms [sic] Sales, Inc., nor did it have a unity of interest with the Defendant Southmill."  Dkt. No. 441 at 25.  In support of their contention, defendants point to my March 26, 2009 decision applying Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), and finding  that "Kaolin/South Mill and its distribution entities are separate decisionmakers pursuing separate economic interests as is evidenced by [a] suit between them." In re Mushroom, 54 F. Supp. 3d 382, 389 (E.D. Pa. 2014); see Dkt. No. 441 at 25.  At oral argument plaintiffs conceded that "it[ i]s true that the Court concluded that Kaolin and the South Mill Distribution Centers . . . were[ no]t a single economic entity under Copperweld" but they argued that "that[ i]s a different issue than whether Kaolin could control the prices at which South Mill sold.  And . . . under the [EMMC] agreement[ ], Kaolin had the right to control the prices at which South Mill sold."  Dkt. No. 768 at 29:10-18.

Plaintiffs, however, have not illustrated that there is any distinction with a difference between my Copperweld finding and the answer to the question of whether South Mill New Orleans is owned or controlled by Kaolin such that the Illinois Brick controls or owns exception

applies to permit its claims.  Nor have they directed the Court to any case law which would support a finding that there is such a distinction on the facts now before me.  For the Illinois Brick controls or owns exception to apply, it is not enough for plaintiffs to point to Kaolin's representation in the EMMC membership agreement that it "is in a position to control the mushrooms subject to this Agreement . . . ."  Dkt. No. 517, Ex. 4 at 7, ¶ 14.  The question is not whether "the price at which the distributor sold to Diversified was controlled by the EMMC . . . ."  Dkt. No. 768 at 149:11-12.  See In re ATM Fee Antitrust Litig., 686 F.3d 741, 758 (9th Cir. 2012) ("[I]nput on policies and pricing issues by interested members does not constitute the type of control necessary to meet the exception to Illinois Brick."); see also Sun Microsystems Inc. v. Hynix Semiconductor Inc., 608 F. Supp. 2d 1166, 1180–81 (N.D. Cal. 2009) (rejecting the plaintiff's argument that application of the control exception depended only upon the "narrower issue of whether sufficient control [was] exercised in connection with the" particular transaction which gave rise to the alleged antitrust violation and "not whether it is exercised in connection with structural day to day control of an entity").  Instead, for the control exception to apply, there must be "such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale . . . ."  Hess I, 424 F.3d at 372 (citation and internal quotation omitted) (finding that the plaintiffs did "not come within the control exception because [the manufacturer defendant did] not own any interest in its dealers and no functional unity exist[ed] among" the dealers and the manufacturer); see also Fisher v. Wattles, 639 F. Supp. 7, 9 (M.D. Pa. 1985) (asserting that to fall within the owns or controls exception plaintiffs must show "such significant control" that the two companies are "virtually the same entity").

In my prior decision, I noted that

> [w]hile some overlap existed in ownership between the affiliated
> distributors and the member growers, they were not under common
> control in the same sense as is a corporation and its wholly-owned
> subsidiary, a corporation and its divisions or as are two
> corporations owned in identical proportions by the same set of
> investors.

In re Mushroom, 621 F. Supp. 2d 274, 290 (E.D. Pa. 2009).  I explained that "there is no indication that the overlapping owners would have control independent of their co-owners.  The varying ownership between the affiliated entities shows they are not controlled by a single decision-maker."  Id.  Considering the question again on reconsideration, I explained that "[t]heir relationship is one of competitive reality lacking the complete unity of interest and does not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action."  In re Mushroom, 54 F. Supp. 3d 382, 389 (E.D. Pa. 2014) (citation and internal quotations omitted).

Indeed, although in earlier briefing on the Capper-Volstead question plaintiffs argued that "the Thomas distribution entities applied EMMC prices to the sale of mushrooms at all times," they also posited that "[t]he interests of the Thomas Distribution Entities were sometimes at odds with ***** and Kaolin, and the Kaolin and the Thomas Distribution Entities did not operate as a single economic unit."  Dkt. No. 273 at 13.  Plaintiffs explained that "***** and ***** each own 50% of both" Kaolin and South Mill Mushroom Sales, Inc.  Id. at 12.  "However," they explained,

> four distribution entities related to Kaolin were not 100% owned
> by the Pias.  Instead, ***** and *****, through 100% ownership
> in two companies called Pennsylvania Mushroom Distribution,
> Inc. and Mushroom Substrate Technologies, Inc., held a 50%
> ownership interest in the four mushroom distribution companies in
> Dallas, Houston, New Orleans, and Atlanta . . . .  The remaining
> 50% ownership interest in the distribution centers was held by
> Stuart Thomas, through his ownership of Thomas Mushroom
> Distribution, Inc[.], and Dallas South Mill Inc.

Id. at 13.  Plaintiffs noted that "***** and Kaolin even entered into litigation regarding these issues illustrating the diversity of their interests." Id.; see Dkt. No. 273, Ex. 12 (September 23, 2005 Compl., Dallas S. Mill, Inc. et al. v. Kaolin Mushroom Farms, Inc. et al., N.D. Tx, 05-cv-01890, Dkt. No. 1-1).  Accordingly, in finding that Copperweld did not bar plaintiffs' claims, I explained that

> [t]he lack of unity of interest [between growers and distributors] is particularly evident with [the] affiliation [between Kaolin and the South Mill distribution centers] as a lawsuit ensued between Kaolin/South Mill and a distribution center.  It is hard to imagine how interests could have been congruent and control exercised to constitute 'one consciousness' when litigation occurred between the entities.

In re Mushroom, 621 F. Supp. 2d 274, 290 (E.D. Pa. 2009).

Now, however, plaintiffs would have me find that that Illinois Brick does not bar Diversified's claims because "there is no threat of duplicative recovery, nor any need to engage in complex theories of apportionment."  Dkt. No. 549 at 9 (emphasis added).  I decline to so find.  The previous lawsuit between Kaolin and the South Mill Distribution centers with respect to mushroom pricing, Dkt. No. 273, Ex. 12, shows that the concerns voiced in Illinois Brick – multiple lawsuits, double recovery and tracing – would clearly be implicated if Diversified were allowed to proceed with its claims.  On the record before me, a reasonable jury could not find that the owns or controls exception to Illinois Brick should apply to permit Diversified's claims to proceed.  Plaintiffs have not established that a genuine dispute remains with respect to the question of whether Diversified has antitrust standing under Illinois Brick.  Accordingly, I will grant summary judgment in favor of defendants and against Diversified with respect to

Diversified's claims.[21]

My finding that Diversified may not proceed as a class representative is not dispositive of the question of whether plaintiffs have met their burden to establish adequacy and typicality for purposes of class certification.  I must consider defendants' remaining arguments.

### B.     Associated

Certain defendants also argue that, as a group purchasing organization, Associated Grocers[22] does not have antitrust standing because it is "owned and controlled by its members" and "is not a 'direct purchaser' . . . ."  Dkt. No. 441 at 25.  On this basis, they seek to dismiss or summary judgment in their favor with respect to Associated's claims.  They also argue that Associated cannot be considered to be a legitimate class representative for purposes of plaintiffs' motion for class certification.  Dkt. No. 537 at 23-24.

In support of their argument, certain defendants cite In re OSB Antitrust Litigation, No. 06-826, 2007 WL 2253418, at *3 (E.D. Pa. Aug. 3, 2007), which held that only "members of group buying organizations who have a significant ownership interest in or functional control over their organizations have standing as direct purchasers.  Where no member has such interest or control, the direct purchaser is the group buying organization itself."  See Dkt. No. 441 at 25-

---

[21]     In their motion to dismiss or for summary judgment, certain defendants also argue that Diversified should be dismissed because it failed to produce an adequate witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure.  Dkt. No. 441 at 21.  At oral argument, plaintiffs argued that "this really seems to be just some kind of discovery dispute that had they raised it with us during the discovery period, we could[ ha]ve provided another person, they could[ ha]ve asked for the other person and he would[ ha]ve been deposed."  Dkt. No. 768 at 38:3-7.  Counsel for certain defendants conceded that "maybe" the question of whether Diversified had produced an adequate 30(b)(6) witness "is a discovery dispute," noting that their "main argument . . . is Diversified Foods was an indirect purchaser."  Id. at 133:12-16.  I decline to dismiss Diversified on the basis of Rule 30(b)(6).

[22]     Associated is "a member owned wholesaler."  Dkt. No. 755, Ex. 2 (Burnett 30(b)(6) Dep.) at 14:5.  Its 30(b)(6) designee testified that "[w]e service approximately 211 stores. . . .  The majority of our business is done in Louisiana . . . ."  Id. at 14:5-13.

28.  Certain defendants contend that "it cannot be disputed that Associated Grocers is both owned and controlled solely by its group members."  Id. at 28.

Plaintiffs respond that certain defendants have not shown the requisite "functional unity" between Associated and any of its shareholders.  Dkt. No. 457 at 9.  They argue that no shareholder has been identified "that is 'virtually the same entity' as Associated," and that

> Associated is owned by more than 170 independent grocers who, in turn, own more than 200 grocery stores in Louisiana and Mississippi. . . . Most of the independent grocers/shareholders own 1% or less of Associated's common stock.  . . . Only two shareholders own more than 5% of the stock, and no shareholder owns more than 7%. . . . Associated has its own officers and more than 650 employees; none is also employed by one or more of the shareholders.

Id.  They contend that none of Associated's shareholders "have a significant interest in or functional control over Associated."  Dkt. No. 768 at 34:2-4.  To the extent that twelve shareholders who buy from Associated are represented on Associated's board of directors, plaintiffs argue that "this is not the kind of control that creates an exception to Illinois Brick."  Dkt. No. 457 at 10.

Considering a similar question of whether MARTA, an entity which acted as a non-exclusive purchasing agent for its members "was the direct purchaser," rather than its members, the Court in In re TFT-LCD (Flat Panel) Antitrust Litig., No. 11-4119, 2014 WL 4386740, at *3-4 (N.D. Cal. Sep. 4, 2014) found "that the ownership and control exception does not apply to [MARTA's] members" where, inter alia, "MARTA was run not by its members but by its Board of Directors" and "[a]lthough each of MARTA's members owned stock in the entity, the individual amounts that each member owned were de minimis . . . ."

Here, the chairman of Associated's board of directors testified that at their meetings Associated's board considered "the complete management of Associated Grocers":  "personnel

issues, . . . growth plan issues, . . . competitive issues from a wholesaler standpoint, supply issues as it relates to each of the categories in which we purchase . . . .  Pretty much everything – everything that you can imagine when you're running a company . . . ."  Dkt. No. 441 at 29, quoting Dkt. No. 441, Ex. H (Roberts Dep.) at 42:13-43:9.  This testimony does not support a finding that Associated was subject to functional control by its members.  Indeed, certain defendants themselves note that the chairman of Associated's board of directors "confirmed that the *board* controls Associate[d] Grocers' business practices."  Dkt. No. 441 at 28 (emphasis added).  On the record before the Court, I decline to dismiss or to grant summary judgment in favor of certain defendants with respect to Associated's claims.[23]

Certain defendants also argue that the inclusion of buying groups such as Associated in the putative class creates an ascertainability issue, as mini-trials will be necessary to determine whether the direct purchaser under Illinois Brick is the buying group or its members.  See Dkt. No. 537 at 22.  To alleviate any concerns regarding the ascertainability of any class members who are buying groups, I will follow the lead of my colleague in In re OSB, who modified the class definition to make clear that "[f]or group buying organizations and their members, direct

---

[23]     To the extent that certain defendants instead rely on the cost plus exception to Illinois Brick in seeking to dismiss Associated's claims, plaintiff s argue that "there is no pre-existing contract between Associated and its customers that provides for the purchase of a fixed quantity of mushrooms on a cost-plus basis."  Dkt. No. 457 at 11.  Certain defendants argue that "Associated's members specified the type and quantity of fresh agaricus mushrooms to be purchased by Associated, and Associated then purchased the requested type and amount, and resold them to the members at a fixed percentage markup."  Dkt. No. 441 at 26-27 n.6.  Certain defendants thus contend that "Associated was insulated from any alleged overcharge since its members were committed to purchasing a fixed quantity regardless of price."  Id. at 27 n.6.  Plaintiffs counter that "Associated's shareholders decide from what to order from Associated based on the available price.  If they do not like the price for a particular item, they may purchase it elsewhere.  They are not obligated by contract to purchase fixed quantities on a cost-plus basis."  Dkt. No. 457 at 11-12.  Plaintiffs argue that "[i]f the cost-plus exception could be satisfied by orders placed for product marked up in price by the seller, there would be nothing left of Illinois Brick."  Id. at 12.  I agree with plaintiffs that the cost plus exception does not apply on the facts before the Court.

purchasers are either:  (1) members who have a significant ownership interest in or functional

control over their organizations; or (2) if no member has such interest or control, the

organizations themselves."  2007 WL 2253418, at *10.

