IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |

O'NEILL, J.                                                December 13, 2016

## MEMORANDUM

Now before me is another motion in this long-running antitrust litigation arising out of

plaintiffs' claims that defendants engaged in a conspiracy to control the supply of and set

artificially-inflated distribution prices for fresh agaricus mushrooms.[1] Defendant M.D. Basciani

& Sons, Inc., joined by certain other defendants,[2] moves for summary judgment with respect to

plaintiffs' claims under Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act and

opt-out plaintiff Giant Eagle's Ohio Valentine Act claim. Dkt. No. 518. M.D. Basciani argues

that summary judgment is warranted in its favor because: (1) plaintiffs are indirect purchasers of

mushrooms who lack antitrust standing; (2) some of plaintiffs' claims are barred by the statute of

---

[1]    I granted plaintiffs' motion for class certification on November 22, 2016. See
Dkt. Nos. 779 and 780.

[2]    The following defendants join in M.D. Basciani's motion to the extent that it
relates to plaintiffs' claims against them under Section 7 of the Clayton Act: Brownstone
Mushroom Farm; To-Jo Fresh Mushrooms, Inc.; Country Fresh Mushroom Co.; Gino Gaspari &
Sons, Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.; Southmill
Mushroom Sales, Inc.; Modern Mushroom Farms, Inc.; C&C Carriage Mushroom Co.; Sher-
Rockee Mushroom Farm, LLC; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.;
Louis M. Marson, Jr., Inc.; Monterey Mushrooms, Inc.; John Pia (Dkt. No. 519). JM Farms joins
in M.D. Basciani's motion generally. (Dkt. No. 522).

Also before me with respect to the motion are defendant M. Cutone's response in
support, Dkt. No. 525, plaintiffs' opposition, Dkt. No. 539, plaintiffs' appendix in support of
their opposition to the motion, Dkt. No. 536, M.D. Basciani's reply, Dkt. No. 554, M.D.
Basciani's sur-reply, Dkt. No. 565, M.D. Basciani's supplemental sur-reply, Dkt. No. 716, and
plaintiff's response thereto. Dkt. No. 720.

limitations; (3) M.D. Basciani did not have a conscious commitment to a common scheme

designed to achieve an unlawful objective; (4) the record lacks evidence of alleged antitrust

injury; and (5) Section 7 of the Clayton Act does not apply to the conduct at issue in this case.

See Dkt. No. 518 (Mem.). For the reasons that follow, I will deny the motion for summary

judgment.

## BACKGROUND

M.D. Basciani & Sons, Inc. is a mushroom grower and was a member of the Eastern

Mushroom Marketing Cooperative (EMMC) from its inception until 2004. Dkt. No. 518 (Mot.)

at ¶¶ 1, 14, 54. Under the EMMC membership agreement, members agreed "not to sell or

otherwise dispose of mushrooms except as provided under the terms of [the membership]

Agreement and the Articles of Incorporation and Bylaws of the Cooperative." Dkt. No. 517, Ex.

4 (Executed Membership Agreement for Bella Farms) at 4, ¶ 6. Plaintiffs contend that from on

or around February 4, 2001 and through at least August 8, 2005, the EMMC and its members

circulated written price lists and pricing policies for "sales of mushrooms made by distributors to

the retail, wholesale, and foodservice markets." Dkt. No. 517 at 5. Through its policies, the

EMMC endeavored to set floor pricing for mushrooms at the point of distribution, and not the

price for mushrooms emerging from growing operations. See Dkt. No. 517 at Ex. 12 (███████

███████ Dep.) at 75:18-24 ("Q. . . . one of the policies that the EMMC adopted was to try to set

prices for – the downstream price that shippers got when they sold their product to wholesalers

and retailers, correct? A. Yes, sir.").

Plaintiffs also contend that to support the EMMC's minimum pricing policies, defendants

implemented a supply control scheme – purchasing and leasing mushroom farms in order to

place on the properties deed restrictions prohibiting the conduct of business related to the

production of mushrooms. Dkt. No. 185 at ¶ 94; see also id. at ¶¶ 69, 73-81; Dkt. No. 517, Ex.

36 (April 17, 2001 EMMC management committee minutes identifying plans to address the

question: "How can we control SUPPLY??"). Specifically, plaintiffs claim that

> [t]hrough membership dues and a "Supply Control Assessment,"
> EMMC collected approximately ▮▮ million from its members
> during 2001-2002. EMMC, acting as an agent of its members,
> then spent approximately ▮▮ million to purchase four mushroom
> farms and to acquire lease options on two additional mushroom
> farms in the eastern United States for the purpose of shutting them
> down and reducing the mushroom production capacity available
> for nonmember non-conspirators to grow mushrooms in
> competition with the Defendants.

Dkt. No. 185 at ¶ 72. M.D. Basciani, citing the testimony of ▮▮▮▮▮▮▮, contends that it

"was not in favor of the purchase of defunct mushroom farms at all by the EMMC . . . ." Dkt.

No. 518 (Mot.) at ¶ 44. ▮▮▮▮▮▮▮ testified that M.D. Basciani "was 'really not involved

in these purchases . . . . It wasn't my decision. So I don't really know, you know' why they put

deed restrictions on the defunct mushroom farms." Dkt. No. 518 (Mot.) at ¶ 49, quoting Dkt.

No. 518, Ex. 1 (▮▮▮▮▮▮▮ Dep.) at 144:3-6.

M.D. Basciani sells all of its mushrooms to ▮▮▮▮▮▮▮ which was never a

member of the EMMC and is not a party to this litigation. See Dkt. No. 518 (Mot.) at ¶¶ 3, 5, 6;

Dkt. No. 518, Ex. 1 (▮▮▮▮▮▮▮ Dep.) at 77:17-19. M.D. Basciani asserts that it "sells

generalized raw mushrooms while [▮▮▮▮▮▮▮] sells fresh mushroom products at the

wholesale level, which are differentiated horizontally (types, grades, quality, packaging, and

shop-keeping units) and vertically (quality, service, and terms of trade)." Dkt. No. 554 at 5

(emphasis omitted). M.D. Basciani also claims that it sells its mushrooms only to ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ "at a negotiated price in a willing buyer, willing seller transaction." Dkt. No. 518 (Mem.)

at 3. M.D. Basciani contends that when ▮▮▮▮▮▮▮ takes possession of the mushrooms it

purchases, title to the mushrooms passes to ██████████. Id. M.D. Basciani asserts that it was not the sole supplier of fresh agaricus mushrooms to ██████████ and that ██████████ bought most of its fresh mushrooms from farms other than M.D. Basciani. Dkt. No. 554 at 5.

M.D. Basciani contends that it is a separate corporate entity from ██████████ See id. M.D. Basciani has its own bank accounts, financial statements and assets, board of directors meetings, annual shareholder meetings and payrolls. See In re Mushroom, 2012 WL 298480, at *1. However, ██████████ is the Vice President of both M.D. Basciani and ██████████. See In re Mushroom, 2012 WL 298480, at *1 (E.D. Pa. Jan. 31, 2012). Additionally, M.D. Basciani and ██████████ have identical owners, with each holding the same percentage of shares in M.D. Basciani and in ██████████. See id. Also, on some occasions ██████████ wrote checks to the EMMC to pay for the annual dues or special assessments owed by M.D. Basciani. Id.

