THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE MUSHROOM DIRECT PURCHASER ANTITRUST LITIGATION : : : : THIS DOCUMENT RELATES TO: : ALL ACTIONS : | Master File NO. 06-0620 |

O'NEILL, J.                                                                      February 22, 2017

**<u>MEMORANDUM</u>**

      On November 22, 2016, in conjunction with my decision to certify a class in this long-running antitrust litigation, I granted certain defendants'[1] motion seeking summary judgment with respect to the claims of plaintiff Diversified Foods and Seasonings, Inc. See Dkt. No. 779 at 30-37 (discussion of Diversified motion in class certification opinion), Dkt. No. 780 (class certification order), Dkt. No. 791 (redacted class certification opinion and order). A group of plaintiffs who identify themselves as the "Direct Purchaser Class Plaintiffs"[2] now seek reconsideration of that decision pursuant to Local Rule 7.1(g). Before me are: plaintiffs' motion for reconsideration of the Court's dismissal of class representative Diversified Foods & Seasonings, Inc. (Dkt. No. 787), certain defendants' opposition to the motion for reconsideration

---

[1] "Certain defendants" are: the Eastern Mushroom Marketing Cooperative (EMMC), Robert A. Feranto, Jr., t/a Bella Mushroom Farms; Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom Farm; To-Jo Fresh Mushrooms, Inc.; Cardile Mushrooms, Inc.; Cardile Bros. Mushrooms Packaging; Country Fresh Mushroom Co.; Forest Mushroom Inc.; Gino Gaspari & Sons, Inc.; Gaspari Mushroom Co., Inc.; Gaspari Bros., Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; LRP Mushrooms, Inc. LRP-M Mushrooms LLC; Modern Mushroom Farms, Inc.; Sher-rockee Mushroom Farm, LLC; C&C Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis M. Marson Jr., Inc.; Monterey Mushrooms, Inc.; United Mushroom Farms Cooperative, Inc.; John Pia; and Michael Pia. Dkt. No. 537.

[2] Publix Supermarkets, Inc. and Giant Eagle, Inc. are opt-out plaintiffs. References to "plaintiffs" in this opinion do not encompass the opt-out plaintiffs.

(Dkt. No. 799) and plaintiffs' reply (Dkt. No. 803).[3] As is further set forth below, I find that plaintiffs have not met their burden on reconsideration and I will deny their motion.

## STANDARD OF REVIEW

Local Civil Rule 7.1(g) allows parties to file motions for reconsideration. E.D. Pa. Loc. R. 7.1(g). On a motion for reconsideration,

> a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.

Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999), citing Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). "[T]he burden is on the movant . . . ." Egervary v. Rooney, 80 F. Supp. 2d 491, 506 (E.D. Pa. 2000) (citation omitted). A finding of clear error requires a "'definite and firm conviction that a mistake has been committed.'" Johnson v. SmithKline Beecham Corp., 724 F.3d 337, 345 (3d Cir. 2013), quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982). "[A] motion for reconsideration addresses only factual and legal matters that the Court may have overlooked. [It is improper] to 'ask the Court to rethink what [it] had already thought through – rightly or wrongly.'" Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (citation omitted). "Because of the interest in finality . . . courts should grant motions for reconsideration sparingly." Rottmund v. Cont'l Assurance Co., 813 F. Supp. 1104, 1107 (E.D. Pa. 1992).

---

[3] On February 7, 2017, plaintiffs filed a motion for entry of final judgment under Rule 54(b) of the Federal Rules of Civil Procedure and/or for certification of an appeal pursuant to 28 U.S.C. § 1292(b) (Dkt. No. 805) that they explain "is presented in the alternative to Plaintiffs' pending motion for reconsideration of the Court's decision to dismiss Diversified as a class representative . . . ." Dkt. No. 805-1 at ECF p.6. I will consider the certification motion in a separate opinion after defendants file their response.

