IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| ALL ACTIONS | : | |

O'NEILL, J.                                                                 March 6, 2017

## MEMORANDUM

This long-running antitrust litigation, which has been certified as a class action,[1] arises

out of plaintiffs'[2] claim that defendants acted in violation of Sections 1 and 2 of the Sherman Act

and Section 7 of the Clayton Act by conspiring "to set artificially-inflated prices" for fresh

agaricus mushrooms, see Dkt. No. 185 at ¶ 93, and through the implementation of a supply

control scheme related to the production of mushrooms.  Id. at ¶ 94.  Certain defendants[3] seek

partial summary judgment with respect to plaintiffs' claims against defendant John Pia.  Now

before me with respect to their motion are:  defendants' motion for partial summary judgment on

the issue of entitlement to immunity from plaintiffs' claims under § 1 of the Sherman Act and for

---

[1] See Dkt. No. 779 (class certification opinion), Dkt. No. 780 (class certification order), Dkt. No. 791 (redacted class certification opinion and order).  Defendants filed petitions with the Court of Appeals for the Third Circuit for leave to appeal the class certification decisions pursuant to Rule 23(f) of the Federal Rules of Civil Procedure, but the Court of Appeals denied their petitions on January 9, 2017.

[2] Publix Supermarkets, Inc. and Giant Eagle, Inc. are opt-out plaintiffs.  Further references to "plaintiffs" in this opinion do not encompass the opt-out plaintiffs.

[3] Here, "certain defendants" are:  the Eastern Mushroom Marketing Cooperative (EMMC), Robert A. Feranto, Jr., t/a Bella Mushroom Farms; Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom Farm; To-Jo Fresh Mushrooms, Inc.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Gaspari Mushroom Co., Inc.; Gaspari Bros., Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; Sher-Rockee Mushroom Farm, LLC; C&C Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis M. Marson Jr., Inc.; Monterey Mushrooms, Inc.; John Pia; and Michael Pia.  See Dkt. No. 513 (Mot.) at 3; Dkt. No. 513 (Mem.) at 13.

Reconsideration of the Court's March 2, 2009 Opinion (Dkt. No. 513), plaintiffs' opposition to

the motion for summary judgment with respect to John Pia (Dkt. No. 612), certain defendants'

reply in support of the motion of John Pia for partial summary judgment (Dkt. No. 615),

plaintiffs' sur-reply in opposition to the motion of John Pia for partial summary judgment (Dkt.

No. 650) and defendant John Pia's sur-reply in support of the motion for partial summary

judgment (Dkt. No. 652).[4]  For the reasons that follow, I will deny the instant motion.

## BACKGROUND[5]

John Pia was a 50% co-owner and secretary/treasurer of Kaolin Mushroom Farms, a

mushroom grower and a member of the Eastern Mushroom Marketing Cooperative (EMMC).

Dkt. No. 245, Ex. 25 (Pia. Dep.) at 7:12-14, 7:22-24, 11:13-15; 33:18-34:8.  Pia was also a 50%

co-owner and president of South Mill Mushroom Sales, Inc., a mushroom distribution entity.  Id.

---

[4]        As has been the case in this litigation on more than one occasion, in considering
certain defendants' motion, the Court has been required to follow the thread of the parties'
arguments through a winding maze of briefs and also to set aside arguments which have been
rendered moot by the Court's intervening decisions.  A group of defendants first sought
summary judgment with respect to plaintiffs' claims against John Pia in a July 1, 2008 motion
for partial summary judgment.  Dkt. No. 245.  On March 26, 2009, I denied their request for
summary judgment with respect to plaintiffs' claims against John Pia without prejudice to
refiling a subsequent motion.  Dkt. No. 294 at 25; see also id. at 9 n.6 ("[R]esolution at this
stage would be premature.  While some of the discovery may have allowed for plaintiffs to
discover facts relating to defendants' individualized arguments, the nature of the Capper-
Volstead exemption did not require plaintiffs to do so at this stage and I find sufficient their Rule
56(f) affidavit stating that that discovery on such issues is still necessary.").  Certain defendants
then sought summary judgment on John Pia's behalf for a second time on January 6, 2014 in
their motion for partial summary judgment and reconsideration of the Court's March 26, 2009
Opinion.  Dkt. No. 513.  In their opposition to that motion, plaintiffs did not specifically respond
to certain defendants' arguments with respect to plaintiffs' claims against John Pia.  See Dkt. No.
534.  Then, in response to the Court's Order of October 14, 2014 which directed plaintiffs' to file
a response, Dkt. No. 610, plaintiffs filed a specific opposition to certain defendants' renewed
motion for partial summary judgment with respect to their claims against John Pia on November
12, 2014.  Dkt. No. 612.  Certain defendants filed a reply on December 8, 2014.  Dkt. No. 615.
Plaintiffs' sur-reply, Dkt. No. 650, and John Pia's sur-reply, Dkt. No. 652, then followed.
[5]        The factual background of this litigation is set forth in detail in the Court's prior
decisions and is discussed in this memorandum only to the extent necessary to explain the
Court's decision

