UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

```
IN RE:                          :    Case No. 2:06-cv-00620-BMS
                                :
MUSHROOM DIRECT PURCHASER       :    Philadelphia, Pennsylvania
ANTITRUST LITIGATION            :    April 26, 2019
                                :    9:28 a.m.
. . . . . . . . . . .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE BERLE M. SCHILLER
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For WM. Rosenstein & Sons Co.:     Adam M. Moskowitz, Esquire
                                   The Moskowitz Law Firm, PLLC
                                   2 Alhambra Plaza
                                   Coral Gables, FL 33134

                                   Andrew W. Kelly, Esquire
                                   John Gregory Odom, Esquire
                                   Stuart E. Des Roches, Esq.
                                   Odom & Des Roches LLP
                                   650 Poydras Street
                                   Suite 2020
                                   New Orleans, LA 70130

                                   Barry L. Refsin, Esquire
                                   Maureen S. Lawrence, Esquire
                                   Hangley Aronchick Segal &
                                   Pudlin
                                   One Logan Square, 27th Floor
                                   Philadelphia, PA 19103

                                   Bruce E. Gerstein, Esquire
                                   Jonathan M. Gerstein, Esq.
                                   Noah Silverman, Esquire
                                   Scott W. Fisher, Esquire
                                   Joseph Opper, Esquire
                                   Garwin Gerstein and Fisher
                                   88 Pine Street, 10th Floor
                                   New York, NY 10005

Dan Zimmerman, Esquire
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130

David C. Raphael, Jr., Esq.
David P. Smith, Esquire
Susan C. Segura, Esquire
Smith Segura & Raphael LLP
3600 Jackson Street
Suite 111
Alexandria, LA 71303

Kevin Landau, Esquire
Taus, Cebulash & Landau, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038

Tal J. Lifshitz, Esquire
Thomas A. T. Ronzetti, Esq.
Kozyak Tropin & Throckmorton
2525 Ponce De Leon Boulevard
9th Floor
Coral Gables, FL 33134

For Associated Grocers, Inc.,        Adam M. Moskowitz, Esquire
M. Robert Enterprises, Inc.,         The Moskowitz Law Firm, PLLC
M.L. Robert, II, L.L.C.,             2 Alhambra Plaza
And Market Fair, Inc.:               Coral Gables, FL 33134

Barry L. Refsin, Esquire
Maureen S. Lawrence, Esquire
Hangley Aronchick Segal &
Pudlin
One Logan Square, 27th Floor
Philadelphia, PA 19103

Bruce E. Gerstein, Esquire
Jonathan M. Gerstein, Esq.
Scott W. Fisher, Esquire
Joseph Opper, Esquire
Garwin Gerstein and Fisher
88 Pine Street, 10th Floor
New York, NY 10005

Dan Zimmerman, Esquire
David L. Patron, Esquire
Brent B. Barriere, Esquire
Susie Morgan, Esquire
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130

David C. Raphael, Jr., Esq.
Susan C. Segura, Esquire
Smith Segura & Raphael LLP
3600 Jackson Street
Suite 111
Alexandria, LA 71303

Tal J. Lifshitz, Esquire
Kozyak Tropin & Throckmorton
2525 Ponce De Leon Boulevard
9th Floor
Coral Gables, FL 33134

For Diversified Foods &         Adam M. Moskowitz, Esquire
Seasonings, Inc.:               The Moskowitz Law Firm, PLLC
                                2 Alhambra Plaza
                                Coral Gables, FL 33134

                                Barry L. Refsin, Esquire
                                Maureen S. Lawrence, Esquire
                                Hangley Aronchick Segal &
                                Pudlin
                                One Logan Square, 27th Floor
                                Philadelphia, PA 19103

                                Bruce E. Gerstein, Esquire
                                Jonathan M. Gerstein, Esq.
                                Scott W. Fisher, Esquire
                                Joseph Opper, Esquire
                                Garwin Gerstein and Fisher
                                88 Pine Street, 10th Floor
                                New York, NY 10005

                                Dan Zimmerman, Esquire
                                Phelps Dunbar LLP
                                365 Canal Street, Suite 2000
                                New Orleans, LA 70130

```
                                    David C. Raphael, Jr., Esq.
                                    Susan C. Segura, Esquire
                                    Smith Segura & Raphael LLP
                                    3600 Jackson Street
                                    Suite 111
                                    Alexandria, LA 71303

                                    Tal J. Lifshitz, Esquire
                                    Kozyak Tropin & Throckmorton
                                    2525 Ponce De Leon Boulevard
                                    9th Floor
                                    Coral Gables, FL 33134


Publix Super Markets, Inc.:         Adam M. Moskowitz, Esquire
                                    The Moskowitz Law Firm, PLLC
                                    2 Alhambra Plaza
                                    Coral Gables, FL 33134

                                    Alberto Rodriguez, Esquire
                                    David P. Germaine, Esquire
                                    Joseph M. Vanek, Esquire
                                    Paul E. Slater, Esquire
                                    Sperling & Slater, P.C.
                                    55 West Monroe Street
                                    Suite 3200
                                    Chicago, IL 60603

                                    Barry L. Refsin, Esquire
                                    Hangley Aronchick Segal &
                                    Pudlin
                                    One Logan Square, 27th Floor
                                    Philadelphia, PA 19103

                                    Susan C. Segura, Esquire
                                    Smith Segura & Raphael LLP
                                    3600 Jackson Street
                                    Suite 111
                                    Alexandria, LA 71303

                                    Brian C. Hill, Esquire
                                    Moira E. Cain-Mannix, Esq.
                                    Marcus & Shapira LLP
                                    One Oxford Centre
                                    301 Grant Street
                                    35th Floor
                                    Pittsburgh, PA 15219
```

```
                                        Tal J. Lifshitz, Esquire
                                        Benjamin J. Widlanski, Esq.
                                        Kozyak Tropin & Throckmorton
                                        2525 Ponce De Leon Boulevard
                                        9th Floor
                                        Coral Gables, FL 33134

                                        Eric L. Bloom, Esquire
                                        Hangley Aronchick Segal &
                                        Pudlin
                                        4400 Deer Path Road
                                        Suite 200
                                        Harrisburg, PA 17110


For the Defendants:                     H. L. Montague, Jr., Esquire
                                        Berger Montague PC
                                        1818 Market Street
                                        36th Floor
                                        Philadelphia, PA 19103

                                        William A. DeStefano, Esq.
                                        Geoffrey R. Johnson, Esq.
                                        Geoffrey R. Johnson, Esq.
                                        Terri A. Pawelski, Esquire
                                        Matthew C. Brunelli, Esquire
                                        Stevens & Lee
                                        1818 Market Street
                                        29th Floor
                                        Philadelphia, PA 19103


For Franklin Farms, Inc.:               James J. Rodgers, Esquire
                                        Dilworth Paxson
                                        1500 Market Street
                                        Suite 3500
                                        Philadelphia, PA 19102


For M.D. Basciani & Sons, Inc.          Donna M. Albani, Esquire
                                        Law Offices of Donna M.
                                        Albani
                                        11 Hampton Lane
                                        Glen Mills, PA 19432

                                        William A. DeStefano, Esq.
                                        Stevens & Lee
                                        1818 Market Street
                                        29th Floor
                                        Philadelphia, PA 19103
```

```
For Mario Cutone Mushroom Co.,     Joel I. Fishbein, Esquire
Inc.:                              Litchfield Cavo LLP
                                   1515 Market Street
                                   Suite 1220
                                   Philadelphia, PA 19102


For Mushroom Alliance, Inc.:       William A. DeStefano, Esq.
                                   Stevens & Lee
                                   1818 Market Street
                                   29th Floor
                                   Philadelphia, PA 19103

                                   Matthew J. Borger, Esquire
                                   Klehr Harrison Harvey
                                   Branzburg L.L.P.
                                   1835 Market Street
                                   Suite 1400
                                   Philadelphia, PA 19103


For National Council of Farmer     James A. Backstrom, Esquire
Cooperatives:                      James A. Backstrom,
                                   Counsellor at Law
                                   1515 Market Street
                                   Suite 1200
                                   Philadelphia, PA 19102


Transcription Service              O'Connor Legal, Medical &
                                   Media Services, LLC
                                   P.O. Box 384
                                   South Sutton, NH 03273
```

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1        (Call to Order of the Court)

 2            THE COURT:   All right.  I'll say good morning,

 3   again.

 4            BRUCE GERSTEIN:   Morning, Your Honor.

 5            ANDREW KELLY:   Morning, Your Honor.

 6            BARRY REFSIN:   Morning, Your Honor.

 7            THE COURT:   This is In Re:  Mushroom Direct

 8   Purchaser Antitrust Litigation, the Number 06-620.  Now,

 9   everybody, let's all the Attorneys state your name and who you

10   represent.

11            MR. KELLY:   Andrew Kelly of Odom and Des Roches.

12   I'm here on behalf of the Direct Purchaser Class Plaintiffs,

13   Your Honor.

14            MR. REFSIN:   And Barry Refsin of Hangley Aronchick

15   Segal Pudlin & Schiller on behalf of the Direct Purchaser

16   Class.

17            THE COURT:   Okay.

18            MR. GERSTEIN:   Bruce Gerstein of Garwin Gerstein and

19   Fisher for the Direct Purchaser Class, Your Honor.

20            THE COURT:   Any other Plaintiff Lawyers back there?

21            MR. KELLY:   No.

22            THE COURT:   No?  Okay.

23            MR. KELLY:   Yeah, there -

24            PLAINTIFF'S ATTORNEY:   I think we all are.

25            MR. GERSTEIN:   They are, Your Honor.  They're all
```

1    Plaintiffs, but -

2              THE COURT:   Yeah, I know, but -

3              MR. GERSTEIN:   - we can do the talking.

4              THE COURT:   - anyone from a different firm, or -

5              DAN ZIMMERMAN:   Yes, Your Honor, Dan Zimmerman from

6    Phelps Dunbar.

7              THE COURT:   See?  I knew there was a stranger in our

8    midst.

9              MR. ZIMMERMAN:   Yes, Your Honor.

10             BENJAMIN WIDLANSKI:   And Judge, Ben Widlanski on

11   behalf of Kozyak -- for Kozyak Tropin & Throckmorton, on behalf

12   of the Plaintiff Class.

13             THE COURT:   On behalf of who?

14             MR. WIDLANSKI:   The Plaintiff Class.

15             THE COURT:   Oh, the whole Class.

16             MR. KELLY:   Same.

17             THE COURT:   All right.  Defendants?

18             WILLIAM DESTEFANO:   Good morning, Your Honor.

19   William DeStefano for the firm, Stevens & Lee, on behalf of the

20   group of Defendants previously identified.

21             H. LADDIE MONTAGUE, JR.:   Laddie Montague from

22   Berger Montague, on behalf of the same group of Plaintiffs

23   [sic].

24             THE COURT:   All right.

25             MR. MONTAGUE:   The same group of Defendants.

```
 1            DONNA ALBANI:   Donna Albani -

 2            THE COURT:   He's learning.  He's on the other side

 3   of the bench, you know?  Normally, he's over there.  Okay.

 4            MS. ALBANI:   Donna Albani for M.D. Basciani & Son,

 5   Inc.

 6            JAMES RODGERS:   James Rodgers for Franklin Farms.

 7            MATTHEW BORGER:   Matt Borger from Klehr Harrison on

 8   behalf of the Mushroom Alliance.  Good morning, Your Honor.

 9            THE COURT:   All right.  Now, the first thing I want

10   to talk about is settlements.  I've received Plaintiffs' Motion

11   to Sever, and for preliminary approval of a settlement between

12   Class Plaintiffs and Cardile Mushrooms, Inc. and Cardile Bros.

13   Mushroom Packaging.

14            I'll be issuing an Order on that Motion shortly.

15   Before I do that, however, I understand there may be additional

16   settlement, or settlements, in the works.  If so, does it make

17   sense for the Court to wait for additional filings in order to

18   simplify the timeframe for approval of any settlements?

19            MR. GERSTEIN:   Your Honor, there is some settlements

20   in the works that we're close to, particularly Mr. Montague and

21   Mr. DeStefano's Clients.  And I think it would make sense to

22   wait, because we would have to work out the details of that

23   settlement.  And it would cut down on the amount of Notices

24   that have to go out, because, or else, we'd have to have

25   multiple Notices for the settlements.
```

```
 1              THE COURT:   All right.  Well, we will wait for that

 2    before I do anything on any of the other settlements.

 3              MR. GERSTEIN:   I think that that makes sense,

 4    Your Honor.

 5              THE COURT:   Okay.  And I want to make clear that the

 6    Plaintiffs should notify the Court promptly of any further

 7    settlements, and also notify the other Defendants of any

 8    Cooperation Provisions contained in those pending settlements.

 9    And I'll get to that last issue in more detail, when we discuss

10    the Motions in Limine.

11              MR. BORGER:   Your Honor, on behalf of the

12    Mushroom Alliance, I would just like to give the Court notice

13    that the Mushroom Alliance has reached a settlement with the

14    Class Plaintiffs.

15              MR. GERSTEIN:   I overlooked that, Your Honor.  Yes,

16    and L&M do, also.

17              THE COURT:   Say that again.

18              MR. BORGER:   J&M [phonetic] Farms, also.

19              MR. GERSTEIN:   JM did, also.  I apologize.

20              THE COURT:   What's that?

21              MR. GERSTEIN:   There's another settlement with the

22    Mushroom Alliance and JM Farms, also, that we've reached

23    agreement.  We have the paper over at -

24              THE COURT:   What are you talk -

25              MR. GERSTEIN:   There was another settlement with the
```

1    Mushroom Alliance and -

2              THE COURT:   Right.

3              MR. GERSTEIN:   - J&M Farms that we've entered into

4    an agreement.   But we have to basically produce the papers.

