**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.*, | : | **No. 15-6480** |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **IN RE MUSHROOM DIRECT** | : | **No. 06-0620** |
| **PURCHASER ANTITRUST** | : | |
| **LITIGATION** | : | |

## MEMORANDUM

**Schiller, J.**                                                                **September 1, 2020**

      Bi-Lo Holdings, LLC. has sued Defendants in this case, alleging that they violated antitrust law by conspiring to raise the price of fresh agaricus mushrooms. Defendants collectively and Defendant-Creekside individually have moved for summary judgment against Bi-Lo, claiming that Bi-Lo lacks antitrust standing to pursue its claims for damages. Bi-Lo, for its part, has asked the Court for additional time to take discovery on the issues raised in these motions. Bi-Lo also seeks to remove claims assigned to it by C&S Wholesale Grocers from the purview of the class of direct purchasers certified in the related case of *In Re Mushroom Antitrust Litigation*, of which C&S was a member. For the following reasons, the Court will deny Bi-Lo's request for additional time for discovery, grant summary judgment to Defendants and Creekside on Bi-Lo's claims for damages, deny summary judgment on Bi-Lo's claim for injunctive relief, and deny Bi-Lo leave to remove claims from the class action settlement.

1

## I.    BACKGROUND[1]

### A.    Factual Background

Bi-Lo has accused the Eastern Mushroom Marketing Cooperative, its members, and various affiliates of unlawfully colluding to inflate the price of fresh agaricus mushrooms. The instant motions, however, do not deal with whether or not antitrust laws were violated. Instead, they concern a threshold question: can Bi-Lo even maintain an action against Defendants for antitrust damages? The Court finds that it cannot.

The facts relevant to what is presently before this Court can be stated in three sentences. There is no evidence Bi-Lo bought mushrooms from any Defendant or any other party accused of violating antitrust law.[2] Rather, "Bi-Lo entered into a supply agreement on December 22, 2004, to purchase all of its requirements for certain items, including mushrooms, from its vendors through [non-defendant] C&S [Wholesale Grocers]."[3]  (Pl.'s Facts, 6-7.) C&S began supplying Bi-Lo with mushrooms in 2005. (Pl.'s Facts, Ex. 2 at ¶¶ 2.1, 2.2.)

### B.    Procedural Background

This case is one of a related series of actions dealing with alleged price fixing and collusion in the market for fresh agaricus mushrooms. It all began in February 2006, when WM Rosenstein & Sons Co. filed a class action complaint, alleging that various players in the mushroom industry colluded to inflate the price of mushrooms by agreeing on minimum prices and by

---

[1] Unless otherwise specified, citations to the filings in this case refer to the docket in *Winn-Dixie et al. v. EMMC* (docket no. 15-6480).

[2] For the sake of completeness, the Court notes that in an interrogatory answer, Bi-Lo's counsel states that "[o]n information and belief, Bi-Lo purchased mushrooms directly from Monterey . . . ." (Pl. Bi-Lo Holdings, LLC's Resp. to Def. Statement of Undisputed Facts and Pls.' Additional Statement of Undisputed Material Facts in Opp. To Defs.' Mot. for Summ. J. [Pl.'s Facts], Ex. 1 at 9.) As the Court will explain later, this does not create a factual controversy.

[3] C&S "is not a defendant in this case, nor is it alleged to be a co-conspirator of the defendants." (Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J. Against Pl. Bi-Lo Holdings, LLC. [Defs.' Facts], ¶ 1.)

decommissioning various mushroom farms in order to reduce mushroom supply. That complaint was later consolidated with six similar class actions, and a consolidated class action complaint was filed on November 13, 2007.

On December 7, 2015, Bi-Lo, along with co-plaintiff Winn-Dixie, initiated this action. Their complaint was similar in all meaningful respects to the ones that preceded it. In the Complaint, Bi-Lo stated that "Plaintiff purchased Agaricus mushrooms directly from one or more Defendants." (Compl. ¶ 13.) On January 22, 2019, Bi-Lo filed an Amended Complaint that alleged the same. (First Am. Compl. ¶ 19.)

In the consolidated class action, the Court certified a class of direct purchasers on November 22, 2016. *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158 (E.D. Pa. 2016). On February 14, 2018, the Court granted preliminary approval for a settlement between Defendants Creekside and Kitchen Pride and the class, and on March 14, 2018, the Court granted preliminary approval for a settlement between Georgi and the class. On March 22, 2018, the Court approved the form of Notice to class members, notifying them that if they wished to be excluded from the class, and by extension the settlements, they needed to opt out by July 28, 2018. The only opt-outs were Winn-Dixie, Bi-Lo, Publix, and Giant Eagle—C&S remained in the class. The Court granted final approval of the settlement between class members and Creekside, Kitchen Pride, and Giorgi on December 17, 2018, entering final judgment on the class' claims against those defendants.

On June 28, 2019—nearly a year after C&S declined to opt out of the class—C&S and Bi-Lo entered into an "Agreement for Assignment of Antitrust Claims". (Pl.'s Facts, Ex. 3 at 1.) The agreement defined "Antitrust Claims" as

C&S's rights, title, and interest in (and to) all claims and causes of action that C&S

may have under the antitrust or similar laws of the United States or any State thereof, including consumer protection, deceptive trade practice, unfair competition law claims, and causes of action, arising out of or relating to C&S's purchase of Disputed Products from any of the Defendants that C&S sold to SEG during the Relevant Time Periods referenced in Schedule B. The Antitrust Claims are set forth in Schedule B. For the avoidance of doubt, the Antitrust Claims do not include, and this Agreement will not apply to, any claims or causes of action related to C&S's sale of Disputed Products to any person or entity other than SEG.

(*Id*. at ¶ 3(a).)[4]  In relevant part, the agreement states:

> Upon the Effective Date of this Agreement, C&S, for good and valuable consideration and without any further action by any Party, shall be deemed to have absolutely, unconditionally and irrevocably sold, transferred, assigned, and conveyed unto SEG all of its rights, title and interest in, to, and under the Antitrust Claims.
>
> …
>
> C&S shall retain all rights, title and interest in (and to) any and all antitrust or other legal claims arising out of, or pertaining to, Disputed Products not purchased by SEG from C&S, regardless of whether or not any such clams are asserted in any of the Antitrust Class Actions, or against a Defendant.