   C.   **Rosenstein and the Robert Companies**

   Although they have not moved to dismiss their claims, certain defendants also attack the

typicality of the claims of Rosenstein and the Robert companies.  Dkt. No. 537 at 25.

"Rosenstein is a produce wholesaler that purchases mushrooms among other fruits and

vegetables for resale to its customers who are located in roughly a 200 mile radius of Scranton,

Pennsylvania."  Dkt. No. 549 at 19, <u>citing</u> Ex. 63 (Rosenstein Dep.) at 22:9-21; 31:16-32:7.  The

Robert companies, plaintiffs M.L. Robert, II, LLC; M. Robert Enterprises, Inc. and Market Fair,

Inc.,[24] "own and operate six grocery stores in the New Orleans area."[25]  Dkt. No. 549 at 19,

<u>citing</u> Ex. 67 (Robert Dep.) at 7:25-13:17.

   Certain defendants argue that Rosenstein and the Robert companies are not typical

because they "are small, localized mom-and-pop businesses that do business in tiny corners of a

---

   [24]   Although the complaint names Market Fair. Inc. as a plaintiff, the proper entity is
Market Fare, LLC.  Dkt. No. 538 Ex. J. (Robert 30(b)(6) Dep.) at 11:4-15, 69:10-15, 72:17-23.
Plaintiffs argue that "a typographical error in the name of one of the class representatives in
Plaintiffs' Complaint ('Market Fair, Inc.' instead of 'Market Fare, LLC') does not show that
representatives of the Robert companies did not read the Complaint or fulfill the obligations of
the Robert Companies as a class representative."  Dkt. No. 549 at 23.  Although the
typographical error is regrettable, I decline to find that it makes the Robert stores an inadequate
representative of the putative class.
   [25]   Associated was the Robert companies' primary supplier of mushrooms.  Dkt. No.
538, Ex. J (Robert 30(b)(6) Dep.) at 20:17-24 ("almost all of my purchases come through"
Associated), and the Robert plaintiffs are proceeding under "an assignment of claims related to
the mushrooms that they purchased from Associated . . . ."  Dkt. No. 185 at ¶ 16.  Absent a valid
assignment from Associated, the Robert plaintiffs would have been indirect purchasers barred
from pursuing a claim under <u>Illinois Brick</u>.  Defendants originally made an assignment-based
challenge to the adequacy of the Robert companies, but they have withdrawn their challenge
following the Court of Appeals' decision in <u>Wallach v. Eaton Corp.</u>, 837 F.3d 356, 362 (3d Cir.
2016), which held that consideration is not required in order to validly assign an antitrust claim
from a direct purchaser to an otherwise indirect purchaser.  <u>See</u> Dkt. No. 775.

much broader proposed relevant geographic market – the entire non-Western United States."

Dkt. No. 537 at 25; see Dkt. No. 538, Ex. J (Robert 30(b)(6) Dep.) at 95: 18-23 (explaining that

the Robert companies "are not a big box, low cost, high volume kind of store.  We are more

specialty neighborhood stores . . . .").  They argue that Rosenstein and the Robert companies are

not "typical of the large supermarket chains, pizza chains and food service companies that

purchased substantially more than 80% of the agaricus mushrooms sold during the relevant time

period."  Id.  Certain defendants also contend that Rosenstein and the Robert companies are not

typical because they "were largely uninterested in price and made their purchasing decisions on

the basis of quality and timely delivery."  Dkt. No. 537 at 25-26.  M.D. Basciani echoes certain

defendants' argument in its own argument that "the record reveals putative class representatives

who represent a broad spectrum of purchasers with unique and individual business models,

specifications, and terms of trade."  Dkt. No. 538 at 30-31.

     In support of their argument, certain defendants point to In re Milk Products Antitrust

Litigation, 195 F.3d 430, 436 (8th Cir. 1999), where the Court of Appeals for the Eighth Circuit

affirmed the District Court's finding that the sole class representative was not sufficient to meet

the typicality and adequacy requirements because of its isolated location, distinct purchasing

practices and an insufficient desire to vigorously pursue the interests of the entire class.  But

more than a single class representative remains in this litigation and, as plaintiffs contend, there

is "no evidence that any of these class representatives are in such isolated geographic areas that

their claims would not be representative of all of the class members."  Dkt. No. 549 at 17.  "[N]o

class representative[ ] testified that it was unwilling or unable to represent other class members."

Id.

     Plaintiffs respond that typicality requires only that:

> (1) the claims of the class representative must be generally the
> same as those of the class in terms of both (a) the legal theory
> advanced, and (b) the factual circumstances underlying that theory;
> (2) the class representative must not be subject to a defense that is
> both inapplicable to many members of the class and likely to
> become a major focus of the litigation; and (3) the interests and
> incentives of the representatives must be sufficiently aligned with
> those of the class.

Id. at 14, quoting Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 598 (3d Cir. 2012).  Likewise,

the adequacy requirement is met where "the named plaintiffs and the absent class members have

claims that arise from the same course of conduct by the defendants and they seek the same

remedies."  In re Am. Investors Life Ins. Co. Annuity Mkt. Sales & Practices Litig., 263 F.R.D.

226, 235 (E.D. Pa. 2009).

     "The case at bar does not present the same obstacles to class certification that were faced

in In re Milk Products."  In re Linerboard Antitrust Litig., 203 F.R.D. 197, 210 (E.D. Pa. 2001),

aff'd, 305 F.3d 145 (3d Cir. 2002) (finding that the "named plaintiffs are not inadequate class

representatives because of the timing, location, and amount of their purchases").  Although there

are variations between Rosenstein and the Robert companies and each of the putative class

representatives, this does not render their claims atypical where the claims "rely on the same

legal theories, and arise from the same alleged illegal agreement, as do those of the absent class

members."  In re: Processed Egg Prod. Antitrust Litig., No. 08-MD-2002, 2016 WL 3584632, at

*10 (E.D. Pa. June 30, 2016); cf. In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 242

(E.D.N.Y. 1998) ("Typicality refers to the nature of the claims of the representative, not the

individual characteristics of the plaintiff.").  "Differing purchasing methods and prices do not

necessarily defeat a finding of typicality and adequacy, provided that the alleged misconduct

applies across the array of methods, and prices."  In re Processed Egg Prod. Antitrust Litig., 312

F.R.D. 171, 180 (E.D. Pa. 2015).  What matters here is that "plaintiffs allege that all potential

class members were injured as a result of the defendants' allegedly anticompetitive conduct."
Processed Egg, 2016 WL 3584632, at *10.  I find that defendants have not rebutted plaintiffs'
showing that neither Rosenstein nor the Robert companies have interests which are antagonistic
to those held by the rest of the class.

Thus I find that plaintiffs have met their burden to establish typicality and adequacy
under Rule 23(a).

## V.      Predominance

In order to certify a class under Rule 23(b)(3), "questions of law or fact common to class
members [must] predominate over any questions affecting only individual class members."  Fed.
R. Civ. P. 23(b)(3).  "[T]he analysis is not a merits determination."  Harnish v. Widener Univ.
Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016).  "The office of a Rule 23(b)(3) certification
ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of
the controversy fairly and efficiently."[26]  Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S.
Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013) (alterations and internal quotations omitted).  Put
another way, what matters for purposes of the predominance determination is whether there are
common questions, not common answers.  See Butler v. Sears, Roebuck & Co., 727 F.3d 796,
801 (7th Cir. 2013) (finding the district court abused its discretion where it "asked not for a

---

[26]      As one court has explained,

> [a]t the class certification stage, . . .  the district court must . . .
> ensure that the plaintiffs' presentation of their case will be through
> means amenable to the class action mechanism.  We are looking
> here not for hard factual proof, but for a more thorough
> explanation of how the pivotal evidence behind plaintiff's theory
> can be established.  If there is no realistic means of proof, many
> resources will be wasted setting up a trial that plaintiffs cannot
> win.

In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 29 (1st Cir. 2008).

showing of common questions, but for a showing of common answers").

 While commonality and predominance present similar considerations, the Court of Appeals has held that the predominance standard is "far more demanding." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) (citations omitted); see also Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."). Thus, in deciding whether class-action treatment is appropriate, I must "give careful scrutiny to the relation between common and individual questions in" this litigation. Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (U.S. 2016). Common questions are those "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." Id. (quotation and alterations omitted). Individual questions are those "where members of a proposed class will need to present evidence that varies from member to member . . . ." Id. (quotation omitted).

 I "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate . . . ." Hydrogen Peroxide, 552 F.3d at 311 (citations and quotations omitted); see also Harnish, 833 F.3d at 304-05 ("[T]he court's Rule 23(b)(3) finding necessarily entails some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case . . . ."). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." Hydrogen Peroxide, 552 F.3d at 311 (quotation and citation omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some

affirmative defenses peculiar to some individual class members.'" Tyson Foods, 136 S. Ct. at

1045, quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp.

123-124 (3d ed. 2005).

Relevant here, plaintiffs must show that common issues predominate with respect to their

ability to prove:  (1) a violation of the antitrust laws; (2) antitrust impact from the violation; and

(3) measurable damages.  See Hydrogen Peroxide, 552 F.3d at 311.  I now consider whether

plaintiffs have met their burden with respect to each of these elements.

### A.      Antitrust Violation

Plaintiffs have shown that common issues predominate with respect to the first element –

whether there has been a violation of the antitrust laws.  They contend they have direct evidence

of the antitrust violation "including Defendants' explicit agreement to fix prices, written price

lists, and an express agreement to restrict output."  Dkt. No. 517 at 28.  They argue that "[a]ll of

the evidence concerning Defendants' violation of the antitrust laws will focus on Defendants'

conduct" and will include "membership agreements, price lists, pricing policies, minutes of

EMMC meetings, e-mails, EMMC newsletters, assessments for the Supply Control Program,

EMMC memoranda touting the success of the conspiracy, and testimony from Defendants," none

of which will "raise individual issues."  Id. at 29-30.  In opposing class certification, neither

certain defendants nor M.D. Basciani dispute plaintiffs' contention that they will use evidence

which is common to the class to demonstrate the antitrust violations which they claim.  See Dkt.

No. 537, Dkt. No. 538.

"Evidence that [defendants] entered into a conspiracy that would affect all class members

would perforce be evidence common to all class members for proving the conspiracy. . . .

However, proof of conspiracy is not proof of common injury."  Blades v. Monsanto Co., 400

F.3d 562, 572 (8th Cir. 2005); cf. Food Lion, LLC v. Dean Foods Co., 312 F.R.D. 472, 486 (E.D.

Tenn. 2016) (explaining that it "makes sense" that common issues regarding the existence and

scope of the conspiracy predominate "because determination of the conspiracy issue will focus

on the conduct of the defendants, not the individual class members").

> B.     **Antitrust Impact**

With respect to the second element, plaintiffs must show that it is possible to prove with

predominating common evidence that the class members suffered an injury – or impact – from

the antitrust violations which they claim.[27] See Kleen Prods. LLC v. Int'l Paper Co., 831 F.3d

919, 927 (7th Cir. 2016) ("What is essential is whether the class can point to common proof that

will establish antitrust injury . . . on a classwide basis."). I find that they have met their burden.

As the Court of Appeals for the Third Circuit explained in Hydrogen Peroxide:

> In antitrust cases, impact often is critically important for the
> purpose of evaluating Rule 23(b)(3)'s predominance requirement
> because it is an element of the claim that may call for individual, as
> opposed to common, proof. Plaintiffs' burden at the class
> certification stage is not to prove the element of antitrust impact,
> although in order to prevail on the merits each class member must
> do so. Instead, the task for plaintiffs at class certification is to
> demonstrate that the element of antitrust impact is capable of proof
> at trial through evidence that is common to the class rather than
> individual to its members. Deciding this issue calls for the district
> court's rigorous assessment of the available evidence and the
> method or methods by which plaintiffs propose to use the evidence
> to prove impact at trial.