On August 12, 2012, U.S. Magistrate Judge Timothy R. Rice granted plaintiffs' discovery motion seeking to sanction M.D. Basciani and ██████████ for spoliation. Dkt. No. 452. In his decision, Judge Rice found that "M.D. Basciani had control over [██████████] documents and the two entities acted as one in participating in the EMMC." Id. at ECF p. 3. In support of his decision, he noted that, although ██████████ testified that M.D. Basciani is a corporate entity distinct from ██████████ with its own bank accounts, financial statements and assets, board of directors meetings, annual shareholder meetings and payrolls, "██████████ ██████████ acknowledged [██████████] may have written checks to the EMMC to pay annual dues or special assessments owed by M.D. Basciani." Id. at ECF p. 3-4. Judge Rice explained that "[i]n June of 2001, [██████████] used ██████████ from its credit line to pay for M.D. Basciani's contribution to a land purchase through the EMMC." Id. at ECF p. 4.

Thereafter, M.D. Basciani and non-party ████████ filed objections to Judge Rice's Order. See Dkt. Nos. 458 and 459. M.D. Basciani and ████████ argued that Judge Rice incorrectly concluded that M.D. Basciani controlled ████████ and that therefore he erred in awarding sanctions for spoliation. They raised the same arguments against a finding of control that Judge Rice considered in resolving the spoliation motion, reasserting their contention that, because they are separate corporations, M.D. Basciani did not have control over ████ documents. I overruled the objections and affirmed Judge Rice's Order on October 22, 2012. Dkt. Nos. 472, 473.

## STANDARD OF REVIEW

"[G]enerally, in an antitrust case, the court applies the traditional summary judgment standard." Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp., 206 F. Supp. 2d 702, 710 (E.D. Pa. 2002) aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144 (3d Cir. 2003). Summary judgment will be granted under Rule 56 "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## DISCUSSION

### I.   Antitrust Standing

M.D. Basciani argues that summary judgment is warranted in its favor because it does not

sell its mushrooms to anyone other than ███████, rendering plaintiffs indirect purchasers without antitrust standing[3] to bring their claims against it. Dkt. No. 518 (Mot.) at ¶¶ 86-94; Dkt. No. 518 (Mem.) at 2-4. It argues that because ███████ holds the title to the mushrooms it sells, plaintiffs "neither buy nor take title or possession of mushroom products from M.D. Basciani . . . ." Dkt. No. 518 (Mem.) at 3-4; see also Dkt. No. 554 at 5.

Pursuant to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), there is a "general rule that only direct purchasers from antitrust violators may recover damages in antitrust suits." Howard Hess Dental Labs., Inc. v. Dentsply Intern., Inc. (Hess I), 424 F.3d 363, 369 (3d Cir. 2005); see McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 847-48 (3d Cir. 1996) ("[T]he [Illinois Brick] Court . . . enunciat[ed] a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action . . . ."). However, even if no member of the class buys mushrooms directly from M.D. Basciani, summary judgment is not necessarily warranted in its favor under Illinois Brick. In the Third Circuit, indirect or secondary purchasers may sue under the antitrust laws if they can establish one of three possible exceptions to the Illinois Brick direct purchaser rule: (1) a "cost-plus" exception, (2) a "co-conspirator" exception, and (3) an "owned or controlled" exception. See In re: Domestic Drywall Antitrust Litig., No. 13-2437, 2016 WL 3769680, at *4 (E.D. Pa. July 13, 2016), citing Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 968 n.22 (3d Cir. 1983) and Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc. (Hess II), 602 F.3d 237, 258-59 (3d Cir. 2010). Plaintiffs do not argue that

---

[3]    "The antitrust standing inquiry seeks to determine whether the plaintiff is a proper party to bring a private antitrust action." Animal Sci. Prod., Inc. v. China Minmetals Corp., 34 F. Supp. 3d 465, 499 (D.N.J. 2014) (internal quotation omitted). "That Article III standing and antitrust standing both employ the term 'standing' tends to confuse matters. The two concepts are distinct, with the former implicating a court's subject matter jurisdiction and the latter affecting only the plaintiff's ability to succeed on the merits." Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., No, 15-3289, 2016 WL 4651381, at *5 (3d Cir. Sept. 7, 2016).

the cost-plus exception permits their claims against M.D. Basciani, but argue that both the co-conspirator exception and the owned or controlled exception foreclose M.D. Basciani's antitrust standing argument. I will consider their arguments in turn.

### A.    Co-Conspirator Exception

First, plaintiffs argue that, "[a]s a co-conspirator, [M.D.] Basciani is jointly and severally liable for its role in the conspiracy, irrespective of whether or not it sold mushrooms directly to Plaintiffs." Dkt. No. 539 at 6. M.D. Basciani responds that it "cannot conspire with [ ███████ ] as a matter of law," because, "although they are distinct legal entities, M.D. Basciani and [ ███████ ] are commonly owned by the same individuals in identical proportions." Dkt. No. 554 at 7. Like M.D. Basciani, I also conclude that the co-conspirator exception does not permit plaintiffs' claims to proceed against it, but do so for a different reason: ███████ has not been joined as a defendant in this litigation.

As the Court of Appeals has explained,

> [T]he limited co-conspirator exception to the direct purchaser rule
> . . . allows an entity to sue its supplier <u>and</u> its supplier's supplier if
> (1) it sues both at once, and (2) the immediate supplier (i.e., the
> middleman) was so wrapped up in the conspiracy that it would be
> barred from seeking antitrust relief against the top-level supplier in
> a suit of its own.

<u>Wallach v. Eaton Corp.</u>, 837 F.3d 356, 362 n.3 (3d Cir. 2016) (emphasis in original); <u>see also</u> <u>Animal Sci. Prod., Inc. v. China Minmetals Corp.</u>, 34 F. Supp. 3d 465, 505 (D.N.J. 2014) ("An indirect purchaser may sue if it can establish that the actual direct purchaser, the middleman, has entered into a price-fixing conspiracy with the manufacturer, [or in this case, the grower,] thus rendering the direct purchaser a 'co-conspirator.'"). The Court of Appeals "has expressly refused to adopt a co-conspirator exception to <u>Illinois Brick</u> absent the joinder as defendants of the alleged co-conspirators immediately upstream . . . ." <u>Hess I</u>, 424 F.3d at 371; <u>cf. Mid-</u>

Atlantic Toyota, 516 F. Supp. at 1296 (finding the Illinois Brick doctrine barred the claims of a plaintiff who had "not in his lawsuit named the individual Toyota dealers as . . . defendants," meaning "[t]he risk of multiple liability facing the distributor defendants would thus appear to be a significant one"). Thus, the co-conspirator exception does not permit plaintiffs' claims against M.D. Basciani absent ████████████ joinder as a defendant.

### B.    Control Exception

Plaintiffs also argue that M.D. Basciani's motion for summary judgment fails "because Illinois Brick does not apply where an upstream participant in the distribution chain controls a downstream participant." Dkt. No. 539 at 6. They cite Judge Rice's spoliation Order in arguing that the Court has "already found that [M.D.] Basciani controlled ████████" because Judge Rice held that M.D. "Basciani and ████████ 'acted as one in participating in the EMMC.'" Dkt. No. 539, at 6, quoting Dkt. No. 452 at 3. M.D. Basciani responds that the control exception to Illinois Brick does not apply to permit plaintiffs' claims against it, noting that "M.D. Basciani does not own [████████ . . . ." Dkt. No. 554 at 7. On the record before me, I find that the control exception precludes summary judgment.