## DISCUSSION[4]

When I granted summary judgment in favor of certain defendants with respect to Diversified's claims, I found that plaintiffs had "not established that a genuine dispute remains with respect to the question of whether Diversified has antitrust standing under Illinois Brick."[5] Dkt. No. 779 at 36.  Pursuant to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), there is a "general rule that only direct purchasers from antitrust violators may recover damages in antitrust suits."  Howard Hess Dental Labs., Inc. v. Dentsply Intern., Inc. (Hess I), 424 F.3d 363, 369 (3d Cir. 2005); see McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 847-48 (3d Cir. 1996) ("[T]he [Illinois Brick] Court . . . enunciat[ed] a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action . . . ."). "Illinois Brick's direct purchaser rule seeks to counteract 'the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants, and the weakening of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers.'"  Wallach v. Eaton Corp., 837 F.3d 356, 365 (3d Cir. 2016), quoting Gulfstream III Assocs. v. Gulfstream Aerospace Corp., 995 F.2d 425, 439 (3d Cir. 1993) (Greenberg, J., concurring and speaking for the majority).  In the Third Circuit, indirect or secondary purchasers may still sue under the antitrust laws if they can establish one of three possible exceptions to the

---

[4] The factual background of this litigation is set forth in detail in the Court's prior decisions and is discussed in this memorandum only to the extent necessary to explain the Court's decision on reconsideration.

[5] As I noted in my prior decision, Dkt. No. 779 at 23 n.16, the Court of Appeals has explained that Article III standing and antitrust standing are "distinct" concepts.  Hartig Drug Co. Inc. v. Senju Pharm. Co., 836 F.3d 261, 269-70 (3d Cir. 2016) (explaining that "the direct purchaser rule represents a policy decision intended to aid the purposes of the antitrust statutes and does not speak to whether there is an Article III case or controversy"); see also Warren Gen Hosp. v. Amgen, Inc., 643 F.3d 77 (3d Cir. 2011) (noting "the different components of antitrust standing:  the statutory requirement contained in Section 4 that the plaintiff be the direct purchaser as set forth in Illinois Brick and the requirement that the plaintiff have suffered a recognizable injury").

Illinois Brick direct purchaser rule: (1) a "cost-plus" exception, which is not relevant here, (2) a "co-conspirator" exception and (3) an "owned or controlled" exception. See In re: Domestic Drywall Antitrust Litig., No. 13-2437, 2016 WL 3769680, at *4 (E.D. Pa. July 13, 2016), citing Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 968 n.22 (3d Cir. 1983) and Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc. (Hess II), 602 F.3d 237, 258-59 (3d Cir. 2010).

On summary judgment, certain defendants argued that Diversified was "an indirect purchaser, rather than a direct purchaser of fresh agaricus mushrooms, having purchased all of its fresh agaricus mushrooms from one or more distributors of Defendant Southmill Mushroom Sales, Inc. . . . ." Dkt. No. 441 at 10; see also id. at 24-25 ("Diversified purchased all of its fresh agaricus mushrooms from . . . South Mill of New Orleans."). Plaintiffs responded that "[b]ecause Diversified was the first purchaser to purchase at a price fixed by the EMMC, its claims do not involve any proof of passed-on damages of the kind barred by Illinois Brick." Dkt. No. 457 at 12. I held that I was "not persuaded that Illinois Brick does not apply to bar Diversified's claims simply because the EMMC fixed mushroom distribution prices instead of the prices for mushrooms sold by growers to distributors," Dkt. No. 779 at 31, and thus continued to consider whether any of the relevant exceptions to the Illinois Brick rule would permit Diversified's claims to proceed. I found that Diversified could not rely on the co-conspirator exception because South Mill of New Orleans is not named as a defendant in this litigation. Dkt. No. 779 at 32. I also found that "[o]n the record before me, a reasonable jury could not find that the owns or controls exception to Illinois Brick should apply to permit Diversified's claims to proceed," id. at 36, citing my previous determination that "Kaolin/South Mill and its distribution entities are separate decisionmakers pursuing separate economic interests as is evidenced by [a] suit between them," In re Mushroom, 54 F. Supp. 3d 382, 389

(E.D. Pa. 2014); see Dkt. No. 441 at 25.

On reconsideration, plaintiffs argue that "[b]ecause of the cursory briefing that the Illinois Brick issue received, [they] believe that the Court may have overlooked key Third Circuit precedent . . . ." Dkt. No. 797-1 at ECF p. 7. Specifically, plaintiffs argue that in dismissing Diversified's claim, the Court did not consider In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144 (3d Cir. 1993) or In re Modafinil Antitrust Litigation, 837 F.3d 238 (3d Cir. 2016). Dkt. No. 787-1 at ECF p. 4. Plaintiffs argue that Lower Lake Erie and Modafinil "make clear that when defendants' conduct limits the supply of goods or services to the market . . . the market participants that are most directly impacted by the conduct have a right to sue for damages even if they can be characterized as indirect purchasers." Dkt. No. 787-1 at ECF p. 7. They also argue that Lower Lake Erie and Modafinil support "their argument that Illinois Brick does not operate to bar non-pass on damage theories." Dkt. No. 787-1 at ECF p. 7.