at 8:5-18.  Additionally, Pia was the president of the EMMC in 2000, when it came into being.

Dkt. No. 612, Ex. A. (Pia Dep.) at 55:8-18.  When they first moved for summary judgment in

Pia's favor, certain defendants noted that when asked what his duties were as president of the

EMMC, Pia testified, "[c]heerleading."  Dkt. No. 245 at 78, citing Pia Dep. at 56:2-4.  Pressed

for further information, he testified that "the first year was pretty much consumed [with] toning

the anger and difficulties that members had in their prior life with eachother."  Id. at 56:9-12.

Consistent with his testimony, in a July 2, 2001 email from Pia to the EMMC, he explained that

he was "stepping aside as President" and noted that among the EMMC's "tremendous strides"

during his tenure was having

> brought together people from all over the country that 12 months
> ago, had either a poor relationship or no relationship at all.  In all
> except the most rare circumstances we have come to trust the
> words and actions of fellow members.  Who would have thought
> this possible one year ago?  We were so consumed with cutting
> each other's throats we could not see what it was doing to us.

Dkt. No. 513, App'x, Ex.G at CREEK-RFP-0000349.  As president, Pia was a member of the

EMMC's executive committee which, he testified, "was an informal group that would . . . throw

ideas around and make recommendations to the board."  Dkt. No. 245, Ex. 25 (Pia Dep.) at

58:18-21.

        Plaintiffs contend that during Pia's tenure as president, "the EMMC implemented the

price-fixing agreements at issue here, including setting the prices to be charged and

implementing the first price fix in February 2001."  Dkt. No. 612 at 4.  Asked whether the

EMMC adopted minimum pricing "[a]s part of the rules and regulations of the EMMC," Pia

testified that it "did adopt minimum pricing."  Dkt. No. 245, Ex. 25 (Pia Dep.) at 59:4-8.

However, Pia testified that he could not explain how the minimum pricing was set or "recall the

basis for the levels of minimum pricing in the various regions."  Id. at 59:9-15.  Asked whether,

to his knowledge, he "or any of the member of the EMMC attempt[ed] to get a nonmember to agree to any type of minimum pricing or any of the policies of the EMMC," Pia responded "[n]o." Id. at 363:4-11.  Asked whether, "[n]otwithstanding advice from counsel to the contrary," he "or any other member of the EMMC attempt[ed] to induce or persuade or agree with a nonmember that the nonmember should follow one or more EMMC policy," Pia responded, "[n]o.  Never." Id. at 363:19-25.  However, the record in this litigation also includes the deposition testimony of Stuart Thomas,[6] who testified that it was John Pia who verbally communicated to him the prices at which the South Mill distribution entity – which was not an EMMC member – should resell mushrooms to the market.  Dkt. No. 612, Ex. B (Thomas Dep.) at 47:22-48:10 ("Q.  . . . who communicated to you the prices at which you should sell?  A.  John Pia."); id. at 92:16-93:10 ("Q.  . . . why are your prices set by the EMMC . . . ?  . . . A.  I was informed by John Pia that I had to follow the rules of the EMMC. . . . . Q.  Who verbally communicated that pricing?  A. John Pia.").  Also, in his July 2, 2001 email to the EMMC, Pia wrote:

> On the subject of market pricing:  I think you have to go back to our fathers['] time, or before, to find a situation which allowed us to realize the levels of fresh market pricing that we now see, during a period of unprecedented low cannery prices.  Of all the things that the EMMC has done, this has to stand out as . . . the most significant accomplishment.  Yet, it doesn't happen by magic.  It

---

[6]        Although they cite no evidence in their brief to support the characterization, certain defendants refer to Thomas as "a *disgruntled* partner of John Pia."  Dkt. No. 615 at ECF p. 6 (emphasis added).  However, the record in this case reveals that Thomas was once a fifty percent owner of South Mill Distribution, which was "an umbrella organization" for mushroom distributorships in Dallas, Atlanta and New Orleans.  Dkt. No. 273, Ex. 11 (Thomas Dep.) at 14:22-24.  Pia and his brother Michael Pia also held ownership interests in the distribution entities.  Id. at 11:7-12:17, 13:15-14:17.  Asked how, in the end, he had gone "from [being] a 50 percent owner to not being an owner of South Mill Distribution," Thomas answered, "[t]hrough a lot of litigation.  There was numerous lawsuits.  I was sued by  . . . my partners . . . [t]he Pias." Id. at 15:10-18.  He testified that the litigation ultimately was settled and that under the settlement he "gave the ownership 100 percent to the Pias."  Id. at 16:6-12.

> happens only because each of us as members, maintains our honor
> and commitment to those things we have agreed to do as a team.

Dkt. No. 513, App'x, Ex.G at CREEK-RFP-0000349.  He wrote that "[i]ncreased pricing in the

future should allow us to keep up with the 'cost of business[.]'  No longer should we hope for the

demise of an industry member to be able to realize pricing suitable to maintain our own

existence."  Id. at CREEK-RFP-0000350.  Concluding his email, Pia asked, "[w]here would our

fresh market pricing be today with cannery pricing at $.30 and $.20 . . . ?"  Id.

Pia also testified that he thought he had been on a "supply committee" in the EMMC; he

testified that it was "a committee that dealt with joint purchasing, purchasing goods together in

bulk form, trying to pass value to membership in that way" – i.e., the term "supply" in the

committee's name did not refer to the alleged supply control scheme.  Dkt. No. 245, Ex. 25 (Pia

Dep.) at 58:9-15.  However, there is other evidence of record that would support a finding that

Pia was involved in the EMMC's efforts to control the supply of mushrooms.  In an April 21,

2001 email, he wrote that "[w]e all suffer when things are bad.  The purpose of the EMMC is to

minimize the number of times we face that problem.  It is working.  We have accomplished

nothing short of a miracle."  Dkt. No. 273, Ex. 21.  He explained that "[f]or months now, I have

worked my butt off at the expense of my own company to further this cause in which I so much

believe."  Id.  Discussing the possibility that two closed mushroom farms owned by non-EMMC

member Money's  – Dublin and Hillsboro – could return to mushroom production, he wrote that

> [o]n Tuesday, the Executive Committee will begin to work on the
> supply side issue.  Hopefully, if and when we can come up with
> what we think is a workable solution, we will address the
> membership with the hopes of being able to raise the money it
> takes to carry out the job.  If you agree with the plan, and support
> us with the funding, we will make it happen.

Id.  Then, on May 23, 2001, Pia wrote to the EMMC that, at the Money's auction, there had been

"three other bidders" for the Money's farms including non-EMMC member mushroom grower, Rakraha and that "our challenge was to unseat the incumbent bid from Rakraha." Dkt. No. 273, Ex. 29. He described the outcome as "a day of victory," because the EMMC was successful in making the winning bid for the properties (and for a dollar amount "well below the maximum bid authorized by the membership"). Id. In a June 9, 2001 email, Pia wrote that the duties of the EMMC's Executive Committee

> have recently consisted of carrying out the responsibilities of organizing and fulfilling the needs required for the purchase of the previously failed attempt to purchase the operating Money's facilities, and lastly dealing with the project of renting mushroom growing doubles in Chester and Berks County, for the purpose of creating order in the supply side of business.