5    And -

6              THE COURT:   Okay.

7              MR. GERSTEIN:   - that would also -

8              THE COURT:   So that's going to be like Cardile and

9    everything else?

10             MR. GERSTEIN:   Right.

11             THE COURT:   Okay.

12             MR. GERSTEIN:   Would be part of that.

13             THE COURT:   Good; all right.   Who are you?

14             JOEL FISHBEIN:   I'm Joel Fishbein.   I thought this

15   started at 9:30.   I'm sorry.

16             THE COURT:   What'd you think?

17             MR. FISHBEIN:   I thought this started at 9:30.   I

18   apologize.   My name's Joel Fishbein.   I represent Cutone

19   Mushroom.

20             THE COURT:   Okay.

21             MR. FISHBEIN:   M. Cutone.

22             THE COURT:   What I'm going over now is any

23   settlements that we're done.   And we've already had comments

24   that there's two or three settlement.   Did you hear?

25             MR. FISHBEIN:   I've heard about that.   Yes.

```
1              THE COURT:   Okay.  Good.  Okay.

2              MR. FISHBEIN:   Thank you.

3              THE COURT:   You're not in any of them, are you?

4              MR. FISHBEIN:   Not yet.

5              THE COURT:   Oh.

6              MR. FISHBEIN:   Not that I'm aware of, no.

7              THE COURT:   Good.  I knew you'd get to that

8    eventually.  All right.  So, who's left?

9              MR. GERSTEIN:   We have -

10             MR. RODGERS:   Franklin's left, Your Honor.  Frankly,

11   we're a little bit concerned at the way this process has played

12   out.  We understand that the Court was involved in helping the

13   main Parties get close to settlement, which is certainly a -

14             THE COURT:   I sure hope so.

15             MR. RODGERS:   - laudable thing.  I'm just concerned

16   that that process not be used to whipsaw the couple of us that

17   have been trying to settle -

18             THE COURT:   Have I said -

19             MR. RODGERS:   - and haven't gotten there.

20             THE COURT:   - anything to you?  By the way, who do

21   you represent?

22             MR. RODGERS:   Franklin, Your Honor.

23             THE COURT:   Have I said anything to you?

24             MR. RODGERS:   Not a word, Your Honor.

25             THE COURT:   Have I whipsawed you?
```

```
 1              MR. RODGERS:   No, you have not.

 2              THE COURT:   I never even spoke to you until now,

 3   right?

 4              MR. RODGERS:   That's correct, Your Honor.  I'm not

 5   suggesting you would whipsaw, Your Honor.  Thank you.

 6              THE COURT:   Oh.

 7              MS. ALBANI:   We're left, too, Your Honor.

 8              THE COURT:   You want to be whipsawed?

 9              MS. ALBANI:   Well, I don't know.  I have to echo

10   Mr. -

11              THE COURT:   Well, in today's world, I shouldn't say

12   that to you, I guess.  I don't know.

13              MS. ALBANI:   That's okay.  I have to echo

14   Mr. Rodgers' concern.  We learned yesterday, the first time,

15   that there had been ex parte communications with Your Honor by

16   Mr. Montague and Mr. Gerstein.

17              We understood that there was actually a meeting on

18   April 23rd.  And we would like the record to note that we were

19   never given notice that such a request had been made.

20              We were not given notice that a meeting had been

21   scheduled.  And we were not notified by the Court that a

22   meeting -- promptly notified that a meeting had occurred with

23   Counsel, without our notice.

24              We feel we've been unfairly prejudiced, as a result.

25   We don't know what transpired at that meeting.  We have no way
```

1    of knowing or confirming, or disproving, what happened.

2              THE COURT:   Well, let me just say -

3              MS. ALBANI:   And -

4              THE COURT:   - that to you and everybody.  If anyone

5    is in the midst of a settlement or think I can facilitate

6    what's going on, I'm happy to talk.

7              MS. ALBANI:   We -

8              THE COURT:   I don't have a problem with that.

9              MS. ALBANI:   The process in the case, to-date,

10   Your Honor, has involved, for example, Judge O'Neill has

11   schedule to separate settlement conferences with Counsel.  And

12   the process that was followed at that time was to assign

13   Magistrate Rice, in the first instance.

14             THE COURT:   Yeah, well, I told you -

15             MS. ALBANI:   Magistrate Hey -

16             THE COURT:   - there's a new Sheriff in town.

17             MS. ALBANI:   I understand that, Your Honor.

18             THE COURT:   Okay.

19             MS. ALBANI:   I'm just expressing our concerns and

20   noting, for the record, that we never received notice of a

21   meeting.

22             THE COURT:   Well, I don't know why you'd receive

23   notice from me.  All I know is I got a phone call.  Two Lawyers

24   said they'd think I might be helpful.  Would I mind

25   entertaining them coming and talking about it?  I said, no,

```
 1   come on in.

 2            MS. ALBANI:   And of course, we would have been

 3   thrilled to be invited to that meeting.

 4            THE COURT:   You were.

 5            MS. ALBANI:   And of course, we have a Settlement

 6   Offer on the table.  And this was all -

 7            THE COURT:   Well, great.

 8            MS. ALBANI:   - news to us -

 9            THE COURT:   If you want to come talk to me about it

10   with Mr. Gerstein, I'm happy to do it.

11            MS. ALBANI:   Thank you, Your Honor.  I'm just

12   putting that on the record.

13            THE COURT:   Okay.  Anybody else want to come in and

14   talk to me about settlement?  I'd be happy to do it.  I won't

15   contribute to the settlement, though, but -

16            MR. GERSTEIN:   Your Honor, just for the record, I'm

17   happy to meet with you and any of the Defendants' Counsel, if

18   it would be helpful to them to have to overcome our

19   differences.

20            But I take issue with the word that it was ex parte,

21   because, as to these specific Defendants, it was discrete.  You

22   had Counsel from both sides with you.  So, there was nothing

23   ex parte done regarding our conversation.

24            THE COURT:   So -

25            MS. ALBANI:   I don't think Mr. Gerstein will
```

1   disagree that he did not contact us and say that he was making

2   that request, or invite us to participate.

3          THE COURT:   Well, as to who came to the meeting, it

4   was Counsel for several Defendants and Counsel for Plaintiffs.

5   Now, if you weren't in that discussion, maybe you and

6   Mr. Gerstein ought to talk about moving your settlement

7   discussions forward.  And if I can facilitate them, I'm happy

8   to do it.

9          MS. ALBANI:   Thank you, Your Honor.

10          THE COURT:   Okay.  So, let's talk about the Motions

11   in Limine.  I've read each of them and I'm prepared to rule on

12   them soon.

13          But I understand you'd like to make oral argument on

14   some of the Motions.  And I may have some follow-up questions.

15   So, I'd like to take them in order, Plaintiffs' Motions, and

16   then Defendants' Motions.

17          So, first, regarding Plaintiffs' Motion to Preclude

18   Defendants from Asserting a Good-Faith or Reliance on

19   Counsel Defense, which is ECF Number 956.  Plaintiffs, you may

20   make your argument.

21          MR. REFSIN:   Yes, thank you, Your Honor.

22   Barry Refsin for the Direct Purchaser Class.

23          THE COURT:   If you want, if it's easier, you can sit

24   at the table.

25          MR. REFSIN:   Oh, I'm -

```
 1              THE COURT:   Just move the microphone closer to you,
 2    if it's easier -
 3              MR. REFSIN:   I -
 4              THE COURT:   - to -
 5              MR. REFSIN:   No, I think I'm fine here.
 6              THE COURT:   Oh, okay.
 7              MR. REFSIN:   Thank you, Your Honor.
 8              THE COURT:   All right.
 9              MR. REFSIN:   This Motion in Limine involves
10    arguments and evidence that we believe the Defendants intend to
11    put on, that they tried to act in good-faith to comply with the
12    Capper-Volstead Act, which is the exemption from immunity that
13    was, at one point, at-issue in this case.
14              And we believe they also intend to try to show that
15    they relied on Counsel in their belief that the Capper-Volstead
16    Act provided immunity.  And that issue, as Your Honor knows,
17    was decided by Judge O'Neill, who granted Summary Judgment to
18    the Plaintiffs on that issue, and said that that Affirmative
19    Defense on that very narrow Antitrust Immunity does not apply.
20              Since that issue is now out of the case, we don't
21    think it's appropriate for the Defendants to argue that
22    immunity and tell the jury about that immunity to try to expand
23    that very narrow immunity that Judge O'Neill found did not
24    apply.
25              The Court ruled on this issue in 2014.  It was in a
```

1  case that's reported at 54 F.Supp.3d 382.  And the Court found

2  that the -- and said that:

3          "The affirmative defense of good faith reliance on

4          counsel is [only] warranted where the offense alleged

5          involves willful, unlawful specific intent."

6          And he said, here:

7          "A violation of the Sherman Act does not require

8          proof of specific intent, [so that] the advice of

9          Counsel would not be a proper defense to such related

10         claims."

11         So, we don't believe that that evidence that the

12  Defendants had the advice of Counsel on the Capper-Volstead Act

13  is something that should be presented to the jury.  That same

14  issue was addressed by Judge Pratter in the Eggs case.

15         Now, the Eggs case is cited.  There are a lot of

16  different opinions in the Eggs case that we've cited in the

17  Motions in Limine.

18         There's some respects in which the Eggs case is

19  similar to this case.  There's some respects in which it does

20  not.

21         But, on this issue, about whether you should be able

22  to argue that there's a good-faith exception to the

23  Capper-Volstead Act, where the jury gets to hear about the

24  Capper-Volstead Act, after the Judge grants Summary Judgment to

25  the Plaintiffs on it, the case is on all fours with this case.

1      And Judge Pratter first decided that there was no

2  good-faith expansion to the narrow Capper-Volstead Immunity.

3  That was in a case that she decided in 2016.  And then, she

4  decided a Motion in Limine exactly like the one that we're

5  bringing here.

6      And she decided, in April 5th, 2018, at

7  2008 Westlaw 1637960 that all testimony relating to Defendants'

8  belief of immunity had been rejected at Summary Judgment and

9  should not come into the trial.

10      We think that the same result should be reached here.

11  We don't think that the fact that the Defendants believed that

12  they were entitled to immunity is relevant to the Rule of

13  Reason.

14      The issue under the Rule of Reason is whether there

15  was a reasonable restraint on competition.  The fact that the

16  Defendants had legal advice has no relevance to the effect of

17  their conduct on competition, that they fixed prices.

18      We're accusing them of fixing prices and of limiting

19  supply.  The fact that they thought they had immunity from

20  antitrust prosecution doesn't change the effect of that conduct

21  on competition.

22      The Defendants say that it should be -- submit that

23  it's an issue, that the questions of intent are relevant to the

24  application of the Rule of Reason.  That's not correct.  The

25  Rule of Reason does not consider the good-faith of the

1    Defendants.

2         Now, there is some caselaw that says that issues of

3    intent may be relevant to interpreting the facts under the Rule

4    of Reason.  But the facts that we have here, the fact that

5    there was legal advice about whether the immunity was

6    satisfied, is not the kind of evidence that's relevant to

7    determining competitive effects.

8         In fact, the Third Circuit confirmed, in 2017, in a

9    Rule of Reason case, that intent was not an element of a Rule

10   of Reason case.  And that's in the Lipitor that's reported at

11   868 F.2d 231 [sic], where the Court said, in a Rule of Reason

12   case, that intent is not an element of an Antitrust Claim.  And

13   benign intent does not shield anticompetitive conduct from

14   liability.

15        Like I said, it may be relevant in some cases to

16   interpret the facts.  But the fact that there's an Attorney who

17   gave advice about an immunity that doesn't apply to this case

18   is not the kind of evidence that would be appropriate,

19   interpreting those facts.

20        THE COURT:  All right.  Let me -

21        MR. REFSIN:  And in fact, just one last thing, if it

22   had any slight relevance, it's something that should be

23   excluded under Federal Rule of Evidence 403, because it would

24   be extremely prejudicial to tell the jury about an immunity

25   that doesn't apply.

1        THE COURT:   All right.  Let me hear -

2        MR. REFSIN:   Thank you.

3        THE COURT:   - from your Opponent.  Who's going to

4   take the other side of that argument?