---

[4] "Schedule B" reads in relevant part:

Mushrooms:

The complaint filed by Winn-Dixie Stores, Inc. and Bi-Lo Holding LLC (the "Complaint"), consolidated in the Multidistrict Litigation pending in the United States District Court for the Eastern District of Pennsylvania styled *In Re: Mushrooms Antitrust Litigation*, MDL No. 06-0620 (E.D.Pa) ("MDL No. 620") against certain third-party manufacturers and suppliers that are or at any time will be named as defendants in the Complaint, including without limitation, any amended Complaints, including, without limitation, the following:   Eastern Mushroom Marketing Cooperative, Inc., Robert A. Feranto, Jr. t/a Bella Mushroom Farms, Brownstone Mushroom Farms, Inc., To-jo Fresh Mushrooms, Inc., Cardile Mushrooms, Inc., Cardile Bros. Mushrooms Packaging, Country Fresh Mushroom Co., Forest Mushrooms Inc., Franklin Farms, Inc., Gino Gaspari & Sons, Inc., Gaspari Bros. Inc., Giorgi Mushroom Company, Giorgio Foods, Inc., Kaolin Mushroom Farms, Inc., South Mill Mushroom Sales, Inc., LRP Mushrooms Inc., LRP-M Mushrooms LLC, Leone Pizzini and Son,  Inc., Modern Mushroom Farms, Inc., Sher-Rocke Mushroom Farm, C & C Carriage Mushroom Co., Oakshire Mushroom Farm, Inc., Phillip Mushroom Farms, Inc., Harvest Fresh Farms, Inc., Louis M. Marson, Jr., Inc., Mario Cutone Mushroom Co., Inc., M.D. Basciani & Sons, Inc., Monterey Mushrooms, Inc., Masha & Toto, Inc. T/a M & T Mushrooms, W & P Mushroom Inc., Mushroom Alliance, Inc., Creekside Mushrooms Ltd., J-M Farms, Inc., United Mushroom Farms Cooperative, Inc., John Pia and Michael Pia, and their respective domestic and foreign parents, subsidiaries, affiliates, predecessors, successors and assigns (together with any defendant added to the Complaint, including without limitation, any amended Complaints, collectively, the "Defendants"), wherein damages are sought for the alleged antitrust law violations in connection with purchases of Mushrooms, from at least January 1, 2001 to the date of the final, non-appealable resolution of Complaint, including without limitation, any amended Complaints, manufactured, supplied or produced by Defendants.

(Pl.'s Facts, Ex. 3, at Schedule B).

(*Id.* at ¶¶ 7, 9.)

The assignment was brought to the attention of (at least some) Defendants a month later. On July 18, 2019, Bi-Lo and Winn-Dixie moved this Court to consolidate their case for trial with opt outs Publix and Giant Eagle. On July 25, 2019, Giorgi filed a memorandum in opposition, in which it argued, among other things, that "[a] key question in the *Winn-Dixie* matter . . . will be whether Winn-Dixie Plaintiffs directly purchased fresh agaricus mushrooms from the Eastern Mushroom Marketing Collective or any of its members." (Giorgi's Mem. of Law in Opp. to Winn-Dixie Pls.' Mot. to Consolidate Their Opt-Out Claims, at 5, *In Re: Mushroom Direct Purchaser Antitrust Litig.*, 6-620, E.C.F. No. 1052 (E.D. Pa. July 25, 2019).) By way of rebuttal, Bi-Lo produced the agreement assigning C&S's antitrust claims to Bi-Lo—first in an email with counsel for Certain Defendants and Giorgi, (Pl.'s Facts, Ex. 4), and then as an exhibit to its reply to Giorgi's response. (Winn-Dixie Pls.' Reply Mem. in Supp. of Their Mot. to Consolidate Their Opt-Out Claims for Trial with the Related Publix and Giant Eagle Opt-Out Claims, at Ex. 3, *In Re: Mushroom Direct Purchaser Antitrust Litig.*, 6-620, E.C.F. No. 1057 (E.D. Pa. July 29, 2019).)

On August 19, 2019, the Court granted preliminary approval of a settlement between the class and the remaining Defendants,[5] giving any class member until October 25, 2019 to object. No objections came, and the Court granted final approval of the settlement on January 9, 2020,

---

[5] The settlement included the following Defendants: Cardile Mushrooms, Inc., Cardile Brothers Mushroom Packaging, Inc., J-M Farms, Inc., Mushroom Alliance, Inc., Franklin Organic Mushroom Farms, Mario Cutone Mushroom Co., Inc., M.D. Basciani & Sons, Inc., Eastern Mushroom Marketing Cooperative, Inc., Robert A. Ferranto, Jr. t/a Bella Mushroom Farms, Brownstone Mushroom Farms, To-Jo Fresh Mushrooms, Inc., Country Fresh Mushroom Co., Gino Gaspari & Sons, Inc., GaspariMushroom Co., Inc., Kaolin Mushroom Farms, Inc., South Mill Mushroom Sales, Inc., Modern Mushroom Farms, Inc., Sher-Rockee Mushroom Farm, LLC, C&C Carriage Mushroom Co., Phillips Mushroom Farms, Inc., Louis M. Marson, Jr., Inc., Monterey Mushrooms, Inc., Forest Mushroom, Inc., Harvest Fresh Farms, Inc., Leone Pizzini and Son, Inc., LRP-M Mushrooms LLC, United Farm Cooperative, Inc., Masha & Toto, Inc., t/a as M&T Mushrooms, Oakshire Mushroom Farm, Inc., W&P Mushroom, Inc., and John Pia.

entering final judgment on the class' claims that same day.

Now before this Court are four interrelated motions. First, all Defendants[6] have moved for summary judgment, arguing that under the bar to antitrust damage actions by indirect purchasers outlined in the Supreme Court's opinion in *Illinois Brick v. Illinois*, Bi-Lo cannot maintain an action for damages because it did not purchase mushrooms directly from an alleged conspirator. Defendants further claim that the fact that C&S assigned its antitrust claims to Bi-Lo does not change this equation because the assignment occurred after C&S failed to opt out of the class, and thus the assignment did not convey to Bi-Lo the right to pursue damage claims outside the class action. Second, Defendant Creekside moves separately for summary judgment, reiterating Defendants' arguments about the implications of Bi-Lo's indirect purchaser status, but adding that C&S could not have assigned antitrust claims against Creekside to Bi-Lo because Creekside had settled with the class prior to the assignment. Third, Bi-Lo, along with its opposition to the merits of Defendants' and Creekside's motion, has requested additional discovery on the issue of its indirect purchaser status pursuant to Rule 56(d). Finally, Bi-Lo has moved for leave to exclude the claims assigned to it by C&S from the direct purchaser class.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts

---

[6] For clarity, the motion was made by Franklin Organic Mushrooms, Inc., Eastern Mushroom Marketing Cooperative, Inc. ("EMMC"), Robert A. Ferranto, Jr., t/a Bella Mushroom, Farms, Brownstone Mushroom Farms, Inc., To-Jo Fresh Mushrooms, Inc., Country Fresh Mushroom Co., Gino Gaspari & Sons, Inc., Gaspari Mushroom Co., Giorgi Mushroom Company, Giorgio Foods, Inc., Kaolin Mushroom Farms, Inc., South Mill Mushroom Sales, Inc., Modern Mushroom Farms, Inc., Sher-rockee Mushroom Farm, LLC, C&C Carriage Mushroom Co., Oakshire Mushroom Farm, Inc., Phillips Mushroom Farms, Inc., Louis M. Marson, Jr., Inc., Monterey Mushrooms, Inc., John Pia, Michael Pia, Forest Mushrooms, Inc, Mario Cutone Mushrooms Co., Inc., and M.D. Basciani & Sons, Inc. It was later joined by Creekside, United Mushroom Farm Cooperative, J-M Farms, Mushroom Alliance, and Cardile Mushrooms.