552 F.3d at 311-12 (emphasis added citations omitted); see also Kleen Prods., 831 F.3d at 927

---

[27]     "In antitrust cases, '[p]roof of injury (whether or not an injury occurred at all)
must be distinguished from calculation of damages (which determines the actual value of the
injury).'" In re Plastics Additives, No. 03-2038, 2010 WL 3431837, at *4 (E.D. Pa. Aug. 31,
2010), quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 188 (3d
Cir. 2001), as amended (Oct. 16, 2001). There is a "possibility of 'impact' in the absence of
actual damages." In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 222 n.30
(M.D. Pa. 2012)

("While we have no quarrel with the proposition that each and every class member would need to make . . . a showing [that every class member must prove at least some impact from the alleged violation] in order ultimately to recover, we have not insisted on this level of proof at the class certification stage.").[28]

Plaintiffs claim they were injured because they paid higher prices for fresh agaricus mushrooms than they would have but for the alleged price fixing and supply control conspiracies.  In their motion for class certification plaintiffs assert that they "will prove antitrust impact using five types of common proof:  (1) the Bogosian shortcut; (2) the nature of Defendants' conspiracy; (3) the structure of the market; (4) Defendants' own contemporary observations about the effects of their agreement; and (5) Professor Elhauge's empirical analyses of prices during the class period."  Dkt. No. 517 at 32; see also Dkt. No. 758 at 7 (arguing that in addition to the Bogosian shortcut, their "evidence of common impact includes Defendants' horizontal[29] conspiracy to fix prices and limit supply, the structure of the market, Defendants' contemporaneous documents, Defendants' success in stopping the decline of mushroom prices and causing them to increase, and Professor Elhauge's empirical analyses").  Certain defendants argue that each of these "means of proving antitrust impact . . . falls far short of meeting Plaintiffs' burden" and plaintiffs have not proffered a reliable class-wide method of proving impact  Dkt. No. 537 at 29.  I disagree.

---

[28]   "A district court which has taken an initial look at the merits is not foreclosed from later entertaining, post-discovery, a summary judgment motion from defendants asserting that plaintiffs cannot establish the requisite antitrust . . . impact through common means."  In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 26 (1st Cir. 2008).

[29]   Plaintiffs continue to insist that the price fixing conspiracy is "horizontal" although I previously found that "that there are both horizontal and vertical agreements in play in the alleged conspiracy in this case."  Dkt. No. 670 at 26.

1.      **Rule of Reason**

Before considering plaintiffs' proposed proof of impact, I note that it must be considered through the lens of the rule of reason,[30] at least insofar as it applies to their price fixing claim. After plaintiffs filed their motion for class certification, I entered an order finding that the rule of reason is the appropriate mode of antitrust analysis for plaintiffs' price-fixing claim, while plaintiffs' supply control claim is subject to per se[31] liability.  See Dkt. Nos. 670 and 671.

Plaintiffs argue that the rule of reason decision "has no effect on class certification" and that "[t]he distinction between the Rule of Reason and the per se rule affects proof of liability.  It does not affect proof of impact, . . . which [is] at the center of Defendants' attack on Plaintiffs' evidence of predominance."  Dkt. No. 758 at 2.  But certain defendants argue that "one of Plaintiffs' proposed common methods of proving class-wide impact," "the Bogosian presumption," "is inapplicable to their Rule of Reason claim."  Dkt. No. 754 at 2.  They also

---

[30]      "The rule of reason requires the fact-finder to 'weigh [ ] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.'"  Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010), quoting United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993). Analysis under the rule of reason requires application of a burden shifting framework that first obligates a plaintiff to show that the challenged conduct has produced anti-competitive effects within the market.  Brown Univ., 5 F.3d at 668.  When a plaintiff meets this burden, the burden shifts to the defendants to show that the challenged conduct promotes a sufficiently procompetitive justification; upon this showing, the plaintiff may rebut by showing that the restraint was not reasonably necessary to achieve the procompetitive objective.  Id.  In applying the rule of reason, the fact finder "must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).  The inquiry focuses on whether the restraint "is one that promotes competition or one that suppresses competition."  Deutscher Tennis Bund, 610 F.3d at 830, quoting Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 691 (1978).

[31]      "[P]er se analysis, permits courts to make 'categorical judgments' that certain practices, including [some types of] price fixing, horizontal output restraints, and market-allocation agreements, are illegal per se.  Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 509 (4th Cir. 2002).

argue that as a result of the Court's decision regarding the rule of reason, it is "now apparent that Plaintiffs must prove additional elements of their price fixing claim, notably the relevant product and geographic markets and harm to competition within those markets."  Dkt. No. 754 at 1, <u>see</u> <u>also</u> Dkt. No. 537 at 27, <u>citing</u> <u>Gordon v. Lewiston Hosp.</u>, 423 F.3d 184, 210 (3d Cir. 2005) (further citations omitted).  They assert that "the need to prove additional elements (namely the outlines of the relevant geographic markets, the existence of unlawful vertical agreements, and harm to competition due to those agreements) will inject a host of individualized issues into a trial of this case and create manageability problems."  Dkt. No. 754 at 2.

I will consider what effect, if any, the rule of reason has on plaintiffs' proposed proof of impact as I determine whether it may be established at trial through available evidence common to the class.

## 2.    <u>Bogosian</u> Shortcut

First, plaintiffs assert that a finding of predominance is warranted because "this case involves precisely the kind of facts that the Third Circuit has identified as suitable for the <u>Bogosian</u> presumption."  Dkt. No. 758 at 6.  In <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 454 (3d Cir. 1977), the Court of Appeals explained that "when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual."  The Court concluded that antitrust impact may be presumed under certain circumstances, explaining that:

> If . . . a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove the fact of damage <u>simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price</u>.  If the price structure in the industry

> is such that nationwide the conspiratorially affected prices at the
> wholesale level fluctuated within a range which, though different
> in different regions, was higher in all regions than the range which
> would have existed in all regions under competitive conditions, it
> would be clear that all members of the class suffered some
> damage, notwithstanding that there would be variations among all
> dealers as to the extent of their damage.

Id. at 455 (emphasis added).[32]

Certain defendants contend that the Court should not apply the Bogosian shortcut because it "has been applied only in cases involving alleged per se violations with a clear causal nexus to the harm alleged by the plaintiffs," and it "does not apply to Rule of Reason claims."  Dkt. No. 754 at 2.  Although the cases cited by certain defendants[33] do not explicitly foreclose the application of the Bogosian presumption in a rule of reason price-fixing case, they support certain defendants' argument that "no [Third] Circuit case [has] condoned the certification of a case based solely on the Bogosian presumption without qualitative proof of impact."  Dkt. No. 768 at 123:16-19.  Indeed, the Court of Appeals has cautioned that "[a]pplying a presumption of impact based solely on an unadorned allegation of price-fixing would appear to conflict with the 2003 amendments to Rule 23, which emphasize the need for a careful, fact-based approach, informed, if necessary, by discovery."  Hydrogen Peroxide, 552 F.3d at 326, citing Fed. R. Civ. P. 23 advisory committee's note, 2003 Amendments ("[D]iscovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial."); see also In re K-Dur Antitrust Litig., No. 01-1652, 2008 WL 2660723, at

---

[32] "[T]he antitrust violation at issue in Bogosian was a per se offense."  Package Shop, Inc. v. Anheuser-Busch, Inc., No. 83-513, 1984 WL 6618, at *21 (D.N.J. Sept. 25, 1984).  Defendants assert that "Bogosian was a tying case", and "at the time it was decided, tying was considered a per se violation."  Dkt. No. 754 at 2 n.2.

[33] See In re Linerboard Antitrust Litig., 305 F.3d 145, 152 (3d Cir. 2002); Hydrogen Peroxide, 552 F.3d at 326; Am. Seed Co. v. Monsanto Co., 238 F.R.D. 394, 400 (D. Del. 2006), aff'd, 271 F. App'x 138 (3d Cir. 2008).

*10 (D.N.J. Mar. 27, 2008) (recognizing "the limits of the <u>Bogosian</u> short-cut).

In arguing that the <u>Bogosian</u> presumption should still guide the Court's predominance determination after its decision regarding the applicability of the rule of reason to their price-fixing claims, plaintiffs focus on the alleged supply control conspiracy, arguing that "the basic economic laws of supply and demand support application of the shortcut because a reduction in supply will generally cause prices to rise and the shortcut in those circumstances is merely 'a demonstration of the laws of supply and demand at work.'" Dkt. No. 758 at 6, <u>quoting</u> <u>In re Linerboard Antitrust Litig.</u>, 305 F.3d 145, 153 (3d Cir. 2002). Plaintiffs also argue that their evidence of common impact is not limited to the <u>Bogosian</u> shortcut. Dkt. No. 758 at 7.

After having decided that plaintiffs' claims in this litigation do not present a clear case of per se liability, I decline to find that the <u>Bogosian</u> shortcut is on its own sufficient to support a finding that common proof of antitrust impact predominates. Instead, I find that plaintiffs' "belt and suspenders" approach is required to demonstrate that common questions predominate with respect to the question of antitrust impact – both with respect to their supply control claims and with respect to their price-fixing claims. <u>Cf.</u> <u>In re Linerboard</u>, 305 F.3d at 153 (affirming the District Court's conclusion that the putative class had met its burden of showing impact where it credited the econometric models of the plaintiffs' experts in addition to relying on the <u>Bogosian</u> shortcut); <u>Am. Seed Co. v. Monsanto Co.</u>, 238 F.R.D. 394, 401 (D. Del. 2006), <u>aff'd</u>, 271 F. App'x 138 (3d Cir. 2008) (declining to find common impact based only on the <u>Bogosian</u> presumption where the market was complex and the plaintiffs' expert had not "supported his theory of presumed impact with any supporting documentation"). Accordingly, I will consider plaintiffs' other claimed common proof of antitrust impact.

### 3.        Nature of the Conspiracy

Beyond the <u>Bogosian</u> shortcut, plaintiffs argue that the nature of the claimed conspiracy,

"an express conspiracy . . . that was intended to impact all class members," supports a finding

that impact may be proven using evidence which is common to the class.  Dkt. No. 768 at 8:15-

18.  They explain that

> [e]very defendant member of the EMMC signed a membership
> agreement, attended the meetings at which prices were fixed,
> agreed to sell at fixed prices, paid dues to support the EMMC's
> price fixing activities, agreed to buy up and deed restrict
> mushroom farms to prevent them from being put into production,
> and made contributions to pay for the farm purchases.

Dkt. No. 772 at 5.  In support of their position, plaintiffs cite the EMMC's "comprehensive price

lists" which identified "particular circumstances in which the EMMC members were allowed to

depart from the prices on the price list" and its "elaborate system of monitoring and

enforcement" which allowed the EMMC "to audit members . . . to make sure they were

complying with both the price list and the policies."  Dkt. No. 768 at 47:24-48:25; <u>see also</u> Dkt.

No. 517, Ex. 2 (Elhauge Rpt.) at ¶¶ 20-32.  It has been held that evidence of a standardized

pricing structure "presumably establishes an artificially inflated baseline from which any

individualized negotiations would proceed [and] provides generalized proof of class wide

impact."  <u>In re Urethane Antitrust Litig.</u>, 251 F.R.D. 629, 638 (D. Kan. 2008), <u>aff'd</u>, 768 F.3d

1245 (10th Cir. 2014); <u>see also</u> <u>In re Polyester Staple Antitrust Litig.</u>, No. 03-1516, 2007 WL

2111380, at *23 (W.D.N.C. July 19, 2007) (finding "price increase announcements that

identified the manufacturers' intended increase in percentages . . .  support Plaintiffs' position

regarding the market-wide uniformity of price").

Certain defendants describe the evidence cited by plaintiffs as, "at best . . . background or

supporting evidence . . . ," and argue that it "is not itself sufficient to prove that any purchaser

was in fact injured."[34] Dkt. No. 537 at 36, 37.  They contend instead that "the record evidence in this case demonstrates that the EMMC's attempts at price stabilization failed miserably."  Id. at 37.  They also contend that "the EMMC's supply control program accomplished nothing because the empirical evidence overwhelmingly indicates that the EMMC . . . purchased or deed restricted only 4 of the 9 mushroom farms that closed during or prior to the relevant time period and . . . no other actual competitor or potential new entrant into the mushroom business was interested in acquiring these farms."  Id. at 37-38.