The owned or controlled exception to Illinois Brick permits suits brought by indirect purchasers when "the direct purchaser to whom they pay the passed-on overcharge is owned or controlled by a conspirator." In re Lithium Ion Batteries Antitrust Litig., No. 13-MD-2420 YGR, 2014 WL 309192, at *9 (N.D. Cal. Jan. 21, 2014); see also Hess I, 424 F.3d at 371 ("The 'control exception' to Illinois Brick 'might' permit an indirect purchaser to sue an initial seller when the initial seller 'own[s] or control[s]' the direct purchaser."), quoting Ill. Brick, 431 U.S. at 736 n.16. For the exception to apply, courts " require 'relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect

purchaser that there effectively has been only one sale.'" Hess I, 424 F.3d at 372, quoting

Jewish Hosp. Ass'n of Louisville v. Stewart Mech. Enters., Inc., 628 F.2d 971 (6th Cir. 1980).

In other words, "this exception is available only if the plaintiff shows that the defendant has such

control over the subsidiary that the defendant can be said to have 'set prices along the chain of

distribution.'" In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 101 (E.D.N.Y. 2012), quoting

Kloth v. Microsoft Corp., 444 F.3d 312, 321 (4th Cir. 2006). "Modes of control that might

qualify for the control exception include 'interlocking directorates, minority stock ownership,

loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust

agreements.'" Hess I, 424 F.3d at 372, quoting In re Brand Name Prescription Drugs Antitrust

Litig., 123 F.3d 599, 605 (7th Cir. 1997) (alteration in original); see Labrador, Inc. v. Iams Co.,

No. 94-4463, 1995 WL 714454, at *3 (C.D. Cal. Sept. 18, 1995) ("Joint ownership or financial

interdependence between a manufacturer and a distributor could evidence the control factor.");

cf. Royal Printing Co. v. Kimberly Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980) ("There is

little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a

subsidiary or division of a co-conspirator.").

     M.D. Basciani does not directly respond to plaintiffs' argument that Judge Rice's finding

supports application of the owned or controlled exception to permit their claims against it.

Instead, it argues that "the mechanics of the market indicate that there has not effectively (nor

actually) been 'one sale' of the product." Dkt. No. 554 at 8. They contend that "the product that

M.D. Basciani sells – generalized raw mushrooms – is undisputedly not what plaintiffs buy –

fresh mushroom products at the wholesale level." Id. at 7 (emphasis omitted). Thus, M.D.

Basciani contends that plaintiffs "do not purchase – directly or indirectly – the product that M.D.

Basciani sells." Id. at 8 (emphasis omitted).

I find that material questions of fact remain with respect to whether there was sufficient functional unity between ███████████ and M.D. Basciani to warrant application of the control exception to <u>Illinois Brick</u> to permit plaintiffs' claims against M.D. Basciani. Although Judge Rice's decision was limited to the question of whether M.D. Basciani had control over ██████████ ██████ in the context of document production, his findings are instructive here. In particular, I note that at the deposition of ███████████████ as the corporate designee for M.D. Basciani, he admitted that there may have been occasions when ████ wrote checks to the EMMC to pay annual dues or special assessments owed by M.D. Basciani. Dkt. No. 518 (Ex. 1) at 86:21-88:5; <u>see also</u> M.D. Basciani Resp. to Pls.' First Set of Interrogs., Dkt. No. 389, Ex. G at 14 ("█████████ was paid out of [█████████████] credit line to pay for [M.D. Basciani's] contribution to pay for a land purchase through the EMMC."). He also testified that M.D. Basciani and ██████████████ were owned and operated and controlled by the same individuals and that he and the other co-owners made decisions for both ██████████████ and M.D. Basciani. Dkt. No. 518 (Ex. 1) at 280:12-22. On the record before me, I decline to grant summary judgment in favor of M.D. Basciani based on its antitrust standing argument.

## II.   Statute of Limitations

### A.   Section 2 Claims

M.D. Basciani argues that the statute of limitations bars plaintiffs' claims under Section 2 of the Sherman Act because plaintiffs filed their Revised Consolidated Amended Class Complaint on November 13, 2007, more than one year after tolling allowed by 15 U.S.C. § 15(b) and after final judgment was entered in the Department of Justice action on September 9, 2005. Dkt. No. 518 (Mem.) at p. 5. Plaintiffs contend that the Court has "already disposed of [M.D.] Basciani's claims that the allegations of a conspiracy to monopolize were untimely" in the

context of granting plaintiffs the right to file the revised consolidated amended complaint. Dkt. No. 539 at 11-12. I decline to grant summary judgment with respect to plaintiffs' Section 2 claims based on the statute of limitations for the following reasons.

On October 12, 2007, M.D. Basciani filed a response in opposition to plaintiffs' motion seeking to file the revised consolidated amended class action complaint, in which it argued that an additional complaint on behalf of a putative class of direct purchasers, "the Katsiroubas Complaint[,] . . . contain[ed] another alleged claim against [M.D.] Basciani – conspiracy to monopolize – which [was] not set forth in the Consolidated Amended Class Action Complaint . . . ." Dkt. No. 176 at 5. M.D. Basciani argued that it would be prejudiced "[t]o the extent that plaintiffs['] true purpose is to in some way end run the statute of limitations by having this alleged claim 'relate back' in whole or in part to their original Complaints."[4] Dkt. No. 176 at 5. In their motion seeking leave to file the revised consolidated amended class action complaint, plaintiffs acknowledged that "the Katsiroubas Complaint contain[ed] express allegations of a conspiracy to monopolize that were not included in the Consolidated Amended Complaint," but argued that they did "not seek to amend their complaints in any substantive respect," explaining that the revised consolidated amended class action complaint "was filed on behalf of the same class that was identified in the Consolidated Amended Class Complaint." Dkt. No. 170-3 at 4 n.3. Having considered the parties' arguments, on November 9, 2007, I granted plaintiffs' motion and permitted them to file the revised consolidated amended complaint, which included a conspiracy to monopolize claim under Section 2 of the Sherman

---

[4]        The Katsiroubas complaint was filed on October 27, 2006. See Katsiroubas and Sons, Inc. et al. v. EMMC, Inc. et al., Civ. A. No. 06-4829, Dkt. No. 1. On April 25, 2007, I denied defendants' motion seeking to dismiss the conspiracy to monopolize claim set forth therein. See Id. at Dkt. No. 13 (E.D. Pa. Apr. 25, 2007).

Act.[5] Dkt. No. 184 at 1. I held that "[b]ecause both the consolidated amended class action complaint and the Katsiroubas Complaint are brought on behalf of the same putative class, such a consolidation promotes judicial economy and avoids duplication." Id.

Now, in response to M.D. Basciani's motion for summary judgment, plaintiffs argue that "for statute of limitations purposes, the Katsiroubas Complaint related back to the filing date of the first class complaint filed," citing American Pipe Construction Co. v. Utah, 414 U.S. 538 (1974). Dkt. No. 539 at 10. Under American Pipe, "[f]iling a federal class action tolls the federal statute of limitations on individual claims pending a decision on class certification in the same federal court based on the facts alleged in the class case." In re Linerboard Antitrust Litig., 223 F.R.D. 335, 344 (E.D. Pa. 2004), citing Crown Cork & Seal Inc. v. Parker, 462 U.S. 345 (1983); and American Pipe, 414 U.S. 538. "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." Crown, Cork & Seal, 462 U.S. at 354. American Pipe tolling protects defendants by ensuring they have adequate notice of claims against them. See American Pipe, 414 U.S. at 555 ("Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors."). It also "insure[s] effectuation of the purposes of litigative efficiency and economy . . . ." Id. at 556.