Certain defendants respond that they "and other defendants have raised Illinois Brick on numerous occasions," Dkt. No. 799 at ECF p. 8, and "that Plaintiffs have had multiple opportunities over the years to raise their arguments," leaving "the Court . . . well within its discretion to refuse Plaintiffs one more bite at the apple." Id. at 9 (internal quotation omitted). They note that plaintiffs never previously cited either Lower Lake Erie, or Modafinil[6] to the Court and contend that neither decision "provides any reason to question the Court's decision" to grant summary judgment in their favor with respect to Diversified's claims. Dkt. No. 799 at ECF p. 5-6. They also argue that the Court's prior "analysis was in keeping with Third Circuit

---

[6] Plaintiffs argue in their reply that Modafinil had not been decided when the Illinois Brick issues were briefed in this case. Dkt. No. 803 at ECF p. 5. However, as certain defendants note, although they could have, "plaintiffs did not file a notice of supplemental authority with the court regarding Modafinil when it was decided in September of 2016." Dkt. No. 799 at ECF p. 3.

precedent declaring that Illinois Brick must be applied by looking to the 'economic substance' or the 'mechanics of the transactions' between the upstream and downstream entities." Id. at ECF p. 6, citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 88 (3d Cir. 2011).

Even if I were to decide to "reconsider" an argument which was not squarely before me when I rendered my prior decision, neither Lower Lake Erie nor Modafinil persuade me that Diversified should be permitted to proceed with its claims in this litigation. Plaintiffs argue that Lower Lake Erie and Modafinil stand for the proposition that "the key question under the direct purchaser rule is who 'bore the brunt of the increased costs.'" Dkt. No. 787-1 at ECF p. 9. They argue that the Court of Appeals has held that Illinois Brick does not "announc[e] a strict prohibition against recovery by indirect purchasers." Dkt. No. 778-1 at ECF p. 8, quoting Lower Lake Erie, 998 F.2d at 1167 n.21. Plaintiffs contend that Lower Lake Erie and Modafinil show that "Illinois Brick is not about the nature of the distributors' 'affiliations' [with the growers]," but rather is "about the nature of the plaintiffs' damage claims and the party most directly injured by defendants' conduct." Dkt. No. 787-1 at ECF p. 8. Plaintiffs argue that Diversified has antitrust standing because it "paid the fixed price set by the EMMC" and because "[n]o other entity in the distribution chain was more directly injured by the EMMC's conduct." Dkt. No. 787-1 at ECF p. 10. In response, certain defendants argue that the "'most directly injured' test . . . contradicts a wealth of Third Circuit case law consistently applying Illinois Brick as a bright line test that looks to the nature of the upstream transactions, not the downstream effect on the plaintiff." Dkt. No. 799 at ECF p. 12. They argue that "Lower Lake Erie cannot be interpreted as an end-run around Illinois Brick's bright line rule." Id. at ECF p. 10. Certain defendants also argue that Modafinil does not apply here because "it was not a price-fixing or a supply reduction case, but a 'market exclusion' case." Id. at ECF p. 14. For the following

-6-

reasons I agree with certain defendants that neither of the cases cited by plaintiffs warrant reconsideration of my prior decision.

As the Court of Appeals explained in Merican, Inc. v. Caterpillar Tractor Co., "[t]he issue [under Illinois Brick] is not whether Appellees have sustained injuries too remote to give them standing or whether they are they are the direct targets of an alleged conspiracy, but rather whether they are in the class of persons considered to be injured in their business or property under section 4 [of the Clayton Act] by an antitrust violation." 713 F.2d 958, 966 (3d Cir. 1983). Under Illinois Brick, "a district court must focus on the possibility of duplicative recovery and the potential for overly-complex damage claims if a damage suit is allowed." Id. In Kansas v. UtiliCorp United, Inc., the Supreme Court explained that

> [t]he rationales underlying Hanover Shoe and Illinois Brick will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.' . . . The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule.