Dkt. No. 513, App'x, Ex. J at 1-2 (CREEK000112-13). In a February 8, 2002 email, he wrote to representatives of EMMC members that they should "be prepared to discuss whether we want to buy [a] farm ou[t] from under Blue Mountain," noting "the importance of continuing on the plan of absorbing available plants/production" and cautioning that the EMMC was handing power "over to non members by not battling them toe to toe in the marketplace . . . ." Dkt. No. 273. Ex. 30.

In this litigation, I have previously considered and rejected defendants' contention that, because of the Capper-Volstead Act, 7 U.S.C. § 291, the EMMC and its members are exempt from antitrust liability for any price fixing or supply control efforts.[7] See In re Mushroom Direct

---

[7]     In relevant part, I found the EMMC did not qualify as an exempt agricultural cooperative under Capper-Volstead because one member, M. Cutone Mushroom Co., Inc., was not technically a grower of agricultural produce. In re Mushroom, 621 F. Supp. 2d at 286. This ruling still stands. In 2011, defendants asked the Court of Appeals for the Third Circuit to review this Court's initial Capper-Volstead determination, but the Court of Appeals held that "a district court order denying a defendant [the Capper-Volstead Act's] protections is not effectively unreviewable after final judgment, and, therefore, is not a collateral order subject to interlocutory review." In re Mushroom, 655 F.3d 158, 167 (3d Cir. 2011). A number of

Purchaser Antitrust Litig., 621 F. Supp. 2d 274 (E.D. Pa. 2009); see also In re Mushroom, 54 F.

Supp. 3d 382, 384 (E.D. Pa. 2014).  However, certain defendants support the instant motion for

summary judgment with their assertion that it is an "uncontested material fact[ ]" that "based on

the advice of counsel, the individual Defendant EMMC member growing companies and their

affiliated distribution companies had a good faith belief that they were immune from antitrust

claims under § 1 of the Sherman Act."  Dkt. No. 513 (Mem.) at 1.  Certain defendants contend

that "the record reflects that Pia (as did every other individual affiliated with a member of the

EMMC) relied on counsel from 'a prestigious law firm' who 'put together every aspect of the

new co-op' and EMMC 'moves' were blessed before a decision was taken."[8]  Dkt. No. 615 at

---

defendants subsequently sought reconsideration of my 2009 decision.  See Dkt. No. 513.  I
denied their request for reconsideration and certified my Order for appeal.  In re Mushroom
Direct Purchaser Antitrust Litig., 54 F. Supp. 3d 382, 384 (E.D. Pa. 2014).  The Court of Appeals
then denied defendants' requests for permission to appeal from this Court's 2014 decision
seeking reconsideration of my Capper-Volstead finding.  Dkt. No. 614.

[8]     In my Opinion denying defendants' motion for reconsideration of my Capper-
Volstead decision, I noted that counsel for the EMMC had not told defendants that Capper-
Volstead removed all restrictions from their proposed conduct, but rather, instructed its members
that any anticompetitive conduct might be protected under Capper-Volstead only if certain
conditions were met.  See In re Mushroom Direct Purchaser Antitrust Litig., 54 F. Supp. 3d 382,
392 n.15 (E.D. Pa. 2014).  I wrote that

> defendants were instructed by their counsel that members of the
> EMMC must be "producers", i.e. mushroom growers and farmers
> and were advised that the Capper-Volstead Act affords only a
> limited exception and does not provide a blanket immunity from
> antitrust law. . . . Counsel also advised defendants that there is no
> protection offered by . . . Capper-Volstead if the potentially § 1
> offending "agreement" is entered into with a *non*-member and
> there is also no protection if the activity engaged in under Capper-
> Volstead § 1 shield otherwise violates the complex law under § 2
> of the Sherman Act . . . .

Id. (internal quotations and citations omitted); see also Dkt. No. 513, Ex. I at 3 (January
23, 2001 letter to Pia) (concluding that "the EMMC must, going forward, continue to
comply with Capper-Volstead's other requirements and must also not overstep its bounds

ECF p. 1-2 (citations omitted).