5        GEOFFREY JOHNSON:   Good morning, Your Honor.

6   Geoff Johnson from Stevens & Lee.  Just want to respond to a

7   couple points here, and kind of cut through the thicket on

8   this.

9        Mr. Refsin says we can't argue an immunity.  As we

10  said on the first page of our response to their Motion, we're

11  not arguing an immunity.  Judge O'Neill has ruled, and we will

12  accept that Ruling for purposes of this trial, no Good-Faith

13  Immunity Defense, period.

14       Having said that, after ruling that there was no

15  Good-Faith Immunity Defense, Judge O'Neill applied the Rule of

16  Reason to the Price-Fixing Claims.  And the Rule of Reason very

17  clearly requires -- and these are Judge O'Neill's words,

18  quoting the Third Circuit:

19           "An analysis of all the circumstances of a case."

20           Not only that, for over 100 years, the Supreme Court

21  has said, you have to look to the history and purpose of

22  conduct.  And the Third Circuit has said that the intent

23  underlying a restraint -- and I'm quoting here -- is:

24           "A crucial variable in aiding the Court to assess the

25            competitive effects of the restraint."

1          They seek to categorically preclude, in advance of

2    trial, any and all reference to the involvement of Legal

3    Counsel in the decision-making process that goes to the heart

4    of the alleged price restraints.  We submit it is impossible

5    for Your Honor to do that in a vacuum in advance of trial.

6          With respect to the claimed prejudice, their

7    Pleading, and throughout this case, has been littered with

8    allegations that we intentionally broke the law.  That's what

9    we did, apparently.

10         Naked price fixing, that the EMMC was formed for no

11   unlawful purpose.  These are their -- or, sorry, for no lawful

12   purpose.

13         THE COURT:   There you go, you know?

14         MR. JOHNSON:   Sorry.

15         THE COURT:   Sounded like someone I once heard of who

16   said, I don't know why he would do it.

17         MR. JOHNSON:   But, Your Honor, we should be

18   permitted.  It belies reason to say they would be prejudiced -

19         THE COURT:   You don't know -

20         MR. JOHNSON:   - by -

21         THE COURT:   - my reference, huh?

22         MR. JOHNSON:   I do not, Your Honor.

23         THE COURT:   No?

24         MR. JOHNSON:   I apologize.

25         THE COURT:   Took place in -

```
 1              MR. JOHNSON:   What is the reference?

 2              THE COURT:   - Helsinki.  Go ahead.

 3              MR. JOHNSON:   But, Your Honor, we would be the ones

 4    unfairly prejudiced, if we were not permitted to counter their

 5    allegations that we broke the law.  And it is not an Immunity

 6    Defense, to be clear.  But it is a factor to be considered in

 7    the mix.

 8              If you want to put a Limiting Instruction in the Jury

 9    Charge to say you can't consider this as an Immunity Defense,

10    fine, because we don't seek to assert that at this trial.  We

11    may appeal it later, if we have to.  But, for purposes of

12    trial, we accept it.

13              But, at this point, it's too early in the game.  And

14    also, to note, their Exhibit List is littered with examples,

15    and their deposition testimony, too, of the involvement of

16    Legal Counsel in this decision-making process at-issue with

17    respect to the price restraint.

18              So, we submit that it's just too premature to grant

19    this Motion.  And instead, case-by-case objections is the more

20    appropriate method here.

21              THE COURT:   Okay.  Thank you.

22              MR. JOHNSON:   Thank you, Your Honor.

23              THE COURT:   Now, I want to hear argument from

24    Plaintiffs regarding Plaintiffs' Motion to Preclude References

25    at Trial to the Capper-Volstead Act.  That's ECF Number 957.
```

1          MR. REFSIN:    Yes, Your Honor.   This Motion is

2     related to the first.   It's a similar issue.   But this actually

3     involves evidence about the Capper-Volstead Act, itself.   I

4     mean, that's the limited immunity that's already been ruled out

5     of this case.

6          And I would just like to add that I think either of

7     these Motions are premature.   I mean, these are issues that I

8     think are likely to come up in the Defendants' opening in this

9     case.

10          We believe that they're going to open this case by

11     saying that they believed, in good-faith, that they had a

12     defense to antitrust immunity.   And that's something that would

13     be very prejudicial in this case, because those issues have

14     been found not to apply in this case.

15          And the caselaw is very clear that this immunity is a

16     very narrow immunity that the Defendants are not entitled to

17     claim, as Judge O'Neill found.   In fact, on the Capper-Volstead

18     Act Immunity, itself, that's an issue that's been addressed

19     three separate times by this Court.

20          Judge O'Neill found, twice, that the Capper-Volstead

21     Act Immunity didn't apply.   In 2011, he ruled that it didn't

22     apply.

23          He denied a Reconsideration Motion on that issue in

24     2014.   And then, I believe Your Honor, when you first got

25     involved in this case, rejected another Motion for

1   Reconsideration in 2018.  It's very clear that the

2   Capper-Volstead Act is out of this case.

3           The issue, again, came up in Eggs.  I mentioned Eggs

4   with respect to the first Motion.  But, Judge Pratter also

5   granted a Motion in Limine barring arguments about the

6   Capper-Volstead Act Immunity.  And she barred that, even though

7   the Defendants, in their Motion in Limine, suggested that there

8   had been an issue that had not been considered on Summary

9   Judgment.

10          And she said, while that issue wasn't raised on

11  Summary Judgment, I ruled on Summary Judgment that there was no

12  Capper-Volstead Act Immunity.  The Defendants cannot raise that

13  issue during trial, because it's been decided.

14          Now, it's true that there's some documents that are

15  on the Exhibit List that refer to the Capper-Volstead Act, and

16  might refer to some of the Lawyers that were involved.  I mean,

17  obviously, those things are going to need to be adjusted.

18          We didn't know how Your Honor was going to rule in

19  these Motions.  And we put together an Exhibit List that could

20  address any possible issue -

21          THE COURT:  Well, we can deal -

22          MR. REFSIN:   - that might come up.

23          THE COURT:   - with that at Instructions to the

24  jurors.

25          MR. REFSIN:  Excuse me?

```
 1            THE COURT:   We can deal with that -

 2            MR. REFSIN:   Yeah.

 3            THE COURT:   - by proposing Instructions that -

 4            MR. REFSIN:   Well, I think some of that can be dealt

 5   with in Instructions.  And it might also be possible, on

 6   certain documents, to redact them, if they raise issues that

 7   Your Honor rules shouldn't be presented to the Defendants.  And

 8   we will work -- or to the jury.

 9            And we will work with the Defendants to make sure

10   that those issues are eliminated from the Exhibits, if

11   Your Honor agrees with us that those issues have been decided

12   and should be out of the case.

13            THE COURT:   All right.

14            MR. REFSIN:   And let me just end by saying that,

15   again, the fact that Lawyers gave advice on an immunity from

16   the Antitrust Laws that said it's not that -- the

17   Capper-Volstead Act doesn't say that price fixing, and supply

18   control is a procompetitive issue.  It recognizes that this

19   kind of conduct might be anticompetitive.  But it says, we

20   grant an exemption from it.

21            So, legal advice about whether that exemption from

22   the competitive rules of the Antitrust Laws doesn't say

23   anything about whether the conduct is competitive or

24   anticompetitive.  It's an exception from the Antitrust Laws.

25            So, it doesn't help anybody to interpret the facts
```

1   under the Rule of Reason, because the Capper-Volstead Act is an

2   exception from the Antitrust Laws.  And I just want to repeat

3   again that we do believe it would be unduly prejudicial to tell

4   the jury about an exception from the Antitrust Laws that

5   clearly doesn't apply in this case.

6                THE COURT:   All right.

7                MR. REFSIN:    Thank you.

8                MR. JOHNSON:   Thank you, Your Honor.  I'll be very

9   brief in response.  We're not claiming an immunity under

10  Capper-Volstead.

11               We will abide by Judge O'Neill's Ruling for this

12  trial.  And you won't hear anything to the contrary from us on

13  that.  And to be quite frank, Judge Pratter's Ruling in Eggs

14  actually supports us on this.  She said you -

15               THE COURT:   Good.  Well, let's get cracking, then.

16               MR. JOHNSON:   Okay.  It's a good point, Your Honor.

17  I appreciate it.

18               THE COURT:   All right, good.

19               MR. JOHNSON:   In that case, she said you cannot

20  introduce evidence to show the Capper-Volstead Immunity.  But,

21  the documents may be admissible for another lawful purpose.

22  That's what we seek to do here:  admit them, just as part of

23  the wholistic framework required by the Rule of Reason.

24               It's funny.  There's a lot of reference to

25  Judge O'Neill rejecting Reconsideration Motions.  And in our

1    view, what this is, is kind of a last-minute attempt, before

2    trial, to get the Per Se Rule on the Price-Fixing Claims by

3    taking relevant evidence out of the mix.

4           And we would ask Your Honor to reject that attempt.

5    The Rule of Reason requires an analysis of all the

6    circumstances of the case.  And that includes the fact of

7    attempted Capper-Volstead compliance, whether it was successful

8    or not.

9           With respect to the proposition that these references

10   in their documents and the deposition testimony can simply be

11   redacted to remove references to Capper-Volstead.  The Rule of

12   Completeness doesn't allow for that, Your Honor.

13          You can't just ask somebody to cover up one eye and

14   look at something else.  It requires that you look at the

15   entire document out of fairness to us and to our Clients.

16          Finally, I would just, again, submit that a Limiting

17   Instruction saying you can't consider any evidence of attempted

18   Capper-Volstead compliance with respect to the Immunity Defense

19   is the way to go in this case, not to categorically exclude,

20   prematurely, any and all such relevant evidence.  Thank you.

21          THE COURT:  All right.  Now, Plaintiffs, make

22   argument on your Motion to Preclude Defendants from Presenting

23   Evidence, or Arguing that Price-Fixing was Justified by a

24   Desire to Avoid Financial Ruin, or Their Financial Condition,

25   which is your ECF Number 958.

```
 1              MR. REFSIN:   Yes, Your Honor.   Thank you.
 2   Barry Refsin for the Direct Purchaser Class.   And this is an
 3   issue, again, that involves the application of the Rule of
 4   Reason to the Price-Fixing Claims.   And this is an issue that
 5   has run throughout this case.
 6              Almost every Brief that the Defendants file in this
 7   case make the argument that they had to engage in price-fixing
 8   in this case, because they were going out of business.   And if
 9   they didn't price-fix in 2000 and 2001, they would have gone
10   out of business.
11              They've continued to make that argument.   We cite a
12   lot of Briefs in our Motion in Limine where they make their
13   argument.
14              They've continued to make that argument in the
15   Motions in Limine that they filed right now.   In fact, in
16   opposition to the Motion in Limine Number 1 that we talked
17   about already, they made the following statement.
18              They said, by way of background, during the relevant
19   period, and regrettably still, the industry faced widespread
20   turmoil and unprofitability.   In an attempt to salvage the
21   industry, Defendants endeavored to form the EMMC as a proper
22   cooperative, under the Capper-Volstead Act, to promote
23   efficiencies and competition in the market for fresh Agaricus
24   mushrooms.
25              We think that, if the Court doesn't grant this
```

1   Motion, that's exactly the argument that we're going to hear in

2   the Defendants' opening at trial.  And we think that that's an

3   argument that is one that is clearly precluded by the

4   applicable Supreme Court Law, and Third Circuit Law.

5          The Rule of Reason allows Defendants to justify the

6   anticompetitive effects of conduct.  But it doesn't permit any

7   argument that they possibly come up with.

8          There's certain types of attempted justifications

9   that the law clearly doesn't prevent at trial, in order to

10  defend a Rule of Reason case.  Like I already said, the

11  relevant inquiry in the Rule of Reason is whether the

12  challenged conduct increases competition, or decreases

13  competition.

14         THE COURT:   Or is unreasonable.

15         MR. REFSIN:   You're right.  It's -

16         THE COURT:   Unreasonable.

17         MR. REFSIN:   Yeah, it's an unreasonable restraint on

18  competition.

19         THE COURT:   Right.

20         MR. REFSIN:   It's not a general consideration of

21  whether it was a good business decision.  I mean, very often -

22         THE COURT:   Well, it says being unreasonable would

23  be a bad business decision.

24         MR. REFSIN:   Yeah.  I guess I would differ a little

25  bit with that framing of the issue.  It may be a good business

1   decision to conspire with your Competitor, because it would

2   improve your profitability in the case.  Now, it's a bad

3   decision, if you get caught and you get sued for conspiracy.

4          So, the issue isn't whether it's something that's

5   profitable for you.  It's whether it's a reasonable restraint

6   on competition.  Is it something that's good for competition,

7   or bad for competition?

8          And as Judge O'Neill pointed out in the Mushroom

9   case, and this also runs all throughout the Third Circuit cases

10  and the Supreme Court cases, there are three steps to the Rule

11  of Reason.