are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Reves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

## III.   DISCUSSION

### A.   Bi-Lo's Request for Additional Discovery Under Rule 56(d)

First, the Court must decide whether to evaluate the summary judgment motions now or later. Pursuant to Rule 56(d), Bi-Lo has requested more time to take discovery on issues relevant to Defendants' motion. (Pl.'s Rule 56(d) Decl., E.C.F. No. 273.) The Court has already explained that Bi-Lo is not entitled to additional discovery under 56(d) in its Order of June 4, 2020. It did so after considering a Rule 56(d) declaration virtually identical to the one presented here. Bi-Lo's current Rule 56(d) declaration contains no information that might upset the Court's previous reasoning. *Compare* (Pl.'s Rule 56(d) Decl.) *with* (Pl.'s Resp. in Opp. to Defs.' Mot. For Leave To File Sur-Reply & Pl.'s Cross Mot., in the Alternative, for Leave to File a Resp. to Defs.' Proposed Sur-Reply, Ex. 1, E.C.F. No. 249). Bi-Lo's request for additional discovery is denied.

**B.      Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on the grounds that there is no genuine dispute of material fact that Bi-Lo cannot maintain claims for damages in this action. Defendants reason that: (1) Bi-Lo lacks standing to sue Defendants for antitrust damages based on its own purchase of mushrooms; and (2) Bi-Lo's claims assigned to it by C&S were settled and dismissed as part of the settlement of the class action. For the following reasons, the Court agrees.

**1.      Bi-Lo's Antitrust Standing Based on Its Own Purchases of Mushrooms**

Defendants argue that there is no dispute of material fact that Bi-Lo does not have antitrust standing on the basis of its own purchase of allegedly overpriced mushrooms. They argue that there is no evidence Bi-Lo ever purchased mushrooms from an alleged conspirator, and therefore this action is barred by the rule forbidding antitrust damage actions by parties who do not directly purchase goods from the alleged antitrust violators. The Court agrees.

**a.      The Bar to Antitrust Damage Actions by Indirect Purchasers**

"Since the Supreme Court's 1977 decision in *Illinois Brick Co. v. Illinois*, courts have generally refused to allow damage actions under the federal antitrust laws by 'indirect' purchasers—those who bought an illegally monopolized or cartelized product or service through the agency of a dealer, distributor, or some other independent reseller who was not a participant in the antitrust violation." Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L. Rev. 1717, 1717 (1990). The Supreme Court has developed this rule over the course of four cases.

First, in *Hanover Shoe Inc. v. United Shoe March Corp.*, the Court rejected the proposition that an antitrust defendant could avoid liability by arguing that plaintiffs had "passed on"[7] the

---

[7] "In general, '[p]assing on describes the action of an overcharged buyer who passes the extra expense on to those

8

increase in price caused by its antitrust violations to downstream purchasers. 392 U.S. 481, 489-91 (1968). In *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), the Court took the next logical step, finding that indirect purchasers of products that were overpriced as a result of antitrust violations could not sue for damages stemming from any overcharge that had been passed downstream to them. First, "[t]he Court found that permitting the offensive use of the pass-on theory without the defensive use (prohibited in *Hanover Shoe*) would 'create a serious risk of multiple liability for defendants,' since defendants could be sued by indirect purchasers and direct purchasers." *Warren Gen. Hosp.*, 643 F.3d at 85 (quoting *Illinois Brick*, 431 U.S. at 730). Second, the Court determined that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick*, 431 U.S. at 735. Finally, the Court found that requiring courts to "trace the complex economic adjustments to a change in the cost of a particular factor of production"—as would be required to determine an indirect-purchaser plaintiff's damages stemming from overcharge to the direct purchaser—"would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings . . . ." *Id*. at 732. In its analysis, the Court stressed that it was particularly keen to avoid situations where "the overcharge would have to be apportioned among the relevant wholesalers, retailers, and other middlemen . . . ." *Id*. at 740.

Over the next 42 years, the Court twice reaffirmed *Illinois Brick*'s bar to damage actions by indirect purchasers. In *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), the Court held that the bar to damage lawsuits by indirect purchasers applied even when direct purchasers were

---

who buy from him.'" *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 85 n.9 (3d Cir. 2011) (quoting *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 16 n.4 (3d Cir. 1978)).

required by law or regulation to pass on all of the overcharge to downstream purchasers. The Court reasoned that even if a direct purchaser passed on 100% of the overcharge to an indirect purchaser, the direct purchaser may still have suffered antitrust damages in a situations where it could have raised its prices absent the overcharge, or where there was a delay between the increase in defendants' price and the increase in the direct purchasers' price. *Id*. at 209-11. As a result, the damages from any overcharge would still have to be apportioned between direct and indirect purchasers—the calculation *Illinois Brick* was designed to preclude.

Then, in *Apple Inc. v. Pepper*, 139 S.Ct. 1514 (2019), the Court clarified that *Illinois Brick* outlined a bright-line rule that applied *whenever* a plaintiff was two or more steps in the production chain removed from an antitrust violator. It rejected the argument that, when the antitrust violator is not the entity that set the price of the product, the policy concerns underlying *Illinois Brick* were best served by barring litigation by parties two or more steps removed from the price setter rather than the antitrust violator. The Court reasoned, "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Id.* at 1524 (quoting *UtiliCorp*, 497 U.S. at 216).

The combined effect of the four major indirect-purchaser cases is a single bright-line rule: "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Id*. at 1521.

### b.      Bi-Lo's Antitrust Standing Under *Illinois Brick*

Under the *Illinois Brick* line of cases, Bi-Lo has antitrust standing if it either: (1) purchased overpriced mushrooms directly from an antitrust violator; or (2) falls into one of the limited exceptions to the bar on suits by indirect purchasers. The Court finds that, as a matter of law, neither is the case here.

### i.       Bi-Lo Is Not A Direct Purchaser

Bi-Lo is not a direct purchaser of mushrooms allegedly overpriced due to Defendants' violation of antitrust law. The only evidence Bi-Lo proffers to show that it bought mushrooms from an alleged antitrust violator is its own unverified answer to an interrogatory. The answer states that "[o]n information and belief, Bi-Lo purchased mushrooms directly from [Defendant] Monterey . . . ." (Pl.'s Facts, Ex. 1 at 9.) That is insufficient to create a genuine dispute of material fact as to whether Bi-Lo is a direct purchaser.

"[W]here a party offers its own answers to interrogatories in opposition to a motion for summary judgment which is supported by affidavits, such answers must (1) be based upon the personal knowledge of the person supplying the answers; (2) set forth facts which would be admissible in evidence; and (3) affirmatively demonstrate that the person supplying the information is competent to supply the answers." *Brand v. Westall*, Civ. A. No. 94-0312, 1995 WL 235579, at *4 (D.D.C. Apr. 21, 1995) (citing *Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270, 273 n.1 (2d Cir. 1968)). A party's interrogatory answer that fails to meet this standard cannot put a fact into controversy, as the information contained within it would be inadmissible.