As support for their argument that the nature of the conspiracy cannot support a finding of impact, certain defendants cite In re Plastics Additives, No. 03-2038, 2010 WL 3431837, at *4 (E.D. Pa. Aug. 31, 2010), where the court held that "[p]laintiffs cannot demonstrate antitrust impact on a basis common to the class through reference to list prices and price increase announcements."  See Dkt. No. 537 at 38.  However, in Plastics Additives, the Court explained that "the evidence of record show[ed] that the prices paid by customers did not correspond with Defendants' price increases . . . ."  2010 WL 3431837, at *4.

That is not necessarily the case here.  Certain defendants contend that Dr. Johnson demonstrated that "the actual sale prices of fresh mushrooms during the so-called class period bear no relationship to the EMMC's minimum price lists."  Dkt. No. 537 at 38.  However, plaintiffs contend that Professor Elhauge's analyses "show sharp price spikes when both price lists were introduced."[35]  Dkt. No. 549 at 33, citing Dkt. No. 517, Ex. 53 (Elhauge Reply), Figs.

---

[34]     Of course, plaintiffs do not rely on this evidence alone, but ask the Court to consider it in conjunction with the other elements of its "belt and suspenders" approach to establishing predominance.

[35]     "Like any evidence, admissible expert opinion may persuade its audience, or it may not. . . .  The district court may be persuaded by the testimony of either (or neither) party's expert with respect to whether a certification requirement is met."  Hydrogen Peroxide, 552 F.3d at 323; see also id. ("[O]pinion testimony should not be uncritically accepted as establishing a

1 & 2.  To support his conclusion in this case, Professor Elhauge has performed what he refers to as a "direct before and after price comparison," comparing prices before the alleged conspiracy began to prices "right after it became effective."  Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 98.  Professor Elhauge "found that of the class members who bought the same mushroom item under the same delivery terms in both periods, ***** paid at least ***** more for at least one mushroom item in the latter period."  Id.  He "ran the same sort of analysis for every other possible before-and-after period of thirty days" and his analysis showed a correlation between price increases and the timing of the EMMC's issuance of minimum price lists in February 2001 and October 2002.  Id. at ¶ 99.  In contrast, in Plastic Additives, plaintiffs "ha[d] done no empirical analysis of the actual effect of the price increases upon which they rely," and instead "rel[ied] on documents collected from Defendants."  2010 WL 3431837, at *5.

Defendants ultimately argue that "Plaintiffs' use of the 'nature' of the challenged conduct as a means of proving common impact . . .  fails because Plaintiffs are unable to prove that the alleged conspiracy succeeded."  Dkt. No. 537 at 38-39 (emphasis added).  "But the [predominance] analysis is not a merits determination."  Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016).  Plaintiffs need not prove that the conspiracy succeeded to obtain certification of the putative class.  Rather, they need only show that antitrust impact is capable of proof with predominating common evidence.  See Hydrogen Peroxide, 552 F.3d at 311-12.  Weighing the competing expert testimony, including Professor Elhauge's before and after price comparison, I find that the nature of the claimed conspiracy bolsters a finding that

---

Rule 23 requirement merely because the court holds the testimony should not be excluded, under Daubert or for any other reason."); In re Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 219 (M.D. Pa. 2012) ("Expert opinion evidence is subject to the same 'rigorous analysis' as other evidence, and the court need not blindly accept it simply because it meets the Daubert requirements for admissibility at trial.").

common issues predominate in this litigation.[36]

### 4.     Structure of the Market

Plaintiffs also argue that "the structure of the market . . . made it likely that the

conspiracy would impact all or almost all of [the putative] class members."  Dkt. No. 768 at

8:18-20.  More specifically, they contend that a showing of impact which is common to the

putative class can be anticipated because fresh agaricus mushrooms are a commodity product in

a concentrated geographic market with high barriers to entry where the EMMC and its members

held dominant market shares.  See Dkt. No. 517 at 37.  "Many courts have accepted market-

structure analyses in finding predominance with respect to antitrust impact. . . .  However, before

accepting such an analysis, the Court must be persuaded that the market-structure factors

identified by the plaintiffs' expert do, in fact, exist."  In re Blood Reagents Antitrust Litig., No.

09-2081, 2015 WL 6123211, at *31 (E.D. Pa. Oct. 19, 2015) (citations omitted); cf. In re

Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 220 (M.D. Pa. 2012) (finding that

"evidence common to the class will establish a confluence of circumstances that would facilitate

collusive pricing practices in the chocolate confectionary market" where plaintiffs submitted

expert reports and testimony which showed that "the structure of the . . . industry facilitates

collusive pricing" because, inter alia, the "market is comprised of products which are 'reasonably

interchangeable' . . . ;" it "has high barriers to market entry," and "demand is not greatly

influenced by price changes . . . ") (emphasis omitted).  Certain defendants argue that "the

markets at issue in this case do not actually possess those characteristics claimed by Plaintiffs as

evidence that the structure of the mushroom market made it likely that the EMMC's activities

---

[36]     "A court's determination that an expert's opinion is persuasive or unpersuasive on a Rule 23 requirement does not preclude a different view at the merits stage of the case." Hydrogen Peroxide, 552 F.3d at 324.

would raise prices." Dkt. No. 537 at 39. I will consider the different elements of plaintiffs'
market structure argument in turn.

### i.       Commodity

Plaintiffs argue that a finding that common issues predominate is supported because the
market for fresh agaricus mushrooms "is a market for interchangeable commodity
products . . . ."[37] Dkt. No. 772 at 5. Their expert explains that "defendants sold standardized
mushroom types (white/brown, sliced/unsliced) and sizes (small/medium/large in various sized
packages)." Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 42. Professor Elhauge posits that "the
EMMC price lists themselves provide strong evidence that fresh agaricus mushrooms are
commodities because they indicate that, for each agaricus type and size, EMMC members were
able to agree on the same minimum prices for all sellers." Id. He concludes that "[t]he evidence
confirms that customers do not perceive a significant difference between the mushrooms
produced by different sellers." Id. It is Professor Elhauge's opinion that "[b]ecause there was
relatively little differentiation between the mushrooms, . . . it is easy to detect and deal with
departures from the minimum prices using the monitoring and enforcement mechanisms" put in
place by the EMMC. Id. at ¶ 43.

Unsurprisingly, certain defendants respond that "[f]resh agaricus mushrooms, far from
being pure commodity products, can actually vary widely in terms of quality, size, packaging,
specifications and value-added services such as slicing and washing." Dkt. No. 537 at 39, citing
Dkt. No. 537, Ex. 2 (Johnson Rpt.) at ¶ 34. Their expert concludes that "the existence of detailed
minimum prices imply a substantial degree of differentiation in mushroom products" and opines

---

[37]       "Interchangeability implies that one product is roughly equivalent to another for
the use to which it is put; while there may be some degree of preference for one over the other,
either would work effectively." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430,
437 (3d Cir. 1997) (citation omitted).

that "if these Agaricus mushrooms were commodities, there would be no reason for the cooperative to determine individual prices by product type, grade, package and region."  Dkt. No. 537, Ex. 2 (Johnson Rpt.) at ¶ 46.  Dr. Johnson opines that "[b]ecause different products had different minimums over time . . . one cannot determine whether any particular customer paid a supra-competitive price simply by the existence of the minimums.  Instead, an inquiry into the price paid by each customer for each mushroom product that appeared on the price list is required," arguably supporting a finding that common issues do not predominate.  Id. at ¶ 48. Echoing the other defendants, M.D. Basciani argues that the case involves "fresh agaricus mushroom products at the wholesale level, which are not commodities" because they "are differentiated horizontally (types, grades, quality, packaging, and shop-keeping units) and vertically (quality, service, and terms of trade)."[38]  Dkt. No. 750 at 6.

Professor Elhauge responds that "agaricus mushrooms are commodities within each size and type, and so specifying a minimum price for all sizes and types was enough to implicitly establish the minimum price for every combination of size and type."  Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 42 (emphasis in original).  He opines that "[t]o the extent that mushroom products are differentiated across different combinations of size, type and other characteristics . . . an economist can systematically control for that using a separate fixed-effects variable for each customer to systematically control for the extent to which some customers tend to pay higher or lower prices than others for the same mushroom items."  Id. at ¶ 69.

---

[38]       M.D. Basciani also contends that a finding of common impact is not supported because "demand for fresh agaricus mushroom products is price elastic . . . ," meaning that consumer demand is sensitive to price changes, "rendering prices insensitive to effective output restrictions."  Dkt. No. 750 at 4-5, citing Dkt. 538, Ex. A. (Lopez Rpt.) at ¶ 84.  Professor Elhauge responds that "the observation that the demand for fresh agaricus mushrooms was 'elastic' at existing prices would merely confirm that the EMMC cartel was maximizing profits." Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 77.

For purposes of the instant motion, I credit Professor Elhauge's conclusion that the mushrooms at issue in this litigation are commodities within each size and type and that fixed-effects variables may be used to control for product differentiation, a finding which supports the conclusion that common questions predominate.

## ii.    Geographic Market

Certain defendants argue that because plaintiffs' price fixing claim will be decided under the rule of reason, it is plaintiffs' burden on class certification "to show the contours of the relevant geographic market and harm to competition within that market."[39] Dkt. No. 754 at 4; cf. King Drug Co. of Florence v. Smithkline Beecham Corp., 791 F.3d 388, 412 (3d Cir. 2015) ("The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets.") (citation omitted).  They maintain that plaintiffs have not met their burden because "there is substantial evidence of record that the relevant geographic markets in this case are regional and . . . it would be a mistake to treat the different regional markets as a fungible group."  Dkt. No. 754 at 2.  Certain defendants argue that "all of Plaintiffs' impact and damages methodologies are based on the assumption that the relevant geographic market is the entire non-Western United States," id., and contend that common issues do not predominate because plaintiffs "have offered no plan for a class-wide method of proving antitrust injury and damages that takes into account relevant differences between regional fresh mushroom markets." Id. at 21.

Plaintiffs argue that nothing about my decision to apply the Rule of Reason to plaintiffs'

---

[39]      "The relevant geographic market . . . is that area in which a potential buyer may rationally look for the goods or services he seeks."  Gordon v. Lewiston Hosp., 423 F.3d 184, 212 (3d Cir. 2005); see also U.S. Horticultural Supply v. The Scotts Co., 367 F. App'x 305, 311 (3d Cir. 2010) (noting that the geographic market is based on buyer behavior).

price fixing claim affects their arguments about the geographic market.  Dkt. No. 758 at 9-10.

They maintain that the relevant market "should not be decided as a matter of class certification."

Id. at 9.  Instead, they argue that "market definition is an element of Plaintiffs' liability case in a

Rule of Reason Case" and contend that "[i]f that definition fails, it fails as to all Plaintiffs."  Id.

at 5 (emphasis added).[40]

     Very predictably, plaintiffs' expert and defendants' experts disagree with respect to the

scope of the relevant geographic market.[41]  Professor Elhauge opines that the non-Western

---

[40]     The Court of Appeals has explained that

> evidence as to an issue or element need not be produced at class
> certification where the very nature of the issue or element
> guarantees that all class members' claims will "prevail or fail in
> unison," and therefore there is "no risk whatever that a failure of
> proof on the common question . . . will result in individual
> questions predominating."

Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 305 (3d Cir. 2016), quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1191, 1196, 185 L. Ed. 2d 308 (2013).

[41]     Plaintiffs argue that "[t]he battle of the experts with respect to proper market definition does not warrant taking the issue of market structure as evidence of common impact away from the jury."  Dkt. No. 549 at 37; see also Dkt. No. 768 at 54:12-15 (arguing that the relevant geographic market is "a disputed issue of fact that[ i]s common among all the class, and it[ i]s an issue for a jury to decide").  However, the Court of Appeals has instructed that "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."  Hydrogen Peroxide, 552 F.3d at 323.  As one Court has explained,

> the task presented by a "battle of the experts" in the Rule 23(b)(3)
> context is one of determining whether the plaintiff's expert
> testimony is evidence that is (1) common to the class; (2)
> methodologically capable of addressing the question it seeks to
> answer; and (3) substantially probative of the issue, enough so that
> a reasonable factfinder could rely on it in part to resolve the case
> on the merits.  The testimony need not be flawless or impenetrable
> – indeed, almost no testimony ever is – and the factfinder will
> ultimately weight the testimony accordingly.  At the class
> certification stage, however, the expert testimony must simply
> provide a reliable basis upon which to determine that the putative

United States is the relevant geographic market.  Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶¶ 55-57.

As I explained in my <u>Daubert</u> opinion relevant to Elhauge, he reaches this conclusion by

considering:  "(1) that fresh mushrooms are highly perishable and that transport over the Rocky

Mountains is impractical; and (2) that his regression analysis provides direct evidence of the

EMMC's ability to raise prices in the non-Western United States."  Dkt. No. 693 at 44, <u>citing</u>

Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶¶ 56-57.  In his reply report, he explains that "even if one

considered different regions in different markets, that would not matter for assessing the

commonality of impact because the EMMC's fixed-price lists explicitly cover every region."

Dkt. No. 517, Ex. 53 (Elhauge Reply) at 45, ¶ 106.  He avers that "to the extent that [he] did not

use the narrowest possible antitrust market for inferring market power, that would tend to

<u>understate</u> market power, thus making [his] market definition <u>conservative</u> for purposes of

inferring market power."  <u>Id.</u> at 45-46, ¶ 106 (emphasis in original).  Professor Elhauge opines

that "direct evidence of market power is the <u>best</u> evidence that a firm has market power, and thus

that high shares in that market accurately infer the ability to raise prices."  <u>Id.</u> at 42, ¶ 96.

 Certain defendants argue that Professor Elhauge's opinion cannot support a finding of

predominance because it "amounts to mere speculation" and is based on "a shallow foundation in

the record facts and no empirical analysis whatsoever . . . ."  Dkt. No. 754 at 6.  They contend

that "the record evidence," including the conclusions of their expert, Dr. Johnson, "indicates that

---

class's claims are best served by class treatment.

<u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>, No. 06-1175, 2014 WL 7882100, at *43
(E.D.N.Y. Oct. 15, 2014), <u>report and recommendation adopted</u>, No. 06-1775, 2015 WL 5093503
(E.D.N.Y. July 10, 2015); <u>see also</u> <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 603 (3d Cir.
2012) (explaining that the Court of Appeals "would prefer a more explicit discussion and
comparison of . . . competing expert testimony from the District Court to aid [its] appellate
review").  Accordingly, I will consider the experts' differing views with respect to the relevant
geographic market in determining whether plaintiffs can meet their burden to establish
predominance.

purchasers of fresh Agaricus mushrooms shop within regional markets."[42]  Id. at 7.  Dr. Johnson

questions Professor Elhauge's failure "to test for smaller, local markets compared to an all 'non-

Western states' geographic market."  Dkt. No. 537, Ex. 2 (Johnson Rpt.) at ¶ 101.  As is

explained above, he concludes that "[t]here are many factors that require consideration in any

determination of a relevant geographic market for mushrooms, none of which Professor Elhauge

analyzed or discussed."  Id.  These factors include:  imports from Canada "and the fact that states

near the Canadian border could substitute away from domestic mushrooms," the presence "of

non-EMMC growers in the Midwest and East that might be sufficient to defeat a price increase

from the EMMC in some locations" and customer-specific transportation costs and viable

shipping ranges.  Id. (emphasis in original).  In support of their argument, certain defendants cite

testimony from the class representatives as well as from the opt-out plaintiffs "that they generally

sourced mushrooms within a range of a few hundred miles," and the testimony of "[s]everal

defendants . . . that their delivery ranges were limited."  Dkt. No. 754 at 7.  Certain defendants

note that "the EMMC considered the different regions covered by its membership to be salient

enough to issue separate minimum price lists for each region."  Id. at 8.

     In response, plaintiffs assert that "[i]f the jury agrees with Professor Elhauge that the

market is in the non-Western United States[,] . . . an excess of ***** percent of that market is

controlled by the EMMC and its members . . . ," which "suggests that all or almost all the class

members purchasing in that market were affected by the price fixing-agreement."  Dkt. No. 768

at 54:16-25.  Plaintiffs contend that Professor Elhauge

---

[42]     Conversely, M.D. Basciani's expert, Dr. Lopez opines that Professor Elhauge's geographic market definition is too small and should be expanded to include the entire United States.  See Dkt. No. 538, Ex. A. (Lopez Rpt.) at ¶ 32.  M.D. Basciani does not independently raise the issue of the relevant geographic market in its opposition to plaintiffs' motion for class certification.  See Dkt. No. 538.

> explained that the claim about regional submarkets was
> economically irrelevant to the existence of impact because:  (1) his
> regression analysis specifically controlled for differences in
> geographic location; (2) the EMMC's price lists applied in every
> region; and (3) to the extent that the geographic market was too
> broad[,] it would only serve to understate Defendants' market
> power.

Dkt. No. 758 at 12, <u>citing</u> Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 106; and Dkt. No. 549 at 37.

They also assert that "even if some analysis of the various regions were appropriate, the evidence

still shows that the EMMC's conduct was likely to have had an effect on increasing prices in

each region," as the EMMC price lists "specifically set different prices for different

regions . . . ."  Dkt. No. 758 at 10-11.  Further, plaintiffs argue that with respect to the supply

control allegations, which are not subject to the rule of reason, the alleged conspiracy "limited

supply in the entire market and further supports the conclusion that all or almost all class

members were impacted by Defendants' conduct."  <u>Id.</u> at 11.

      For purposes of class certification, the question that matters is whether common evidence

can be used to define the relevant market, not the secondary question of what issues might arise

if the relevant market is not found to be the non-Western United States (i.e., if there are regional

submarkets).  "Rule 23(b)(3) requires a showing that <u>questions</u> common to the class

predominate, not that those questions will be answered, on the merits, in favor of the class."

<u>Amgen Inc. v. Conn. Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013)

(emphasis in original).  "Whether or not Plaintiffs have correctly defined the relevant market [is

a question which] applies to the claims of all class members" and the geographic scope of the

relevant product market "is not an issue that affects different class members differently."  Dkt.

No. 758 at 9.

      I decline to adopt certain defendants' position that plaintiffs cannot establish

predominance because there are varied regional markets for fresh agaricus mushrooms rather than the market put forward by Professor Elhauge.[43]  I find Professor Elhauge's opinion is sufficiently supported to allow a finding that plaintiffs have met their burden to show that evidence common to the class is capable of answering the question of whether the relevant geographic market is the non-Western United States.  Indeed, at oral argument, certain defendants allowed that "whether or not there[ are] separate markets or one market[,] that would be a common issue."  Dkt. No. 768 at 88:10-14.  But cf. Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l, 695 F.3d 330, 348 (5th Cir. 2012) (finding the district court did not abuse its discretion when it adopted a magistrate judge's determination "that individualized issues . . . would predominate over common ones, given the lack of a national market or a nationwide conspiracy").  My conclusion as to predominance, however, should not be confused with a conclusion that plaintiffs will ultimately prevail in proving that the non-Western United States is the appropriate market definition for determining impact.[44]

### iii.    Vertical Agreements

Certain defendants argue that, "[u]nder the rule of reason, Plaintiffs are obligated to prove separate vertical agreements either between the mushroom distributors and their affiliated growers or between the distributors and the EMMC, and then to prove that each of those

---

[43]      I do not disagree with certain defendants that, "if, in fact they[ a]re separate markets[,] then that raises a whole bundle of individual issues."  Dkt. No. 768 at 88:10-14.  To be sure, plaintiffs run the risk of decertification or otherwise being unable to proceed with their claims if they are unable to prove that there is antitrust impact in the relevant geographic market as they would have it defined.  See Dkt. No. 754 at 23 (certain defendants' argument that "if the relevant antitrust markets are regional," "three of Plaintiffs' proposed methods of proving class-wide impact – market structure, EMMC documents, and their expert's ***** increase chart – are incapable of doing so" because they do not separately address particular geographic regions).

[44]      "[F]indings with respect to class certification do not bind the ultimate fact-finder on the merits."  Hydrogen Peroxide, 552 F.3d at 324.

agreements harmed competition within each relevant product and geographic market."[45]  Dkt.
No. 754 at 30.  They assert that certification is not warranted because plaintiffs "have not
articulated . . . a feasible plan for doing so on a class-wide basis."  Id.  Plaintiffs respond that
they will use "common evidence" to prove "that mushroom growers and their affiliated
mushroom distributors joined together to fix the price of agaricus mushrooms and limit their
supply."  Dkt. No. 758 at 16-17.  They contend there are no individual issues because the
involvement of the distributors does not create any issue under the direct purchaser rule of
Illinois Brick . . . ."  Id. at 17-18.

　　　For the reasons set forth above, I do not agree with plaintiffs' contention that there are no
Illinois Brick issues in this case.  Instead, I find that under Illinois Brick, membership in the class
is limited to those who made their purchases through distribution chains which are fully
integrated or which meet either the co-conspirator exception or the owns or controls exception.  I
must, therefore, consider certain defendants' argument that the need to consider the nature and
effect of the grower-distributor relationships destroys predominance.

　　　Certain defendants argue that "Plaintiffs must clearly explain how they plan to show how at
trial how [the] non-defendant distributors joined the alleged conspiracy."  Dkt. No. 754 at 34.
They argue that

> even for the distributors Plaintiffs did name as defendants,
> Plaintiffs will have to show, for each grower-distributor pair:  (a)
> whether the price at which the distributor sold was affected by the

---

[45]　　　In  my rule of reason decision, I found "that there are both horizontal and vertical
agreements in play in the alleged conspiracy in this case . . . ."  Dkt. No. 670 at 26.  I explained
that "the conspiracy alleged here involves an agreement by the members of the EMMC to fix not
the prices which they themselves charged, but rather the prices charged by vertically oriented
distributors – some of whom are integrated with EMMC members and some of whom are not."
Id. at 29.  I posited that "absent cooperation from the vertically oriented distributors, integrated
and not, the EMMC's agreement to fix mushroom distribution prices would be meaningless."  Id.
at 30.

> EMMC price policy in each regional relevant market; (b) that no
> sales took place between them that would lead to a pass-through
> issue under <u>Illinois Brick</u>, (c) how each distributor entered into an
> agreement with its affiliated grower and/or other members to
> restrain trade, and (d) how that agreement harmed competition
> within the relevant market.

<u>Id.</u>

In support of their argument that the grower-distributor relationships bar a finding of predominance, certain defendants cite <u>In re Fine Paper Antitrust Litigation</u>, a case where the Court of Appeals affirmed the district court's denial of class certification to a group of purchasers alleging a horizontal conspiracy among paper mills and vertical conspiracies between the mills and merchants that sold paper.  685 F.2d 810 (3d Cir. 1982).  The Court explained that the plaintiffs "sought to include in their classes not only entities which purchased from the named defendants but also those who purchased from an unspecified number of alleged co-conspirators . . . ."  <u>Id.</u> at 822.  The Court found that the district court had not abused its discretion when it concluded that "the likely factual variations among the alleged vertical conspiracies" were a basis for denying certification under Rule 23(b)(3)."  The Court explained that

> [t]he common issue here, whether there was a horizontal
> conspiracy among the mill defendants, easily could be
> overwhelmed by the separate proof required to establish that each
> individual independent merchant had participated with the mills in
> an individual vertical conspiracy.  Proof as to vertical conspiracy
> would vary among the class members, depending on the identity of
> the merchants from whom the respective government entities
> purchased their paper.

<u>Id.</u>  Certain defendants also cite <u>In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation</u>, 691 F.2d 1335, 1343 (9th Cir. 1982), a case where the Court found that individual questions would predominate if the plaintiffs were to rely on the control exception to

Illinois Brick.  The Court explained that "[a]ssuming arguendo that [the oil company] defendants engaged in a conspiracy to fix the wholesale price of gasoline, an across-the-board increase in gasoline prices may well indicate nothing more than the dealers' independent decisions to pass on wholesale overcharges to the consuming public."  Id. at 1343.  It explained that if the control exception were applicable "the degree to which the individual retail dealers may have exercised independent pricing discretion is important."  Id.  The Court held that

> [p]roof of a close conformity between wholesale and retail prices is insufficient to establish a vertical conspiracy claim on a class-wide basis.  Absent common evidence of standard contracts that demonstrate control over the retail dealers' pricing decisions or some other readily demonstrable and equally convincing evidence, individual issues will predominate and render class treatment inappropriate.

Id.  It found that plaintiffs had not met their burden to show that their proposed classes satisfied the requirements of Rule 23 where they had "failed to suggest any acceptable method of demonstrating on a class basis that the individual retail dealers lacked pricing discretion . . . ."  Id.