M.D. Basciani does not address plaintiffs' citation to American Pipe in its reply to plaintiffs' response. Dkt. No. 554 at 12-13. Nor does it argue that it lacked adequate notice of

---

[5]    M.D. Basciani did not seek reconsideration of that decision at the time it was rendered, but essentially asks for reconsideration of it now.

the claim against it for conspiracy to monopolize. Instead, it argues only that the Section 2 claim

is time-barred because "[n]o prior alleged claim for conspiracy to monopolize had been asserted

in plaintiffs' Complaint." Id. at 12. M.D. Basciani's argument does not persuade me that

plaintiffs' Section 2 claim is barred by the statute of limitations and I will not grant summary

judgment in its favor on that basis.[6]

### B.   Ohio Valentine Act

M.D. Basciani also argues that the statute of limitations bars opt-out plaintiff Giant Eagle

Inc.'s claim under Ohio's antitrust statute, the Valentine Act, Ohio Rev. Code §§ 1331.01, et seq.

See Dkt. No. 554 at 13; see also Civ. A. No. 06-3523, Dkt. No. 10 (Giant Eagle Am. Compl.).

However, I find that summary judgment is not warranted with respect to Giant Eagle's Valentine

Act claim.

The Valentine Act has a 4 year statute of limitations. Ohio Rev. Code § 1331.12(B).

Giant Eagle filed its initial complaint in the Western District of Pennsylvania on April 6, 2006,

see Civ. A. No. 06-3523, Dkt. No. 1. M.D. Basciani argues that Giant Eagle's Valentine Act

claim is untimely because the tolling provision set forth in Section 16(i) of Title 15 of the United

States Code (also known as Section 5(i) of the Clayton Act) does not apply to state law claims.

See Dkt. No. 554 at 13. Plaintiffs respond that the statute of limitations does not bar Giant

Eagle's Valentine Act claim because "Section 5(i) of the Clayton Act tolls claims for one year

following the conclusion of any United States action under any antitrust law, including state

---

[6]      Whether plaintiffs' conspiracy to monopolize claim is limited to those damages
accruing after October 27, 2002, the date four years prior to the date on which the Katsiroubas
complaint was filed, remains an open question. There is a split of authority with respect to
whether the initial class claims and any newly-filed claims must be identical in order to
commence tolling under American Pipe. See In re Cmty. Bank of N. Va., 622 F.3d 275, 299 (3d
Cir. 2010) (noting a "competing line of authority" on the question of whether "class action
tolling only applies to claims that are identical to those asserted in the initial class action," but
not ruling on the issue).

antitrust laws." Dkt. No. 539 at 12 (emphasis in original), citing 15 U.S.C. § 16(i).

Section 5(i) provides, in relevant part that

> [w]henever any civil or criminal proceeding is instituted by the
> United States to prevent, restrain or punish violations of any of the
> antitrust laws, but not including an action under section 4A[, 15
> U.S.C. § 15a,] the running of the statute of limitations in respect to
> every private or State right of action arising under said laws and
> based in whole or in part on any matter complained of in said
> proceeding shall be suspended during the pendency thereof and for
> one year thereafter . . . .

15 U.S.C. § 16(i). The relevant question here is whether Giant Eagle's Valentine Act claim

constitutes a "private or State right of action arising under said laws and based in whole or in part

on any matter complained of in" the DOJ action.[7] M.D. Basciani argues that the Valentine Act

claim "does not arise under 'said laws,' i.e., the antitrust laws of the United States which are the

antitrust laws referred to in Section 16(i) . . . ." Dkt. No. 554 at 13. Plaintiffs argue that "under

the clear language of the [Clayton] Act, Giant Eagle's [Valentine Act] claim satisfies the

requirements of Section 16(i) as it arises under the antitrust laws and is based on the matters

complained of in the government action." Dkt. No. 539 at 12. Neither M.D. Basciani nor

plaintiffs cite authority for their respective interpretations of the language of the statutory tolling

provision.

Considering this question, the Court in In re Cathode Ray Tube (CRT) Antitrust

Litigation, found that "to be clear, § 16(i) only applies to federal law, not state law." No. C-07-

5944-SC, 2014 WL 1091589, at *11 (N.D. Cal. Mar. 13, 2014) (citations omitted). In support of

its decision, the Court cited 15 U.S.C. § 12, which defines the term "antitrust laws" by reference

---

[7]     M.D. Basciani does not argue that there is insufficient overlap between Giant
Eagle's Ohio Valentine Act claim and the matters considered in the DOJ action.

to a list of specific statutory provisions.[8] The Court also cites the Supreme Court's decision in

Nashville Milk Co. v. Carnation Co., which explained that "the definition contained in [Section]

1 of the Clayton Act is exclusive. Therefore it is of no moment . . . that [a statute] may be

colloquially described as an 'anti-trust' statute." 355 U.S. 373, 376 (1958); see also N.J. Wood

Finishing Co. v. Minn. Mining & Mfg. Co., 332 F.2d 346, 350 (3rd Cir. 1964), (holding that

"'Antitrust laws' as that term is employed in Section 4 has a restricted meaning" and includes

only the specific statutes listed in Section 1 of the Clayton Act), aff'd, 381 U.S. 311 (1965).

Thus, in Cathode Ray, the Court found that it was required to consider "whether New York's

Donnelly Act, which includes a tolling provision modeled on the federal provision, w[ould] also

toll Plaintiff's Donnelly Act claim."[9] Cathode Ray, 2014 WL 1091589, at *11. The Court

---

[8]     The Ohio Valentine Act is absent from this list. Specifically, 15 U.S.C. § 12
provides that:

> "Antitrust laws," as used herein, includes the Act entitled "An Act
> to protect trade and commerce against unlawful restraints and
> monopolies," approved July second, eighteen hundred and ninety;
> sections seventy-three to seventy-six, inclusive, of an Act entitled
> "An Act to reduce taxation, to provide revenue for the
> Government, and for other purposes," of August twenty-seventh,
> eighteen hundred and ninety-four; an Act entitled "An Act to
> amend sections seventy-three and seventy-six of the Act of August
> twenty-seventh, eighteen hundred and ninety-four, entitled 'An Act
> to reduce taxation, to provide revenue for the Government, and for
> other purposes,' " approved February twelfth, nineteen hundred
> and thirteen; and also this Act.

[9]     The Donnelly Act's tolling provision provides that

> Whenever any civil or criminal proceeding is instituted by the
> federal government to prevent, restrain, or punish violations of the
> federal antitrust laws, the running of the period of limitations in
> respect of every right of action arising under sections three
> hundred forty, three hundred forty-two and three hundred forty-
> two-a of this article, based in whole or in part on any matter
> complained of in the federal proceeding, shall be suspended during
> the pendency of said proceeding and for one year thereafter . . . .

ultimately found that because "the Donnelly Act's tolling provision maps to the federal law, [the plaintiff's] Donnelly Act claim [was] tolled for the pendency of the federal . . . proceedings." Id. at *13. Here, however, the Ohio Valentine Act, unlike New York's Donnelly Act, does not include a tolling provision. See Ohio Rev. Code §§ 1331.01, et seq. Therefore I find that the Clayton Act's tolling provision does not apply to toll the limitations period for Giant Eagle's Valentine Act claim. But this does not end the analysis.