497 U.S. 199, 216 (1990), quoting Illinois Brick, 431 U.S. at 744.

In reaching its conclusion that the Lower Lake Erie plaintiffs had standing to pursue their antitrust claims, the Court of Appeals stated that it "remain[ed] loyal to upholding the concerns voiced by the Supreme Court in Illinois Brick . . . ." 998 F.2d at at 1168. The Court of Appeals also explained that to determine whether the plaintiff steel companies had antitrust standing, it was required "to ascertain *the nature of the relationship between the parties*." Id. at 1168 (emphasis added).

In the case, the steel company plaintiffs claimed that they had to pay inflated lake transport charges and dock handling fees because the railroad defendants had conspired to prevent non-railroad owned docks on Lake Erie from unloading ships carrying iron ore. In the

end, the Court of Appeals did not "resolve[ ] the standing issue . . . with reference to the 'indirect purchaser rule' of Illinois Brick," as the District Court had done. 998 F.2d at 1165. Instead, the Court of Appeals "conclude[d] that the standing requirement [wa]s satisfied under a different rationale." Id. The Court of Appeals then looked to whether the plaintiffs could satisfy all of the factors set forth in Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519 (1983), finding that the facts of the Lower Lake Erie case required "a more complete analysis" and that it could not decide the case "solely on the operation of the Illinois Brick concern, i.e., that the potential for duplicative recovery and complex apportionment of damages meant that the plaintiffs were not persons injured in their business or property by reason of violation of the antitrust laws . . . ." Lower Lake Erie, 998 F.2d at 1166 (citation and internal quotation omitted). As my colleague explained in In re Processed Egg, 312 F.R.D. at 147, the Court of Appeals in Lower Lake Erie ultimately allowed recovery for an overcharge paid to the vessel companies "only because the intermediate parties were conceived by the . . . Court of Appeals in the aggregate as one industry serving a single customer."[7]

---

[7] "The court reasoned that because every component of this industry – the iron, the ships, the docks, and the railroads – existed for the sake of creating steel, the lost profits of the steel industry as a result of the conspiracy were, essentially, damages directly attributable to the defendants." In re Processed Egg, 312 F.R.D. at 146-47. With respect to damages for dock handling services, the Court of Appeals held there was no "specter of indirectness" because "the dominant relationship in the context of the steel companies purchasing dock services from [the railroad was] one of customer-provider." Lower Lake Erie, 998 F.2d at 1170. The Court of Appeals also explained that while "the steel companies, in respect to lake transport damages [we]re, in some sense, 'indirect' purchasers," there were "no missing links in the causation chain" because of the conspiracy's "unique circumstances." Id. The Court of Appeals reasoned that

> [t]he steel companies were the sole customers of the industry involved in the transhipment of ore; indeed, the industry existed for them. True, the steel companies made payments for ore movement services to various parties, defendants and non-defendants alike, but it was unquestionably the steel companies

For Lower Lake Erie to apply on the facts now before me, plaintiffs would have me conclude that Kaolin, the EMMC-member grower, and South Mill, who distributed Kaolin's mushrooms to Diversified, acted "in the aggregate" as a single entity to charge Diversified the EMMC-fixed price for agaricus mushrooms.  However, the fact remains that plaintiffs have not given me a reason to reconsider my previous finding that "Kaolin/South Mill and its distribution entities are separate decisionmakers pursuing separate economic interests as is evidenced by [a] suit between them." In re Mushroom, 54 F. Supp. 3d 382, 389 (E.D. Pa. 2014).

Further, even after its decision in Associated General Contractors the Supreme Court has declined to depart from application of the Ilinois Brick direct purchaser rule.  See Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 217 (1990) (holding that the direct purchaser rule should apply "even assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case").  Thus, since its decision in Lower Lake Erie, the Court of Appeals has not agreed with other plaintiffs who have endeavored to replace the bright-line direct purchaser rule set forth in Illinois Brick "with a test examining whether the plaintiff was the target of the challenged conduct . . . ." Dkt. No. 799 at ECF p. 11.  In McCarthy v. Recordex Service, Inc., 80 F.3d 842, 851 (3d Cir. 1996), the Court of Appeals rejected the plaintiffs' argument "that the absolute bar of the 'direct purchaser' rule has been supplanted by [the] balancing approach" set forth in Associated General Contractors.  In reaching its conclusion in McCarthy, the Court of Appeals explained that Lower Lake Erie was "fully distinguishable" because "the plaintiffs' claims did not involve 'the particular kind of double recovery Illinois

---

> who bore the brunt of the increased costs attributed to the railroad's agreement to thwart development of the less expensive technology.