In a June 9, 2001 email in which Pia detailed the formation of the EMMC, he wrote that the EMMC's lawyer "put together every aspect of the new Co-op.  From By-laws, to Articles of Incorporation, Membership Agreements, etc.  He has briefed each and every member as to the 'do's and don'ts', and constantly reinforces them via email communication, attendance at both general membership meetings and Board of Director meetings."  Dkt. No. 513, App'x, Ex. J at 1 (CREEK000112).  Pia wrote that "[t]he Co-op continues today, operating well within the limits of the law."  Id.  In support of their motion, certain defendants cite "Pia's uncontroverted testimony . . . that: '. . . all legal questions, any time we thought we could get into thin ice . . . . [w]e discussed it with [counsel] . . . and eventually all those moves were blessed before a decision was taken."  Dkt. No. 615 at ECF p. 6, quoting Pia Dep. at 363.  John Pia contends "that his reliance on counsel left him with no inkling he (or other members of the EMMC) were violating the Sherman Act . . . ."  Dkt. No. 652 at ECF p. 4.

## STANDARD OF REVIEW

"[G]enerally, in an antitrust case, the court applies the traditional summary judgment standard."  Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp., 206 F. Supp. 2d 702, 710 (E.D. Pa. 2002) aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144 (3d Cir. 2003).  Summary judgment will be granted under Rule 56 "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

_____

under antitrust law on issues such as price discrimination, predatory pricing, agreements with competitors and outsiders, boycotts and attempted or actual monopolization, etc.").

law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden,

the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "[I]n an antitrust case, the summary

judgment opponent need not match, item for item, each piece of evidence proffered by the

movant, but simply must exceed the mere scintilla standard."  In re: Processed Egg Prod.

Antitrust Litig., No. 08-MD-2002, 2016 WL 5539592, at *5 (E.D. Pa. Sept. 28, 2016)

(alterations and quotations omitted).

**DISCUSSION[9]**

Plaintiffs contend that their claim against John Pia is that he "personally participated in

and furthered the EMMC's conspiracy to fix prices and restrict the supply of mushrooms."  Dkt.

No. 612 at 2.  They argue that "[c]orporate officers, directors and agents like Mr. Pia may be

individually liable for antitrust violations if they personally participate in, ratify, or otherwise

authorize anticompetitive activity."  Dkt. No. 612 at 2.  The Court of Appeals for the Third

Circuit has not decided a case involving the appropriate standard for individual liability under the

antitrust laws.  So, in support of plaintiffs' argument that "individual corporate officers, such as

Mr. Pia, may be held individually liable for antitrust violations where the officer 'participated in

---

[9]     When certain defendants first sought summary judgment on Pia's behalf, they
rested their argument, in part, on the ground that, as an officer of an EMMC member, he lacked
the capacity to conspire pursuant to Copperweld Corp. v. Independence Tube Corp., 467 U.S.
752, 769 (1984).  See Dkt. No. 245 at 77 (citing Copperweld and arguing that "[i]t is well settled
that 'officers or employees of the same firm do not have the plurality of actors required for a § 1
conspiracy'"); see also Dkt. No. 513 (Mem.) at 10 ("Nor can there be any doubt that the
downstream distribution Defendants (including the Southmill Distributors and Manfredini
Enterprises) are to be viewed as single entities with their downstream distributors Kaolin and
LRP-M under the Copperweld Doctrine . . . .").  Following my decisions that Copperweld does
not immunize the EMMC or its members from antitrust liability, see In re Mushroom, 621 F.
Supp. 2d at 291; In re Mushroom, 54 F. Supp. 3d at 389, defendants no longer rely on the case in
their reply or sur-reply.  Dkt. No. 615; Dkt. No. 652.  Accordingly, I do not revisit the case in
this opinion.