12         The first step, the Plaintiffs have a burden to show

13  anticompetitive effects.  And then, it's the Defendants' burden

14  to show that the conduct promotes a sufficiently procompetitive

15  justification.  And then, if they do that, the Plaintiffs,

16  then, have a burden to show that the restraint wasn't

17  reasonably necessary to achieve the procompetitive objective.

18         Now, the Defendants are saying that, in that second

19  step -- their burden to show procompetitive justifications --

20  they can show that, without the price-fixing, that they would

21  have gone out of business, and that it was procompetitive,

22  because, by price-fixing, they were able to stay in business.

23         That's precisely the kind of justification that the

24  Supreme Court has said is impermissible.  It's often said that

25  the Antitrust Laws protect competition and not Competitors.

1       The argument that the Defendants are making is that,

2   if they had to compete with each other, they would go out of

3   business.  They're making an argument that it would be good for

4   -- that it was good for them to fix prices and stay in

5   business.

6       The Supreme Court has rejected that justification

7   over and over.  It rejected it in the NCAA case.  It rejected

8   it in the National Society of Professional Engineers case.  And

9   it rejected it in Goldfarb v. Virginia State Bar.

10      Those are all Rule of Reason cases where the

11  Defendants argued that they took some step that limited

12  competition.  And they claimed that it was good for them, and

13  helped them to compete.

14      The Goldfarb v. Virginia State Bar case, for

15  instance, was a case where a Bar Association published a

16  Minimum Fee Schedule and said that that was designed to avoid

17  the economic suicide of the Lawyers.

18      The Supreme Court said, that's not permissible.

19  You're saying that you don't want to compete with each other.

20  The Third Circuit agrees that that kind of argument is not

21  permissible, as a procompetitive justification.

22      In the LePage's case at 324 F.3d 141, the Court said

23  that a defense that the Defendant was merely acting in

24  furtherance of its economic interests doesn't constitute the

25  type of business justification as that is an acceptable defense

1    to anticompetitive conduct.

2            And the Ninth Circuit made this point very clear.

3    This is a case that we cite in our Brief.  It's Freeman v.

4    San Diego Association of Realtors, 322 F.3d 1133, at 1152,

5    note 24.

6            The Court said -- and this is a quote, indeed:

7            "If there is any argument the Sherman Act

8            indisputably forecloses, it is that price fixing is

9            necessary to save companies from losses they would

10           suffer in a competitive market.  While a competitor

11           who fixes prices to stem his losses may be a more

12           sympathetic character than one who does so to fatten

13           his purse, he enjoys no favored legal position."

14           That's the argument that the Defendants are making.

15   It's one that's not permissible under the Rule of Reason.  And

16   we think it should be precluded at trial.

17           The Defendants don't have a single case where they

18   say that kind of argument is appropriate.  They cite cases.

19   But none of them involve this idea that they needed to fix

20   prices in order to stay in business.

21           The last point I'll make, again, is that there's a

22   serious Rule 403 prejudice issue here, if the Defendants are

23   able to argue to the jury that they deserve sympathy, because

24   they were going out of business, and, therefore, should be

25   allowed to restrict competition by engaging in price-fixing.

```
1              That's an issue that can't completely be corrected

2    with an Instruction.  I mean, that goes to the heart of the

3    Antitrust Laws.  It's an argument that's not permissible under

4    applicable law.  And we believe it should be precluded.

5              THE COURT:   All right.

6              MR. REFSIN:   Thank you.

7              THE COURT:   Let me -

8              GEOFFREY RICHARD JOHNSON:   Good morning, Your Honor.

9    Geoff Johnson, Sr. for Defendants.  It's very kind of

10   Mr. Refsin to write our opening statement and explain our

11   theories to the -

12             THE COURT:  He won't bill you for it.

13             MR. GEOFFREY JOHNSON:   - Court.  Well, we wouldn't

14   pay it, because it's not our opening statement and it's not our

15   theories.

16             The evidence that Plaintiffs seek to preclude -- and

17   actually, I'm not even sure it's evidence.  It's this vague

18   notion, this category of financial condition and financial

19   ruin.

20             That's not what our evidence will be.  And for that

21   reason, this vague category that they seek to preclude the

22   evidence on, which is, in effect, seeking a reconsideration of

23   Judge O'Neill's Order on Rule of Reason, Your Honor ought to

24   deny this as premature and vague.

25             Here's the real reason for the evidence and the
```

1    evidence that's going to be presented.  We're not going to use

2    evidence of financial condition to argue that price restraints

3    were needed to prevent competition.

4          Our evidence is going to show that price restraints

5    prevented further farm closures, which promoted competition.

6    The alleged restraints arguably benefitted consumer welfare by

7    facilitating new, diversified products, promoting consumer

8    choice, and improving industry-wide production efficiencies.

9    That's why evidence of financial condition is going to be

10   relevant in this trial.

11         I would point out, Your Honor, that this is an

12   antitrust case.  It's all about financial condition.  The

13   financial data is an essential part of Plaintiffs' Expert

14   Report.  How can they say we're going to exclude this evidence,

15   when it becomes part of their own case?

16         There are other issues as to which the finances are

17   relevant.  Evidence of the Defendants' market power is a key

18   issue.

19         Evidence of the implementation and effective price

20   restraints, and the bargaining power of the Growers against

21   large Retailers:  essential issue in this case.  And how can

22   you present that without having some indication of the

23   financial condition of the Defendants?

24         As I said, Your Honor, this is, effectively, a Motion

25   for Reconsideration disguised of Judge O'Neill's Order that the

1  Rule of Reason applies to the Price-Fixing Claim.  What they're

2  doing is taking that Ruling and trying to exclude evidence,

3  piece-by-piece, that supports that Ruling, and have you ignore

4  Supreme Court Holdings that say, in the Rule of Reason, you

5  must consider the industry as a whole, and look at the history

6  of the industry.

7          So, for these reasons:  one, vague Claim for relief;

8  two, seeking reconsideration; three, ignoring the Rule of

9  Reason; four, ignoring the procompetitive aspects of our

10  evidence that we're going to present; and finally, five, and,

11  frankly, in the Eggs case, this evidence was permitted by

12  specific Ruling of Judge Pratter.  So, for all these reasons,

13  Your Honor, we'd ask you to deny this Motion.

14          THE COURT:  All right.

15          MR. MONTAGUE:  Your Honor, may I be heard for one

16  brief minute on this?

17          THE COURT:  You got something new to say?

18          MR. MONTAGUE:  Yes.

19          THE COURT:  All right.

20          MR. MONTAGUE:  Thank you, Your Honor.  I just want

21  to call the Court's attention to the seminal case that really

22  governs this issue that no one has mentioned.  And that is the

23  Board of Trade of the City of Chicago, and Judge Brandeis'

24  Decision of 1918, which is still good law.

25          And I'd just like to read a little bit from the

1    conclusion of that.  The Supreme Court says, to determine that

2    -- this is a Rule of Reason case, where there were Rules on the

3    Board of Trade which dealt with calls which dealt with price.

4              "To determine [that] question, the court must

5              ordinarily consider the facts peculiar to the

6              business [to which the restraint is applied], its

7              condition before and after the restraint was imposed,

8              the nature of the restraint, and its effect [and]

9              actual or probable.

10             "The history of the restraint, the evil believed to

11             exist, the reason for adopting the particular remedy,

12             the purpose or end sought to be [obtained], are all

13             relevant facts.  [It is] not because a good intention

14             will save an otherwise objectional regulation or the

15             reverse."

16             This is the most important:

17             "But because knowledge of intent may help the court

18             to interpret facts and [to] predict consequences."

19             The District Court erred, therefore, in striking from

20   the answer:

21             "Allegations concerning the history and purpose of

22             the 'Call' rule, and [in later excluding] evidence on

23             that subject."

24             Now, their evidence is replete, Your Honor, with

25   references to the EMMC as a cooperative, of the Capper-Volstead

1   Act.  And the jury, they're going to hear the words

2   "cooperative".

3          They're going to hear the Capper-Volstead Act.

4   They're going to hear price-fixing.  They're going to hear

5   minimum price schedule.  They have no idea what the foundation

6   for that.

7          As Mr. Johnson said, we're not claiming immunity.

8   We're just having the jury understand the background, the

9   history, and the purpose and effect of what was done, so they

10  have an understanding, under the Rule of Reason.

11         And the Decisions that were cited of Judge O'Neill

12  were all before he ruled on the Rule of Reason issue.  Thank

13  you.

14         THE COURT:  All right.  Plaintiffs, you may make

15  your argument regarding your Motion to Exclude Evidence or

16  Argument Regarding Individual Issues Unique to Opt-Out

17  Plaintiffs, Publix and Giant Eagle.

18         MR. REFSIN:  Yes, Your Honor.  Thank you.

19  Barry Refsin, again; and I will do that in just one moment.  I

20  would just like to respond briefly to one point that

21  Mr. Montague made.

22         I mean, he said that Chicago Board of Trade governs

23  this case.  It's a 1918 case.  There's been a lot said on the

24  Rule of Reason since 1918, including an Opinion by the

25  Third Circuit that I referred to earlier in the Lipitor case.

```
 1              It's Lipitor Antitrust Litigation, 868 F.3d 231.  And

 2    the Third Circuit there told us what the Third Circuit's

 3    treatment of the Chicago Board of Trade's case was.  And this

 4    is what the Third Circuit said about the Chicago Board of Trade

 5    case.

 6              It said, intent is not an element -- and this is a

 7    quote:

 8              "Intent is not an element of an Antitrust Claim.  And

 9              benign intent does not shield anticompetitive conduct

10              from liability.  A Party's good intention cannot save

11              an otherwise objectionable restraint of trade."

12              And it cites Chicago Board of Trade v. United States,

13    the case that Mr. Montague just cited.  It, then, said:

14              "The antitrust inquiry is confined to a consideration

15              of impact on competitive conditions."

16              And it cites the National Society of Professional

17    Engineers case from the Supreme Court that I referred to.  And

18    then, it continues:

19              "And good motives will not validate an otherwise

20              anticompetitive practices."

21              And it cites the NCAA case that I also referred to.

22    It's clear that, when a Defendant is arguing that it needs to

23    fix prices to stay in business, even if it's arguing that it's

24    going to give consumers more options -- that's exactly what the

25    argument was in the Lawyer's case in the Supreme Court that I
```

```
 1   referred to -- that's an impermissible argument.

 2            That's an argument that competition isn't good

 3   enough.  And that's not the basis of our Antitrust Laws.  The

 4   basis of our Antitrust Laws is competition.

 5            If people can't survive under competition, they go

 6   out of business.  That's the effect of competition.  You don't

 7   get to argue, under the Sherman Act, that you needed to fix

 8   prices in order to stay in business.  That's a prohibited

 9   justification.  And that's not -

10            THE COURT:   All right.

11            MR. REFSIN:   - an argument -

12            THE COURT:   Go onto your -

13            MR. REFSIN:   - that Judge Pratter -

14            THE COURT:   - next -

15            MR. REFSIN:   - dealt with.

16            THE COURT:   Go onto the next point, Mr. -

17            MR. REFSIN:   Let me move onto the next Motion.  And

18   that Motion deals with the Opt-Outs.  Everybody agreed, when we

19   set up the trial structure in this case, that the Opt-Outs

20   would not be included in this trial.  That's why the Court

21   bifurcated the trial.

22            But, despite the fact that we have a bifurcated

23   trial, the Defendants' Witness List, Exhibit List, and

24   Deposition Designations show that they intend to offer

25   substantial evidence about Publix and Giant Eagle in the Class
```

```
 1   case, even though those Entities opted out of the Class.  The

 2   evidence about Giant Eagle and Publix is completely irrelevant

 3   and should be included.

 4              THE COURT:   Well, let me -

 5              MR. REFSIN:   Excluded.

 6              THE COURT:   - ask you.  Why should I preclude

 7   Dr. David from testifying to his general analysis of the

 8   mushroom industry?

 9              MR. REFSIN:   Well, because Dr. David, in his Report,

10   said that his Report had nothing to do with the Class trial.

11   His Report -

12              THE COURT:   Listen to what I'm asking.  Why should I

13   preclude Dr. David from testifying to his general analysis of

14   the mushroom industry?

15              MR. REFSIN:   Because he offered an analysis in

16   response to the Opt-Out Experts; he didn't give us a Report

17   that said he was giving us any expert analysis that applied to

18   the Class case.  His Expert Report -

19              THE COURT:   Forget the Class case.  He's talking

20   about the mushroom industry.

21              MR. REFSIN:   No.  But, he's not.  He has an Expert

22   Report that begins with the Docket Numbers from the Opt-Out

23   case.  And this is what he says in the very first paragraph of

24   his Report.  He said that his Report is about:

25              "Opt-Out Plaintiffs in this action, Giant Eagle, Inc.
```

```
 1              (Giant Eagle), and Publix Super Market, Inc.

 2              (Publix), collectively Plaintiffs, have accused the

 3              Eastern Mushroom Marketing Cooperative, together with

 4              EMMC Members and various Non-Members Entities, of a

 5              conspiracy to fix prices and control the supply of

 6              fresh Agaricus mushrooms in the Eastern United

 7              States."

 8         And then, in paragraph 2, he says:

 9              "I have been asked by Counsel for certain Defendants

10              in this Action to analyze the opinions of Plaintiffs'

11              Experts, Dr. Keith Leffler and Dr. Paul Prentice, as

12              expressed in these Expert Reports."

13         There was no disclosure in Dr. David's Expert Report

14    that he was offering any opinion against the Class Plaintiffs.

15    And while we attended the depositions, we didn't ask any

16    questions, because he was giving an opinion that didn't apply

17    to our case.

18         Now, they have a separate Expert, Dr. Johnson, who

19    gave opinions about the Class Claims.  If there was some

20    general evidence that was applicable to us, Dr. Johnson could

21    have included it in his Report, or they could have had

22    Dr. David say that he was offering opinions applicable to the

23    Class case.

24         But that's not what they did.  They have a Report

25    that says he's responding to opinions in the Opt-Out case.  And
```

1  given that we've now bifurcated the case, there's no reason for

2  them to now bring an Expert in who was not disclosed as an

3  Expert in the Class case to testify in the Class case.

4          In fact, all the Parties agreed that there should be

5  separate trials in the Class case and the Opt-Out case, because

6  of the potential prejudice associated with trying the Class and

7  the Opt-Out cases together.  So, there's no reason now to

8  permit the Defendants to ambush the Class Plaintiffs by

9  injecting those individual issues into the Class case -

10          THE COURT:   All right.

11          MR. REFSIN:   - on the eve of trial.

12          THE COURT:   Let me hear from Defendants.

13          TERRI PAWELSKI:   Good morning, Your Honor.

14  Terri Pawelski from Stevens & Lee.  I think Your Honor has

15  already touched upon the exact issue, which forms the response

16  to our Motion.