Here, the assertion that "Bi-Lo purchased mushrooms directly from Monterey" was made by Bi-Lo's counsel "on information and belief" rather than personal knowledge. *See Gostin v. Nelson*, 363 F.2d 371, 371 (3d Cir. 1966) (finding that a district court properly declined to consider, at the summary judgment stage, "counter-affidavit, the relevant portions of which were based entirely on information and belief"). It contains no facts that show affirmatively that Bi-Lo's counsel is competent to testify to Bi-Lo's relationship with Monterey. As such, there is no dispute of material fact that Bi-Lo lacks antitrust standing because it was not a direct purchaser of

11

mushrooms from an alleged conspirator.

        **ii.**        **Bi-Lo Lacks Antitrust Standing Under the Cost-Plus Exception to *Illinois Brick***

Bi-Lo argues that, despite its status as an indirect purchaser, there is nonetheless a factual controversy over whether it falls into the "cost-plus" exception to *Illinois Brick*. The Court finds no evidence to support this claim.

The Supreme Court has recognized an exception to *Illinois Brick*, "where there is a pre-existing, fixed-quantity, cost-plus contract between the direct purchaser and its customer . . . so that the [indirect purchaser] plaintiff has absorbed the illegal overcharge in its entirety." *Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 577 (3d Cir. 1979) (discussing *Hanover Shoe* and *Illinois Brick*). The term "cost-plus" refers to an arrangement where the price the seller of a good charges to the buyer is calculated by taking the amount the seller paid for the good and adding a predetermined markup. The *Illinois Brick* Court reasoned that indirect purchasers subject to cost-plus contracts need not be denied antitrust standing because:

> the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

431 U.S. at 736.

Bi-Lo asserts, repeatedly, that it bought mushrooms from C&S subject to a pre-existing cost-plus contract. As a result, it claims to have standing to pursue damages under *Illinois Brick*. However, as Bi-Lo freely admits, and as is clear from the face of the contract, Bi-Lo's agreement with C&S was not for a "fixed quantity" of mushrooms. While Bi-Lo was required to purchase its mushroom "requirements" from C&S, the contract does not specify a fixed quantity of mushrooms.

As a result, Bi-Lo's contract with C&S does not qualify it for an exception *to Illinois Brick*'s bar on antitrust damage actions by indirect purchasers.

In an attempt to get around this fact, Bi-Lo contends that an indirect purchaser with a requirements contract can quality for the cost-plus exception to *Illinois Brick*. (Pl.'s Resp. in Opp. to Def.'s Summ. J. Mot. Against Bi-Lo [Bi-Lo's Brief], at 16-17.) Bi-Lo's reasoning is that, because its contract with C&S was a requirements contract, Bi-Lo "could not reduce its mushroom purchases in response to higher mushroom prices", making its contract effectively one for a fixed quantity of mushrooms. The Court is unpersuaded.

As an initial matter, the Court must strictly follow the requirements of the cost-plus exception. The Third Circuit has explicitly described "fixed-quantity" as a necessary element of the cost-plus exception. *Mid-W. Paper Prod. Co.*, 596 F.2d at 580.

Moreover, Bi-Lo is incorrect when it contends that it qualifies for the cost-plus exception even though it did not contract with C&S for a fixed quantity of mushrooms. A requirements contract is one "pursuant to which a seller agrees to supply a sufficient quantity of an item to meet a buyer's requirements . . . ." Banks, 28A N.Y. Prac., Contract Law § 26:37.[8]  Under a requirements contract, a buyer may vary the quantity of goods purchased from a seller so long as the variance is reasonable and done in good faith. N.Y. U.C.C. § 2-306; *HML Corp. v. Gen. Foods Corp.*, 365 F.2d 77, 81 (3d Cir. 1966) (under New York law, "generally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements"). As a result, Bi-Lo certainly could have reduced the quantity of mushrooms it purchased from C&S in response to a price increase, and any damages stemming from that reduction belong to C&S, not Bi-Lo. *Illinois Brick*, 431 U.S.

---

[8] The Supply Agreement is governed by New York law. (Pl.'s Facts, Ex. 2 ¶ 20.5.)

at 733 n.13 ("[E]ven if the defendant shows that as a result of the overcharge the direct purchaser increased its price by the full amount of the overcharge, the direct purchaser may still claim injury from a reduction in the volume of its sales caused by its higher prices."). As a result, the damages from any overcharge perpetuated by Defendants would have to be apportioned between the two. That is the exact sort of undertaking *Illinois Brick* was designed to avoid, which demonstrates that Bi-Lo's requirements contract does not place it within the cost-plus exception to *Illinois Brick*. *UtiliCorp*, 497 U.S. at 208 ("The direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges between direct and indirect purchasers."). Thus, Bi-Lo is an indirect purchaser and lacks antitrust standing to sue Defendants for damages based on its own purchase of mushrooms. Such damages belong to C&S, not Bi-Lo.

### 2.    Bi-Lo's Right to Pursue Claims Assigned to It By C&S

Bi-Lo asserts a secondary source of antitrust standing. On June 28, 2019, C&S assigned Bi-Lo its antitrust claims stemming from mushrooms it bought from Defendants and sold to Bi-Lo. Bi-Lo argues that it has standing to recover antitrust damages on those assigned claims.

"There is no serious doubt that an antitrust claim can be expressly assigned." *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437 (3d Cir. 1993). Nor is there serious doubt that C&S effectively did so here.[9] As a result, there is no real question that the assignment from C&S conveyed to Bi-Lo antitrust claims that were not subject to *Illinois Brick*.

---

[9] Defendants argue that, despite executing the assignment agreement, C&S did not actually assign any claims to Bi-Lo. The Court finds Defendants' argument difficult to understand. The agreement says, "Upon the Effective Date of this Agreement, C&S, for good and valuable consideration and without any further action by any Party, shall be deemed to have absolutely, unconditionally, and irrevocably sold, transferred, assigned, and conveyed unto SEG all of its rights, title, and interest in, to, and under the Antitrust Claims." (Pl.'s Facts, Ex. 3 at ¶ 7.) The agreement in turn defines "Antitrust Claims" as "claims and causes of action that C&S may have under the antitrust or similar laws . . . arising out of or relating to C&S's purchase of Disputed Products from any of the Defendants that C&S sold to SEG during the Relevant Time Period[.]"(*Id.* at ¶ 3(a).) Any reasonable reading of that language yields the conclusion that C&S assigned antitrust claims to Bi-Lo.

14

The question though, is whether Bi-Lo may pursue damages on those claims in this matter. Defendants argue that, because C&S conveyed its antitrust claims after the deadline to opt out of the class action had passed, Bi-Lo never had the right to seek recovery outside of the class action. As a result, Defendants argue, because the class action settled, and the class claims were dismissed, Bi-Lo's assigned claims were extinguished and Bi-Lo cannot seek damages on them here.