Here, unlike in Fine Paper or Petroleum Products, I do not find that factual variations among the distributor/grower relationships require that I deny certification under Rule 23(b)(3).  "[C]lass actions have been certified where the relationship among defendants was vertical as well as horizontal."  Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 166 (C.D. Cal. 2002) (citing cases); cf. Package Shop, Inc. v. Anheuser-Busch, Inc., No. 83-513, 1984 WL 6618, at *25 (D.N.J. Sept. 25, 1984) ("Mere factual complexity in a rule of reason case is no reason to deny class certification.").  For example, in Transamerican Refining Corporation v. Dravo Corporation, the Court rejected the defendants' argument that common issues would not predominate where  the plaintiffs sought to certify a

class of "[a]ll purchasers of specialty steel piping material in the United States who purchased

specialty steel from any of the defendants or their co-conspirators . . . ."  130 F.R.D. 70, 72 (S.D.

Tex. 1990).  Echoing the arguments defendants make in this litigation, the <u>Transamerican</u>

defendants characterized the plaintiffs' claims as relating to "separate, multiple conspiracies

between an individual fabricator and supplier" and argued that there was

> a vast difference between horizontal conspiracies involving a
> standardized product sold at a standardized price, and the unique
> vertical contracts that existed . . . between pipe suppliers of
> different levels and functions, custom pipe fabricators, general
> contractors, engineers, agents and owners dealing with custom-
> designed, custombuilt manufacturing plant installations having no
> standard price.

<u>Id.</u> at 74.  The Court, however, found that  "the gravamen of the complaint [was] the conspiracy,

not individual injury . . . ."  <u>Id.</u> at 76.  It explained that "if the alleged conspiracy caused

artificially high price levels to prevail in the specialized steel piping industry when such pipe was

sold on a cost plus basis, the existence of this conspiracy could constitute proof of injury to the

class of purchasers of such piping."  <u>Id.</u> at 74.  Ultimately, the Court found "that proof of impact

as to each member of the Plaintiffs' class could be made in a generalized manner, and that it

would not be necessary at the trial on liability for each member of the class to prove this factor

on an individual basis . . . ."  <u>Id.</u> at 75.  "[T]he alleged interlocking nature of the scheme" lent

support to a conclusion that the "[p]laintiffs' evidence would have class-wide application."  <u>Id.</u>

<u>But see</u> <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 27 (1st Cir. 2008)

("[T]he plaintiffs must be able to sort out the effects of any permissible vertical restraints from

the effects of the alleged, impermissible horizontal conspiracy.").

Here, plaintiffs' claims of impact do not depend on the makeup of the intervening market

between the growers and the distributors.  <u>See</u> <u>Package Shop, Inc. v. Anheuser-Busch, Inc.</u>, No.

-67-

83-513, 1984 WL 6618, at *17 (D.N.J. Sept. 25, 1984) ("[V]ariations among contractual forms do[ ] not necessarily present an insurmountable obstacle to class certification . . . ."). Plaintiffs claim that there is evidence of an explicit agreement by the members of the EMMC to fix the distribution prices for agaricus mushrooms and to control their supply. They intend to prove that distributors had no discretion in setting the distribution prices charged for agaricus mushrooms – the price charged to the bottom layer of the cake – and, with proof which applies on a class-wide basis, they intend to prove the fixed distribution prices had an impact across the class. That different defendants may have had different ways of ensuring that mushroom distribution prices conformed with the EMMC's price lists – that there may have been different relationships between different parts of the top and middle layers of the "cake" – does not change the answer to the question of whether plaintiffs suffered an antitrust impact as a result of the claimed conspiracy to fix mushroom distribution prices. Likewise, plaintiffs' supply control claim turns on common proof that defendants' agreement to purchase and deed restrict certain mushroom farms had an effect on prices which was common to the class. "Even if . . . the issue of injury-in-fact presents individual questions, . . . it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 108 (2d Cir. 2007). Ultimately, I do not find that any uncommon issues with respect to the grower-distributor relationships will defeat a finding of predominance.

### 5.    Defendants' Observations

In support of their claim that common issues predominate, plaintiffs also point to documents in which "the members of the EMMC recognized that their agreement was impacting all or almost all of the class members." Dkt. No. 768  at 8:20-25. For example, plaintiffs cite a

document titled "EMMC Accomplishments" which reported that "cooperative pricing raised average industry per pound prices from *****."  Dkt. No. 517 at 39, citing Dkt. No. 517, Ex. 18, EMMC-DOJ-0090 (also claiming to have "[a]nnually taken over ***** million pounds out of production from facilities which could have easily been purchased and remained in production").  They point to a December 27, 2004 email from the EMMC's executive director which includes an estimate that "*****" of the EMMC's total volume of mushrooms sold was "in compliance with our agreed upon pricing and policies."  Dkt. No. 517 at 40, <u>citing</u> Dkt. No. 517, Ex. 49, Giorgi 00000197.  They also cite an email from ***** to the members of the EMMC in which he wrote, "I think everybody agrees that we've won a lot of battles in the last 9 months in the area of supply management. . . . [T]he farm closings have resulted in ***** million pounds being taken off the market."  Dkt. No. 517 at 40, n. 69, <u>citing</u> Dkt. No. 517, Ex. 58, CREEK-RFP-0000502.

Certain defendants argue the documents cited by plaintiffs are "incapable of showing that all, or if not all, which putative class members were injured," and "there is good reason to doubt the accuracy of the EMMC members' statements" in the documents cited by plaintiffs.  Dkt. No. 537 at 41.  But any such doubt is not sufficient to dissuade me from finding that there are more questions common to the class than individual questions when it comes to the issue of antitrust impact.  "Of course," as the Court explained in <u>In re Processed Egg Products Antitrust Litigation</u>, 312 F.R.D. 171, 184 (E.D. Pa. 2015), "this evidence does not directly show that the conspiracy was implemented or that Plaintiffs were injured as a result."  But it "is probative of whether common issues will predominate with respect to antitrust impact, as it is probative of whether the conspiracy occurred and was anticompetitive," and it is the predominance question that I am here tasked with deciding, not whether the documents cited by plaintiffs are sufficient to <u>prove</u> the

merits of their claims.  Id.; see also In re Blood Reagents Antitrust Litig., No. 09-2081, 2015 WL 6123211, at *33 (E.D. Pa. Oct. 19, 2015) (finding that the defendants' "documents, standing alone, would not suffice to prove impact.  They do, however, lend support to a finding of predominance.").

### 6.   Professor Elhauge's Empirical Analysis

Finally, plaintiffs contend that Professor Elhauge's quantitative analysis supports the conclusion "that all or nearly all class members suffered an impact from Defendants' price fixing and supply control efforts."  Dkt. No. 758 at 11; see also Dkt. No. 517 at 41.  They explain that

> [t]o establish common impact, Professor Elhauge relied on:  (1) the nature of the agreement and market structure; (2) his before-and-after analysis showing that ***** of customers suffered a price spike of more than ***** within ***** of the EMMC's first or second price list; (3) the fact that ***** of buyers bought at prices that complied with the EMMC's minimum price lists in every month that the first fixed-price list was in effect; and (4) his individual regression analysis.

Dkt. No. 549 at 45; see also Dkt. No. 772 at 5 (citing "his average effects regression, individual regressions, before and after pricing analyses, and supply control model" [46]).  Defendants argue that Professor Elhauge's models "are not capable of showing class-wide impact."  Dkt. No. 773 at 5 (emphasis omitted); see also Dkt. No. 537 at 44-50; Dkt. No. 538 at 37-39.

I am required to weigh Professor Elhauge's analysis (which I have already found to be admissible under Daubert, see Dkt. Nos. 693, 694, 718, 719) and determine whether it supports a finding that plaintiffs' theory of impact is susceptible to proof at trial through available evidence common to the class.  "Rule 23 not only authorizes a hard look at the soundness of statistical

---

[46]       But see Dkt. No. 549 at 47, citing Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 384 (explaining that the purpose of Professor Elhauge's supply control model is not to show "whether or not any class member in fact incurred an overcharge," but rather to provide "an alternate damage calculation that isolates the effects of Defendants' Supply Control Program").

models that purport to show predominance – the rule commands it."  In re Rail Freight Fuel

Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 255 (D.C. Cir. 2013).

### i.  Professor Elhauge's Regression Analysis

"Courts frequently recognize that regression analysis can be used to isolate the effect of

an alleged conspiracy on price, taking into consideration other factors that might also influence

price, like cost and demand."  Processed Egg, 312 F.R.D. at 193 (internal quotation and citations

omitted).  Professor Elhauge "ran a regression to see whether the EMMC price-fixing conspiracy

raised prices throughout the period when it was in place" – his "average effects" regression.  Dkt.

No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 64.  Plaintiffs assert that "Prof. Elhauge's regression analysis

showed that the EMMC's conduct 'raised fresh agaricus mushroom prices by approximately

*****% during the conduct period if one uses all defendants who provided useful data.'"  Dkt.

No. 517 at 41, quoting Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 31.  Professor Elhauge opines

that this regression "controlled for any and all individual buyer characteristics that remain fixed

over the period" and "thus indicates that the proven anticompetitive impact affected all or nearly

all customers when coupled with the evidence that the nature of the conduct and market structure

indicate that the conduct should have had a similar effect on all buyers."[47]  Dkt. No. 517, Ex. 2

(Elhauge Rpt.) at ¶ 96.

Certain defendants argue that Professor Elhauge's average effects regression "is legally

insufficient to show antitrust impact" because it generates an "average overcharge" which "is

legally insufficient to meet the requirement of proving fact of damage for every class member

. . . ."  Dkt. No. 537 at 45 (internal quotations omitted).  But the Supreme Court has held that "[a]

---

[47]   I previously found that the regression analysis was sufficient to "fit[ ] the case under Rule 702" and declined to exclude it, explaining that Professor Elhauge had "robustly supported his conclusions of common impact," even if the analysis "might not ultimately show that all or nearly all class members were impacted . . . ."  Dkt. No. 693 at 34-35.

categorical exclusion of [representative evidence] . . . would make little sense.  A representative or statistical sample, like all evidence, is a means to establish or defend against liability."  <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 136 S. Ct. 1036, 1046, 194 L. Ed. 2d 124 (2016).  Thus it is necessary to more closely consider whether Professor Elhauge's average effects regression can support a finding of predominance in the context of this litigation.  "Whether and when statistical evidence can be used to establish classwide liability will depend on the purpose for which the evidence is being introduced and on 'the elements of the underlying cause of action . . . .'"  <u>Id.,</u> quoting <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011).

In support of their argument that Professor Elhauge's average effects regression is not enough, certain defendants cite <u>In re Plastics Additives</u>, No. 03-2038, 2010 WL 3431837, at *15 (E.D. Pa. Aug. 31, 2010), where the court declined to find proof of common impact, explaining that the plaintiffs' experts' "regressions tell us nothing about individual class member experience."  <u>See</u> Dkt. No. 537 at 45.  Here, I agree that, without more, Professor Elhauge's average effects regression would not be sufficient to show that common impact predominates.  Plaintiffs themselves recognize this, arguing that "the principal purpose of Professor Elhauge's average effects regression is to calculate damages, and Plaintiffs have not relied on it as the sole evidence of common impact . . . ."  Dkt. No. 772 at 4.

But even if Professor Elhauge's average effects regression analysis does not, on its own, support a finding of common impact, it may be used, as plaintiffs argue, to "confirm the existence of common impact by observing the aggregate effect of those prices at a customer level."  Dkt. No. 535 at 19 (Pls.' <u>Daubert</u> Opp'n Mem.); <u>cf.</u> <u>In re Air Cargo Shipping Servs. Antitrust Litig.</u>, No. 06-1175, 2014 WL 7882100, at *53 (E.D.N.Y. Oct. 15, 2014) (explaining that "predominance is a holistic inquiry that permits consideration of various forms of evidence"

and "the mere fact that [the expert's regression] analysis does not 'on its own' establish

classwide impact is irrelevant"), report and recommendation adopted, 2015 WL 5093503

(E.D.N.Y. July 10, 2015).  As my colleague has explained, "[t]he case law understandably

allows for averages and aggregations, but only if the court is convinced that the averages and

aggregations are not masking individualized issues that are likely to predominate should the class

action move forward."  Processed Egg, 312 F.R.D. at 159.  Plaintiffs have convinced the Court

that this is the case.