At oral argument, Giant Eagle argued that "even if you assume there[ i]s no government tolling on the Valentine Act claims, we should be able to assert a claim four years back from the filing of the claim in 2006 to April 6th, 2002." Dkt. No. 768 at 200:6-9. Giant Eagle argued that the continuing violation doctrine "would allow [it] to go back four years from the date [it] filed [its] complaint back to 2002." Id. at 199:3-6. M.D. Basciani did not respond to this argument at oral argument, and instead chose to rest on its papers. See Dkt. No. 768 at 200:22-25.

Courts have applied the continuing violation doctrine to Valentine Act claims. See, e.g. Trane U.S. Inc. v. Meehan, 563 F. Supp. 2d 743, 758–59 (N.D. Ohio 2008) (addressing the federal and Valentine Act claims together because each has a four year statute of limitations); Hometown Health Plan v. Aultman Health Found., No. 2006 CV 06 0350, 2009 WL 1806759 (Oh. Ct. Comm. Pl. Apr. 15, 2009) ("There is a 'continuing violation' exception to the general four-year statute of limitations."). "The 'continuing violation' exception . . . recognizes that 'a cause of action accrues each time the plaintiff is injured by an act of the defendants.'" Trane, 563 F. Supp. 2d at 558-59, quoting DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996). "In the case of a continuing price-fixing conspiracy 'that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and

---

N.Y. Gen. Bus. Law § 342–c.

that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" In re Processed Egg Prod. Antitrust Litig., No. 08-MD-2002, 2012 WL 6645533, at *1 (E.D. Pa. Dec. 20, 2012), quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997). "Thus, on a given date when a plaintiff purchases a product, the price of which was anticompetitively fixed, 'a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date. To recover those damages, he must sue within the requisite number of years from the accrual of the action." In re Processed Egg Prod. Antitrust Litig., No. 08-MD-02002, 2011 WL 5980001, at *1 (E.D. Pa. Nov. 30, 2011), quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971).

In light of the continuing violation doctrine, I find that M.D. Basciani has not met its burden to show that no genuine issues of material fact remain regarding whether Giant Eagle's Ohio Valentine Act is barred by the statute of limitations.

## III.   Conscious Commitment to a Common Scheme

M.D. Basciani argues that it is entitled to summary judgment on plaintiffs' claims under Section 1 and Section 2 of the Sherman Act because "there is no genuine issue of material fact that M.D. Basciani did not have a conscious commitment to a common scheme designed to achieve an unlawful objective." Dkt. No. 554 at 14; see also Id. at 15 ("For the same reasons set forth with respect to plaintiffs Section 1 claim, there is no genuine issue of material fact that M.D. Basciani did not have a conscious commitment to a common scheme designed to achieve an unlawful objective.") (emphasis omitted). It contends that "the unrefuted evidence of record is that M.D. Basciani joined a Capper-Volstead agricultural cooperative . . . in good faith and in

reliance on the advice of counsel that the organization was duly-constituted and lawful." Id. at

14. (emphasis omitted).

Plaintiffs respond that "Basciani is wrong as a legal matter that proof of an antitrust

conspiracy requires proof of motive and intent," and further, "[e]ven if there were such an

requirement . . . the evidence . . . is more than sufficient to find that Basciani was driven by a

motive to increase prices by fixing prices and limiting the supply of agaricus mushrooms." Dkt.

No. 539 at 15. Plaintiffs contend that Basciani's participation in the EMMC establishes its

conscious commitment to a common scheme to increase mushroom prices." Id.

I have previously considered and rejected defendants' contention that the EMMC and its

members are exempt from antitrust liability under Capper-Volstead. See In re Mushroom Direct

Purchaser Antitrust Litig., 621 F. Supp. 2d 274 (E.D. Pa. 2009); see also In re Mushroom, 54 F.

Supp. 3d 382, 384 (E.D. Pa. 2014). In relevant part, I found the EMMC did not qualify as an

exempt cooperative under Capper-Volstead because one member, M. Cutone Mushroom Co.,

Inc., was not technically a grower of agricultural produce. In re Mushroom, 621 F. Supp. 2d at

286. This ruling still stands. In 2011, defendants asked the Court of Appeals for the Third

Circuit to review this Court's initial Capper-Volstead determination, but the Court of Appeals

held that "a district court order denying a defendant [the Capper-Volstead Act's] protections is

not effectively unreviewable after final judgment, and, therefore, is not a collateral order subject

to interlocutory review." In re Mushroom, 655 F.3d 158, 167 (3d Cir. 2011). A number of

defendants subsequently sought reconsideration of my 2009 decision. See Dkt. No. 513. I

denied their request for reconsideration and certified my Order for appeal. In re Mushroom

Direct Purchaser Antitrust Litig., 54 F. Supp. 3d 382, 384 (E.D. Pa. 2014). The Court of Appeals

then denied defendants' requests for permission to appeal from this Court's 2014 decision

seeking reconsideration of my Capper-Volstead finding. Dkt. No. 614.

Accordingly, I decline to find that there is no genuine dispute of fact with respect to plaintiffs' claims under Section 1 or Section 2 to the extent that such a conclusion would rest on M.D. Basciani's reliance on Capper-Volstead immunity.

## IV.   Antitrust Injury

M.D. Basciani argues that summary judgment is warranted in its favor because "the record is devoid of evidence of alleged antitrust injury." Dkt. No. 518 (Mem.) at 5. Plaintiffs claim they were injured because they paid higher prices for fresh agaricus mushrooms than they would have but for the alleged price fixing and supply control conspiracies. In support of its argument, M.D. Basciani cites the report of its expert, Dr. Rigoberto Lopez without further explanation or analysis. Dkt. No. 518 (Mem.) at 5 ("Here, as more fully set forth in the Expert Report and Addendum of Dr. Lopez, there is no genuine issue of material fact that plaintiffs have failed to come forward with evidence of alleged antitrust injury.").

In response, plaintiffs argue that "Dr. Lopez testified that his role was limited to criticizing the methodologies and analysis used by Plaintiffs' experts."[10] Dkt. No. 539 at 8-9, citing Dkt. No. 536, Ex. 8 (Lopez Tr.) at 172:8-173:6; 235:23-239:3 (Dr. Lopez's testimony that he did not undertake an independent analysis of what the damages are in this case). Plaintiffs contend they have set forth evidence which "shows that the EMMC defendants recognized that their minimum price fixing and Supply Control Agreement increased prices by about ▮" and that their experts have . . . confirmed that Defendants' conduct increased prices above

---

[10]      Indeed, I considered Dr. Lopez's arguments in weighing M.D. Basciani's motion to exclude the report and testimony of plaintiff's expert, Professor Einer Elhauge. Because I ultimately denied M.D. Basciani's motion to exclude Elhauge, see Dkt. Nos. 693, 694, 718, 719, its argument that "Professor Elhauge's reports must be stricken because he is not qualified to render the opinions he offers . . ." is moot. Dkt. No. 554 at 10.

competitive levels." Dkt. No. 539 at 8. They cite the finding of their expert Professor Einer Elhauge "that prices generally increased by about ▇▇ as a result of Defendant[s'] conduct and that all or almost all of the class members were impacted by Defendants' conduct." Id. Plaintiffs also cite Dr. Keith Leffler's findings that Publix, an opt-out plaintiff, "paid about ▇▇ higher average prices for mushrooms as compared to the year before" the alleged conspiracy began and that Giant Eagle, also an opt-out plaintiff, "paid about ▇▇ higher average prices for mushrooms as compared to the year before" the alleged conspiracy. Dkt. No. 539 at 8, quoting Dkt. No. 536, Ex. 7 (Leffler Rpt.) at ¶¶ 51-52.