Id. at 1169.

Brick sought to prevent.'" McCarthy, 80 F.3d at 851.

More recently, in Warren General Hospital v. Amgen Inc., the Court of Appeals rejected the plaintiff's "argument that it ha[d] antitrust standing because it [wa]s the first injured party in the chain of distribution . . . ." 643 F.3d 77, 91 (3d Cir. 2011). Instead, in finding the plaintiff was an indirect purchaser, the Court of Appeals concluded there was "no way of getting around the conclusion that Warren General is the second purchaser in the chain of distribution" where "purchases go through at least one other stage in the chain of distribution before reaching Warren General" and there were no allegations that the wholesaler between the plaintiff and the defendant was "controlled or owned by Amgen and thus part of the conspiracy."[8] Id. at 88. The Court of Appeals reasoned that "[b]ecause of the complicated interplay between market forces, the possibility that the wholesaler was harmed by defendant's actions exists even if the majority of the injury is borne by the indirect purchaser." Id. at 94. The Court of Appeals explained that in Illinois Brick, "the [Supreme] Court manifested its unwillingness to recognize any exceptions to the direct purchaser rule, . . . warning that 'the process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the Hanover Shoe rule was meant to avoid . . . .'" Warren Gen., 643 F.3d at 86, quoting Illinois Brick, 431 U.S. at 743-45. Thus, it explained that "Hanover Shoe and its progeny[, i.e., Illinois Brick,] did not resolve what party was a direct purchaser by calculating exactly where the harm lay." Id. at 92.

Plaintiffs assert that Warren General was different from this case because in Warren General drug prices were set by the wholesaler from whom the hospital purchased the drug (i.e. the equivalent of the mushroom distributors), not the drug manufacturer (i.e., the equivalent of

---

[8] The Warren General decision includes citations to Lower Lake Erie and Associated General Contractors, but does not specifically discuss either case. 643 F.3d at 83, 92.

the mushroom growers). Dkt. No. 787-1 at ECF p. 10 n.2. Plaintiffs argue that "[h]ere, South Mill of New Orleans did not independently set the prices that Diversified paid.," but rather, "[t]he prices were collectively set by the EMMC members . . . ." Dkt. No. 787-1 at ECF p. 10 n.2. But here, like in Warren General, there is no evidence that Kaolin (the EMMC-member grower) owned or controlled South Mill (the distributor). There is "no way of getting around the conclusion that [Diversified] is the second purchaser in the chain of distribution . . . ."[9] Warren General, 643 F.3d at 88; see also In re Hypodermic Prod. Antitrust Litig., 484 F. App'x 669, 675 (3d Cir. 2012) (citing with approval the Court of Appeals' focus in Warren General on "the mechanics of the transactions" and finding that "because the hypodermic products pass through at least one other stage in the chain of distribution before reaching Healthcare Providers, the Distributors, not Healthcare Providers, are the direct purchasers in contract sales"); Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc. (Hess I), 424 F.3d 363, 372-73 (3d Cir. 2005) (finding that the plaintiffs did not become direct purchasers from a manufacturer who drop-shipped products to them because "the dealers still make the sale to [the] Plaintiffs and [the manufacturer] makes the sale to the dealers;" instead what mattered for purposes of the Illinois Brick analysis was "the economic substance of the transaction"); Animal Sci. Prod., Inc. v. China Minmetals Corp., 34 F. Supp. 3d 465, 502 (D.N.J. 2014) ("[T]he requirement that a

---

[9] Similarly, in Kendall v. Visa U.S.A., Inc., the Court of Appeals for the Ninth Circuit held that the plaintiffs – merchants – could not maintain an antitrust suit against credit card companies as direct purchasers because they ran "squarely into the Illinois Brick wall." 518 F.3d 1042, 1049 (9th Cir. 2008). The plaintiffs alleged that the defendants – both credit card companies and banks – conspired to set fees on credit card purchases. Id. at 1044-45. The Ninth Circuit held that because the fees at issue were set by the credit card companies and not by the banks, the banks were "middlemen." Id. at 1048-49. Because the plaintiffs failed to allege any facts showing that the banks were either controlled by or in a conspiracy with the credit card companies, the plaintiffs could not get around the direct purchaser rule to bring claims against the credit card companies. Id. at 1050.

plaintiff be a 'direct purchaser' is a bright-line rule of antitrust standing. And to determine whether plaintiff is a direct purchaser, the court must look to the 'economic substance' of the transaction."); In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 101 (E.D.N.Y. 2012) (explaining that Illinois Brick "established a mostly bright-line rule barring indirect purchasers from seeking damages for antitrust violations in federal court").