the unlawful acts, or where he acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the antitrust law,'" plaintiffs cite <u>Higbie v. Kopy-Kat, Inc.</u>, 391 F. Supp. 808, 810 (E.D. Pa. 1975).  Dkt. No. 650 at ECF p. 2, <u>quoting</u> <u>Higbie</u>, 391 F. Supp. at 810.  They also cite <u>Murray v. National Football League</u>, No. 94-5971, at *23 (E.D. Pa. June 28. 1996), where the court found that "the personal participation of [individual association members] in the adoption, ratification or enforcement of a policy on behalf of the [unincorporated association] subjects them to individual liability" for an antitrust violation.  Dkt. No. 612 at 3.  Plaintiffs argue that they are merely required to show "knowledge and participation in the allegedly anticompetitive conduct, not knowledge that the conduct violates antitrust laws."  Dkt. No. 650 at ECF p. 3 n.1.

Certain defendants, however, argue that "[i]n order to hold an individual . . . liable under the Sherman Act, plaintiffs must show that Pia knowingly participated in actions he knew to be anti-competitive" and that because the evidence shows that Pia relied on counsel, who "blessed" the creation of the EMMC and its operations, summary judgment must be granted in his favor. Dkt. No. 615 at ECF p. 1-2 (citations omitted).  Certain defendants concede that "this Court . . . has held . . . good faith [reliance on counsel] does not suffice to provide the protections of Capper Volstead Immunity to the members of the EMMC" but argue that "the evidence strongly supports Pia's entitlement to summary judgment from Plaintiffs' claims."  <u>Id.</u> at ECF p. 5; <u>see also</u> Dkt. No. 652 at ECF p. 1 (noting that "they understand that . . . this court rejected the concept that good faith reliance on counsel can be a defense against losing Capper Volstead immunity and that this Court has generally stated that because specific intent is not required under the Sherman Act, advice of counsel is not a defense").  Pia argues that "what is at issue in [certain defendants'] motion for summary judgment is whether the unrebutted evidence of his

good faith reliance on counsel demonstrates he did <u>not</u> 'knowingly participate' in actions which were to his understanding 'inherently unlawful conduct.'" Dkt. No. 652 at ECF p. 2 (emphasis in original); <u>see also</u> Dkt. No. 615 at ECF p. 5 ("There is simply no evidence that Pia or any other individual associated with an EMMC member knowingly violated the antitrust laws or believed the EMMC actions breached the Sherman Act."). He contends that his motion for summary judgment should be granted because he lacks the requisite knowledge to state a claim for individual liability under the Sherman Act. Dkt. No. 652 at ECF p. 4.

In support of the motion, certain defendants contend that the Court of Appeals for the Sixth Circuit set forth the appropriate test for holding individuals liable under the Sherman Act in <u>Brown v. Donco Enterprises</u>, 783 F.2d 644 (6th Cir. 1986). Dkt. No. 615 at ECF p. 2. In <u>Brown</u>, the Sixth Circuit concluded that

> [i]ndividual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions.

<u>Brown</u>, 783 F.2d at 646. Defendants also cite <u>Murphy Tugboat Co. v. Shipowners & Merchants Towboat, Co.</u>, 467 F. Supp. 841, 853 (N.D. Ca. 1979), which they contend stands for the proposition that individual antitrust liability is limited to "cases of inherently unlawful conduct . . . ." Dkt. No. 615 at 3. Defendants argue that under <u>Murphy</u>, individuals may only be liable for conduct that is "per se unlawful," although they concede that the Court of Appeals for the Third Circuit has not ruled on this question. <u>Id.</u>

Plaintiffs respond that that none of the cases cited by certain defendants support Pia's "claim that Plaintiffs must prove that he specifically knew that the conduct in which he participated violated the antitrust laws." Dkt. No. 650 at ECF p. 2. I agree. To withstand