17          First of all, Dr. David comes as no surprise to the

18  Class Plaintiffs.  He's been around in this case since the

19  beginning of time.

20          They've had his Report.  And if, you know, Mr. Refsin

21  selectively read from the first two paragraphs of his Report,

22  obviously there's a lot more to his Report than that.

23          We don't want to try the Opt-Out case, or the Opt-Out

24  issues in the Class Plaintiff trial.  That would be of no use

25  to us.

1          But there certainly are issues relevant to the

2   overall mushroom industry, which Your Honor asked, and which I

3   didn't hear a clear answer given by Mr. Refsin, which should

4   not be precluded.

5          For example, Your Honor, Dr. David prepared mass data

6   charts, relevant to the entire mushroom industry, which were

7   used by Mr. DeStefano in the Class Certification hearing.  So,

8   he does opine upon several issues that are relevant to the

9   entire industry.

10          And that is the only testimony which we are looking

11   to put before the jury in the Class Plaintiff case.  And you

12   know, if there is an objection that something has gone too far

13   as to the Opt-Outs, or not relevant, that can certainly be

14   made.

15          But to say that this is any sort of ambush, or that

16   they haven't had his Report for years upon years, and that

17   there are not issues germane to the mushroom industry at-large,

18   is simply false, Your Honor.

19          So, we would ask that Dr. David, at this point in

20   time, not be precluded from the opinions that he has issued,

21   and which the Plaintiffs have had for years.  Unless Your Honor

22   has any more questions, I think I can leave it at that.

23          THE COURT:   Leave it at that.

24          MS. PAWELSKI:   Excellent; thank you, Your Honor.

25          THE COURT:   Now, I want to move on to -

```
 1              MR. MONTAGUE:   Your Honor -

 2              THE COURT:   - some of the -

 3              MR. MONTAGUE:   - may I just add one thing?

 4              THE COURT:   You keep interjecting.

 5              MR. MONTAGUE:   I know.

 6              THE COURT:   What are you, Columbo?  Go ahead.

 7              MR. MONTAGUE:   Thank you, Your Honor.  I just want

 8  to point out that, during the Rule of Reason argument that we

 9  had, before Judge O'Neill, I proffered and discussed three of

10  Jesse David's charts, using his name.  And there was no

11  objection by Counsel for the Class.

12              THE COURT:   All right.  Let's talk about some of the

13  Defendants' Motions.  Plaintiffs have requested to make

14  argument about Defendants' Motion to Preclude Admission of EMMC

15  Meeting Materials as Business Records, which is ECF Number 950.

16  Plaintiff?

17              MR. REFSIN:   And I think it's Defendant's Motion.

18              THE COURT:   Oh, okay.

19              MR. REFSIN:   So, I think they should probably go

20  first.

21              THE COURT:   Go ahead.

22       (Asides)

23              MR. DESTEFANO:   Benefits of age.  Anyway,

24  Your Honor -

25              THE COURT:   To what?
```

1          MR. DESTEFANO:   I said the benefits of age.

2          THE COURT:   What benefit is that?

3          MR. DESTEFANO:   You can have younger people do your

4  work for you.

5          THE COURT:   Oh, okay.  I didn't know.  I was

6  thinking about age.

7          MR. DESTEFANO:   Anyway, sir, I think -

8          THE COURT:   Trying to -

9          MR. DESTEFANO:   - this is -

10         THE COURT:   I'm trying to martial the evidence for

11 benefits.

12         MR. DESTEFANO:   Right.

13         THE COURT:   Go ahead.

14         MR. DESTEFANO:   I'm trying martial evidence for

15 benefits.  But, in any event, sir, straightforward Motion;

16 there's been no foundation suggested by the Defendants -- I'm

17 sorry, by the Plaintiffs for the admission of these documents

18 as business records.

19         If the Defendants care to lay the proper foundation

20 at trial, then, of course, we would not object, or to overcome

21 an objection.  To make matters plain, these are hearsay,

22 Your Honor.

23         They don't qualify as business records.  For starters

24 -- and this may be the start and the end of the analysis --

25 although there was evidence of the time of the meeting, there's

1    no evidence as to when these notes were made, and when they

2    were transcribed.  And they want to admit the transcribed

3    version of the notes.  So, they don't qualify prima facie as

4    business records, first of all.

5             Secondly, we concede in our Motion that, if there can

6    be some other foundation made for the admission of these

7    Minutes Notes, or I think they're mostly referred to as meeting

8    notes, obviously they would come in.

9             I mean, the most obvious of foundations would be they

10   may come in as an admission of a Party Opponent.  They may also

11   come in as statements of a Co-Conspirator made during the

12   course of, or in furtherance of a Co-Conspirator.

13            The problem with that is that the notes do not

14   attribute any statement to any individual.  You almost have to

15   look at them.  But, I think the bottom line here -

16            THE COURT:  I hope that's what people do.

17            MR. DESTEFANO:  Yeah.  The bottom line here -

18            THE COURT:  Look at them.

19            MR. DESTEFANO:  - is that, you know, we have

20   meet-and-confer obligations with respect to these Exhibits.  A

21   lot of these Minute Notes, they got these.

22            If they come up with an obvious foundation that they

23   can articulate to us, even before trial, we won't object.  But,

24   I think that that foundation has to be laid somewhere.

25            THE COURT:  Here's an invitation.

1          MR. DESTEFANO:   Yeah, it's -

2          THE COURT:   Mr. Refsin, he made an invitation to

3   you.

4          MR. DESTEFANO:   I made an invitation.

5          MR. REFSIN:   And I -

6          MR. DESTEFANO:   So -

7          MR. REFSIN:   I'll take him up when I -

8          THE COURT:   Oh, good.

9          MR. REFSIN:   - get to stand up.

10          THE COURT:   Well, I hope -

11          MR. DESTEFANO:   - to decide this -

12          THE COURT:   - you do.

13          MR. DESTEFANO:   - in a vacuum now would probably be

14   improper.   And each document is a specific document.   Whether

15   it qualifies under the Business Records Exception -

16          THE COURT:   What I'm getting from your argument is

17   that you haven't really sat down to go over whether some of

18   these records are actually admissible.

19          MR. DESTEFANO:   Right; correct.

20          THE COURT:   Why not?

21          MR. DESTEFANO:   Well, because it -

22          THE COURT:   We've been around for years.

23          MR. DESTEFANO:   Well, we just exchanged each

24   other's -

25          THE COURT:   Oh, okay.

```
 1              MR. DESTEFANO:   - Exhibits.

 2              THE COURT:   This is something that I think you guys

 3   can come to some reasonable decision about.

 4              MR. DESTEFANO:   It's quite possible that we will.

 5   But we haven't done that.  And to -

 6              THE COURT:   All right.

 7              MR. DESTEFANO:   - ask the Court now to make a

 8   blanket Ruling -

 9              THE COURT:   Well, why don't you let me know?  Sit

10   down and talk about it, and let me know, before I rule on it.

11              MR. DESTEFANO:   We will.

12              THE COURT:   All right.  Go ahead, Mr. Refsin.

13              MR. REFSIN:   Okay.  Thank you, Your Honor.  And

14   Mr. DeStefano began by saying that he's not asking for any

15   categorical Ruling on these Minutes of the MMC meetings and the

16   Agendas for these meetings.

17              I mean, he is asking for categor [phonetic] Ruling

18   that they are not business records.  And we think that there's

19   a foundation that's already been established.  And we make it

20   in our submission, showing that these documents are, in fact,

21   business records.  And they also satisfy the other separate

22   exceptions to the Hearsay Rules.

23              And we initially began by responding to the request

24   to categorically deny these meeting materials.  But we

25   realized, in putting together our Brief, that the record that
```

1    we have in this case is so complete that we think that, at

2    least for the documents that the Defendants identified as

3    Exhibits, as examples of the meeting materials, that the Court

4    can actually rule on the admissibility of the materials that

5    the Defendants identified as examples in their Brief.

6           And we think that would be very useful, because there

7    are a lot of other materials just like this that the Defendants

8    say don't satisfy the Business Records Exception, but that the

9    record clearly establishes that they, on their face, together

10   with testimony in this case, they're business records.

11          And I'd like to just make it clear what these

12   documents are.  They're really two types of documents that the

13   Defendants identify in their Motion.

14          First, they're Agendas of the EMMC meetings.  And

15   these are the meetings where the Defendants got together.  They

16   came up with pricing rules and the prices that they were

17   fixing, and decided on the Supply-Control Assessments.

18          And what they would do would be, before every monthly

19   meeting, they would send out a printed Agenda with the date of

20   the meeting on top of it, and the issues that they were going

21   to discuss at that meeting.

22          And then, according to their Bylaws, they were

23   required to keep Meeting Minutes for those meetings.  And

24   that's the second type of document.

25          Mr. DeStefano called them notes.  But they're the

1  Meeting Minutes that they compiled, in accordance with their

2  Bylaws.  And they were compiled, according to the testimony, by

3  an Office Manager that they hired to keep the notes.

4          And according to the Bylaws, those notes were

5  available to all Members.  They identified at the top every

6  single EMMC Member that attended.  And the Bylaws required

7  every Member to attend every meeting every month.  And if a

8  Member missed more than, I think, one meeting, they were fined

9  for not attending the meetings.

10          So, these aren't like the documents in the cases that

11  the Defendants identify where they're just handwritten notes

12  with no dates on them.  I mean, these are the formal documents

13  that the EMMC operated its business by.  And this is exactly

14  the kind of document that satisfy the Business Records

15  Exception.

16          Now, one of the objections that the Defendants make

17  to admitting them as business records is that there's not

18  adequate authentication.  But it's clear that, in the

19  Third Circuit, that business records can be admitted under the

20  Business Records Exception in Rule 803.6 without any witness at

21  all.