Bi-Lo makes a number of arguments in response. First, Bi-Lo contends that it may pursue damages on C&S's assigned claims through this action because it timely opted out of the class, even if C&S did not. Second, it argues that Defendants' claims regarding the effect of C&S's failure to opt out of the class on the assignment to Bi-Lo are barred by the equitable doctrines of waiver and laches. Finally, Bi-Lo argues that it should have been given an opportunity to exclude C&S's assigned claims from the class, but it was not, and thus it must now be permitted to pursue C&S's claims through an individual action. The Court ultimately finds none of Bi-Lo's arguments persuasive. Instead, the Court concludes the claims assigned to Bi-Lo by C&S were settled and dismissed in the resolution of the class action, and Bi-Lo may not further press those claims here.

### a.    The Limited Relevance of *In Re Fine Paper Litigation*

As an initial matter, the Court must decide what law governs this issue. Both parties suggest that questions of Bi-Lo's ability to pursue C&S's claims outside the class action are governed by the holding in *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081 (3d Cir. 1980). There, the Third Circuit ruled that when a member of a certified class assigns part of its antitrust claim to a non-class member, the defendants have the option of either involuntarily joining the assignee in the class action, or consenting to a separate suit by the assignee. The Court finds that *Fine Paper*, while relevant, does not outright control the outcome here.

In *Fine Paper*, merchant houses that purchased and resold fine paper sued a group of mills,

15

alleging a conspiracy to fix prices and stifle competition. *Id*. at 1088-89. The district court certified a class of direct purchasers that included the merchant houses, the class reached a settlement with several defendants, and the court set a deadline for class members to request exclusion from the class. *Id*. at 1089.

Then an added complication arose—several of the merchant houses had previously sold paper to the state of Washington and, "at the time of, and in connection with" the sale, "executed assignments of antitrust claims to the state." *Id*. Washington, as the partial assignee of claims assigned to it by class members, requested exclusion from the class. *Id*. The Third Circuit was tasked with determining whether Washington could assert its assigned claims in an individual action.

Applying the common law of contracts, the Third Circuit concluded that the appropriate rule was that Defendants got to choose—they could either permit Washington to opt out or require that Washington be involuntarily joined as a plaintiff in the class action.[10] Thus, if this case was controlled wholly by *Fine Paper*, the next step in the Court's analysis would be to determine whether Defendants consented to Bi-Lo's pursuit of C&S's claims through an individual action, either by failing to join Bi-Lo in the class action, or in some other manner.

---

[10] The court reasoned that:

> [under the common law of contracts,] unless the obligor has consented, the partial assignee may not maintain the original suit against the obligor unless all parties having the collective right to the entire claim are joined in the proceeding. Thus, partial assignments are recognized, but the rights of the obligor to be free of successive and repeated suits growing out of the same basic facts are also protected by the prudent use of joinder rules. If a suit is brought by either an assignor or partial assignee, the obligor has the option of requiring joinder of the necessary parties or resorting to interpleader. . . .With respect to the claims to which it holds partial assignments, Washington can be made a party but, unlike other class members, will not have the right to opt out. The compulsory joinder provisions of Rule 19 and the necessity to give protection to the obligors from additional litigation from partial assignees require such a result.

*Id*. at 1091 (citations omitted).

16

However, there is a crucial distinction between the issue here and the one addressed in *Fine Paper*. In *Fine Paper*, when the merchant houses assigned their claims to Washington, the period to opt out of the class had not yet passed. As a result, when the merchant houses assigned their claims to Washington, the merchant houses still possessed the right to pursue those claims in individual actions. As a result, the Court in *Fine Paper* had no occasion to address the rights of a partial assignee to pursue a damage action on its assigned claim when the assignor had relinquished its own right to do so by declining to opt out of a class. While the Third Circuit found that "Washington . . . will not have the right to opt out", that limit on Washington's rights did not stem from any limit on the rights of the assignors, but rather from the defendants' right "to be free of successive and repeated suits growing out of the same basic facts . . . ." *Id*. at 1091.

This case presents a very different situation. Unlike the assignors in *Fine Paper*, C&S lacked the ability to pursue its claims in an opt out action when it assigned its claim to Bi-Lo. As a result, the Court must answer a question not raised in *Fine Paper*: can an assignee of class claims press those claims in an individual action when the assignor lacked the right to do so at the time of the assignment? The Court ultimately finds that the answer is "no".

      **b.**    **Bi-Lo's Right To Pursue Its Assigned Claims Through This Action**

As the partial assignee[11] of C&S's claims, Bi-Lo never had the right to pursue C&S's claims outside the class action because C&S lacked such a right at the time the assignment was made.

---

[11] Bi-Lo is incorrect when it asserts that its assignment from C&S was complete rather than partial. A partial assignment occurs where the assignee is "authorized to demand from the obligor directly payment of its part of the claim but shall not be authorized to demand payment of the whole." 29 Williston on Contracts § 74:72 (4th ed. 1999). Here, C&S assigned Bi-Lo the right to collect damages based on the mushrooms C&S bought from Defendant and sold to Bi-Lo, but not the mushrooms C&S did not sell to Bi-Lo. That is a partial assignment.

C&S assigned Bi-Lo its "claims and causes of action that C&S may have under the antitrust or similar laws . . . arising out of or relating to C&S's purchase of [mushrooms] from any of the Defendants[.]" (Pl.'s Facts, Ex. 3 at ¶ 3(a).) Here it is helpful to note that "a cause of action is a species of property", *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), and "[a]s with most ownership interests, ownership of a legal claim confers upon its owner a cluster of legal entitlements that correspond to the familiar property law metaphor of the 'bundle of rights.'" Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right Not to Sue*, 115 Colum. L. Rev. 599, 621 (2015). One such right is "the remedial rights of the plaintiff against the defendant . . . ." Restatement (Second) of Judgments § 24 cmt. a (1982). However, a related right is the claimholder's right to press the claim in "his own day in court." *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 798 (1996) (citations omitted). "The right to one's own day in court means a right to meaningful control over litigation strategy and goals, including choice of legal representative." Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. Rev. 109, 134 (2015). In short, the right to a "full and fair opportunity to litigate[.]" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)).

The two entitlements are generally synonymous—a party who asserts that it has a claim is generally asserting both the right to legal relief and the right to control the litigation in pursuit of that relief. But not always. The laws enabling class action litigation function to strip claimholders of their right to their "own day in court", so long as certain substantive prerequisites and procedural safeguards are met. Thus, in the context of a class action predominantly for money damages, once a class has been certified, notice has been sent, and the opt out period has expired, a class member who did not exercise their right to opt out still possesses a potential entitlement to relief, but not

the right to personally advocate for the appropriateness or form of the relief.[12]  That responsibility rests with the class counsel. Advisory Committee's Notes to 2003 Amendment of Fed. R. Civ. P. 23(g)(1)(B) ("[T]he primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class.").