Here, unlike in Plastics Additives, Professor Elhauge has supported his opinion with

more than an industry-wide regression.  Cf. 2010 WL 3431837, at *16 (explaining that the

plaintiffs' expert "admitted that Plaintiffs . . . are attempting to use the single, industrywide

estimates as if they were equally applicable to all class members").  To further support his

conclusion that there was common impact, Professor Elhauge "also ran separate regressions for

each class member."  Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 101.  Plaintiffs explain that

Professor Elhauge "took his primary regression model and ran it for each class member for

whom Defendants produced transactional data,"[48] allowing him "to determine whether the two

EMMC price increases adversely impacted each class member."  Dkt. No. 517 at 44, citing Dkt.

No. 712, Ex. 2 (Elhauge Rpt.) at ¶ 105.  Professor Elhauge opines that "[t]his approach

conservatively tends to underestimate the commonality of impact" because "it sacrifices the

statistical power of large numbers that is provided by a single regression."  Dkt. No. 517, Ex. 2

---

[48]     Professor Elhauge explained that "[w]hile [he] did not have sufficient data to
apply [his] statistical analysis to all class members, [he] would not expect the impact on those
class members to be significantly different," where "(1) the sales were subject to the same
minimum pricing policies, (2) identical monitoring and enforcement mechanisms applied, (3) the
supply control scheme reduces the amount of supply available to all customers, (4) the
mushrooms are commodities, and (5) the sales were subject to the same market conditions."
Elhauge Rpt. at ¶ 109.

(Elhauge Rpt.) at ¶ 101.  Plaintiffs maintain that when he individually applied his regression analysis to an updated dataset, Professor Elhauge found "that *****% of all class members with statistically significant results were impacted in either the period of the first or the second EMMC price increase."  Dkt. No. 517 at 44, citing Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 34 (explaining that this represented *****% of purchases).

In contrast, in Plastic Additives, the defendants' expert (and not, like here, the plaintiffs' expert) ran individual regressions for "the subset of customers that purchased [one category of] products in both the conspiracy and the post-conspiracy periods" and found that of those 115 customers (representing 86% of the volume purchased during the conspiracy period), "only 34 . . . showed evidence of a significant increase in price as a result of the alleged conspiracy." 2010 WL 3431837, at *16.  For the other category of products, "[w]hile 56 of the 155 [(representing 89% of the second product category's volume sold during the conspiracy period)] showed evidence of a statistically significant increase in price, 99 did not."  Id.  The results of Professor Elhauge's individual regressions are more strongly indicative of common impact than the results generated by the individual regressions which the defendants' expert performed in Plastic Additives.

Certain defendants criticize Professor Elhauge's analysis because his "individual-level regressions showed some plaintiffs did not experience a statistically significant increase in price."[49]  Dkt. No. 537 at 46.  They explain that in Plastic Additives, the Court declined to find predominating proof of impact where it was "left with individual regressions showing that some

---

[49]     In subsequent briefing, certain defendants explain that that "the problem is not that Plaintiffs' impact model or models have turned up some likely-uninjured purchasers, but that the model or models are not capable of showing class-wide impact."  Dkt. No. 773 at 5 (emphasis in original).  However, on class certification I am not convinced that plaintiffs' models are incapable of showing class-wide impact when they are considered in combination with plaintiffs' other proposed proof of impact.

of the class members suffered no impact during the conspiracy period."  2010 WL 3431837, at

*17; see Dkt. No. 537 at 46.  Plaintiffs respond that "[a] result that is not statistically significant

does not prove that the class member was not impacted."  Dkt. No. 549 at 27, citing Dkt. No.

517, Ex. 53 (Elhauge Reply) at ¶ 147-63.  They argue that "there is no basis for the Court to

adopt Defendants' conclusion that the vast majority of the class has not been impacted as a

matter of law" and "the most that Defendants have succeeded in demonstrating is an issue for a

jury to resolve"  Dkt. No. 549 at 29 (internal quotation omitted); cf. Processed Egg, 312 F.R.D.

at 200 (E.D. Pa. 2015) (finding that a "lack of identified potentially uninjured members

distinguishes this case from others in which courts declined to infer that an observed price

increase would have had an impact on virtually every class member").  Further, plaintiffs argue

that "Tyson Foods and Kleen Products explicitly rejected the claim that Plaintiffs have to

establish that the class contains no uninjured members as a predicate for certification" and assert

that "[a]t the certification stage, plaintiffs are only required to produce a reliable method for

demonstrating injury and measuring class wide damages based on common proof."  Dkt. No. 774

at 3.

　　　　I agree with plaintiffs that a finding of predominance is not foreclosed by the possibility

that there may be uninjured class members.  See Kleen Prods. LLC v. Int'l Paper Co., 831 F.3d

919, 927 (7th Cir. 2016) (explaining that the Court had "not insisted on" a showing of impact by

every class member "at the class certification stage"); see also Tyson Foods, 136 S. Ct. at 1050

(explaining that "the question whether uninjured class members may recover is one of great

importance," but that it was not "fairly presented by th[e] case" before "disbursement of a

damages award"); In re Flonase Antitrust Litig., 284 F.R.D. 207, 227 (E.D. Pa. 2012) ("[Courts]

have routinely observed that the inability to show injury as to a few does not defeat class

certification where the plaintiffs can show widespread injury to the class.") (citation omitted).
But see In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 252
(D.C. Cir. 2013) ("The plaintiffs must also show that they can prove, through common evidence,
that all class members were in fact injured by the alleged conspiracy.").[50]

Defendants also fault Professor Elhauge's regression analyses because the "dataset used
in the average overcharge and individual regressions includes only 11 of 27 defendants, and
*****% of proposed class members"[51] and thus "would ask the jury to assume that the out-of-
sample purchasers were in fact injured, and that the out-of-sample defendants in fact charged
higher prices." Dkt. No. 754 at 26; see also Dkt. No. 537 at 47 (arguing that "Professor Elhauge
did not look at any data from 11 of the 27 Defendants, and thus, there is no evidence that those
defendants followed the minimum prices").[52] Plaintiffs argue that "Professor Elhauge used all of
the data that was reasonably available and Defendants should not be permitted to defeat class
certification because they failed to keep and/or destroyed records." Dkt. No. 549 at 45. Indeed,
the Supreme Court has now held that "representative evidence" is "a permissible means of"
"fill[ing] an evidentiary gap created by [a defendant's] failure to keep adequate records." Tyson
Foods, 136 S. Ct. at 1047. Plaintiffs assert that Professor Elhauge "considered whether the data
that Defendants failed to produce or that he could not use was likely to materially alter any of his

---

[50]     To the extent that defendants' challenges to Professor Elhauge's empirical
analysis "center on the results of his analysis . . . rather than the feasibility of using a single
formula methodology," such challenges might be better viewed as a "merits issue" and "not a
class certification issue." In re Titanium Dioxide Antitrust Litig., 284 F.R.D. 328, 347 (D. Md.
2012) (emphasis in original, internal quotation and citation omitted).
[51]     Plaintiffs contend that "the *****% subset of the class members considered in the
Elhauge regression represented *****% of all sales transactions." Dkt. No. 549 at 46.
[52]     I previously held that Professor "Elhauge has sufficiently shown that his decision
to use a subset of defendants' data was reliable since those defendants produced the most
complete data over the relevant time period and represented the majority of total sales made by
defendants." Dkt. No. 693 at 30 (emphasis added).

conclusions" and "concluded that it was not."  Dkt. 549 at 45.

Also in support of his conclusion that there was a common impact, Professor Elhauge performed a before and after price comparison[53] – "directly compar[ing] prices right before the conspiracy started to prices right after it became effective."  Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 98.  Plaintiffs point to Professor Elhauge's "Before-and-After" comparison as evidence that "*****% of all class members experienced a price increase of more than ***** within ***** of either the first or second price lists issued by the EMMC."  Dkt. No. 758 at 11.  They note that Professor Elhauge's analysis shows "that such effects did not occur in any time period in which the EMMC did not issue new price lists" and that putative "class members experienced a price increase within ***** days of the EMMC's price[ ] lists regardless of the geographic region." Dkt. No. 758 at 11.

Certain defendants argue that Professor Elhauge's price increase chart "only shows that some purchasers paid some increases in prices for some products" and "[s]uch analysis cannot prove that each purchaser was harmed by the defendants' practice."  Dkt. No. 537 at 43 (internal quotation omitted).  They also contend that the chart is faulty because it "does not, and cannot, control for other factors that may have affected prices."  Id.  They argue that there are "no control variables in" this analysis, and "that prices rose does not in itself demonstrate antitrust impact," but rather, prices could have risen for "other reasons."  Dkt. No. 768 at 128:4-8. Certain defendants contend that "there is a serious cherry picking problem here[, b]ecause

---

[53]     In the analysis, Professor Elhauge "considered the prices paid by class members ***** before and ***** after February 4, 2011 and October 11, 2002, the dates of the two principal price increases imposed by the EMMC."  Dkt. No. 517 at 42, citing Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 98.  He also "performed the same kind of before and after analysis for every ***** period from 1999-2005" and found that "[i]n most periods where the EMMC was not imposing a price increase, the percentage of class members paying at least ***** more ***** after any given date was about *****%."  Dkt. No. 517 at 42, citing Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 99.

there[ i]s no comparison with prices that decreased.  There[ i]s no comparison to . . . anything

that we rigorously demand in a regression model . . . ."  Id. at 128:11-15.  They contend that their

expert, Dr. Johnson, points to "large purchasers [who] are putative class members who had no

increase in price . . . whatsoever," but Professor Elhauge "omits these people from his [before

and after price] chart."  Id. at 128:18-129:1.

I agree that "the fact that prices rose does not, in and of itself, demonstrate antitrust

impact – at trial, plaintiffs must show that they experienced price increases that resulted from

anticompetitive conduct.  However, a showing that prices behaved similarly across groups of

customers contributes to a finding of predominance at the certification stage."  In re Blood

Reagents Antitrust Litig., No. 09-2081, 2015 WL 6123211, at *32 (E.D. Pa. Oct. 19, 2015)

(finding that the plaintiffs' experts' "empirical pricing analysis" was not "as persuasive as his

market analysis or the results of his damages models" but that it "provide[d] additional support

for his assertion that plaintiffs will be able to prove impact using common proof"); see also In re

Air Cargo Shipping Servs. Antitrust Litig., No. 06-1175, 2014 WL 7882100, at *59 (E.D.N.Y.

Oct. 15, 2014) (considering challenges to an expert's regression models and finding that "none of

these issues affect the question of whether [the expert's] report is fundamentally probative of

classwide impact.  Instead, they bear on the question of whether [the expert's] report is

dispositive proof" which was "not a determination for the court to make" on class certification),

report and recommendation adopted, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).  I find that

plaintiffs have shown that Professor Elhauge's regression analyses may be used as common

proof that plaintiffs suffered an impact from defendants' price fixing and supply control efforts.

### i. Professor Elhauge's Supply Control Model

In opposing class certification, certain defendants also fault Professor Elhauge's supply

-78-

control model as being "unable to show whether or not any class member in fact incurred an

'overcharge'" as a result of the deed restrictions because it is "a purely theoretical construct,

based on counter-factual assumptions."  Dkt. No. 537 at 48.  They argue that "[t]he most such a

model could show is the potential for injury, not the fact of injury."  Id. at 49 (emphasis in

original).  Plaintiffs respond that the purpose of Professor Elhauge's supply control model is not

to show "whether or not any class member in fact incurred an overcharge," but rather to provide

"an alternate damage calculation that isolates the effects of Defendants' Supply Control

Program."  Dkt. No. 549 at 47, citing Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 384.  They argue

that Professor Elhauge explained that "the Supply Control Program would impact all or nearly all

class members because the reduction in output caused a market wide change in the intersection

of supply and demand" and "[t]he resulting effect on prices . . . is thus systemic, affecting the

prices received by all buyers in the market . . . ."  Dkt. No. 549 at 47, citing Dkt. No. 517, Ex. 2

(Elhauge Rpt.) at ¶ 120 (internal quotations omitted).  Plaintiffs argue that with respect to proof

of impact "in cases involving supply restrictions," application of the Bogosian shortcut is

appropriate because "the presumption of impact is merely 'a demonstration of the laws of supply

and demand at work.'"  Dkt. No. 549 at 47-48, quoting Linerboard, 305 F.3d at 153.