M.D. Basciani has not met its burden to show that there is no genuine dispute as to any material fact regarding the question of whether plaintiffs were injured as a result of M.D. Basciani's claimed conduct in this action.

## V.   Clayton Act

M.D. Basciani, joined by certain defendants, argues that summary judgment is warranted in defendants' favor with respect to plaintiffs' claims under Section 7 of the Clayton Act. Dkt. No. 518 (Mot.) at ¶¶ 137-175; Dkt. No. 118 (Mem.) at 10-15; see also Dkt. No. 519 (adopting paragraphs 137-175 of M.D. Basciani's motion and the arguments set forth at pages 10-15 of M.D. Basciani's brief). Plaintiffs argue that disputed issues of fact remain with respect to their Section 7 claims. Dkt. No. 539 at 18. I agree with plaintiffs.

Plaintiffs claim that "[d]efendants' acquisition and holding of competitor mushroom farms violated Section 7 of the Clayton Act." Dkt. No. 185 at ¶ 111. As I have previously explained, "Section 7 makes it unlawful for a person to acquire the assets of another person where the acquisition may have anticompetitive effects." In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 702–03 (E.D. Pa. 2007). In relevant part, Section 7

provides that:

> No person engaged in commerce or in any activity affecting
> commerce shall acquire, directly or indirectly, the whole or any
> part of the stock or other share capital and no person subject to the
> jurisdiction of the Federal Trade Commission shall acquire the
> whole or any part of the assets of another person engaged also in
> commerce or in any activity affecting commerce, where in any line
> of commerce or in any activity affecting commerce in any section
> of the country, the effect of such acquisition may be substantially
> to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18.  I will consider the arguments in favor of summary judgment in turn.

First, M.D. Basciani contends that defendants cannot be liable for plaintiffs' Section 7

claim because "Section 7 of the Clayton Act does not apply to the EMMC's lease or acquisition

of real estate." Dkt. No. 518 (Mem.) at 11.  However, in keeping with the broad mandate of the

antitrust laws, "courts have generally adopted a flexible approach in determining the scope of"

the Clayton Act's references to "acquire," "assets," and "acquisition." Gerlinger v.

Amazon.Com, Inc., 311 F. Supp. 2d 838, 853 (N.D. Cal. 2004); see Mr. Frank, Inc. v. Waste

Mgmt., Inc., 591 F. Supp. 859, 866 (N.D. Ill. 1984) ("A broad, pragmatic view of the statutory

language is consistent with the Congressional purpose that § 7 be a prophylactic measure . . . .")

(citations and internal quotations omitted).  Thus, in United States v. Columbia Pictures

Corporation, the Court explained that "[assets] is not a word of art, nor is it given a built-in

definition by statute . . . .  As used in this statute, and depending upon the factual context,

'assets' may mean anything of value." 189 F. Supp. 153, 182 (S.D.N.Y. 1960) ("The test is

pragmatic.  The final answer is not in the dictionary.").  The Court also held that the Clayton Act

does not impose a "specific method of acquisition.  It is primarily concerned with the end result

of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring

person to the acquiring person to give the transfer economic significance and the proscribed

adverse 'effect.'" Id.

M.D. Basciani cites a noted antitrust treatise in support of its argument that "purchase[s] (or leases) of real property would normally lie outside of § 7 concern." Dkt. No. 518 (Mem.) at 11, quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1202e (2d ed., 2000).[11] But this is not a case involving the ordinary acquisition of real property. Here, plaintiffs argue that "[t]he evidence unequivocally shows that Basciani and the other members of the EMMC did not use the EMMC to acquire mushroom farms to expand their business or as an investment. They purchased the mushroom farms to shut them down in order to increase the price of agaricus mushrooms." Dkt. No. 539 at 19. Plaintiffs have set forth sufficient evidence to raise a material question of fact regarding whether the EMMC purchased, leased and deed restricted mushroom properties in order to reduce the amount of land available for mushroom production so as to inflate mushroom prices by reducing supply. See, e.g. Dkt. No. 539 at 19, citing Dkt. No. 536, Ex. 5 (November 4, 2001 email from ███████████ to EMMC) at CREEK-RFP-0000502 ("I think everybody agrees that we've won a lot of battles in the last █ months in the area of supply management . . . the farm closings have resulted in █ million pounds being taken off the market."); Dkt. No. 536, Ex. 6 at EMMC-DOJ-0090 (document listing "EMMC Accomplishments" as including having "[a]nnually taken over █ million pounds out of production from facilities which could have easily been purchased and remained in production"

---

[11]     More fully, the Areeda and Hovenkamp Antitrust Law treatise explains that:

> Purchase (or leases) of real property would normally lie outside of § 7 concern. To buy office or plant space is certainly to acquire an asset, but it is not ordinarily of any more antitrust concern than buying ordinary goods or services necessary for one's operations. This is clearest when equivalent properties are readily available to others'; central-city office space seems an obvious example.

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1202e (2d ed., 2000).

and identifying "Future EMMC Goals and Commitments" to include the commitment of

"███████ in leased facilities to remain out of production"); Dkt. No. 536, Ex. 11 (May 23, 2001

email from ███████ to ███████ and others describing as a "victory" the EMMC's

winning bid for the Hillsboro and Dublin Farms).

In a section of Areeda and Hovenkamp's treatise – a section not cited in M.D. Basciani's

brief – they explain that the acquisition of real property may indeed fall within Section 7's ambit

where "it concerns a limited supply of the very subject matter of subsequent competition," since

"[s]uch additional control over supply of real estate sold or rented might well enhance the

buyer's market power"; these acquisitions of property represent "the loss of a going concern and

the transfer of market share from one firm to a former competitor." [12]  Phillip E. Areeda &

Herbert Hovenkamp, Antitrust Law ¶ 1202e3 (3d ed., 2006). Areeda and Hovenkamp explain

that in cases where a limited supply of the subject matter of competition exists, the effects of

consolidating control in the real estate market should be "tested by the usual antimerger

standards." Id.

---

[12]     Again, more fully, the Antitrust Law treatise explains that:

> In some exceptional cases a real estate transfer represents the loss
> of a going concern and the transfer of market share from one firm
> to a former competitor. An example might be the sale by a
> marketer of all of its merchandising sites to a rival marketer . . . .

> Real property is also a § 7 "asset" when the acquisition
> concerns a limited supply of the very subject matter of subsequent
> competition. Consider, for example, the acquisition of a large
> office building by an interstate area's major owner of existing
> office buildings and land. Such additional control over supply of
> real estate sold or rented might well enhance the buyer's market
> power. This consolidation of control in the market for the
> disposition of real estate is within concern [of § 7], and its effects
> would be tested by the usual antimerger standards.

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1202e3 (3d ed., 2006).