Plaintiffs also contend that reconsideration is warranted because "none of the policies of Illinois Brick support barring Diversified's claims," arguing that "[t]here is no chance of duplicative recovery because Diversified is the first purchaser affected by the price fixed by the EMMC . . . ." Dkt. No. 803 at 6 (emphasis omitted). But, plaintiffs have not given me any reason to reconsider my prior finding that "[t]he previous lawsuit between Kaolin and the South Mill Distribution centers with respect to mushroom pricing, Dkt. No. 273, Ex. 12, shows that the concerns voiced in Illinois Brick – multiple lawsuits, double recovery and tracing – would clearly be implicated if Diversified were allowed to proceed with its claims." Dkt. No. 779 at 36. In Warren General, where, as is alleged here, a distributor did not itself pay the anticompetitive price, the Court of Appeals explained that the direct purchaser rule would still protect against the risk of multiple liability because "[t]he price increases created by the defendant's anticompetitive practices might affect the *demand* for the products the wholesaler sells, even if the price *increase* is borne by the indirect purchaser," giving both direct and indirect purchasers grounds for claiming damages. 643 F.3d at 95 (emphasis in original).[10]

---

[10] Plaintiffs also argue that there is no "need to prove complex theories of apportionment" because "South Mill's purchase price was not affected by the conspiracy and its selling price was set by the EMMC, not independent market forces." Dkt. No. 803 at ECF p. 6. But this argument does not persuade me that Diversified's claims should be permitted to proceed. In Kansas v. UtiliCorp United, Inc., the Supreme Court declined to adopt the similar reasoning of dissenting Justice White that, "where there is a 'perfect and provable' passthrough, there is no danger that both the [direct purchaser] and the indirect purchasers will recover

Plaintiffs argue as well that "the conclusion that Diversified cannot sue for damages creates a gap in antitrust enforcement where no one has the right to sue for overcharge damages on the Kaolin-grown mushrooms purchased by Diversified."[11]  Dkt. No. 803 at ECF p. 6.  They argue that because "South Mill's *selling* price was fixed[,] it did not experience any overcharges for which it could sue."  Id. (emphasis in original).  But Diversified could have sued for damages on the Kaolin-grown mushrooms that it purchased – it could have brought a claim against South Mill of New Orleans, the distributor.  Plaintiffs have argued elsewhere that "[t]he South Mill Mushroom Distributor was part of the conspiracy, it was controlled by Kaolin.  It participated in that conspiracy." Dkt. No. 768 at 25:18-20.  Plaintiffs' failure to name South Mill of New Orleans as a defendant is what creates any "gap in antitrust enforcement," not application of the Illinois Brick direct purchaser rule.  Cf. Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 931 (3d Cir. 1986) (declining to recognize co-conspirator exception to Illinois Brick "where, as here, the alleged co-conspirators are not also joined as co-defendants"); In re Ditropan XL Antitrust Litig., No. 06-01761, 2007 WL 2978329, at *4 (N.D. Cal. Oct. 11, 2007) ("Alleged co-conspirator-intermediaries, whose participation must be demonstrated if a vertical conspiracy is to be proved and Illinois Brick circumvented, must be named as defendants.").

Finally, and most recently, in Modafinil, the Court of Appeals reiterated the rule that

---

damages for the same anticompetitive conduct . . . ."  497 U.S. 199, 224 (1990) (White, J., dissenting).  Instead, the Supreme Court explained that "the means by which the passthrough occurred remain[ed] unsettled" in the case and found that "[t]he difficulties posed by issues of this sort led us to adopt the direct purchaser rule" and therefore "declined to create an exception that would require their litigation." Id. at 211.