defendants' motion plaintiffs do not have to show that Pia knew the EMMC's alleged efforts to
fix mushroom distribution prices or to control supply were in violation of the antitrust laws.  As I
have previously explained, "a violation of the Sherman Act does not require proof of specific
intent  . . ."  In re Mushroom, 54 F. Supp. 3d 382, 392 (E.D. Pa. 2014).  While "a defendant's
state of mind or intent is an element of a criminal antitrust offense" the "general rule" is that a
civil antitrust offense can be "established by proof of *either* an unlawful purpose *or* an
anticompetitive effect."  U.S. v. U.S. Gypsum Co., 438 U.S. 422, 436 n.13 (1978) (emphasis
added).  Indeed, as plaintiffs note, Dkt. No. 650 at ECF p. 3, in Murphy, the court cautioned that
its statement that it was "appropriate to limit personal liability to cases of participation in
inherently wrongful conduct," was "not intended to suggest that proof of unlawful intent is
necessary to impose civil liability on officers."  467 F. Supp. at 853 n.7.  The court noted that
"there is no warrant in the authorities" it cited "to impose a requirement which would in effect
equate the standard of proof for civil and criminal liability."  Id.  I am not persuaded that Murphy
Tugboat requires me to find in Pia's favor.[10]

Nor do I find that the Sixth Circuit's decision in Brown requires me to grant summary
judgment in Pia's favor.  Even if the standard set forth in Brown applies, and "the evidence must
demonstrate that Pia exerted his influence so as to shape corporate intentions," 783 F.2d at 646, a
higher standard than is set forth in either Higbie or Murray (decisions that require evidence only
of knowledge and participation),[11] it still would not matter that Pia believed that the EMMC's

---

[10]     Also, after the parties briefed the present motion, I entered an order finding that
the rule of reason is the appropriate mode of antitrust analysis for plaintiffs' price-fixing claim,
while plaintiffs' supply control claim is subject to per se liability.  See Dkt. Nos. 670 and 671.
So even if the Court of Appeals were to follow Murphy and restrict individual antitrust liability
to per se claims, plaintiffs' supply control claims against Pia would remain.

[11]     See also Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., No. 97-
5499, 2000 WL 264295, at *35 (S.D.N.Y. Mar. 9, 2000) ("A corporate officer or director can be

efforts were protected by Capper-Volstead.  To prevail under <u>Brown</u>, plaintiffs need only show that there is a material question of fact with respect to the issues of whether Pia was "actively and knowingly engaged in a scheme designed to achieve anticompetitive ends" and whether he exerted his influence to shape the EMMC's intentions.  <u>Brown</u>, 783 F.2d at 646.  On the evidence set forth above, I find that such questions remain.  The testimony of Pia and Thomas regarding the communication of EMMC-mandated prices to mushroom distributors raises questions as to whether Pia was actively and knowingly involved in the EMMC's efforts to fix mushroom distribution prices.  Likewise, Pia's emails regarding the EMMC's efforts to "creat[e] order in the supply side of business," Dkt. No. 513, App'x, Ex. J at 1-2, raise questions as to whether he was actively and knowingly involved in the EMMC's efforts to control the supply of fresh agaricus mushrooms.  Further, questions remain as to whether, through his "cheerleading" and his participation in various EMMC committees, Pia exerted his influence so as to shape the EMMC's intentions.  <u>Cf.</u> <u>In re Southeastern Milk Antitrust Litig.</u>, 801 F. Supp. 2d 705, 740 (E.D. Tenn. 2011) (denying summary judgment with respect to the plaintiffs' claims against an individual defendant where there was evidence that the individual defendant "was one of the two individuals responsible for designing, initiating and driving the conspiracy alleged in th[e] case," e.g., he "developed the business plan," "signed the full supply agreements and the amendments thereto" and "authorized and participated in the creation of . . . a sham competitor").  Consequently, I will deny certain defendants' motion for summary judgment with respect to

---

held personally liable for damages arising from an antitrust violation where he or she participated in the unlawful acts, or where he or she acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws.") (citation omitted); .<u>Cont'l Ortho. Appliances, Inc. v. Health Ins. Plan</u>, 994 F. Supp. 133, 142 (E.D. N.Y. 1998) (finding on a motion to dismiss that the plaintiffs had sufficiently alleged antitrust claims against the individual defendants where the complaint alleged "that the individual defendants held meetings at various times at which they agreed to rig bids, communicated with eachother to carry out their illegal scheme, [and] authorized and participated in the conspiracy . . .").

plaintiffs' claims against John Pia.

An appropriate Order follows.