22          There's some documents that are authenticated on

23  their face.  And if you look at the documents that are attached

24  to the Defendant's Motion, these are the kinds of documents

25  that the Third Circuit found are authentic on their face.

```
 1            In the Japanese Electric Products Antitrust
 2   Litigation, at 723 F.2d 238, the Third Circuit dealt with
 3   Minutes actually of meetings that were accused of being
 4   price-fixing meetings, just like the ones here.  And the Court
 5   looked at the Minutes and said, on their face, that, under the
 6   totality of the circumstances, these documents were Meeting
 7   Minutes and they satisfied the Business Records Exception.
 8            We have this testimony about how the Agendas were
 9   circulated, the regularity of them, how the Minutes were
10   circulated and their regularity.  That's the kind of evidence
11   that the Third Circuit found in the Japanese Products Antitrust
12   Litigation is appropriate for authentication, and supported
13   their admission under the Business Records Exception.
14            Mr. DeStefano also mentioned that there's a question
15   about timeliness.  There's no issue about the timeliness of
16   these documents.
17            On their face, the Agendas have dates on them.  The
18   Minutes have dates on them.  There's no indication in the
19   record that they were created any significant amount out of
20   time after the dates, on their face.
21            I mean, there's a Processed Eggs case out there on
22   Business Records.  But this is another case in which we have a
23   different, from the Processed Eggs case.
24            In the Egg Products case, there were informal emails
25   that were exchanged that discussed certain meetings.  These
```

```
 1   aren't informal notes or emails.  These are the actual Minutes

 2   that were required to be kept by the EMMC Bylaws.  And they

 3   were made available -

 4              THE COURT:   I read your Motions -

 5              MR. REFSIN:   - to all the Members.

 6              THE COURT:   - on this, both sides.

 7              MR. REFSIN:   But -

 8              THE COURT:   At the time of trial, I sure hope you've

 9   gotten together beforehand, because this, to me, is something

10   that shouldn't even be a debate.  So -

11              MR. REFSIN:   Yeah, I actually agree, Your Honor,

12   that I'm surprised that they objected on business records.

13   This seems like a clear issue.  And -

14              THE COURT:   So -

15              MR. REFSIN:   - that's really why we asked for a

16   Ruling on the ones that they attached, because it seems so

17   clear that they're business records.

18              THE COURT:   - I expect you to get together and reach

19   agreement on this.

20              MR. REFSIN:   Okay.

21              THE COURT:   Okay?

22              MR. REFSIN:   Thank you.  There are also a lot of

23   other reasons for their admission.  But we won't -

24              THE COURT:   I -

25              MR. REFSIN:   - discuss that.
```

```
 1              THE COURT:   - understand.  Defendants -

 2              MR. DESTEFANO:   May we have a brief -

 3              THE COURT:   - you -

 4              MR. DESTEFANO:   - rebuttal?

 5              THE COURT:   What's that?

 6              MR. REFSIN:   No.

 7              MR. DESTEFANO:   May we have a couple minutes of

 8   rebuttal for that?

 9              THE COURT:   I understand the issue.  I don't need

10   rebuttal.  What I want is you guys get together and decide

11   which of the records you think are okay to be admitted.

12              Now, we want to talk about a Motion to Preclude

13   Admission of Discovery Deposition Testimony.  Now, I want to

14   know who you intend to introduce, what witnesses' depositions

15   you want to introduce.  And my concern is the jury.

16              I don't want them to become disengaged.  So I want to

17   get more information about which witnesses, and how long the

18   relevant portion of the deposition is, whether it's videotaped

19   or not.  And if I were going to limit the number of witnesses,

20   which witnesses would you prioritize in using deposition

21   testimony for?  Have you discussed this at all?

22              MS. PAWELSKI:   To some degree, we have.  But there's

23   still enough room where we can't come to -

24              THE COURT:   How many depositions do you intend to

25   introduce?
```

```
 1              MS. PAWELSKI:   We filed the Motion to Preclude
 2    Plaintiffs from -
 3              THE COURT:   Okay.
 4              MS. PAWELSKI:   So it's a little bit opposite of what
 5    you're asking.  We filed the Motion to have all witnesses -
 6              THE COURT:   Mr. Refsin -
 7              MS. PAWELSKI:   - come live.
 8              THE COURT:   - how many witnesses' depositions do you
 9    intend to read to the jury, or -
10              MR. REFSIN:   Well -
11              THE COURT:   - show videotapes, or -
12              MR. REFSIN:   Yeah, we intend to use videotape.
13    Virtually all of these witnesses have been videotaped.  I don't
14    have an exact count.  But I hesitate to give you an estimate.
15    I'm not sure exactly what -
16              THE COURT:   Well, I want to know -
17              MR. REFSIN:   - it is.
18              THE COURT:   - for just the economy of time.  I don't
19    want to have jurors sitting there watching a deposition, which
20    I know is going to be exciting.
21              MR. REFSIN:   Yeah, just to give you a little bit of
22    comfort -- I hope this gives you some comfort -- I mean, we've
23    done this in other big antitrust cases.  And we recognize we're
24    not playing an entire deposition to the jury.  I hope you
25    didn't think that's what we were asking to do.
```

```
 1              THE COURT:   I don't know what you were asking.

 2              MR. REFSIN:   No, what we intend to do, we usually

 3   edit these videotaped Deposition Designations down to something

 4   less than 45 minutes, because we realize asking a jury to

 5   listen to more than 45 minutes -- 45 minutes is probably

 6   pressing the jury's attention on a videotaped deposition.

 7              So what we generally do on videotaped deposition is

 8   edit them down as short as possible.  We identify any

 9   objections that remain in the deposition testimony, after

10   meeting and conferring with the Defendants, and ask Your Honor

11   to rule on those objections before it's played to the jury.

12              So it generally goes very smoothly.  Really, usually,

13   the videotaped depositions go much faster than the live

14   testimony.

15              Now, we do intend to offer live witnesses, as well.

16   I mean, it's not a completely deposition-driven case.  But, we

17   believe that, under Rule 32, we're entitled to use the

18   depositions of Officers, Directors, Managing Agents -

19              THE COURT:   I understand that.

20              MR. REFSIN:   - and Rule 36 -

21              THE COURT:   I just want to be efficient.

22              MR. REFSIN:   Yeah, we -

23              THE COURT:   I don't want to bore the jurors.

24              MR. REFSIN:   And we take that obligation very

25   seriously.  And we do edit these very succinctly so to keep the
```

```
 1  jury's attention.  And one of the things that we thought we
 2  would discuss with Your Honor today is the process that
 3  Your Honor would like to adopt for ruling on objections to
 4  videotaped depositions, so that all those objections are
 5  resolved before -
 6              THE COURT:  Well, that's why -
 7              MR. REFSIN:   - we get there.
 8              THE COURT:   - she's here.
 9              MS. PAWELSKI:   Your Honor, first, I would like to
10  point out, these were discovery depositions, not trial
11  depositions.  By rough estimate, there are approximately 24,
12  25 people listed by Class Plaintiffs to play the videos.
13              In addition to that, Mr. DeStefano and I have
14  received Subpoenas for these same people that they wish to call
15  -- or not wish to call.  They would like to play by video.
16              I would like to also mention, to say that it's an
17  easy process to go through to edit these videotapes and play
18  them, and to have Your Honor decide on the objections that the
19  Parties can't come into agreement with, Mr. DeStefano were
20  Local Counsel in the Eggs case.
21              I can tell you that Judge Pratter had a nightmare
22  deciding which videos would be played, versus live testimony,
23  versus objections of the videotape.  It is an enormous,
24  enormous task that Class Plaintiffs are asking you to take on.
25              Also, Your Honor, as you know, you have complete
```

1  discretion, regardless of the Federal Rules.  It's your

2  decision whether to have the jury in the box looking at

3  somebody, assessing their credibility, their demeanor, on the

4  stand, or being bored to death watching video, after video,

5  after video.

6          We think that it's serves the purpose of judicial

7  economy and certainly helps the jury in assessing the witness'

8  credibility and demeanor.  These are all people who are within

9  Subpoena Power of the Courthouse.  And in fact, we've received

10 several Subpoenas at this point.

11         So, for all of those reasons, Your Honor, we believe

12 that the jury should hear live from the witnesses.  And it can

13 save Your Honor a lot of work in deciding which parts of the

14 videos can be played.

15         MR. REFSIN:   Yeah.  Thank you, Your Honor.  I mean,

16 first, with respect to the Subpoenas, I mean, we don't know how

17 Your Honor's going to resolve this issue.  So we've served

18 Subpoenas to protect ourselves.

19         We think that we're entitled to use these depositions

20 for any purpose.  We're dealing with depositions that qualify

21 under Federal Rule of Civil Procedure 32(a)(3), which has no

22 requirement for unavailability.

23         It says that if the witness is an Officer, Director,

24 Managing Agent, or witness designated under Rule 30(b)(6), that

25 deposition can be used for any purpose.  This is not that great

```
 1   an issue.  It's really less work than having a live witness on

 2   the stand.

 3           We did this a couple of summers ago, in front of

 4   Judge Goldberg in the Provigil trial.  We had a procedure that

 5   gave Judge Goldberg a package with the cutdown Designations,

 6   the Exhibits that were being introduced during that witness'

 7   testimony, and all the objections that any Party were still

 8   maintaining.

 9           And I think we gave that to Judge Goldberg maybe two

10   nights before the video deposition would be played.  He ruled

11   on them.  We had our Video Tech cut the videos down.  And we

12   played them to the -

13           THE COURT:  Where are these -

14           MR. REFSIN:  - jury.

15           THE COURT:  - witnesses?

16           MR. REFSIN:  Well, we have some that are within

17   100 miles.  So they qualify as available.  They're all adverse

18   witnesses, though.  Obviously they're not our witnesses.

19   They're the Defendants' witnesses.

20           I mean, and there are also some that are beyond

21   100 miles and are technically unavailable, and would fall

22   within 32(a)(4).  So we're only talking in this Motion about

23   the ones who are available, because the ones that are

24   unavailable obviously qualify under 32(a)(4) as unavailable

25   witnesses.  But there's really no reason to -
```

```
 1          THE COURT:   How many hours of testimony are you

 2   talking about?

 3          MR. REFSIN:   Your Honor, I don't have that count

 4   yet.  And I mean, we've done the Designations on the -- you

 5   know, we've exchanged Designations on the depositions with the

 6   Defendants.

 7          Those Designations are still overinclusive.  I mean,

 8   the way this works, in my experience, at least, is, as you get

 9   closer to trial, you keep narrowing down the Deposition

10   Designations.

11          And we usually have a process where, a couple of days

12   before you would play the video, you would give the final

13   Designation -- exchange final Designations and work it out, you

14   know, what the counter-Designations are, and what objections

15   still remain.

16          And the reason you do it that way is because, based

17   on what happens at trial, you're able to narrow it further.  So

18   this isn't an issue where I think it's a good idea to make

19   Rulings on these videotaped depositions until you get to trial

20   and you see, because they're always a lot narrower issues than

21   it looks like on the initial set of Designations.

22          I would like to point out that the events in this

23   case are very old.  This is a case that has been going on for

24   13 years.

25          THE COURT:   No kidding.
```

1              MR. REFSIN:   The depositions took place a lot longer

2   ago.  The depositions are a lot closer to the actual events

3   than live testimony at trial would be.

4              So I suspect that a lot of the live testimony -- if

5   you take live testimony from some of these people, a lot of

6   it's going to be spent refreshing the witness' recollection

7   with what he originally testified to.  So it's really not more

8   efficient -

9              THE COURT:   And what did these -

10             MR. REFSIN:   - in this case.

11             THE COURT:   - witnesses testify to?

12             MR. REFSIN:   They testified to their participation

13  in the EMMC, and what they did in EMMC.  These are the Managers

14  of each of the Defendant Companies.

15             They're the 30(b)(6) Designees, or the Officers of

16  the Company, mostly that attended the EMMC meetings.  I mean,

17  these are not low-level employees.  These are the high

18  upper-level employees of these Companies.  In a lot of cases,

19  they're the Owners.

20             I actually think it would be more efficient to use

21  video in this case, because it's going to be a very short clip.

22  All the Exhibits are going to be pre-ruled on by the Court, in

23  the course of the Deposition Designation exchange.  And you're

24  not going to have a lot of refreshing recollection, because

25  it's going to be the deposition that's played.

1          Yeah, I recognize that the Court has discretion to

2   manage the events at trial, and to avoid duplication.  And

3   that's mostly what the Defendants' cases deal with.

4          They deal with cases where you had a witness that was

5   called, and then also video played.  And that's not what we

6   intend to do.

7          We intend to make a choice between live testimony and

8   video deposition testimony.  And if we use the video, we're not

9   going to have duplicate of live testimony for that

10  adverse witness.  We will just play the video deposition.

11          Now, the Defendants might choose, in their case, when

12  they put on their evidence, they may call that witness live.

13  And we had that happen in the Provigil trial in front of

14  Judge Goldberg, too.

15          We put on a witness by videotape, based on the

16  deposition that was taken during discovery.  We played, you

17  know, maybe 20 minutes of that deposition, of a high-level

18  Executive and one of the Defendants.  And then, the Defendant

19  called that witness live in his case.  And I would suspect that

20  that would be what would happen here.