That is where C&S found itself on the day it assigned its claims to Bi-Lo. A class had been certified that included C&S, C&S had declined to opt out of the class, and Garwin Gerstein & Fisher LLP had been appointed to prosecute the claims held by class members. Therefore, although C&S had claims against Defendants insofar as it was potentially entitled to relief from Defendants as a result of alleged antitrust violations, it lacked the right to individually advocate for that relief in court because it failed to opt out of a certified class. Instead, its right to recover on its claims was limited to the relief Garwin Gerstein & Fisher LLP could obtain.

The Court determines Bi-Lo's rights as C&S's partial assignee by applying these facts to the common law of contracts. *See Fine Paper*, 632 F.2d at 1090 (determining the effect of an assignment of an antitrust claim on the rights of the assignee is a matter of federal common law); *Gulfstream III Assocs.*, 995 F.2d at 437-38. Under "the common law principle of '*nemo dat quod non habet*'…the assignee, obtains by the transfer [only] what its assignor had . . . ." 29 Williston on Contracts § 74:56 (4th ed. 1999); *see Mitchell v. Hawley*, 83 U.S. 544, 550 (1872). Because C&S lacked the right to prosecute its own claims outside the class action and the decisions made by class counsel, Bi-Lo, as C&S's assignee, also lacks the right to do so.

Bi-Lo attempts to avoid this conclusion by noting that it opted out of the class prior to receiving C&S's assignment. As a result, Bi-Lo claims, the constraints on C&S's ability to

---

[12] Class members may, of course, petition the court for leave to remove themselves from the class after the opt-out deadline has passed. *See In re Processed Egg Prod. Antitrust Litig.*, 130 F. Supp. 3d 945, 953 (E.D. Pa. 2015). However, such relief is discretionary, and therefore not indicative of any sort of right on the part of the class member.

prosecute its claims do not apply to Bi-Lo. However, Bi-Lo's arguments that its own exclusion from the class mitigates the constraints on claims assigned to it by a class member cannot be squared with either Third Circuit precedent or common law assignment principles.

With regard to precedent, two Third Circuit cases make clear that when an assignee who is not a class member is assigned class claims by a class member, the assignee's non-class status does not mean that the claims are treated as if they belong to a non-class member. In *Fine Paper*, there was no question that "Washington is not included within the [direct purchaser] class," but its status as a non-class member did not translate to any additional right to prosecute its assigned claim outside the class action. 632 F.2d at 1091. This principle was made yet more explicit in *In re Modafinil Antitrust Litigation*, in which the Third Circuit found that partial assignees can be counted as class members when evaluating whether a class meets Rule 23's numerosity requirement. 837 F.3d 238, 251-52 (3d Cir. 2016). The court reasoned that "*Fine Paper Litigation* envisioned the class action mechanism as a proper tool for partial assignees to participate in the lawsuit, albeit with *fewer* individual rights than other claimants . . . partial assignees may properly be treated as class members." *Id*. at 252 (emphasis added). The import of *Fine Paper* and *In Re Modafinil* is that there is no legal reason Bi-Lo's status as a non-class member would translate into any greater right to prosecute C&S's claims than C&S would have had absent the assignment.[13]

Likewise, Bi-Lo's argument cannot be squared with the common law principles that govern assignments of antitrust claims. It is blackletter law that "the assignee steps into the shoes of the

---

[13] Thus Bi-Lo is wrong in its assertion that "the effect of Bi-Lo's timely opt out for the certified class and the first round of settlements [with Creekside, Kitchen Pride, and Giorgi] carried through to the second round of class settlements [with the rest of the class]." (Bi-Lo's Brief, at 9.) Bi-Lo is correct insofar as it recognizes its initial opt out excluded it from the class for all purposes going forward. However, as the above analysis details, Bi-Lo's status as a non-class member does not mean the claims assigned to it by C&S are free from constraints imposed on class claims.

assignor." 29 Williston on Contracts § 74:56 (4th ed. 1999) ("Simply stated, the assignee steps into this pair of the assignor's shoes absolutely, and, if the shoes are dirty, then that dirt sullies the assignee no less than it did the assignor."). As a result, "[a]n assignee's right against the obligor is subject to all . . . defenses thereto . . . ." Restatement (First) of Contracts § 167(1) (1932). These defenses include not only defenses to the merits of the claim, but defenses based on where and how the claims may be prosecuted. For instance, if an assignor may only press a claim through arbitration, the same constraint will apply to the assignee. *See GMAC Commercial Credit LLC v. Springs Indus., Inc.*, 171 F. Supp. 2d 209 (S.D.N.Y. 2001).[14]

Here, while Bi-Lo may have opted out of the class, it took C&S's claims subject to the defense that those claims could only be prosecuted as part of the certified class. Defendants exercise that defense here and it can be no less effective against Bi-Lo than it would have been had it been exercised against C&S. To that end, if, on the day C&S assigned its claims to Bi-Lo,

---

[14]     Bi-Lo argues that a different common law principle controls, namely that "[w]hen the obligor has notice of an assignment by the plaintiff-and the assignee is not joined-a judgment for or against the obligor will not bar a later suit by the assignee." (Bi-Lo's Brief, at 4) (quoting *In re Fine Paper*, 632 F.2d at 1091 which in turn cites Restatement (Second) of Judgments § 104 (Tent. Draft No. 3, 1976)); *see also* Restatement (Second) of Judgments § 55 (1982). This principle was cited as one of the bases for the rule in *Fine Paper*. Applying this principle, Bi-Lo claims that Defendants had notice of the assignment in July 2019, failed to join Bi-Lo before settling the class claims, and therefore cannot now move for summary judgment on the grounds that Bi-Lo's assigned claims were extinguished in the class settlement.

There are two problems with Bi-Lo's argument. First, the principle Bi-Lo cites does not displace the equally fundamental principle of *nemo dat*—assignments are taken subject to whatever defenses could have been leveled against the assignor. Application of that principle here is sufficient to find Bi-Lo lacks the right to pursue its assigned claims in an individual damage action without analysis of notice or consent on the part of the Defendants. The fact that the *Fine Paper* court invoked a different principle on facts where *nemo dat* could not apply does not displace that conclusion.