I agree with plaintiffs that defendants' argument regarding Professor Elhauge's supply

control model is not sufficient to defeat a showing of predominance.  In In re Processed Egg

Products Antitrust Litigation, 312 F.R.D. 171, 192 (E.D. Pa. 2015), the Court rejected an

argument similar to that made by certain defendants, finding that at this stage plaintiffs need not

"disaggregate each alleged anticompetitive action and isolate its effect."  The court explained

that while the "[d]efendants will certainly be able to argue at summary judgment or at trial that

the alleged conspiracy . . . was not successful in restricting supply and therefore that the

observed price increase in [the plaintiffs' expert's] model is not attributable to the conspiracy," the issue was "a common question as to the merits of [the] Plaintiffs' claims."  Id. at 194.

Ultimately, I conclude that plaintiffs have met their burden to show that common issues predominate with respect to the question of whether they suffered an antitrust injury.  On the record before me, any factual questions with respect to impact which must be decided individually for different class members do not outweigh the questions which are common to the class.

### B.    Antitrust Damages

I am also convinced that plaintiffs have met their burden to demonstrate that common questions predominate with respect to the element of measurable damages.  "The predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations . . . overwhelm questions common to the class.'"  In re Modafinil Antitrust Litig., 837 F.3d 238, 260 (3d Cir. 2016), as amended (Sept. 29, 2016), quoting Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013).  Therefore I must consider whether "there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact."  Kleen Prods., 831 F.3d at 929.

"Plaintiffs must show that there is a reliable means for measuring damages with reasonable accuracy in the aggregate."  Processed Egg, 312 F.R.D. at 202.  "Calculations need not be exact, . . . but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."  Comcast, 133 S. Ct. at 1433 (citations and internal quotation omitted).  Plaintiffs submit Professor Elhauge's "two separate aggregate damage

calculations" in support of their class certification motion:  (1) his regression analysis which "compared mushroom prices before and after the time that the EMMC's conspiracy [– including both the price fixing and supply control schemes –] was effective and controlled for non-conspiratorial factors that might affect price such as input costs, changes in demand for mushrooms, seasonal effects, and characteristics of sellers, buyers, mushroom items purchased, and delivery items;" and (2) a calculation of aggregate damages resulting from the alleged supply control conspiracy "us[ing] an estimate of the demand elasticity for fresh mushrooms to predict how much prices would have increased above but-for levels if supply was reduced below but-for levels by the Supply Control Program."[54]  Dkt. No. 517 at 50-51.  Ultimately, using the regression analysis, Professor Elhauge concludes that total damages to the class were \$\*\*\*\*\* million.  Dkt. No. 517 at 50, citing Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 36.  He also concludes that the Supply Control Program resulted in overcharge damages to the class totaling \$\*\*\*\*\* million.  Dkt. No. 517 at 51, citing Dkt. No. 517, Ex. 2 (Elhauge Rpt.) at ¶ 123.

Certain defendants assert that with Professor Elhauge's analysis, plaintiffs propose "to simply ask the jury to award an aggregate amount and then burden the Court with an as-yet-undefined procedure for a 'later damages phase' to determine (a) which purchasers are in fact entitled to damages, and (b) how much."  Dkt. No. 537 at 54.  They argue that because plaintiffs have not proposed "a method of identifying which Plaintiffs should receive damages, let alone

---

[54]      Professor Elhauge's calculation "relied on the EMMC's own estimates that its Supply Control Program had succeeded in keeping \*\*\*\*\* million pounds of mushrooms off the market."  Dkt. No. 517 at 51.  But, as he explains in his reply report, if the factfinder does not credit the EMMC's own estimation of the mushrooms the supply control program prevented from entering the market, it would be straightforward to plug an alternative number into his model to generate an alternative damages calculation.  See Dkt. No. 517, Ex. 53 (Elhauge Reply) at ¶ 378.  Thus, I previously found that "while there might be a factual dispute about the true extent of any reduction in supply caused by the EMMC's supply control efforts, Prof. Elhauge's [supply control] analysis has sufficient foundation in the factual record to be admissible."  Dkt. No. 693 at 40.

how much," their proposed proof of damages is insufficient to support class certification.  Id.

But I "reject[ ] Defendants' arguments premised on the notion that variation of damages between

and among class members defeats predominance."  Processed Egg, 312 F.R.D. at 203; see W.

Palm Beach Police Pension Fund v. DFC Glob. Corp., No. 13-6731, 2016 WL 4138613, at *14

(E.D. Pa. Aug. 4, 2016) ("the need to perform individual damages calculations does not foreclose

class certification under Rule 23(b)(3)").  "[A]t the class certification stage, plaintiffs are not

obliged to drill down and estimate each individual class member's damages.  The determination

of the aggregate classwide damages is something that can be handled most efficiently as a class

action, and the allocation of that total sum among the class members can be managed

individually, should the case ever reach that point."[55]  Kleen Prods., 831 F.3d at 929; but see In

re Medical Waste Serv. Antitrust Litig., No. 03-1546, 2006 WL 538927, at *7-8 (D. Utah Mar. 3,

2006) ("It is simply not enough that Plaintiffs merely promise to develop in the future some

unspecified workable damage formula.  A concrete, workable formula must be described before

certification is granted.").

Certain defendants also fault Professor Elhauge's regression models because they

"measure only a global average difference in price between the 'control' period and the alleged

'conspiracy' period" and "do not attempt to quantify the impact (if any) of the various vertical

agreements between any grower and its distributors."  Dkt. No. 754 at 35.  They argue that "[i]f

the Court or the jury finds that any of the vertical arrangements at issue did not constitute a

'meeting of the minds' or harm competition within the relevant market, Plaintiffs have offered

no means of determining what, if any, price effect they caused or of backing that effect out of

---

[55]     That being said, in the end there must be a "way to ensure that [any] damages
award goes only to injured class members . . . " i.e., "a means of distributing the aggregate award
only to injured class members."  Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1051, 1053,
194 L. Ed. 2d 124 (2016) (Roberts, J., concurring).

their proffered aggregate damages figure." Id. at 36.  They contend that "if even one of the approximately 16 vertical relationships is found not to have violated the Sherman Act," a "class-wide trial . . . would ultimately be futile." Id.  Certain defendants argue that "[a]n appropriate class-wide damages model 'must measure only those damages attributable' to the theory of wrongdoing and cannot include 'damages that are not the result of the wrong.'"  Dkt. No. 754 at 35, quoting Comcast, 133 S. Ct. at 1434 (emphasis added).

I agree that plaintiffs' damages model must "measure damages resulting from the particular antitrust injury on which [defendants'] liability in this action is premised." Comcast, 133 S. Ct. 1426, 1434; see Kleen Prods., 831 F.3d at 929 ("Comcast insists that the damages theory must correspond to the theory of liability . . . .").  But that is not to say that Professor Elhauge's damages calculations must disaggregate the damages resulting from the alleged price-fixing and supply control conspiracies or from the horizontal and vertical elements of the alleged price-fixing conspiracy in order to permit a finding that plaintiffs have satisfied the predominance requirement of Rule 23(b)(3).  In Comcast, the Supreme Court explained that a damages model which "calculated damages resulting from the alleged anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact . . . might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case." Comcast, 133 S. Ct. 1426, 1434 (quotations omitted). The problem in Comcast was that not all of the theories of antitrust impact underlying the plaintiffs' damages calculations survived at class certification – "the plaintiffs['] model in Comcast could not reliably demonstrate impact to the class from the theory advanced by the class." Processed Egg, 312 F.R.D. at 192.  I am not faced with the same problem here, as both the supply control and price fixing claims remain in this case, as do plaintiffs' claims against

defendants in both the top and middle layers of the "cake."  With respect to the vertical and

horizontal elements of the alleged price-fixing conspiracy, "[p]laintiffs' theory of liability is not

that each individual agreement caused an individual harm, such that a new damages model

would be required under Comcast.  Instead, their theory of liability is that each individual

agreement contributed to the market-wide harm, and that all . . . defendants are jointly and

severally liable for this harm . . . .  This theory may ultimately be proven wrong, but it does

match Plaintiffs' damages theory."  In re Modafinil Antitrust Litig., 837 F.3d 238, 262 (3d Cir.

2016), as amended (Sept. 29, 2016).  With respect to the two different conspiracies claimed,

plaintiffs argue that "if the jury ultimately finds that Defendants engaged in a price fixing

conspiracy that caused damages . . . [t]here would be no additional damages from Defendants'

Supply Control Program . . . because the regression would measure the damages arising from

whatever conspiratorial conduct occurred during the class period."  Dkt. No. 517 at 51.  And, if

"the jury concludes that no damages should be awarded for the price-fixing conspiracy, Professor

Elhauge's alternate calculation provides a damage estimate limited to the overcharge caused by

the Supply Control program."  Id.

        Ultimately, I find that Professor Elhauge has set forth "statistically feasible methods for

estimating damages on a class-wide basis . . . ."  In re Chocolate Confectionary Antitrust

Litigation, 289 F.R.D. 200, 224 (M.D. Pa. 2012).

**VI.    Superiority**

        The final requirement for class certification pursuant to Rule 23(b)(3) is that a class

action be "superior to other available methods for the fair and efficient adjudication of the

controversy."  Fed. R. Civ. P. 23(b)(3).  "The 'superiority' requirement asks whether a case is

better brought as a class action or in an alternative form of litigation, such as individual

lawsuits." Processed Egg, 312 F.R.D. at 203.  "The requirement that a Section (b)(3) class action

be the 'superior' method of resolving the claims ensures that there is no other available method

of handling it which has greater practical advantages." Glaberson v. Comcast Corp., No. 03-

6604, 2014 WL 7008539, at *3 (E.D. Pa. Dec. 12, 2014) (citations omitted).  Factors relevant to

a finding of superiority include "class members' interests in pursuing separate actions, the extent

of any independent litigation already begun by class members, the desirability of concentrating

the litigation in this forum, and the difficulties likely to be encountered in the management of a

class action." Id., citing Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs argue that "[g]iven the abundance of common questions of law and fact [in this

litigation], the class action device is far superior to, and more efficient than, any other procedure

available for resolving the factual and legal issues raised by Plaintiffs' claims."  Dkt. No. 517 at

52.  They contend that "a class action will be significantly more manageable than thousands of

individual actions." Id. at 53.  Certain defendants do not contest plaintiffs' superiority

arguments.  M.D. Basciani disputes superiority on the basis of its arguments regarding common

impact and damages.  Dkt. No. 538 at 39.  Because I am not persuaded by defendants' arguments

regarding common impact and damages, I find no reason to disagree with plaintiffs' contention

that a class action is the superior device for resolving the claims in this litigation.

## CONCLUSION

Consistent with all of the above, I will grant plaintiffs motion for class certification and I

will certify the following class, finding that it meets the requirements set forth in Rules 23(a) and

23(b)(3) of the Federal Rules of Civil Procedure:

> all persons and entities in the non-Western United States who
> purchased fresh agaricus mushrooms directly from an Eastern
> Mushroom Marketing Cooperative (EMMC) member or one of its
> co-conspirators or its owned or controlled affiliates, agents, or

subsidiaries at any time between February 4, 2001 and August 8, 2005 (the "Class Period"). For group buying organizations and their members, direct purchasers are either: (1) members who have a significant ownership interest in or functional control over their organizations; or (2) if no member has such interest or control, the organizations themselves. The Class excludes the EMMC, its members and their parents, subsidiaries and affiliates.

The non-Western United States refers to the following states which were in the six regions of the country which plaintiffs claim were subject to the EMMC's pricing policies: Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, New Jersey, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Tennessee, Alabama, Mississippi, Arkansas, Louisiana, Wisconsin, Minnesota, Iowa, Kansas, Nebraska, Colorado, Oklahoma, Texas, Ohio, Missouri, Michigan, Indiana, Kentucky, West Virginia, Illinois and the District of Columbia.

I will appoint the following plaintiffs as the representatives of the Class: Wm Rosenstein & Sons Co.; Associated Grocers, Inc.; M. Robert Enterprises, Inc., M.L. Robert, II, L.L.C.; and Market Fare, LLC.

Finally, I will grant in part and deny in part the motion by certain defendants to dismiss, or in the alternative for summary judgment, with respect to the claims brought by plaintiffs Diversified Foods and Seasonings, Inc. (Civ. A. No. 06-0657) and Associated Grocers, Inc. (Civ. A. No. 06-1854), granting judgment in favor of defendants and against Diversified with respect to Diversified's claims and denying the motion in all other respects.

An appropriate Order follows.