In the end, I am not persuaded by the argument that the claimed supply control

conspiracy falls outside the concern of § 7 because it centers on the lease or acquisition of real

estate.  Under the facts set forth by plaintiffs, material questions remain with respect to whether

defendants sought to enhance their market power through the acquisition of competitor

mushroom farms[13] in a scheme which I find could be subject to liability under Section 7.[14]  Cf.

U.S. v. Archer Daniels-Midland Co., 584 F. Supp. 1134, 1139 (S.D. Iowa 1984) (finding that an

operating lease was an acquisition within the meaning of Section 7, explaining that "[i]f, for

example, a firm in an industry leased most of all of its competitors' facilities for a period of ten

years, there could be little doubt that the effect may be substantially to lessen competition or to

tend to create a monopoly within the meaning of section 7 for those ten years") (internal

---

[13]     Plaintiffs argue that the farms targeted by the EMMC would have been valuable to competitor mushroom farms since they were already zoned for the production of mushrooms. Dkt. No. 539 at 21-22; see Dkt No. 536, Ex. 15 (article from "The Produce News" explaining that "[i]t is very difficult to get permits to put in a new mushroom farm."); Dkt. No. 536, Ex. 7 (Leffler Rpt.) ("Because mushrooms are grown using composted manure, significant odor, fly, and compost disposal issues occur.  As a result there are a few properly zone properties available to grow mushrooms.  The lack of zoning results in barriers to entry into the mushroom market."). They contend that "[t]he purchase of such valuable assets to keep them out of the hands of competitors is precisely the kind of conduct targeted by Section 7."  Dkt. No. 539 at 21-22.

[14]     M.D. Basciani also argues that to the extent that it "viewed the monies paid as an investment in real estate, it cannot be held liable under Section 7 of the Clayton Act as a matter of law." Dkt. No. 518 (Mem. at 15).  In support of its argument, it cites Pennsylvania Railroad Company v. Interstate Commerce Commission, which held that the "provisions of section 7 of the act prohibiting the acquisition of the stock of one corporation engaged in commerce by another so engaged do not apply if the stock is purchased 'solely for investment' . . . ."  66 F.2d 37, 39 (3d Cir. 1933), aff'd sub nom. Interstate Com. Comm'n v. Pa. R Co, 291 U.S. 651, (1934).  I do not here answer the question of whether a purchase of real estate (and not stock) made solely for investment purposes could be subject to liability under Section 7.  Even assuming, arguendo that it could not, I find that material questions of fact remain with respect to the question of whether M.D. Basciani made payments toward the EMMC's property acquisitions solely for the purposes of investment.  Summary judgment is not warranted on the basis of this argument.  See, e.g. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 647 n.29 (1957) (explaining that "whether any stock purchase is an investment turns largely on the intent of the purchaser" and overturning the District Court's finding that du Pont purchased General Motors' stock solely for investment on the basis of evidence that it also may have been du Pont's purpose to secure a noncompetitive preference).

quotation omitted).

Second, M.D. Basciani contends that to the extent that plaintiffs' Section 7 claims arise

out of "the acquisition of assets of another person engaged in commerce or in any activity

affecting commerce . . . ," the acquisition must be direct and, because only the EMMC directly

acquired any assets (i.e. mushroom farms, or farm leases or deed restrictions), members of the

former EMMC cannot be held liable under Section 7.[15] Dkt. No. 518 (Mot.) at ¶¶ 147, 149; see

also Dkt. No. 518 (Mem.) pp. 12-15; see also Dkt. No. 518, Ex. 11 (February 22, 2002

"Memorandum of Grant of Option, Right of First Refusal and Restriction" between Ohio Valley

Mushroom Farm, Inc., as seller, and Eastern Mushroom Marketing Cooperative as buyer).

Plaintiffs respond that it is the effect of the transaction which matters and argue that Section 7

liability may be imposed on the members of the EMMC because "[i]n acquiring and

subsequently shutting down non-EMMC mushroom growing operations, the EMMC acted on

behalf of its members to support the members' price fixing scheme." Dkt. No. 539 at 18-19.

M.D. Basciani argues that "[t]he acquisition must . . . be direct" because, "[i]n contrast to

the first part of Section 7 pertaining to stock acquisition, the second part of Section 7[,] relating

to the acquisition of assets of another person engaged in commerce or in any activity affecting

commerce, does not include a 'directly or indirectly' qualifier . . . ." Dkt. No. 554 at 9. I find

that the failure to include the "directly or indirectly" qualifier in the second part of Section 7 is

---

[15]     Defendants made a similar argument in the context of an earlier motion to dismiss
in this litigation. They argued "that as a matter of law a member, affiliate or officer of a
cooperative cannot be held liable under Section 7 for the cooperative's acquisitions because mere
membership in an agricultural cooperative, like mere stock ownership in a corporation, should
not and does not give rise to Section 7 liability." In re Mushroom Direct Purchaser Antitrust
Litig., 514 F. Supp. 2d 683, 703 (E.D. Pa. 2007) (alterations and internal quotation omitted). I
denied the motion to dismiss, finding that plaintiffs were entitled to offer evidence with respect
to the "precise nature of the acquisitions in this case and the corresponding roles of the member
defendants." Id. at 704.

not conclusive of the question as to whether assets acquisitions must always be direct for liability

to attach under Section 7. If Congress had intended for the second part of Section 7 to apply

only to the direct acquisition of assets, it could have done so with explicit language. Instead, I

find that the omission of any qualifying language creates an ambiguity requiring further

consideration.

No other court has directly considered this question, but cases applying Section 7 provide

meaningful guidance. Considering the 1950 amendments to Section 7 which added the language

regarding the acquisition of assets, the Supreme Court explained that "[i]t is settled law that

'[i]mmunity from the antitrust laws is not lightly implied.'" United States v. Phila. Nat'l Bank,

374 U.S. 321, 348 (1963), quoting People of State of Ca. v. Fed. Power Comm'n, 369 U.S. 482,

485 (1962). The Supreme Court reasoned that "acquisition of 'assets' as used in amended

[Section] 7 was not meant to be a simple equivalent of acquisition by merger, but was intended

rather to ensure against the blunting of the antimerger thrust of the section by evasive

transactions such as had rendered the original section ineffectual." Phila. Nat'l Bank., 374 U.S.

at 346. It noted that "the 1950 amendment was intended . . . to enlarge the number of

transactions covered by [Section] 7 . . . . ." Id. at 342 n.18. Notably, in its discussion, the

Supreme Court pointed to the House Report on the bill to amend Section 7, which explains that

> [t]he bill retains language of the present statute which is broad
> enough to prevent evasion of the central purpose. It covers not
> only purchase of assets or stock but also any other method of
> acquisition such as, for example, lease of assets. It forbids not
> only direct acquisitions but also indirect acquisitions, whether
> through a subsidiary or affiliate or otherwise.

H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8-9 (1949), see Phila. Nat'l Bank., 374 U.S. at 346.

Considering this legislative history, the Court in Community Publishers, Inc. v. Donrey

Corporation reasoned that "[t]he inclusion of the catch-all phrase 'or otherwise' in the legislative

-26-

history is very telling, as it indicates that the term 'indirectly' must be broadly interpreted, lest persons and firms manipulate corporate structures in order to avoid the appearance of direct acquisition." 882 F. Supp. 138, 140 (W.D. Ark. 1995). It found that "the term 'directly or indirectly' should be interpreted as broadly as necessary to accomplish the purposes of the antitrust laws . . . ." Id. Similarly, in Geneva Pharmaceuticals Technology Corporation v. Barr Laboratories Inc., the Court of Appeals for the Second Circuit explained that "the Clayton Act's application to 'direct or indirect' acquisitions suggests . . . that parent/subsidiary relationships, or any other corporate structure, ought not preclude application of the Clayton Act § 7 to any entity that had an active role in an acquisition that tends 'substantially to lessen competition.'" 386 F.3d 485, 510 (2d Cir. 2004).