[11]   In Dimartino v. BMW of North America, LLC, the court rejected the plaintiff's similar argument that Illinois Brick should not apply where the "consumers are the only one party who would pursue a claim . . . ." No. 15-8447, 2016 WL 4260788, at *4-5 (D.N.J. Aug. 11, 2016). The court declined to find antitrust standing, noting inter alia that the plaintiff's allegation "that the second-parties were merely pass through entities for the final sale to the consumer . . . in no uncertain terms, makes the second-parties the direct purchasers." Id.

"[w]hen . . . the anticompetitive conduct is price-fixing, the only customers who will have antitrust standing are the direct customers of the conspiracy members." 837 F.3d at 265. Modafinil, therefore, does not require that I reconsider my decision with respect to Diversified's price-fixing claims. However, on reconsideration, plaintiffs argue that "[l]ike the challenged conduct in . . . Modafinil, the EMMC's supply control program eliminated lower cost product from the market." Dkt. No. 787-1 at ECF p. 12. They contend that Modafinil requires that I reconsider whether Diversified's claims based on the EMMC's supply control agreement are barred by Illinois Brick. Id. at 10-11. I do not find that Modafinil requires me to permit Diversified's supply control claims to proceed.

Defendants argue that "Modafinil is not informative here because . . . [i]t was not a price-fixing or a supply reduction case, but a 'market exclusion' case, which discussed antitrust standing for purchasers from non-conspirators under common law principles of joint and several liability." Dkt. No. 799 at ECF p. 14. Indeed, in Modafinil, the Court of Appeals explained that the case was "not about price-fixing. It is, instead, a case about market exclusion, as it concerns conduct that prevents a competitive market from forming at all." 837 F.3d at 265. The Modafinil plaintiffs argued that "each of the four generic [drug] manufacturer[ defendants] allegedly entered into separate anticompetitive arrangements with Cephalon," the brand name drug manufacturer defendant. 837 F.3d at 266. The Court of Appeals reasoned that "[i]f any one of them had refused to enter into this arrangement, there would have been no antitrust injury for anyone" but "because all four entered into . . . reverse-payment settlement agreements and prevented a competitive market from forming, each contributed to the market-wide harm, and each [could] be held jointly and severally liable for such harm." Id. It concluded that "[t]he class member who would have purchased from Teva is harmed by the Ranbaxy and Mylan

-14-

agreements to the same extent that a Ranbaxy or Mylan customer would be" and therefore held that "any class member would have antitrust standing to sue any or all of the four generic companies individually." Id.

Plaintiffs argue that Diversified's supply control claims should be permitted to proceed because, "[l]ike the market exclusion in Modafinil, the EMMC's supply control program was designed to interfere in the functioning of a competitive market." Dkt. No. 803 at ECF p. 10. But, unlike in Modafinil, the agreement that is alleged to have created the harm in this case – the claimed agreement among the members of the EMMC to purchase or lease properties in order to remove them from mushroom production – is one step removed from plaintiffs. As defendants argue, "the plaintiffs in Modafinil were direct purchasers and therefore [the] case did not make any pronouncements regarding the applicability of Illinois Brick to an alleged supply restraint." Dkt. No. 799 at ECF p. 16. The Modafinil plaintiffs directly purchased generic drugs from at least one of the four generic defendants who were each alleged to have entered into an anticompetitive agreement. Here, in contrast, the plaintiffs made their purchases from mushroom distributors – and not from the mushroom growers who are alleged to have entered into a supply control agreement. Thus, as defendants argue, "[t]his case is no different from Processed Egg," a case "alleging a supply restraint where [the] court . . . applied the direct purchaser rule." Dkt. No. 799 at ECF p. 17; see In re Processed Egg Prod. Antitrust Litig., 312 F.R.D. 124, 147 (E.D. Pa. 2015) (applying Illinois Brick to the plaintiffs' claims regarding an alleged conspiracy by egg producers to control and limit the supply of eggs); see also In re Midwest Milk Monopolization Litig., 730 F.2d 528, 529 (8th Cir. 1984) (applying Illinois Brick to the plaintiffs' claims that the defendants conspired to control the supply of raw milk).

Ultimately I find no clear error of law or fact in my decision to grant certain defendants'

motion seeking summary judgment with respect to the claims of plaintiff Diversified Foods and Seasonings, Inc. Thus I will deny plaintiffs' motion.

An appropriate Order follows.