21          But we don't think it's appropriate to just

22  categorically rule out that witnesses who qualify, under

23  Rule 32(a)(3), whose depositions can be used for any purposes,

24  should be ruled categorically not able to be presented by

25  deposition.  Thank you.

```
 1              MS. PAWELSKI:   Your Honor, just very, very briefly.

 2              THE COURT:   Go ahead.

 3              MS. PAWELSKI:   Your Honor, it's entirely appropriate

 4    to use your discretion to keep these depositions out of the

 5    trial.  And the Courts can't be clearer that you have complete

 6    discretion to do so.

 7              Moreover, Mr. Refsin is absolutely correct.  These

 8    are not only high-level company people.  These are primarily

 9    the Defendants who will either be in court, watching the trial,

10    because their businesses are at stake, or available upon very

11    short notice.  So they will either be here, or can certainly be

12    in court.

13              I think Mr. Refsin is trying to oversell the fact

14    that the events which happened a long time ago will not be

15    remembered by these people.  These people have been living this

16    case for 13 years.  And it is closest to them than anyone else,

17    than any of the Lawyers, anyone else, because they've been so

18    intimidated and scared about what's been happening.

19              And again, I think he's somewhat overselling the fact

20    that we will all come to an agreement on which portions of

21    these depositions will be played.  Remember, they're long,

22    rambling, discovery depositions, which Mr. DeStefano and I sat

23    through, years ago.  And they are fraught -

24              THE COURT:   You don't look -

25              MS. PAWELSKI:   - with -
```

```
 1              THE COURT:   - that old.

 2              MS. PAWELSKI:   Thank you.

 3              THE COURT:   Oh, again.  Sorry.

 4              MS. PAWELSKI:   Working with Mr. DeStefano has aged

 5   me more than otherwise.  But, they're long.  We haven't -

 6              THE COURT:   Yeah, me, too.

 7              MS. PAWELSKI:   - come to any agreement.  The

 8   exchange has been riddled with objections on both sides.  And I

 9   truly believe -

10              THE COURT:   Well, I'm going to -

11              MS. PAWELSKI:   - Your Honor -

12              THE COURT:   - tell you something.  I expect you to

13   sit down, talk about the depositions, and decide:  A, maybe

14   it's better to bring the person in, life; or, B, look at the

15   deposition, the video, and cut it down to its essentials.

16   That's it.  I don't want to have a jury sitting there through a

17   bunch of videotapes from 13 years ago.

18              MS. PAWELSKI:   Well, we don't think that's a good

19   idea, either.  We want them live.  If they're available, we

20   want them to come in, and we want the jury to hear them

21   testify, live.  We want the jury to see these people.

22              THE COURT:   Well, they're your people, aren't they,

23   most of them?

24              MS. PAWELSKI:   Absolutely.

25              THE COURT:   Yeah.
```

1          MS. PAWELSKI:   Yes.  They are.  They're all our

2    people, Your Honor, and we want them live.  They'll be here.

3    If Mr. Refsin tells me to bring them here on a certain day,

4    they'll be here.

5          THE COURT:   There you go.  Look at that.

6          MR. REFSIN:   And Your Honor, they're entitled to

7    present them live, if they want, in their case.  I mean, if

8    they come in, live, in their case, their testimony should be

9    limited.

10          Their cross examination should be narrowly limited to

11    the scope of the direct.  And it's likely they're going to have

12    to testify twice.

13          I think that our approach is really the much more

14    efficient way to deal with it.  It's not something that should

15    categorically be dealt with right now, in this Motion in

16    Limine.

17          THE COURT:   It's not going to be categorically dealt

18    with.  I expect you to deal with it, and come up with a

19    sensible solution.  All right?

20          MS. PAWELSKI:   Thank you, Your Honor.

21      (Asides)

22          THE COURT:   Now, Defendants, you want to make

23    argument about your Motion to Prohibit Reference to Settlements

24    with Settling Defendants, Except for Impeachment Purposes?

25    Well, I think that's pretty clear.  I mean, I don't -

```
1              MATTHEW BRUNELLI:   But, Your Honor -

2         THE COURT:   We're not going to talk about -

3         MR. BRUNELLI:   - I think you're right.

4         THE COURT:   - any amounts of settlement.

5         MR. BRUNELLI:   I'm sorry?

6         THE COURT:   We're not going to talk about any

7    amounts.

8         MR. BRUNELLI:   Well, I think it's possible.  I'm

9    sorry, Matthew Brunelli, also from Stevens & Lee.  Your Honor,

10   I think the issue of whether a Settlement Agreement contained a

11   Cooperation Clause -

12        THE COURT:   That's right.  That's good.

13        MR. BRUNELLI:   - as well as the amount of settlement

14   is relevant to this case and can be used to show bias.  And I

15   believe we briefed that issue for Your Honor.

16        THE COURT:   You did.

17        MR. BRUNELLI:   Okay.

18        THE COURT:   Response?

19        MR. REFSIN:   Yeah, I think that we agree.  I mean,

20   the Plaintiffs filed our own Motion to keep the Settlement

21   Agreements out.

22        So we agree that, at least initially, none of the

23   settlements with prior Defendants should come into evidence.

24   And we agree with Your Honor that the amounts of the

25   settlements should never come into evidence, because that's
```

1   clearly prejudicial.  It's also very ambiguous.  There are a

2   lot of reasons why a Party -

3         THE COURT:   Okay.

4         MR. REFSIN:   - could settle.

5         THE COURT:   I got your argument.

6         MR. REFSIN:   But the one thing I disagree a little

7   bit about is even the cooperation.  We think the Cooperation

8   Agreements are too ambiguous.  The only kind of evidence that -

9         THE COURT:   You know now, I don't have a problem

10   with -- if the Cooperation Agreements, that can be for bias.

11         MR. REFSIN:   Okay.

12         THE COURT:   I understand the argument.

13         MR. REFSIN:   All right.  Yeah, my argument is that

14   you have to have a direct financial interest for the settlement

15   to be admissible, and even to show bias that there's still a

16   lot of ambiguity -

17         THE COURT:   Well, if it's -

18         MR. REFSIN:   - even without a Cooperation Provision.

19         THE COURT:   - the witness' Company, he's got a

20   direct financial interest.

21         MR. REFSIN:   No.  Well, when I say direct financial

22   interest, I mean a direct financial interest in the outcome of

23   the trial.

24         Once there's a settlement, that witness doesn't have

25   an interest in the outcome, doesn't get money from the

1  settlement.  If his -

2          THE COURT:   Well, I understand -

3          MR. REFSIN:   - amount that he pays -

4          THE COURT:   - you argument.

5          MR. REFSIN:   - gets reduced to -

6          THE COURT:   I understand your argument, Mr. Refsin.

7          MR. REFSIN:   Thank you, Your Honor.

8          THE COURT:   Okay.

9          MR. BRUNELLI:   Your Honor, may I have one brief

10  moment?  I think, if I heard you correctly, you're of the

11  opinion that the amount of the settlement is not admissible?

12          THE COURT:   Right.

13          MR. BRUNELLI:   Okay.  Well, we did cite, within our

14  Brief, U.S. v. Bell Harbor International, Inc., a case out of

15  the D.C. Circuit, that actually says the opposite, that the

16  terms of the Settlement Agreement, including the amount, as

17  well, including the Cooperation Agreements, as well, would be

18  both admissible.

19          THE COURT:   I understand they could be both

20  admissible.  But I don't have to admit them.  I'm not mandated

21  to admit the amount.

22          MR. BRUNELLI:   I understand that you're not

23  mandated.  But we should not be precluded from offering that

24  information, if appropriate, during cross examination,

25  Your Honor, because -

```
 1              THE COURT:   Well -

 2              MR. BRUNELLI:   - it goes to the issue of bias.   We

 3  have -

 4              THE COURT:   - bias -

 5              MR. BRUNELLI:   Go ahead.

 6              THE COURT:   - goes to cooperation.   I understand

 7  that.   We're in agreement there.   The amount, to me, is

 8  irrelevant.

 9              MR. BRUNELLI:   Well, Your Honor, as of now, anyway,

10  we have two Companies that settled for relatively de minimis

11  amounts, that, within their Settlement Agreement -

12              THE COURT:   I don't know.

13              MR. BRUNELLI:   - it contains -

14              THE COURT:   I haven't seen any agreement.   I don't

15  know.   You're telling me that.

16              MR. BRUNELLI:   I'm telling you this.   Yes.   There

17  are two Defendants that have settled for, what I would suggest,

18  are relatively de minimis amounts.   And in their Settlement

19  Agreement, they have Cooperation Clauses.

20              THE COURT:   Okay.

21              MR. BRUNELLI:   On the other hand, we have a third

22  Defendant, who settled for a multi-million-dollar settlement,

23  who does not have a Cooperation Clause.   Your Honor, we think

24  that those facts, presented to a jury, could show bias.

25              THE COURT:   Okay, thank you.
```

```
 1              MR. REFSIN:   And I mean, Your Honor, that's exactly

 2    the kind of argument that's severely prejudicial to any

 3    Plaintiff.   There's no way for a jury to assess whether a

 4    settlement is de minimis.

 5              I mean, he just came up here and represented that

 6    they're de minimis.   He didn't tell you anything about that

 7    Defendant's ability to pay.

 8              He didn't tell anything about why the Defendant made

 9    that decision.   And it's a completely ambiguous type of

10    evidence, and a severely prejudicial kind of evidence, because

11    the jury might decide that those were the real wrongdoers, or

12    that those settlements are the real value of the case.

13              It's just a very ambiguous type of evidence, the

14    amount of a settlement.   You're going to have a mini-trial, if

15    you go down that road, about whether that's a de minimis

16    settlement, or a big settlement, and the reasons why it came

17    about.   And that's the kind of evidence that gets excluded,

18    under Rule 403.

19              THE COURT:   All right.

20              MR. GERSTEIN:   Your Honor, can I just say one thing

21    about that, because I think it's clearly relevant to this, is

22    the settlement that they're talking about, which is in front of

23    you now, deals with the issue of ability to pay and the most

24    favored nation, which we've discussed beforehand.

25              That goes to the heart of it.   That would mean that
```

1    we would have to bring in, for example, the Party with the most

2    favored nation to explain -

3          THE COURT:   I understand -

4          MR. GERSTEIN:   - that they waived that.

5          THE COURT:   - all that.  You heard -

6          MR. GERSTEIN:   Okay.

7          THE COURT:   - what I had to say about this.  Okay.

8       (Asides)

9          THE COURT:   Now, as to trial procedure, I think we

10   all agreed, but I'll go over it.  At the last status conference

11   in February, I let you know some of my trial procedures.

12          But, as a reminder, it will be an eight-person jury.

13   I've decided that four alternates should be sufficient.  Anyone

14   have a problem with that?  No?  Okay.

15          I will conduct voir dire, but will give you an

16   opportunity to ask additional questions at sidebar, with a

17   particular prospective juror.  In other words, if someone

18   raises their hand in response to a question, I bring them up to

19   sidebar.

20          Counsel will be there, with that particular

21   prospective juror.  And you can ask additional questions.  If

22   you have an objection to that juror for cause, you should make

23   that objection for cause at that point.

24          Thereafter, you can exercise your peremptory strikes.

25   But if you don't make the challenge for cause then and there,

1  that juror's going to be back with the group.  And you may have

2  to use your peremptories.

3           Each side will have five peremptory strikes.  We will

4  sit from 9:30 to 4:30 each day, with an hour lunchbreak and a

5  short break in the morning, and a short break in the afternoon.

6           Each side is going to have 12 trial days.  And as I

7  told you at the last status conference, you can figure out how

8  to manage that, yourselves.  Do you have any issues you want to

9  raise with me now about that, at this time?  No?

10          Each side will have 45 minutes to present opening

11  statements.  Now, for the Defendants, I would like to have one

12  primary opening statement.

13          However, I recognize that not all the Defendants

14  share the same Counsel.  To the extent that Counsel for any

15  individual Defendant would like to present opening statements,

16  I expect them to be very brief, and to address issues that are

17  specific to that Defendant, not to rehash what the primary

18  Defense opening covers.  Does anyone have a problem with that,

19  or a question?

20          As a final matter, I would like to have a final

21  pretrial conference in the morning of trial.  We will begin at

22  8:30 a.m. on May 20th in this courtroom.

23          Now, I understand you are all continuing to work

24  through the Defendants who are still in the case, as we move

25  into the trial.  And I expect you will continue to provide the

1   Court with updates of any dismissals, or settlements, that you

2   will make appropriate filings, so that we can keep the Docket

3   in order.

4           I received Defendants' Motion to Amend the Scheduling

5   Order based on Defendant's Concerns about Disclosing Its

6   Potential Bases for Motions for Judgment, as a Matter of Law.

7   Does the Plaintiff have a position on this?

8           MR. REFSIN:   Yeah, Your Honor.  Well, we don't know

9   whether you want us to respond to that.  I mean, our position

10  is that Your Honor has your procedures for Pretrial Orders.

11  And we will live with Your Honor's procedures.

12          We don't see it as an issue about work product.  I

13  mean, people identify their legal theories all the time in

14  Pretrial Orders.

15          There's no such thing as trial by ambush.  We don't

16  think it's a work product issue.  But we will do what

17  Your Honor wants to do with -

18          THE COURT:   Okay.

19          MR. REFSIN:   - pretrial issues.

20          THE COURT:   All right.

21          MR. REFSIN:   And if Your Honor wants us to respond

22  formally, of course, we will do that.

23          THE COURT:   You don't have to.  I understand what

24  you're saying.  Now, based on the Pretrial Scheduling Order, I

25  know that today is the deadline for you to exchange Reply

1  Deposition Designations and Objections to Deposition

2  Designations.

3          I'm assuming I'm going to have that.  To the extent

4  that you have objections, you can submit them to me within a

5  week.  And I will rule on them shortly thereafter, so you have

6  time to edit any videotaped deposition accordingly.  Does

7  anyone have any designated deposition testimony that you intend

8  to introduce near the beginning of trial?