Second, the reason the *Fine Paper* court invoked the principle Bi-Lo cites is not present here. It is true that disposition of an assignor's claims against an obligor does not bar suit by a partial assignee if it occurs after the obligor has notice of the assignment. But the reason is that (with limited exceptions) the moment the obligor receives notice of the assignment serves as an inflection point whereby the assignee is subject to "any defense or claim that accrues in favor of the obligor before it receives notification of the assignment" but not ones that accrued after. 29 Williston on Contracts § 74:56 (4th ed. 1999) This mattered *in Fine Paper*, where any potential defense of *res judicata* would have accrued after defendants had notice of the assignment. Here, however, the defense Defendants invoke accrued before the assignment occurred. Therefore, the rule cited by Bi-Lo, while applicable in *Fine Paper*, is not applicable here.

it had instead filed an individual lawsuit seeking damages from Defendants, that lawsuit would have been dismissed on the grounds that its claims could only be pursued through the class action. *See Tate v. Werner*, 68 F.R.D. 513, 520 (E.D. Pa. 1975) (dismissing a claim in a class action complaint where the plaintiffs were all members of a certified class pressing an identical claim in separate litigation and had not opted out of the original class); *see also Dentry v. Snyder*, Civ. A. No. 17-10643, 2020 WL 1506404, at *2 (E.D. Mich. Mar. 30, 2020) (dismissing a lawsuit because the plaintiff was a member of a class certified in another lawsuit—one in which a class had been certified but final judgment had not been entered); *Dickey v. Swarthout*, Civ. A. No. 12-0747, 2012 WL 1414314, at *2 n.3 (E.D. Cal. Apr. 23, 2012) ("A member of a class action seeking equitable relief cannot raise those claims in a separate equitable action."); *see generally Groseclose v. Dutton*, 829 F.2d 581, 584 (6th Cir. 1987); *Goff v. Menke*, 672 F.2d 702, 705 (8th Cir. 1982); *Crawford v. Bell*, 599 F.2d 890, 892-93 (9th Cir. 1979). The same must be true for Bi-Lo. Thus, while C&S did convey to Bi-Lo the right to recover on its antitrust claims, it could not convey the right to personally seek recovery outside of the class action. The effect of C&S's assignment was to entitle Bi-Lo to share in whatever relief could be obtained through the prosecution of the class action.

### c.    Bi-Lo's Additional Defenses

Bi-Lo makes two additional arguments for why it may pursue its assigned claims through an individual action despite the fact that C&S failed to opt out of the class. Bi-Lo claims that: (1) Defendants' arguments regarding the limit of C&S's assignment are barred by the doctrines of waiver and laches; and (2) that Defendants' arguments regarding the assignment fail because Bi-Lo should have been given an opportunity to remove C&S's claims from the class. The Court finds neither argument persuasive.

### i.      Waiver and Laches

First, Bi-Lo argues that the doctrines of waiver and laches preclude Defendants from arguing now that C&S's failure to opt out of the class means Bi-Lo lacks the right to pursue the claims in an individual action. According to Bi-Lo, Defendants found out about the assignment in July 2019, yet did not argue that such claims could not be pursued outside the class action until April 2020. As a result, Bi-Lo claims, Defendants should be barred by both waiver and laches from asserting such arguments now. The Court disagrees.

Bi-Lo is not entitled to a defense of laches. "The elements of the equitable defense of laches are (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *E.E.O.C. v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984) (citation omitted). The burden is on the party invoking laches, and Bi-Lo has not met that burden. First, it is not clear that the timing of Defendants' argument demonstrates a lack of diligence. While Defendants may have been aware of the assignment in July 2019, the primary basis for this motion, the revelation that Bi-Lo did not purchase mushrooms directly from Defendants, did not occur until Bi-Lo responded to Defendants' interrogatories on March 18, 2020, roughly a month before Defendants filed this motion. Moreover, Bi-Lo's only argument for how Defendants' alleged delay was prejudicial is that it "prevented C&S from opting out of certified class and the first settlement class." (Bi-Lo's Brief, at 10.) Even assuming that denying C&S an opportunity to opt out of the settlement with Defendants prejudiced Bi-Lo, this argument fails because C&S declined to opt out of the class before the assignment, and thus Defendants' actions did not cause the prejudice in question. As a result, Bi-Lo's laches argument fails.

Likewise, the Court is unpersuaded by Bi-Lo's waiver argument. Waiver occurs when a party intentionally relinquishes a known right. *Globe Indem. Co. v. Cohen,* 106 F.2d 687, 691 (3d

Cir. 1939); *Hermes Consol., Inc. v. United States,* 58 Fed. Cl. 409, 411 (2003) ("As a bedrock of the Anglo–American law of equity, 'waiver' has been defined as an 'intentional relinquishment or abandonment of a known right or privilege.'"). Here, Bi-Lo has not actually identified any action Defendants either took or failed to take that could reasonably be construed as waiver. Rather Bi-Lo's argument is simply that Defendants should have raised these arguments sooner. Yet Bi-Lo does not identify when Defendants' alleged delay turned into waiver, nor any principled way of demarcating such a point in time. Nor can the Court imagine one. Defendants are arguing based on facts uncovered during discovery that there is no dispute of fact that Bi-Lo lacks standing to bring antitrust claims, and are doing so after the close of discovery. Thus, there is nothing about the timing of Defendants' arguments that would indicate they intentionally relinquished a known right.

### ii.       The Necessity of a Second Opt Out Period

Bi-Lo also argues that class members should have been afforded an opportunity to opt out of the second settlement agreement. As previously discussed, the class settled with Defendants in two stages. First, the class settled with Creekside, Kitchen Pride, and Giorgi—with the preliminary approval on March 14, 2018 and final approval on December 17, 2018. As part of the settlement procedure, the Court gave class members until July 28, 2018 to request exclusion from the class. Second, the class settled with the remaining defendants—with preliminary approval on August 19, 2019 and final approval on January 9, 2020. There, the Court did not grant class members who had declined to opt out of the settlement with Creekside, Kitchen Pride, and Giorgi the opportunity to opt out of the class for the purpose of the final settlement.

Bi-Lo now argues that that the class members that did not opt out of the class prior to final approval of the Creekside/Kitchen-Pride/Giorgi settlements should have been given another

24

opportunity to opt out prior to the second settlement. Bi-Lo argues that such an opportunity was required by Rule 23(e)(4), which states: "[i]f the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."

There are two problems with Bi-Lo's argument. First, as suggested by the term "may" in the phrase "the court *may* refuse to approve a settlement", "[t]he decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion." Advisory Committee's Notes to 2003 Amendment of Fed. R. Civ. P. 23(e)(3). Moreover, as Judge Brody noted in *In Re National Football League Players' Concussion Injury Litigation*:

> Due process does not require a second opt-out period. In a class action, class members' rights are sufficiently protected when there is: (1) adequate notice to the class; (2) an opportunity for class members to be heard and participate; (3) the right of class members to opt out; and (4) adequate representation by the lead plaintiff(s).

307 F.R.D. 351, 423 (E.D. Pa. 2015); *see also Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 634-35 (9th Cir. 1982). Thus, while Bi-Lo may believe the Court should have exercised its discretion differently, it has no grounds to claim any sort of legal entitlement to another opt out opportunity.