The broader interpretation of Section 7, which views the statute as extending to reach "indirect acquisitions, whether through a subsidiary or affiliate or otherwise," H.R. Rep. No. 1191, 81st Cong., 1st Sess. 8-9 (1949), not just in the context of stock purchases, but also in the context of asset acquisitions, is consistent with the Court's finding in Columbia Pictures that "[t]he statute imposes no specific method of acquisition." 189 F. Supp. at 182. It is also consistent with plaintiffs' argument that, "under a pragmatic interpretation [of Section 7], members of the EMMC may be held liable for violating section 7 for acquiring mushroom farms through the EMMC in order to shut them down." Dkt. No. 539 at 19. Thus in Nelson v. Pacific Southwest Airlines, the Court held that even a terminated acquisition "agreement could constitute an acquisition for Section 7 purposes" if the plaintiff could show that the defendant "achieved significant control over the decisionmaking processes or the property of [the company it sought to acquire] during the pendency of the agreement." 399 F. Supp. 1025, 1029 (S.D. Cal. 1975); see also McTamney v. Stolt Tankers and Terminals (Holdings), S.A., 678 F. Supp. 118,

121 (E.D. Pa. 1987) ("The economic control analysis set forth in <u>Nelson v. Pacific Southwest Airlines</u> is realistic and sensible. Also, it is consistent with the interpretive theme of numerous cases considering the Clayton Act's purposes and applicability."). Questions remain as to whether the members of the EMMC played an "active role in an acquisition that tends substantially to lessen competition." <u>Geneva Pharm. Tech. Corp.</u>, 386 F.3d at 510 (internal quotations omitted). I decline to grant the motion for summary judgment on the basis of M.D. Basciani's argument regarding direct versus indirect acquisitions.

Finally, M.D. Basciani argues that the Clayton Act does not apply to the EMMC's purchase of properties in Dublin, Georgia and Hillsboro, Texas and the La Conca D'Oro mushroom farm in Berks County, Pennsylvania because the purchases were made from companies in bankruptcy. Dkt. No. 518 (Mem.) at 11-12. M.D. Basciani argues that "the acquisition of assets of a failing corporation is not within the ban of § 7 of the Clayton Act. Dkt. No. 518 (Mot.) at ¶ 172, <u>citing</u> <u>Int'l Shoe Co. v. F. Trade Comm'n</u>, 280 U.S. 291, 302 (1930). It cites <u>United States v. Pennzoil Co.</u>, 252 F. Supp. 962, 978 (W.D. Pa. 1965) for the proposition that "[t]he Clayton Act does not apply in bankruptcy or receivership cases." Dkt. No. 518 (Mem. at 12). In <u>Pennzoil</u>, 252 F. Supp. at 978, the Court explained that the Clayton Act is not "applicable to acquisitions where the acquired company is in such financial straits that termination of the enterprise seems inevitable," citing the "failing company" defense set forth in <u>International Shoe</u>. In <u>International Shoe</u>, the Supreme Court held that

> the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable . . . does not substantially lessen competition or restrain commerce within the intent of the Clayton Act.

280 U.S. at 302-03.[16]  In support of its motion, M.D. Basciani cites the declaration of its expert,

Dr. Rigoberto Lopez, who contends that the EMMC purchased or leased mushroom farms "in a

state of distress at foreclosure prices" and that "[t]heir aggregate potential capacity does not

imply actual production or supply of mushrooms had the EMMC not placed deed restrictions on

them." Dkt. No. 554, Ex. (Declaration of Rigoberto A. Lopez, Ph.D.) at ¶ 18.  M.D. Basciani

argues that "the record reveals that the alleged mushroom farms acquired or leased by the

EMMC were dinosaurs and not in operation at the time they were purchased or leased by the

EMMC." Dkt. No. 518 (Mot.) at ¶ 173.

Plaintiffs counter M.D. Basciani's motion with citations to evidence that the mushroom

farms in question "would have otherwise been purchased in by third parties or members of the

EMMC and put into production as producers of fresh mushrooms." Dkt. No. 539 at 20, see Dkt.

No. 536, Ex. 11 (May 23, 2001 email from ▇▇▇ explaining that there had been "three other

bidders" for the Money's farms including non-EMMC member mushroom grower, Rahkraha and

that "our challenge was to unseat the incumbent bid from Rakraha"); Dkt. No. 536, Ex. 12 (April

21, 2001 email from ▇▇▇ explaining that "Rakraha has an offer on two of the Money's farms

that are presently closed; Dublin and Hillsboro. This could add ▇▇▇ pounds of new

production."); Dkt. No. 536, Ex. 10 (▇▇ Dep.) at 165:4-165:22 ("Q. . . . [W]hy was the

EMMC interested in buying them and putting a deed restriction on them?  A.  Because they

were worrying about some of the members buying. It was just protection against the members.

They was worrying [sic] about ▇▇▇ buying it. . . . So everybody was worrying that ▇▇

▇▇ or ▇▇▇ or maybe ▇▇ will come and through a third party buy the farms and

---

[16]     The Supreme Court specified that a failing corporation is one "with resources so
depleted and the prospect of rehabilitation so remote that it faced the grave probability of a
business failure with resulting loss to its stockholders and injury to the communities where its
plants were operated . . . ." Int'l Shoe, 280 U.S. at 302.

later on reopen them."). Plaintiffs also argue that "the facts here . . . show that the goal of the
EMMC was not to keep the farms in business[,] but rather to keep them shut down to restrict
competition." Dkt. No. 539 at 20; see Dkt. No. 536, Ex. 6 (identifying the EMMC's
accomplishments as having "[a]nnually taken over ▮ million pounds out of production from
facilities which could have easily been purchased and remained in production"); id. (describing
the EMMC's "Goals and Commitments" as including a "[c]omitment of ▮▮▮▮ in leased
facilities to remain out of production."); Dkt. No. 536, Ex. 13 (EMMC Operational Meeting
Notes dated October 22, 2001 estimating the "supply reduction" in mushrooms since January
2001 to be a total of ▮▮▮▮ pounds, including ▮▮▮▮ pounds from Money Jackson,
▮▮▮▮ pounds from Prince Crossing, ▮▮▮▮ pounds from Evansville, ▮▮▮▮ pounds
from Hillsboro, ▮▮▮▮ pounds from Ohio Valley, ▮▮▮▮ pounds from Amadeo,
▮▮▮▮ pounds from Gallo, and ▮▮▮▮ pounds from Pictsweet).

Ultimately, there is no evidence that the purpose of the EMMC's purchase or lease of
mushroom farms was within the circumstances the Supreme Court envisioned in International
Shoe: to facilitate their ongoing business without the purpose of lessening competition. I find
that the record on summary judgment is not sufficient to support a finding that plaintiffs' Section
7 claims are barred by the failing company defense. Material questions of fact remain and I
decline to grant summary judgment in favor of defendants on the basis of this argument.

An appropriate Order follows.