9          MR. KELLY:  Your Honor, Andrew Kelly, on behalf of

10  the Class Plaintiffs.  I would suspect, based on the procedures

11  the Court has outlined, that we may play deposition testimony

12  as soon as the second day of the trial.

13          THE COURT:  Okay.

14          MR. KELLY:  And I was unclear on whether you were

15  suggesting that Designations should come to you within a week

16  of today or -

17          THE COURT:  Of today.

18          MR. KELLY:  - within a week of when they're to be

19  played.

20          THE COURT:  Of today.

21          MR. KELLY:  Within a week of today, we should -

22          THE COURT:  Yeah.

23          MR. KELLY:  - submit a designated -

24          THE COURT:  Right.

25          MR. KELLY:  - package with -

```
 1              THE COURT:   That'll give me time -

 2              MR. KELLY:    - objections.

 3              THE COURT:   - to look at that.  And if I have to

 4    have a meeting with you, before trial, we have time to do it.

 5              MR. KELLY:   Yes, sir.

 6         (Asides)

 7              THE COURT:   If you have an Attorney that is going to

 8    read deposition into the record, I don't have a problem with

 9    that.  I usually allow that.  But you got to let me know and

10    let the other side know.

11              MR. KELLY:   Your Honor, if I could address the

12    Designation issue one more time?

13              THE COURT:   Yeah.

14              MR. KELLY:   One issue that's been discussed a few

15    times, during the Motions in Limine this morning, are issues

16    relating to evidence that should be precluded.  Of course,

17    that's what the Motions in Limine were all about.

18              And what we have done is assumed, you know, the

19    worst, in terms of what your Rulings would be, and, thus,

20    over-designated.  So, as a result of the Rulings on the Motions

21    in Limine, and other issues that have arisen, we will be

22    slashing the designated testimony dramatically.

23              I'm not sure if having it to you a week from today is

24    really plausible for us, because we don't know yet, if, for

25    example, any of the testimony about Lawyers, or
```

 1   Capper-Volstead, or any of that has to be slashed out -

 2             THE COURT:   All right.

 3             MR. KELLY:   - or left in.

 4             THE COURT:   How about seven days after I issue my

 5   Rulings on the Motions -

 6             MR. KELLY:   Fair enough -

 7             THE COURT:   - in Limine?

 8             MR. KELLY:   - Your Honor.

 9             THE COURT:   All right?

10             MR. KELLY:   We will do our absolute best.  Yes, sir.

11             THE COURT:   Now, while I've, of course, familiarized

12   myself with this case, since it was transferred to me, it would

13   be helpful for me to understand the facts that remain in the

14   dispute, prior to the start of trial, especially because the

15   Parties never filed the routine Motions for Summary Judgment.

16   We never got those.  So, I don't know what issues you still

17   think are part of this case.

18             As for the Summary of Applicable Law, I know that

19   your Proposed Jury Instructions will also cover this.  However,

20   a short summary of the elements that must be proven for each of

21   the remaining Claims, including what must be proven for

22   Class Members to recover against each of the Defendants, would

23   be helpful.

24             For example, I understand there must be a showing at

25   trial with respect to some of the Illinois Brick Exceptions.  A

1     Summary of the Applicable Law would be instructive.  Are there

2     any other issues you'd like to raise at this time?

3         (Asides)

4             MR. KELLY:   Yes, Your Honor.  I had a couple of

5     mechanical questions.  In terms of Exhibits, will there be a

6     time when the Court rules on Exhibit objections in advance of

7     trial?  Or how does your process work -

8             THE COURT:   Normally, what I do -- first of all, you

9     should exchange all Exhibits ahead of time.

10            MR. KELLY:   Sure.

11            THE COURT:   And give the Court a list of all the

12    Exhibits you intend to introduce at trial.  After the trial

13    starts, you introduce your Exhibits.  And by the way, if you

14    have a problem with any of the Exhibits, I want to get that

15    straightened out before trial.

16            I don't want any argument during trial about a

17    specific Exhibit.  I will have ruled on that before that.  So,

18    if you have a problem with intended Exhibits, I have to know

19    before trial starts.

20            MR. KELLY:   Seven days, sir?

21            THE COURT:   Okay.

22            MR. KELLY:   Okay.

23            MR. REFSIN:   Your Honor, is that for all Exhibits

24    before trial, or before a witness -

25            THE COURT:   All Exhibits.

1        MR. REFSIN:   - would -

2        THE COURT:   All Exhibits.

3        MR. REFSIN:   Okay, not before a particular witness

4   goes up; you want to do them -

5        THE COURT:   No, all Exhibits; now, what I'll do is,

6   after I've ruled on all those objections to the Exhibits, the

7   trial will start.  And that way, during the trial, the Exhibits

8   will come in.

9        There won't be any fights.  There won't be any

10  arguments.  And when Plaintiff rests, you move for the

11  admission of all your Exhibits, after you rest.  We don't do it

12  piecemeal.

13       Same things with Defendants, wait until the end of

14  your case, then move for the admission of all your Exhibits at

15  one time.  Now, by that time, since you've already had Rulings

16  on all the Exhibits, there shouldn't be much of a debate.  Does

17  that answer your question?

18       MR. KELLY:   Yes, sir.

19       THE COURT:   Okay.  Any other questions?

20       MR. REFSIN:   What's your practice with respect to

21  whether the admitted Exhibits go back with the jury?

22       THE COURT:   Say that again.  Oh.

23       MR. REFSIN:   Do -

24       THE COURT:   I usually tell the jurors, if there is a

25  particular Exhibit they want to see, they send a note through

1  my Deputy Clerk here.  And he brings it out.

2        We discuss it, the Lawyers and I, in open court, to

3  see whether there's an objection to the jurors getting that

4  particular Exhibit.  If there's no objection, then I send the

5  Exhibit back.  I've found that it's much easier to do it that

6  way than load the jurors down with 30 or 40, or 400 Exhibits.

7        MS. ALBANI:   Your Honor?

8        THE COURT:   Yes, ma'am.

9        MS. ALBANI:   Yeah, we have an issue here.  We were

10  advised, before the hearing this morning, that the

11  Class Plaintiffs had settled with the Named Defendants, and

12  that they had contacted Your Honor to let you know that.  The

13  problem -

14        THE COURT:   All right.  Is this -

15        MS. ALBANI:   - that we have is that -

16        THE COURT:   Are you asking me -

17        MS. ALBANI:   - if this goes -

18        THE COURT:   Didn't you -

19        MS. ALBANI:   No, this was separate.

20        THE COURT:   I thought you -

21        MS. ALBANI:   But we -

22        THE COURT:   - raised this before we started.

23        MS. ALBANI:   Well, it's a little different.  They're

24  acting as though -

25        THE COURT:   Oh.

```
 1              MS. ALBANI:   - there has been no settlement.  Now,

 2   if there is a settlement -

 3              THE COURT:   I don't have a settlement.

 4              MS. ALBANI:   - we're not privy to this.

 5              THE COURT:   I have not received word that they have

 6   a settlement.

 7              MS. ALBANI:   Okay.

 8              THE COURT:   I know they'd talked about it.  But I

 9   don't know that -

10              MS. ALBANI:   Well -

11              THE COURT:   - anything happened.

12              MS. ALBANI:   - Mr. DeStefano advised me, coming up

13   today, that a settlement had been reached, and maybe we should

14   try for a September trial date.  So, I'm a little at a loss,

15   because I just found this out, as to how their Clients -

16              THE COURT:   The only one who would know if there was

17   a settlement, of course, is them, and me.  But I don't have

18   word that there's a settlement.

19              MS. ALBANI:   Okay.  This is -

20              THE COURT:   I was told -

21              MS. ALBANI:   - what I'm told.

22              THE COURT:   - that there isn't a settlement yet.

23              MS. ALBANI:   Okay.  Yeah, Your Honor, we're -

24              THE COURT:   I wish there were.

25              MS. ALBANI:   - in the dark here.
```

```
 1            THE COURT:   But there isn't.

 2            MS. ALBANI:   We're in the dark.  And if there is a

 3   settlement, then we would definitely need more time, because

 4   we'd have to sort out the issues of how we could get their

 5   Clients to attend the trial, in addition to ours.  We know we

 6   will be here.  But if there are Defendants that are not

 7   attending the trial, we need to know that.

 8            THE COURT:   I understand that.

 9            MS. ALBANI:   We really need to know that.  It's just

10   a matter of practicality and prejudice.

11            THE COURT:   Well -

12            MS. ALBANI:   So -

13            THE COURT:   - at this moment -

14            MS. ALBANI:   - we'd be -

15            THE COURT:   - there is no settlement.

16            MS. ALBANI:   Okay.

17            THE COURT:   If there is -

18            MS. ALBANI:   Okay.  Mr. DeStefano -

19            THE COURT:   - you better get it to me.

20            MS. ALBANI:   - can speak to me as to why he advised

21   me this morning, before the hearing, that there was a

22   settlement.

23            MR. RODGERS:   Your Honor, if a settlement is

24   reached, then I assume it might be appropriate, then, to reach

25   back to you to talk about adjustments in the schedule, etc.
```

```
1              THE COURT:   Yeah, we can have the trial sooner.

2              MR. RODGERS:   Well, it certainly would be a

3    different trial.  Thank you, Your Honor.

4              MR. REFSIN:   And Your Honor, going back to the

5    mechanics of Exhibits, I mean, usually Exhibits can't be shown

6    to the jury until it's admitted into evidence.  What's your

7    procedure with showing the Exhibits -

8              THE COURT:   Oh.

9              MR. REFSIN:   - to the jury?

10             THE COURT:   When you want to introduce an Exhibit

11   that we've already agreed is okay, during presenting your case,

12   you can -

13             MR. REFSIN:   Okay.  So, because you've ruled on any

14   objections beforehand, anything that you've ruled on already

15   can be shown to the jury, without any -

16             THE COURT:   Yes.

17             MR. REFSIN:   - further -

18             THE COURT:   Yeah.

19             MR. REFSIN:   Thank you.

20             THE COURT:   You're going to stand up and say, well,

21   this Exhibit here is -- and you'll show it to them.

22        (Asides)

23             THE COURT:   Anything else?

24             MR. KELLY:   Your Honor, the last mechanical question

25   would be regarding the use of demonstratives in opening
```

```
 1   statements:  permitted or not permitted?

 2           THE COURT:   I permit it.  What are you talking

 3   about?  A chart, a board, or -

 4           MR. KELLY:   Exactly, that -

 5           THE COURT:   That's fine.

 6           MR. KELLY:   Okay.

 7           THE COURT:   But you got to show it to the other

 8   side, beforehand.

 9           MR. KELLY:   Yes, Your Honor.

10           THE COURT:   Okay?

11           MR. KELLY:   I'm certain we can work out a timing and

12   schedule -

13           THE COURT:   Okay.

14           MR. KELLY:   - for the exchange of those with the

15   Defendants.

16           THE COURT:   All right.  Now, if anyone, you need to

17   set the courtroom up before trial, you got to let my office

18   know, so we can make arrangements for you to come into the

19   courtroom, a day before, or two days before.  And set up

20   whatever you have to set up.

21           MR. KELLY:   Thank you, Your Honor.  Our Tech People,

22   for the respective Parties, have been in touch.  And they have

23   been in touch with Courtroom Staff, and -

24           THE COURT:   Oh, good.  Okay.

25           MR. KELLY:   - those discussions are ongoing right
```

```
 1   now.

 2              THE COURT:   Great; okay.

 3              MR. KELLY:   Your Honor, I also wanted to just state

 4   for the record, because we have advised Mr. DeStefano of this

 5   some weeks ago, on behalf of all Defendants at that time, was

 6   that we are not pursuing Section 2 and Section 7 -- Clayton Act

 7   Section 7, aspects of our Claim.  We're going with the

 8   straightforward Section 1, price-fixing allegations.

 9              THE COURT:   There you go.  You've just cut down a

10   length of the trial.  See that?

11              MR. DESTEFANO:   That's it?

12              MR. KELLY:   Yeah, it's Section 1, price fixing and

13   supply control.  We're not seeking relief under Section 2, or

14   Clayton Act Section 7.

15              THE COURT:   All right.  Okay.

16              MR. KELLY:   All right.

17              THE COURT:   Anything else?  All right.  Have a nice

18   weekend, everybody.

19              MR. BORGER:   Thank you, Your Honor.

20              MR. GERSTEIN:   Thank you, Your Honor.

21              MR. MONTAGUE:   Thank you, Your Honor.

22         (Proceedings concluded at 11:01 a.m.)

23

24

25
```

# C E R T I F I C A T I O N

I, <u>VICTORIA O'CONNOR</u>, court-approved transcriber,
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.


*Victoria O'Connor*
_____          _____
        Victoria O'Connor                        04/29/19
                                                 Date

O'CONNOR LEGAL, MEDICAL & MEDIA SERVICES LLC
603.865.1255 • 888.524.5596
www.oconnorlmms.com