Second, the Court properly exercised its discretion in approving the second settlement agreement without a second opt out period. The notice sent to class members following preliminary approval of the first settlement clearly apprised them of the fact that they would be bound by all future judgments in the case, not just the settlement with Giorgi, Kitchen Pride, and Creekside. (Notice of Filing of Direct Purchaser Class Pls.' Revised Long and Short Form Notice Documents,

*In Re: Mushroom Direct Purchaser Antitrust Litigation*, 6-620, E.C.F. No. 875, Ex. A, at 11 (E.D. Pa. March 16, 2018) ("If you do nothing, you remain in the Class. You will be bound by any judgment reached in this case.")); (*Id.* at Ex. B, at 4) ("If you do nothing . . .[y]ou will be bound by any judgment reached in this case."). Moreover, giving class members who joined the class for the first settlement the opportunity to opt out of the second would have violated the rule against one-way intervention, which disfavors rulings in the class action context that "allow members of a class to benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 548 (1974). Permitting class members to remove themselves from the class not only after learning the terms of the settlement, but after actively reaping the benefits of a previous class settlement, would have been inappropriate. 3 Newberg on Class Actions § 9:52 (5th ed.) ("Put simply, the second opt-out opportunity turns the class suit into the once-feared 'one-way intervention device'—that is, it enables class members to determine whether they want to be part of the case (and be precluded by it) with full knowledge of the case's outcome. There is no risk involved for them whereas the defendant is bound either way."). Lastly, Bi-Lo's argument that fairness required a second opt out period is undercut by the fact that no class members objected to the second settlement.

As a result, the Court does not find that Bi-Lo ever had any sort of legal entitlement to an opportunity to remove its assigned claims from the class. C&S had a fair opportunity to remove itself from the class and it declined, forgoing any future right to prosecute its claims in an individual action. Bi-Lo, having accepted C&S's assignment almost a year after the opt out period ended, lacks that right as well.

### d.      Bi-Lo's Entitlement to Recovery on Its Assigned Claims

While C&S's assignment was valid, it only gave Bi-Lo what C&S had, *i.e.* the right to

recover whatever relief the class was able to obtain. The agreement between class representatives and Defendants—approved by both Garwin Gerstein & Fisher LLP in their capacity as lead counsel in charge of Bi-Lo's assigned claim, as well by this Court—served as a final adjudication of Bi-Lo's assigned claims. That means two things. First, that Bi-Lo is entitled to the same relief as any other class member on its assigned claims. Second, that Bi-Lo cannot maintain C&S's claims in this action because they have already been adjudicated.

What exactly Bi-Lo's status means in terms of recovery on its assigned antitrust claims is a question the parties have yet to brief. The Court will seek input from the parties before addressing that question.

### 3.    Summary

There is no genuine dispute that Bi-Lo cannot maintain an antitrust suit for damages based on its own purchase of mushrooms because Bi-Lo was an indirect purchaser and therefore did not accrue antitrust standing as a result of its own purchases. Nor is there dispute that Bi-Lo cannot maintain suit based on the claims assigned to it by C&S, as those claims were dismissed as part of the settlement of the class action. As such, Bi-Lo has no damage claims against Defendants that it may pursue in this action. On that basis, the Court will grant summary judgment against Bi-Lo and in favor of Defendants on all of Bi-Lo's claims for monetary damages.

### C.    Creekside's Motion for Summary Judgment

Creekside has moved separately for summary judgment, and here things are simpler. There is no factual dispute that Bi-Lo lacks the ability to sue Creekside for damages. First, there is no evidence Creekside or Creekside's alleged coconspirators sold mushrooms to either Bi-Lo or any middleman with whom Bi-Lo had a cost-plus contract. As a result, under *Illinois Brick*, Bi-Lo lacks standing to sue Creekside based on its own purchase of mushrooms. *See supra* III.B.1.

Second, C&S's assignment of claims to Bi-Lo did not include any claims against Creekside, as Creekside had settled with the class (of which C&S was a member) six months before the assignment. There is thus no genuine dispute of material fact that Bi-Lo lacks any colorable damages claim against Creekside.

### D.    Bi-Lo's Standing to Sue for Injunctive Relief

Bi-Lo, as an indirect purchaser, does have standing to sue for injunctive relief. "*Illinois Brick* does not preclude indirect purchasers from suing for injunctive relief", as the *Illinois Brick* Court's concerns regarding the difficulty of calculating damages and the risk of multiple recovery do not apply to plaintiffs seeking injunctive relief. *Mid-W. Paper Prod. Co.*, 596 F.2d at 594; *see Pepper*, 139 S. Ct. 1514, 1520 n.1 (2019) ("*Illinois Brick* did not address injunctive relief"). As neither Defendants nor Creekside advance any reason why Bi-Lo cannot pursue injunctive relief, the Court finds that those claims stand.

### E.    Bi-Lo's Motion for Leave to Opt Out of The Second Class Settlement

Bi-Lo has moved for leave to "opt out of the second round of settlements with respect only to the portion of C&S's direct purchase claim that is based on C&S's direct purchase of mushrooms from Defendants and co-conspirators that C&S sold to Bi-Lo." (Pl. Bi-Lo Holdings LLC's Mot. for Leave to Opt Out of the Second Round of Settlement Classes, at 8.) As the period for opting out of the class has passed, Bi-Lo argues that it is entitled to opt out pursuant to Rules 6(b) and 60(b)(1). Under Rule 6(b) "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Under Rule 60(b)(1) "[o]n motion and just terms, the court may relieve a party . . . from a final judgment . . .[for] mistake, inadvertence, surprise, or excusable neglect[.]" Bi-Lo argues that the Court should have provided class members with a

second opportunity to opt out before approving the second class settlement, therefore Bi-Lo should have the opportunity to remove its assigned claims from the class now because its failure to do so earlier was excusable.

Bi-Lo is wrong for two reasons. First, as discussed above, Bi-Lo is simply incorrect when it says that the Court was required to give class members an opportunity to opt out of the settlement with the remainder of Defendants. *See supra* III.B.2.c.ii. Second, neither Rule 6(b) nor 60(b)(1) applies here, as Bi-Lo did not fail to remove C&S's claims from the class due to excusable neglect. Rather, it never had the opportunity to do so in the first place—the period for removing C&S's claims from the class having passed before the claims were assigned to Bi-Lo. A litigant cannot "neglect" to take an action it never had the right or opportunity to take in the first place.[15] As a result, Bi-Lo is not entitled to an opportunity to remove its assigned claims from the class.

## IV.    CONCLUSION

For the foregoing reasons, Bi-Lo's request to take additional discovery in order to respond to Defendants' and Creekside's motions for summary judgment is denied; summary judgment is granted for Defendants as to Bi-Lo's claims for damages and denied as to Bi-Lo's claims for injunctive relief; summary judgment is granted for Creekside as to Bi-Lo's claim for damages and denied as to Bi-Lo's claims for injunctive relief; and Bi-Lo's request for an additional opt out opportunity is denied.

An Order consistent with this Memorandum will be docketed separately.

---

[15] The Court does not understand Bi-Lo to be arguing that C&S failed to remove itself from the class during the opt out period due to excusable neglected, and that Bi-Lo, as C&S's assignee, may now move for leave on that basis. In any event, there is no question C&S is properly within the class and that Bi-Lo, as only a partial assignee of C&S's claims, cannot challenge the propriety of C&S's class membership overall.